# EXHIBIT "A"

1

2           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
3

4    GREGORY BROOKS,                )
                                    )
5          Plaintiff,               )
                                    )
6            vs.                    ) Case No. 17-3626
                                    )
7    THE DOE FUND, INC., TERRY      )
     COOPER individually and in his )
8    official capacity, JAMES       )
     WASHINGTON individually and in )
9    his official capacity, and     )
     ANTHONY WIGGINS individually   )
10   and in his official capacity,  )
                                    )
11         Defendants.              )
     -----------------------------)
12

13

14

15

16

17       CONFIDENTIAL DEPOSITION OF GREGORY BROOKS

18                 New York, New York

19               Thursday, June 7, 2018

20

21

22

23

24   Reported by: MICHELLE COX

25   Job No: 142124

Page 2

1

2

3

4

5                          June 7, 2018

6                          10:13 p.m.

7

8          Confidential Deposition of GREGORY BROOKS,

9    held at the offices of Jackson Lewis LLP, 666

10   Third Avenue, New York, New York, pursuant to

11   Notice, before Michelle Cox, a Certified

12   LiveNote Reporter and Notary Public of the

13   State of New York and New Jersey.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4            DEREK SMITH LAW GROUP

 5            Attorneys for Plaintiff

 6                   1 Pennsylvania Plaza

 7                   New York, NY 10119

 8            BY:   KELLY O'CONNELL, ESQ.

 9

10            JACKSON LEWIS

11            Attorneys for The Doe Fund and

12            James Washington

13                   666 Third Avenue

14                   New York, NY 10017

15            BY:   STEVEN SEIDENFELD, ESQ.

16                   LORI BAUER, ESQ.

17

18            LEWIS BRISBOIS

19            Attorneys for Terry Cooper

20                   77 Water Street

21                   New York, NY 10005

22             BY:   BRADLEY BARTOLOMEO, ESQ.

23

24    ALSO PRESENT:  Eunice Gilmore

25
```

Page 4

1

2        IT IS HEREBY STIPULATED AND AGREED by and

3   between the attorneys for the respective

4   parties herein, that filing and sealing be and

5   the same are hereby waived.

6        IT IS FURTHER STIPULATED AND AGREED that

7   all objections, except as to the form of the

8   question, shall be reserved to the time of the

9   trial.

10       IT IS FURTHER STIPULATED AND AGREED that

11  the within deposition may be sworn to and

12  signed before any officer authorized to

13  administer an oath, with the same force and

14  effect as if signed and sworn to before the

15  Court.

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1
 2  G R E G O R Y   B R O O K S, called as a witness,
 3        having been duly sworn by a Notary Public, was
 4        examined and testified as follows:
 5  EXAMINATION BY
 6  MR. SEIDENFELD:
 7        Q    Good morning, Mr. Brooks.  I introduced
 8        myself to you before, but let me do so on the
 9        record.
10             My name is Steven Seidenfeld, and I'm here
11        with Lori Bauer, and we're from the law firm of
12        Jackson Lewis, and we represent the defendant,
13        The Doe Fund, and defendant, James Washington,
14        in the lawsuit that you have filed against them
15        in the Eastern District of New York.
16             Also sitting with me is Eunice Gilmore,
17        who is the director of human resources for The
18        Doe Fund, and Brad Bartolomeo, who represents
19        defendant, Terry Cooper.
20             Have you ever had your deposition taken
21        before --
22        A    No.
23        Q    Okay.  So the purpose of taking a
24        deposition today is for me to ask you some
25        questions to find out more about the lawsuit
```

Page 6

1            Brooks - Confidential

2    you're bringing.  Along those things I'll be

3    asking you a series of questions.

4        So a deposition is a little unlike the

5    regular conversation, in that we have our court

6    reporter, Michelle, taking down everything that

7    I ask and that you answer.

8        So just go over a few ground rules to make

9    sure we have a clear record.

10        Does that make sense?

11   A    Yes.

12   Q    So the first difference is that in a

13   regular conversation I might start asking a

14   question, and by the time I'm two-thirds of way

15   through it, you'll know the answer and you'll

16   jump in and you'll answer.

17        If you do that here today, the court

18   reporter won't be able to take down both my

19   full question and your answer.

20        So I ask that when I'm asking you a

21   question you let me finish.  And if I interrupt

22   you please let me know and I'll let you finish.

23        Do you understand?

24   A    I do.

25   Q    The other difference between a deposition

1            Brooks - Confidential

2     and a regular conversation is that in regular

3     conversation, when I ask you a question, you

4     might respond by either shaking your head or

5     nodding your head or saying uh-huh or uh-uh.

6     If you do that today, the court reporter won't

7     be able to take that down.

8          So I ask that in response to my questions

9     that you try and make sure your answers are

10    audible and that you either say "yes" or "no."

11    And if you forget, we'll make sure to remind

12    you.  You won't be the first.

13         I want to make sure that you understand

14    the questions I ask.

15         So if there's something I've asked you and

16    you don't understand, please let me know.

17         Do you understand?

18    A    I understand.

19    Q    If I ask a question and you answer, I'm

20    going to assume that you heard my question,

21    understood it and gave your best answer.

22         Do you understand?

23    A    I do.

24    Q    If a question calls for a yes-or-no

25    answer, I'd like for to you answer "yes" or

```
 1                 Brooks - Confidential
 2    "no."  If you feel that there's something
 3    additional that you'd like to explain, just let
 4    me know and we can do that.
 5         Does that make sense?
 6    A    Yes.
 7    Q    Breaks.
 8         This isn't an endurance test.  If at any
 9    time today you need to take a break, just let
10    us know -- the only -- and you can take one.
11         The exception is if there's a question
12    pending, I'll ask that you answer the question
13    first and then we can take a break.
14         Do you understand?
15    A    Yes.
16    Q    Objections.
17         At times your attorney, Ms. O'Connell, may
18    object.  For the most part this is just for the
19    record and after she objects, you can go ahead
20    and answer my questions, unless she directs you
21    not to answer, which will be rare in a
22    deposition like this.
23         Do you understand?
24    A    Yes.
25    Q    Do you understand the oath that you took
```

1                 Brooks - Confidential

2    is the same as if you were in court?

3    A    Yes.

4    Q    And you understand that you have to tell

5    to the truth?

6    A    Yes.

7    Q    Even if you think it will hurt your case?

8    A    Yes.

9    Q    And you understand that there are

10   consequences associated with not telling the

11   truth when you're under oath?

12   A    Yes.

13   Q    Is there anything today prohibiting you

14   from giving responsive answers to my questions?

15   A    No.

16   Q    Are you taking any medications or drugs

17   that are preventing you from giving responsive

18   answers?

19   A    I take medication, but it shouldn't stop

20   me from giving you answers.

21   Q    Okay.  The medication doesn't affect your

22   memory?

23   A    No.

24   Q    You had a good night sleep last night?

25   A    Not really.

```
 1              Brooks - Confidential

 2    have filed divorce proceedings?

 3    A    No.

 4    Q    Prior to living in the Bronx at your

 5    wife's apartment, where did you live before

 6    that?

 7    A    I stayed in a three-quarter house.

 8    Q    Okay.  Where was that?

 9    A    In Brooklyn.

10    Q    And do you know what the dates were?

11    A    I only stayed there for a few days.

12    Q    Okay.  And before that?

13    A    I was in prison.

14    Q    And where was that?

15    A    The prison that I left?

16    Q    Yes.

17    A    Queensboro.

18    Q    And how long were you there for?

19    A    About a month.

20    Q    And that would have been in the early

21    spring of 2016?

22    A    It's possible.

23    Q    Okay.  And before that where were you?

24    A    I was in Franklin Correctional Facility.

25    Q    And do you know where that is?
```

1           Brooks - Confidential

2    you were in Rikers Island, 1997, had you ever

3    been in prison or jail before?

4    A    Yes.

5    Q    When was that?

6    A    2005.

7    Q    So I think I asked you -- that was -- 2005

8    would have been covered in the period of what

9    we said between --

10   A    I mean 1995.

11   Q    All right.  1995.

12        And what prison were you in then, or was

13   it a jail?

14   A    I was in Rikers Island.

15   Q    And for how long?

16   A    Two years, a little over two years.

17   Q    And before that were you ever in prison or

18   jail?

19   A    Before that I was home.

20   Q    And you said -- home was in the Bronx or

21   was it with your friend in Manhattan?

22   A    No, I was with my family.

23   Q    And where was that?

24   A    112th Street and Lexington Avenue.

25   Q    Any other time you spent in a prison, jail

Page 42

1              Brooks - Confidential

2    Q    Yes.

3    A    6th grade.

4    Q    Do you have a GED?

5    A    No.

6    Q    Are you working towards one?

7    A    I would like to get one.

8    Q    Can you read and write?

9    A    Yes.

10   Q    I'm just going to go back and hopefully we

11   can do this a little more quickly in your

12   history.  I just want to ask you about your

13   conviction history.

14        So starting with the most recent, when was

15   the last time you were convicted of a crime?

16   A    2012, 2013.

17   Q    I'm sorry, did I ask you for the most

18   recent?

19   A    Yes.

20   Q    The most recent, I'm sorry, you said was?

21   A    2012, 2013.

22   Q    And what were you charged with?

23   A    Possession of a weapon.

24   Q    And were you convicted?

25   A    I was.

Page 43

```
 1              Brooks - Confidential
 2   Q    You plead guilty?
 3   A    I did.
 4   Q    How much time -- what was your sentence
 5   of?
 6   A    Four years.
 7   Q    Did you serve all four years?
 8   A    Five years post supervision.
 9   Q    When you say "five years post
10   supervision," what do you mean?
11   A    It's like parole.
12   Q    So four years you were you in prison or
13   jail and then another year on parole?
14   A    Five years on parole.
15   Q    I'm sorry.
16        So you were in prison for four years, and
17   then parole for five?
18   A    Yeah.
19   Q    So you're still currently on parole today?
20   A    Yes.
21   Q    Okay.  What was the -- before that, when
22   was the last time you were convicted of a
23   crime?
24        Actually -- strike that.
25        And that was what we spoke about before
```

Page 44

1              Brooks - Confidential

2    when you were in Queensboro and Franklin and

3    Rikers Island?

4    A    Yeah.

5    Q    And before the conviction for possession

6    of a weapon, what was the next -- what was the

7    next most recent crime you were convicted of?

8    A    Drugs.  Drug crime.

9    Q    What was it?

10   A    Directing a sale.

11   Q    Do you know when that was?

12   A    1998.

13   Q    Okay.  And were you convicted?

14   A    Yes.

15   Q    Did you plead guilty?

16   A    I did.

17   Q    So no trial?

18   A    No.

19   Q    Okay.  How long were you sentenced for?

20   A    Four and a half to nine years.

21   Q    How long did you serve?

22   A    Six.

23   Q    And that was before, when we discussed you

24   were in Gowanda or Attica, Upstate Correctional

25   Facility, Clinton, Sing Sing and Rikers?

```
 1              Brooks - Confidential
 2   A    Yes.
 3   Q    Prior to that, what was the next most
 4   recent crime you were convicted of?
 5   A    Gun possession.
 6   Q    And when was that?
 7   A    In 1997.
 8   Q    And you pled guilty?
 9   A    I did.
10   Q    How much time, what was your sentence?
11   A    One year.
12   Q    And did you serve the full year?
13   A    No.
14   Q    How long did you serve?
15   A    Six, seven months, something like that.
16   Q    And that was at Rikers?
17   A    Yes.
18   Q    And before that, when was the next most
19   recent conviction?
20   A    I wasn't convicted of nothing else.
21   Q    Was that when you were in Rikers around
22   1995?
23        Strike that.
24        Were you charged with something?
25   Actually, strike that.
```

1                Brooks - Confidential

2        So before 1997, had you been convicted of

3    any other crimes?

4    A    Before 1997, was I convicted of anything,

5    yes.  As a child I was convicted of gun

6    possession.

7    Q    And that was when you were 14?

8    A    Yeah.

9    Q    Any other times that we haven't discussed

10   when you were arrested, other than what we've

11   discussed, have there been times when you were

12   arrested but not convicted of a crime?

13   A    Yeah, when I was on Rikers Island.  That's

14   the only time.

15   Q    I'm sorry?

16   A    When I was on Rikers Island, that's the

17   only time.

18   Q    That was the first time you were on Rikers

19   Island?

20   A    Yes.

21   Q    Around -- and you believe -- you said

22   around 995?

23   A    Yes.

24   Q    And what were you charged with?

25   A    Homicide.

Page 47

                    Brooks - Confidential

1

2       Q    And was there a trial?

3       A    Yes.

4       Q    And what was the result of the trial?

5       A    I was innocent.

6       Q    Okay.  Do you know what the specific

7       charge was?

8       A    Murder in the second degree.

9       Q    Tell us what you were alleged of doing?

10      A    No.

11      Q    Why not?

12      A    I'm not talking about that.

13      Q    I know this is not a pleasant topic, but

14      we're entitled to ask questions about your

15      background, especially given your demands in

16      this case for emotional distress damages.  We

17      need to know about your background and your

18      past.  I apologize if it's uncomfortable, but

19      we really need you to answer.

20      A    Repeat the question.

21           MR. SEIDENFELD:  Can you repeat my

22      question before.

23           (Record read.)

24  BY MR. SEIDENFELD:

25      Q    Okay.  I'll ask my question again.

1               Brooks - Confidential

2        What were you accused of doing when you

3    were charged with second degree murder?

4    A    I was accused of killing somebody.

5    Q    And who was that?

6    A    I don't know.

7    Q    What were -- did you ever find out the

8    person who you were accused of killing?

9    A    I don't remember his name.

10   Q    Was it someone -- someone you never knew?

11   A    Yeah, I didn't know him.

12   Q    Okay.  How did you come to be arrested for

13   the murder?

14   A    The police came to my house and picked me

15   up.

16   Q    What did they say to you?

17   A    That I was under arrest.

18   Q    Did they tell you why?

19   A    No.  They waited until they got me into

20   the precinct.

21   Q    At some point did somebody tell you you

22   were under arrested?

23   A    Yes.

24   Q    What did they tell you?

25   A    I was under arrest in connection with the

Page 49

1              Brooks - Confidential

2    murder of some person, the guy.  I don't

3    remember his name.

4    Q    You had a trial, right?

5    A    I did.

6    Q    Okay.  And at the trial, did the

7    prosecution lay out why they believed you had

8    committed the crime?

9    A    Yes.

10   Q    What did they say?

11   A    They said they had witnesses saying that I

12   did it.

13   Q    Where did they say -- where did they

14   accuse you of doing this?

15   A    What?

16   Q    Where did the prosecutor say -- where did

17   the prosecutors alleged that you committed this

18   crime, the location of the murder?

19   A    I don't remember.

20   Q    Was it in Manhattan?

21   A    Yeah, it was in Manhattan.

22   Q    Upper Manhattan?

23   A    In Manhattan.  I don't remember the exact

24   location.

25   Q    Okay.  Do you remember who the witnesses

Page 50

```
 1              Brooks - Confidential
 2  were?
 3  A    Not by name.
 4  Q    Where they people that you knew?
 5  A    Yes.
 6  Q    Okay.  How did you know them?
 7  A    Seeing them in the neighborhood.
 8  Q    Okay.  And did they testify at trial?
 9  A    They did.
10  Q    Okay.  And they -- do you know what they
11  testified?
12  A    From what I remember, they said they seen
13  me in the proximity of where they were, but
14  none of them actually said I did it.
15  Q    Okay.  And were you -- what was -- strike
16  that.
17       Were you acquitted, or did the trial
18  result in a hung jury?
19  A    I was acquitted.
20  Q    And so the two years that you were in
21  Rikers, was while you were on trial for that
22  case?
23  A    Yes.
24  Q    In around 1995?
25  A    Yes.
```

```
 1              Brooks - Confidential
 2         Any other incidents where you were
 3    physically assaulted in Rikers Island when you
 4    were there in 9995?
 5    A    I was cut on two separate occasions.  And
 6    I got into a lot of fights there.
 7    Q    Did you ever receive any discipline for
 8    any of the fights?
 9    A    What do you mean, "discipline"?
10    Q    Did you lose any privileges?
11    A    Yes.
12    Q    What happened?  When?
13         What privileges did you lose?
14    A    All of them.
15    Q    Were you sent -- what do you mean by "all
16    of them"?
17    A    I was sent to punitive segregation, the
18    box.
19    Q    Solitary confinement?
20    A    Yes.
21    Q    For how long?
22    A    I don't know.  I was there for a long
23    time.
24    Q    More than a year?
25    A    Yeah.
```

Page 78

1                Brooks - Confidential

2    Q    So more than half of the two years that

3    you were there in 1995?

4    A    A spent a lot of that time in a pin, yeah.

5    Q    Any other -- strike that.

6         In 1997 when you were in Rikers Island,

7    were you ever physically assaulted?

8    A    I got into fights there, too.

9    Q    Okay.  What were the circumstances of the

10   fights?

11   A    It was gang related.

12   Q    Were you in a gang when you were in Rikers

13   Island?

14   A    Yes, I was.

15   Q    What gang were you in?

16   A    I was a Blood.

17   Q    And did you join when you were in Rikers,

18   or you previously had been a member?

19   A    No, when I was in Rikers Island.

20   Q    And did you join that second time in 1997?

21   A    There's no joining twice.

22   Q    So the first time in 1995 you had joined?

23   A    Yes.

24   Q    Okay.  And were the fights that you were

25   involved in 1995, were they gang related, too?

1            Brooks - Confidential

2    A    Some of them.

3    Q    Okay.  What ones -- can you tell me about

4    the fights that weren't gang related?

5    A    The fight where I got cut wasn't gang

6    related.

7    Q    What was the dispute over?

8    A    I told you that.

9    Q    Okay.  The one we just spoke about

10   earlier?

11   A    Yes.

12   Q    Okay.  Any other fights in 1995 that

13   weren't gang related?

14   A    Yeah, things like fighting over the

15   telephone and stuff like that.

16   Q    But those weren't -- it was the fight that

17   we discussed earlier that led to you being sent

18   to solitary confinement where you were cut?

19   A    The fight that sent me to solitary

20   confinement -- the first time, I was in

21   solitary confinement when I got cut.

22   Q    Okay.  So what was the fight that led you

23   to be assigned to solitary?

24   A    It was a fight in the house, in the

25   housing unit.

Page 80

1               Brooks - Confidential

2    Q    What was it about?

3    A    A new guy had come in, and it was an issue

4    over whether he would do, like -- because we

5    all had to, like, clean the house.  And I was

6    informed that he said that he was not going to

7    clean like the rest of us.  And so dudes

8    approached him and they started fighting with

9    him.

10        And then -- he was a really huge guy.  So

11   people were running from him.  And he came

12   directly to me.  And I didn't run.  We fought

13   until the police came.

14   Q    When you say "house," you're just

15   referring to the section of the -- of Rikers

16   where you were located?

17   A    Yeah.

18   Q    So between 1995 and 1997, you were back in

19   New York City?

20        After you were released from Rikers, after

21   you were acquitted and before you were arrested

22   again in 1997 --

23   A    Yeah.

24   Q    -- ever sexually assaulted then?

25   A    No.

Page 81

1                   Brooks - Confidential

2    Q    Ever physically assaulted during that

3    period?

4    A    No.

5    Q    Okay.  When you were released from Rikers

6    in 1997, where did you go when you were

7    released?

8    A    Went to my friend's house.

9    Q    Okay.  And in New York City?

10   A    Yes.

11   Q    Before you went to -- were you arrested,

12   again, before you went to Arizona?

13   A    Before I went to Arizona, that was the

14   drug arrest.

15   Q    That was the 1997 arrest?

16   A    1998.

17   Q    Okay.  So you were released in 1998?

18   A    No.

19   Q    I'm sorry, which --

20   A    That's when it happened.

21   Q    Okay, the drug arrest was in 1998?

22   A    Yeah.

23   Q    And that's when you went -- that's when

24   you were in Rikers, in Sing Sing, in Clinton,

25   in Upstate Correctional Facility, in Attica and

Page 84

```
 1              Brooks - Confidential
 2   A     Mm-hmm.  Yes.
 3   Q     I'm sorry?
 4   A     I said yes.
 5   Q     And then from about 1998 to, you said
 6   about 2004, you were in a variety of different
 7   correctional facilities; first in Rikers and
 8   then at several facilities in Upstate New York?
 9   A     Yes.
10   Q     Okay.  Were you ever physically -- so I'm
11   going to ask you questions about all of these
12   facilities in one, so we can just go through
13   each question once.
14         If you can tell me the answers are yes, if
15   you can tell me which facility you were in,
16   then we can hopefully move this along a little
17   faster.
18         Okay?
19   A     Okay.
20   Q     So from the period of 1998 to 2004 when
21   you were in the different correctional
22   facilities that we listed, were you ever
23   physically assaulted?
24   A     Yes, I got into fights.
25   Q     How -- in which facilities?
```

1              Brooks - Confidential

2    A    Clinton.

3    Q    What happened in Clinton?

4    A    There was a riot.

5    Q    What was your involvement?

6    A    What was my involvement?

7         Well, I was gang banging at the time.

8    Q    So -- with the Bloods?

9    A    Yeah.

10   Q    And what did you -- what started the riot?

11   A    Well, two things started it.  It was the

12   night before a Blood had got cut.  And when I

13   was on my way to the yard, I was assaulted by

14   another guy.  So when we got into the yard, you

15   know, it just erupted.

16   Q    When you say "assaulted," what did he do

17   to you?

18   A    He punched me in the face.

19   Q    Did you fight back?

20   A    No.  Not at that point I didn't.

21   Q    You fight back at a subsequent point?

22   A    When we got in the yard, yeah.

23   Q    And what did you do?

24   A    I hit him upside the head with a weight

25   bar.

