UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREGORY BROOKS,<br><br>   Plaintiff,<br><br>                -against-<br><br>THE DOE FUND, INC., TERRY COOPER individually and in his official capacity, JAMES WASHINGTON individually and in his official capacity, and ANTHONY WIGGINS individually and in his official capacity,<br><br>   Defendants. | Civ. No.: 17-3626 |

**DECLARATION OF GREGORY BROOKS IN OPPOSITION OF DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

I, Gregory Brooks, declare under the penalties of perjury that the following is true and correct:

1. I am over 18 years old and am a resident of the State of New York.

2. I am heterosexual African-American man.

3. I am a husband and the father of three.

4. At all relevant times herein, I was obligated to complete parole and had the option of joining additional programs to help me return to the workforce.

5. In addition to my parole, on or around June 27, 2016, I was admitted into Defendant THE DOE FUND's ("TDF") Ready Willing and Able program ("RWA") as a resident at 520 Gates Ave, Brooklyn New York 11216.

6. While in the RWA program, I was required to follow all of Defendant TDF's rules and procedure, failure to do so would impact my parole.

7. My Case Manager, Mr. Dashell Porter ("Mr. Porter"), assured me that TDF would accommodate of my schedule regarding my parole and a mandatory treatment program (Parole stipulation).

8. Mr. Porter instructed me, "**If I wanted to go to a specific route, I need to speak to Mr. Cooper about that**."

9. That at all times relevant hereto, Defendant TERRY COOPER ("Cooper"), as the Supervisor/ Dispatch Administrator for Defendant TDF, had supervisory authority over me with regard to my new employment at TDF.

10. As a Senior Dispatcher for TDF, Defendant Cooper managed RWA participant's schedules and Defendant Cooper could assign or change routes.

11. On or around July 6, 2016, I told Defendant Cooper, "**Hey Terry, I want to pull you up later to find out about that Hudson Route.**" (Brooks Tr. 155:3-18).

12. I said above referring to a specific employment option offsite, called the Hudson Route.

13. When Defendant Cooper responded to my inquiry of a scheduling change, saying, "**OOOH YEAH, I LIKE TO BE PULLED UP, CHAINED UP AND WHIPPED!**" Defendant Cooper and the rest of the TDF staff laughed, including individuals "on the work crew" and "supervisors."

14. I did not report the Defendant Cooper's inappropriate sexual comments because it was obvious that TDF supervisors and employees were used to hearing Defendant Cooper make sexual comments at the workplace ant TDF's management had no interest in correcting Defendant Cooper's unlawful behavior.

15. On or around July 15, 2016, Defendant Cooper issued I a starting date and a field schedule. But the schedule Defendant Cooper chose for I conflicted with my parole schedule, spending time with my children, and picking up my children after school.

16. On or around July 21, 2016, around 9:00 a.m., Defendant Cooper sexually assaulted me.

17. When Defendant Cooper sexually assaulted me in his office, I was horrified and shocked by the act. As a heterosexual man, I assumed that the first time Defendant Cooper touched my penis, it had to be unintentional, therefore I moved back slightly to prevent it from reoccurring. However, Cooper continued to touch me, and he grabbed my penis in his office.

18. After I left Defendant Cooper's office, I suspected Defendant Cooper was not finished sexually harassing and assaulting me, so I set my phone to record any audio of our conversation before he entered my bedroom. And in my bedroom Defendant Cooper sexually assaulted me by taking my penis out of my pants and stroking it.

19. After Defendant Cooper was finished sexually harassing me, he informed me that he granted me the weekend off and that he moved me from the night shift to the morning shift.

20. All along Defendant Cooper had the power to adjust my schedule, however he wanted sex from me in exchange for making the adjustment.

21. Defendant Cooper's unwanted sexual advances on July 21, 2016 made me extremely uneasy and uncomfortable. Defendant Cooper violated me, leaving I distraught, demoralized, and profoundly stress.