Page 86

1               Brooks - Confidential

2    Q    Were there any repercussions?

3    A    It was a big fight in the yard.

4    Q    Any repercussions for you individually?

5    A    It was a riot.  So everybody was fighting.

6    I was getting hit, people was getting hit.

7    Q    Sure.

8         After the fact --

9    A    It wasn't an organized fight.

10   Q    I wasn't asking about -- I was asking

11   after the fact.

12        You know, before you had mentioned you

13   were in a fight in Rikers and you had been sent

14   to solitary.

15        So I'm asking after --

16   A    Oh, oh, oh, oh.  I think I understand

17   better.

18        Was there administrative repercussions

19   because of --

20   Q    Yes.

21   A    Yes.

22   Q    And what were they?

23   A    Five years in the box.

24   Q    And was that all some -- "in the box," you

25   mean in solitary?

Page 87

1              Brooks - Confidential

2    A    Yes.

3    Q    And was that all at Clinton?

4    A    Yeah.

5    Q    Do you remember what year that was,

6    approximately?

7    A    Maybe '9 --

8    Q    Sorry?

9    A    '98, '99.

10   Q    So shortly after you were convicted in

11   1998?

12   A    Mm-hmm.

13   Q    Okay.  Any -- while you were in the

14   various Upstate facilities that we discussed,

15   and also in Rikers Island during this period,

16   were you ever sexually assaulted?

17   A    No.

18   Q    Did you ever sexually assault anyone?

19   A    No.

20   Q    Were you ever touched in a sexual manner

21   without your consent?

22   A    No.

23   Q    Okay.  After you were release from

24   solitary confinement and from Clinton, did you

25   go to a different facility?

1             Brooks - Confidential

2    A    Yes.

3    Q    That was Upstate Correctional?

4    A    Yes, it was still punitive segregation.

5    Q    Is that the same -- so solitary

6    confinement?

7    A    Yes.

8    Q    Did there ever come a point during this

9    time in prison, in jail when you were out of,

10   you said, punitive segregation; was there ever

11   a point?

12   A    Yes, when I went to Attica.

13   Q    You were back in the general population?

14   A    Yeah.

15   Q    Were you ever in any fights at Attica?

16   A    None.

17   Q    Ever physically assault anyone in Attica?

18   A    No.

19   Q    Anyone ever physically assault you?

20   A    No.

21   Q    Ever sexually assaulted in Attica?

22   A    No.

23   Q    What about -- had somebody touched you in

24   a sexual manner without your consent?

25   A    No.

Page 128

1           Brooks - Confidential

2  it now.  It's as needed when I can't rest.

3  Q    Okay.  So it's not on a regular -- so now

4  it's not on a regular basis?

5  A    No, it's just when I need it.

6  Q    So when do you need it, to rest?

7  A    Yeah.

8  Q    In 2017 it was the same thing, you just

9  took it when you needed it to rest?

10 A    Yeah.  When I couldn't rest, yeah.

11 Q    And what about in 2011-2012, then were you

12 taking it regularly?

13 A    Yeah, I was taking it regularly.  Sometime

14 I miss it.  Sometimes I would miss.

15 Q    That was up until the point when you

16 stopped taking it, when you were in Franklin?

17 A    Yeah.

18 Q    Okay.  I'm going to ask you some questions

19 about your time as a participant in the Ready,

20 Willing & Able program.

21      Do you know when you first arrived at the

22 Ready, Willing & Able program?

23 A    The actual date, no.  I'm not good with

24 dates.

25 Q    Does end of June 2016 sound right to you?

Page 129

                  Brooks - Confidential

1

2    A     June 2016?

3          Yeah, I guess.

4    Q     And why did you go to The Doe Fund to join

5    the Ready, Willing & Able program?

6    A     While I was on parole, somebody came, and

7    I guess a recruiter of sorts, came in and he

8    said that they give you work and housing --

9    and -- immediate work.  They put you to work

10   immediately and they give you housing.  And

11   that's exactly what I needed, so . . .

12   Q     And did they give you counseling?

13   A     Counseling?

14   Q     Counseling?

15   A     Like mental health counseling?

16   Q     Like you had -- did you work with a

17   caseworker?

18   A     Yeah.

19   Q     Okay.  And they gave you -- in part, it

20   was to give you training to reenter the

21   workforce?

22   A     They had training programs.  They had a

23   work -- we went on routes every day, as far as

24   work was concerned.  But they also had training

25   for other programs.  And I believe I signed up

1                    Brooks - Confidential

2     for pest control.

3     Q    Okay.  And the purpose of -- another

4     purpose of being in the Ready, Willing & Able

5     program was to help you find work at an outside

6     employer that was outside of The Doe Fund?

7     A    My understanding was, the idea was for

8     stable -- what was the term?

9          I think it was "independent living,"

10    meaning consistent work and housing.

11    Q    Very shortly after you joined the Ready,

12    Willing & Able program you started working for

13    4C Foods?

14    A    Yes.

15    Q    What did you do at 4C?

16    A    I was a forklift operator.

17         (Deposition Exhibit 2, Document

18    Bates-stamped TDF 00001 through TDF000004,

19    marked for identification as of this date.)

20    Q    Mr. Brooks, I'm going to hand you what's

21    been marked as Plaintiff's Exhibit No. 2, which

22    is Bates-stamped TDF0001 through TDF0004.

23         Mr. Brooks, is this the terms -- is this

24    the sheet documenting the terms of

25    participation that were part of you joining the

1               Brooks - Confidential

2    Ready, Willing & Able program?

3    A    Yes, I believe so.

4    Q    Okay.  And take a look at the last page of

5    the document.

6         You see where it says "Participant's

7    Signature"?

8    A    Mm-hmm.

9    Q    That's your signature?

10   A    Yes.

11   Q    And see the date is 6/28/16?

12   A    Yes, I see that.

13   Q    And that's about the date you joined the

14   Ready, Willing & Able program?

15   A    Mm-hmm.

16   Q    Go back to the first page.

17        You see in the second paragraph it says "I

18   understand and agree that, as a participant

19   ("trainee) in RWA, I must follow all the

20   program rules, regulations and guidelines as

21   set forth in this statement in my independent

22   living plan, which I will develop with my case

23   manager."

24        And this independent living plan is what

25   you referenced before?

Page 132

                    Brooks - Confidential

1

2    A    Yes.

3    Q    And you were assigned a case manager?

4    A    Yes.

5    Q    And do you know who that was?

6    A    Dash Porter.

7    Q    Dash Porter is a male?

8    A    Yeah.

9    Q    You know Dash Porter's race?

10   A    No.

11   Q    Is Dash Porter African-American?

12   A    Could be.  Could be mixed with something

13   or something else.

14        But does he have brown skin, yes.

15   Q    And if you'll look a couple of lines down,

16   the third line from the bottom, you see where

17   it says "I understand and agree that my failure

18   or refusal to follow these Terms of

19   Participation and/or my ILP may result in

20   discharge from RWA and a possible transfer to

21   another DHS facility."

22        Do you see that?

23   A    Third line from the bottom?

24   Q    Here.

25   A    This one?

Page 133

1                    Brooks - Confidential

2    Q     See where I'm reading from?

3    A     Yes.

4    Q     You understand this document was outlining

5    the terms and conditions of you participating

6    in the RWA program?

7    A     Yeah.

8    Q     Okay.  And do you see below where it says

9    "A. Program Rules"?

10   A     "A.  Program Rules"?

11   Q     Yes.

12         Those were all the rules you were expected

13   to follow as --

14   A     Oh, "A.  Program Rules."  I see it.

15   Q     -- in order to stay in the program?

16   A     Yeah, I see it.

17   Q     And things like if you just look at number

18   seven, for example, "Curfew is 10:00 p.m,

19   unless a late/overnight pass has been

20   approved," that was one of the rules of the

21   program?

22   A     Curfew is at 10:00 p.m. or earlier, if

23   required by a trainee's parole officer.

24   Q     That was one of the rules, just like all

25   these others rules listed here.

Page 134

1                Brooks - Confidential

2         You were told you had to follow them in

3    order to stay in the program?

4    A    Yes.

5    Q    Did you read this at the time when it was

6    given to you?

7    A    Yeah, I skimmed through it.

8    Q    Okay.

9    A    But I had my counselor there with me to

10   point out things that were important.

11   Q    Your counselor --

12   A    Dash Porter.

13   Q    Do you remember what Dash Porter pointed

14   out to you?

15   A    No.

16   Q    Okay.  So you don't remember, what, if

17   anything, was pointed out?

18        No?

19        You have to answer the question?

20   A    No, I don't recall.

21   Q    Take a look at Page TDF0003, the third

22   page of the document.  Let me just ask you.

23   You mentioned that you skimmed or read the

24   document.

25        You don't have any trouble reading or

1           Brooks - Confidential

2    in The Doe Fund's Gates Avenue Facility --

3    A    Yes.

4    Q    Just let me finish.

5         -- while you were working for 4C Foods --

6    and the court reporter can read that back to

7    you if you need to hear the whole question.

8         MR. SEIDENFELD:  Maybe let's read it back

9    to him.

10        (Record read.)

11   Q    Mr. Brooks, I just want to make sure we're

12   clear.

13        You said that you stopped dealing with The

14   Doe Fund when you started working for 4C Foods.

15        But my question, and I'm a little confused

16   by that, because it's my understanding while

17   you were working for 4C Foods, that you still

18   lived in The Doe Fund Gates Avenue Facility; is

19   that correct?

20   A    That is correct.  I was only on DHS

21   shelter status, at that point.  That's what

22   they told me.

23        Once I got a job, I was no longer a Doe

24   Fund participant.  And so one of the things

25   they offered to me was no longer available to

1          Brooks - Confidential

2   me.  So I was just "shelter status."  That's

3   what they called it.

4   Q    You said you weren't -- so did you not

5   meet with your caseworker after you started

6   working for 4C?

7   A    Yes, I did.  I had to meet with -- that's

8   what I said.  I had to meet with my caseworker

9   to prove that I was trying to find my housing

10  and to give updates and turn in my pay stubs.

11  Q    And caseworker, Mr. Porter, even while you

12  were working at 4C was still -- was helping you

13  with this processes or guiding -- at least

14  guiding you through them?

15  A    No.  I was pretty much doing things on my

16  own.  They would come to me with certain

17  offers, and some of them I would look into.

18       But by that time it wasn't -- it wasn't

19  Mr. Porter, because they switched my case

20  manager, eventually.

21  Q    Okay.  Who did they switch your case

22  manager to?

23  A    His name was Young.  O'Neil Young.  I

24  believe that was his name.

25  Q    Do you know what Mr. O'Neil's race was?

Page 144

1                   Brooks - Confidential

2         Mr. Porter, a couple of times he told me

3    about a couple of different sites that I could

4    sign up to, but I don't recall if it was before

5    or after I stopped working with The Doe Fund.

6         Mr. O'Neil gave me a couple of leads on

7    apartments.  But I conveyed to Mr. O'Neil that

8    I had already obtained an apartment, and I was

9    waiting for the construction to be done with it

10   before I was able to move in.

11   Q    Okay.  So while you were still living at

12   Gates Avenue, you had obtained subsequent

13   housing?

14   A    Yes, I did.

15   Q    And that's the 630 Howard Avenue address?

16   A    Yes, it is.

17   Q    That's where you went to live after you

18   left Gates Avenue?

19   A    Yes.

20   Q    I just want to -- one more follow-up

21   question.

22        So after you started working for 4C, did

23   you ever receive any compensation in any form

24   from The Doe Fund?

25   A    I don't know, because I stopped using that

Page 149

                    Brooks - Confidential

1

2    Q    And Mr. Matthews is Timothy Matthews, who

3    we discussed before.

4         Do you know if Mr. Cooper reported to

5    Craig Trotta?

6    A    Who?

7    Q    Craig Trotta?

8    A    I don't know who that is.

9    Q    Did you ever see a Craig Trotta when you

10   were at the Gates Avenue facility?

11   A    I don't know who you're talking about.

12   Q    You know that Mr. Cooper was a homosexual

13   when you met him?

14   A    Yes.  From comments that he was making,

15   yes.

16   Q    What comments?

17   A    He was making a lot of sexual comments.

18   Q    When?

19        When was this?

20   A    Since the day I walked in the door I

21   observed him making sexual comments with other

22   people.

23   Q    So on the first day what comments did you

24   observe him making?

25   A    I don't remember exactly what he said, but

Page 150

1              Brooks - Confidential

2    I remember it being a sexual comment.

3    Q    Do you remember who he was making them to?

4    A    No.  I didn't know nobody that was in the

5    building.  I knew that Mr. Washington was

6    there, though.

7    Q    You said Mr. Washington observed

8    Mr. Cooper making, what types of comments?

9    A    It was something sexual.  I don't remember

10   exactly what he said.

11   Q    Was it something that just indicated that

12   he was homosexual, or was it something -- was

13   he talking about -- I'm sorry.

14        Was it comments -- was he talking about a

15   significant other or a boyfriend?

16   A    He was talking to somebody that was there.

17   Q    Were they comments that were -- you found

18   inappropriate?

19   A    Yeah.  I found it kind of strange for him

20   to be making those type of comments in there.

21   Q    When you say "those types of comments,"

22   I'm just trying to understand what you mean?

23   A    Flirting.  Flirtatious comments he was

24   making with the other guys there.

25   Q    Other Ready, Willing & Able participants?

Page 152

1            Brooks - Confidential

2  sitting, waiting.

3  Q    You don't remember to who?

4  A    No.

5  Q    You don't remember the comment?

6  A    I don't remember exactly what he said, no.

7  Q    And did you report this to anyone?

8  A    No.

9  Q    Why not?

10 A    Because it wasn't none of my business.  He

11 didn't say it to me.

12 Q    So it didn't upset you?

13 A    I didn't feel comfortable with it.  I made

14 a point that I would be as brief as possible

15 with him, because I could see that he was loose

16 like that, so . . .

17 Q    You're referring to Mr. Cooper?

18 A    Yes.

19 Q    When you say he was "loose like that,"

20 what did you mean?

21 A    He was loose with his sexual jokes and

22 comments.

23 Q    And you didn't report that to anyone?

24 A    No.

25 Q    You said you made it a point to stay away

1                  Brooks - Confidential

2    from Mr. Cooper?

3    A    I made it a point to interact with him as

4    little as possible.

5    Q    Okay.  And just to go back to the comment

6    that you said you observed on the first day,

7    you can't remember the comment, correct?

8    A    No.

9    Q    You can't remember who made the comment,

10   correct?

11   A    It was Mr. Cooper.

12   Q    You don't remember who he made the comment

13   to?

14   A    No.

15   Q    Initially, you wanted to go speak with

16   Mr. Cooper about being assigned to the Hudson

17   route?

18   A    I think -- I believe I spoke to

19   Dash Porter about that.

20   Q    Did you also speak to Mr. Cooper about it,

21   at some point?

22   A    I remember speaking to him when I wanted

23   to get taken off that route.  But it's possible

24   I did ask him about the route, too.  I don't

25   remember, though.

Page 155

```
 1              Brooks - Confidential
 2   on -- are you there?
 3        It's on Page 4, at the bottom of the page.
 4        It says (As read):  "On or around
 5   July 6th, plaintiff told defendant Cooper, 'Hey
 6   Terry, I want to pull you up later to find out
 7   about that Hudson Route'."
 8   A    That's right, yes.
 9   Q    Does that refresh your recollection about
10   whether you initiated --
11   A    I --
12   Q    I'm sorry.  I know you know -- like I
13   said, I know you know where I'm going.  You
14   just have to let me finish for the record.
15        That refreshes your recollection about
16   whether you initiated a conversation with
17   Mr. Cooper about joining the Hudson route?
18   A    Yes, it does.
19   Q    Okay.  And this was -- even though you had
20   already felt that you observed Mr. Cooper
21   engaging in conduct that you found
22   questionable?
23   A    Yes.
24   Q    Why didn't you go to someone else if you
25   already had concerns about Mr. Cooper?
```

1            Brooks - Confidential

2   A    He was in control about that.  He was in

3   control of the routes.

4         When I asked around about who was in

5   control of the routes, they told me I had to

6   speak to Terry.

7         So I said this, right here, in a room

8   filled with other participants.  And this is

9   when he made the comment that he likes to be

10  pulled up, chained down and whipped.

11  Q    So that's your belief, that on this

12  July 6th, he said that in response to you

13  asking about being assigned to the Hudson

14  route?

15  A    Yes.

16  Q    Who else was there?

17  A    It was several other participants.  I

18  don't know -- I don't know them.  I was pretty

19  quiet.  I didn't speak to many people.

20  Q    Is it possible that the comment you're

21  attributing to Mr. Cooper occurred later on?

22  A    No.

23  Q    Okay.  How did you -- so you said other

24  people told you that Mr. Cooper was the person

25  to see about being assigned to a route?

```
 1              Brooks - Confidential
 2    A    Yes.
 3    Q    Who are those people?
 4    A    Mr. Porter.
 5    Q    Mr. Porter told you that?
 6    A    Dash Porter.
 7    Q    Okay.  What did he tell you?
 8    A    That Cooper is -- if I wanted to go to a
 9    specific route, I need to speak to Mr. Cooper
10    about that.
11    Q    Why did you want to be on the Hudson
12    Route?
13    A    It was summertime.  It was on Chelsea
14    Piers.  The environment was nice, by the water.
15    Q    What do you mean by bottle of water?
16    A    I said by the water.
17    Q    Oh, I apologize, by the water.
18         If you go to the next page.  If you look
19    at 28, Page 5, Complaint 28.
20         And then it says "In front of other
21    employees, Defendant Cooper responded, 'Oooh,
22    yeah, I like to be pulled up, chained up and
23    whipped'."
24         That's what you were referring to a moment
25    ago?
```

1              Brooks - Confidential

2    A    Yes.

3    Q    You said "Cooper with the rest of the

4    staff laughed."

5         Who was there that laughed?

6    A    The people that were in the room.

7    Q    Who was in the room?

8    A    I told you I don't know them.  I don't

9    know them.

10   Q    You don't remember the names of anyone in

11   the room?

12   A    No.

13   Q    Are they RWA program participants?

14   A    Yup.

15   Q    Were there any employees of The Doe

16   Fund --

17   A    Everybody.

18   Q    -- I'm sorry, other than Mr. Cooper?

19   A    Everybody worked for The Doe Fund.

20   Everybody was either on the work crew or they

21   were supervisors?

22   Q    So you -- at The Doe Fund there was a

23   distinction between people who are part of the

24   Ready, Willing & Able program and people who

25   were in the administrative staff of The Doe

Page 159

                    Brooks - Confidential

 1    Fund?

 2    A     Say that again.

 3    Q     Strike that.

 4          So the people who were part of the Ready,

 5    Willing & Able program, they, as part of the

 6    Workforce Development phase, they were assigned

 7    to the work crews, correct -- road crews,

 8    correct?

 9    A     We had street -- street cleanings, which

10    was us, and we had supervisors.

11          We wore the blue shirts and the

12    supervisors wore the red shirts.

13          You got different shirts for different

14    people.  Like, Terry wore a white shirt.  And

15    he was like a upward supervisor.

16    Q     Mr. Cooper ever go out with you on the

17    routes?

18    A     Never.

19    Q     Was he your supervisor on the routes?

20    A     He was a supervisor for dispatch.

21    Q     Was he a supervisor on the route?

22    A     He was the supervisor for dispatch.

23    Q     That's not my question.

24          I'm asking was he a supervisor on the

Page 160

                    Brooks - Confidential

1

2   route?

3   A     Not that I know of.

4   Q     Did he ever accompany you on the route?

5   A     No, he did not.

6   Q     Did you have a supervisor on the route?

7   A     Several.

8   Q     Okay.  And on the Hudson route, who was

9   it?

10  A     It was several different supervisors.

11  Q     Who were they?

12  A     I forget his name, Julio something.

13  Q     Any other supervisors?

14  A     That's the name that I remember.  It was

15  supervisors.  He was the one that drove us

16  there.

17        But we had different people driving us

18  there, depending on the day -- excuse me, and

19  depending who was there.

20  Q     Those were the people in the red shirts?

21  A     Yeah.

22  Q     Okay.  And when you were at a work -- when

23  you were at a road site, what did the people in

24  the red shirts do?

25  A     They made rounds, made sure we were

Page 161

1               Brooks - Confidential

2    working.

3    Q    And what were you and the other people in

4    the blue shirts doing?

5    A    We were doing street maintenance.

6    Q    Okay.  If you look back at the complaint,

7    and you look at Paragraph 31,

8    traditionally -- strike that.

9         So let's go back to July 6th and the

10   comment that you heard Mr. Cooper make.

11        Did you report it to anyone?

12   A    What comment?

13   Q    The comment, oooh, yeah, I like to be

14   pulled up, chained up and whipped.

15   A    No, I did not.

16   Q    Why not?

17   A    Because I didn't want no problems.  I just

18   ignored that.  I ignored it.

19   Q    Okay.  You look at Paragraph 31.

20        It says "On or around July 8th, again,

21   plaintiff contacted Cooper to obtain

22   information on the Hudson route."

23        So you initiated contact with Cooper on

24   the 8th?

25        Do you understand the question,

Page 162

1              Brooks - Confidential

2    Mr. Brooks?

3    A    I remember speaking to him, but I don't

4    remember what the date was.

5    Q    And he wasn't your supervisor at that

6    point?

7    A    What do you mean?

8    Q    Mr. Cooper wasn't your supervisor?

9    A    He was the route supervisor.

10   Q    But not your supervisor?

11   A    Not my supervisor.  He was the supervisor

12   that I was told that I need to speak to in

13   order to get a specific route.

14        So he was the one that I had to talk to

15   about being placed on a route.

16   Q    He was someone -- but he didn't supervise

17   you on that route?

18   A    While working on the route?

19   Q    Right.

20   A    No.

21   Q    And he didn't supervise you while you were

22   doing your in-house work?