22. In sexually harassing me, Defendant Cooper singled out me as a heterosexual man, he could intentionally shame. Defendant Cooper also preyed on me as a parolee, of whom he could take advantage given my dependency on my continued enrollment in TDF's program in order to avoid incarceration and to see my wife and children.

23. Determined to report the sexual harassment, I sought out Defendant JAMES WASHINGTON that same day, only to be informed that Defendant JAMES WASHINGTON was in meetings and unavailable.

24. That same day, I went to my wife's home to prepare a complaint against Defendant Cooper. Overcome by deep humiliation and a sense of helplessness, I wept as he wrote my complaint.

25. Defendant Cooper violated my manhood, leaving me embarrassed and the trauma prevented me from sharing with my wife what Defendant Cooper had done to me.

26. I knew that Defendant Cooper targeted me not only because he was much bigger than me, but because I was an easy target that would not put up a fight because I needed to complete Defendant TDF's program, I needed employment, and I could not violate my parole.

27. I feared returning to the TDF but had to because he could not risk violating my parole.

28. With night TDF curfew approaching, I called the Gates Ave facility and my parole officer to inform them that I would be late because Defendant TDF had a strict curfew.

29. Gates Ave facility and my parole officer indicated to me that I would not have any issue as I notified them.

30. Once arrived at the Gates facility, I handed the TDF security my complaint regarding the sexual assault. I requested for security to place it in Defendant JAMES WASHINGTON's mailbox.

31. On or around July 23, 2016, I arrived for my last "night shift" before starting my new schedule. Mr. Wiggins a TDF Director, was supervising the route that night and he informed me that he had no information regarding my new schedule.

32. Mr. Wiggins instructed me to speak to with my case manager the following day.

33. The following day, Mr. Porter and Defendant Mr. Wiggins met with I and told me that he would have to work weekends and that they would have a set schedule for me by the end of the day.

34. On or around July 25, 2016, while I was waiting in front of the TDF building for my meeting with TDF Human Resources meeting. Defendant Cooper confronted me in front of the TDF building without me initiating any communication with him.

35. Defendant Cooper said to me in a very hostile manner, "**YOU SAY, THIS MOTHER FUCKER.**"

36. I interpreted Defendant Cooper's conduct and statement "**YOU SAY, THIS MOTHER FUCKER,**" as an act of violence.

37. Defendant Cooper said the above while extremely close to my face and in attempt to intimidate me.

38. I asked Defendant Cooper to please back away, as TDF employees around at the time attempted to calm Defendant Cooper.

39. I was alarmed and frightened by Defendant Cooper's aggressive behavior.

40. One of TDF employees advised me, "**YOU DON'T WANT NO PROBLEMS WITH TERRY. YOU WOULD RATHER HAVE PROBLEMS WITH MR. JAMES WASHINGTON BEFORE YOU HAVE A PROBLEM WITH TERRY**."

41. Upon hearing the above, I feared that Defendant Cooper would retaliate against me and have me thrown out of the program.

42. Defendant TDF staffed asked me to describe how the sexual harassment by Defendant Cooper occurred and I relayed in detail the events of the day before when Defendant Cooper touched my penis multiple times.

43. For several days, TDF did not issue my new schedule or provide any resolution concerning Defendant Cooper's sexual harassment.

44. On or around July 28, 2016, in a meeting about my schedule, Defendant JAMES WASHINGTON told me that I could not have a full weekend or an "overnight" visit with my family, only a "late night" visit because I was too new to the program.

45. This was the first time that TDF told me that my request would be a problem.

46. During this meeting, Mr. Matthews entered the office, despite Defendant JAMES WASHINGTON's objections Mr. Matthews indicated that he could help me, and Mr. Matthews lead me out of the office.

47. As we left, Defendant JAMES WASHINGTON told me, "**REMEMBER YOU CAN HAVE A LATE NIGHT NOT AN OVERNIGHT**."

48. Mr. Matthews told me, "I told you I got you…let's go," and lead I to the office of Mr. Ronald Holly.

49. Furthermore, Mr. Matthews told me that my parole officer already gave me permission for overnight visits with my family.