23   A    No.

24   Q    He didn't supervise you in connection with

25   any other parts of your participation in the

```
 1              Brooks - Confidential

 2   Ready, Willing & Able program?

 3   A    He was in control of the pay.

 4   Q    What do you mean?

 5   A    The schedule.

 6   Q    What do you mean "he was in control of the

 7   pay"?

 8   A    He was in control of the pay.

 9   Q    Did he set your -- did he set a rate of

10   pay -- the rate of your stipend?

11   A    Did he set the rate?

12   Q    I'm sorry, what was your answer?

13   A    I don't know what you mean by, "did he set

14   the rate."

15   Q    You said he controlled the pay?

16   A    He controlled our schedules, our time

17   schedules and how much we're supposed to get

18   pay.  I believe we're supposed to sign our

19   hours.

20   Q    Isn't it true that his title wasn't even

21   supervisor?

22   A    No, he was a supervisor.

23   Q    That wasn't his title?

24   A    Yes, it was.

25   Q    Do you know what his title --
```

Page 164

                    Brooks - Confidential

1

2       A     He was the supervisor of dispatch.

3       Q     Did anyone ever --

4             MR. SEIDENFELD:  Can we go off for one

5       second?

6             (Recess taken.)

7   BY MR. SEIDENFELD:

8       Q     When you spoke with Mr. Cooper on

9       July 8th, did he do anything inappropriate

10      then?

11      A     I don't remember the date, but . . .

12      Q     Let me --

13      A     I do remember approaching him on a

14      staircase.  We were going down the stairs and I

15      asked him about the route, and he told me, I

16      got you and then walked away.

17      Q     So nothing inappropriate in that

18      interaction, right?

19      A     No.

20      Q     Okay.

21            (Deposition Exhibit 4, Document Entitled

22      "Community Improvement Project, Field

23      Schedule", marked for identification as of this

24      date.)

25      Q     Mr. Brooks, I'm going to hand you what's

1             Brooks - Confidential

2    been marked as Plaintiff's Exhibit 4, which is

3    Bates-stamped TDF000142.

4         This is the schedule that you received as

5    part of the Workforce Development program for

6    the week starting Sunday, July 17, 2016,

7    correct?

8    A    Yes.

9    Q    This shows you were assigned to the Hudson

10   route?

11   A    Yes.

12   Q    It shows that on Sunday the 17th, Monday

13   the 18th, Tuesday the 19th and Wednesday the

14   20th, you were assigned to work from 3:00 to

15   11:30 p.m., correct?

16   A    Yes.

17   Q    Do you know who gave this schedule to you?

18   A    Do I recall who handed it to me, no.

19   Q    And this was what you had requested, to be

20   assigned to the Hudson route?

21   A    Yes.

22   Q    If you look at Paragraph 35 of your

23   complaint, it says that you immediately

24   contacted Mr. Porter to inform him about a

25   discrepancy.

Page 166

1                Brooks - Confidential

2         And that was referring to a discrepancy in

3    the schedule?

4    A    Yes.

5    Q    What did you tell Mr. Porter?

6    A    Well, at the time, this wasn't conducive

7    to me spending time with my child -- getting my

8    kids and my -- the drug program that I was in.

9    Q    Mr. Porter said that he would look into it

10   and try to fix it for you?

11   A    Yeah.  He said he would speak to Terry

12   about it.

13   Q    And did you work -- strike that.

14        Did you participate in the Workforce

15   Development program on the days of this

16   schedule, on the 17th, 18th, 19th and 23rd?

17   A    Yeah.

18        Mr. Porter said I had to go to work

19   because that's what the schedule was for.  And

20   that once he fixed it, then I wouldn't have to

21   work on those days.  But I was required to do

22   this, their schedule.

23   Q    Isn't it true that after July 23rd, that

24   while you were on the -- strike that.

25        Isn't it true that after July 23rd, that

1                Brooks - Confidential

2    A    The Hudson route.

3         I was on the Hudson route -- that was the

4    Hudson route, period.  There wasn't any

5    alternate schedule for the Hudson route.  They

6    had a different crew from a different building,

7    facility, that worked in the nighttime.  This

8    was the nighttime route, and it was just for

9    our crew.

10        And I worked this route for about three

11   weeks, maybe.

12   Q    I want you to look at Line 6.

13        Do you see that above, right above seven?

14   A    Yeah.

15   Q    Does anything on Row 6 show that you

16   worked the Hudson route the week ending

17   7/30/2016?

18   A    It says "OFF."

19   Q    It says "OFF," then it says "SPE," then it

20   says Myrtle Avenue BID.  Vernon LIC, SPE, SPE,"

21   and then it says "OFF."

22        I'm just reading across Row 6.

23        Is that what it says there?

24   A    Yeah, that's what it says.

25   Q    And it shows you were off on Sunday and

1            Brooks - Confidential

2    off on Saturday, correct?

3    A    Yeah.  I'm not sure if that's accurate,

4    though.

5    Q    Why wouldn't it be accurate?

6    A    I'm not sure if it's accurate because I do

7    remember working the Hudson route for a couple

8    of weeks.  They -- I had made problems trying

9    to get it changed.  I had to speak to several

10   different people.  I had to argue with Wiggins

11   about it.  I had to speak to Tim about it.  I

12   had to speak to Ronald.  I had to speak to a

13   lot of people about getting the route changed.

14   Eventually it got changed, and Mr. Washington

15   helped with that, but that was after the

16   situation with Terry.

17   Q    Okay.  So after -- let me ask you a

18   question:  After the situation with Terry or

19   with Mr. Cooper, did you work the Hudson route

20   any more after that?

21   A    Not that I remember.

22   Q    You have any documents that would show us

23   when you were assigned to the various routes?

24   A    Any documents that I do have I turned it

25   over to my attorney.

1                  Brooks - Confidential

2    A    I guess it is.

3    Q    There was a time when you were assigned to

4    the Vernon route?

5    A    Yes, I did work at -- on Vernon before,

6    yes.

7    Q    Okay.  And if you see CM -- if you look

8    next to that it says "Maspeth."

9         Is that also a route that you were

10   assigned to?

11   A    I believe -- that sounds familiar.  So it

12   could be possible that I worked there a couple

13   of times.

14   Q    And then if we just go back to that "CUS"

15   at the end of Row 3, does that -- is there any

16   route that you recall being assigned to that

17   could have had the abbreviation CUS; do you

18   remember?

19   A    No.

20   Q    Okay.  No route that you recall had that

21   abbreviation?

22   A    I don't remember having no abbreviations

23   at all.  You're telling me this now.  But I

24   don't recognize CUS at all for nothing.

25   Q    I want to turn your attention to

Page 176

1               Brooks - Confidential
2    Paragraph 40 of the complaint.  You see where
3    it says "By way of example, one of the workers
4    told Defendant Cooper, 'Get your ass out of
5    here, Terry, you're holding us up.'  Defendant
6    Cooper replied 'Everything you say has to do
7    with my ass.  I know you want some.  You just
8    can't stop thinking about my ass'."
9         And that was on July 17, 2016?
10   A    I don't remember what date it was.  I
11   remember it was a day we were going to a route.
12   We were going to the route.  It was the Hudson
13   route.
14   Q    You remember if it was the first -- you
15   remember it was the first --
16   A    I believe it was my first time going out.
17   Q    And that would have been July 17th, based
18   on what we looked at?
19   A    Yeah.
20   Q    Okay.  Where did Mr. Cooper actually --
21   where did Mr. Cooper allegedly say this?
22   A    He said it inside the van.  We were all
23   loaded up in the van.
24   Q    Was he in the van?
25   A    No, he was standing outside of the van.

1              Brooks - Confidential

2    Q    Who said, "Get your ass out of here,

3    Terry, you're holding us up"?

4    A    I don't know.  They were in the back.

5    Q    Someone in the van?

6    A    Yeah.  I was in the front of the van.

7    Q    Okay.  Do you remember anyone else who was

8    either in the van or outside the van?

9    A    Yeah.

10   Q    Who?

11        Who was in the van?

12   A    I know Anthony Marshall was in the van.

13   Q    Who is Anthony Marshall?

14   A    He was on the work crew with me as well.

15   Q    He was RWA program participant?

16   A    He worked the Hudson River Park.

17   Q    Who else?

18   A    I don't know.  I don't know the rest of

19   the guys like that.

20   Q    Other people in the program?

21   A    Other people in the van that was working

22   the route.

23   Q    And the program?

24        Yes?

25   A    The supervisor was there, too.  I don't

```
 1              Brooks - Confidential
 2   remember his name.  But it's Julio something.
 3   Q    He was one of the people in the red
 4   shirts?
 5   A    Yeah.
 6   Q    Did Julio hear the comment?
 7   A    I assume he did.  Everybody else did.
 8   Q    You don't know if Julio heard it or not?
 9   A    I don't know if he could even recall it,
10   but . . .
11   Q    When you first got to Gates Avenue, did
12   you have a roommate?
13   A    Yes, I did.
14   Q    Who was your roommate?
15   A    Turk.
16   Q    Do you know Turk's last name?
17   A    I believe his name was Mohammad.
18   Q    So Turk Mohammad?
19   A    I don't know if that's his real first
20   name.  That's what people called him.
21   Q    Okay.  Any other roommates?
22   A    Yeah.  Later on down the line.
23   Q    About how long were you roommates with
24   Turk?
25   A    For quite a while.  For the majority of my
```

Page 182

1                  Brooks - Confidential

2    Q    So you -- it was an off day?

3    A    Yeah, I wasn't working.

4    Q    Okay.  I got to go -- one second, I

5    apologize Mr. Brooks.  I want to go back to the

6    comments that you allege Mr. Cooper made on the

7    17th saying, "Everything you have to say has to

8    do with my ass."

9         Did you report those comments to anyone?

10   A    Did not.

11   Q    Why not?

12   A    I didn't want no problems.  He wasn't

13   speaking to me directly.

14   Q    You didn't feel that it concerned you?

15   A    Did it concern me?

16   Q    It didn't -- you didn't feel that it

17   related to you, the comments?

18   A    No, that's not what I said.

19        He wasn't speaking directly to me.  I

20   mean, I didn't like the comments.  I would have

21   preferred not to be around that.  But it wasn't

22   personal with me.  I didn't feel like it was

23   professional for him to be doing that at work.

24   But he wasn't speaking directly to me, he was

25   talking to somebody else in the van and I just

```
 1              Brooks - Confidential
 2   overheard it because he was right in front of
 3   me.  He was right outside the van.  I was
 4   sitting next to the van door.  So he was
 5   talking that right there right before me,
 6   so . . .
 7   Q    Okay.  You say that Mr. Cooper asked you
 8   to come to his office at about 9:00 a.m. on the
 9   morning of July 21st while you were outside
10   having a smoke break.
11        Does that sound correct?
12   A    Yeah, in the morning I was outside
13   smoking, he came and asked --
14   Q    We'll get to that in a second.
15        What were you doing that morning?
16   A    I was smoking.
17   Q    But before that, what time did you wake
18   up, do you remember?
19   A    No, I don't remember the time I woke up.
20   Q    What were you doing before you were
21   outside smoking?
22   A    I was in my room.
23   Q    Okay.  Did you eat breakfast?
24   A    No.
25   Q    Okay.  So you went outside and you were
```

```
 1              Brooks - Confidential
 2   arrived at Gates Avenue?
 3   A    Who, Paul?
 4   Q    Paul Washington, excuse me, yes.
 5   A    No.
 6   Q    When's the last time you spoke to
 7   Paul Washington?
 8   A    I can't recall.
 9   Q    Was it this year?
10   A    No.
11   Q    You say Mr. Cooper called you into his
12   office, correct?
13   A    While I was smoking he asked me how was
14   the Hudson route, did I like it.  I said it was
15   good, it's just not conducive with my schedule.
16   He said but you liked it, right.  I was like,
17   yeah, it was all right.  He said when you
18   finish smoking, come into my office.  I said
19   all right.
20   Q    Can I ask you, you said Mr. Stevens was
21   outside.
22        Who is Mr. Stevens?
23   A    The house manager.
24   Q    Do you know his first name?
25   A    James, I think.  I'm not sure.
```

1            Brooks - Confidential

2    A    Initially he said, Come in, because I was

3    standing at the door.  He said come in.

4    Q    The door was still open, correct?

5    A    Yeah.

6            He said something about coming over to the

7    desk and he don't bite, some shit like that.  I

8    don't really remember what he said.  But I

9    remember him telling me to come to the desk.

10   Q    And did you go to the desk?

11   A    I did.

12   Q    Were you -- the chairs were they on the

13   other side of his desk?

14   A    What do you mean?

15   Q    He had a chair -- he was sitting behind

16   his desk, you said?

17   A    Yeah.

18           He was sitting at the desk, yes.

19   Q    And he told you to come in and sit, right?

20   A    No.  He just said come here.  Come to the

21   desk.

22   Q    So did you stand next to him while he was

23   sitting?

24   A    Yeah.

25   Q    And then what did he say?

1             Brooks - Confidential

2    A    He was talking about the route.

3    Q    The Hudson route, correct?

4    A    He was talking about whether or not he

5    could give me both my weekend days off.

6    Q    What -- do you remember what else he said?

7         Did you say something in response?

8    A    Not really, because at this point --

9    because he was flinging his hands and he end up

10   touching me.

11   Q    You say he was flinging his hands.

12        What do you -- strike that.

13        So if he was -- was he speaking as he was

14   flinging his hands?

15   A    Yeah, he was speaking with his hands.

16   Q    Well, no, no.  You said -- I want to know

17   what he was saying while he was flinging his

18   hands.

19   A    He was talking about the route.  He was

20   telling me he don't know if he could give me

21   both days, whatever.

22   Q    Was he flinging his hands -- did he touch

23   you at that point?

24   A    Yeah.

25   Q    What, if anything -- where did he touch

Page 192

1              Brooks - Confidential

2    you when he was flinging his hands?

3    A    He touched my penis.  I thought it was a

4    mistake.

5    Q    You say he touched it.

6         What do you mean?

7    A    He touched it.  He was going like this

8    while he was talking with his hands and he end

9    up touching my penis.  And I thought it was a

10   mistake.  I should have known better.  I backed

11   up so he could finish talking.

12   Q    When you say he touched it as he was

13   flinging his hands, did he grabbed it?

14   A    Not at that point, no.

15   Q    Did he -- what part of his hand did he

16   touch it with?

17   A    It was his left hand.

18   Q    It was the front of his hand, back of his

19   hand?

20   A    I don't know.  He was going like this.  So

21   I don't know if -- it was possibly his fingers

22   or something.

23   Q    How long was there contact, this initial

24   time?

25   A    It was immediately.

1                 Brooks - Confidential

2           Is that clear?

3    Q      Yes.

4    A      Then he took his hand out and grabbed my

5    penis on my pants.  He wasn't inside.  He was

6    on my pants when he grabbed my penis.

7           Is that clear?

8    Q      Yes.  I know this is -- I apologize in

9    advance.  But we just need to make sure we

10   understand what happened to you regarding --

11   A      All right.  Do you understand?

12   Q      Yes, that's very -- so it was over the

13   pants.

14          And then what -- then did you say anything

15   in response?

16   A      No.  I was shocked.  I couldn't believe

17   it.  I was in shock.

18   Q      Okay.  And then what happened next?

19   A      I exited the room.  I told him I had to go

20   and get ready for a shower.  I had to go see my

21   son and got up out of there.

22   Q      Did he say anything to you before he left?

23   A      When I reached the door he said he's

24   coming up in a minute.

25   Q      What did you do after you left the office?

1               Brooks - Confidential

2    started taping?

3    A    Yes, I did.

4    Q    You used -- that was your cell phone?

5    A    Yes, it was.

6    Q    Did you use any other devices to tape?

7    A    No.

8    Q    Did you have a camera?

9    A    No.

10   Q    Did you ever have a 16 mega pixel camera?

11   A    Yes, I do.  I own one.

12   Q    You still own it?

13   A    Yep.

14   Q    Did you have it with you in your room at

15   that time?

16   A    No, I didn't.

17   Q    Okay.  Did you tell Mr. Cooper you were

18   taping him when he came in?

19   A    No.

20   Q    So I just want to make sure.

21        Do have any video of any interactions with

22   you and Mr. Cooper from July 21, 2016?

23   A    No.

24   Q    Okay.  At some point subsequently -- at

25   some point after you told The Doe Fund about

Page 200

1                    Brooks - Confidential
2       Mr. Cooper's actions, did The Doe Fund start an
3       investigation?
4       A     Yes.
5       Q     During this investigation, did you tell
6       anyone at The Doe Fund you had video of the
7       incident in your room?
8       A     Yes, I did.
9       Q     Why did you do that?
10      A     Because I didn't think people was going to
11      believe me.  I wanted them to take me
12      seriously.
13      Q     Did they take you seriously?
14      A     Yes, they did.
15      Q     And as soon as you complained, they took
16      action very quickly, right?
17            MS. O'CONNELL:  Objection.
18      A     As soon as I complained I got a meeting
19      with HR.
20      Q     The morning -- the same morning that The
21      Doe Fund received your complaint?
22      A     No, it wasn't the same morning.
23      Q     But did you meet with Mr. James Washington
24      the same morning that you -- that he received
25      your complaint?

1                Brooks - Confidential

2    A    I made the complaint that night when I

3    came back from my wife's house.  I wrote it at

4    my wife's house.  I put it in

5    James Washington's desk -- his mailbox.  And

6    the next day James Stevens came in and told me

7    that James Washington wanted to see me.

8    Q    And you met with James Washington that

9    next morning?

10   A    And I met with him, yes.

11   Q    And that was a Friday, the next day,

12   correct, that day you met Mr. Washington?

13   A    I don't know which day it was.

14   Q    I'll just -- if you take a look at

15   Exhibit 4, you can see that it shows that

16   Sunday is the 17th, Monday the 18th, Tuesday

17   the 19th, Wednesday the 20th, Thursday --

18   A    This don't exactly tell when that

19   happened.  The day that I made that report --

20   Q    Well, the day you made --

21   A    -- I think it was the 24th.

22   Q    The day that you alleged the incident with

23   Mr. Cooper happened was July 21st, correct,

24   2016?

25   A    Yeah.

Page 202

1                    Brooks - Confidential

2    Q    Okay.  And do you remember -- I'll tell

3    you it's a Thursday.

4         Do you have any reason to believe it

5    wasn't?

6    A    No, I don't.  No.

7    Q    Then you met with Mr. Washington that next

8    morning on -- Friday morning, correct?

9    A    Yeah.  I met with him the next day, yes.

10   Q    And then you met again with Ms. Gilmore

11   and other members -- other employees of The Doe

12   Fund that following Monday as a part of their

13   investigation, correct?

14   A    I met with two people that they said was

15   from HR.  And we all was in the office with

16   Mr. Washington.

17   Q    And that was Monday the 25th, July 25?

18   A    I don't remember the dates.

19   Q    Okay.

20   A    I just remember being there.

21   Q    You remember if it was the next weekday?

22   A    No.

23   Q    If you don't remember, that's fine.  We

24   can move on.

25   A    Yeah, I said no.

1           Brooks - Confidential

2    room.

3    Q     Where -- did you close the door?

4    A     No, he closed the door.

5    Q     Okay.  And, what, if anything, did -- who

6    spoke first?

7    A     I can't recall.  I think he spoke first.

8    He asked me why was my door locked.  I told him

9    I always lock the door.  He said why was it

10   locked?  Why was it locked?  I said it's a slam

11   lock.

12   Q     And then what did you and Mr. Cooper

13   discuss?

14   A     I remember asking him what did he have as

15   far as the schedule was concerned.  And he

16   started talking about the schedule, but at the

17   same time he started to touch me.

18   Q     And what was he saying when he started to

19   touch you?

20   A     I could barely remember.  He just was

21   saying he don't know if he could give me both

22   weekend days off.  That's what we had been

23   discussing.  That's what I asked everybody for,

24   from my counselor on up to James Washington, I

25   asked for the weekends off so I could spend the

1              Brooks - Confidential

2    time with my family.

3         So he was telling me he don't know if he

4    could give me both days off, maybe one day.

5    But at the same time he was fondling my penis.

6    But when he came in, he grabbed my phone.

7    That's the first thing that he did.  He took my

8    phone off the bed.

9    Q    What did he say?

10   A    He asked me was I on the phone.

11   Q    And what did you saw?

12   A    I said, yeah.  It was recording.  I was

13   new to these smartphones.

14        So when I started recording -- I think

15   this was the first time I even ever made a

16   recording, period.

17        So the recording -- it had a mic on it.

18        You know what I mean?

19        And you could see the mic.  And so when he

20   picked up my phone and seen it was a mic, I

21   guess he assumed that it was somebody else on

22   the other line.  I think.  I don't know what he

23   assumed.  But that's what he asked me, was I on

24   the phone.

25        I took my phone out of his hand and put it

Page 206

1              Brooks - Confidential

2    back on the bed, and I told him, yeah, I'm on

3    the phone.

4    Q    You said he was foundling you.  Again I'm

5    going to ask you what exactly he did.

6    A    He started touching my penis and --

7    Q    Over your -- were you wearing the same

8    thing you were wearing downstairs?

9    A    Yes, I was wearing the same thing.

10   Q    And did he touch you over your pants or

11   under your pants?

12   A    Over.  He rubbed it for a second and he

13   pulled it out.  He tried stroking it.

14   Q    When you said he pulled it out, he reached

15   under your underpants?

16   A    Yeah, yeah.

17   Q    And pulled your penis out of your pants?

18   A    Yeah.

19        MS. O'CONNELL:  Let the record reflect

20   that the plaintiff was making masturbation

21   motions.

22        MR. BARTOLOMEO:  Objection to the

23   characterization.

24   Q    If you can characterize what he was doing?

25        MR. SEIDENFELD:  If he's not -- like I

1           Brooks - Confidential

2    A    For a couple of second because I backed

3    up.

4    Q    Did you say anything when you backed up?

5    A    No.

6    Q    Did he say anything?

7    A    He was talking the whole while.  I

8    couldn't hear him, but he was saying something.