50. As such, I went to Mr. Ronald Holly's office to receive a new schedule. Mr. Holly said, "**I DON'T KNOW WHO FUCKED UP, BUT YOUR SCHEDULE BEEN IN THE COMPUTER. YOU DON'T EVEN HAVE TO COME IN TO WORK ON SATURDAY BECAUSE IT IS IN THE COMPUTER THAT YOU HAVE THOSE DAYS OFF**."

51. Mr. Holly showed me on the computer my scheduled days off and apologized for the inconvenience. Mr. Holly said, "**IT WAS NOT YOUR FAULT, SOMEONE WASN'T CROSSING THEIR T'S AND DOTTING THEIR I'S. JUST MAKE SURE YOU'RE HERE TO WORK ON MONDAY**."

52. On or around July 29, 2016, during a night out with my family, I called the facility for a second confirmation that I had a late-night status approved.

53. Defendant TDF employee Mr. Clifford confirmed that I was approved to stay out late.

54. I returned to the facility at my scheduled time, however, as I headed to my room, the head guard told me he was not allowed back in my room because I was late.

55. The above statements and conduct confirmed for me that Defendant TDF and its' supervisors were setting me up to be removed from TDF because of my recent complaint about Defendant Cooper.

56. On or around July 30, 2016, Mr. Bell, Defendant TDF's Acting Dispatcher stopped me as he was leaving to visit my family. Bell asked me, "**Where are you going? You have to work**."

57. I informed Bell that I was approved to have weekends off.

58. It was then that I first discovered that Defendant TDF wrote me up for a "No Call, No Show" on July 25, 2016, despite the fact that Defendant JAMES WASHINGTON told me he would be put on the "In House" list and be excused for the day.

59. Additionally, TDF reported me as a "No Call, No Show" on July 28, 2016, when Mr. Porter and Mr. Timothy Matthews instructed me to follow my old work schedule.

60. Neither "No Call, No Show" should have occurred because I was following orders of my TDF supervisors.

61. At all material times, it was TDF's practice to have employees seek shelter when it rained when working outside. However, I was rebuked for doing so after I made a complaint against Defendant Cooper, while other TDF employees around me were not.

62. On one occasion, JAMES WASHINGTON and I agreed that I would receive a day off because I needed to see my parole officer and needed to return back to the facility to speak to TDF's Human Resources. But, on, that day he was put in for a "no call no show."

63. Previously, Mr. Porter and Defendant JAMES WASHINGTON granted me weekends off to see my children.

64. I testified that when I went to make complaints about the retaliation after Defendant Cooper left, JAMES WASHINGTON would tell me that, "**It was going to be taken care of, and he would send me to somebody, and then it would be a problem [again]**."

65. Because of the above retaliatory acts of Defendant TDF, I knew then that the TDF employees and TDF supervisors were setting me up for failure and termination from the program, and additional violations of my parole terms.

66. I feared that I would lose my employment, be removed from the program, or be punished by my parole officer despite my attempts to follow proper procedure and follow the schedule that Defendant TDF communicated to him.

67. After I reported to Defendant TDF that Defendant Cooper sexually harassed me, TDF subjected me to numerous forms of retaliation.

68. Defendant TDF and Mr. Wiggins retaliated against me for my complaints by treating me less favorably to other Defendant TDF residents and employees. Defendant TDF and Mr. Wiggins retaliated against me by withdrawing employment opportunities to me and discouraging me from taking fulltime employment outside of the program.

69. Defendant TDF retaliated against me by refusing other housing opportunities to me, that were typically offered to others.

70. Additionally, Defendant TDF's supervisors purposely woke me up earlier in the morning on days they knew I worked a night shift. Defendant TDF's supervisors did so by banging loudly on my door , jingling keys, or making other noises. The noise is so loud that other residents notice too.

71. Defendant TDF knew that Defendant Cooper made unwanted sexual advances and comments to employees in the past and did not remedy the situation.