9    I pulled my pants up and I remember saying that

10   I have to go.  I got to get ready.  I got to

11   get in the shower, and he exited my room.

12   Q    Do you remember what kind of pants you

13   were wearing?

14   A    No.

15   Q    They were loose fitting pants?

16   A    I don't remember.

17   Q    Do you remember trying -- why didn't you

18   push his hand away?

19   A    I pulled back.

20   Q    Okay.  And was it such a brief encounter

21   that you didn't have time to push his hand

22   back?

23   A    It was long enough.  But I didn't touch

24   him.  I just pulled back and pulled up my

25   pants.

Page 209

1            Brooks - Confidential

2    Q    You said it was a for a couple of seconds,

3    I believe.

4         Is that what you just testified to a

5    minute ago?

6    A    Yeah.  I wasn't timing it.  It didn't take

7    very long, though.

8    Q    A matter of seconds -- actually, strike

9    that.

10        Mr. Cooper -- I'm sorry.  I apologize.

11        Mr. Brooks, in the course of this

12   litigation you produced to us some of the tapes

13   that you made?

14   A    Is that an insult?

15   Q    I apologize.

16   A    You call me that man three times.

17   Q    I apologize.

18        MR. SEIDENFELD:  We can go off.

19        MS. O'CONNELL:  No, you can stay on the

20   record.

21        MR. BARTOLOMEO:  Yeah, let's stay on the

22   record, please.  I'd like to hear.

23        MR. SEIDENFELD:  Okay.

24   A    Is that an insult?

25   Q    I didn't mean it as an insult.  You know,

Page 212

1                    Brooks - Confidential

2           Plaintiff's Exhibit 6, the file called "Terry"

3           from zero to 3 minutes and 15 seconds.

4                    (Tape Playing.)

5      BY MR. SEIDENFELD:

6           Q     Mr. Brooks, is that the recording that you

7           made?

8           A     Yes.

9           Q     Why did you let Mr. Cooper enter your room

10          if he had already allegedly touched you when

11          you were downstairs in his office?

12          A     He knocked on the door, I opened the door.

13          Q     How come you didn't tell him to leave or

14          say, Please don't come in?

15          A     He's staff.  I can't control what's going

16          on in there.  They run that building.  I don't

17          run that building.

18          Q     Mr. Cooper worked in the dispatch office.

19                Did he have any authority having to do

20          with the residential aspect --

21          A     I don't know.

22          Q     -- of the Gates Avenue --

23          A     I don't know what kind of authority he

24          has.  I just knew he was a supervisor.  He was

25          up there.  He came up there.

1           Brooks - Confidential

2    phones.  The phones thing -- the record thing

3    was all new to me.  The smartphones is new to

4    me.  I was just learning about how to deal with

5    smartphones.

6    Q    What did you do after Mr. Cooper left?

7    A    I got ready to take my shower.

8    Q    Did you go talk to anyone about what

9    happened before you took your shower?

10   A    No.

11   Q    Why not?

12   A    Because I knew I had to leave.  I didn't

13   know who I was going to talk to anyway.  I

14   didn't know what I was going to do.  I never

15   been in a situation like this before.  It never

16   happened to me.  Not in prison.  Not in the

17   streets.  I didn't know what to do.

18        My only recourse was to be violent, and I

19   knew I couldn't do that because I would have

20   been back in prison.  So I didn't know what to

21   do.

22        So after I got in the shower, I went

23   downstairs and I went to speak to

24   Mr. Paul Washington.  I trusted Paul.

25   Q    We'll get there in a minute.

Page 217

1           Brooks - Confidential

2           I just want to ask, when you went to go

3    take a shower, where was your phone?

4           Did you leave it in your room?

5    A    I don't remember.

6    Q    Did you bring the phone to the bathroom?

7    A    I don't remember.

8    Q    Was there anyone in the shower room when

9    you got there?

10   A    No.

11   Q    In your complaint you say Mr. Cooper came

12   into the bathroom while you were in the shower;

13   is that correct?

14   A    That's correct.

15   Q    What did he do?

16   A    He came and looked in.

17   Q    When you he "looked in," what did he do?

18   A    He looked at me.

19   Q    Where were you?

20   A    I was standing by the mirrors.

21   Q    Were you dressed?

22   A    I think I had pants on or something.  I

23   think I had my shirt off.

24   Q    Was it before or after you showered?

25   A    It was before I showered.

1              Brooks - Confidential

2    Q    Okay.  Did he say anything to you?

3    A    No.

4    Q    Did you say anything to him?

5    A    No.

6    Q    How long did he look at you for?

7    A    A few seconds.  He looked like he was

8    nervous.  He looked in and then he left.

9    Q    Then you went and you showered?

10   A    Yeah.

11   Q    What did you do next?

12   A    Got dressed, went outside and spoke to

13   Mr. Washington.

14   Q    Didn't you go and speak to Mr. Cooper

15   first?

16   A    Nope.

17   Q    Sorry, I just didn't hear you.

18   A    I don't -- I don't -- no, I don't

19   remember.  I think I went to speak to

20   Mr. Washington first.  Then I came back because

21   he told me to speak to James Washington.  And

22   that's when I went in and tried to record Terry

23   admitting that he had touched me.

24   Q    Can you take a look at your complaint.

25   Mr. Brooks, can you take a look at your

Page 219

1               Brooks - Confidential

2  complaint.  I want to direct you to

3  Paragraph 73.

4      It says "Plaintiff returned to Defendant

5  Cooper's office after his shower, hoping to

6  finally get his schedule sorted out, so that he

7  could have time to be a father to his

8  children."

9      Do you see that?

10 A    Yes.

11 Q    Does that refresh your recollection about

12 whether you went to speak with Mr. Cooper

13 before you went to speak with

14 Mr. Paul Washington?

15 A    No.  I don't know what sequence that I

16 went to speak to him.

17     It was after my shower, yes.  But I don't

18 know if I went to speak to Paul first or if I

19 went to speak to Terry first.  I don't know.  I

20 don't remember.

21 Q    Why did you go and meet with Mr. Cooper

22 after your shower?

23 A    I wanted to get him on the record saying

24 something about what he did.

25 Q    You recorded -- so you recorded that

Page 221

1                      Brooks - Confidential

2         him.  But somebody came, opened the door and

3         yelled for Terry.

4         Q    And this was the meeting on July 21, 2016,

5         when you went back to Terry's office after you

6         had taken a shower?

7         A    Yes.

8         Q    Okay.  Now we're going to play the file

9         named Terry 2, which we had marked as

10        Plaintiff's Exhibit 7 from 2 minutes and 50

11        seconds to six minutes and 30 seconds.

12              (Tape Playing.)

13   BY MR. SEIDENFELD:

14        Q    Mr. Brooks, we stopped the recording at

15        426.

16              From 250 to 426, were you in Mr. Cooper's

17        office, or were you on your way there?

18        A    I was on my way there.

19        Q    Okay.  And do you know any of the other

20        people's whose voices you heard on the tape we

21        just played?

22        A    No.

23        Q    Okay.  And you didn't go talk to them or

24        report what happened to any of them?

25        A    No, I didn't know them.

Page 222

1                    Brooks - Confidential

2        Q     Okay.  We're going to play the rest of the

3        file, Terry 2 starting at 426.

4              (Tape Playing.)

5    BY MR. SEIDENFELD:

6        Q     Mr. Brooks, is that the recording, a piece

7        of the recording that you made during your

8        meeting with Mr. Cooper?

9        A     Yeah, that was the second.

10       Q     Okay.  I heard some other voices on the

11       recording.

12             Do you know who any of those voices were?

13       A     No.  People was coming in and out.  I

14       don't know.

15       Q     People were -- the whole -- during the

16       whole time of the recording that we played

17       people were coming in and out?

18       A     They weren't coming inside the office.

19       But dudes were sticking their head in front of

20       the door and talking.

21       Q     Was the door open?

22       A     It wasn't wide open.  You could hear it

23       opening and closing.  You could hear it.

24       Q     Okay.  Again, why didn't you say anything

25       to Mr. Cooper about what had happened,

1           Brooks - Confidential

2    allegedly happened, if you knew you were

3    recording this?

4    A    Like I said, I believe he knew that I was

5    recording, too.

6    Q    So why wouldn't you at least --

7    A    I didn't know what to think.  I never did

8    nothing like that before.

9         To answer your question, I did nothing

10   like this before.  I never had to try to get a

11   person to say what they were doing on tape.  I

12   never did it.

13   Q    I understand that you didn't know how to

14   get him to say what happened.

15        But why didn't you say what you alleged

16   had happened?

17   A    I didn't know how to speak about the

18   issue, period.

19   Q    Not even to say something along the --

20   Hey, Terry, why did you do this to me when --

21   A    No, not even to say that.  I wanted to

22   fight Terry.  And I don't really talk when I'm

23   ready to fight.  I wanted to fight.  That's

24   what I wanted to do.

25        So I went to speak to somebody that I

1                Brooks - Confidential

2   could speak to, which was Mr. Paul Washington

3   so he could advise me on what I should do.

4   Q    That was after you spoke to Terry?

5   A    Immediately after.  I don't know.  I

6   don't -- yeah, yeah, it was after I spoke to

7   Terry.

8   Q    Why did you go speak to Terry a second

9   time before you went to go speak to

10  Paul Washington?

11  A    I told you I don't know if I went before

12  or after, but I know I wanted to get him on

13  tape saying something sexual to me.

14       I didn't want to initiate it.  I wanted

15  him to say it on his own like he always do.

16  Q    You say "like he always do."

17       Are you referring to -- other than the two

18  incidents we discussed, are there any other

19  times that Mr. Cooper touched you

20  inappropriately?

21  A    No.

22  Q    Why did you say to him, What can I do to

23  show my appreciation?

24  A    What?

25  Q    Why did you say to Mr. Cooper, what can I

Page 225

1              Brooks - Confidential

2    do to show my appreciation?

3    A    He said where's my appreciation at.  He

4    said where's my appreciation.

5    Q    Right.

6         And then later you responded what can I

7    do --

8    A    Later?  Immediately.

9         I said what can I do to show you my

10   appreciation, because I wanted him to say

11   something sexual.  But he knew I was lying to

12   him and he said, good-bye.

13   Q    Why did you thank him for changing your

14   schedule?

15   A    I was having a hard time getting my

16   schedule changed.

17   Q    Why say thank you to someone who you claim

18   has just subjected you to this type of

19   treatment?

20   A    Why?

21        Maybe it would have been better not to

22   thank him.

23   Q    I'm trying to understand your thinking at

24   the time.

25        Can you tell us what your thinking was at

Page 226

1              Brooks - Confidential

2    the time you thanked him?

3    A     No, I can't.  I don't know what I was

4    thinking.

5    Q     After this meeting with Terry, you went to

6    go see Paul Washington?

7    A     I don't know if it was before or after.  I

8    spoke to Paul Washington.  I don't -- I don't

9    remember.

10   Q     What did you say to Mr. Washington

11   Mr. Paul Washington?

12   A     I told him what happened.

13   Q     And what did you tell him happened?

14   A     I told him that Terry touched me.

15   Q     Did you tell him that you went down to

16   speak with Terry after that happened?

17   A     He told me to go speak to

18   James Washington.  And I think -- that's why I

19   think I went and spoke to Paul Washington first

20   before I came back.

21   Q     I'm sorry?

22   A     That's why I think I went to speak to

23   Paul Washington first before I came back in the

24   building.  I don't remember, though.

25   Q     You said before you came back in the

Page 228

1           Brooks - Confidential

2       And I told him I wanted to fight him, but

3   I didn't know what to do.  He said don't, don't

4   do nothing like that.  Go speak to

5   James Washington.  And then I think I went back

6   in the building to speak to James Washington,

7   but he wasn't there.  And so I went to go get a

8   recording.

9       That's -- yeah, that's what I think

10  happened.  Then I went and tried to get

11  Terry -- try to record Terry saying something

12  inappropriate to me on tape.

13  Q    Did Paul Washington suggest you do that?

14  A    What, record him?

15  Q    Yes.

16  A    No.

17  Q    How come if Paul Washington told you just

18  to go report the incident, why did you go back

19  and speak to Terry if that's the order that

20  these meetings happened in?

21  A    I just told you I wanted to get him on

22  record saying something inappropriate to me.

23  Q    You said then you went to go and try and

24  speak to James Washington.

25      What happened?

Page 229

1               Brooks - Confidential

2     A    He wasn't there, or he was in a meeting or

3     something; I don't know.  I know he was not

4     accessible.

5     Q    What did you do next?

6     A    I left.  I went to the Bronx.

7     Q    To your wife's house?

8     A    Yep.

9     Q    Why didn't you file a police report?

10    A    I'm uncomfortable with police to begin

11    with.  One of my parole stipulations is not to

12    have any police contact.

13    Q    That stipulation prevents you from

14    reporting what you believe to be an assault?

15    A    No police contact means no police contact

16    to me.  I never filed anything on anybody

17    before, ever.  I usually get my own justice.

18    Q    Why didn't you get your own justice

19    against Mr. Cooper?

20    A    I didn't want to go back to prison.  I

21    have children.  I didn't want to go to prison.

22    Q    Did you tell your parole officer what

23    happened?

24    A    I did.

25    Q    Who is your parole officer?

Page 230

1                    Brooks - Confidential

2    A    Bido.

3    Q    And what's the last name?

4    A    That is the last name.

5    Q    The last name is P-i-d-o?

6    A    B-i-d-o.

7    Q    B-i-d-o.

8         And when did you tell your parole officer

9    about what happened?

10   A    Immediately, as soon as I seen her.

11   Q    Do you know if your parole officer

12   reported this to the police?

13   A    No.

14   Q    Did you --

15   A    I don't know.

16   Q    -- ask her not to?

17   A    No.

18   Q    What did your parole officer say to you

19   when you told her what you alleged happened?

20   A    She asked me if I was okay.  She asked me

21   was I comfortable staying at the Gates facility

22   anymore.  I said I'm all right.  He's not here,

23   because he wasn't there.

24        And that was about it.

25   Q    Do you know if this was before or after

Page 231

1            Brooks - Confidential

2    you spoke with Mr. James Washington the next --

3    the day after the alleged incident?

4    A    I believe it was after.

5    Q    It was after?

6    A    I believe so.

7    Q    You said it was -- you said you told your

8    parole officer immediately.

9         Was it the same -- was it that day?

10   A    The next time I seen her I told her.

11   Q    Do you remember when that was?

12   A    No.

13   Q    Was it after you had met with The Doe Fund

14   as part of their investigation?

15   A    I think so.  I'm not sure.

16   Q    When you left the Gates Avenue facility,

17   you said you went to your wife's house in the

18   Bronx?

19   A    Yeah.

20   Q    And what did you tell your wife about what

21   happened?

22   A    I typed up the report, that's what I did.

23   Q    Did you tell your wife about what

24   happened?

25   A    No.

Page 232

```
                    Brooks - Confidential
 1
 2    Q    Why not?
 3    A    I was embarrassed.
 4    Q    Why were you embarrassed?
 5    A    Because I felt I should have fought him.
 6    Q    Did you ever tell your wife about what
 7    happened?
 8    A    No.
 9    Q    To this day she has no idea?
10    A    No.
11    Q    Does she know you're involved in a
12    litigation?
13    A    No.
14    Q    Mr. Brooks, you said you told your parole
15    officer that you weren't afraid to be at the
16    Gates Avenue facility, despite what I alleged
17    happened.
18         Why was that?
19    A    Because Terry was gone.
20    Q    But not immediately, right?
21    A    What do you mean, "not immediately"?
22    Q    He was --
23    A    He wasn't there at the time.
24    Q    What do you mean, "at the time"?
25    A    And Washington told me that he wouldn't be
```

Page 233

1              Brooks - Confidential

2    coming back until the end of the investigation.

3    Q    And that's when you met with

4    Mr. Washington, James Washington the next --

5    the morning after the day of the incident?

6    A    I'm going to need a break.  I'm going to

7    need a break.

8    Q    Okay.

9    A    I got to smoke.  I got to go.

10         (Recess taken.)

11         (Deposition Exhibit 8, Document Entitled

12   "Complaint," marked for identification as of

13   this date.)

14   Q    Mr. Brooks, I'm going to hand you what

15   we've marked as Plaintiff's Exhibit 8.

16         Is that the complaint that you typed up

17   the night of July 21, 2016 at your wife's

18   house?

19   A    Yes, it is.

20   Q    And you wrote this on your own?

21   A    Yes, I did.

22   Q    Did anyone review it?

23   A    No.

24   Q    And -- strike that.

25         Before you submitted it to

Page 238

1            Brooks - Confidential

2        A year from the present, from today?

3        You have to say "yes."

4   A    Yeah, I believe so.

5   Q    Let's go back to your complaint.

6        When you returned to Gates Avenue, you

7   brought the complaint with you in an envelope?

8   A    Yes.

9   Q    And --

10  A    I don't know if it was in an envelope,

11  though.  I know I brought the complaint with

12  me.

13  Q    Was it folded -- did you -- so some people

14  couldn't see what was on it?

15  A    I don't remember.

16  Q    Okay.  What did you do with it?

17  A    I put it in Mr. Washington's mailbox.

18  Q    Okay.  At this point had you told anyone

19  about what happened, other than Paul

20  Washington?

21  A    No.

22  Q    And that was the night of July 21st, the

23  same day as the incident?

24  A    Yes.

25  Q    The next morning you met with

```
 1              Brooks - Confidential

 2   James Washington?

 3   A    Yes.

 4   Q    And what did you -- what did

 5   Mr. Washington tell you?

 6   A    He told me that he was -- there would be

 7   an investigation.  And until the completion of

 8   that investigation, Terry would not be coming

 9   back in, that I didn't have to worry about

10   seeing him.

11   Q    And was that the case?

12   A    No.  I did see him again.

13   Q    You saw him the day that he came in to be

14   interviewed by The Doe Fund, right?

15   A    Yes, I believe so.

16   Q    But he wasn't working, he was just there

17   to be interviewed?

18   A    As far as I know.

19   Q    And after that date did you ever see

20   Mr. Cooper again?

21   A    No.

22   Q    Okay.  And as far as you know, are you

23   aware that The Doe Fund terminated him?

24   A    I found that out later.

25   Q    Okay.  When later?
```

1              Brooks - Confidential

2    A    When somebody from The Doe Fund called me.

3    Q    Okay.  Do you know if it was Kanise

4    from --

5    A    I believe it was Kanisa.

6    Q    And that was shortly after you had met

7    with The Doe Fund as part of their

8    investigation?

9    A    It was after.  I don't remember how long

10   after, but it was after.

11   Q    And when you met with -- when The Doe Fund

12   conducted their investigation, who did you meet

13   with?

14   A    Two HR people and Mr. Washington.

15   Q    Ms. Gilmore?

16   A    That name sounds familiar, yes.

17   Q    The woman who's been -- she just stepped

18   out.

19        The woman who has been sitting here with

20   us here today?

21   A    Yes, she does look familiar.

22   Q    And another person from The Doe Fund?

23   A    Yes.

24   Q    And they took your allegation seriously?

25   A    What do you mean did they take my

Page 241

1                Brooks - Confidential

2   allegation seriously?

3   Q     They took you seriously; they didn't blow

4   you off and say go away?

5   A     They asked me a series of questions.

6   Q     To find out what happened; is that

7   correct?

8         To understand your allegations, correct?

9   A     They asked me questions.

10        What their motive was, I don't know.

11  Q     Mr. Brooks, in this case, you're

12  complaining that The Doe Fund and

13  Mr. Washington and Mr. Cooper retaliated

14  against you.

15        What's the basis for your claim?

16  A     I never said Mr. Cooper retaliated against

17  me.

18  Q     Who retaliated against you?

19  A     The employees at The Doe Fund.

20  Q     Which employees?

21  A     Mr. Wiggins, who was disturbing my routes,

22  not allowing me to go on my routes.  He refused

23  to give me a new schedule.  He would pull me

24  off of my routes.

25        Even though I was there on time and on the

Page 242

                    Brooks - Confidential

1     van, he would have me taken off the van and had

2     to stand on the corner, and kind of made me a

3     rover; meaning that I had a steady site that I

4     was going to, and he pulled me off of that

5     site, which was the Vernon site, without my

6     knowledge.

7           And what else?

8     Q    Let me -- we'll go -- actually, I'm sorry,

9     tell me the other people who you claimed

10    retaliated against you, and we'll go back

11    through.

12    A    It was Mr. Wiggins.  I think it was

13    Mr. Stevens.  He used to wake me up every

14    morning even though I had a sleeping pass.  And

15    he would wake me up, and I was not able to get

16    sleep so I could go to work.

17          And other little things that was

18    happening.  I tried to recall most of the

19    things that was going on.

20    Q    What else was going on that you allege as

21    retaliation?

22    A    Like I said, with the work sites.

23    Q    Mr. Wiggins?

24    A    Mr. Wiggins.

25

Page 243

1              Brooks - Confidential

2    Q    So for now -- we'll go through the

3    incidents.  But I just want you to tell me all

4    the people who you claimed retaliated against

5    you?

6    A    Mr. Washington.

7    Q    James Washington?

8    A    Yeah.

9    Q    Okay.  Who else?

10   A    Timothy Matthews.  Eric, who was the head

11   of security.

12   Q    Anyone else?

13   A    That's all, to my recollection.

14        Oh, well, Mr. O'Neil Young.  He was kind

15   of -- he was giving me a hard time.  But, you

16   know, I don't know if that was retaliation.  I

17   don't know if it was intentional.

18   Q    Anyone else?

19   A    Not that I recall at the moment.

20   Q    What did Mr. Young do to retaliate, if

21   anything, against you?

22   A    Well, I said I don't know if it was

23   retaliation or whatever.  He was just giving me

24   a hard time.

25   Q    About what?

Page 244

                    Brooks - Confidential

1

2    A    He was pretending that I wasn't trying to

3    get my own apartment.