72. Defendant TDF retaliated against I for reporting Defendant Cooper's aggressive sexual advances.

73. Defendant TDF failed to take any action to remedy the ongoing pattern and practice of sexual harassment and retaliation.

74. Defendant TDF forced me to continue working with TDF employees that harassed me, even after I complained to JAMES WASHINGTON. This made me extremely uncomfortable and scared that he would continue the harassment.

75. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Mr. Wash Lost Bed**" contains the voice of Defendant Washington, TDF's employee James Stevens (the Gates Ave House Manager), and Gregory Brooks.

76. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Targeted by Tim**" contains the voice of TDF's employee Eric (Head of Security at Gates Ave) and Gregory Brooks.

77. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Lost bed Tim**" contains the voice of TDF's employee Eric (Head of Security at Gates Ave) and Gregory Brooks.

78. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Mr. Bell I**" contains the voice of TDF's employee Mr. Bell and Gregory Brooks.

79. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Mr. Bell II**" contains the voice of TDF's employee Mr. Bell.

80. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Bell off on Sat. and Sun. Wiggins**" contains the voice of TDF's employee Mr. Bell.

81. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Playing with Schedule**" contains the voice of TDF's employee Ronald Holly and Gregory Brooks.

82. I recorded while I lived at TDF, the recording submitted to Defendants titled "**No call No show**" contains the voice of TDF's employee Mr. Bell and Gregory Brooks.

83. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Mr. Porter an Assistant Director**" contains the voice of my Case Manager Dashiell Porter, TDF's Assistant Director Timothy Mathews and Gregory Brooks.

84. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Mr. Bailey - "they're fucking raping people here"**" contains the voice of TDF's employee Mr. Bailey (a former Gates Ave resident) and Gregory Brooks.

85. I recorded while I lived at TDF, the recording submitted to Defendants titled **"Money DHS rent Talk with DOE FUND Staff**" contains the voice of my Case Manager Dashiell Porter, TDF's employee Timothy Mathews, and Gregory Brooks.

86. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Mr. Washington**" (**I's Exhibit 12**) contains the voice of Defendant Washington, an unknown TDF staff member, and Gregory Brooks.

87. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Trainee Discussing Schedule**" contains the voice of at resident/street cleaner at TDF's Gates Ave location and Gregory Brooks.

88. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Threatened Late Night**" contains the voice of TDF's employee Eric (Head of Security at Gates Ave) and Gregory Brooks.

89. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Playing with Schedule Ronald Holly**" (also **I's Exhibit 15**) contains the voice of TDF's employee Ronald Holly and Gregory Brooks.

90. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Late night MW**" contains the voice of TDF's employee Timothy Mathews, Defendant Washington, and Gregory Brooks.

91. I recorded while I lived at TDF, the recording submitted to Defendants titled "**HR Meeting I**" contains the voice of TDF's employee Eunice Gilmore, another woman I don't know, Defendant Washington and Gregory Brooks.

92. I recorded while I lived at TDF, the recording submitted to Defendants titled "**HR Meeting II**" contains the voice of TDF's employee Eunice Gilmore, another woman I don't know, Defendant Washington, and Gregory Brooks.

93. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Mr. Washington on Vernon schedule**" (also **I's Exhibit 14**) contains the voice of Defendant Washington and Mr. Bell, and Gregory Brooks.

94. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Terry 2**" contains the voice of Defendant Cooper and Gregory Brooks.

95. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Terry 3**" contains the voice of Defendant Cooper and Gregory Brooks.

96. I recorded while I lived at TDF, the recording submitted to Defendants titled "**Call with Doe Fund HR Kanise**" contains the voice of TDF's employee Kanise in the Human Resource Department and Gregory Brooks.

**\*\*\*\* The remaining portion of this page has been intentionally left blank \*\*\*\***

I declare certify under penalty of perjury that the foregoing is true and correct.

_____        3/27/2019
            Gregory Brooks                                      Date

MELLINDA ALEXIS
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01AL6374355
Qualified in New York County
Commission Expires     April 23, 2022

13