4    Q    Anything else?

5    A    Not that I remember.

6    Q    Eric, head of security, what did he do?

7    A    I had an overnight pass and I was out at

8    my wife's house.  Mr. Washington had gave me

9    permission to go out and come in after 10:00.

10   And when I returned he said that I didn't have

11   an overnight pass.  And that I wasn't allowed

12   to go into my room.  And I protested and I told

13   him that Mr. Washington himself gave me

14   permission, as well as Mr. Porter, who was my

15   counselor at the time.

16   Q    When was this?

17   A    This was after the incident with

18   Mr. Cooper.

19   Q    When?

20   A    I don't remember.  I recorded it, though.

21   I recorded a portion of it.  I didn't get to

22   record the first part because I didn't know

23   that this was going to happen.  So when I

24   walked in I didn't know that it was going to be

25   a problem.

Page 245

1              Brooks - Confidential

2         And when I protested against it saying I

3    was going up to my room, he told me that I had

4    to sit in some corner and wait until --

5    sometime in the morning.  And I told him I'm

6    not going to do that.  He told me that he's

7    going to call the police on me.

8    Q    Did you go back to your room?

9    A    I did not.

10   Q    Where did you go?

11   A    I went and sat down.

12   Q    Where did you sit down?

13   A    I think I went to the backyard to smoke a

14   cigarette.

15   Q    Do you know what time you returned?

16   A    No.

17        Eventually, you know --

18   Q    No, I'm asking you what time you came back

19   to Gates Avenue.

20   A    No, I don't remember what time I came back

21   to Gates.

22   Q    Anything else Eric did to retaliate

23   against you?

24   A    Well, he was used by Timothy Matthews,

25   telling me that I lost my bed.  This happened

Page 246

1              Brooks - Confidential

2    several times.

3         MR. SEIDENFELD:  I'm sorry, could you just

4    read back.

5         (Record read.)

6    Q    Okay, and when was that?

7    A    I don't know the exact date.

8    Q    Was it close towards the time when you

9    left the Gates Avenue facility?

10   A    Was it towards the time that I left the

11   Gates Avenue facility?

12   Q    You want me to rephrase it?

13   A    Yes, please.

14   Q    How long before -- strike that.

15        How close in time did this happen to the

16   time when you left Gates Avenue?

17   A    Permanently?

18   Q    In July of 2017.

19   A    I can't really recall.

20        What I do know is it happened on several

21   occasions.

22   Q    When was the last time it happened?

23   A    I don't know.  I recorded it.  I recorded

24   it, and I recorded Eric saying that Tim -- that

25   it was Tim that was saying that I lost my bed.

Page 247

1              Brooks - Confidential

2    And he don't -- and that he believes it was

3    retaliation against me.  He said he don't know

4    if it was something personal with me or

5    whatever.

6    Q    Eric said that you?

7    A    Eric said that to me, because he said it

8    was abnormal for them to be doing that to me.

9    Q    Anything else that Eric did to retaliate

10   against you?

11   A    Eric was part of the security there.  So

12   the security would often come up to my room

13   when I'm sleep and ask me for a urine.

14   Q    Was that part of your parole drug testing?

15   A    They are not parole.

16   Q    Was it part --

17   A    They are not my parole officers.

18   Q    Was it part of the terms you agreed to

19   when you agreed to stay at the Gates Avenue

20   facility?

21   A     No.  That was part of The Doe Fund

22   program.  I was no longer a part of The Doe

23   Fund program.  They were not allowed to ask me

24   for urine anymore.

25   Q    When you say you were no longer a part of

Page 248

1                  Brooks - Confidential

2    The Doe Fund program, what do you mean?

3    A    I was no longer a apart of The Doe Fund

4    program meaning, I was no longer on the work

5    staff, on the work crews.  I was no longer

6    eligible to get the trainings that was offered

7    and, therefore, I was no longer -- I was no

8    longer eligible to go on my weekend visits with

9    my wife and children.

10   Q    But you were still residing at The Doe

11   Fund facility?

12   A    Because it's a shelter.  It's a shelter.

13        They did everything that they could do to

14   kick me out.  They wanted me out.

15   Q    Who wanted you out?

16   A    All of them.  Particularly,

17   Timothy Matthews -- and -- as was stated by

18   Eric.  And so they tried to make life difficult

19   for me.  They changed my room.  That's how my

20   room got changed from the first guy, Turk, that

21   I was rooming with, into a larger room

22   downstairs.

23   Q    Didn't you request for your room to be

24   changed?

25   A    I did not.  No, I did not.

Page 249

                    Brooks - Confidential

1

2    Q    So what else did -- anything else that

3    Eric did to retaliate against you?

4    A    Not that I remember.  I don't remember

5    every little thing that they did.

6         I just remember -- what I do remember, it

7    was something every single day.

8         But, you know, that was one of the, you

9    know, problems was the urine.

10        What they did have permission to do, being

11   a DHS shelter, was to take a Breathalyzer test.

12   I did that.  But I wouldn't urine for them.  So

13   they were upset with me about that.

14   Q    That just happened one time?

15   A    No, it happened several times.

16   Q    Do you remember when?

17   A    No, I can't pinpoint every time that it

18   happened, all the dates.

19   Q    Okay.  And how did Mr. Matthews retaliate

20   against you?

21   A    By telling the security that I had lost my

22   bed when I had a right to be out at that time.

23   There was a culture there where you call before

24   the time and let them know that you were coming

25   late, that they would hold the bed.

Page 250

1                Brooks - Confidential

2        I would call the front desk and let them

3    know I was behind for whatever reason, and that

4    became a problem.  And even though I would call

5    in advance, they would take my bed anyway and

6    make me sit inside this room for hours.

7    Q    How many times -- when did that happen?

8    A    It happened on a few occasions.  I don't

9    remember the exact times, but I do recall tape

10   recording one of the times.  Maybe once or

11   twice I tape recorded it.

12   Q    Anything else Timothy Matthews did to

13   retaliate against you?

14   A    No.  It was more, you know, verbal

15   attitudes and things of that nature.  I

16   recorded what I had.

17   Q    What did Mr. Stevens do to retaliate

18   against you?

19   A    I told you he would come --

20   Q    Just the wake up?

21   A    -- to my door and bang on the door and

22   jingle his keys and slam doors in the hallways

23   and I couldn't sleep.

24   Q    What about -- anything else that

25   Mr. Stevens did?

Page 251

1                Brooks - Confidential

2    A     You know, he had a standoffish attitude.

3    All of them had a standoffish attitude when

4    dealing with me.  I didn't care.  I figured

5    that they didn't like me because of the report

6    that I made against, you know, one of their

7    coworkers.  So it was hostile.  They were

8    hostile.

9         Also, I do know that -- I don't know who

10   did it, but one of them told some of the work

11   crew what happened with Terry.  And I remember

12   speaking with a guy and he said Terry got fired

13   because he touched somebody.  And I don't know

14   if he knew it was me or not, but . . .

15   Q     Who told you this?

16   A     Somebody who worked on one of the routes.

17   And I went in and spoke to Mr. Washington about

18   it.  I was very upset.  And I told

19   Mr. Washington I thought that this was supposed

20   to be between us and HR.

21        And he act like he was surprised, like he

22   didn't know how it got out of the room.  But

23   only me, him and HR was there.  So, you know,

24   who said something.

25        And so --

Page 252

1                    Brooks - Confidential

2    Q    The person who said that Terry got fired

3    for touching someone didn't say -- didn't tell

4    you that he knew it was you?

5    A    No, he didn't say that.

6    Q    Okay.  So as far as you know, whatever was

7    told didn't specifically relate to your

8    incident with Terry, or you weren't identified?

9    A    No.  He didn't say if he knew it was -- I

10   don't know if he knew it was me or not, or if

11   he was mentioning that to -- hoping that I

12   would say something about it.  But I just

13   listened.

14         And I said, Really, oh, okay.  And that

15   was that.

16   Q    When -- when did this happen?

17   A    I don't remember when it happened.  I just

18   remember it happened.  I don't remember what

19   date it was.

20   Q    Did it happen in 2017?

21   A    I don't remember when it happened.

22   Q    Do you remember where you were working

23   when it happened?

24   A    No.

25   Q    Was it when you were at 4C?

Page 254

1              Brooks - Confidential

2    anymore and Terry was gone, you know.

3        And I addressed that to Mr. Washington,

4    like, I shouldn't feel like -- I shouldn't be

5    retaliated against by the staff.  If that was

6    their friend, they should have told him to stop

7    doing what he was doing.

8    Q    How did Mr. Williams retaliate against

9    you?

10   A    Well, he was -- I was trying to get my

11   change of program, and they told me I had to

12   speak it Wiggins.

13       I went to speak to Wiggins one day, and he

14   started talking, like, tough street talk.  I

15   recorded him saying that he kick ass from -- in

16   Ready, Willing & Able to the streets.  He's

17   well-known in Harlem, from the east side to the

18   west side.

19       To me it appeared to be a intimidation

20   thing where he was trying to intimidate me.  So

21   I concluded he knew about the situation that

22   happened with me and what's his name.  So --

23   Q    Why did you conclude that based on that?

24   A    Because I had no problems with that man. I

25   didn't even know him.  All I knew was he was

Page 255

```
 1              Brooks - Confidential
 2   the guy I had to go speak to.
 3   Q    Speak to about what?
 4   A    About getting a new schedule, a new work
 5   schedule.
 6   Q    And do you know what Mr. Wiggins' title
 7   was?
 8   A    No.  But I do -- what people told me was
 9   that he was like a Mr. Washington for the
10   porter.
11   Q    For the who?
12   A    For the porter, I believe.  I could be
13   wrong.
14        But people told me he was like a
15   Mr. Washington, that he was somebody.  And when
16   Mr. Washington is not there, he was the guy.
17        And he was making little subtle threats.
18   Q    What kind of threats?
19   A    Indirect threats.
20   Q    What did he say?
21   A    I told you.  Like how he kick ass from
22   here to Harlem, and everybody -- he's about
23   that mess, you know, meaning violence.
24        And so he was giving me a tough time with
25   getting my schedule, talking about he not going
```

Page 256

1               Brooks - Confidential

2    to give me two weekend days off.  You know, I'm

3    going to get what he give me.  Stuff like that.

4    Q    Is this when you were on the Workforce

5    Development phase of the program?

6    A    This was when I was doing the street

7    cleaning, trying to get my thing changed.

8    Because even though Terry wasn't there, I still

9    hadn't got a schedule, a work schedule.

10        And I was trying to get my hands on a work

11   schedule, because I had to turn in my work

12   schedule to my counselor and to my parole, and

13   they refused to give it to me.

14        And so he was the guy I was told I had to

15   speak to.  And when I did, this is what

16   happened.  He was telling me about how he kick

17   ass.  And he was telling me he wasn't going to

18   give me days.

19   Q    Anyone else you claim retaliated against

20   you?

21   A    No.  I mean, I recall Mr. Ronald Holly

22   saying that I need to get my shit together.

23   And I didn't understand where that was coming

24   from.  This was one of the opportunities where

25   he pulled me off of the work truck.  And I'm

Page 257

1              Brooks - Confidential

2    like, What do you mean I need to get my shit

3    together?  He said you need to get your shit

4    together.

5         I was there on time.  I was on the work

6    truck.  They pulled me off of the work truck,

7    made me stand on the corner and said I was

8    going to a different route.

9         And so I spoke to Mr. Bell about it,

10   and . . .

11   Q    Anyone else retaliated against you?

12   A    I wouldn't say retaliated against.  I was

13   just -- I was having a lot of hard times on the

14   sites.  I would be doing my job.  And there was

15   a guy at the Vernon route, and the Myrtle route

16   that would just give me a hard time.

17   Q    Do you remember his name?

18   A    No.  He was the supervisor for those

19   routes.  The Vernon route.  I can't remember

20   his name.  I probably wrote it down somewhere.

21   But right now I don't remember his name.  He

22   would always run up on me and, you know, bother

23   me about something.

24        I'm a good worker.  I like to work.  So I

25   know my work ethic is exemplary.  So I couldn't

Page 258

1                   Brooks - Confidential

2    understand why he was bothering me so much.

3    Q    Anyone else?

4    A    Not that I could recall at this point.

5    Q    How did Mr. Washington retaliate against

6    you?

7    A    I believe I explained that already.

8    Q    I don't believe you did.

9         Can you answer again?

10   A    I was speaking with him about all of this

11   stuff.  He would tell me that it was going to

12   be taken care of, and he would send me to

13   somebody, and then it would be a problem.

14   Q    What stuff?

15   A    Everything from taking off of work.  I got

16   put in for a no call no show.

17   Q    Did anything -- who put you in for a no

18   call no show?

19   A    Mr. Bell, put me in for a no call no show.

20   And anyway it wasn't true.

21        Me and Mr. Washington had discussed that,

22   and I was getting the day off because I needed

23   to see my parole officer and then I needed to

24   return back to the facility to speak to HR.

25        On that day I was put in for a no call no

1          Brooks - Confidential

2    show.  And I was very clear with Mr. Washington

3    about it, and I still got put in for a no call

4    no show.

5    Q    How do you know you were put in for a no

6    call no show?

7    A    Because he told me.  Mr. Bell told me I

8    was put in for a no call.  He's the one who did

9    it.

10   Q    Would you have any -- were there any

11   repercussions for --

12   A    Yeah.  It's a writeup.  It's on my work

13   record.

14   Q    Did anything happen?

15   A    What do you mean, "did anything happen"?

16   Q    Did you lose an assignment?

17        Did you lose any pay?

18   A    No, it's --

19   Q    Were you suspended, demoted?

20        Were you terminated?

21        Did anything happen to you as a result of

22   you alleging you were written up for a no show?

23   A    It was put on my record that I didn't call

24   or didn't show.  And it was expressed to me if

25   I got more no call no shows, that I would be

Page 260

```
 1              Brooks - Confidential
 2    terminated from the work assignments.
 3          I didn't think that was fair because
 4    Mr. Washington is the one that told me I could
 5    have off on that day; and he did the same thing
 6    with my late pass.
 7          He told me that I had a late pass, and
 8    when I came in, I was accosted by the security
 9    and berated and yelled at, talking about why
10    I'm not in on time.
11    Q    When was this?
12    A    The time I told where I told you he said
13    that he was going to call the police on me.
14    Q    Who said he was going to call the police
15    on you?
16    A    Eric.
17    Q    Okay.  Any other people who retaliated
18    against you?
19    A    That's all I could recall at this time.
20    Q    You also claimed for discrimination based
21    on your race.
22          Who discriminated against you based on
23    your race?
24    A    I feel it was not -- it was not only my
25    race.  It was my status as well.
```

Page 261

1              Brooks - Confidential

2    Q    First, I want to ask you who do you allege

3    discriminated against you based on your race?

4    A    All the administers at The Doe Fund.

5    Q    How did they discriminate against you

6    based on your race?

7         Strike that.

8         Who at The Doe Fund?

9    A    Timothy, James Washington, Mr. Wiggins.  I

10   don't know if his name -- his name is

11   Anthony Wiggins, Mr. Stevens.

12   Q    How did Timothy discriminate against you

13   based on your race?

14   A    I feel like they wouldn't have did that if

15   I was another race.

16   Q    And what do you base that on?

17   A    Their attitudes towards me.

18   Q    Were there other people at The Doe -- at

19   the Ready, Willing & Able program who they

20   treated differently?

21   A    I don't know about what they did with

22   other people.  I wasn't in other people's

23   business like that.

24   Q    Did Timothy say anything to you that made

25   you believe he was discriminating against you

Page 262

1              Brooks - Confidential

2  based on your race?

3  A    Are you asking me did he say any racial

4  comments?

5  Q    Did he?

6  A    I can't remember.

7  Q    What's Timothy's race?

8  A    I believe he's either Spanish or

9  Caucasian.  I'm not sure.

10  Q    How did Mr. Washington discriminate

11  against you based on your race?

12  A    The same thing.

13  Q    Mr. Washington, the same thing you mean by

14  giving you attitude?

15  A    Yeah.

16  Q    Did Mr. Washington say anything to you

17  that you believed that made you believe that

18  this attitude was based on your race?

19  A    Not that I recall.

20  Q    And what's Mr. Washington's race?

21  A    I don't know.

22  Q    You don't know if Mr. Washington's

23  African-American?

24  A    No, I believe they said he was Dominican.

25  I don't know.  I'm not sure.

Page 264

1                   Brooks - Confidential

2    African-American?

3    Q     Isn't it true that he's African-American?

4    A     Okay.

5    Q     Is that yes?

6    A     If you say so.

7    Q     It's not if I say so.

8    A     I don't know their ethnical background.

9    Q     Would it surprise you to know he was

10   African-American?

11   A     No.

12   Q     What facts do you have to support your

13   claim that Mr. Stevens discriminated against

14   you based on your race?

15   A     I believe that I would have been treated

16   different if I was from another race.

17   Q     So your only basis is your opinion?

18   A     Yeah.

19   Q     What facts -- strike that.

20         Do you know -- isn't it true that

21   Mr. Wiggins is black or African-American?

22   A     I don't know that.

23   Q     Would it surprise you to know that

24   Mr. Wiggins is African-American?

25   A     Okay.

Page 265

1              Brooks - Confidential

2    Q    What facts do you have to support your

3    claim that Mr. Wiggins treated you differently

4    because of your race?

5    A    I believe I would have been treated

6    different if I was somebody from another race.

7    Q    Is the only basis for that allegation your

8    opinion?

9    A    That's how I feel, yes.

10   Q    Okay.  What facts do you have to support

11   your claim that Timothy Matthews discriminated

12   against you based on your race?

13   A    Things that he was doing.

14   Q    What things?

15   A    Getting me kicked out.  Having me put to

16   sit in a room after I did everything that the

17   organization requested that I do, I still was

18   punished for it.

19   Q    What did --

20   A    I believe he wouldn't have did that to me

21   if I was from another race.

22   Q    And that's just based on your opinion?

23   A    That's how I feel about it.

24   Q    Okay.  Anyone else you allege

25   discriminated against you based on your race?

Page 266

                    Brooks - Confidential

1

2    A    Not that I recall.

3    Q    Mr. Brooks, who did you tell about your

4    allegations with -- who did you tell -- strike

5    that.

6         Mr. Brooks, who did you tell about what

7    you alleged happened between you and

8    Mr. Cooper?

9    A    I told Mr. Paul Washington.  I told

10   Mr. James Washington.  I told my counselor.

11   Q    Who is your counselor?

12   A    Yolanda.

13        I told my PO.  I told a few counselors.

14   Q    Counselors where?

15   A    Therapists.

16   Q    Who?

17   A    Early on when we read the report, I told

18   that man.

19   Q    Dr. Reich?

20   A    Yes.

21   Q    Did you tell anyone else at The Doe Fund?

22   A    Not that I recall, no.

23   Q    And who is Yolanda?

24   A    She was my drug and alternative to

25   violence counselor.

Page 270

1                    Brooks - Confidential

2    BY MR. SEIDENFELD:

3        Q    Mr. Cooper -- I'm really sorry.

4        Mr. Brooks, I apologize.

5             Mr. Brooks, you have a claim in this

6        litigation, sir, claiming -- alleging sexual

7        harassment; is that correct?

8        A    Did you just ask me if I have a claim

9        against sexual harassment --

10       Q    You have a claim of sexual harassment,

11       correct?

12       A    Yes.

13       Q    Other than the incidents we discussed

14       involving Mr. Cooper, is there anything else

15       that supports your -- any other facts -- do you

16       have any other facts to support your claim of

17       sexual harassment?

18       A    Just the recordings that I produced.

19       Q    Other than the incidents with Mr. Cooper

20       on July 21, 2016, you don't allege that you

21       were sexually harassed in any other way?

22       A    By anyone else, you mean?

23       Q    By anyone else, certainly, yes.

24       A    No, I don't.

25       Q    What, if anything -- what about -- did

Page 271

1              Brooks - Confidential

2    Mr. -- do you allege that Mr. Cooper did

3    anything other than what we discussed that

4    constituted sexual harassment?

5    A    No.

6    Q    Before we spoke briefly about your

7    allegations of retaliation.  You mentioned some

8    names and some facts that you believe were

9    retaliatory.

10        For Mr. Matthews, what facts do you have

11   to support the claim that he retaliated against

12   you?

13   A    A recording where Eric stated that.

14   Q    And what's the basis that that was based

15   on retaliation?

16   A    I had been doing everything I was supposed

17   to do in the program, and I had been following

18   all the rules and guidelines set up for me

19   while living in the Gates Avenue facility.

20   They had no reason to punish me.

21   Q    So just your opinion?

22   A    That's a fact.

23   Q    I'm asking -- no, no, no.  I'm not

24   asking you about what happened.

25        I'm asking you what facts support the

Page 272

1              Brooks - Confidential

2    claim that what you said happened was based on

3    retaliation?

4    A    I told you the recordings that I have with

5    other staff members saying that what they were

6    doing to me was abnormal.  It's something

7    that's not done.  And it's something that my

8    hand didn't call for.  And it wasn't just Eric,

9    it was also Mr. Bell, who was also a

10   supervisor.  He took over from Mr. Cooper's

11   position as the dispatch supervisor.  And he

12   apologized to me because he knew that they were

13   retaliating against me.

14        And I got that on record as well.

15   Q    How did Mr. Bell know what happened

16   between you and Mr. Cooper?

17   A    I don't know how he knew.  I don't know

18   how he knew or if he knew that something was

19   going on with Mr. Cooper.

20        But what I do know is he knew people were

21   doing things to me that my hand didn't call

22   for, and he apologized to me for it.

23   Q    So you don't know if Mr. Bell knew about

24   what happened between you and Mr. Cooper?

25   A    I never discussed it with him.

Page 273

1              Brooks - Confidential

2    Q    Okay.  Do you know if Mr. Matthews knows

3    about what happened between you and Mr. Cooper?

4    A    I believe so.

5    Q    And what's the basis for that opinion?

6    A    What's the basis of that opinion, is

7    after -- prior to this situation, I didn't have

8    any problems with any of the staff.

9         After the situation it was a hostile

10   situation with all of the staff.  And I never

11   had no personal disagreements with anyone.

12   Q    You don't know for a fact that

13   Mr. Matthews knew about the incident between

14   you and Mr. Cooper?

15   A    I never told him.

16   Q    And you don't know if anyone else told

17   him?

18   A    I was never there to witness someone tell

19   him.  But I feel that he did --

20   Q    And that's just your opinion?

21   A    I'm quite sure they did.

22        I mean, he's administration staff.  I had

23   dudes in the work crew that knew something

24   happened.  So I'm quite sure Mr. Matthews knew.

25   Q    You don't have any factual basis for that?

Page 274

1                 Brooks - Confidential

2    A    I never witnessed somebody tell him, and I

3    never told him myself.

4    Q    How about Eric, head of security; do you

5    know if he knew about the allegations of the

6    incident between you and Mr. Cooper?

7    A    I believe he knew.

8    Q    How -- why do you believe that?

9    A    Based on how he was treating me.  He was

10   also hostile towards me and he threatened to

11   call the police on me.  And I never had a

12   problem with him before.  I didn't disrespect

13   him.  I wasn't loud or boisterous towards him.

14   Q    But you never told him?

15   A    Did I ever tell him about the incident?

16   Q    Mm-hmm.

17   A    I never told him about the incident, no.

18   Q    Did you ever witness anyone tell him?

19   A    No.

20   Q    Do you know if O'Neil Young was aware of

21   the allegations -- strike that.

22        Do you know if O'Neil Young knows about

23   the allegations you made concerning you and

24   Mr. Cooper?

25   A    I don't know.

Page 275

1             Brooks - Confidential

2    Q    Did you ever tell him?

3    A    I never told him.

4    Q    Did you ever see anyone tell him?

5    A    No, I did not.

6    Q    Do you know if Ronald Holly knows about

7    your allegations regarding Mr. Cooper?

8    A    I believe that he did.

9    Q    Did you ever tell him?

10   A    No, I did not.

11   Q    Did you ever witness anyone tell him?

12   A    No, I did not.

13   Q    Do -- it's only your opinion that you are

14   basing that belief on?

15   A    Not just opinion.  The evidence is in the

16   way they were treating me.  They were treating

17   me in a hostile nature after the incident.

18   Before the incident I didn't have a problem

19   with any of these gentlemen at all.

20   Q    But you don't know for sure if he knew?

21   A    I never witnessed it.

22   Q    Do you know if Mr. Wiggins knows about the

23   allegations between and you Mr. Cooper?

24   A    I believe so.

25   Q    And did you tell him?

Page 276

1              Brooks - Confidential

2   A    No, I did not tell him.

3   Q    Did you ever witness anyone tell him?

4   A    No.

5   Q    What do you base the belief on?

6   A    His treatment of me.  His hostile behavior

7   towards me.  His, you know, indirect threats of

8   violence.

9   Q    What's your belief that you alleged that

10  those threats are based on retaliation?

11  A    Because I did not know the man prior to

12  this.  I never met him.  I never seen him

13  before.  There was no reason for him to be

14  hostile with me.

15  Q    So you didn't interact with Wiggins before

16  of the incident with Cooper?

17  A    No, I did not.

18  Q    Did you interact with Ronald Holly before

19  the incident with Mr. Cooper?

20  A    Yes.

21  Q    Did you interact with O'Neil Young before

22  the incident with Cooper?

23  A    No.

24  Q    Did you interact with Eric before the

25  incident with Mr. Cooper?

Page 277

1                    Brooks - Confidential

2    A    Yes.

3    Q    Did you interact with Mr. Matthews before

4    the incident with Cooper?

5    A    Yes.

6    Q    Did Mr. Stevens know about the allegations

7    you made against Mr. Cooper?

8    A    I believe so.

9    Q    Did you ever tell him?

10   A    No, I did not.

11   Q    Did you ever see anyone tell him?

12   A    No, I did not.

13   Q    What's the basis of your belief he knew?

14   A    Because he was hostile towards me as well.

15   Q    And you told Mr. Washington about the

16   incident between you and Mr. Cooper, correct?

17   A    Yeah.

18   Q    What facts do you have to support your

19   claim that Mr. Washington retaliated against

20   you based on the fact that you told him about

21   the incident with Mr. Cooper?

22   A    Like I addressed earlier, I would ask him

23   for permission to stay out late or to have a

24   home pass, and he would give me permission.

25   Then when I came back, I was in trouble.  And I

Page 278

1            Brooks - Confidential

2    was punished for it.

3    Q    How were you punished?

4    A    I told you that earlier.  I was made to

5    sit in a room and wait for hours before I was

6    able to get in my bed or go to the room.

7            MR. SEIDENFELD:  I think we're going to

8    finish for today.

9            MR. BARTOLOMEO:  I'd like to at least put

10   on the record that on behalf of

11   Defendant Cooper, we are reserving our right to

12   call the witness back to complete the

13   deposition, or at least to take the deposition

14   of the witness pursuant to the federal rules.

15           MR. SEIDENFELD:  And we reserve the right

16   to bring Mr. Brooks back for the remainder of

17   the time that we have under the rules.

18           MR. BARTOLOMEO:  And can we just -- can

19   you just go off the record for a second.

20           (Discussion off the record.).

21           MR. SEIDENFELD:  The interrogatories that

22   we introduced today as Exhibit 9 are not

23   verified.  We had asked Mr. Brooks' counsel to

24   verify them today, and she responded that they

25   would not able -- that Mr. Brooks would not be

Page 312

1                          Brooks

2     Q     Where did it save the files?

3           When you took a picture, where was the

4     information of that picture saved?

5     A     Yeah, on a memory card.

6     Q     And where is that memory card today?

7           Does your attorney have it?

8     A     No.

9     Q     Do you still have it?

10    A     Yes.

11    Q     Are the pictures that you provided to your

12    attorney and which she's provided to us, excuse

13    me, not the pictures -- withdrawn.

14          What did you use that camera for in terms

15    of -- related to this litigation?

16    A     I used the camera to bluff The Doe Fund

17    employees into getting a written confession out

18    of Terry.  That's why I used the camera.

19    Q     Did you take any pictures, video or audio

20    recordings with that camera that are related to

21    this litigation?

22    A     No, I did not.  I did that with my phone.

23    Q     Where did you get the camera from?

24    A     I bought it.

25    Q     And when did you buy the camera; was it

CONFIDENTIAL

Page 319

Brooks

2   discriminated against because of your race.

3          In what ways do you claim Mr. Cooper

4   discriminated against you based of your race?

5   A     He knew I was in a vulnerable situation,

6   being homeless, being Black, just coming home

7   from prison, being on parole, and he took

8   advantage of that.

9   Q     And I asked you in what sense do you

10  believe you were being discriminated,

11  specifically by Mr. Cooper, against you, based

12  on your race; what type of things did he do?

13         MS. O'CONNELL:  Objection.

14  A     He touched me.

15  Q     Other than the alleged -- the allegations

16  that you made with respect to any sort of

17  contact that Mr. Cooper, and you had with each

18  other, what else, if anything, do you claim

19  that he did or said that led you to believe

20  that he was discriminating against you based on

21  your race?

22         MS. O'CONNELL:  Objection.

23  A     He tried to use his position to violate

24  me.  He was trying to use, I guess, his

25  position, his superior position as a means to

CONFIDENTIAL

Page 320

                              Brooks

1
2     get what he wanted.
3          He knew I needed my schedule changed, so
4     he kind of tried to use that over my head.
5          MR. BARTOLOMEO:  I'm going to move to
6     strike the last answer as nonresponsive.  And
7     I'll ask it again very clearly.
8     Q    Mr. Brooks, in what ways do you allege
9     Mr. Cooper discriminated against you based on
10    your race?
11         And I'll just ask that you listen to the
12    question and address that question
13    specifically.
14         MS. O'CONNELL:  Objection.
15    A    I believe he did what he did because I was
16    ^Black.
17    Q    And what did you say that he did.
18         Are you referring to the incident on the
19    21st?
20    A    Yeah, he used that as an intimidation
21    tactic.
22    Q    That you're Black as an intimidation
23    tactic?
24         I don't understand.  Can you clarify for
25    us.

CONFIDENTIAL

Page 321

1                           Brooks

2       A    He did what he did because I was black, in

3       a vulnerable situation.  And he used everything

4       that he could to be intimidating.

5       Q    Okay.  And what facts do you have to

6       support that Mr. Cooper discriminated against

7       you based on your race?

8       A    What facts do I have?

9       Q    Yeah.

10           What facts do you have to support your

11      allegations that Mr. Cooper discriminated

12      against you based on your race?

13      A    Well, I got a bunch of recordings and

14      statements that I made immediately after the

15      situation, so . . .

16      Q    And what -- do you play in the

17      recordings -- withdrawn.

18           So can you tell us anyone who is a

19      different race than you that Mr. Cooper treated

20      more favorably?

21      A    I wasn't around him like that.  He was not

22      my peer.  I wasn't around him.  I only went to

23      him when I had to.

24      Q    So do you have any understanding that

25      Mr. Cooper treated anybody more favorably or

Page 322

1                        Brooks

2      less favorably who is not black?

3      A     I don't know.

4      Q     In what ways do you claim the audio

5      recordings support your allegation that

6      Mr. Cooper discriminated against you based on

7      your race?

8      A     Well, a lot of different people knew

9      Mr. Cooper's personality, and they described it

10     on those audio recordings.

11     Q     And I'm asking you specifically, you've

12     made a very severe or significant claim against

13     my client, Mr. Brooks.

14           And I just want to understand what do you

15     say supports your allegation that Mr. Cooper

16     discriminated against you based on your race,

17     what on those recordings.

18     A     I don't remember.  I haven't listened to

19     those audio recordings.  I've been trying to

20     put the audio recordings behind me.  I've been

21     trying not to think about it.

22           So I don't listen to it.

23     Q     When was the last time you listened to the

24     recordings, Mr. Brooks?

25     A     I don't remember.  I don't remember.

CONFIDENTIAL

Page 324

1                        Brooks

2     know what facts you have or information you

3     have to support those allegations?

4          MS. O'CONNELL:  Objections.

5     A    No.  I know that I was touched by a man,

6     and it was not my will, and I got proof that

7     he's like that.  And I know that people that

8     was in The Doe Fund also experienced his

9     behavior, and that's what I recorded, period.

10    Q    And you've said now multiple times you

11    have "proof."

12         I'm just asking you to tell me what that

13    proof is.

14    A    That proof is that your client,

15    Mr. Cooper, walked around sexually harassing

16    people all day.  And he was well-known for it.

17    He did it for many years.

18         But me, he touched.  And other than that,

19    I don't know what you're asking me for.

20    Q    Okay.  Earlier today you've testified that

21    you really didn't spend very much time at all

22    with Mr. Cooper.  And I'm paraphrasing

23    obviously.  But that you really didn't interact

24    with him and you didn't see him much.

25         Do you recall giving that testimony?

CONFIDENTIAL

Page 325

Brooks

1

2      MS. O'CONNELL:  Objection.

3   A    I didn't tell you that I didn't see him

4   much.  I didn't hang out with him.  We wasn't

5   friends.  We didn't socialize.  When I had to

6   interact with him, which was very rare, it was

7   when I needed something.

8   Q    Okay.

9   A    When I needed something, that's it.  I

10  would see him around the building every day.

11  Yes, I seen him around the building every day.

12  I didn't interact with him every day, though.

13  Q    And who do you allege he also sexually

14  harassed other than yourself?

15  A    I don't know who he sexually harass.

16  Q    It is correct that you just did say,

17  Mr. Cooper -- you actually, said, I believe it

18  was my client, walked around sexually harassing

19  people all day.  And I'm paraphrasing again.

20  A    That's what I said.

21  Q    And I'm asking you now, since you said

22  that, who did he sexually harass other than

23  yourself?

24  A    I don't know everybody in The Doe Fund.  I

25  don't know everybody in The Doe Fund by name.

CONFIDENTIAL

Page 326

1                           Brooks

2      I didn't socialize with everybody in The Doe

3      Fund.

4           I wasn't keeping a score of everybody that

5      he was sexually harassing.  I was not doing

6      that.  But I heard him speaking to people all

7      the time and saying jokes and comments that

8      were sexual in nature.

9           Was I watching who he was talking to, no,

10     that's not my type of scene.

11          But there are people on the recordings

12     that have said that he spoke to them in that

13     manner as well.

14          It was about six guys at one time that was

15     like, yeah, he did that to me.  Yeah, he did

16     that to me.  Yo, I almost punched Terry in the

17     face because he said this to me, yeah.

18     Q    Were any of those individuals employees of

19     The Doe Fund?

20     A    We all worked for The Doe Fund.  We were

21     on the street crew.

22     Q    Have you ever heard the term "trainee"?

23     A    Yeah, I heard the term "trainee."

24     Q    And where did you hear that?

25     A    Where did I hear that?

CONFIDENTIAL

Page 328

                            Brooks

1

2    A      I didn't meet him until Mr. Cooper was

3    gone.

4    Q      Mr. Stevens?

5    A      I don't know.

6    Q      Which gender is Terry; is he a male or

7    female?

8           MS. O'CONNELL:  Objection.

9    Q      What is your understanding, Mr. Brooks, of

10   what Mr. Cooper's gender is?

11   A      He's a male.

12   Q      In what ways do you claim Mr. Cooper

13   discriminated against you based on your gender?

14          MS. O'CONNELL:  Objection.

15   A      He was trying to force me to do something

16   that was against my will.

17   Q      When you say that, are you referring to

18   the allegation you made about the incidents

19   that occurred?

20   A      Yeah, I'm not a homosexual, and he tried

21   to force me to do a homosexual act.

22   Q      In what ways did he try to force you to do

23   a homosexual act?

24   A      By touching me.

25   Q      Did he ask that you touch him?

Page 329

1                          Brooks

2       A     He did not.

3       Q     And other than the specific allegations,

4       are you -- do you have -- withdrawn.

5             Other than the testimony you just gave, is

6       there anything else that you claim Mr. Cooper

7       did that discriminated against you based on

8       your gender?

9             MS. O'CONNELL:  Objection.

10      A     I don't remember

11      Q     You can't remember what?

12      A     I can't remember if he did something else.

13      Q     Sitting here today, do you have any proof

14      of any other things Mr. Cooper did or you

15      allege Mr. Cooper did that discriminated

16      against you based on your gender?

17            MS. O'CONNELL:  Objection.

18      A     I can't remember.

19      Q     And I think this is probably a good time

20      to mark as an exhibit -- I believe we're at 10.

21      I'm going to pass to you, in a moment, a copy

22      of what's been marked -- will be marked, as

23      Exhibit 10 for identification.

24            It's a copy of the responses and

25      objections to defendant's first set of

CONFIDENTIAL

Page 332

```
1                          Brooks
2         Page 11.
3               Do you see that question and response
4         there?
5               Do you see the question and answer as
6         titled "Interrogatory No. 9"?
7               Yes or no.
8    A     Yeah, I can see it.
9    Q     And the question reads:  Identify each
10        person -- and I'm paraphrasing again -- who you
11        claimed discriminated against you based upon
12        your race and/or status of being previously
13        convicted.  And identify each document which
14        relates to supports or refutes this allegation.
15              In response, your response indicates that
16        (As read):  "Plaintiff states in addition to
17        each person listed in Rule 26(a) Disclosures,
18        you also add Doe Fund House Manager Stevens."
19              I'm going to ask you, other than the
20        claims you made against Mr. Cooper, and how he
21        alleged discriminated against you based on your
22        race, in what ways did Mr. Washington, or do
23        you claim Mr. Washington discriminated against
24        you based on our race?
25   A     Because I feel like Mr. Washington, as
```

CONFIDENTIAL

Page 333

1                              Brooks

2          well as others, would not have treated me in

3          the same regard had I been of another race.

4          Q     In what way do you claim that Mr. Stevens

5          discriminated against you based on our race?

6          A     For the same reason.

7          Q     And I believe you just said that they

8          wouldn't have treated you the same way, if you

9          were from another race?

10         A     Yes.

11         Q     In what way did they treat you?

12         A     They were hostile towards me, and they

13         were doing things to try to get me kicked out

14         of my shelter situation.

15         Q     And you're claiming those things

16         occurred -- withdrawn.

17               Are you claiming those things occurred

18         before or after the alleged incident with

19         Mr. Cooper?

20         A     Yeah, it happened after I made the

21         complaint about what Mr. Cooper did.

22         Q     In what ways do you claim

23         Mr. Paul Washington discriminated against you

24         based on your race?

25         A     Paul Washington never discriminated

CONFIDENTIAL

Page 335

1                          Brooks

2      Q    And I understand that, Mr. Brooks.

3           And I'm asking you, are claiming that

4      Mr. Paul Washington discriminated against you

5      in any way?

6      A    No.

7      Q    You see Ms. Gilmore is here, correct?

8      A    Yeah.

9      Q    Okay.  In what ways did Ms. Gilmore

10     discriminate against you based on your race?

11          MS. O'CONNELL:  Objection.

12     Q    Do you remember the question?

13     A    I can't remember the interaction I had

14     with Ms. Gilmore.

15     Q    What facts do you have to support your

16     allegations that Ms. Gilmore discriminated

17     against you based on our race?

18          MS. O'CONNELL:  Objection.

19     A    I have no recollection of our interaction

20     at all.

21     Q    That wasn't my question.

22          My question is:  What facts do you have to

23     support your allegation that Ms. Gilmore

24     discriminated against you based on your race?

25     A    I don't know I.  Don't remember.

CONFIDENTIAL

1                          Brooks

2      Q    You don't remember how she discriminated

3      against against you, correct?

4      A    I don't remember.

5      Q    Do you remember any way in which you

6      allege -- withdrawn.

7           What facts do you have to support any of

8      the allegations that you've made that

9      Ms. Gilmore discriminated against you?

10          MS. O'CONNELL:  Objection.

11     A    I don't recall.

12     Q    Do you have any understanding of how she

13     discriminated against you based on your gender?

14     A    I don't recall.

15     Q    And what about your conviction status?

16     A    I don't recall.

17     Q    Your ethnicity?

18     A    I don't recall.

19          MS. O'CONNELL:  Objection.

20     Q    What's Ms. Gilmore's race, to the best of

21     your understanding?

22     A    I don't know.

23     Q    You can see her sitting here today?

24     A    Yes.

25     Q    And what's your understanding of what her

CONFIDENTIAL

Page 337

1                        Brooks

2      race she?

3      A    I don't know.

4           MS. O'CONNELL:  Objection.

5      A    I don't know.

6      Q    You've named a number of other individuals

7      that you claimed discriminated against you

8      based on your race -- excuse me, based on your

9      gender.

10          Mr. Wiggins, how did he discriminate

11     against you based on your gender?

12          MS. O'CONNELL:  Objection.

13     A    I don't recall.

14     Q    And Mr. Porter, how did he discriminate

15     against you based on your gender?

16          MS. O'CONNELL:  Objection.

17     A    I don't recall.

18          MR. BARTOLOMEO:  And, Counsel, what are

19     your objections for?

20          MS. O'CONNELL:  My client can't testimony

21     to legal opinions.  You're asking for the

22     reasons why he was subject to discrimination.

23          MR. BARTOLOMEO:  In what way is asking him

24     about allegations that he's made about being

25     discriminated against, in what way does that

CONFIDENTIAL

Page 338

1                          Brooks
2        call for a legal opinion?
3              MS. O'CONNELL:  Because he may not
4        completely understand every legal aspect of
5        discrimination, why that would be.
6              MR. BARTOLOMEO:  And I'm not asking him to
7        write a brief.  I'm asking him what is his
8        basis of understanding that he believes he was
9        discriminated against.
10             MS. O'CONNELL:  We're just preserving ou
11       objections for the record.
12             MR. BARTOLOMEO:  Okay.
13   BY MR. BARTOLOMEO:
14       Q    In what way do you believe you were
15       treated differently by Mr. Wiggins based upon
16       your gender?
17       A    Well, because I made a complaint about a
18       sexual assault, I believe I was treated
19       differently.
20       Q    And you based that on the fact that --
21       you're saying that he treated you differently
22       because of the complaint.
23             Is there anything having to do with your
24       gender that you believed Mr. Wiggins treated
25       you differently?

CONFIDENTIAL

Page 339

Brooks

1

2      A      Well, I was assaulted because of my

3      gender.   I was assaulted because of my gender.

4      I was assaulted verbally and physically because

5      of my gender.

6          I was told that -- I like to be chained

7      down, whipped and things like that by your

8      client, Mr. Cooper, and that was because of my

9      gender.

10         And after I wrote, informing The Doe Fund

11     of what had transpired between me and your

12     client, they decided to retaliate against me.

13     And Mr. Wiggins was one of those people, as

14     well as Mr. Stevens, as well as

15     Mr. James Washington, as well as

16     Timothy Matthews, as well as Eric.

17     Q      As well as who?

18     A      Eric.

19     Q      Who's Eric?

20     A      Eric was the head security guard at the

21     facility.

22         And all this transpired because of my

23     gender.

24     Q      So other than the allegations of being

25     treated differently after you made the

CONFIDENTIAL

Page 340

1                          Brooks

2      complaint about the alleged incident on the

3      21st, was there anything that you believed

4      Mr. Wiggins did to treat you differently

5      because of your gender?

6      A     You said other than the incident?

7      Q     Yeah.

8            You just said, and you've testified a

9      number of times that things changed and people

10     treated you differently after you made this

11     complaint; is that correct?

12     A     That's correct.

13     Q     I'm asking, was there anything else, other

14     than those circumstances that you described,

15     that you believe Mr. Wiggins did on the basis

16     of your gender; in what ways did he treat you

17     differently based on your gender?

18     A     Well, what he did is, he started pulling

19     me off the buses and started screwing around

20     with my work situation.

21     Q     This was after you made the complaint?

22     A     This is after I made the complaint.

23     Q     Before you made the complaint --

24     A     Before I made the complaint I never met

25     the man.

CONFIDENTIAL

Page 341

1                       Brooks

2      Q    And Mr. Wiggins, he's a man; is that

3      correct?

4      A    Yeah.

5      Q    And is it your testimony that Mr. Wiggins

6      treated you differently because you're a man?

7      A    Not only because I'm a man, because of the

8      whole situation.

9      Q    And, again, I'm asking you a very specific

10     question.  I believe it calls for a yes-or-no

11     answer.  To the extent you need to explain

12     more, that's fine.

13         But I'm asking you:  Do you believe

14     Mr. Wiggins treated you differently because you

15     were a man?

16     A    Yes.

17     Q    And other than what you've already

18     testified to, in what other ways did he do

19     that?

20     A    Well, he was making threats.

21     Q    And what kind of threats did Mr. Wiggins

22     make?

23     A    Well, he was making direct threats.  He

24     was telling me about how bad he is on the

25     street.  How he kick ass in The Doe Fund and

Page 342

                          Brooks
1
2     out of The Doe Fund, from the west side of
3     Harlem to the east side of Harlem.  I happen to
4     be from Harlem.
5     Q     And why did you perceive those as threats?
6     A     Because he was saying it directly to me.
7     Q     Was anybody else standing with you?
8     A     Was there --
9     A     Anybody else present?
10          MS. O'CONNELL:  Objection.
11    A     I don't recall.
12    A     Somebody else was in the room, but I don't
13    recall who it was.
14          This is when I was trying to get my
15    schedule.  And I was told that I had to see
16    Mr. Wiggins for my schedule.  And this is when
17    I went into the room, he started telling me
18    things and making threats.  I don't remember
19    everything that he said, but he made -- well,
20    he was saying I was fucking up.  And that's
21    when all the threats and stuff came in.
22    Q     Mr. Porter -- withdrawn.
23          Is there anything other than just your
24    personal opinion that gives you the reason to
25    believe that Mr. Wiggins treated you

CONFIDENTIAL

Page 343

1                          Brooks

2        differently because of your gender?

3        A     I don't recall.

4        Q     Isn't it true that there were no females

5        that were treated better than you by

6        Mr. Wiggins?

7        A     I don't recall.  It was a male facility.

8        It was very few females around.

9        Q     So when you say "male

10       facility" -- withdrawn.

11             Other than Ms. Gilmore, how many other

12       females -- withdrawn.

13             At your particular facility, how many

14       females were there?

15       A     I don't really recall.  I know I seen

16       around, maybe three.  I don't recall.  And they

17       were workers and they were in and out.  They

18       had offices and whatever.

19       Q     When you say "workers," that means they

20       weren't clients of The Doe Fund, they weren't

21       residents;  Is that correct?

22       A     No, they weren't residents.

23       Q     Were any of the residents female?

24       A     None of the residents were females.

25       Q     And, you know, Mr. Porter, you've also

CONFIDENTIAL

Page 344

1                          Brooks

2        claimed that he discriminated against you -- he

3        also treated you differently based on your

4        gender.

5             In what ways, other than what you told us

6        about today already, with respect to the things

7        that happened after the incident, in what ways

8        do you claim Mr. Porter treated you differently

9        based on your gender?

10            MS. O'CONNELL:  Objection.

11       A    I don't recall.

12            MR. BARTOLOMEO:  Off the record.

13            (Recess taken.)

14   BY MR. BARTOLOMEO:

15       Q    You claimed that Hanson discriminated

16       against you based on your race; is that

17       correct?

18       A    I don't recall.

19       Q    You don't recall whether or not you

20       brought a claim against Mr. Hanson for

21       discriminating against you based on your race?

22       A    Yeah, I don't recall.

23            MS. O'CONNELL:  Ms. Hanson.

24       A    I don't recall.

25       Q    What facts do you have to support that

Page 345

1                        Brooks

2        Ms. Hanson discriminated against you based on

3        your race?

4             MS. O'CONNELL:  Objection.

5        A    I don't recall.

6        Q    And what facts do you have to support that

7        Ms. Hanson treated you differently because of

8        your race?

9        A    I don't recall.

10       Q    Isn't it true your only basis is your

11       opinion?

12            MS. O'CONNELL:  Objection.

13       A    I don't believe so.

14       Q    Excuse me?

15       A    I don't believe so.

16       Q    You don't believe what?

17       A    That's my only basis is my opinion.  I

18       have several recordings and facts.

19       Q    Okay.  So I just asked you what facts do

20       you have to support that Ms. Hanson

21       discriminated against you based on your race?

22       A    I don't recall everything that's in those

23       recordings.

24       Q    I'm not asking you to recall everything,

25       Mr. Brooks.

CONFIDENTIAL

Page 346

1                        Brooks

2          I'm asking you what, to the best of your

3     knowledge, sitting here today, what facts do

4     you have to support that Ms. Hanson treated you

5     differently because of your race?

6          MS. O'CONNELL:  Objection.

7     A     I don't recall.

8     Q     Isn't it true that Ms. Hanson did not

9     treat females better than you?

10    A     I don't know.

11    Q     You don't know?

12    A     No.

13    Q     I'm sorry, could you speak up?

14    A     No.

15    Q     And Mr. Porter, what facts do you have to

16    support that Mr. Porter treated you differently

17    based on your race?

18         MS. O'CONNELL:  Objection.

19    A     I don't recall.

20    Q     Is there any other basis for your

21    allegation that Mr. Porter treated you

22    differently based on your race other than your

23    opinion?

24         Mr. Brooks?

25    A     Yeah, I don't recall.

CONFIDENTIAL

Page 347

1                           Brooks

2      Q    What is the -- what facts do you have to

3      support that Mr. Bell treated you differently

4      based on your race?

5           MS. O'CONNELL:  Objection.

6      Q    Mr. Brooks, are you awake?

7      A    I am awake.

8      Q    Because your eyes are closed, that's why

9      I'm asking.

10     A    Yeah, I'm starting to get a headache.

11     Q    Why don't we take a moment.

12     A    I don't need a moment.  Let's get to it.

13     Q    So I just ask, if you could, to the best

14     of your knowledge, tell me what facts you have

15     to support that Mr. Bell treated you

16     differently because of your race?

17     A    Well, I don't recall, but I do remember,

18     Mr. Bell writing me up for no call no show, and

19     it wasn't correct.

20          So I felt that that was wrong.  I didn't

21     feel he would do that in a situation where I

22     was different, from another race or not being

23     in a shelter and having financial problems at

24     the time, so . . .

25     Q    And what race is Mr. Bell?

CONFIDENTIAL

Page 349

1                          Brooks

2            Mr. Porter, in what ways did Mr. Porter

3      treat you differently based on your gender?

4      A     I don't recall that.

5      Q     And when I say, "Mr. Porter," is that

6      correct that he's a male?

7            It's a yes-or-no question, Mr. Brooks.

8      A     Yes.

9      Q     And Ms. Gilmore, is Ms. Gilmore a male or

10     female?

11     A     Female.

12     Q     And Ms. Hanson is also female; is that

13     correct?

14     A     I'm assuming so.  Being that you're saying

15     "Ms."

16     Q     Okay.  Well, you are the one that met

17     Ms. Hanson.

18           What is your understanding of whether

19     she's male or female?

20     A     Ms. Hanson, I'm assuming is a female.

21     Q     I don't want you to assume.  I'm just

22     asking you to the best of your knowledge?

23     A     Female.

24     Q     In what ways did Ms. Hanson treat you

25     differently based upon your gender?

CONFIDENTIAL

Page 350

                            Brooks

1

2       A     I don't recall.

3       Q     And Mr. Holly, is that a male as well?

4       A     Yes.

5       Q     And in what ways did Mr. Holly treat you

6       differently based on your gender?

7       A     I can't recall.

8       Q     Mr. Bell is also a male, correct?

9       A     Yes.

10      Q     And Mr. Bell, in what ways did he treat

11      you differently based upon your gender?

12      A     I can't recall.

13      Q     Mr. Stevens, in what ways did Mr. Stevens

14      treat you differently based upon your gender?

15      A     Mr. Stevens was harassing me.  Ringing the

16      keys and banging on the door when I was

17      sleeping.

18            And his ^anonymity for me spawned out of

19      the fact that I wrote a sexual harassment

20      report on his coworker.

21      Q     What part of what you just told us was

22      because you -- what part of what you just

23      testified to do you allege Mr. Stevens did

24      because of your gender?

25      A     It was based on my gender.  I was

Page 351

                          Brooks
1
2      assaulted because of my gender.
3      Q     I understand the allegations that you've
4      made against Mr. Cooper.
5            What I'm saying right now, Mr. Stevens,
6      what did he do to treat you differently because
7      of your gender?
8      A     I just told you earlier that he was
9      banging on my door and keeping me awake when I
10     needed to be sleep for work.
11     Q     Did you ever see him do that with anybody
12     else?
13     A     No, he did not.
14     Q     What time did he bang on your door?
15     A     Every morning.
16     Q     At what time?
17     A     Around seven o'clock, something like that.
18     Q     Isn't it true that The Doe Fund, the
19     residence requires you -- has a curfew at a
20     certain hour and wake up at a certain time?
21     A     Yeah.  That's for people that don't
22     have -- I have last passes.  I worked
23     overnight.  And so I'm able to stay in and
24     sleep, and you knew that.  He was aware of
25     that.  All the staff knew that.

CONFIDENTIAL

Page 352

1                          Brooks

2          I work overnight.  I get in around

3     two o'clock in the morning.  Take a shower.

4     I'm in bed around 3:00.  He comes banging on

5     the door at 7:00, you know, and jingling his

6     keys to keep me awake.  So I would usually have

7     to leave the facility because I couldn't sleep,

8     with him coming back and forth.

9          And I'd be tried while I was on -- at

10    work.  And I had a job that was dangerous.  I

11    was driving a forklift.  Sometimes I was

12    falling asleep on the forklift.

13    Q    Is there -- is it your testimony that

14    there's an exception to the rule that everybody

15    must be up at 7:00 a.m. when you worked late in

16    the night?

17    A    There's an exception to the rule?

18         That is the policy, when you would have a

19    late night pass, you get to sleep in.  When you

20    have a late night job, you get to sleep in.

21    And that's in every shelter.

22    Q    And Mr. Stevens, that's a male, correct?

23    A    Yes, he is.

24    Q    And is he, Mr. Stevens, is it your

25    understanding -- withdrawn.

CONFIDENTIAL

Page 353

                           Brooks

1

2          Do you have an understanding of what

3      Mr. Stevens' job was?

4      A    House manager.

5      Q    And house manager, is it part of their job

6      to wake everybody up?

7      A    I don't know.  I don't know his job

8      description.

9      Q    And did you have roommates at the time, at

10     the time you claim Mr. Stevens was banging on

11     the door and jingling key?

12     A    Yes.

13     Q    Did those roommates all have the ability

14     to sleep in, as you're describing?

15     A    I don't know.

16     Q    Did you talk to your roommates at all?

17     A    Very rarely.

18     Q    Were they the same individuals?

19     A    Not all the time.

20     Q    What were their names?

21     A    I don't know.

22     Q    How long did you share a room with these

23     individuals?

24     A    I don't remember.

25     Q    You also make allegations in this case

CONFIDENTIAL

Page 354

Brooks

2     that based upon your conviction status that you

3     were treated differently.

4          You've also made allegations that based

5     upon your conviction status, people treated you

6     less favorable; is that correct?

7     A     I believe so.

8     Q     In what ways did Mr. Cooper treat you less

9     favorably based on your conviction status?

10    A     By assaulting me.

11    Q     Other than what you claim was an assault,

12    Mr. Brooks, is there anything else that you

13    claim Mr. Cooper did to treat you differently

14    because of your conviction status?

15    A     By talking to me in a sexual manner.

16    Q     And are these the same -- withdrawn.

17          Are these the same comments you told us

18    about today and last week?

19    A     I believe I wrote it in my complaint.

20    Q     I understand.

21          But I'm asking with respect to the

22    deposition testimony you gave, is there

23    anything else in addition to what you already

24    told us that you believe Mr. Cooper said, and

25    he did so based upon your conviction status?

CONFIDENTIAL

Page 355

1                      Brooks

2          MS. O'CONNELL:  Objection.

3    A    I don't recall.

4    Q    Are you aware of whether -- withdrawn.

5          Do you know if Mr. Cooper has ever been

6    convicted of a crime?

7    A    No, I don't.

8    Q    Can you tell me anyone who you believe

9    Mr. Cooper treated differently than you

10   because -- withdrawn.

11         Can you tell me anyone that Mr. Cooper

12   treated more favorably than you because they

13   had a different conviction status?

14   A    I don't know.

15   Q    Mr. James Washington, how did --

16   Mr. James Washington, what facts do you have to

17   support that Mr. James Washington treated you

18   differently based upon your conviction status?

19   A    Because I came to him with an issue, and

20   he didn't uphold me.  He actually did things

21   that made my situation worse.

22   Q    What things?

23   A    And none of this could have been

24   accomplished if I wasn't -- hadn't been

25   convicted of a crime and wasn't in his care.

CONFIDENTIAL

Page 356

1                          Brooks

2     Q    Are you saying as a result of you being

3     convicted of a crime you were forced to be

4     under his care?

5     A    That's not what I said.

6     Q    Okay.  So explain to me what you said,

7     then, because I didn't understand?

8     A    I said he was a director and I went to him

9     with an issue.  That issue got blown up.

10    People found out about it that wasn't supposed

11    to know about it.  And then I was treated

12    harshly in his facility that he was head of.

13    And I went to tell and told him about that as

14    well, and it never stopped.

15    Q    When you said there was an issue, what

16    issue was that?

17    A    The issue of Mr. Cooper touching me and

18    sexually harassing me.  The issue of me being

19    pulled over -- pulled out of buses when I was

20    on my way to work.  The issues with me being,

21    you know, waken up while I was resting for

22    work.  I went to him with several issues;

23    issues of me getting a pass and then coming in

24    and having to sit in a room for hours, not

25    being able to go to my bed.  When I got direct

CONFIDENTIAL

Page 357

1                          Brooks

2      permission from Mr. Washington himself.  It's

3      issues like that that I felt I was being

4      targeted because of my conviction.  And not

5      only just because of my conviction, because I

6      wrote a statement against a fellow coworker of

7      his.

8      Q     Other than what you already told me, is

9      there anything else that you say that supports

10     your claim that Mr. Washington treated you

11     differently because of your conviction status?

12     A     Not that I could recall.

13     Q     And Mr. Wiggins, you've also claimed he

14     treated you differently based on your

15     conviction status.

16           What facts do you have to support that

17     complaint?

18     A     Because I was convicted, I guess he felt

19     like he could speak to me in a hostile manner.

20     And he also was responsible for pulling me off

21     of the buses when I was going to work.  He was

22     responsible for not -- for me not receiving a

23     copy of my schedule.  He was responsible for

24     making all these decisions that went against

25     me, and he used other workers to do so.

CONFIDENTIAL

Page 358

                              Brooks

1

2          For example, I was getting on the bus.

3     I'm on the bus.  I'm waiting to go out to my

4     work site.  I'm there.  I'm on time, and

5     another guy get a call and come to the bus and

6     say, Is Brooks in here?  The supervisor said,

7     Yeah.  I'm like, Yeah, I'm right here.  They

8     like, Brooks, come off the bus.

9          I later found out that it was because of

10    Mr. Wiggins.  Mr. Wiggins specifically called

11    somebody because he wasn't even on the site.

12    He called somebody, told them to pull me off

13    the bus so I wouldn't go to work, and had me

14    standing on the corner for a while before --

15    before anything happened with me, so . . .

16    Q    Do you know if Mr. Washington's ever been

17    convicted of a crime?

18    A    I don't know.

19    Q    Do you know if Mr. Wiggins has ever been

20    convicted of a crime?

21    A    I don't know.

22    Q    Do you know if Mr. Porter's ever been

23    convicted of a crime?

24    A    I don't know.

25    Q    Do you know if Ms. Gilmore has ever been

CONFIDENTIAL

Page 359

                              Brooks

1

2      convicted of a crime?

3      A     I don't know.

4      Q     Do you know if Ms. Hansen's ever been

5      convicted of a crime?

6      A     I don't know.

7      Q     Do you know if Mr. Holly has ever been

8      convicted of a crime?

9      A     I don't know.

10     Q     Do you know if Mr. Bell has ever been

11     convicted of a crime?

12     A     I think he might have said that he was,

13     but I don't remember.

14     Q     And Mr. Stevens, do you know whether

15     Mr. Stevens has ever been convicted of a crime?

16     A     I don't know.

17     Q     And with respect to Mr. Porter, what facts

18     do you have to support your claim that

19     Mr. Porter treated you differently because of

20     your conviction status?

21     A     I don't recall.

22     Q     And Ms. Gilmore, what facts do you have to

23     support that Ms. Gilmore treated you

24     differently based upon your conviction status?

25     A     I don't recall.

CONFIDENTIAL

Page 360

1                          Brooks

2    Q    And Ms. Hanson, what facts do you have to

3    support that Ms. Hanson treated you differently

4    because of been your conviction status?

5    A    I don't recall.

6    Q    And Mr. Holly, what facts do you have to

7    support your claim that Mr. Holly treated you

8    differently based upon your conviction status?

9    A    I don't recall.

10   Q    Mr. Bell, what facts do you have to

11   support that Mr. Bell treated you differently

12   based upon your conviction status?

13   A    I don't recall.

14   Q    And Mr. Stevens, what facts do you have to

15   support that Mr. Stevens treated you

16   differently based upon your conviction status?

17   A    I don't recall.

18   Q    What residents at the Gate Avenue facility

19   were treated better than you and did not have a

20   conviction history?

21        MS. O'CONNELL:  Objection.

22   A    I don't know what other residents were

23   doing or their interaction with the status, I

24   don't know.

25   Q    So do you have any basis to claim that the

CONFIDENTIAL

Page 361

1                          Brooks

2       individuals that you've named or stated treated

3       you differently because of your conviction

4       status, do you have any basis to claim that

5       they treated other residents who were not

6       convicted of a crime differently?

7       A    All I know is how they treated me.

8       Q    Are there other residents at the Gates

9       Avenue facility that have been convicted of

10      crimes?

11      A    I don't know.

12      Q    Isn't it true that The Doe Fund's purpose

13      is to help formally incarcerated individuals to

14      achieve self-sufficiency?

15      A    That's what I believed when I came there.

16      Q    Have you ever been convicted of a civil

17      assault, other than what you've already

18      testified to today?

19      A    No.

20      Q    Do you know what a civil assault is?

21      A    No, but I've never been convicted of an

22      assault, period, so . . .

23      Q    You've brought allegations, or part of

24      your complaint alleges that Mr. Cooper

25      committed an assault on you; is that right?

CONFIDENTIAL

Page 369

                           Brooks

1

2          Do you allege that anyone else at The Doe

3     Fund committed an assault against you other

4     than Mr. Cooper?

5     A     Not physical.

6          MS. O'CONNELL:  Could we go off the record

7     for a second.

8          (Recess taken.)

9          MR. BARTOLOMEO:  Based on an

10    off-the-record conversation between all counsel

11    for all parties, I believe that plaintiff's

12    counsel is willing to stipulate, that the 11th

13    cause of action, which current reads:

14    "Eleventh cause of action:  Assault and battery

15    (against All, Cooper individually)" is

16    actually -- I believe counsel's willing to

17    stipulate that's just being alleged as against

18    Mr. Cooper individually and against no other

19    individuals or the Doe Fund; is that right?

20         MS. O'CONNELL:  Yes, counsel is

21    stipulating to that.

22    BY MR. BARTOLOMEO:

23    Q     I'm going to turn your attention back to

24    what's been marked as Plaintiff's Exhibit 3 for

25    identification.

CONFIDENTIAL

Page 379

1                        Brooks

2    again, to try to deal with or abate the

3    depression.  And that caused a problem with my

4    parole.

5         I came home and I was on Level 4.  Level 4

6    is the best level you could be on.  You only

7    have to see parole once every four months.  And

8    that was because of my behavior while I was

9    incarcerated.  It was exemplary.

10        I ran the drug programs while I was

11   incarcerated.  I did the alternative to

12   violence programs.  I advocated, and I was the

13   one that was in control of running the groups.

14        So when I came home and this happened to

15   me, I picked up again.  I relapsed.

16        Bad on me, hurt me, but it also hurt me as

17   far as parole was concerned because now I got

18   dropped from Level 4 to Level 1.

19   Q    What is Level 1?

20   A    Level 1 means that instead of going to see

21   my parole officer once every four months, so

22   that would be three times a year.  I had to go

23   see him every week, again.

24   Q    Is there a level where you have to see a

25   parole officer every two weeks?

Page 380

Brooks

A      Yeah, that's Level 2.

And eventually I got put into Level 2
where I went to go see them every two weeks.
But after the incident, it became every week.

Now, it was every two weeks.  I'm
currently still on Level 2.

Q      Okay.  Why did you get dropped to Level 2
from Level 4?

A      Because of drug use and because I got
kicked out of The Doe Fund.  They kicked me
out.  They did their best to kick me out.
Wicked people.

They kicked me out of The Doe Fund, so I
was homeless.  Slept with a friend, at a
friend's until my apartment thing kicked in.

My parole officer came to see me at The
Doe Fund.  I was no longer there.  So he was
about to put out a warrant for my arrest,
saying that I had ran away from parole, so to
speak.

And so that caused me stress.  I had to go
to another drug program and do another drug
program, which was about eight months, and to
deal with my relapse problem that occurred

CONFIDENTIAL

Page 381

1                         Brooks

2        behind the stress that I was dealing with at

3        The Doe Fund from what happened with

4        Mr. Cooper.

5        Q     Just --

6        A     Also, me and my wife, our sexual

7        interaction is not what it used to be.  I don't

8        feel like touching her often.

9              And so it made my situation with my wife

10       worse.  She started to feel like I didn't want,

11       I wasn't attracted to her anymore.

12       Q     We are far afield from what the original

13       question was.

14             The original question was that to support

15       your claim what -- you know, what things were

16       done that caused you this emotional distress.

17       I think you've now answered that.  I just want

18       to ask you, Mr. Brooks, you know, as far as

19       your level, your parole level.

20             Your status, if I understand you

21       correctly, you were on Level 4 when you were

22       released from incarceration; is that right?

23       A     Yes.

24       Q     And were you on Level 4 at the time you

25       entered The Doe Fund?

CONFIDENTIAL

Page 395

1                      Brooks

2      Q    What was that person's name?

3      A    I don't know.

4      Q    How long after the incident did this

5      individual -- like how many days after this

6      incident or the alleged incident with

7      Mr. Cooper, how many days after did this person

8      tell you that he believed Terry got fired

9      because he was accused of touching somebody?

10     A    I don't know.  I don't remember.

11     Q    How did that person -- withdrawn.

12          Did that person tell you anything else,

13     other than he believed that Terry had been

14     fired for touching somebody?

15     A    No.  What he said -- he said that he

16     believes that Terry got fired because he

17     touched somebody.  He said he don't know if it

18     was because he touched somebody or because he

19     was stealing from The Doe Fund.  Because he

20     said that Terry was stealing that -- it's been

21     accused that Terry was stealing, so, outside of

22     everything.

23     Q    So he gave you two possible explanations

24     for why Mr. Cooper was fired?

25     A    Yes.

CONFIDENTIAL

Page 401

1                        Brooks

2              (Tape playing.)

3    BY MR. BARTOLOMEO:

4        Q    Was that you and Mr. Washington on that

5        tape, Mr. Brooks?

6        A    Yes.

7        Q    Was anybody else on that tape?

8        A    No.

9        Q    There came a point where you said -- you

10       stated on that audio clip that the "route

11       situation had been kind of simmering down."

12            What did you mean by that?

13       A    I meant behind the last couple of days, I

14       wasn't having issues.

15       Q    So your route situation had basically been

16       resolved; is that correct?

17       A    Not resolved.  I was just saying they

18       didn't bother me for the last couple of days.

19       Q    You said something about a Breathalyzer on

20       that tape also.

21            Do you remember that?

22       A    Yes.

23       Q    Isn't it true that you say here that the

24       issue with the Breathalyzer was just an error

25       with the machine?

CONFIDENTIAL

Page 402

1                          Brooks

2       A     Yeah.

3       Q     And the security guard said that you we're

4       okay to go?

5       A     Yeah.

6       Q     And Mr. Matthews also said you were okay

7       to go, correct?

8       A     Yeah, that's after he brought me down into

9       his office.

10      Q     Who brought you down into his office?

11      A     Mr. Matthews.

12            He brought me down in the office and asked

13      me, What, is there a problem I don't want to do

14      the program.  And I found that to be strange

15      for him to say that.

16            What does me blowing in a Breathalyzer

17      have to do with me not wanting to do the

18      program anymore?

19      Q     Wasn't one of the conditions of you being

20      in the program that you comply with the rules

21      of the program?

22      A     Absolutely.  And I was complying to the

23      rules of the program.  That's why it didn't

24      make sense to me for him to say that.

25      Q     So maybe I'm unclear.

CONFIDENTIAL

Page 403

1                          Brooks

2           Is it permitted for a participant in the

3    program to refuse a drug test?

4    A     As you heard on the tape that -- number

5    one, that wasn't a drug test; it was a

6    Breathalyzer.

7    Q     I'm just asking as a general matter, is it

8    permitted for a participant in the program to

9    refuse a drug test?

10   A     I don't know.

11   Q     With respect to -- the same question

12   regarding an alcohol test or a Breathalyzer, is

13   it permitted for a participant in the program

14   to refuse an alcohol or a Breathalyzer test.

15   A     I don't know if it's permitted to refuse a

16   alcohol/Breathalyzer test in the program.

17          But I know that I was not refusing.  I

18   blew into that Breathalyzer a few times.  And

19   he just assumed I didn't want to do the

20   program.  And I blew in it and I waited.  And I

21   sat there and waited for him to try to fix

22   their machine so I can do it again for them.

23          Because they came upstairs and got me so I

24   can do it again; even though I blew on it a

25   couple of times with the staff.

CONFIDENTIAL

Page 404

1                          Brooks

2          And another staff -- what I mean by

3     "staff" is security.  Another security, like I

4     said in the tape, had blew on it and it came up

5     the same way.  He knew he wasn't drinking

6     either, and knew it was something wrong with

7     their machine.

8     Q    I'm going to now play for you, on same

9     exhibit, Exhibit 12, I believe it is, another

10    clip.

11         (Tape Playing.)

12    Q    It's true that you asked Mr. Washington

13    who else knows during that audio clip; is that

14    correct?

15    A    Yes.

16    Q    And isn't it true that you don't know if

17    anyone outside those involved in the

18    investigation knew about the complaint that you

19    made about Mr. Cooper?

20    A    Say that again.

21    Q    Isn't it true you don't know if anyone

22    outside of those involved in the investigation

23    knew about the complaint and allegations you

24    brought against Mr. Cooper?

25    A    I don't know how other people found out.

CONFIDENTIAL

Page 412

Brooks

1

2      not to report to work while the matter was

3      being investigated?

4      A      Yes.

5             (Deposition Exhibit 14, File Entitled

6      "Washington on Vernon," marked for

7      identification as of this date.)

8      Q      And now I'm going to play you something

9      from the audio clips.  This is also -- this is

10     an audio clip.  We're going to mark for

11     identification as Plaintiff's Exhibit 14.  It's

12     titled "Washington on Vernon."  We're going to

13     play the segment between two minutes to 50

14     seconds to five minutes and 59 seconds.  The

15     audio clip indicates that it was last modified

16     on July 22, 2016.

17            (Tape playing.)

18     BY MR. BARTOLOMEO:

19     Q      Mr. Brooks, you've now listened to that

20     audio clip, which we've marked for

21     identification as Plaintiff's Exhibit 14.

22            Is that a conversation you had with

23     Mr. Washington?

24     A      Yes, it is.

25     Q      And how long after the alleged incident

CONFIDENTIAL

Page 413

                        Brooks

1

2    with Mr. Cooper did that conversation happen;

3    was it the next day, next week, something other

4    than that?

5    A    I don't remember.

6    Q    If I indicated to you now that the --

7    excuse me, that the date on the audio file says

8    it was last modified on July 22, 2016, does

9    that refresh your recollection as to what date

10   that conversation took place?

11   A    No, I don't remember.

12   Q    What date did you file your complaint

13   against -- excuse me.  Withdrawn.

14        What date do you allege the incident with

15   Mr. Cooper occurred?

16   A    I don't -- I told you I don't remember

17   dates at all, so -- but I do know that when I

18   wrote the complaint, I had the date on that

19   complaint.

20   Q    All right.  On the complaint, I believe

21   what we've referred to is Plaintiff's Exhibit

22   Exhibit 8.  I've now placed that before you.

23        Mr. Brooks, if you would please pick you

24   head up, look at it.  And tell me if there's a

25   date on there that would refresh your

Page 414

1                         Brooks

2      recollection as to when the incident you allege

3      occurred with Mr. Cooper.

4      A    7/21/2016.

5      Q    Now, if I told you that this audio clip

6      last modified or bears a stamp, a time and date

7      stamp of 7/22 of 2016, would that be the day

8      after the alleged incident with Mr. Cooper?

9           Yes or no?

10     A    Yes.

11     Q    And would this make sense that this

12     conversation was held -- withdrawn.

13          Was this conversation held with

14     Mr. Washington right after he received and

15     reviewed your complaint?

16     A    Yes, it was after.  It was after me making

17     the complaint.

18     Q    And he also told you that he had sent the

19     complaint over to HR; is that correct?

20     A    Yes.

21     Q    And he also told you that Mr. Cooper would

22     not returned to Gates Avenue facility until the

23     matter was resolved, correct?

24     A    Yes.

25     Q    And isn't it true that also during that

CONFIDENTIAL

Page 415

1                          Brooks

2       conversation, you and Mr. Washington discussed

3       your schedule; is that correct?

4       A     Yes.

5       Q     And that was the same day that he had

6       received your complaint; is that correct?

7       A     I believe so.

8       Q     Do you have any reason not to believe so?

9       A     I believe so.

10      Q     I'm asking you -- withdrawn.

11            Isn't it true that Mr. Washington called

12      Mr. Bell on the telephone to assist with your

13      schedule?

14      A     To assist?

15            Sounds to me he was calling for

16      information.

17      Q     I think that's just a matter of, what we

18      would say, semantics.

19            What is your understanding of why

20      Mr. Washington was calling Mr. Bell on the

21      telephone that day?

22      A     To get accurate information.  We didn't

23      know where Vernon was.  He didn't know -- I

24      said Queens.  He said Vernon.  I didn't know

25      what he was talking about when he was saying

Page 416

1                        Brooks

2      Vernon.  And so he obviously didn't know

3      either, so he called Mr. Bell to find out.

4      Q    So they are doing this in attempt to help

5      you out with your schedule; is that right, give

6      you information, provide you information to

7      help out with your schedule, correct?

8      A    I can't say I know what was his reason for

9      doing that.  You got to ask him that.

10     Q    Is it your understanding that they were

11     trying to assist you with your scheduling?

12     A    No.

13     Q    Then what were they doing?

14     A    He was getting information.  He was trying

15     to find out where I was going to be available

16     to speak with HR.

17     Q    You were able to get that information on

18     your own?

19     A    Clearly I wasn't because I went in there

20     to speak to him about it.

21     Q    Okay.  And so if you asked somebody to

22     assist you, you asked -- isn't it true you

23     asked Mr. Washington to assist you with getting

24     information about your schedule?

25     A    I didn't ask Mr. Washington to assist me.

Page 418

1                       Brooks

2       the work assignment, on that Monday so you

3       could be interviewed in connection with your

4       complaint.

5              Is that a yes or no?

6       A     I don't know.

7       Q     You don't know if Mr. Washington assisted

8       you with changing your schedule so that you

9       could be interviewed on that Monday?

10      A     I don't know.

11      Q     Were you interviewed in connection with

12      your complaint?

13      A     Yes.

14      Q     Who was present?

15      A     Two women and Mr. Washington.

16      Q     What day of the week was it?

17      A     I don't remember.

18      Q     Were you supposed to work that day?

19      A     I believe so.

20      Q     Did you work on that day?

21      A     I can't remember.

22      Q     I'm going to ask now for another clip,

23      which is titled "Playing with schedule,

24      Ronald Holly."  We're going to mark this for

25      identification as Plaintiff's Exhibit 15.  The

CONFIDENTIAL

Page 419

1                          Brooks

2        clip "Playing with Schedule, Ronald Holly," it

3        is -- we're going to play 0 through 1 minute 30

4        seconds, and it does not bear a time or date

5        stamp.  So we're going to go without further

6        ado, playing the chip.

7              (Deposition Exhibit 15, File Entitled

8        Playing with Schedule, Ronald Holly," marked

9        for identification as of this date.)

10             (Tape Playing.)

11       Q     Mr. Brooks?

12       A     Yes.

13       Q     You were able to listen to that, correct?

14       A     Yeah.

15       Q     So is that correct that that was a

16       conversation with Mr. Holly?

17       A     Yes.

18       Q     And Holly says today is the 29th.

19             He's referring to July 29th, correct?

20       A     Yes.

21       Q     And then Holly also told you that your

22       schedule is fixed and you didn't have to work

23       weekends; is that correct?

24       A     That's what he said.

25       Q     Was is correct, though, what he said?

Page 420

                            Brooks

1

2     A     No.  I end up having problems later on

3     with Mr. Bell, telling me that I was supposed

4     to be at work.

5     Q     You told Mr. Stevens during that

6     conversation, also, during that audio clip,

7     that you had a copy of your schedule?

8     A     Yeah.  That was a misstatement.  I had

9     seen a copy.  He showed it to me on the

10    computer.  He didn't give me a copy in my hand.

11    Q     And you told him your days off were

12    Saturday and Sunday?

13    A     That's what I told him, yes.

14          MR. BARTOLOMEO:  I need a few moment break

15    if that's okay.

16          (Recess taken.)

17   BY MR. BARTOLOMEO:

18    Q     Mr. Brooks, before -- excuse me.

19          Last time you were here you testified to a

20    couple of different medications that you had

21    been prescribed for sleeping.

22          When was the last time you took either of

23    those medications?

24    A     A couple of weeks ago.

25    Q     And was this the Remeron or the

CONFIDENTIAL

Page 460

1                    Brooks

2     Q     Is there anything you'd like to add with

3     respect to any of those individuals?

4     A     At this point, no.  No.

5     Q     I believe at some point --

6     A     Oh --

7     Q     Go ahead, if you have something further to

8     say, go ahead.

9     A     Well, I do know that when I first came

10    into the organization, Dash Porter, he was my

11    case manager.  And I was very excited about

12    being a part of The Doe Fund.  I thought that

13    it could be a career thing for me because it

14    was something I wanted to get into.  I wanted

15    to get into helping people that came home from

16    prison reestablish their lives.  Because the

17    transition to get back into work, to get back

18    to stable living is really difficult for a

19    prisoner.  I know because I've been on that end

20    of the road quite a few times.

21          After becoming, you know, starting to

22    write and tell my stories through writing, I

23    figured that that would be a very good asset to

24    the organization, and I expressed that with

25    Mr. Porter.  And he thought so as well.  He

CONFIDENTIAL

Page 461

                        Brooks

1

2    thought I could growth in the organization as

3    well.

4         But then, of course, after this situation,

5    where I made the complaint, and it appeared to

6    me that The Doe Fund wanted to attack the

7    victim instead of the actual predator.  It made

8    me not want to be a part of the organization

9    anymore.

10   Q    I understand that.  But I was asking

11   specifically with respect to the people that

12   are named, do you have anything else that you

13   want to add, about them, about actions that

14   they took, statements that they made, or

15   anything else that's in connection with the

16   claims of discrimination, harassment,

17   retaliation, or the other allegations and

18   causes of actions set forth in the complaint?

19   A    I thought I was answering.

20        So at this point, no, there's nothing else

21   I want to add.

22   Q    Now, with respect to additional

23   individuals, at some point you had -- or your

24   attorney has communicated that there was a

25   Julio, the Chelsea driver, Chelsea route

CONFIDENTIAL

Page 484

1                        Brooks

2      Q    Okay.  Isn't it true before you left the

3      Gates Avenue facility, that you already

4      arranged -- that you had already lined up the

5      apartment at 630 Howard Avenue?

6      A    Yes.

7           I was waiting to move in.  They were doing

8      some work on it.

9           MR. SEIDENFELD:  This is going to be 21.

10          (Deposition Exhibit 21, Document Entitled

11     "Client Acknowledgment of Responsibility Form,"

12     marked for identification as of this date.)

13     Q    Mr. Brooks, I've just handed you what's

14     been marked as Plaintiff's Exhibit 21.  I want

15     you to just to look at document bearing Bates

16     No. TD5 through 8.

17          MR. BARTOLOMEO:  I want to say, for the

18     record, Plaintiff's Exhibit 20 is a document

19     bearing Bates No. Brooks 251.

20     Q    Back to Plaintiff's 21, Mr. Brooks, I just

21     want you to look at the bottom of TDF5.

22          Is that your signature where it says

23     "signature" next to your name?

24     A    Yes, it is.

25     Q    Okay.  Have you seen this document before?

CONFIDENTIAL

Page 489

1                          Brooks

2      work, they would give me a late pass.  But they

3      never --

4      Q     Anyone ever explained to you what the

5      policy was, whether you've seen the late pass

6      policy or not?

7      A     I got explained the late pass policy when

8      they took my overnight visits.  And they said

9      that that was because I was no longer a part of

10     the program.

11           (Deposition Exhibit 24, File Entitled

12     "Late Night MW," marked for identification as

13     of this date.)

14     Q     I'm going to introduce as Exhibit 24, the

15     file you produced called "Late Night MW," which

16     is shown as last modified 7/29/16.  I'm going

17     to play from one minute to 2 minutes and 42

18     seconds.

19           (Tape Playing.)

20     Q     Mr. Brooks, was that a record that you

21     produced in this litigation?

22     A     Yes, it was.

23     Q     That was you speaking to Mr. Washington?

24     A     Yes.

25     Q     He was explaining to you the late pass

CONFIDENTIAL

Page 490

1                         Brooks

2       policy?

3       A     Okay.

4       Q     Is that a "yes"?

5       A     Yes, he was.

6       Q     And what he was explaining to you was

7       consistent with what is on document -- which is

8       on Plaintiff's 22, that if you're in the

9       program -- if you look at the chart at the

10      bottom of the page.

11            If you're in the program 30 to 60 days,

12      you get two late passes and no overnight

13      passes; that's what it says there?

14      A     Mm-hmm.

15      Q     And that's what Mr. Washington told you?

16      A     That's what he said.

17            MR. SEIDENFELD:  I'm going to go off for a

18      minute.  Off the record.

19            (Recess taken.)

20      Q     All right.  Mr. Brooks, the reason that

21      you were asked to leave Gates Avenue was for a

22      curfew violation?

23            Whether you agree with the decision or

24      not, that's what you were told?

25      A     Yes.

Page 491

1                    Brooks

2    Q    Are you aware of other people being asked

3    to leave the facility because of curfew

4    violations?

5    A    No.

6    Q    Is it possible that there were people who

7    have been asked to leave because of curfew

8    violations that you weren't aware of?

9    A    I don't know.

10   Q    You don't know the reason why everyone who

11   was asked to leave Gates Avenue?

12   A    I don't know.  I don't even know when

13   people were asked to leave.  I'm not in

14   people's business like that.

15        So if I see somebody one day, and I don't

16   see them another, it's not -- it's not my

17   business or like -- because I don't socialize

18   with them.

19        You know what I mean?

20        So if I don't see somebody, it's just I

21   don't see them.

22   Q    Okay.  So you don't -- other than

23   yourself, you don't know the reasons why anyone

24   was asked to leave the Gates Avenue facility?

25   A    No.

CONFIDENTIAL

Page 492

                              Brooks

1

2    Q    I want to ask you a couple of questions

3    about your claim for intentional infliction of

4    emotional distress.

5         Do you have any evidence that The Doe Fund

6    directed Mr. Cooper to engage in the conduct

7    that he did?

8         MR. SEIDENFELD:   Objection.

9    Q    You can answer.

10   A    I don't know.

11   Q    Any evidence that -- so, is that a "no"?

12   A    I don't know.

13   Q    Okay.  Any evidence that it was part of

14   Cooper's role as an employee at The Doe Fund to

15   engage in the conduct that you allege?

16        MR. BARTOLOMEO:   Objection.

17        MS. O'CONNELL:   Objection.

18   A    I don't know.

19   Q    You, in your interrogatories, said a

20   supervisor, Vernon, first name may be Bergis.

21   A    Bergis?

22   Q    You allege he retaliated against you?

23   A    Yes.

24   Q    What's the basis for your belief he

25   retaliated against you?

CONFIDENTIAL

Page 493

Brooks

1

2      A     Well, he was giving me a hard time from

3      day one.  When I got on the Vernon route, he

4      was trying to sneak up on me and catch me not

5      working and take pictures of me.  However, he

6      kind of caught me working, but I observed him.

7      And he was always making trouble for me.  He

8      was always coming and saying something crazy.

9           So one particular day I remember it was

10     raining and I -- it was raining outside and I

11     went underneath something to get out of the

12     rain.  And he came yelling at me talking about

13     why I was not working.  I said, Yo, you see

14     that it's raining.  And when it's raining, we

15     generally get out of the rain.

16          And in all my other sites, that's what I

17     was taught that when it's raining, we get out

18     of the rain.  And so he started yelling at me

19     and everything and told me to get back to work.

20     Q      Anything else?

21     A      I can't remember everything that he did.

22     But I know every time I worked with him, he

23     created a problem between him and I.  And I

24     didn't understand why until I found out that he

25     was actually right under Mr. Wiggins.

CONFIDENTIAL

Page 494

                              Brooks

1

2          Wiggins had trained him and everything

3     like that.  So then it started to make sense

4     why he would target me and start messing with

5     me.

6     Q    So did you tell Mr. Bergis about what

7     happened -- you allege happened between you and

8     Mr. Cooper?

9     A    No, I did not.

10    Q    Did you witness anybody else tell him?

11    A    No.

12    Q    The only basis that you have to believe

13    he's even aware of the complaint you made is

14    based on your opinion?

15         MS. O'CONNELL:  Objection.

16    Q    You can answer.

17    A    I don't know.

18    Q    So what's your basis?

19         I'm asking you that --

20    A    I told you.

21         MS. O'CONNELL:  Objection.

22    A    I told you I believe that, you know, that

23    it was through Wiggins.

24    Q    So you believe Wiggins told him?

25         Did you witness any conversation between

CONFIDENTIAL

Page 501

1

2               C E R T I F I C A T E

3    STATE OF NEW YORK           )

4                           :ss

5    COUNTY OF NEW YORK      )

6

7          I, MICHELLE COX, a Notary Public within

8    and for the State of New York, do hereby

9    certify:

10          That GREGORY BROOKS, the witness whose

11    deposition is hereinbefore set forth, was duly

12    sworn by me and that such deposition is a true

13    record of the testimony given by the witness.

14          I further certify that I am not related to

15    any of the parties to this action by blood or

16    marriage, and that I am in no way interested in

17    the outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto set my

19    hand this 27th day of June 2018.

20

21                    _____

22                    MICHELLE COX, CLR

23

24

25