1

2          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK

3

4   GREGORY BROOKS,                )
                                   )
5         Plaintiff,               )
                                   )
6          vs.                     ) Case No. 17-3626
                                   )
7   THE DOE FUND, INC., TERRY      )
    COOPER individually and in his )
8   official capacity, JAMES       )
    WASHINGTON individually and in )
9   his official capacity, and     )
    ANTHONY WIGGINS individually   )
10  and in his official capacity,  )
                                   )
11        Defendants.              )
    -----------------------------)

12

13

14

15

16

17        CONFIDENTIAL DEPOSITION OF GREGORY BROOKS

18                 New York, New York

19               Thursday, June 7, 2018

20

21

22

23

24   Reported by: MICHELLE COX

25   Job No: 142124

Page 2

```
 1
 2
 3
 4                    June 7, 2018
 5                    10:13 p.m.
 6
 7
 8        Confidential Deposition of GREGORY BROOKS,
 9    held at the offices of Jackson Lewis LLP, 666
10    Third Avenue, New York, New York, pursuant to
11    Notice, before Michelle Cox, a Certified
12    LiveNote Reporter and Notary Public of the
13    State of New York and New Jersey.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2        A P P E A R A N C E S:
 3
 4        DEREK SMITH LAW GROUP
 5        Attorneys for Plaintiff
 6            1 Pennsylvania Plaza
 7            New York, NY 10119
 8        BY:   KELLY O'CONNELL, ESQ.
 9
10        JACKSON LEWIS
11        Attorneys for The Doe Fund and
12        James Washington
13            666 Third Avenue
14            New York, NY 10017
15        BY:   STEVEN SEIDENFELD, ESQ.
16            LORI BAUER, ESQ.
17
18        LEWIS BRISBOIS
19        Attorneys for Terry Cooper
20            77 Water Street
21            New York, NY 10005
22        BY:  BRADLEY BARTOLOMEO, ESQ.
23
24        ALSO PRESENT:  Eunice Gilmore
25
```

Page 4

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED by and
 3    between the attorneys for the respective
 4    parties herein, that filing and sealing be and
 5    the same are hereby waived.
 6        IT IS FURTHER STIPULATED AND AGREED that
 7    all objections, except as to the form of the
 8    question, shall be reserved to the time of the
 9    trial.
10        IT IS FURTHER STIPULATED AND AGREED that
11    the within deposition may be sworn to and
12    signed before any officer authorized to
13    administer an oath, with the same force and
14    effect as if signed and sworn to before the
15    Court.
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2    G R E G O R Y   B R O O K S, called as a witness,
 3        having been duly sworn by a Notary Public, was
 4        examined and testified as follows:
 5    EXAMINATION BY
 6    MR. SEIDENFELD:
 7        Q   Good morning, Mr. Brooks.  I introduced
 8        myself to you before, but let me do so on the
 9        record.
10            My name is Steven Seidenfeld, and I'm here
11        with Lori Bauer, and we're from the law firm of
12        Jackson Lewis, and we represent the defendant,
13        The Doe Fund, and defendant, James Washington,
14        in the lawsuit that you have filed against them
15        in the Eastern District of New York.
16            Also sitting with me is Eunice Gilmore,
17        who is the director of human resources for The
18        Doe Fund, and Brad Bartolomeo, who represents
19        defendant, Terry Cooper.
20            Have you ever had your deposition taken
21        before --
22        A   No.
23        Q   Okay.  So the purpose of taking a
24        deposition today is for me to ask you some
25        questions to find out more about the lawsuit
```

2 (Pages 2 to 5)

1         Brooks - Confidential
2    you're bringing.  Along those things I'll be
3    asking you a series of questions.
4         So a deposition is a little unlike the
5    regular conversation, in that we have our court
6    reporter, Michelle, taking down everything that
7    I ask and that you answer.
8         So just go over a few ground rules to make
9    sure we have a clear record.
10        Does that make sense?
11   A   Yes.
12   Q   So the first difference is that in a
13   regular conversation I might start asking a
14   question, and by the time I'm two-thirds of way
15   through it, you'll know the answer and you'll
16   jump in and you'll answer.
17        If you do that here today, the court
18   reporter won't be able to take down both my
19   full question and your answer.
20        So I ask that when I'm asking you a
21   question you let me finish.  And if I interrupt
22   you please let me know and I'll let you finish.
23        Do you understand?
24   A   I do.
25   Q   The other difference between a deposition

1         Brooks - Confidential
2    and a regular conversation is that in regular
3    conversation, when I ask you a question, you
4    might respond by either shaking your head or
5    nodding your head or saying uh-huh or uh-uh.
6    If you do that today, the court reporter won't
7    be able to take that down.
8         So I ask that in response to my questions
9    that you try and make sure your answers are
10   audible and that you either say "yes" or "no."
11   And if you forget, we'll make sure to remind
12   you.  You won't be the first.
13        I want to make sure that you understand
14   the questions I ask.
15        So if there's something I've asked you and
16   you don't understand, please let me know.
17        Do you understand?
18   A   I understand.
19   Q   If I ask a question and you answer, I'm
20   going to assume that you heard my question,
21   understood it and gave your best answer.
22        Do you understand?
23   A   I do.
24   Q   If a question calls for a yes-or-no
25   answer, I'd like for to you answer "yes" or

1         Brooks - Confidential
2    "no."  If you feel that there's something
3    additional that you'd like to explain, just let
4    me know and we can do that.
5         Does that make sense?
6    A   Yes.
7    Q   Breaks.
8         This isn't an endurance test.  If at any
9    time today you need to take a break, just let
10   us know -- the only -- and you can take one.
11        The exception is if there's a question
12   pending, I'll ask that you answer the question
13   first and then we can take a break.
14        Do you understand?
15   A   Yes.
16   Q   Objections.
17        At times your attorney, Ms. O'Connell, may
18   object.  For the most part this is just for the
19   record and after she objects, you can go ahead
20   and answer my questions, unless she directs you
21   not to answer, which will be rare in a
22   deposition like this.
23        Do you understand?
24   A   Yes.
25   Q   Do you understand the oath that you took

1         Brooks - Confidential
2    is the same as if you were in court?
3    A   Yes.
4    Q   And you understand that you have to tell
5    to the truth?
6    A   Yes.
7    Q   Even if you think it will hurt your case?
8    A   Yes.
9    Q   And you understand that there are
10   consequences associated with not telling the
11   truth when you're under oath?
12   A   Yes.
13   Q   Is there anything today prohibiting you
14   from giving responsive answers to my questions?
15   A   No.
16   Q   Are you taking any medications or drugs
17   that are preventing you from giving responsive
18   answers?
19   A   I take medication, but it shouldn't stop
20   me from giving you answers.
21   Q   Okay.  The medication doesn't affect your
22   memory?
23   A   No.
24   Q   You had a good night sleep last night?
25   A   Not really.

Brooks - Confidential

1
2    Q    You think it will affect your ability to
3    give -- understand my questions and give
4    truthful answers?
5    A    No.
6    Q    Any other reasons that you can't provide a
7    truthful and responsive answer to any of my
8    questions today?
9    A    No.
10   Q    I'm just going to ask you a little bit
11   about what you did to prepare for today's
12   deposition.
13       Did you review any documents?
14   A    I went over it, but I didn't have much
15   time to review it.
16   Q    Okay.
17   A    I work.
18   Q    I'm sorry?
19   A    I work, so I didn't have much time to
20   review.  I tried to, though.
21   Q    What documents did you try and review?
22   A    Trying to understand what this process is
23   like, the deposition, the deposition process.
24   Q    What documents did you look at to help you
25   understand what the deposition process was?

Brooks - Confidential

1
2    A    I can't remember the title of it.  It just
3    described depositions, that I will be asked
4    questions and I had to answer honestly.
5        That's pretty much what I got out of it.
6    But I didn't get to read it all.
7    Q    What was -- I understand you didn't get to
8    read it all and you don't know the title.
9        But what was it?
10       What was in it, generally?
11   A    A breakdown of this proceeding.
12   Q    And what did it say about this proceeding?
13   A    That I was going to be asked question and
14   that I had to answer them.
15   Q    Do you know if that's a document that you
16   provided to us in response to our request for
17   this litigation?
18   A    No, it's not.
19   Q    Is it something that your attorneys
20   prepared for to you review?
21   A    Yes.
22   Q    Okay.  Did you look at any of the
23   pleadings in this case?
24   A    The pleadings?
25   Q    Yes, sure.

Brooks - Confidential

1
2        Do you know what I'm referring to?
3    A    No.
4        What are you referring to?
5    Q    You know you filed a complaint to start
6    this litigation?
7    A    Yes.
8    Q    Did you review that?
9    A    Yes, a while ago.
10   Q    Do you know when that was?
11   A    Maybe last year sometime.
12   Q    Okay.  Have you reviewed any -- strike
13   that.
14       You know that we had asked you to provide
15   certain documents in connection with this case.
16       Have you reviewed any of the documents
17   that you provided to your counsel that were
18   produced to us?
19   A    Have I reviewed any of the documents that
20   I provided to my counsel --
21   Q    Yes.
22   A    -- to provide to you?
23   Q    In preparation for your deposition today.
24   A    No.
25   Q    Have you reviewed any of the documents

Brooks - Confidential

1
2    that The Doe Fund produced to your attorneys in
3    preparation for today's deposition?
4    A    No.
5    Q    Did you review -- do you have any notes
6    about your deposition?
7    A    No.
8    Q    I know in this case you produced some
9    audio recordings.
10       Have you reviewed those in preparation for
11   your deposition?
12   A    No.
13   Q    Do you have any audio recordings that's
14   relevant to your case that you haven't provided
15   to your attorneys?
16   A    No.
17   Q    Other than with Ms. O'Connell or anyone
18   else from her firm, have you discussed your
19   deposition with anyone else?
20   A    No.
21   Q    Any family members?
22   A    No.
23       I told my employee [sic] that I had to
24   come and do something with my lawyer.  That's
25   how I got off of work.

4 (Pages 10 to 13)

Page 14

Brooks - Confidential

1
2  Q   Okay.  Who is your employer?
3  A   MaidPro.
4  Q   And what did you say?
5  A   I told him I had to see my lawyer.  I was
6  going through some type of court proceeding.
7  Q   And who did you say that to?
8  A   My boss.
9  Q   What's your boss' name?
10  A   John.
11  Q   Do you know John's last name?
12  A   Debaer or something like that.  I don't
13  know how to pronounce it.
14  Q   Do you know how to spell it?
15  A   No, but I have it in my phone.
16  Q   Okay.  At a break, maybe, we can give it
17  to the court reporter so we can have a clean
18  record.
19      (Brief interruption.)
20
21  Q   Mr. Brooks, earlier you mentioned that you
22  had taken some medication this morning.
23      What was the medication?
24  A   I didn't say that.
25  Q   I am sorry.

Page 15

Brooks - Confidential

1
2      What did you say?
3  A   I said I take medication.
4  Q   Okay.  And when -- what medication do you
5  take?
6  A   Sleeping medication.
7  Q   Do you know what it is?
8  A   Trazodone or something like that.
9  Q   When's the last time you took Trazodone?
10  A   Couple of days ago.
11  Q   Is it prescribed to you by a doctor?
12  A   Yes.
13  Q   Do you know the name of the doctor?
14  A   I forgot how to pronounce her name.
15  Q   Do you know how to spell it?
16  A   Luda, or something like that.  I don't
17  know, it's an African name.
18  Q   Where is the doctor located?
19  A   In Brooklyn.
20  Q   Where in Brooklyn?
21  A   The clinic that I go to.  Brooklyn Center
22  Health Clinic, Brooklyn Plaza.
23  Q   And when were you first prescribed the
24  sleeping medication?
25  A   This time or any --

Page 16

Brooks - Confidential

1
2  Q   Sure --
3  A   -- any time.
4  Q   -- this time.  Most recently.
5  A   About a couple of months ago.
6  Q   How did you -- strike that.
7      How did you find Ms. O'Connell's law firm
8  to represent you?
9  A   On the Internet.
10  Q   And did you call them up?
11  A   Yes.
12  Q   Okay.  And do you know when that was?
13  A   It was a couple of years ago.
14  Q   Was it while you were still a -- well,
15  strike that.
16      Was it while you were still a participant
17  in the Ready, Willing & Able program?
18  A   No, I was not.
19  Q   Was it when you were still living at The
20  Doe Fund's Gates' Avenue facility?
21  A   I believe so, yes.
22  Q   At what point were you no longer a
23  participant -- when do you believe you were not
24  longer a participant in the Ready, Willing &
25  Able program?

Page 17

Brooks - Confidential

1
2  A   Maybe it was November.  Maybe in
3  November 2017, when I got my own job.
4  Q   November 2017?
5  A   Maybe.  I'm not quite sure.  I'm not
6  really good with dates.
7  Q   So I'm going to be asking you -- we're
8  going to go over your allegations, and I'm
9  going to ask you, to the best you recall when
10  things happened.
11      If you don't recall the exact date, let me
12  know.  If you recall a range, that's fine, too.
13  And we'll work to see if we can help you
14  remember.
15      Okay?
16  A   Okay.
17  Q   So did Ms. O'Connell's law firm represent
18  you when you filed your charge with the EEOC?
19  A   Yes.
20  Q   Do you know when that was?
21  A   No.
22  Q   If I told you it was in August of 2016,
23  does that sound correct?
24  A   Yeah, I think so.
25  Q   Okay.  So before when I -- as of

Brooks - Confidential

1
2   August 2016, you were still in the Ready,
3   Willing & Able program?
4   A   I was living there in the Gates' facility.
5   Q   Okay.  And had you retained -- had you
6   spoken with anyone at Ms. O'Connell's law firm
7   prior to the incidents that you claim happened
8   with Terry Cooper on July 21, 2016?
9   A   No.
10  Q   So it was after the incidents you alleged
11  happened with Terry Cooper that you --
12  A   Yeah.
13  Q   -- reached out --
14      I'm sorry, you have to let me finish.
15      It was after the incidentals you allege
16  happened with Terry Cooper on July 21, 2016,
17  that you reached out to Ms. O'Connell's law
18  firm.
19  A   Yes.
20  Q   Did you contact any other law firms?
21  A   For what?
22  Q   Contact any other law firms after -- after
23  the alleged incident with Terry Cooper on
24  July 21, 2016?
25  A   I did.

Brooks - Confidential

1
2   Q   Which law firms?
3   A   I was doing an Internet search, and I was
4   looking for someone to represent me with this
5   type of lawsuit.
6       So I reached out to a couple of them.  I
7   don't particularly remember the names of them,
8   though.
9   Q   Do you remember the names of any of the
10  attorneys that you spoke with?
11  A   No.
12  Q   Do you remember what you discussed with
13  them?
14  A   Yes.
15  Q   What did you discuss with them?
16  A   The complaint.
17  Q   When you say "the complaint," what do you
18  mean?
19  A   The complaint that I wrote up.
20  Q   You're referring to the complaint that you
21  wrote up the day of the alleged incident with
22  Mr. Cooper?
23  A   Yes.
24  Q   Did you end up retaining any of these law
25  firms?

Brooks - Confidential

1
2   A   One of them, yes.
3   Q   Other than Ms. O'Connell's law firm?
4   A   Yes.
5   Q   What law firm was that?
6   A   I can't remember the name.
7   Q   Okay.
8   A   It was a long time ago.
9   Q   Was it after July 21, 2016?
10  A   After the incident?
11  Q   Yes.
12  A   Yes.
13  Q   Okay.  And why aren't they -- are they
14  still representing you?
15  A   No.
16  Q   When did they stop representing you?
17  A   A couple of months later.
18  Q   Was Ms. O'Connell's law firm and this
19  other law firm representing you at the same
20  time?
21  A   No.
22  Q   When did -- strike that.
23      Why did you switch from this first law
24  firm to Ms. O'Connell's law firm?
25  A   They said it was going to be a conflict of

Brooks - Confidential

1
2   interest.  They knew who Terry was.
3   Q   Okay.  And you don't remember who you
4   spoke to?
5   A   No.
6   Q   What's your arrangement with
7   Ms. O'Connell's law firm in this case?
8   A   Excuse me, what is my arrangement?
9       MS. O'CONNELL:  Objection.
10  Q   Strike that.
11      How are you paying Ms. O'Connell's law
12  firm in this case.
13      MS. O'CONNELL:  Objection.
14      You can answer.
15  Q   You can answer.
16  A   I'm not paying them.
17  Q   Is it a contingency basis?
18  A   What does that mean?
19  Q   That you'll pay them a percentage of
20  anything that you recover.
21      Is that the agreement you have with
22  Ms. O'Connell's law firm?
23  A   It is.
24  Q   Do you know what the percentage is?
25  A   No.

6 (Pages 18 to 21)

Brooks - Confidential

1
2  Q   Is there a written agreement between you
3  and Ms. O'Connell's law firm stating out the
4  terms of their representation of you?
5  A   Yes, it is.
6  Q   Do you know if it's in there, the amount
7  that you'll provide them?
8  A   I don't remember.  It was a lot of
9  paperwork.  I don't remember.
10  Q   Is Gregory Brooks your full name?
11  A   Gregory Scott Brooks.
12  Q   Ever go by a different name?
13  A   No.  Just Gregory Scott or Gregory Brooks.
14  Q   Any nicknames?
15  A   People call me Gee.
16  Q   When did that start?
17  A   Since I was a kid.
18  Q   What's your present address?
19  A   630 Howard Avenue.
20  Q   And how long have you lived there?
21  A   For a little over a year.
22  Q   About June of 2016 -- I'm sorry, June of
23  2017?
24  A   About two days after I was kicked out of
25  the Gates Avenue facility, I was living over

Brooks - Confidential

1
2  there.
3  Q   Do you remember when that was?
4  A   I can't recall.  I'm bad with dates.
5  Q   Do you remember the month?
6  A   No.
7  Q   Do you remember the year?
8  A   It was about a year ago.
9  Q   Okay.  So was it May or June of 2016?
10  A   It was summertime, I believe.
11  Q   May or June of 2017?
12  A   I don't remember.
13  Q   Okay.  Before 630 Howard Avenue, where did
14  you live?
15  A   Gates Avenue.
16  Q   And that was the residence associated with
17  The Doe Fund?
18  A   Yes.
19  Q   And that was where you lived when you were
20  a part of the Ready, Willing & Able program?
21  A   Yes.
22  Q   And about how long did you live there?
23  A   About seven months to a year.
24  Q   Okay.  And where were you -- where did you
25  live -- strike that.

Brooks - Confidential

1
2      At 630 Howard Avenue, does anyone live
3  there with you?
4  A   No.
5  Q   Is it an apartment?
6  A   It is.
7  Q   Do you rent?
8  A   Yes.
9  Q   How much is your rent?
10  A   780.
11  Q   Per month?
12  A   Yeah.
13  Q   Is there any subsidy?
14      Do you receive any subsidy for your rent,
15  for your rent payments?
16  A   Subsidy, you mean assistance?
17  Q   Public assistance of some sort.
18  A   Yeah, I have a program assisting me with
19  rent.
20  Q   And is that on top of the 780, or does
21  that cover a portion of it?
22  A   A portion.
23  Q   Do you know what portion that is?
24  A   About 500.  I think 580, something like
25  that.

Brooks - Confidential

1
2  Q   Okay.  And you said before Howard Avenue
3  you lived at Gates Avenue, you said for
4  about -- between seven months to a year.
5  A   Mm-hmm.
6  Q   And where were you before that?
7  A   In a shelter.
8  Q   Do you know what shelter?
9  A   I believe it was on Bedford Avenue.
10  Q   About how long were you there for?
11  A   A couple of days.
12  Q   And before that, where did you live?
13  A   I was staying with my wife.
14  Q   Okay.  Where does your wife live?
15  A   In the Bronx.
16  Q   What's the address?
17  A   I'm not giving you my wife's address.
18  Q   You have to give us your wife's address.
19  There's no reason to withhold it.
20      MS. O'CONNELL:  You can -- you have to
21  answer the question.  But we can protect the
22  information so there won't be any harassment.
23  A   838 Leland Avenue.
24  Q   And is there an apartment?
25  A   No.

```
 1              Brooks - Confidential
 2   Q    It's a private house?
 3   A    It's a condo.
 4   Q    It's a condo.
 5       Is there a number associated with the
 6   condo?
 7   A    I just gave you the number.
 8   Q    Mr. Brooks, there's no need to get upset
 9   here.  These are just some background questions
10   that we ask of every witness in a case like
11   this.  It's nothing personal to you.
12       So if you can just bear with me, we'll be
13   able to get through this as best we can.
14       So 830 Leland Avenue is the complete
15   address?
16   A    838.
17   Q    838 Leland Avenue is the complete address?
18   A    That's the address.
19   Q    If you were to send a letter there, that's
20   all you would write?
21   A    Bronx, New York.
22   Q    Who lives there?
23   A    My wife and children.
24   Q    Does your wife currently live there?
25   A    Yes.
```

```
 1              Brooks - Confidential
 2   Q    Okay.  Who lives there -- you said your
 3   children as well?
 4   A    Yes.
 5   Q    How old are your children?
 6   A    Eleven and 12.
 7   Q    Okay.  And these are children -- these are
 8   your biological children?
 9   A    These are my biological children.
10   Q    Are you and your wife currently legally
11   married?
12   A    Yes.
13   Q    Okay.  When did you get married?
14   A    May 5, 2006.
15   Q    And you've been continuously married since
16   then?
17   A    Yes.  Separated.
18   Q    When were you separated?
19   A    2011, 2010, one of them years.
20   Q    And you're still --
21   A    Separated.
22   Q    Sorry.
23       You're still separated as of today?
24   A    Yes.
25   Q    Okay.  But you haven't -- neither of you
```

```
 1              Brooks - Confidential
 2   have filed divorce proceedings?
 3   A    No.
 4   Q    Prior to living in the Bronx at your
 5   wife's apartment, where did you live before
 6   that?
 7   A    I stayed in a three-quarter house.
 8   Q    Okay.  Where was that?
 9   A    In Brooklyn.
10   Q    And do you know what the dates were?
11   A    I only stayed there for a few days.
12   Q    Okay.  And before that?
13   A    I was in prison.
14   Q    And where was that?
15   A    The prison that I left?
16   Q    Yes.
17   A    Queensboro.
18   Q    And how long were you there for?
19   A    About a month.
20   Q    And that would have been in the early
21   spring of 2016?
22   A    It's possible.
23   Q    Okay.  And before that where were you?
24   A    I was in Franklin Correctional Facility.
25   Q    And do you know where that is?
```

```
 1              Brooks - Confidential
 2   A    Malone.
 3   Q    I'm sorry.
 4   A    I believe it's Malone County.
 5   Q    Upstate?
 6   A    Yup.
 7   Q    How long were you there for?
 8   A    About three years.
 9   Q    Since about 2013?
10   A    Yeah.
11   Q    Okay.  Do you remember the month?
12   A    That I got there?
13   Q    Yes.
14   A    I think it was in June.  I'm not sure, but
15   I think it was June.
16   Q    That's okay.
17       And when -- where were you -- where did
18   you live before that?
19   A    Before that I was on Rikers Island.
20   Q    And for how long?
21   A    I stayed there for a few months.
22   Q    And before that?
23   A    Before that I was living in Park Slope,
24   Brooklyn.
25   Q    You know -- were you living on your own?
```

Page 30

Brooks - Confidential

1
2    A    No.
3    Q    Were you living with your wife?
4    A    I was staying with a friend.
5    Q    Okay.  Who's the friend?
6    A    Karen Longo.
7    Q    You said Karen Longo?
8    A    Yes.
9    Q    How long did you live with Ms. Longo?
10   A    A little over a year.
11   Q    2012 to 2013?
12   A    Mm-hmm.
13   Q    Anyone else live with you and Ms. Longo?
14   A    Eventually my wife and children came to
15   stay.
16   Q    And after you lived -- so I just want to
17   make sure.
18        It was from Park Slope, and after that
19   were you in Rikers Island?
20   A    Yes.
21   Q    And before Park Slope?
22   A    I was in Georgia.
23   Q    I'm sorry?
24   A    Georgia.
25   Q    Where in Georgia?

Page 31

Brooks - Confidential

1
2    A    Norcross.
3    Q    How long were you there?
4    A    About a year.
5    Q    Okay.  Where did you -- did you live in an
6    apartment, in a house?
7    A    I did.
8    Q    In an apartment?
9    A    Yes.
10   Q    And did you live with anyone?
11   A    I had a roommate.
12   Q    And who was the roommate?
13   A    His name was Robert.
14   Q    Do you remember Robert's last name?
15   A    Reed.
16   Q    Okay.  And only one address when you were
17   in Georgia?
18   A    Yes.
19   Q    Okay.  Before that where did you live?
20   A    I lived in Arizona.
21   Q    Okay.  For how long?
22   A    About six years.
23   Q    About 2014 to about 2010?
24   A    Yes, something like that.
25   Q    Where in Arizona?

Page 32

Brooks - Confidential

1
2    A    Tusayan, Arizona.
3    Q    Okay.  And did you live in an apartment or
4    a house?
5    A    I lived in a house.
6    Q    The same house the whole time?
7    A    No.
8    Q    The last place you lived in Tusayan?
9    A    Was a house.
10   Q    Did anyone live with you there?
11   A    My wife and children.
12   Q    Before the last house -- do you remember
13   the dates?
14        Do you remember about how long you lived
15   in that house?
16   A    No.  I stayed there for about four years.
17   Q    Okay.  Did you own or rent it?
18   A    I rented.
19   Q    And before that house where did you live
20   in Tusayan?
21   A    I lived in an apartment.
22   Q    Did you live with anyone?
23   A    My wife and kids.
24   Q    And anywhere before that apartment?
25   A    Yep, I stayed with a cousin out there.

Page 33

Brooks - Confidential

1
2    Q    In Tusayan?
3    A    Mm-hmm.
4    Q    For about how long?
5    A    A few months.
6    Q    Were your wife and kids with you there?
7    A    Yes.
8    Q    And before that apartment?
9    A    I was at New York.
10   Q    And where in New York?
11   A    In the Bronx.
12   Q    Where in the Bronx?
13   A    Brook Avenue.
14   Q    Okay.  That was an apartment?
15   A    Yes.
16   Q    And who did you live with?
17   A    My wife and my kids.
18   Q    You remember about what year that was?
19   A    Yes, around 2004, 2005.
20   Q    And before that?
21   A    I was in prison.
22   Q    And which prison?
23   A    Gowanda.
24   Q    Sorry?
25   A    Gowanda was a prison that I came home

1          Brooks - Confidential
2    from.
3    Q    An where is that?
4    A    I don't remember.  I think it's in
5    Clinton.
6    Q    It's in Upstate New York?
7    A    Yeah.
8    Q    Do you remember how long you were there
9    for?
10   A    Maybe a year.
11   Q    You were in a prison before that?
12   A    Yeah.
13   Q    I'm sorry, before you were in Gowanda,
14   were you in another correctional facility
15   before that?
16   A    Yes.
17   Q    Where?
18   A    Attica.
19   Q    That's in Upstate New York?
20   A    Yes.
21   Q    How long were you there for?
22   A    Maybe a year or two.
23   Q    And what about before that?
24   A    I was in prison.
25   Q    And where?

1          Brooks - Confidential
2    A    Upstate Correctional Facility.
3    Q    That's the name of it, Upstate
4    Correctional Facility?
5    A    Yes.
6    Q    And before that were you in another
7    correctional facility?
8    A    Yes.
9    Q    And what was that?
10   A    Clinton.
11   Q    Okay.  And how long were you there for?
12   A    A few months.
13   Q    And before Clinton?
14   A    Sing Sing.
15   Q    How long were you there for?
16   A    Maybe a month.
17   Q    And before that?
18   A    Rikers Island.
19   Q    And before that?
20   A    I was home.
21   Q    And home is where?
22   A    I was staying with a friend in Manhattan.
23   Q    So from the time you were in Rikers, Sing
24   Sing, Clinton, Upstate Correctional Facility,
25   Attica and Gowanda, do you know what time

1          Brooks - Confidential
2    period that was, generally?
3    A    I think it was '98, 1998.
4    Q    Was when you started or when you left?
5    A    When I started.
6    Q    Okay.  And when did you leave the last
7    place, which I believe was Gowanda?
8    A    2004, I believe.
9    Q    Okay.  Before this period of '98 to 2004,
10   were there any other times when you were in
11   prison?
12   A    Yes.
13   Q    And do you know when?
14   A    In 1997.
15   Q    Okay.  And for how long?
16   A    One year.
17   Q    Okay.  What prison?
18   A    Rikers Island.
19        It's not a prison, it's a jail.
20   Q    Excuse me.
21        And before you were in jail in Rikers
22   Island, had you been incarcerated in a prison
23   or jail prior to that?
24   A    I was home before that.
25   Q    Okay.  And before -- and before the year

1          Brooks - Confidential
2    you were in Rikers Island, 1997, had you ever
3    been in prison or jail before?
4    A    Yes.
5    Q    When was that?
6    A    2005.
7    Q    So I think I asked you -- that was -- 2005
8    would have been covered in the period of what
9    we said between --
10   A    I mean 1995.
11   Q    All right.  1995.
12        And what prison were you in then, or was
13   it a jail?
14   A    I was in Rikers Island.
15   Q    And for how long?
16   A    Two years, a little over two years.
17   Q    And before that were you ever in prison or
18   jail?
19   A    Before that I was home.
20   Q    And you said -- home was in the Bronx or
21   was it with your friend in Manhattan?
22   A    No, I was with my family.
23   Q    And where was that?
24   A    112th Street and Lexington Avenue.
25   Q    Any other time you spent in a prison, jail

Page 38

Brooks - Confidential

1
2  or a correctional facility that we haven't
3  discussed?
4  A   My adolescence.
5  Q   What was that?
6  A   Juvenile.
7  Q   When was that?
8  A   I can't remember.
9  Q   Do you know remember how old you were?
10  A   I think I was 14.
11  Q   And do you remember what facility you were
12  in?
13  A   Yeah.
14  Q   What was it?
15  A   I was in Tryon.
16  Q   Where is that?
17  A   I don't know where it is.  Upstate
18  somewhere.
19  Q   Upstate, that's fine.  Upstate is
20  perfectly fine.
21      What about -- any other times you were in
22  prison or jail or a correctional facility?
23  A   No, I was in group homes, stuff like that.
24  Q   That wasn't as a result of an arrest or a
25  conviction?

Page 39

Brooks - Confidential

1
2  A   Yeah, it was.
3  Q   Okay.  So when was that?
4  A   It was all around the same time.
5  Q   So you were -- how long were you in Tryon?
6  A   About a year.
7  Q   And the group homes were prior to that?
8  A   Mm-hmm.
9  Q   And those were related to the same arrest
10  and conviction?
11  A   Yes.
12  Q   About how long were you in the group
13  homes?
14  A   Months.
15  Q   Any other correctional facilities that we
16  haven't discussed?
17  A   No.
18  Q   What's your date of birth?
19  A   7/19/76.
20  Q   And where were you born?
21  A   Manhattan.
22  Q   What's your phone number?
23  A   My phone number, (347) 358-9500.
24  Q   And Ms. O'Connell said we can mark it
25  confidential.

Page 40

Brooks - Confidential

1
2  What's your Social Security number?
3  A   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.
4  MS. O'CONNELL:  And can we have the phone
5  number and birth date marked confidential?
6  MR. SEIDENFELD:  Sure.
7  Q   Ever use a different Social Security
8  number?
9  A   No.
10  Q   Okay.  And before you said that you're
11  legally married from your wife but separated?
12  A   Yeah.
13  Q   Any other marriages?
14  A   No.
15  Q   Okay.  And you said you had two children
16  with your wife.
17      Any other children?
18  A   My stepson.  I raised him.
19  Q   Is that your wife's son?
20  A   Yes.
21  Q   Okay.  It's not biologically your son?
22  A   No.
23  Q   How old is your stepson?
24  A   Nineteen.
25  Q   What's your wife's current occupation?

Page 41

Brooks - Confidential

1
2  A   I don't know what she do.  She's usually a
3  banker.
4  Q   You ever filed a lawsuit prior to your
5  lawsuit against The Doe Fund?
6  A   No.
7  Q   No divorce?  No bankruptcy?
8  A   No.
9  Q   Okay.  Other than the claims against The
10  Doe Fund, you ever filed an administrative
11  complaint of discrimination either with the
12  EEOC or the State or the City agencies that
13  deal with those types of claims?
14  A   I don't really know what you're talking
15  about.
16      But, no, I haven't filed nothing.
17  Q   Okay.  Ever file a complaint anywhere
18  alleging that other than your allegations in
19  this case, have you ever filed any kind of
20  complaint alleging that you were either
21  discriminated, retaliated or harassed by an
22  employee?
23  A   No.
24  Q   What's your highest level of education?
25  A   Completed?

TSG Reporting - Worldwide - 877-702-9580

1           Brooks - Confidential
2     Q    Yes.
3     A    6th grade.
4     Q    Do you have a GED?
5     A    No.
6     Q    Are you working towards one?
7     A    I would like to get one.
8     Q    Can you read and write?
9     A    Yes.
10    Q    I'm just going to go back and hopefully we
11    can do this a little more quickly in your
12    history.  I just want to ask you about your
13    conviction history.
14         So starting with the most recent, when was
15    the last time you were convicted of a crime?
16    A    2012, 2013.
17    Q    I'm sorry, did I ask you for the most
18    recent?
19    A    Yes.
20    Q    The most recent, I'm sorry, you said was?
21    A    2012, 2013.
22    Q    And what were you charged with?
23    A    Possession of a weapon.
24    Q    And were you convicted?
25    A    I was.

1           Brooks - Confidential
2     Q    You plead guilty?
3     A    I did.
4     Q    How much time -- what was your sentence
5     of?
6     A    Four years.
7     Q    Did you serve all four years?
8     A    Five years post supervision.
9     Q    When you say "five years post
10    supervision," what do you mean?
11    A    It's like parole.
12    Q    So four years you were you in prison or
13    jail and then another year on parole?
14    A    Five years on parole.
15    Q    I'm sorry.
16         So you were in prison for four years, and
17    then parole for five?
18    A    Yeah.
19    Q    So you're still currently on parole today?
20    A    Yes.
21    Q    Okay.  What was the -- before that, when
22    was the last time you were convicted of a
23    crime?
24         Actually -- strike that.
25         And that was what we spoke about before

1           Brooks - Confidential
2     when you were in Queensboro and Franklin and
3     Rikers Island?
4     A    Yeah.
5     Q    And before the conviction for possession
6     of a weapon, what was the next -- what was the
7     next most recent crime you were convicted of?
8     A    Drugs.  Drug crime.
9     Q    What was it?
10    A    Directing a sale.
11    Q    Do you know when that was?
12    A    1998.
13    Q    Okay.  And were you convicted?
14    A    Yes.
15    Q    Did you plead guilty?
16    A    I did.
17    Q    So no trial?
18    A    No.
19    Q    Okay.  How long were you sentenced for?
20    A    Four and a half to nine years.
21    Q    How long did you serve?
22    A    Six.
23    Q    And that was before, when we discussed you
24    were in Gowanda or Attica, Upstate Correctional
25    Facility, Clinton, Sing Sing and Rikers?

1           Brooks - Confidential
2     A    Yes.
3     Q    Prior to that, what was the next most
4     recent crime you were convicted of?
5     A    Gun possession.
6     Q    And when was that?
7     A    In 1997.
8     Q    And you pled guilty?
9     A    I did.
10    Q    How much time, what was your sentence?
11    A    One year.
12    Q    And did you serve the full year?
13    A    No.
14    Q    How long did you serve?
15    A    Six, seven months, something like that.
16    Q    And that was at Rikers?
17    A    Yes.
18    Q    And before that, when was the next most
19    recent conviction?
20    A    I wasn't convicted of nothing else.
21    Q    Was that when you were in Rikers around
22    1995?
23         Strike that.
24         Were you charged with something?
25    Actually, strike that.

```
 1              Brooks - Confidential
 2      So before 1997, had you been convicted of
 3  any other crimes?
 4      A   Before 1997, was I convicted of anything,
 5  yes.  As a child I was convicted of gun
 6  possession.
 7      Q   And that was when you were 14?
 8      A   Yeah.
 9      Q   Any other times that we haven't discussed
10  when you were arrested, other than what we've
11  discussed, have there been times when you were
12  arrested but not convicted of a crime?
13      A   Yeah, when I was on Rikers Island.  That's
14  the only time.
15      Q   I'm sorry?
16      A   When I was on Rikers Island, that's the
17  only time.
18      Q   That was the first time you were on Rikers
19  Island?
20      A   Yes.
21      Q   Around -- and you believe -- you said
22  around 995?
23      A   Yes.
24      Q   And what were you charged with?
25      A   Homicide.
```

```
 1              Brooks - Confidential
 2      Q   And was there a trial?
 3      A   Yes.
 4      Q   And what was the result of the trial?
 5      A   I was innocent.
 6      Q   Okay.  Do you know what the specific
 7  charge was?
 8      A   Murder in the second degree.
 9      Q   Tell us what you were alleged of doing?
10      A   No.
11      Q   Why not?
12      A   I'm not talking about that.
13      Q   I know this is not a pleasant topic, but
14  we're entitled to ask questions about your
15  background, especially given your demands in
16  this case for emotional distress damages.  We
17  need to know about your background and your
18  past.  I apologize if it's uncomfortable, but
19  we really need you to answer.
20      A   Repeat the question.
21          MR. SEIDENFELD:  Can you repeat my
22  question before.
23          (Record read.)
24  BY MR. SEIDENFELD:
25      Q   Okay.  I'll ask my question again.
```

```
 1              Brooks - Confidential
 2      What were you accused of doing when you
 3  were charged with second degree murder?
 4      A   I was accused of killing somebody.
 5      Q   And who was that?
 6      A   I don't know.
 7      Q   What were -- did you ever find out the
 8  person who you were accused of killing?
 9      A   I don't remember his name.
10      Q   Was it someone -- someone you never knew?
11      A   Yeah, I didn't know him.
12      Q   Okay.  How did you come to be arrested for
13  the murder?
14      A   The police came to my house and picked me
15  up.
16      Q   What did they say to you?
17      A   That I was under arrest.
18      Q   Did they tell you why?
19      A   No.  They waited until they got me into
20  the precinct.
21      Q   At some point did somebody tell you you
22  were under arrested?
23      A   Yes.
24      Q   What did they tell you?
25      A   I was under arrest in connection with the
```

```
 1              Brooks - Confidential
 2  murder of some person, the guy.  I don't
 3  remember his name.
 4      Q   You had a trial, right?
 5      A   I did.
 6      Q   Okay.  And at the trial, did the
 7  prosecution lay out why they believed you had
 8  committed the crime?
 9      A   Yes.
10      Q   What did they say?
11      A   They said they had witnesses saying that I
12  did it.
13      Q   Where did they say -- where did they
14  accuse you of doing this?
15      A   What?
16      Q   Where did the prosecutor say -- where did
17  the prosecutors alleged that you committed this
18  crime, the location of the murder?
19      A   I don't remember.
20      Q   Was it in Manhattan?
21      A   Yeah, it was in Manhattan.
22      Q   Upper Manhattan?
23      A   In Manhattan.  I don't remember the exact
24  location.
25      Q   Okay.  Do you remember who the witnesses
```

Page 50

Brooks - Confidential

1
2  were?
3  A   Not by name.
4  Q   Where they people that you knew?
5  A   Yes.
6  Q   Okay.  How did you know them?
7  A   Seeing them in the neighborhood.
8  Q   Okay.  And did they testify at trial?
9  A   They did.
10  Q   Okay.  And they -- do you know what they
11  testified?
12  A   From what I remember, they said they seen
13  me in the proximity of where they were, but
14  none of them actually said I did it.
15  Q   Okay.  And were you -- what was -- strike
16  that.
17      Were you acquitted, or did the trial
18  result in a hung jury?
19  A   I was acquitted.
20  Q   And so the two years that you were in
21  Rikers, was while you were on trial for that
22  case?
23  A   Yes.
24  Q   In around 1995?
25  A   Yes.

Page 51

Brooks - Confidential

1
2  Q   Ever have a restraining order entered
3  against you?
4  A   No.
5      MR. SEIDENFELD:  You know what, let's take
6  a few -- take a little bit of a break.
7      (Recess taken.)
8  BY MR. SEIDENFELD:
9  Q   Mr. Brooks, in the trial for second degree
10  murder we just discussed, were you represented
11  by counsel?
12  A   Yes.
13  Q   Where was the counsel from?
14  A   Manhattan.
15  Q   Was it a private lawyer that you paid for?
16  A   No.
17  Q   Was it through legal aid?
18  A   No.
19  Q   What was it through?
20  A   It was an 18B lawyer.
21  Q   A who?
22      (Record read.)
23  Q   What's an 18B lawyer?
24  A   The name of the organization was Harlem
25  Defense Services.

Page 52

Brooks - Confidential

1
2  Q   I'm sorry, Mr. Brooks, if you could look
3  at the court reporter it may be a little easier
4  for her to take down what you're saying.
5  A   Harlem Defender Services.
6  Q   Is that an organization that provides
7  legal services for -- on a pro bono basis?
8  A   Yes.
9  Q   Okay.  Do you remember the name of the
10  lawyer who represented you?
11  A   Yes.
12  Q   And what was the name?
13  A   Jenny Kronenfeld.
14  Q   Kronenfeld?
15  A   Yeah.
16  Q   Okay.  Before, Mr. Brooks, you said that
17  had you dropped out of school -- did you drop
18  out of school in sixth grade?
19  A   It was either the fifth or the sixth.
20  Q   And what were the circumstances
21  surrounding that?
22  A   My mother died of AIDS.
23  Q   And was your father living at that time?
24  A   No.
25  Q   When did your father pass away?

Page 53

Brooks - Confidential

1
2  A   The year before.
3  Q   And what did he pass away from?
4  A   Same thing.
5  Q   And were you living with -- were you
6  living with your mother at the time she past
7  away?
8  A   Yeah, you could say so.
9  Q   When you say, "you could say so," what do
10  you mean?
11  A   I was supposed to be staying with her.
12  Q   But you were staying somewhere else?
13  A   Yeah, I went to the street.
14  Q   So -- strike that.
15      Did you have any siblings?
16  A   Yes.
17  Q   How many siblings do you have?
18  A   One.
19  Q   Brother or sister?
20  A   Sister.
21  Q   Younger or older?
22  A   Older.
23  Q   How much older?
24  A   Two years.
25  Q   And did she -- was there a period where

14 (Pages 50 to 53)

Page 54

Brooks - Confidential

1
2    you lived with -- both with your mother and
3    father?
4    A   Yes.
5    Q   And your sister lived with you?
6    A   Yes.
7    Q   And after your father passed away, did
8    your sister still live with you?
9    A   Yes.
10   Q   Okay.  You said there was a time when you
11   lived on the streets while your mother was
12   still alive.
13       Did your sister live on the streets as
14   well?
15   A   No.
16   Q   Did she still live with your mother?
17   A   No.
18   Q   And why did you go and live on the
19   streets?
20   A   I found it very difficult to watch my
21   mother dying in front of me.
22   Q   She had AIDS at that time?
23   A   She did.
24   Q   Okay.  Did she ask you to leave?
25   A   No.

Page 55

Brooks - Confidential

1
2    Q   You voluntarily decided to go live on the
3    streets?
4    A   I left.
5    Q   It was a voluntary decision you made?
6    A   Yeah.
7    Q   And how long did you live on the streets?
8    A   I don't remember.
9    Q   How old -- and this was when you were
10   about in the sixth grade?
11   A   Yeah.
12   Q   Okay.  And do you remember what age you
13   were when -- you remember what age you were
14   when you stopped living in the streets?
15   A   When I got arrested.
16   Q   And how old were you when you were
17   arrested?
18   A   Fourteen.
19   Q   Okay.
20   A   Something like that.
21   Q   When you were on the streets,
22   did -- strike that.
23       When you were living in your parents'
24   home, were you ever assaulted?
25   A   What do you mean by that?

Page 56

Brooks - Confidential

1
2    Q   Were you ever assaulted when you lived --
3    you don't know what I mean by the term
4    "assault"?
5    A   It could mean a lot of things.
6    Q   What does it mean to you?
7    A   Well, this is a different kind of assault.
8    It's sexual assault, it's physical, brutal
9    assault, it's mental.
10   Q   Any of those types of assault.
11   A   I've been in fights when I was a kid,
12   yeah.
13   Q   While you were still living with your
14   parents?
15   A   Yes.
16   Q   Those were other children your age?
17   A   Yes.
18   Q   You ever have to go to the hospital as a
19   result of any of those fights?
20   A   No.  Not that I recall, no.
21   Q   All right.  We discussed a few other types
22   of assaults.  You said sexual assault.
23       Were you ever sexually assaulted during
24   the time you were living with your parents?
25   A   No.

Page 57

Brooks - Confidential

1
2    Q   And you said mental assault.
3       You ever mentally assaulted -- actually,
4    what do you mean by the term "mentally
5    assaulted"?
6    A   Being picked on, bullied.
7    Q   I want to go back.  I asked you if you
8    were ever sexually assaulted when you were
9    living with your parents.
10      I want to say not only by your parents,
11   but by anyone else as well.  So I just want to
12   make sure we're clear.
13   A   No.
14   Q   Okay.  And when you were on the streets,
15   were you ever physically assaulted?
16   A   No.
17   Q   Never got into any fights?
18   A   I got into fights, yes.
19   Q   Did you ever physically assault anyone
20   when you were on the streets?
21   A   Yes.
22   Q   What were the circumstances?
23   A   I could barely remember.  I mean, we have
24   arguments and fights.  I was living in the
25   ghetto, in the hood.  Arguments and fights

1          Brooks - Confidential
2  happen all the time.
3    Q   When you say "the streets," I just want to
4  be -- were you living on the streets?
5       Was there some sort of -- any kind of
6  shelter?
7       Where exactly were you staying?
8    A   I was staying with different friends.
9    Q   Okay.  So --
10   A   From house to house.  I had no solid
11 residence.
12   Q   So you were at different friends, but you
13 weren't physically sleeping outside on the
14 streets at night?
15   A   No, no.
16   Q   The friends were your age or were they --
17 I'm sorry.
18   A   Yes.
19   Q   Were any of these friends, were they
20 friends who lived with their parents?
21   A   Yes.
22   Q   Okay.  And so this period when you said
23 you were living on the streets, was really you
24 were moving around from friends to friends'
25 houses, correct?

1          Brooks - Confidential
2    A   Yes.
3    Q   And that was in the neighborhood where you
4  were growing up?
5    A   Yes.
6    Q   When you were moving around to different
7  friends' houses, were you ever physically
8  assaulted?
9    A   Yes, I've been in fights then, too.
10   Q   Ever go to the hospital for any?
11   A   No.
12   Q   Ever have to seek any other kind of
13 medical treatment?
14   A   No.
15   Q   Ever have to seek any medical treatment
16 for the physical assault when you were living
17 at different friends' houses?
18   A   No.
19   Q   When you were living in different friends'
20 houses after sixth grade, were you ever
21 sexually assaulted?
22   A   No.
23   Q   While you were living in other friends'
24 houses, did anyone ever touch you in a sexual
25 manner without your consent?

1          Brooks - Confidential
2    A   No.
3    Q   When you were living in your other
4  friends' houses, did you ever touch someone in
5  a sexual manner without their consent?
6    A   No.
7    Q   Did you ever sexually assault anyone?
8    A   No.
9    Q   You said after you were living in
10 different friends' houses, you were arrested
11 shortly after when you were 14?
12   A   Yes.
13   Q   I just don't recall; what were you charged
14 with when you were 14?
15   A   A weapon.
16   Q   Weapons?  Possession of a weapon?
17   A   Yes.
18   Q   Have you ever -- was it a gun?
19   A   Yes.
20   Q   Where did you get the gun from?
21   A   A friend.
22   Q   Did you ever fire the gun?
23   A   Yes.
24   Q   And what were the circumstances of that?
25   A   I fired the gun on top of the building, it

1          Brooks - Confidential
2  was a shotgun.
3    Q   When was that?
4       I'm sorry, was that in the period you were
5  moving around from different friends'
6  apartments?
7    A   Yeah.
8    Q   Is that what led to your arrest for
9  possession?
10   A   Yes.
11   Q   Okay.  And the weapon that you were
12 arrested for possessing was a shotgun?
13   A   Yes.
14   Q   After that, you said you had gone to a
15 group -- to group homes, correct?
16   A   Yes.
17   Q   Okay.  Were you ever physically assaulted
18 in the group homes?
19   A   I had a fight.
20   Q   With another group home member?
21   A   Yes.
22   Q   Were you ever physically assaulted by any
23 of the staff members of the group home?
24   A   Yes.
25   Q   And what were the circumstances of that?

Page 62

Brooks - Confidential

1
2  A   From what I could remember, I was upset
3  for something.  I gave them attitude, so he
4  beat me up.
5  Q   Who beat you up?
6  A   One of the staff members.
7  Q   And about how old were you?
8  A   Around 14 or 15.
9  Q   This was before you went to Tryon?
10  A   This was when I was at Tryon.
11  Q   Tryon the group home, or was there a group
12  home m before Tryon.
13  A   There was a group home before Tryon.  I
14  didn't get into it with no staff there.  I only
15  got into it with staff at Tryon.
16  Q   Is Tryon a correctional facility, do you
17  know?
18      Were you allowed to come and go as you
19  pleased at Tryon?
20  A   No, no.
21  Q   What about the group home before that?
22  A   No.  I wasn't allowed to come and go as I
23  pleased nowhere, none of them.
24  Q   At the group home before Tryon, were you
25  ever sexually assaulted?

Page 63

Brooks - Confidential

1
2  A   No.
3  Q   Did you ever sexual assault anyone at the
4  group home before Tryon?
5  A   No.
6  Q   Did anyone ever touch you in your genitals
7  or any other sexual manner without your consent
8  at the group home?
9  A   No.
10  Q   What about at Tryon; did anyone ever
11  sexually assault you there?
12  A   No.
13  Q   Did anyone ever touch you in a sexual
14  manner without your consent?
15  A   No.
16  Q   Okay.  Did anyone ever touch you on your
17  genitals or while you were at the group home or
18  at Tryon in a manner that wasn't sexual, other
19  than a doctor?
20  A   What do you mean, a fight?
21  Q   Sure.
22  A   I got in fights at Tryon; yes, I did.
23  Q   Anyone there -- were you hit or kicked in
24  your --
25  A   In my genital area?

Page 64

Brooks - Confidential

1
2  Q   -- genitals?
3  A   No, no.
4  Q   So I asked you if you ever -- I just want
5  to make sure we're covering everything.
6      Other than -- so I asked you if anyone
7  ever touched you in your genitals in a sexual
8  manner while you were in the group home or at
9  Tryon.
10      Did anyone ever touch your genitals in a
11  nonsexual manner when you were in the group
12  home or at Tryon?
13      MS. O'CONNELL:  Objection.
14      You can answer.
15  A   Not that I remember.  Maybe the nurse or
16  something while they were doing a physical.
17  Q   Okay.
18  A   Other than that, no.
19  Q   Nothing other than -- nothing that wasn't
20  a part of a medical procedure or medical
21  examination?
22  A   Yeah.
23  Q   When you were going from friend to
24  friends' home, did you do any drugs?
25  A   Yes.

Page 65

Brooks - Confidential

1
2  Q   What drugs did you do?
3  A   Marijuana.
4  Q   Anything else?
5  A   Drank alcohol from time to time.
6  Q   Okay.  Any other drugs?
7  A   No.
8  Q   Okay.  At the group home and at Tryon, did
9  you take any drugs?
10  A   Yes.
11  Q   What -- marijuana?
12  A   Yes.
13  Q   Did you drink alcohol?
14  A   No.
15  Q   Take any other drugs?
16  A   No.
17  Q   Take heroin?
18  A   Never.
19  Q   Never?
20  A   No.
21  Q   I'm sorry?
22  A   No.
23  Q   You ever taken heroin in your life?
24  A   No.
25  Q   Ever taken any other illegal drugs in your

Page 66

```
 1            Brooks - Confidential
 2   life that we haven't discussed?
 3   A    Any illegal drugs?
 4   Q    Any other illegal drugs that we haven't
 5   discussed?
 6   A    I tried K-2 before one time.
 7   Q    When was that?
 8   A    When I was waiting -- I was out on bail,
 9   2011, maybe '12.
10   Q    You said that you'd never taken heroin,
11   but you sold heroin, correct?
12   A    Yes.
13   Q    And why didn't you take heroin?
14   A    Well -- why didn't I take heroin?
15       Well, honestly, because it was my father's
16   drug of choice.  And he taught me not to do it.
17   So I kind of learned from example.
18   Q    From the experience of watching your
19   father's addiction, you decided that wasn't
20   something you wanted to become involved in?
21   A    Yeah.
22   Q    And just going back to when you left to --
23   when you left your mother's home, you said it
24   was a voluntary decision.
25       You didn't want to watch her, she was
```

Page 67

```
 1            Brooks - Confidential
 2   sick, correct?
 3   A    Yeah.
 4   Q    Do you know if your mother wanted you to
 5   stay or if she wanted you to leave?
 6   A    No, I'm sure she wanted me to stay.
 7   Q    Did she ever tell you that?
 8   A    Yeah.
 9   Q    Okay.  Do you remember -- and your mother
10   was also a drug user?
11   A    She smoked weed.
12   Q    Do you know if she used heroin as well?
13   A    She did not.
14   Q    Okay.  Do you know how your father
15   contracted HIV?
16   A    No.
17   Q    Did he ever tell you?
18   A    He supposedly got it from my mother.
19   Q    I see you're smiling a bit.
20       You're not sure you believe that story?
21   A    That's what I was told.
22   Q    I'm asking.  It seems like you have
23   suspicions about whether that's true.
24   A    I think it was a way of my mother telling
25   us that so I wouldn't hate my father.
```

Page 68

```
 1            Brooks - Confidential
 2   Q    Okay.  And how do you think -- do you have
 3   your own thoughts on how your father contracted
 4   HIV?
 5   A    I believed that he contracted HIV because
 6   of his drug habit.
 7   Q    Through sharing needles?
 8   A    Yes.
 9   Q    Do you know how your mother contracted
10   HIV?
11   A    She told me that she -- she told me that
12   she got it from -- my father stabbed her.  She
13   almost bled out.  She went to the hospital and
14   had to get a blood transfusion, and they gave
15   her dirty blood.  That's what she told me.
16   Q    Okay.  Were you there when this incident
17   happened?
18   A    I was there, yeah.
19   Q    Okay.  Did you call an ambulance?
20       Did you call the police?
21   A    I was five years old.
22   Q    Did someone call an ambulance or the
23   police?
24   A    My grandmother.  My grandmother took her
25   to the hospital.  I don't remember much.
```

Page 69

```
 1            Brooks - Confidential
 2   Q    Okay.  And you say that this is the story
 3   that your mother told you.
 4       Do you have any thoughts on whether that's
 5   true or not?
 6   A    I told you earlier, I assume that she
 7   didn't want us to hate my father.
 8   Q    So you're -- so you're saying that she
 9   told you that to cover up for another reason.
10       What do you think the other reason was of
11   how she contracted HIV?
12   A    I told you that the only other possible
13   thing was his drug use.
14   Q    That your father had given your mother HIV
15   through intercourse?
16   A    Yeah.
17   Q    When you were released from Tryon, you
18   were about 15 or 16?
19   A    Yep.
20   Q    And you went to go live with a cousin,
21   right?
22   A    No.
23   Q    Who did you go live with after you were
24   released from Tryon?
25   A    Yeah.
```

18 (Pages 66 to 69)

Page 70

Brooks - Confidential

1
2   Q   I'm sorry?
3   A   Yeah, I did go stay with my cousin.
4   Q   Where was -- in Manhattan or in the Bronx?
5   A   It was Upstate.
6   Q   Okay.  Do you remember where Upstate?
7   A   Albany.
8   Q   And did you reenroll in school?
9   A   No.
10  Q   Okay.  And when you were living with your
11  cousin, what did you do during the days?
12  A   Sold drugs.
13      MS. O'CONNELL:  If you need any water, let
14  me know, or a break.
15  Q   Okay.  And how long were you selling drugs
16  before you were arrested the next time?
17  A   Up until the point where I was arrested.
18  Q   Okay.  That was in the mid-'90s?
19  A   Yes.
20  Q   Okay.  When you were living in Albany,
21  were you ever actually assaulted, or in the
22  Albany area, were you ever sexually assaulted?
23  A   No.
24  Q   Ever sexually assault anyone?
25  A   No.

Page 71

Brooks - Confidential

1
2   Q   Were you ever physically assaulted when
3   you were living in the Albany area?
4   A   No.  I had fights, though.
5   Q   Anything that required you to go to the
6   hospital?
7   A   No.
8   Q   When you were arrested next for selling --
9   I don't think it was selling.
10      You said it was directing a sale?
11  A   Yeah.
12  Q   And that was while you were living in
13  Albany?
14  A   No.
15  Q   Where?
16      Where was that, I'm sorry?
17  A   It was in Manhattan.
18  Q   So at some point you moved from Albany
19  back to Manhattan?
20  A   Yes.
21  Q   Okay.  Ever sexually assaulted then?
22  A   No.
23  Q   Every had anyone touch your genitals?
24  A   No.
25  Q   Manhattan was when you were arrested for

Page 72

Brooks - Confidential

1
2   directing the sale of drugs?
3   A   Yeah.
4   Q   That's when you went to prison, the first
5   time?
6       That's where -- that's the conviction that
7   led you to being in Rikers in 1997, or is that
8   the conviction that led to you being in Rikers
9   and Sing Sing and Clinton and Upstate and
10  Attica and Gowanda?
11  A   Yes.
12  Q   Which, the first or the second?
13  A   Second.
14  Q   Okay.  So then -- did we skip -- so let me
15  ask you:  How old were you when you were in
16  Rikers for the two-year period while you were
17  awaiting trial?
18  A   I don't know.
19  Q   It was when you were a juvenile?
20  A   I was a teenager.
21  Q   And were you ever sexually assaulted when
22  you were in Rikers during that two-year period?
23  A   No.
24  Q   Anyone ever touch you in a sexual manner
25  without your consent?

Page 73

Brooks - Confidential

1
2   A   No.
3   Q   Anyone ever touch your genitals in any
4   manner without your consent?
5   A   No.
6   Q   When you were in --
7   A   Well, let me not say that.
8       The officers -- I was not consented, but
9   it was part of their search procedures.
10  Q   Any other inmates?
11  A   No.
12  Q   Anyone who was seeing you, providing you
13  medical treatment, touch you in your -- in a
14  sexual manner without your consent?
15  A   No.
16  Q   That's when you were -- what about when
17  you were in Rikers in 1997?
18  A   No.
19  Q   No sexual assault?
20  A   No.
21  Q   So you weren't the victim of a sexual
22  assault?
23  A   No.
24  Q   No one touched you in your genitals in a
25  sexual manner?

TSG Reporting - Worldwide - 877-702-9580

Page 74

Brooks - Confidential

1
2   A   No.
3   Q   Okay.  Anyone touch you in your genitals
4   in any manner without your consent other than
5   the guards or a doctor or as part of a medical
6   procedure?
7   A   No.
8   Q   Anyone ever -- so either of the first few
9   times you were in Rikers, anyone ever assault
10  you, at all, physically, not in a sexual
11  manner?
12  A   Yes.
13  Q   There were fights in prison?
14      I'm sorry, fights when you were in jail?
15  A   Yeah, I got cut.
16  Q   And what were the circumstances?
17      Was it when you were in Rikers in 1995 or
18  1997?
19  A   '95.
20  Q   What were the circumstances?
21  A   There was -- one of the prisoners was
22  burning the bed.  The officers had to let us
23  out of our cells and put us in a pin.  We
24  weren't being watched.  They just put us all in
25  a pin.

Page 75

Brooks - Confidential

1
2      I got into an argument with a guy that was
3   bullying another guy.  And when me and him was
4   about to fight, they jump -- people that knew
5   me and knew him jumped in the middle and he
6   reached over them and cut me.
7   Q   Mr. Brooks, are you recording this on your
8   phone, this deposition, my questioning of you?
9   A   No.
10  Q   Are you sure about that?
11      MS. O'CONNELL:  Asked and answered.
12  Q   You can answer.
13  A   Yeah, I'm sure.
14  Q   Okay.  I ask that you put your phone in
15  your pocket.
16  A   It's too big to go in my pocket.
17  Q   I ask you -- do you have a bag with you?
18  A   Yes, I do.
19  Q   I ask you to put it in your bag?
20      MS. O'CONNELL:  Objection.
21      MR. BARTOLOMEO:  Alternatively, we can
22  always just have them hold it out there for the
23  proceedings today.
24  A   I'm -- no, no.
25      MS. O'CONNELL:  Objection.

Page 76

Brooks - Confidential

1
2   A   I'm not recording.  My phone is not on,
3   period.
4      You wanted look?
5      Look at my phone.
6   Q   I don't need to look at your phone.
7      MR. SEIDENFELD:  We can go off the record
8   and discuss that.
9      MS. O'CONNELL:  We can go off the record.
10      (Discussion off the record.)
11  BY MR. SEIDENFELD:
12  Q   Mr. Brooks, I just want to confirm that
13  you're not recording today's proceedings on
14  your phone; is that correct?
15  A   That's correct.
16  Q   You're not recording today's proceedings
17  on any other device that you have with you?
18  A   That's correct.
19  Q   And if you, at some point, do start to
20  record, will you let us know in advance?
21  A   Yes.
22  Q   We were talking about physical assault
23  while were you in Rikers Island in 1995.  And
24  you had described an incident where you were
25  cut.

Page 77

Brooks - Confidential

1
2      Any other incidents where you were
3   physically assaulted in Rikers Island when you
4   were there in 9995?
5   A   I was cut on two separate occasions.  And
6   I got into a lot of fights there.
7   Q   Did you ever receive any discipline for
8   any of the fights?
9   A   What do you mean, "discipline"?
10  Q   Did you lose any privileges?
11  A   Yes.
12  Q   What happened?  When?
13      What privileges did you lose?
14  A   All of them.
15  Q   Were you sent -- what do you mean by "all
16  of them"?
17  A   I was sent to punitive segregation, the
18  box.
19  Q   Solitary confinement?
20  A   Yes.
21  Q   For how long?
22  A   I don't know.  I was there for a long
23  time.
24  Q   More than a year?
25  A   Yeah.

Page 78

Brooks - Confidential

1
2  Q   So more than half of the two years that
3  you were there in 1995?
4  A   A spent a lot of that time in a pin, yeah.
5  Q   Any other -- strike that.
6      In 1997 when you were in Rikers Island,
7  were you ever physically assaulted?
8  A   I got into fights there, too.
9  Q   Okay.  What were the circumstances of the
10 fights?
11 A   It was gang related.
12 Q   Were you in a gang when you were in Rikers
13 Island?
14 A   Yes, I was.
15 Q   What gang were you in?
16 A   I was a Blood.
17 Q   And did you join when you were in Rikers,
18 or you previously had been a member?
19 A   No, when I was in Rikers Island.
20 Q   And did you join that second time in 1997?
21 A   There's no joining twice.
22 Q   So the first time in 1995 you had joined?
23 A   Yes.
24 Q   Okay.  And were the fights that you were
25 involved in 1995, were they gang related, too?

Page 79

Brooks - Confidential

1
2  A   Some of them.
3  Q   Okay.  What ones -- can you tell me about
4  the fights that weren't gang related?
5  A   The fight where I got cut wasn't gang
6  related.
7  Q   What was the dispute over?
8  A   I told you that.
9  Q   Okay.  The one we just spoke about
10 earlier?
11 A   Yes.
12 Q   Okay.  Any other fights in 1995 that
13 weren't gang related?
14 A   Yeah, things like fighting over the
15 telephone and stuff like that.
16 Q   But those weren't -- it was the fight that
17 we discussed earlier that led to you being sent
18 to solitary confinement where you were cut?
19 A   The fight that sent me to solitary
20 confinement -- the first time, I was in
21 solitary confinement when I got cut.
22 Q   Okay.  So what was the fight that led you
23 to be assigned to solitary?
24 A   It was a fight in the house, in the
25 housing unit.

Page 80

Brooks - Confidential

1
2  Q   What was it about?
3  A   A new guy had come in, and it was an issue
4  over whether he would do, like -- because we
5  all had to, like, clean the house.  And I was
6  informed that he said that he was not going to
7  clean like the rest of us.  And so dudes
8  approached him and they started fighting with
9  him.
10     And then -- he was a really huge guy.  So
11 people were running from him.  And he came
12 directly to me.  And I didn't run.  We fought
13 until the police came.
14 Q   When you say "house," you're just
15 referring to the section of the -- of Rikers
16 where you were located?
17 A   Yeah.
18 Q   So between 1995 and 1997, you were back in
19 New York City?
20     After you were released from Rikers, after
21 you were acquitted and before you were arrested
22 again in 1997 --
23 A   Yeah.
24 Q   -- ever sexually assaulted then?
25 A   No.

Page 81

Brooks - Confidential

1
2  Q   Ever physically assaulted during that
3  period?
4  A   No.
5  Q   Okay.  When you were released from Rikers
6  in 1997, where did you go when you were
7  released?
8  A   Went to my friend's house.
9  Q   Okay.  And in New York City?
10 A   Yes.
11 Q   Before you went to -- were you arrested,
12 again, before you went to Arizona?
13 A   Before I went to Arizona, that was the
14 drug arrest.
15 Q   That was the 1997 arrest?
16 A   1998.
17 Q   Okay.  So you were released in 1998?
18 A   No.
19 Q   I'm sorry, which --
20 A   That's when it happened.
21 Q   Okay, the drug arrest was in 1998?
22 A   Yeah.
23 Q   And that's when you went -- that's when
24 you were in Rikers, in Sing Sing, in Clinton,
25 in Upstate Correctional Facility, in Attica and

Page 82

```
1              Brooks - Confidential
2    Gowanda?
3    A   Yeah.
4    Q   Okay.  I'm sorry, and what was the 1997
5    arrest for?
6        I thought --
7    A   Weapon possession.
8    Q   That was for weapon possession.
9        What type of weapon?
10   A   A gun.
11   Q   Was it -- this is separate from the
12   weapon's possession we spoke about when you
13   were younger, correct?
14   A   Yeah.
15   Q   What type of gun?
16   A   Forty-five.
17   Q   You ever fired it?
18   A   No.
19   Q   Okay.  Where did you get it from?
20   A   One of my customers.
21   Q   I'm sorry?
22       You said cousin or customer?
23   A   One of my customers.
24   Q   What were the circumstances that led to
25   your arrest for the gun possession charge?
```

Page 83

```
1              Brooks - Confidential
2    A   What was the circumstances?
3    Q   Did the -- how did the police come to know
4    that you --
5    A   Well, they just pulled me over while I was
6    walking down the street.
7    Q   And that was for a year.
8        And you were released in 1998?
9    A   Mm-hmm.
10   Q   Okay.  And where did you live in 1998?
11   A   With my friend in Manhattan.
12   Q   Okay.  Were you sexually assaulted during
13   that period?
14   A   No, I wasn't.
15   Q   Anyone ever touch you in a sexual manner
16   during that period?
17   A   Has anyone ever touched me in a sexual
18   manner?
19   Q   Without -- strike that.
20       In that period, anyone ever touch you in a
21   sexual manner without your consent in that
22   period?
23   A   No.
24   Q   Okay.  And then in 1998 you were arrested
25   for, you said, for directing the sale of drugs?
```

Page 84

```
1              Brooks - Confidential
2    A   Mm-hmm.  Yes.
3    Q   I'm sorry?
4    A   I said yes.
5    Q   And then from about 1998 to, you said
6    about 2004, you were in a variety of different
7    correctional facilities; first in Rikers and
8    then at several facilities in Upstate New York?
9    A   Yes.
10   Q   Okay.  Were you ever physically -- so I'm
11   going to ask you questions about all of these
12   facilities in one, so we can just go through
13   each question once.
14       If you can tell me the answers are yes, if
15   you can tell me which facility you were in,
16   then we can hopefully move this along a little
17   faster.
18       Okay?
19   A   Okay.
20   Q   So from the period of 1998 to 2004 when
21   you were in the different correctional
22   facilities that we listed, were you ever
23   physically assaulted?
24   A   Yes, I got into fights.
25   Q   How -- in which facilities?
```

Page 85

```
1              Brooks - Confidential
2    A   Clinton.
3    Q   What happened in Clinton?
4    A   There was a riot.
5    Q   What was your involvement?
6    A   What was my involvement?
7        Well, I was gang banging at the time.
8    Q   So -- with the Bloods?
9    A   Yeah.
10   Q   And what did you -- what started the riot?
11   A   Well, two things started it.  It was the
12   night before a Blood had got cut.  And when I
13   was on my way to the yard, I was assaulted by
14   another guy.  So when we got into the yard, you
15   know, it just erupted.
16   Q   When you say "assaulted," what did he do
17   to you?
18   A   He punched me in the face.
19   Q   Did you fight back?
20   A   No.  Not at that point I didn't.
21   Q   You fight back at a subsequent point?
22   A   When we got in the yard, yeah.
23   Q   And what did you do?
24   A   I hit him upside the head with a weight
25   bar.
```

Brooks - Confidential

1
2    Q   Were there any repercussions?
3    A   It was a big fight in the yard.
4    Q   Any repercussions for you individually?
5    A   It was a riot.  So everybody was fighting.
6    I was getting hit, people was getting hit.
7    Q   Sure.
8        After the fact --
9    A   It wasn't an organized fight.
10   Q   I wasn't asking about -- I was asking
11   after the fact.
12       You know, before you had mentioned you
13   were in a fight in Rikers and you had been sent
14   to solitary.
15       So I'm asking after --
16   A   Oh, oh, oh, oh.  I think I understand
17   better.
18       Was there administrative repercussions
19   because of --
20   Q   Yes.
21   A   Yes.
22   Q   And what were they?
23   A   Five years in the box.
24   Q   And was that all some -- "in the box," you
25   mean in solitary?

Brooks - Confidential

1
2    A   Yes.
3    Q   And was that all at Clinton?
4    A   Yeah.
5    Q   Do you remember what year that was,
6    approximately?
7    A   Maybe '9 --
8    Q   Sorry?
9    A   '98, '99.
10   Q   So shortly after you were convicted in
11   1998?
12   A   Mm-hmm.
13   Q   Okay.  Any -- while you were in the
14   various Upstate facilities that we discussed,
15   and also in Rikers Island during this period,
16   were you ever sexually assaulted?
17   A   No.
18   Q   Did you ever sexually assault anyone?
19   A   No.
20   Q   Were you ever touched in a sexual manner
21   without your consent?
22   A   No.
23   Q   Okay.  After you were release from
24   solitary confinement and from Clinton, did you
25   go to a different facility?

Brooks - Confidential

1
2    A   Yes.
3    Q   That was Upstate Correctional?
4    A   Yes, it was still punitive segregation.
5    Q   Is that the same -- so solitary
6    confinement?
7    A   Yes.
8    Q   Did there ever come a point during this
9    time in prison, in jail when you were out of,
10   you said, punitive segregation; was there ever
11   a point?
12   A   Yes, when I went to Attica.
13   Q   You were back in the general population?
14   A   Yeah.
15   Q   Were you ever in any fights at Attica?
16   A   None.
17   Q   Ever physically assault anyone in Attica?
18   A   No.
19   Q   Anyone ever physically assault you?
20   A   No.
21   Q   Ever sexually assaulted in Attica?
22   A   No.
23   Q   What about -- had somebody touched you in
24   a sexual manner without your consent?
25   A   No.

Brooks - Confidential

1
2    Q   Okay.  What about when you were in
3    Gowanda, ever physically assault anyone there?
4    A   No.
5    Q   Anyone ever physically assault you?
6    A   No.
7    Q   Did you sexually assault anyone there?
8    A   No.
9    Q   Did they sexually assault you?
10   A   No.
11   Q   Were you ever touched in a physical manner
12   without your consent when you were there?
13   A   No.
14   Q   You said you were released from Gowanda in
15   about 2004?
16   A   Mm-hmm, yes.
17   Q   And then you moved to Arizona?
18   A   The Bronx.
19   Q   The Bronx for a short period?
20   A   Yeah.
21   Q   For about how long?
22   A   Few months.
23   Q   And did you meet your wife in New York or
24   in Arizona?
25   A   In New York.

Brooks - Confidential

1
2  Q   Okay.  And you met her after 2004 when you
3  were released?
4  A   No.
5  Q   When did you meet her?
6  A   She was a childhood friend.
7  Q   Okay.  So you had known her since you were
8  little?
9  A   Yes.
10  Q   Okay.  And when did you start dating her
11  before you were married?
12  A   When I came home.
13  Q   So in the 2004 period?
14  A   Yeah.  I mean, we was -- we were writing
15  each other back and forth when I was in prison,
16  but we never was intimate until I came home.
17  Q   She ever visit you in prison?
18  A   She did.
19  Q   But you said you were not intimate with
20  her until after you were released?
21  A   Yeah.
22  Q   Why did you decide to move to Arizona?
23  A   I wanted a new life.
24      MR. SEIDENFELD:  We'll take just a quick
25  break.

Brooks - Confidential

1
2      (Recess taken.)
3  BY MR. SEIDENFELD:
4  Q   Sorry, I don't mean to be a pain.
5      I want to make sure you're still not
6  recording.
7  A   No, I'm not recording.
8  Q   You said that when you were released from
9  prison in 2004 that you moved to Arizona for a
10  better life.
11      What did you mean?
12  A   I wanted to start all over.
13  Q   Did your wife move out with you --
14  actually strike that.
15      When did you marry?
16      When did you get married, what year?
17  A   2005.
18  Q   Okay.  Were you married when you moved out
19  to Arizona?
20  A   Yes.
21  Q   Did your wife move with you?
22  A   Yes.
23  Q   Did you have children at that time?
24  A   One daughter.
25  Q   Okay.  The daughter was born in New York

Brooks - Confidential

1
2  before you moved?
3  A   Yes.
4  Q   Okay.  Did you get the better life that
5  you were looking for in Arizona?
6  A   Yes, I did.
7  Q   And what do you mean by a "better life"?
8  A   Well, we wasn't no longer living in the
9  projects.  We were living in a home.  I was
10  working.  It was easier to find work in Arizona
11  for me.  So I was working.  I held down three
12  jobs, and my wife got to be a stay-at-home mom.
13      Just better than New York, cleaner living.
14  Q   Were -- any -- any sexual assault -- were
15  you a victim of any sexual assault when you
16  were in Arizona?
17  A   No.
18  Q   You have any physical assault?
19  A   No.
20  Q   Any fights?
21  A   No fights.
22  Q   Were you still a member of the Bloods when
23  you were in Arizona?
24  A   No.
25  Q   Was there a point when you were no longer

Brooks - Confidential

1
2  a member?
3  A   Yes.
4  Q   Did you quit; is that --
5  A   Yeah, something like that.
6  Q   Okay.  When did you -- when was that?
7  A   When I was in the box for five years.
8  Q   So before you were released, you decided
9  that you were going to quit being in the
10  Bloods?
11  A   Yes.
12  Q   Is "quit" the right term?
13  A   Not really, but --
14  Q   How would you --
15  A   -- it's --
16  Q   I'm sorry?
17  A   I mean, it's pretty much the same thing,
18  but that's not the right term.
19  Q   How would you explain it?
20  A   I retired.
21  Q   Retired?
22  A   Yeah.
23  Q   So you would -- no -- so from -- that was
24  when you were in Attica?
25  A   No, Upstate.

Page 94

Brooks - Confidential

1
2  Q   Upstate, okay.
3      And since then have you had any
4  affiliation with a gang?
5  A   No.
6  Q   Not even -- what about when you were in
7  prison from 2012 to 2016?
8  A   No.
9  Q   What led you back to New York in 2012?
10     Was it about 2012 that you returned to
11 New York?
12 A   Yes, yes.
13 Q   Why did you come back?
14 A   Well, I separated from my wife. I fell on
15 hard times while in Georgia. Couldn't find
16 stable employment. I lost my apartment. And
17 so I came back to New York to stay with my
18 friend.
19 Q   Did you separate from your wife when
20 you -- around the time when you moved from
21 Arizona to Georgia?
22 A   Yes.
23 Q   Okay. Any assaults of any kind --
24 involved in any assault of any kind when you
25 were in Georgia?

Page 95

Brooks - Confidential

1
2  A   No.
3  Q   Okay. Did you do -- and did you take any
4  illegal drugs while you were in Arizona?
5  A   Yeah, marijuana.
6  Q   Okay. Anything else?
7  A   I drank from time to time.
8  Q   What about in Georgia?
9  A   Yeah.
10 Q   The same?
11 A   Same.
12 Q   Okay. And when you came back to -- you
13 came back to New York, was it in 2012?
14 A   I'm not really sure.
15 Q   I'm sorry?
16 A   I'm not really sure about the dates.
17 Approximately around those times, yes.
18 Q   Did you suffer a loss in the family or
19 someone close to you in around 2011?
20 A   What do you mean, a death?
21 Q   A death.
22 A   No.
23 Q   In around 2011, were you diagnosed with
24 depression?
25 A   Mm-hmm. Around there, yeah.

Page 96

Brooks - Confidential

1
2  Q   What was the cause of the depression?
3  A   Separation from my wife and kids.
4  Q   Was it your wife's decision to initiate
5  the separation?
6  A   Nah. It was my decision to initial -- it
7  was my decision to separate, but . . .
8  Q   Why?
9  A   Mmm?
10 Q   Why?
11 A   We weren't happy.
12 Q   This is when you were still in Arizona?
13 A   Yeah.
14 Q   Did you go to seek -- did you go see a
15 mental health professional?
16 A   Before or after the separation?
17 Q   Around the time period of the separation,
18 you said -- I asked you if you had depression
19 from it. You said yes.
20     Did you go and seek any treatment for the
21 depression?
22 A   I got treatment eventually, yes.
23 Q   And you say "eventually."
24     When did you get treatment?
25 A   After I almost overdosed.

Page 97

Brooks - Confidential

1
2  Q   What did you -- was this -- what year was
3  this, in 2011?
4  A   Yeah, I think so.
5  Q   What did you almost overdose on?
6  A   I don't know what it was. I know it was
7  pills.
8  Q   Prescription pills?
9  A   It was pills in my friend's closet. I
10 just took a bunch of them.
11 Q   That was because you were separated from
12 your wife?
13 A   Yes, it felt like my life was falling
14 apart. I didn't want to live, so . . .
15 Q   You were attempting to -- was it an
16 attempt to take your life?
17 A   It was.
18 Q   Did you have to go to the hospital?
19 A   Yes.
20 Q   Okay. And what happened at the hospital?
21 A   I was unconscious. When I woke up, I had
22 to speak to a therapist.
23 Q   This was in Arizona?
24 A   No.
25 Q   Was this in Georgia?

Page 98

```
 1              Brooks - Confidential
 2    A   No.
 3    Q   This is back in New York?
 4    A   Yes.
 5    Q   Do you know the hospital?
 6    A   Nah, not really.  St. Lutheran, maybe.
 7    Q   Here in Manhattan?
 8    A   No.
 9    Q   In the Bronx?
10    A   In Brooklyn.
11    Q   In Brooklyn, okay.
12        And how long were you in the hospital in
13    2011, do you remember?
14    A   No.
15    Q   Was it a month?
16    A   I don't know.  I think it was a couple of
17    months.  I don't know.
18    Q   You were in the hospital for an extended
19    period of time?
20    A   I think a couple of months, maybe.
21    Q   Okay.  And was it -- were you there
22    voluntarily, or were you -- were you there
23    voluntarily?
24    A   No.
25    Q   You were -- why were you in the hospital
```

Page 99

```
 1              Brooks - Confidential
 2    for seven months -- for several months?
 3    A   Because of that incident.
 4    Q   Okay.  So was it a determination made that
 5    you needed to stay in the hospital because of
 6    the incident where you tried to take your life?
 7    A   Yeah.
 8    Q   Okay.  And did you receive treatment in
 9    the hospital?
10    A   Yes.
11    Q   Okay.  What kind of treatment?
12    A   I was speaking to a therapist for a while,
13    and they gave me medication and I left.
14    Q   Do you know what medication they gave you?
15    A   Trazodone, I think.
16    Q   Do you know what kind of medication that
17    is?
18    A   I know it's for depression.
19    Q   Did you take it?
20    A   Yes.
21    Q   Okay.  Did it -- what were some of the
22    symptoms of depression you were having?
23    A   I was sad a lot.
24    Q   Anything else?
25    A   I wasn't eating.
```

Page 100

```
 1              Brooks - Confidential
 2    Q   Anything else?
 3    A   I was having problems with sleeping.  I
 4    was restless.
 5    Q   The medicine -- I'm sorry, did the
 6    medicine help?
 7    A   Well, it kind of helped.
 8        I was able to sleep, but I didn't like how
 9    it felt in my head.  It felt like my brain was
10    being squeezed or something.
11    Q   When was the last time you took that
12    medicine?
13    A   At that point?
14    Q   Mm-hmm.
15    A   When I was up north.
16    Q   After you were -- after you were arrested?
17    A   Yeah.
18    Q   Okay.  And that's when you were in
19    Franklin Correctional Facility?
20    A   Yes.
21    Q   You stopped taking it at some point after
22    you were in Franklin Correctional Facility?
23    A   Yes.
24    Q   Why did you stop taking it.
25    A   Because at the time they were doing
```

Page 101

```
 1              Brooks - Confidential
 2    medication calls, I was new to the facility.
 3    Q   I'm sorry.
 4    A   I was new to the facility.
 5        And I wanted to get on the phone and speak
 6    to my wife.
 7        My idea was that we could work on our
 8    marriage and settle things.
 9        But they called the medication call too
10    early.  It was too early, so I wouldn't be able
11    to get on the phone and speak to my wife
12    because the medication put me to sleep.
13        So that's when I decided to stop taking
14    it.
15    Q   Did you discuss it with a doctor at the
16    facility?
17    A   No, I didn't want to discuss it with them.
18        I tried to smuggle it back, because they
19    wanted you to take it in front of them.  And I
20    didn't want to do that.  So I tried to smuggle
21    it back to my housing unit so I could be awake
22    in order to get on the phone, and take it when
23    I was ready to go to sleep.  But they didn't
24    allow that, so . . .
25    Q   Then was there a point when they stopped
```

1       Brooks - Confidential
2   prescribing it to you?
3   A   Yeah.
4   Q   When was that?
5   A   I don't remember.
6   Q   Do you remember why?
7   A   Yeah, because I told them.
8   Q   You told them you didn't want to take it
9   any more?
10  A   Yeah.
11      (Deposition Exhibit 1, Letter dated August
12  3, 2017 from Stephen Reich to Derek Smith,
13  marked for identification as of this date.)
14  Q   Mr. Brooks, did you go and visit -- did
15  you have an evaluation by a doctor,
16  Stephen Reich?
17  A   Yes, I believe so.
18  Q   Do you remember when that was?
19  A   No.
20  Q   Was it within the last year?
21  A   Possibly.
22  Q   Was the it after you filed your complaint
23  against The Doe Fund and Mr. Washington and
24  Mr. Cooper?
25  A   Yes, I believe so.

1       Brooks - Confidential
2   Q   How were you referred to Mr. Reich?
3       How were you referred to Reich?
4       THE WITNESS:  Kelly, I can't remember.
5   I've seen so many.
6       MS. O'CONNELL:  Only say what you can
7   remember.
8   A   I don't remember.
9   Q   Were you referred to Mr. Reich by your
10  attorneys?
11  A   I don't recall.  I don't remember the
12  doctor's name.  I've seen so many different
13  therapists.
14  Q   Do you know who -- do you have any
15  independent recollection of who Mr. Reich is or
16  doctor, I should say?
17  A   I don't know if it's the one that I got
18  through my program or if it's the one that I
19  went to go see.
20      I'm bad with names and dates.
21  Q   Okay.  If Mr. Reich -- if Dr. Reich's
22  office was on East 55th Street, does that help
23  refresh your recollection?
24  A   Yes.
25  Q   Okay.  So how were you --

1       Brooks - Confidential
2   A   That's in Manhattan.
3   Q   So how were you referred to Dr. Reich?
4   A   My attorney.
5   Q   You know Dr. Reich beforehand?
6   A   No.
7   Q   Why did you go see Dr. Reich?
8   A   For an evaluation, I believe.
9   Q   That was after you had filed the complaint
10  in this case?
11  A   I believe so, yes.
12  Q   Were you honest when you spoke with
13  Dr. Reich?
14  A   Yes.
15      MR. SEIDENFELD:  I'm going to give Mr.
16  Brooks what's been marked as Plaintiff's
17  Exhibit 1.
18  Q   Mr. Brooks, you can take a look through
19  this, if you want, briefly.  And then I'm going
20  to ask you some questions.
21      MS. O'CONNELL:  Can we read the
22  Bates-stamp into evidence, too?
23      MR. SEIDENFELD:  Yes.
24      I'm handing Mr. Brooks what's been marked
25  as Plaintiff's Exhibit No. 1, which is

1       Brooks - Confidential
2   Bates-stamped Brooks 00036 through Brooks
3   00049.
4   Q   Okay.  Mr. Brooks, have you seen this
5   before?
6       MS. O'CONNELL:  Take as much time as you
7   need.
8       MR. SEIDENFELD:  We can go off the record
9   while we're looking.
10  Q   Mr. Brooks, when you're done, let us know.
11  A   I believe so.  Everything don't look
12  familiar, but I believe I seen --
13  Q   You believe so, you've seen this before?
14  A   I believe so.  Everything don't look
15  familiar, but some things look like I've seen
16  it before.  I never read through that.
17  Q   You never read through the entire
18  document?
19  A   No.
20  Q   But you've seen it and read through parts
21  of it?
22  A   Yeah, I believe so.
23  Q   I'm going to direct you -- if the look on
24  the bottom right of the pages, there's numbers
25  that start Brooks 000.  I'm going to direct you

Brooks - Confidential

1
2  to Brooks 000041. Can you take a look at
3  No. 10.
4        Do you see that?
5  A   Yes.
6  Q   It says "On August 3, 2017, interviewed
7  Mr. Gregory Scott Brooks for a psychological
8  evaluation and report, including psychological
9  testing in connection with his civil litigation
10 against The Doe Fund."
11       Did you see Dr. Reich on August 3, 2017?
12 A   I believe so.
13 Q   Is that the only time you've seen him?
14 A   Yes.
15 Q   If you look below at No. 12, it says
16 "Psychological Evaluation of Gregory Brooks."
17       Did Dr. Reich ask you about your life and
18 your history and your experiences?
19 A   He did.
20 Q   And you told him the things that were --
21 you believed important for him to know about
22 your condition?
23 A   I just answered the questions that he
24 asked me.
25 Q   Okay. Did he ask -- what kind of

Brooks - Confidential

1
2  questions did he ask you?
3  A   Everything.
4  Q   Did he ask you about the different events
5  and -- did he ask you about the various events
6  in your life -- he asked you about different
7  events -- strike that.
8        Did he ask you to tell him all the events
9  in your life that were considered by you to be
10 traumatic?
11 A   No. He was just asking me questions, and
12 I was answering them.
13 Q   Did he ask you questions -- he asked you
14 questions about your entire history, about your
15 entire life, correct?
16 A   Yes.
17 Q   Okay. And you told him the events that
18 you believed were important?
19 A   I told him whatever he was asking me
20 about. It wasn't whether I believed they were
21 important or not. Whatever he was asking me
22 that related to the question is what I
23 answered.
24 Q   Tell me some of the questions that he
25 asked you?

Brooks - Confidential

1
2  A   He asked me about my childhood, and I told
3  him about my childhood.
4  Q   Did he ask you about your time in prison?
5  A   We spoke on it, I believe.
6  Q   Okay. Did he ask you about your
7  relationship -- strike that.
8        Did he ask you about your relationship
9  with your wife?
10 A   Yes.
11 Q   Did he ask you about any past instances
12 where you had been diagnosed with a mental
13 health illness?
14 A   I don't recall.
15 Q   Is it possible that he asked you that?
16 A   I don't remember.
17 Q   Did he ask you for medical -- did he ask
18 you for a history, a medical history, questions
19 about your medical background?
20 A   No, I don't think so.
21 Q   Did he ask you questions about whether you
22 had been depressed in the past?
23 A   Yes.
24 Q   If you look at the bottom of Brooks 41.
25       Mr. Brooks, you have to take a look at the

Brooks - Confidential

1
2  document.
3  A   Mm-hmm.
4  Q   And I want you to see -- we're going to
5  look at the last paragraph.
6        And it says "Gregory Brooks is not certain
7  whether his parents married before or after he
8  was born."
9        Is that correct?
10       You have to say "yes" or "no."
11 A   Yes.
12 Q   Okay. It says (As read): "He originally
13 said that his parents married after he was
14 born, but as the interview went on, it became
15 very clear that he is uncertain of many of the
16 pertinent details concerning his early life."
17       Is that correct.
18       You have to say "yes" or "no," Mr. Brooks.
19 A   Yes.
20 Q   Okay. And "early life," do you mean up
21 until the period of around sixth grade?
22 A   Repeat the question, please.
23 Q   It says that Dr. Reich believes that you
24 were not clear about some of the details about
25 your early life.

Brooks - Confidential

1
2     So I want to know what period you consider
3  "early life."
4     Is it up until six grade, is it younger
5  than that?
6  A   I believe we were talking about my family
7  history.  I did not know much about that.  I
8  didn't know much about any of the decisions
9  that was being made or -- you know, they kept a
10 lot away from me because I was the youngest.
11 Q   When you were a child?
12 A   Yeah.
13 Q   Okay.  And then if you look a little down,
14 it says "What is very crystal clear is that
15 Gregory Brooks had a horrific early life
16 through no fault of his own; an early life
17 which ended in a double tragedy."
18    Do you see that?
19    You have to look at the document,
20 Mr. Brooks.  Still on that last paragraph.
21    Do you see the part I just read?
22 A   Yeah.
23 Q   And "double tragedy" is referring to the
24 deaths of your parents?
25 A   I assume so.

Brooks - Confidential

1
2  Q   It says that you told Dr. Reich that your
3  father was a heroin addict and contracted HIV
4  through shared needles.
5     Does that sound right?
6  A   I believe so.
7  Q   And that's as we've discussed before,
8  correct?
9  A   Yes.
10 Q   And then it talks and says, "His mother
11 told him a different story, but that story is
12 so farfetched it must be doubted.  He said his
13 mother told him his father stabbed her with a
14 knife, and that when she went to the hospital,
15 she was given a blood transfusion which
16 contained the HIV virus, and that his father
17 contracted the HIV virus through unprotected
18 sex with his wife."
19    And that was what we discussed before?
20 A   Yep.
21 Q   Did you discuss with Mr. Reich that you
22 found this story hard -- you found this story
23 not particularly believable, or was that his
24 assessment?
25 A   It was his assessment.

Brooks - Confidential

1
2  Q   We discussed earlier when we were
3  discussing this is that was your -- you
4  believed that that was true as well?
5  A   I don't know what to believe.
6  Q   Or at least that you had doubt about
7  whether the story that your parents told you
8  about, how your mother contracted HIV, was
9  truthful?
10 A   It was possible.  She was cut.  I remember
11 that.  I seen that.  I seen the blood.  I seen
12 the scar.  And I know she had to get a
13 transfusion when I was a kid.  I know that.
14 Because it was a big deal.
15 Q   Sure.
16 A   But I just don't know if that was the
17 reason why she contracted HIV.
18 Q   At least in your mind, there was -- you at
19 least had some doubts about whether that was
20 true or not?
21 A   Yeah.
22 Q   Okay.  And then it says -- you look at the
23 bottom of the paragraph on Brooks 42 on the
24 next page on the first paragraph.
25    Actually, strike that.

Brooks - Confidential

1
2     Did you discuss the incident with your --
3  did you discuss with Dr. Reich that you
4  observed your father stabbing your mother?
5  A   No, I don't recall that.
6  Q   Did you --
7  A   I --
8  Q   I'm sorry, go ahead.
9  A   I don't recall that.  I remember the day.
10 Q   So you told him that it happened, but you
11 didn't tell him that you had observed it?
12 A   No.  I know I seen him leaving.  I know
13 they were arguing over money.
14 Q   Earlier you testified that you were -- you
15 were at home when the incident happened,
16 correct?
17 A   Mm-hmm.  I was around five years old, I
18 believe.
19 Q   Okay.  And did you tell Dr. Reich that you
20 were at home when the incident happened, or
21 just that it happened?
22 A   I don't remember.
23 Q   Okay.  If you look at the second paragraph
24 on Brooks 42, it said:  "After the death of
25 both of his parents, life spiraled even more

Page 114

1           Brooks - Confidential
2   out of control for Gregory.  He was soon placed
3   in the first of a series of group homes as a
4   person in need of supervision."
5           Is that what we discussed before in terms
6   of the group homes when you were -- after you
7   had been living with various friends and when
8   you were at Tryon?
9   A   Yes.
10  Q   Okay.  It says you "tried to run away from
11  a placement in Berkshire Farms."
12          What is Berkshire Farms?
13  A   It's a -- like a campus facility for boys.
14  Q   Was that somewhere that you were sent
15  after you were arrested when you were 14?
16  A   Yeah.
17  Q   Was that "yes"?
18  A   Yes.
19  Q   Okay.
20  A   I don't know how old I was at that point.
21  I don't remember.
22  Q   But it was after your first arrest?
23  A   Yeah, yes.
24  Q   Then the next -- it says, "He said he had
25  trouble with the law and had many fights.  He

Page 115

1           Brooks - Confidential
2   also said his family didn't want him anymore."
3           Who were you referring to when you said
4   that?
5   A   My cousin.
6   Q   This was the cousin that you were living
7   with Upstate?
8   A   Mm-hmm, yes.
9   Q   How did you know -- what did the cousin
10  say to you?
11  A   She didn't say it to me, she said it to
12  the courts.
13  Q   Was there a -- was there a proceeding
14  about whether you would stay living with your
15  cousin?
16  A   Yep.
17  Q   How old was this cousin?
18  A   I don't know.
19  Q   This cousin was an adult?
20  A   Yeah.
21  Q   And what happened at the proceeding?
22  A   I think the judge was about to let me out,
23  and he asked is there anybody in the courtroom
24  that was going to take me.  My cousin was the
25  only adult there, and she said no, that she

Page 116

1           Brooks - Confidential
2   couldn't control me.  I don't listen.  Nobody
3   could control me.
4   Q   That's what your cousin said?
5   A   Mm-hmm.
6   Q   And then where did you -- and then that
7   was the point at which you -- where did you
8   live after that?
9   A   That's when I went through Berkshire Farms
10  and then Tryon.
11  Q   Okay.  Then it says after Tryon you
12  returned to the custody of a cousin when you
13  why 15 or 16 years old.
14          Is that the same cousin?
15  A   Mm-hmm.
16  Q   Okay.
17  A   Yes.
18  Q   And that -- how long were you with that
19  cousin?
20  A   Not very long.
21  Q   That was up until the point where you were
22  arrested again for selling heroin?
23  A   No.
24  Q   When did you live -- how long were you
25  with the cousin?

Page 117

1           Brooks - Confidential
2   A   I don't know, about a couple of months.
3   Q   And then did you go to -- then you moved
4   Upstate?
5   A   No, that's where I was.  I was Upstate.
6   Q   Upstate, okay.
7           And after the cousin, where did you go to
8   live?
9   A   New York.
10  Q   Back in the city?
11  A   Yup.
12  Q   Okay.  If you look at the third paragraph
13  in this document, Brooks 42, it says "His life
14  got worse.  He was sentenced to four and a half
15  to nine years in prison for selling heroin.  He
16  served that sentence in the Clinton Annex,
17  Clinton Main Building, Upstate Correctional
18  Facility and Attica.  He served six years of
19  the nine-year sentence."
20          Is that correct?
21  A   Yes.
22  Q   And you didn't tell Dr. Reich that you
23  were in solitary for almost five years during
24  this sentence?
25  A   I don't remember if it came up or not.

TSG Reporting - Worldwide - 877-702-9580

1          Brooks - Confidential
2    Q   Do you have any recollection of telling
3    him about it?
4    A   No.
5    Q   And then if you look, Mr. Brooks, at this
6    third paragraph on 42, it says "After being out
7    of prison" -- that's referring to the time when
8    you were in Arizona and Georgia?
9        If you look at the third line, the last
10   word of the third line, "after being out of
11   prison."
12   A   Which paragraph?
13   Q   The third paragraph.
14   A   "After being out of prison, he then was
15   sentenced to another four years in prison."
16       Yeah, what about it?
17   Q   That's the period when you were in Arizona
18   and in Georgia?
19   A   No.
20   Q   After you were -- that encompass in
21   between the period when you were realized from
22   Attica and before you were in Franklin
23   Correctional Facility, right, in that period
24   you had lived in Arizona and in Georgia,
25   correct?

1          Brooks - Confidential
2    A   Yeah.
3    Q   And that's when you married your wife and
4    had your children, in that period?
5    A   I married my wife and had my children when
6    I came home from the last prison bid, which was
7    the four and a half to nine.  That's when I
8    lived in Arizona.
9        When I came back from Georgia, that's when
10   I caught the four years in prison.
11   Q   Okay.  And if you look here at the next
12   paragraph, it says you got married in
13   approximately 2005, and separated and 2010,
14   2011.
15       Are you looking -- Mr. Brooks, you have to
16   look at the document.
17       Do you see that, starting at the end of
18   the first line on Paragraph 4?
19   A   Yeah.
20   Q   Do you see that?
21       Did you -- you didn't tell Dr. Reich that
22   you -- because of the separation you took pills
23   and tried to kill yourself?
24   A   I don't know.  I don't know if it came up.
25   Q   Do you have any recollection of telling

1          Brooks - Confidential
2    him that?
3    A   It's possible.  I don't know.  I don't
4    remember.
5    Q   You don't think so?
6    A   I don't remember.
7    Q   Okay.  Did you tell him that after you
8    tried to kill yourself, that you were
9    hospitalized -- strike that.
10       Isn't it true you didn't tell Dr. Reich
11   that after you tried to kill yourself that you
12   were hospitalized for several months?
13   A   I don't remember.
14   Q   Do you have a recollection of telling him
15   that?
16   A   No.
17   Q   Why didn't you tell him that?
18   A   I don't remember if I told him that or
19   not.
20   Q   If you told him that, do you think he
21   would have included it in his report?
22   A   I don't know what he would do.
23   Q   But these were things that were important
24   to your background, important to your history,
25   correct?

1          Brooks - Confidential
2    A   What, things these that was important to
3    my background --
4    Q   I'll ask you a different question.
5        Do you think that being in solitary
6    confinement -- isn't it true that being in
7    solitary confinement for five years played an
8    important -- or was a significant contributor
9    to your mental health problems?
10   A   That's what they say.  That's what I read
11   about.
12       But when I was in the box for all that
13   time, it was my rediscovery.  That's when I
14   realized that I had talent that I didn't know
15   that I had.  That's when I was writing books
16   and designing clothing.
17       So for other people it was -- it may have
18   been that.  It did cause stress at times, being
19   locked in 23 hours a day.  But I made the best
20   out of it by staying busy.
21   Q   It was a stressful time?
22   A   Being in prison is a stressful time,
23   period.
24   Q   Okay.  And being in solitary is even more
25   stressful?

Brooks - Confidential

1
2     A   It can be.
3     Q   Was it for you?
4     A   Like I said, I had my moments.
5     Q   And separation with your wife in around
6  2011 was a significant contributor -- played a
7  significant role in your mental health status?
8     A   It depressed me.
9     Q   And it depressed you to the point where
10 you tried to take your own life?
11    A   I didn't want to live.
12    Q   As a result the recovery from which led
13 you to stay in the hospital, be hospitalized
14 for several months?
15    A   Yeah.
16    Q   And you don't recall whether or not you
17 shared this information with Dr. Reich?
18    A   No, I don't.
19    Q   Okay.
20    A   Can we break now?
21       I'm hungry.
22    Q   Sure, we can take a break.
23    A   Thank you.
24       (Luncheon Recess:  1:00 p.m.)
25    A F T E R N O O N   S E S S I O N

Brooks - Confidential

1
2       (Time noted:  1:53 p.m.)
3  G R E G O R Y   B R O O K S, resumed and
4     testified as follows:
5  EXAMINATION BY (Cont'd.)
6  MR. SEIDENFELD:
7     Q   Mr. Brooks, we're going to ask you a few
8  more questions about Plaintiff's Exhibit 1,
9  which I believe you still have in front of you.
10 If you could turn to Brooks Page 44 at the
11 bottom.
12       See where it says "Adult Sentence
13 Completion Test"?
14    A   Yes.
15    Q   Was that part of your examination with
16 Dr. Reich where he asked you a series of
17 questions and ask you to provide the end of the
18 sentence?
19    A   Yeah, I believe so.
20    Q   Okay.  Take you to the second -- turn to
21 the next page.
22       I want you to look, one, two, three, four,
23 five bullets from the top.
24       You see that?
25       It says "I hate homosexuals that is are in

Brooks - Confidential

1
2  my presence.  Now I hate myself."
3       What did you mean by that?
4     A   I don't recall.  I don't recall why I said
5  that.
6     Q   Do you hate homosexuals?
7     A   No.
8     Q   Did you have any negative feelings towards
9  homosexuals?
10    A   No.
11       Just in a situation like this, yeah.  As
12 far as them being homosexual, no, that's none
13 of my business.
14    Q   Is it true that you try and avoid contact
15 with people who are homosexual?
16    A   Mm-hmm.
17    Q   And why is that?
18    A   In prison you don't want to -- that's a
19 prison custom.
20    Q   What do you mean, it's a "prison custom"?
21    A   You don't want to be involved with
22 homosexuals.
23    Q   What do you mean be "involved"?
24    A   You don't want to be associated with
25 homosexuals in prison.

Brooks - Confidential

1
2     Q   Are people in prison who engage in
3  homosexual activities that aren't -- they
4  wouldn't consider themselves homosexual?
5     A   That what.
6     Q   Are -- did you ever encounter people in
7  prison who engaged in homosexual activities but
8  didn't consider themselves homosexual?
9     A   No, I can't say that.
10    Q   In prison, did you ever -- were you ever
11 involved in any homosexual activities?
12    A   No.
13    Q   Any sexual activities with another man
14 while in prison?
15    A   No.
16    Q   What about outside of prison?
17    A   No.
18    Q   How long did you meet with Dr. Reich for?
19    A   I don't know, a few hours.
20    Q   Two? three?
21    A   Possibly more than that.  I don't really
22 remember.  But it was a few hours.
23    Q   At the beginning you said that you are
24 currently taking Trazodone -- can you tell us
25 what the prescription was.  I can't read my own

Brooks - Confidential

1
2    writing.  I apologize.
3    A   Trazodone.
4    Q   Trazodone?
5    A   Yeah.
6    Q   Okay.  And how long have you been taking
7    it?
8    A   It's Trazodone or Rimron [phonetic].  I
9    think that's how you pronounce it.
10   Q   Are you taking both?
11   A   One or the other.  It's either Trazodone
12   or Rimron.  I know it's something for my sleep.
13   Q   Okay.  And it's just one prescription,
14   you're not sure which one it is?
15   A   Yeah.
16   Q   When did you start taking that
17   prescription?
18   A   Couple of months back.
19   Q   Okay.
20   A   This time, because I took it before.
21   Q   Within 2018?
22   A   Yes.
23   Q   When you said you took it before, when was
24   that?
25   A   2017 and 2012.  Yeah, 2012.

Brooks - Confidential

1
2    Q   Do you remember if it was Rimron, or the
3    other one in either of those cases?
4    A   No.  I know it was Trazodone in 2011.  I'm
5    pretty sure it was Trazodone.
6    Q   What about in 2017?
7    A   No.  The doctor was wondering did they
8    want I give me that or did they want to give me
9    something else.
10       I just know it was a sleeping thing.
11   Q   In 2017, it was a sleeping medication?
12   A   Yeah, and in 2018.
13   Q   And for how long did you take it in 2017?
14   A   Until it ran out.
15   Q   Do you remember when in 2017 you started
16   taking it?
17   A   No.
18   Q   Was it beginning of the year, end of the
19   year?
20   A   I don't remember.
21   Q   When you say until it ran out, you just
22   took one prescription's worth?
23   A   Yeah.
24   Q   Was it a month?
25   A   Maybe a little over.  I did like I do

Brooks - Confidential

1
2    it now.  It's as needed when I can't rest.
3    Q   Okay.  So it's not on a regular -- so now
4    it's not on a regular basis?
5    A   No, it's just when I need it.
6    Q   So when do you need it, to rest?
7    A   Yeah.
8    Q   In 2017 it was the same thing, you just
9    took it when you needed it to rest?
10   A   Yeah.  When I couldn't rest, yeah.
11   Q   And what about in 2011-2012, then were you
12   taking it regularly?
13   A   Yeah, I was taking it regularly.  Sometime
14   I miss it.  Sometimes I would miss.
15   Q   That was up until the point when you
16   stopped taking it, when you were in Franklin?
17   A   Yeah.
18   Q   Okay.  I'm going to ask you some questions
19   about your time as a participant in the Ready,
20   Willing & Able program.
21       Do you know when you first arrived at the
22   Ready, Willing & Able program?
23   A   The actual date, no.  I'm not good with
24   dates.
25   Q   Does end of June 2016 sound right to you?

Brooks - Confidential

1
2    A   June 2016?
3       Yeah, I guess.
4    Q   And why did you go to The Doe Fund to join
5    the Ready, Willing & Able program?
6    A   While I was on parole, somebody came, and
7    I guess a recruiter of sorts, came in and he
8    said that they give you work and housing --
9    and -- immediate work.  They put you to work
10   immediately and they give you housing.  And
11   that's exactly what I needed, so . . .
12   Q   And did they give you counseling?
13   A   Counseling?
14   Q   Counseling?
15   A   Like mental health counseling?
16   Q   Like you had -- did you work with a
17   caseworker?
18   A   Yeah.
19   Q   Okay.  And they gave you -- in part, it
20   was to give you training to reenter the
21   workforce?
22   A   They had training programs.  They had a
23   work -- we went on routes every day, as far as
24   work was concerned.  But they also had training
25   for other programs.  And I believe I signed up

1    Brooks - Confidential
2  for pest control.
3  Q   Okay.  And the purpose of -- another
4  purpose of being in the Ready, Willing & Able
5  program was to help you find work at an outside
6  employer that was outside of The Doe Fund?
7  A   My understanding was, the idea was for
8  stable -- what was the term?
9    I think it was "independent living,"
10 meaning consistent work and housing.
11 Q   Very shortly after you joined the Ready,
12 Willing & Able program you started working for
13 4C Foods?
14 A   Yes.
15 Q   What did you do at 4C?
16 A   I was a forklift operator.
17   (Deposition Exhibit 2, Document
18 Bates-stamped TDF 00001 through TDF000004,
19 marked for identification as of this date.)
20 Q   Mr. Brooks, I'm going to hand you what's
21 been marked as Plaintiff's Exhibit No. 2, which
22 is Bates-stamped TDF0001 through TDF0004.
23   Mr. Brooks, is this the terms -- is this
24 the sheet documenting the terms of
25 participation that were part of you joining the

1    Brooks - Confidential
2  Ready, Willing & Able program?
3  A   Yes, I believe so.
4  Q   Okay.  And take a look at the last page of
5  the document.
6    You see where it says "Participant's
7  Signature"?
8  A   Mm-hmm.
9  Q   That's your signature?
10 A   Yes.
11 Q   And see the date is 6/28/16?
12 A   Yes, I see that.
13 Q   And that's about the date you joined the
14 Ready, Willing & Able program?
15 A   Mm-hmm.
16 Q   Go back to the first page.
17   You see in the second paragraph it says "I
18 understand and agree that, as a participant
19 ("trainee") in RWA, I must follow all the
20 program rules, regulations and guidelines as
21 set forth in this statement in my independent
22 living plan, which I will develop with my case
23 manager."
24   And this independent living plan is what
25 you referenced before?

1    Brooks - Confidential
2  A   Yes.
3  Q   And you were assigned a case manager?
4  A   Yes.
5  Q   And do you know who that was?
6  A   Dash Porter.
7  Q   Dash Porter is a male?
8  A   Yeah.
9  Q   You know Dash Porter's race?
10 A   No.
11 Q   Is Dash Porter African-American?
12 A   Could be.  Could be mixed with something
13 or something else.
14   But does he have brown skin, yes.
15 Q   And if you'll look a couple of lines down,
16 the third line from the bottom, you see where
17 it says "I understand and agree that my failure
18 or refusal to follow these Terms of
19 Participation and/or my ILP may result in
20 discharge from RWA and a possible transfer to
21 another DHS facility."
22   Do you see that?
23 A   Third line from the bottom?
24 Q   Here.
25 A   This one?

1    Brooks - Confidential
2  Q   See where I'm reading from?
3  A   Yes.
4  Q   You understand this document was outlining
5  the terms and conditions of you participating
6  in the RWA program?
7  A   Yeah.
8  Q   Okay.  And do you see below where it says
9  "A. Program Rules"?
10 A   "A.  Program Rules"?
11 Q   Yes.
12   Those were all the rules you were expected
13 to follow as --
14 A   Oh, "A.  Program Rules."  I see it.
15 Q   -- in order to stay in the program?
16 A   Yeah, I see it.
17 Q   And things like if you just look at number
18 seven, for example, "Curfew is 10:00 p.m.,
19 unless a late/overnight pass has been
20 approved," that was one of the rules of the
21 program?
22 A   Curfew is at 10:00 p.m. or earlier, if
23 required by a trainee's parole officer.
24 Q   That was one of the rules, just like all
25 these others rules listed here.

1          Brooks - Confidential
2      You were told you had to follow them in
3  order to stay in the program?
4      A    Yes.
5      Q    Did you read this at the time when it was
6  given to you?
7      A    Yeah, I skimmed through it.
8      Q    Okay.
9      A    But I had my counselor there with me to
10  point out things that were important.
11     Q    Your counselor --
12     A    Dash Porter.
13     Q    Do you remember what Dash Porter pointed
14  out to you?
15     A    No.
16     Q    Okay.  So you don't remember, what, if
17  anything, was pointed out?
18         No?
19         You have to answer the question?
20     A    No, I don't recall.
21     Q    Take a look at Page TDF0003, the third
22  page of the document.  Let me just ask you.
23  You mentioned that you skimmed or read the
24  document.
25         You don't have any trouble reading or

1          Brooks - Confidential
2  understanding a document like this?
3      A    No.
4      Q    Okay.  Now, before you mentioned you had
5  written some books and articles?
6      A    Mm-hmm.
7      Q    Just what book -- what was the name of the
8  book that you wrote?
9      A    "The Psychology of Freedom."
10     Q    Okay.  How long was it?
11         How many pages was it?
12     A    420, I think.
13     Q    Okay.  You wrote it all on your own?
14     A    Yes.
15     Q    And you self-published it, right?
16     A    I did.
17     Q    You can take a look back at "D.  Program
18  Phases."
19         Do you see that?
20     A    Yes, I see it.
21     Q    It says, "I acknowledge that RWA has three
22  phases (Orientation, Workforce Development and
23  Graduate Services).  Staff may shorten or
24  lengthen the time I spend in each phase based
25  on my specific needs and conduct."

1          Brooks - Confidential
2      Do you understand that there were three
3  different phases of the RWA program?
4      A    I understand that.
5      Q    Okay.  And orientation, was that
6  when -- strike that.
7      You see below, right below, it says "I
8  understand that the orientation phase is
9  approximately 30 days, which staff my shorten
10  or lengthen based on an assessment of my needs
11  and conduct.  During orientation, I must remain
12  on facility grounds, except for preapproved
13  appointments, which may include visits to
14  health care providers or criminal justice
15  supervision agencies.  During this phase, I
16  will be assigned to an in-house work crew
17  responsible for various tasks.  I acknowledge
18  that during the orientation, I will receive a
19  $15 stipend.  I understand I am not an employee
20  of The Doe Fund, and that this stipend is not a
21  salary or wage, but is only an incentive to
22  recognize my participation and compliance with
23  the program."
24      When you first started RWA in the RWA
25  program, were you assigned to an in-house work

1          Brooks - Confidential
2  crew?
3      A    Yes, I did in-house work.
4      Q    Okay.  For about a couple of weeks?
5      A    Yes.
6      Q    It was less than a 30-day period?
7      A    I believe so.  I'm not really sure.
8      Q    Okay.  And you see that it says you'll
9  receive a $15 weekly stipend; did you?
10     A    Yeah, I received maybe 30, $30, something
11  like that.
12     Q    You see after that it says I understand
13  that I am not an employee of The Doe Fund and
14  that this stipend is not a salary or a wage.
15         Did you understand that?
16     A    Yes.
17     Q    If you go to the next paragraph, it says,
18  "I understand that when the staff determine --
19  when the staff -- strike that.
20      If you go to the next paragraph it says,
21  "I understand that when staff determine that I
22  have successfully completed the Orientation
23  phase, I will be in the Workforce Development
24  phase of the RWA.  I will be assigned to a work
25  crew and will be paid training incentive of

Page 138

Brooks - Confidential

1      $9.20 for 30 hours a week ($276 total.)
2          And then I'm going to skip ahead to the
3      sentence that says -- at the end of the third
4      line from the bottom, "I understand that I am
5      not an employee of The Doe Fund, and that this
6      training incentive does not constitute wages,
7      but rather an incentive in recognition of my
8      progress in the program."
9          You were assigned to the Workforce
10     Development phase of the program in the
11     beginning of July 2016?
12     A    Yes.
13     Q    And the stipend that you received was part
14     of your -- was an incentive for recognition of
15     your progress in the program?
16     A    I received paychecks on a comdata card.
17     Q    So you received them -- the stipend that
18     you received was on a debit card?
19     A    I don't -- was it a debit card?
20     It was a card that they gave me through
21     The Doe Fund.
22     Q    Okay.  And you understood that as part of
23     the Workforce Development program, that you
24     weren't an employee of The Doe Fund?
25

Page 139

Brooks - Confidential

1      A    No, I was on a work crew.
2      Q    You were on the work crew as part of the
3      Workforce Development phase of the Ready,
4      Willing & Able program?
5      A    Yes.
6      Q    And after you were through with the
7      Workforce Development phase, did you begin to
8      work for 4C Foods?
9      A    No, I stopped working for them.
10     Q    The work --
11     A    It wasn't -- I never completed that
12     "phase."  I was receiving -- I was having
13     problems at work with my routes, and I felt
14     uncomfortable, so I ceased working with The Doe
15     Fund and found my own job, which was 4C.
16     Q    You say you ceased working.
17         You mean you ceased participating in the
18     Workforce Development phase of the Ready,
19     Willing & Able program?
20     A    Yeah, I quit.  I quit the job.
21     Q    You stopped going on the routes, which
22     were part of the Workforce Development program?
23     A    Yes, I did.
24     Q    And you started working for 4C at the end
25

Page 140

Brooks - Confidential

1      of August 2016?
2      A    I don't remember what the date was, but
3      eventually I stopped and I started working for
4      four seasons.
5      Q    You stopped -- when you say you -- strike
6      that.
7          Mr. Cooper -- I apologize for that.  My
8      apologizes.
9          Mr. Brooks, you said it's 4C, as in the
10     letter "C" and not "Seasons"?
11     A    It's the same name for the company.  It's
12     called 4 Seasons and 4C.
13     Q    It's the same place?
14     A    Same place.
15     Q    Okay.  And from the time you started
16     working for 4C, did you ever have -- from the
17     time you started working for 4C, did you ever
18     receive any additional stipends from The Doe
19     Fund?
20     A    I stopped dealing with them altogether.  I
21     was only dealing with them when I had to report
22     to the case manager.
23     Q    You mean you stopped dealing with them --
24     I'm still unclear because you still were living
25

Page 141

Brooks - Confidential

1      in The Doe Fund's Gates Avenue Facility --
2      A    Yes.
3      Q    Just let me finish.
4          -- while you were working for 4C Foods --
5      and the court reporter can read that back to
6      you if you need to hear the whole question.
7          MR. SEIDENFELD:  Maybe let's read it back
8      to him.
9          (Record read.)
10     Q    Mr. Brooks, I just want to make sure we're
11     clear.
12         You said that you stopped dealing with The
13     Doe Fund when you started working for 4C Foods.
14         But my question, and I'm a little confused
15     by that, because it's my understanding while
16     you were working for 4C Foods, that you still
17     lived in The Doe Fund Gates Avenue Facility; is
18     that correct?
19     A    That is correct.  I was only on DHS
20     shelter status, at that point.  That's what
21     they told me.
22         Once I got a job, I was no longer a Doe
23     Fund participant.  And so one of the things
24     they offered to me was no longer available to
25

Brooks - Confidential

1
2  me.  So I was just "shelter status."  That's
3  what they called it.
4      Q    You said you weren't -- so did you not
5  meet with your caseworker after you started
6  working for 4C?
7      A    Yes, I did.  I had to meet with -- that's
8  what I said.  I had to meet with my caseworker
9  to prove that I was trying to find my housing
10 and to give updates and turn in my pay stubs.
11     Q    And caseworker, Mr. Porter, even while you
12 were working at 4C was still -- was helping you
13 with this processes or guiding -- at least
14 guiding you through them?
15     A    No.  I was pretty much doing things on my
16 own.  They would come to me with certain
17 offers, and some of them I would look into.
18         But by that time it wasn't -- it wasn't
19 Mr. Porter, because they switched my case
20 manager, eventually.
21     Q    Okay.  Who did they switch your case
22 manager to?
23     A    His name was Young.  O'Neil Young.  I
24 believe that was his name.
25     Q    Do you know what Mr. O'Neil's race was?

Brooks - Confidential

1
2      A    I believe he was African-American, I don't
3  know.
4      Q    So even while you were working with 4C, as
5  part of the RWA program, you were working with
6  your case manager who either was Mr. Porter or
7  Mr. Young, they were working with you to help
8  you find housing?
9      A    I was required to turn in my pay stubs to
10 prove that I was working so I could get my
11 passes, my late night passes, because it was a
12 late night job.
13     Q    I understand that.  But I just want to ask
14 you a slightly separate question.
15         So while you were working with 4C, both
16 Mr. Porter and Mr. Young were involved, at
17 least to some extent, in helping assisting you
18 or guiding you in finding housing?
19     A    No.
20     Q    Not at all?
21     A    No.
22         What I had to do -- what I was required to
23 do was convey to them that I was attempting to
24 find housing.  So I had to prove to them that I
25 was doing a housing search.

Brooks - Confidential

1
2         Mr. Porter, a couple of times he told me
3  about a couple of different sites that I could
4  sign up to, but I don't recall if it was before
5  or after I stopped working with The Doe Fund.
6         Mr. O'Neil gave me a couple of leads on
7  apartments.  But I conveyed to Mr. O'Neil that
8  I had already obtained an apartment, and I was
9  waiting for the construction to be done with it
10 before I was able to move in.
11     Q    Okay.  So while you were still living at
12 Gates Avenue, you had obtained subsequent
13 housing?
14     A    Yes, I did.
15     Q    And that's the 630 Howard Avenue address?
16     A    Yes, it is.
17     Q    That's where you went to live after you
18 left Gates Avenue?
19     A    Yes.
20     Q    I just want to -- one more follow-up
21 question.
22         So after you started working for 4C, did
23 you ever receive any compensation in any form
24 from The Doe Fund?
25     A    I don't know, because I stopped using that

Brooks - Confidential

1
2  card.  I know that they used to put money on
3  that card.  And we had an issue because I
4  wanted to take the money off of the card and
5  put it in my own private bank account.  They
6  refused.  So I just stopped dealing with the
7  money situation with them totally.
8      Q    That money was a stipend either from your
9  participation in the Orientation in-house
10 program or the Workforce Development program?
11     A    Yeah, it was payment for the work I was
12 doing on the street crews.
13     Q    As part of the Workforce Development part
14 of the program -- of the RWA program?
15         Do you understand my question?
16     A    I believe so.  I guess, yes.
17     Q    Maybe I'm not asking clearly.
18         But after the stipends you received for
19 the Workforce Development part of the program,
20 did you receive any other monies from The Doe
21 Fund as part of the RWA program?
22         I don't -- is it true that you haven't --
23 you didn't -- strike that.
24         Is it true that you didn't -- strike that.
25         Is it true that you didn't receive any

1          Brooks - Confidential
2    monies or stipends from The Doe Fund after the
3    completion of your time in the Workforce
4    Development part of the RWA program?
5    A   I don't know if they actually put money on
6    that card again, because I never used it any
7    more after the conversation that I had with
8    Timothy Matthews.
9        I was completely turned off, and didn't
10   want to deal at all.  So I just put the card
11   away and didn't discuss money or anything with
12   them, and tried to avoid them as much as I
13   could.
14   Q   Who was Timothy Matthews?
15   A   He was the assistant director?
16   Q   Do you know what Mr. Matthews' race is?
17   A   No.  Maybe Spanish or Caucasian.  He's
18   light skin.
19   Q   When was this conversation with
20   Mr. Matthews?
21   A   I don't remember the exact date.
22   Q   Was it while you were working for 4C?
23   A   I believe so.
24   Q   Okay.  And you provided to us all the
25   records that you had, of any stipend payments

1          Brooks - Confidential
2    you received from The Doe Fund?
3    A   I believe I had a printout from
4    Mr. Matthews, and that's all that I had.  And I
5    do believe that I gave it to my attorney.
6    Q   Let me ask:  Is there anything in your
7    possession showing -- strike that.
8        Do you have any records showing any monies
9    you received from The Doe Fund that you haven't
10   provided to your counsel?
11   A   No, not that I know of.
12   Q   Okay.  When you were working -- strike
13   that.
14       When you were assigned to the in-house
15   phase of the RWA program, did anything negative
16   happen to you at The Doe Fund, just in the very
17   initial period?
18   A   No, not that I recall.  I mean --
19   Q   I sorry.  Go ahead.
20   A   While I was in-house?
21   Q   If you can't recall, that's fine.
22   A   I believe I was still in-house when Terry
23   made a comment about being chained -- nope,
24   that wasn't in-house.  I wasn't.  I was
25   actually at a route.

1          Brooks - Confidential
2        So, yeah, through the orientation phase, I
3    didn't have no problems.  No problems.
4    Q   Did you know Mr. Cooper prior to you
5    arriving at the Gates Avenue facility?
6    A   No, I did not.
7    Q   Okay.  Did he have any involvement in the
8    in-house activities at the -- as part -- at the
9    RWA program?
10   A   Not that I know of.
11   Q   Do you know what Mr. Cooper's title was?
12   A   Dispatch supervisor.
13   Q   I'm sorry, do you know what Mr. Cooper's
14   race was?
15   A   He was either black or Latino.  I'm not
16   sure.
17   Q   Do you know who -- did Mr. Cooper have a
18   boss at The Doe Fund?
19   A   I assumed that -- what's his name?
20       I assumed that Mr. Washington and
21   Mr. Matthews were his boss.  Now, I'm not so
22   sure.
23   Q   When you say "Mr. Washington," you're
24   referring to James Washington?
25   A   Yes, I am.

1          Brooks - Confidential
2    Q   And Mr. Matthews is Timothy Matthews, who
3    we discussed before.
4        Do you know if Mr. Cooper reported to
5    Craig Trotta?
6    A   Who?
7    Q   Craig Trotta?
8    A   I don't know who that is.
9    Q   Did you ever see a Craig Trotta when you
10   were at the Gates Avenue facility?
11   A   I don't know who you're talking about.
12   Q   You know that Mr. Cooper was a homosexual
13   when you met him?
14   A   Yes.  From comments that he was making,
15   yes.
16   Q   What comments?
17   A   He was making a lot of sexual comments.
18   Q   When?
19       When was this?
20   A   Since the day I walked in the door I
21   observed him making sexual comments with other
22   people.
23   Q   So on the first day what comments did you
24   observe him making?
25   A   I don't remember exactly what he said, but

Brooks - Confidential

1   I remember it being a sexual comment.
2   Q   Do you remember who he was making them to?
3   A   No.  I didn't know nobody that was in the
4   building.  I knew that Mr. Washington was
5   there, though.
6   Q   You said Mr. Washington observed
7   Mr. Cooper making, what types of comments?
8   A   It was something sexual.  I don't remember
9   exactly what he said.
10  Q   Was it something that just indicated that
11  he was homosexual, or was it something -- was
12  he talking about -- I'm sorry.
13      Was it comments -- was he talking about a
14  significant other or a boyfriend?
15  A   He was talking to somebody that was there.
16  Q   Were they comments that were -- you found
17  inappropriate?
18  A   Yeah.  I found it kind of strange for him
19  to be making those type of comments in there.
20  Q   When you say "those types of comments,"
21  I'm just trying to understand what you mean?
22  A   Flirting.  Flirtatious comments he was
23  making with the other guys there.
24  Q   Other Ready, Willing & Able participants?

Brooks - Confidential

1   A   Yeah.  Yeah, and staff.
2   Q   And other -- and employees of The Doe
3   Fund?
4   A   Administration staff, I guess you would
5   call them.
6   Q   People that worked for The Doe Fund.
7       Do you remember who?
8   A   At that time I didn't know who was who.
9   It was my first day.
10  Q   Did you come to know who these people were
11  later on?
12  A   I found out who James Washington was.  But
13  the other people, they were, like, blur.  I
14  don't really -- I just seen a lot of people --
15  that first day I seen a lot of people walking
16  around.  So I didn't, like, pinpoint who was
17  who.
18  Q   You saw Mr. Cooper make a flirtatious
19  comment to James Washington?
20  A   No.  He made it to someone else in the
21  presence of James Washington.  And
22  James Washington laughed and walked away.
23  Q   You don't remember when, though?
24  A   That was the first day I was there,

Brooks - Confidential

1   sitting, waiting.
2   Q   You don't remember to who?
3   A   No.
4   Q   You don't remember the comment?
5   A   I don't remember exactly what he said, no.
6   Q   And did you report this to anyone?
7   A   No.
8   Q   Why not?
9   A   Because it wasn't none of my business.  He
10  didn't say it to me.
11  Q   So it didn't upset you?
12  A   I didn't feel comfortable with it.  I made
13  a point that I would be as brief as possible
14  with him, because I could see that he was loose
15  like that, so . . .
16  Q   You're referring to Mr. Cooper?
17  A   Yes.
18  Q   When you say he was "loose like that,"
19  what did you mean?
20  A   He was loose with his sexual jokes and
21  comments.
22  Q   And you didn't report that to anyone?
23  A   No.
24  Q   You said you made it a point to stay away

Brooks - Confidential

1   from Mr. Cooper?
2   A   I made it a point to interact with him as
3   little as possible.
4   Q   Okay.  And just to go back to the comment
5   that you said you observed on the first day,
6   you can't remember the comment, correct?
7   A   No.
8   Q   You can't remember who made the comment,
9   correct?
10  A   It was Mr. Cooper.
11  Q   You don't remember who he made the comment
12  to?
13  A   No.
14  Q   Initially, you wanted to go speak with
15  Mr. Cooper about being assigned to the Hudson
16  route?
17  A   I think -- I believe I spoke to
18  Dash Porter about that.
19  Q   Did you also speak to Mr. Cooper about it,
20  at some point?
21  A   I remember speaking to him when I wanted
22  to get taken off that route.  But it's possible
23  I did ask him about the route, too.  I don't
24  remember, though.

Brooks - Confidential
1
2    (Deposition Exhibit 3, Document Entitled
3    "Complaint", marked for identification as of
4    this date.)
5    Q   I just handed Mr. Brooks what's been
6    marked as Plaintiff's Exhibit 3, which is his
7    complaint in this pending litigation.
8        Have you seen this before, Mr. Brooks?
9    A   Yes.
10   Q   These are your allegations against The Doe
11   Fund and Mr. Washington and Mr. Cooper in this
12   case?
13   A   Yes.
14   Q   To the best of your ability, you believe
15   everything in this complaint is truthful and
16   accurate?
17   A   Yes.
18   Q   I want to take you to -- if you look on
19   the left-hand side of the document, you see
20   that each of the sentences have a number next
21   to them.  So I'm going to refer you to
22   different paragraphs by their number.
23       Okay?
24   A   Okay.
25   Q   Take a look at Paragraph 26.  It says

Brooks - Confidential
1
2    on -- are you there?
3        It's on Page 4, at the bottom of the page.
4        It says (As read):  "On or around
5    July 6th, plaintiff told defendant Cooper, 'Hey
6    Terry, I want to pull you up later to find out
7    about that Hudson Route'."
8    A   That's right, yes.
9    Q   Does that refresh your recollection about
10   whether you initiated --
11   A   I --
12   Q   I'm sorry.  I know you know -- like I
13   said, I know you know where I'm going.  You
14   just have to let me finish for the record.
15       That refreshes your recollection about
16   whether you initiated a conversation with
17   Mr. Cooper about joining the Hudson route?
18   A   Yes, it does.
19   Q   Okay.  And this was -- even though you had
20   already felt that you observed Mr. Cooper
21   engaging in conduct that you found
22   questionable?
23   A   Yes.
24   Q   Why didn't you go to someone else if you
25   already had concerns about Mr. Cooper?

Brooks - Confidential
1
2    A   He was in control about that.  He was in
3    control of the routes.
4        When I asked around about who was in
5    control of the routes, they told me I had to
6    speak to Terry.
7        So I said this, right here, in a room
8    filled with other participants.  And this is
9    when he made the comment that he likes to be
10   pulled up, chained down and whipped.
11   Q   So that's your belief, that on this
12   July 6th, he said that in response to you
13   asking about being assigned to the Hudson
14   route?
15   A   Yes.
16   Q   Who else was there?
17   A   It was several other participants.  I
18   don't know -- I don't know them.  I was pretty
19   quiet.  I didn't speak to many people.
20   Q   Is it possible that the comment you're
21   attributing to Mr. Cooper occurred later on?
22   A   No.
23   Q   Okay.  How did you -- so you said other
24   people told you that Mr. Cooper was the person
25   to see about being assigned to a route?

Brooks - Confidential
1
2    A   Yes.
3    Q   Who are those people?
4    A   Mr. Porter.
5    Q   Mr. Porter told you that?
6    A   Dash Porter.
7    Q   Okay.  What did he tell you?
8    A   That Cooper is -- if I wanted to go to a
9    specific route, I need to speak to Mr. Cooper
10   about that.
11   Q   Why did you want to be on the Hudson
12   Route?
13   A   It was summertime.  It was on Chelsea
14   Piers.  The environment was nice, by the water.
15   Q   What do you mean by bottle of water?
16   A   I said by the water.
17   Q   Oh, I apologize, by the water.
18       If you go to the next page.  If you look
19   at 28, Page 5, Complaint 28.
20       And then it says "In front of other
21   employees, Defendant Cooper responded, 'Oooh,
22   yeah, I like to be pulled up, chained up and
23   whipped'."
24       That's what you were referring to a moment
25   ago?

Page 158

Brooks - Confidential

1
2   A   Yes.
3   Q   You said "Cooper with the rest of the
4   staff laughed."
5       Who was there that laughed?
6   A   The people that were in the room.
7   Q   Who was in the room?
8   A   I told you I don't know them.  I don't
9   know them.
10  Q   You don't remember the names of anyone in
11  the room?
12  A   No.
13  Q   Are they RWA program participants?
14  A   Yup.
15  Q   Were there any employees of The Doe
16  Fund --
17  A   Everybody.
18  Q   -- I'm sorry, other than Mr. Cooper?
19  A   Everybody worked for The Doe Fund.
20  Everybody was either on the work crew or they
21  were supervisors?
22  Q   So you -- at The Doe Fund there was a
23  distinction between people who are part of the
24  Ready, Willing & Able program and people who
25  were in the administrative staff of The Doe

Page 159

Brooks - Confidential

1
2   Fund?
3   A   Say that again.
4   Q   Strike that.
5       So the people who were part of the Ready,
6   Willing & Able program, they, as part of the
7   Workforce Development phase, they were assigned
8   to the work crews, correct -- road crews,
9   correct?
10  A   We had street -- street cleanings, which
11  was us, and we had supervisors.
12      We wore the blue shirts and the
13  supervisors wore the red shirts.
14      You got different shirts for different
15  people.  Like, Terry wore a white shirt.  And
16  he was like a upward supervisor.
17  Q   Mr. Cooper ever go out with you on the
18  routes?
19  A   Never.
20  Q   Was he your supervisor on the routes?
21  A   He was a supervisor for dispatch.
22  Q   Was he a supervisor on the route?
23  A   He was the supervisor for dispatch.
24  Q   That's not my question.
25      I'm asking was he a supervisor on the

Page 160

Brooks - Confidential

1
2   route?
3   A   Not that I know of.
4   Q   Did he ever accompany you on the route?
5   A   No, he did not.
6   Q   Did you have a supervisor on the route?
7   A   Several.
8   Q   Okay.  And on the Hudson route, who was
9   it?
10  A   It was several different supervisors.
11  Q   Who were they?
12  A   I forget his name, Julio something.
13  Q   Any other supervisors?
14  A   That's the name that I remember.  It was
15  supervisors.  He was the one that drove us
16  there.
17      But we had different people driving us
18  there, depending on the day -- excuse me, and
19  depending who was there.
20  Q   Those were the people in the red shirts?
21  A   Yeah.
22  Q   Okay.  And when you were at a work -- when
23  you were at a road site, what did the people in
24  the red shirts do?
25  A   They made rounds, made sure we were

Page 161

Brooks - Confidential

1
2   working.
3   Q   And what were you and the other people in
4   the blue shirts doing?
5   A   We were doing street maintenance.
6   Q   Okay.  If you look back at the complaint,
7   and you look at Paragraph 31,
8   traditionally -- strike that.
9       So let's go back to July 6th and the
10  comment that you heard Mr. Cooper make.
11      Did you report it to anyone?
12  A   What comment?
13  Q   The comment, oooh, yeah, I like to be
14  pulled up, chained up and whipped.
15  A   No, I did not.
16  Q   Why not?
17  A   Because I didn't want no problems.  I just
18  ignored that.  I ignored it.
19  Q   Okay.  You look at Paragraph 31.
20      It says "On or around July 8th, again,
21  plaintiff contacted Cooper to obtain
22  information on the Hudson route."
23      So you initiated contact with Cooper on
24  the 8th?
25      Do you understand the question,

Brooks - Confidential

1     Mr. Brooks?
2
3     A   I remember speaking to him, but I don't
4     remember what the date was.
5     Q   And he wasn't your supervisor at that
6     point?
7     A   What do you mean?
8     Q   Mr. Cooper wasn't your supervisor?
9     A   He was the route supervisor.
10    Q   But not your supervisor?
11    A   Not my supervisor.  He was the supervisor
12    that I was told that I need to speak to in
13    order to get a specific route.
14       So he was the one that I had to talk to
15    about being placed on a route.
16    Q   He was someone -- but he didn't supervise
17    you on that route?
18    A   While working on the route?
19    Q   Right.
20    A   No.
21    Q   And he didn't supervise you while you were
22    doing your in-house work?
23    A   No.
24    Q   He didn't supervise you in connection with
25    any other parts of your participation in the

Brooks - Confidential

1     Ready, Willing & Able program?
2
3     A   He was in control of the pay.
4     Q   What do you mean?
5     A   The schedule.
6     Q   What do you mean "he was in control of the
7     pay"?
8     A   He was in control of the pay.
9     Q   Did he set your -- did he set a rate of
10    pay -- the rate of your stipend?
11    A   Did he set the rate?
12    Q   I'm sorry, what was your answer?
13    A   I don't know what you mean by, "did he set
14    the rate."
15    Q   You said he controlled the pay?
16    A   He controlled our schedules, our time
17    schedules and how much we're supposed to get
18    pay.  I believe we're supposed to sign our
19    hours.
20    Q   Isn't it true that his title wasn't even
21    supervisor?
22    A   No, he was a supervisor.
23    Q   That wasn't his title?
24    A   Yes, it was.
25    Q   Do you know what his title --

Brooks - Confidential

1
2     A   He was the supervisor of dispatch.
3     Q   Did anyone ever --
4       MR. SEIDENFELD:  Can we go off for one
5     second?
6       (Recess taken.)
7     BY MR. SEIDENFELD:
8     Q   When you spoke with Mr. Cooper on
9     July 8th, did he do anything inappropriate
10    then?
11    A   I don't remember the date, but . . .
12    Q   Let me --
13    A   I do remember approaching him on a
14    staircase.  We were going down the stairs and I
15    asked him about the route, and he told me, I
16    got you and then walked away.
17    Q   So nothing inappropriate in that
18    interaction, right?
19    A   No.
20    Q   Okay.
21       (Deposition Exhibit 4, Document Entitled
22    "Community Improvement Project, Field
23    Schedule", marked for identification as of this
24    date.)
25    Q   Mr. Brooks, I'm going to hand you what's

Brooks - Confidential

1
2     been marked as Plaintiff's Exhibit 4, which is
3     Bates-stamped TDF000142.
4       This is the schedule that you received as
5     part of the Workforce Development program for
6     the week starting Sunday, July 17, 2016,
7     correct?
8     A   Yes.
9     Q   This shows you were assigned to the Hudson
10    route?
11    A   Yes.
12    Q   It shows that on Sunday the 17th, Monday
13    the 18th, Tuesday the 19th and Wednesday the
14    20th, you were assigned to work from 3:00 to
15    11:30 p.m., correct?
16    A   Yes.
17    Q   Do you know who gave this schedule to you?
18    A   Do I recall who handed it to me, no.
19    Q   And this was what you had requested, to be
20    assigned to the Hudson route?
21    A   Yes.
22    Q   If you look at Paragraph 35 of your
23    complaint, it says that you immediately
24    contacted Mr. Porter to inform him about a
25    discrepancy.

Brooks - Confidential
1
2       And that was referring to a discrepancy in
3  the schedule?
4       A   Yes.
5       Q   What did you tell Mr. Porter?
6       A   Well, at the time, this wasn't conducive
7  to me spending time with my child -- getting my
8  kids and my -- the drug program that I was in.
9       Q   Mr. Porter said that he would look into it
10 and try to fix it for you?
11      A   Yeah.  He said he would speak to Terry
12 about it.
13      Q   And did you work -- strike that.
14      Did you participate in the Workforce
15 Development program on the days of this
16 schedule, on the 17th, 18th, 19th and 23rd?
17      A   Yeah.
18      Mr. Porter said I had to go to work
19 because that's what the schedule was for.  And
20 that once he fixed it, then I wouldn't have to
21 work on those days.  But I was required to do
22 this, their schedule.
23      Q   Isn't it true that after July 23rd, that
24 while you were on the -- strike that.
25      Isn't it true that after July 23rd, that

1       Brooks - Confidential
2  while you were in the Workforce Development
3  phase of the RWA program, that you never had a
4  weekend assignment again?
5       A   I don't recall the dates, but I do know,
6  eventually, that got worked out to give me my
7  weekends so I could spend with my family.
8       (Deposition Exhibit 5, Document Entitled
9  "Work - Gregory Brooks - Client Tracking
10 Database," marked for identification as of this
11 date.)
12      Q   Mr. Brooks, I'm going to hand you what's
13 been marked as Plaintiff's Exhibit 5, which is
14 document bearing Bates No. TDF00026.
15      This is a copy of your schedule for the
16 period of time when you were in the RWA
17 assigned to the Workforce Development part of
18 the program, correct?
19      Let us know when you're ready to answer
20 the question.
21      Are you ready to go back?
22      A   It looks like it could be, correct.  I
23 would have to go through it again.  But it
24 looked like I worked in all these different
25 places, yeah.

1       Brooks - Confidential
2       Q   Okay.  I want to direct your attention to
3  the left side.
4       Do you see No. 7, and you see next to that
5  it says "7/23/16"?
6       Yes?
7       A   I see it.
8       Q   Okay.  And see at the top of that column
9  it says "Week ending date"?
10      A   Yes, I see that.
11      Q   And I want you to look at the last row in
12 the column that's 7.  And you see it says "CIP
13 HRPT, Median Crew, 7.5."
14      Do you see that?
15      Do you see that, where I'm referring to?
16      A   Yes.
17      Q   And that's a Saturday, correct?
18      You can see that if you look up the top --
19 if you look up at the top of that column.
20      So you see that's a Saturday?
21      A   You're talking about the very last one?
22      Q   Where it says -- the last column on
23 Row 7 --
24      A   Seven.
25      Q   -- where it says "HRPT, Median Crew, 7.5."

1       Brooks - Confidential
2       A   Yeah, it's a Saturday.
3       Q   Okay.  And you were doing your activities
4  as part of the Workforce Development program
5  that day, correct?
6       That's what's reported here, correct?
7       A   I guess.  I'm not sure.  I told you I
8  don't remember the dates.  But.
9       Q   You don't have any reason to believe this
10 wouldn't be accurate, right?
11      A   Yeah, I don't have no . . .
12      Q   Now, I want you to look at the rest of the
13 rows going from six to one at the top.  I want
14 you to tell me -- strike that.
15      I want you to look at the rows, six
16 through one.
17      And my question is:  Isn't it correct that
18 after this date that we've discussed, the last
19 column in Row 7, that you never had another
20 weekend assignment?
21      A   What I could remember is -- I believe I
22 had to do like two or three weeks of this, this
23 assignment.
24      Q   When you say "this assignment," what do
25 you mean?

1          Brooks - Confidential
2     A   The Hudson route.
3         I was on the Hudson route -- that was the
4     Hudson route, period.  There wasn't any
5     alternate schedule for the Hudson route.  They
6     had a different crew from a different building,
7     facility, that worked in the nighttime.  This
8     was the nighttime route, and it was just for
9     our crew.
10        And I worked this route for about three
11    weeks, maybe.
12    Q   I want you to look at Line 6.
13        Do you see that above, right above seven?
14    A   Yeah.
15    Q   Does anything on Row 6 show that you
16    worked the Hudson route the week ending
17    7/30/2016?
18    A   It says "OFF."
19    Q   It says "OFF," then it says "SPE," then it
20    says Myrtle Avenue BID.  Vernon LIC, SPE, SPE,"
21    and then it says "OFF."
22        I'm just reading across Row 6.
23        Is that what it says there?
24    A   Yeah, that's what it says.
25    Q   And it shows you were off on Sunday and

1     off on Saturday, correct?
2     A   Yeah.  I'm not sure if that's accurate,
3     though.
4     Q   Why wouldn't it be accurate?
5     A   I'm not sure if it's accurate because I do
6     remember working the Hudson route for a couple
7     of weeks.  They -- I had made problems trying
8     to get it changed.  I had to speak to several
9     different people.  I had to argue with Wiggins
10    about it.  I had to speak to Tim about it.  I
11    had to speak to Ronald.  I had to speak to a
12    lot of people about getting the route changed.
13    Eventually it got changed, and Mr. Washington
14    helped with that, but that was after the
15    situation with Terry.
16    Q   Okay.  So after -- let me ask you a
17    question: After the situation with Terry or
18    with Mr. Cooper, did you work the Hudson route
19    any more after that?
20    A   Not that I remember.
21    Q   You have any documents that would show us
22    when you were assigned to the various routes?
23    A   Any documents that I do have I turned it
24    over to my attorney.

1          Brooks - Confidential
2     Q   All right.
3     A   And I'm quite sure she give you guys a
4     copy.
5     Q   So nothing else in your possession,
6     correct?
7         Nothing else in your possession, correct?
8     A   What do you mean "nothing else my in
9     possession"?
10    Q   Other documents that who show the
11    schedule.
12    A   When I got a change of schedule, if I
13    still had the documents, I provided it to my
14    attorney, which I'm quite sure she provided to
15    you.
16    Q   Okay.  I just want you to take a look at
17    this Exhibit 5 again.  I want you to look,
18    starting on Row 6.  And I want you to look at
19    Sunday and I want you to look at Saturday going
20    up, both columns.
21        Do you understand where I'm asking you to
22    look?
23    A   Yeah.
24    Q   Okay.  Do any of those show, from
25    Row 6 To Row 1, for either Saturday or Sunday,

1          Brooks - Confidential
2     does it show you worked the Hudson route any of
3     those days?
4     A   Like I said, I'm not sure if this is
5     accurate.
6     Q   That wasn't my question.
7         I'm asking you if it shows you worked any
8     of the dates, of the Saturdays or Sundays, from
9     Row 6 to Row 1?
10    A   Yeah.
11    Q   Which one?
12    A   On this document it says Saturday.  I
13    think it got two hours.
14        Excuse me, I got to use the bathroom.  I
15    have to use the bathroom.
16        (Recess taken.)
17    BY MR. SEIDENFELD:
18    Q   Mr. Brooks just directing your attention
19    back to Exhibit 5.
20        You were referring to the Saturday box in
21    Row 3.  You said it says two hours.
22        Do you see that?
23    A   Yeah.
24    Q   It says "CUS" next to that.
25        Do you see that?

1          Brooks - Confidential
2     A   Yeah.
3     Q   That's as far as -- it's your
4    understanding that's referring to custodian
5    duty?
6     A   I don't know what those abbreviations
7    stand for.  I don't know what's this
8    abbreviation.
9     Q   If you look at Row 7 you see "HRPT Median
10   Crew."
11       Do you see where it says that?
12    A   Yes, I see that.
13    Q   Do you understand that to mean the
14   Hudson -- do you understand that to mean the
15   Hudson River route?
16    A   Well, no.
17       Now that you're telling me that's what it
18   is, yeah.
19    Q   You see where it says "Vernon LIC" on
20   Row 5?
21    A   Yeah.
22    Q   And that's the Vernon route?
23       Is that the Vernon route?
24    A   You're asking me that?
25    Q   Is that referring to the Vernon route?

1          Brooks - Confidential
2     A   I guess it is.
3     Q   There was a time when you were assigned to
4    the Vernon route?
5     A   Yes, I did work at -- on Vernon before,
6    yes.
7     Q   Okay.  And if you see CM -- if you look
8    next to that it says "Maspeth."
9        Is that also a route that you were
10   assigned to?
11    A   I believe -- that sounds familiar.  So it
12   could be possible that I worked there a couple
13   of times.
14    Q   And then if we just go back to that "CUS"
15   at the end of Row 3, does that -- is there any
16   route that you recall being assigned to that
17   could have had the abbreviation CUS; do you
18   remember?
19    A   No.
20    Q   Okay.  No route that you recall had that
21   abbreviation?
22    A   I don't remember having no abbreviations
23   at all.  You're telling me this now.  But I
24   don't recognize CUS at all for nothing.
25    Q   I want to turn your attention to

1          Brooks - Confidential
2    Paragraph 40 of the complaint.  You see where
3    it says "By way of example, one of the workers
4    told Defendant Cooper, 'Get your ass out of
5    here, Terry, you're holding us up.'  Defendant
6    Cooper replied 'Everything you say has to do
7    with my ass.  I know you want some.  You just
8    can't stop thinking about my ass'."
9        And that was on July 17, 2016?
10    A   I don't remember what date it was.  I
11   remember it was a day we were going to a route.
12   We were going to the route.  It was the Hudson
13   route.
14    Q   You remember if it was the first -- you
15   remember it was the first --
16    A   I believe it was my first time going out.
17    Q   And that would have been July 17th, based
18   on what we looked at?
19    A   Yeah.
20    Q   Okay.  Where did Mr. Cooper actually --
21   where did Mr. Cooper allegedly say this?
22    A   He said it inside the van.  We were all
23   loaded up in the van.
24    Q   Was he in the van?
25    A   No, he was standing outside of the van.

1          Brooks - Confidential
2     Q   Who said, "Get your ass out of here,
3    Terry, you're holding us up"?
4     A   I don't know.  They were in the back.
5     Q   Someone in the van?
6     A   Yeah.  I was in the front of the van.
7     Q   Okay.  Do you remember anyone else who was
8    either in the van or outside the van?
9     A   Yeah.
10    Q   Who?
11       Who was in the van?
12    A   I know Anthony Marshall was in the van.
13    Q   Who is Anthony Marshall?
14    A   He was on the work crew with me as well.
15    Q   He was RWA program participant?
16    A   He worked the Hudson River Park.
17    Q   Who else?
18    A   I don't know.  I don't know the rest of
19   the guys like that.
20    Q   Other people in the program?
21    A   Other people in the van that was working
22   the route.
23    Q   And the program?
24       Yes?
25    A   The supervisor was there, too.  I don't

Brooks - Confidential

1
2  remember his name.  But it's Julio something.
3  Q  He was one of the people in the red
4  shirts?
5  A  Yeah.
6  Q  Did Julio hear the comment?
7  A  I assume he did.  Everybody else did.
8  Q  You don't know if Julio heard it or not?
9  A  I don't know if he could even recall it,
10  but . . .
11  Q  When you first got to Gates Avenue, did
12  you have a roommate?
13  A  Yes, I did.
14  Q  Who was your roommate?
15  A  Turk.
16  Q  Do you know Turk's last name?
17  A  I believe his name was Mohammad.
18  Q  So Turk Mohammad?
19  A  I don't know if that's his real first
20  name.  That's what people called him.
21  Q  Okay.  Any other roommates?
22  A  Yeah.  Later on down the line.
23  Q  About how long were you roommates with
24  Turk?
25  A  For quite a while.  For the majority of my

Brooks - Confidential

1
2  stay there.
3  Q  Who else were your roommates -- strike
4  that.
5  Was it just you and always one other
6  person to a room?
7  A  No.
8  Q  It was, what, three in a room?
9  A  Yes.
10  Q  When it was you and Turk, was there a
11  third person?
12  A  No.  Just me and Turk.
13  Q  Okay.  And so -- okay.  I maybe just
14  misunderstood.
15  Were there times when you had two other
16  roommates?
17  A  Yeah.
18  Q  Okay.  And was any of that -- so it was
19  never you Turk and someone else?
20  A  No.
21  Q  Okay.
22  A  They moved me downstairs.  I was no longer
23  in the room with Turk.  They moved me with two
24  other dudes.
25  Q  Do you know their names?

Brooks - Confidential

1
2  A  I know one of them name was Green.  His
3  last name was Green.
4  Matter of fact -- yeah, it was two other
5  dudes.  It was me and two other dudes.
6  Q  You can't remember the other guy's name?
7  A  I don't remember them.  And they changed
8  them anyway.  It was a couple of dudes that
9  came and slept in that bed.
10  Q  So it was you Green and someone else and
11  then you, Green and a different person, and you
12  can't remember either of those two people?
13  A  Green wasn't always there either.  Green
14  came --
15  Q  Can you tell me the names of any of the
16  roommates you could remember?
17  A  No, I don't remember them.
18  Q  No one else?
19  A  No.
20  Q  You in contact with Turk at all?
21  A  No.
22  Q  When was the last team you spoke with him?
23  A  Months ago.
24  Q  Okay.  What about Mr. Green?
25  A  No.

Brooks - Confidential

1
2  Q  You haven't spoken to him in months?
3  A  Months.
4  Q  Any other roommates you've been in contact
5  with since you left Gates Avenue?
6  A  No.
7  Q  Just making sure.  Not a trick question.
8  I'm just trying to make sure we close off all
9  the loops.
10  Okay.  I asked you some questions now
11  about your allegations against Mr. Cooper that
12  took place on July 21, 2016.  Just take a look
13  at Exhibit 4.
14  Do you have that in front of you?
15  Like this?
16  Maybe you don't need it.
17  My question is:  Do you know if you were
18  off that day?
19  A  Off what day?
20  Q  The day of July 21st.
21  A  On the day of the assault?
22  Q  That you made the allegations against
23  Mr. Cooper, were you off that day?
24  A  That day was going uptown to see my
25  family.

Page 182

Brooks - Confidential

1
2     Q    So you -- it was an off day?
3     A    Yeah, I wasn't working.
4     Q    Okay.  I got to go -- one second, I
5     apologize Mr. Brooks.  I want to go back to the
6     comments that you allege Mr. Cooper made on the
7     17th saying, "Everything you have to say has to
8     do with my ass."
9          Did you report those comments to anyone?
10    A    Did not.
11    Q    Why not?
12    A    I didn't want no problems.  He wasn't
13    speaking to me directly.
14    Q    You didn't feel that it concerned you?
15    A    Did it concern me?
16    Q    It didn't -- you didn't feel that it
17    related to you, the comments?
18    A    No, that's not what I said.
19         He wasn't speaking directly to me.  I
20    mean, I didn't like the comments.  I would have
21    preferred not to be around that.  But it wasn't
22    personal with me.  I didn't feel like it was
23    professional for him to be doing that at work.
24    But he wasn't speaking directly to me, he was
25    talking to somebody else in the van and I just

Page 183

Brooks - Confidential

1
2     overheard it because he was right in front of
3     me.  He was right outside the van.  I was
4     sitting next to the van door.  So he was
5     talking that right there right before me,
6     so . . .
7     Q    Okay.  You say that Mr. Cooper asked you
8     to come to his office at about 9:00 a.m. on the
9     morning of July 21st while you were outside
10    having a smoke break.
11         Does that sound correct?
12    A    Yeah, in the morning I was outside
13    smoking, he came and asked --
14    Q    We'll get to that in a second.
15         What were you doing that morning?
16    A    I was smoking.
17    Q    But before that, what time did you wake
18    up, do you remember?
19    A    No, I don't remember the time I woke up.
20    Q    What were you doing before you were
21    outside smoking?
22    A    I was in my room.
23    Q    Okay.  Did you eat breakfast?
24    A    No.
25    Q    Okay.  So you went outside and you were

Page 184

Brooks - Confidential

1
2     outside smoking?
3     A    Yep.
4          I woke up.  Went downstairs.  Went to
5     smoke.  And then I was going back upstairs to
6     wash up and get ready to go out.
7     Q    Okay.  And were you with anyone while you
8     were outside smoking?
9     A    I wasn't with nobody at no time.  But
10    there were other people there.
11    Q    All right.  Who was there?
12    A    I remember Mr. Stevens being there, the
13    house manager.  I remember Paul Washington
14    being there.  And it was a bunch of other
15    people running around.  That's where people
16    smoke, in front of the building.
17    Q    Who is Paul Washington?
18    A    He work for PAL.
19    Q    And how did you get to know
20    Paul Washington?
21    A    Because when I was doing in-house, I was
22    doing PAL.
23    Q    What's PAL?
24    A    Police Athletic League.
25    Q    Did you know Mr. Washington before you

Page 185

Brooks - Confidential

1
2     arrived at Gates Avenue?
3     A    Who, Paul?
4     Q    Paul Washington, excuse me, yes.
5     A    No.
6     Q    When's the last time you spoke to
7     Paul Washington?
8     A    I can't recall.
9     Q    Was it this year?
10    A    No.
11    Q    You say Mr. Cooper called you into his
12    office, correct?
13    A    While I was smoking he asked me how was
14    the Hudson route, did I like it.  I said it was
15    good, it's just not conducive with my schedule.
16    He said but you liked it, right.  I was like,
17    yeah, it was all right.  He said when you
18    finish smoking, come into my office.  I said
19    all right.
20    Q    Can I ask you, you said Mr. Stevens was
21    outside.
22         Who is Mr. Stevens?
23    A    The house manager.
24    Q    Do you know his first name?
25    A    James, I think.  I'm not sure.

Brooks - Confidential

1
2  Q   It's okay.
3     So you were saying that Mr. Cooper asked
4  you to come into the office, correct?
5  A   Yeah.
6  Q   And had you been in Mr. Cooper's office
7  before?
8  A   Yes, I think I been in that office.  It
9  wasn't only his office.  It was -- it's an
10 office in an office.
11    It's -- you walk through the door, it's an
12 office.  And then it's another office in the
13 back.  I been -- I think that's Ronald Holly's
14 office.
15    And I had to go in there before for other
16 reasons.  I don't recall what at this time.
17 Q   About how big would you say his office
18 where Mr. Cooper asked you to come see him in?
19 A   I would say about from that portion of the
20 door to around here, about that big.
21    MS. O'CONNELL:  Let the record reflect
22 that plaintiff --
23    MR. SEIDENFELD:  Well, I'll ask him.  I'll
24 ask him if he has -- I'll ask a different.
25

Brooks - Confidential

1
2  BY MR. SEIDENFELD:
3  Q   In terms of feet -- I know that's how you
4  would do it normally.  But it's kind of -- the
5  court reporter can't take that down.
6     Size of the room, do you have a sense
7  about how long or how wide?
8  A   No.  Maybe -- I don't know.  I don't know.
9  I'm not a . . .
10 Q   It's okay.
11    What was in the room?
12    What's in the office?
13 A   Chair, a desk.  A desk, another chair, and
14 some other things I can't really remember what
15 they are.  But it's a couple of chairs and a
16 couple of desks.
17 Q   And when Mr. Cooper called you in, was
18 there anyone else in the office?
19 A   No.
20 Q   Okay.  Where was -- did you guys walk to
21 the office at the same time?
22 A   No, we did not.
23 Q   He was already in there?
24 A   Yeah.
25 Q   When you got in the office, where he was

Brooks - Confidential

1
2  he sitting?
3  A   At his desk.
4  Q   Where were you when you were -- first
5  walked in?
6  A   When I walked in I was standing at the
7  door.
8  Q   Was the door open or closed?
9  A   It's two doors.  One door is to get into
10 where the office is at, then there's another
11 door to where his -- his portion of the office
12 is.  And I was standing in that door, that's
13 the second door.
14 Q   Okay.  Was it open or closed?
15 A   It was open.
16 Q   What about the first door?
17 A   I believe it closes.  I don't know if it
18 slam closes or if I closed it myself.  But --
19 yeah.
20 Q   So you're not sure?
21 A   No, I'm not sure.
22 Q   Was anyone in the outer office in between
23 the first and second door?
24 A   Oh, Mr. Holly's office, no.  That door was
25 closed.

Brooks - Confidential

1
2  Q   Okay.
3  A   Well, I'm going to say I don't know
4  because the door was closed.  I'm assuming.  It
5  was early in the morning.
6  Q   Which door was closed?
7  A   Mr. Holly's door.
8  Q   That's the outer door?
9  A   No, that's not the outer door.
10    You don't have any pictures of the
11 facility?
12 Q   I want to get your best recollection
13 first.
14 A   It's the outer door, then on the left-hand
15 side it's Mr. Holly's door.  That door was
16 closed.  Then you keep walking, that's where
17 the dispatch door was, and that was open.
18 Q   That door was open, okay.
19 A   Yes.
20 Q   So my question is:  In between what you
21 call the "Holly door" and the "dispatch door,"
22 was anyone there?
23 A   No, not that I know of.
24 Q   And Mr. Cooper started -- what did
25 Mr. Cooper say to you, initially?

Brooks - Confidential

1
2      A    Initially he said, Come in, because I was
3    standing at the door.  He said come in.
4      Q    The door was still open, correct?
5      A    Yeah.
6           He said something about coming over to the
7    desk and he don't bite, some shit like that.  I
8    don't really remember what he said.  But I
9    remember him telling me to come to the desk.
10     Q    And did you go to the desk?
11     A    I did.
12     Q    Were you -- the chairs were they on the
13   other side of his desk?
14     A    What do you mean?
15     Q    He had a chair -- he was sitting behind
16   his desk, you said?
17     A    Yeah.
18          He was sitting at the desk, yes.
19     Q    And he told you to come in and sit, right?
20     A    No.  He just said come here.  Come to the
21   desk.
22     Q    So did you stand next to him while he was
23   sitting?
24     A    Yeah.
25     Q    And then what did he say?

Brooks - Confidential

1
2      A    He was talking about the route.
3      Q    The Hudson route, correct?
4      A    He was talking about whether or not he
5    could give me both my weekend days off.
6      Q    What -- do you remember what else he said?
7           Did you say something in response?
8      A    Not really, because at this point --
9    because he was flinging his hands and he end up
10   touching me.
11     Q    You say he was flinging his hands.
12          What do you -- strike that.
13          So if he was -- was he speaking as he was
14   flinging his hands?
15     A    Yeah, he was speaking with his hands.
16     Q    Well, no, no.  You said -- I want to know
17   what he was saying while he was flinging his
18   hands.
19     A    He was talking about the route.  He was
20   telling me he don't know if he could give me
21   both days, whatever.
22     Q    Was he flinging his hands -- did he touch
23   you at that point?
24     A    Yeah.
25     Q    What, if anything -- where did he touch

Brooks - Confidential

1
2    you when he was flinging his hands?
3      A    He touched my penis.  I thought it was a
4    mistake.
5      Q    You say he touched it.
6           What do you mean?
7      A    He touched it.  He was going like this
8    while he was talking with his hands and he end
9    up touching my penis.  And I thought it was a
10   mistake.  I should have known better.  I backed
11   up so he could finish talking.
12     Q    When you say he touched it as he was
13   flinging his hands, did he grabbed it?
14     A    Not at that point, no.
15     Q    Did he -- what part of his hand did he
16   touch it with?
17     A    It was his left hand.
18     Q    It was the front of his hand, back of his
19   hand?
20     A    I don't know.  He was going like this.  So
21   I don't know if -- it was possibly his fingers
22   or something.
23     Q    How long was there contact, this initial
24   time?
25     A    It was immediately.

Brooks - Confidential

1
2      Q    A second?
3      A    Yeah.
4      Q    And what were you wear?
5      A    I don't remember.
6      Q    When this flinging happened, what if --
7    you said you moved away?
8      A    Yeah, I backed up.
9      Q    Did you say anything to him?
10     A    No.
11     Q    Did he say anything to you next?
12     A    Yeah, he was still talking.
13     Q    What was he talking about?
14     A    Same thing, about my schedule.
15     Q    What was he saying about your schedule?
16     A    He was saying that he don't know if he
17   could give me both days.  He's going to try to
18   do what he could do, whatever.
19     Q    I'm sorry, are you done with your answer,
20   Mr. Brooks?
21     A    Yeah.
22     Q    Okay.  And was he touching you at all
23   while he was saying that?
24     A    Eventually, he grabbed my -- he grabbed my
25   waist, the front of my pants, and he said

Brooks - Confidential

1
2  excuse me, I talk with my hands.  And then he
3  grabbed my penis with his hand.
4  Q   Did he stick his -- was he saying anything
5  while he did that, other than -- did he say
6  that -- strike that.
7      Did he say that before or after he said I
8  talk with my hands?
9  A   I was doing it while he was saying it.
10  Q   So he stuck -- you said he stuck his hand
11  in the waist of your pants?
12  A   Yeah.
13  Q   Were you wearing underwear?
14  A   Yeah.
15  Q   Did he stick his hands under the
16  underwear?
17  A   No.
18  Q   So it was between your pants and
19  underwear?
20  A   Mm-hmm.
21  Q   I'm sorry, you have to say "yes" or "no."
22  A   Yes.
23  Q   And what did he do?
24  A   He grabbed my penis.
25  Q   When you say "grabbed," do you mean --

Brooks - Confidential

1
2  when you say "grabbed" what exactly did he do?
3  A   I mean like caressing it, like how a woman
4  would do it.
5  Q   Okay.  And for how long?
6  A   I don't know.  It was a second.  I was
7  shocked.  I know it wasn't that long, but I
8  don't know.
9  Q   Did you say anything?
10  A   No.
11  Q   And so he did that for a second and then
12  he took his hand out?
13  A   No, he didn't have his hand inside my
14  pants.  When he said he talk with my hand, he
15  grabbed my pants like this.  He said I talk
16  with my hands.  And then he took his hand out
17  and grabbed my penis.
18  Q   When he said he spoke with his hands, his
19  hands were on the outside of your pants?
20  A   Yeah.
21      MS. O'CONNELL:  Can we have the record
22  reflect --
23      MR. SEIDENFELD:  You want to go off for a
24  second.  You can just explain to him.  We'll go
25  off the record for a second.

Brooks - Confidential

1
2      (Discussion off the record.)
3  BY MR. SEIDENFELD:
4  Q   So Mr. Brooks, you're sitting here and
5  you're kind of making -- I see you're doing
6  things with his hands, trying to show what
7  happened.  But the court reporter can't take
8  that down.
9      So the best you can, we need you to
10  describe, verbally, what happened.
11      MS. O'CONNELL:  For instance, if he
12  grabbed or -- do you want to go off the record
13  for a second.
14      MR. SEIDENFELD:  I don't know if you're
15  going to give him -- should be giving him an
16  example.
17  A   He grabbed the waistband of my pants.  I
18  don't remember which hand it was, but I know he
19  grabbed the waistband of my pants and he told
20  me he speak with his hands.
21      He grabbed the top of my pants.  So he
22  was -- his hand was inside my pants, right.
23  His fingers was inside the top of the waistband
24  of my pants.  And his palm was on the outside
25  of my pants.

Brooks - Confidential

1
2      Is that clear?
3  Q   Yes.
4  A   Then he took his hand out and grabbed my
5  penis on my pants.  He wasn't inside.  He was
6  on my pants when he grabbed my penis.
7      Is that clear?
8  Q   Yes.  I know this is -- I apologize in
9  advance.  But we just need to make sure we
10  understand what happened to you regarding --
11  A   All right.  Do you understand?
12  Q   Yes, that's very -- so it was over the
13  pants.
14      And then what -- then did you say anything
15  in response?
16  A   No.  I was shocked.  I couldn't believe
17  it.  I was in shock.
18  Q   Okay.  And then what happened next?
19  A   I exited the room.  I told him I had to go
20  and get ready for a shower.  I had to go see my
21  son and got up out of there.
22  Q   Did he say anything to you before he left?
23  A   When I reached the door he said he's
24  coming up in a minute.
25  Q   What did you do after you left the office?

1          Brooks - Confidential
2     A   I ran upstairs and put my tape recorder
3    on.
4     Q   Why didn't you go and report this to
5    anyone?
6     A   I wasn't thinking clearly at all at that
7    point.  I was shocked.  I didn't know what
8    to -- I didn't know what to do.
9         But I knew that he told me he was coming
10   upstairs.  So I wanted to get him on record.
11   He's a supervisor.  I was afraid people wasn't
12   going to believe me if I told them that he had
13   just touched me.
14    Q   You weren't taping during this first
15   meeting in Mr. Cooper's office, were you?
16    A   I was not.
17    Q   Okay.  And before July 21st, had you ever
18   taped anyone, any conversations at the Gates
19   Avenue facility?
20    A   No, I did not.
21    Q   What about video before July 21?
22    A   No.
23    Q   You said you went back up to your room
24   and, you said you started taping.
25        You said you took out your phone and

1          Brooks - Confidential
2    started taping?
3     A   Yes, I did.
4     Q   You used -- that was your cell phone?
5     A   Yes, it was.
6     Q   Did you use any other devices to tape?
7     A   No.
8     Q   Did you have a camera?
9     A   No.
10    Q   Did you ever have a 16 mega pixel camera?
11    A   Yes, I do.  I own one.
12    Q   You still own it?
13    A   Yep.
14    Q   Did you have it with you in your room at
15   that time?
16    A   No, I didn't.
17    Q   Okay.  Did you tell Mr. Cooper you were
18   taping him when he came in?
19    A   No.
20    Q   So I just want to make sure.
21        Do have any video of any interactions with
22   you and Mr. Cooper from July 21, 2016?
23    A   No.
24    Q   Okay.  At some point subsequently -- at
25   some point after you told The Doe Fund about

1          Brooks - Confidential
2    Mr. Cooper's actions, did The Doe Fund start an
3    investigation?
4     A   Yes.
5     Q   During this investigation, did you tell
6    anyone at The Doe Fund you had video of the
7    incident in your room?
8     A   Yes, I did.
9     Q   Why did you do that?
10    A   Because I didn't think people was going to
11   believe me.  I wanted them to take me
12   seriously.
13    Q   Did they take you seriously?
14    A   Yes, they did.
15    Q   And as soon as you complained, they took
16   action very quickly, right?
17        MS. O'CONNELL:  Objection.
18    A   As soon as I complained I got a meeting
19   with HR.
20    Q   The morning -- the same morning that The
21   Doe Fund received your complaint?
22    A   No, it wasn't the same morning.
23    Q   But did you meet with Mr. James Washington
24   the same morning that you -- that he received
25   your complaint?

1          Brooks - Confidential
2     A   I made the complaint that night when I
3    came back from my wife's house.  I wrote it at
4    my wife's house.  I put it in
5    James Washington's desk -- his mailbox.  And
6    the next day James Stevens came in and told me
7    that James Washington wanted to see me.
8     Q   And you met with James Washington that
9    next morning?
10    A   And I met with him, yes.
11    Q   And that was a Friday, the next day,
12   correct, that day you met Mr. Washington?
13    A   I don't know which day it was.
14    Q   I'll just -- if you take a look at
15   Exhibit 4, you can see that it shows that
16   Sunday is the 17th, Monday the 18th, Tuesday
17   the 19th, Wednesday the 20th, Thursday --
18    A   This don't exactly tell when that
19   happened.  The day that I made that report --
20    Q   Well, the day you made --
21    A   -- I think it was the 24th.
22    Q   The day that you alleged the incident with
23   Mr. Cooper happened was July 21st, correct,
24   2016?
25    A   Yeah.

Brooks - Confidential

1
2    Q   Okay.  And do you remember -- I'll tell
3    you it's a Thursday.
4        Do you have any reason to believe it
5    wasn't?
6    A   No, I don't.  No.
7    Q   Then you met with Mr. Washington that next
8    morning on -- Friday morning, correct?
9    A   Yeah.  I met with him the next day, yes.
10   Q   And then you met again with Ms. Gilmore
11   and other members -- other employees of The Doe
12   Fund that following Monday as a part of their
13   investigation, correct?
14   A   I met with two people that they said was
15   from HR.  And we all was in the office with
16   Mr. Washington.
17   Q   And that was Monday the 25th, July 25?
18   A   I don't remember the dates.
19   Q   Okay.
20   A   I just remember being there.
21   Q   You remember if it was the next weekday?
22   A   No.
23   Q   If you don't remember, that's fine.  We
24   can move on.
25   A   Yeah, I said no.

Brooks - Confidential

1
2    Q   I want to go back to when Mr. Cooper came
3    into your room.
4        How long was he there for?
5    A   I don't know, a few minutes.
6    Q   Okay.  Tell me the set up of your room at
7    Gates Avenue at the time?
8    A   Yeah.  The door -- when you walk in the
9    door, there's two closets, one for me, one for
10   my bunkmate.  On the wall and where the closets
11   is, is my bed.
12       So when you walk in it's like -- it got to
13   be like an L shape.  Like, you got to walk
14   straight, then to your right, because the beds
15   were in the middle of the room.  It's a very
16   small room.
17   Q   Okay.  Mr. Cooper came and knocked on the
18   door?
19   A   He did.
20   Q   And you were already recording on your
21   phone at this time?
22   A   Yes, I was.
23   Q   And what happened when you opened the
24   door?
25   A   When I opened the door he came inside the

Brooks - Confidential

1
2    room.
3    Q   Where -- did you close the door?
4    A   No, he closed the door.
5    Q   Okay.  And, what, if anything, did -- who
6    spoke first?
7    A   I can't recall.  I think he spoke first.
8    He asked me why was my door locked.  I told him
9    I always lock the door.  He said why was it
10   locked?  Why was it locked?  I said it's a slam
11   lock.
12   Q   And then what did you and Mr. Cooper
13   discuss?
14   A   I remember asking him what did he have as
15   far as the schedule was concerned.  And he
16   started talking about the schedule, but at the
17   same time he started to touch me.
18   Q   And what was he saying when he started to
19   touch you?
20   A   I could barely remember.  He just was
21   saying he don't know if he could give me both
22   weekend days off.  That's what we had been
23   discussing.  That's what I asked everybody for,
24   from my counselor on up to James Washington, I
25   asked for the weekends off so I could spend the

Brooks - Confidential

1
2    time with my family.
3        So he was telling me he don't know if he
4    could give me both days off, maybe one day.
5    But at the same time he was fondling my penis.
6    But when he came in, he grabbed my phone.
7    That's the first thing that he did.  He took my
8    phone off the bed.
9    Q   What did he say?
10   A   He asked me was I on the phone.
11   Q   And what did you saw?
12   A   I said, yeah.  It was recording.  I was
13   new to these smartphones.
14       So when I started recording -- I think
15   this was the first time I even ever made a
16   recording, period.
17       So the recording -- it had a mic on it.
18       You know what I mean?
19       And you could see the mic.  And so when he
20   picked up my phone and seen it was a mic, I
21   guess he assumed that it was somebody else on
22   the other line.  I think.  I don't know what I
23   assumed.  But that's what he asked me, was I on
24   the phone.
25       I took my phone out of his hand and put it

1          Brooks - Confidential
2  back on the bed, and I told him, yeah, I'm on
3  the phone.
4  Q   You said he was foundling you. Again I'm
5  going to ask you what exactly he did.
6  A   He started touching my penis and --
7  Q   Over your -- were you wearing the same
8  thing you were wearing downstairs?
9  A   Yes, I was wearing the same thing.
10 Q   And did he touch you over your pants or
11 under your pants?
12 A   Over. He rubbed it for a second and he
13 pulled it out. He tried stroking it.
14 Q   When you said he pulled it out, he reached
15 under your underpants?
16 A   Yeah, yeah.
17 Q   And pulled your penis out of your pants?
18 A   Yeah.
19     MS. O'CONNELL: Let the record reflect
20 that the plaintiff was making masturbation
21 motions.
22     MR. BARTOLOMEO: Objection to the
23 characterization.
24 Q   If you can characterize what he was doing?
25     MR. SEIDENFELD: If he's not -- like I

1          Brooks - Confidential
2  said, I explained to him before. There's no --
3  he's testifying, not you.
4      MS. O'CONNELL: Let the record reflect.
5      MR. BARTOLOMEO: Note my objection for the
6  record.
7  A   Well, he was stroking my penis with my
8  hand.
9  Q   Hold on.
10     MR. SEIDENFELD: Can you just read back
11 what Mr. Brooks was saying before Ms. O'Connell
12 interjected.
13     (Record read.)
14 Q   So you said he pulled your -- so you said
15 that he pulled your penis out of your pants and
16 your underwear?
17 A   Yes.
18 Q   Where were you in your room at this time?
19 A   I was standing in front of my bed.
20 Q   And was Mr. Cooper standing?
21 A   Yes, he was standing right in front of me.
22 Q   Okay. And when he pulled your penis out
23 of your pants, what did he do?
24 A   He started stroking it.
25 Q   For how long?

1          Brooks - Confidential
2  A   For a couple of second because I backed
3  up.
4  Q   Did you say anything when you backed up?
5  A   No.
6  Q   Did he say anything?
7  A   He was talking the whole while. I
8  couldn't hear him, but he was saying something.
9  I pulled my pants up and I remember saying that
10 I have to go. I got to get ready. I got to
11 get in the shower, and he exited my room.
12 Q   Do you remember what kind of pants you
13 were wearing?
14 A   No.
15 Q   They were loose fitting pants?
16 A   I don't remember.
17 Q   Do you remember trying -- why didn't you
18 push his hand away?
19 A   I pulled back.
20 Q   Okay. And was it such a brief encounter
21 that you didn't have time to push his hand
22 back?
23 A   It was long enough. But I didn't touch
24 him. I just pulled back and pulled up my
25 pants.

1          Brooks - Confidential
2  Q   You said it was a for a couple of seconds,
3  I believe.
4      Is that what you just testified to a
5  minute ago?
6  A   Yeah. I wasn't timing it. It didn't take
7  very long, though.
8  Q   A matter of seconds -- actually, strike
9  that.
10     Mr. Cooper -- I'm sorry. I apologize.
11     Mr. Brooks, in the course of this
12 litigation you produced to us some of the tapes
13 that you made?
14 A   Is that an insult?
15 Q   I apologize.
16 A   You call me that man three times.
17 Q   I apologize.
18     MR. SEIDENFELD: We can go off.
19     MS. O'CONNELL: No, you can stay on the
20 record.
21     MR. BARTOLOMEO: Yeah, let's stay on the
22 record, please. I'd like to hear.
23     MR. SEIDENFELD: Okay.
24 A   Is that an insult?
25 Q   I didn't mean it as an insult. You know,

Page 210

```
 1         Brooks - Confidential
 2  I just met you today.  I never met Mr. Cooper.
 3  We just read these names as names on a sheet.
 4  So I don't mean anything personal by it.  I
 5  don't mean it as an insult to you.
 6        And if you are offended by it, I
 7  apologize.  That wasn't my intention.
 8  A   I mean, you kept calling me somebody that
 9  assaulted me, that sexually assaulted me.  And
10  you keep calling me his name.  I don't
11  understand.
12        Is that a strategy?
13  Q   Certainly not a strategy.  We've discussed
14  a lot of names today.  And I can just tell you
15  in the course of these depositions, people
16  often transpose names and make a mistake.  It's
17  nothing -- certainly nothing personal.  And if
18  you're offended by it, I sincerely apologize.
19  And I can assure you it's not a strategy and
20  not intentional.  And I'll do my best, as we go
21  forward to make sure it doesn't happen again.
22  That's the best I can do for you, Mr. Brooks.
23      MS. O'CONNELL:  If you want a short break,
24  let me know.
25  A   Come on.
```

Page 211

```
 1         Brooks - Confidential
 2  Q   You all right?
 3  A   All right.
 4  Q   So Mr. Brooks, during the course of this
 5  litigation you've produced to us some of the
 6  audio recordings that you had made.  I'm going
 7  to play one for you now.
 8        This is the recording, and it's file name
 9  is "Terry."
10        (Discussion off the record.)
11      MS. O'CONNELL:  I will say what it is.
12      MR. SEIDENFELD:  So the file produced by
13  plaintiff's counsel called "Terry" is going to
14  be marked as Exhibit 6.
15        (Deposition Exhibit 6, File Entitled
16  "Terry," marked for identification as of this
17  date.)
18  Q   And the part that I'm going to play is
19  from zero -- from the beginning through three
20  minutes and 15 seconds.
21        (Tape playing.)
22      MR. SEIDENFELD:  Hold on.  Can we go off
23  one second?
24      THE COURT REPORTER:  Sure.
25      MR. SEIDENFELD:  We're going to play
```

Page 212

```
 1         Brooks - Confidential
 2  Plaintiff's Exhibit 6, the file called "Terry"
 3  from zero to 3 minutes and 15 seconds.
 4        (Tape Playing.)
 5  BY MR. SEIDENFELD:
 6  Q   Mr. Brooks, is that the recording that you
 7  made?
 8  A   Yes.
 9  Q   Why did you let Mr. Cooper enter your room
10  if he had already allegedly touched you when
11  you were downstairs in his office?
12  A   He knocked on the door, I opened the door.
13  Q   How come you didn't tell him to leave or
14  say, Please don't come in?
15  A   He's staff.  I can't control what's going
16  on in there.  They run that building.  I don't
17  run that building.
18  Q   Mr. Cooper worked in the dispatch office.
19        Did he have any authority having to do
20  with the residential aspect --
21  A   I don't know.
22  Q   -- of the Gates Avenue --
23  A   I don't know what kind of authority he
24  has.  I just knew he was a supervisor.  He was
25  up there.  He came up there.
```

Page 213

```
 1         Brooks - Confidential
 2  Q   Don't you think you could have said, Hey,
 3  I don't want to talk to you now?
 4  A   Don't I think I could have said, Hey, I
 5  don't want to talk to you now?
 6  Q   That's the question.
 7  A   I wasn't thinking at all.  My mind was on
 8  freeze.  I was shocked.  I didn't know what to
 9  think.  I didn't know what to say.  Nothing
10  that I was thinking or I was saying was what I
11  wanted to do or say.
12  Q   But you were thinking enough to make -- to
13  start recording, right?
14  A   Yes.
15  Q   And that was for the purpose of
16  documenting what would happened when Mr. Cooper
17  came into your room?
18  A   Yeah, I didn't expect him to be so
19  aggressive and just coming in and start
20  grabbing my penis.  I thought he would say
21  something -- I didn't even think he was going
22  to pick up the phone and see it.  I was kind of
23  nervous that he seen the phone on record.
24  Q   How come you didn't say, Stop?
25        Or if you were recording how come you
```

```
 1              Brooks - Confidential
 2   didn't at least say, what was going on, don't
 3   do this or Hey --
 4   A   I didn't -- I didn't --
 5   Q   -- stop touching me?
 6   A   I didn't know what to think or say. I
 7   was -- I was slightly paralyzed, mentally, at
 8   the moment.
 9       What I was thinking about doing was
10   striking him. And I was talking myself out of
11   doing that.
12   Q   And did it occur to you, even though you
13   knew you were taping to document what was
14   happening at the time?
15   A   I was documenting. I was recording it.
16   Q   It didn't occur to you to say something on
17   your recording that would indicate what was
18   happening?
19   A   No. I thought it was about to turn
20   violent.
21   Q   Did you say anything that you believe
22   indicated that you thought the interaction was
23   about to turn violent?
24   A   I thought if I would have said -- I
25   thought he knew that I was recording him.
```

```
 1              Brooks - Confidential
 2   Q   How do you know?
 3       What made you think that?
 4   A   He picked up my phone. And he said that
 5   I -- he said that he thought I was on the
 6   phone. I wasn't. It was recording.
 7   Q   When we played that recording, did you
 8   hear him say, Are you on the phone?
 9   A   Yeah.
10   Q   When during the conversation?
11   A   In the beginning of the conversation.
12   Q   Was that the entire -- was that recording
13   the entire time that Mr. Cooper was in your
14   room?
15   A   Yes, it was.
16   Q   The file that's called "Terry" and is
17   Exhibit 6, runs for a total of 12 minutes and
18   44 minutes. The rest of the tape has no audio
19   on it.
20       Why did you keep the tape running?
21   A   What?
22   Q   Why did you keep the tape running?
23       Mr. Cooper already left your room, but the
24   tape still runs for another nine minutes?
25   A   I told you I didn't know how to work the
```

```
 1              Brooks - Confidential
 2   phones. The phones thing -- the record thing
 3   was all new to me. The smartphones is new to
 4   me. I was just learning about how to deal with
 5   smartphones.
 6   Q   What did you do after Mr. Cooper left?
 7   A   I got ready to take my shower.
 8   Q   Did you go talk to anyone about what
 9   happened before you took your shower?
10   A   No.
11   Q   Why not?
12   A   Because I knew I had to leave. I didn't
13   know who I was going to talk to anyway. I never
14   didn't know what I was going to do. I never
15   been in a situation like this before. It never
16   happened to me. Not in prison. Not in the
17   streets. I didn't know what to do.
18       My only recourse was to be violent, and I
19   knew I couldn't do that because I would have
20   been back in prison. So I didn't know what to
21   do.
22       So after I got in the shower, I went
23   downstairs and I want to speak to
24   Mr. Paul Washington. I trusted Paul.
25   Q   We'll get there in a minute.
```

```
 1              Brooks - Confidential
 2       I just want to ask, when you went to go
 3   take a shower, where was your phone?
 4       Did you leave it in your room?
 5   A   I don't remember.
 6   Q   Did you bring the phone to the bathroom?
 7   A   I don't remember.
 8   Q   Was there anyone in the shower room when
 9   you got there?
10   A   No.
11   Q   In your complaint you say Mr. Cooper came
12   into the bathroom while you were in the shower;
13   is that correct?
14   A   That's correct.
15   Q   What did he do?
16   A   He came and looked in.
17   Q   When you he "looked in," what did he do?
18   A   He looked at me.
19   Q   Where were you?
20   A   I was standing by the mirrors.
21   Q   Were you dressed?
22   A   I think I had pants on or something. I
23   think I had my shirt off.
24   Q   Was it before or after you showered?
25   A   It was before I showered.
```

Brooks - Confidential

1
2  Q   Okay.  Did he say anything to you?
3  A   No.
4  Q   Did you say anything to him?
5  A   No.
6  Q   How long did he look at you for?
7  A   A few seconds.  He looked like he was
8  nervous.  He looked in and then he left.
9  Q   Then you went and you showered?
10  A   Yeah.
11  Q   What did you do next?
12  A   Got dressed, went outside and spoke to
13  Mr. Washington.
14  Q   Didn't you go and speak to Mr. Cooper
15  first?
16  A   Nope.
17  Q   Sorry, I just didn't hear you.
18  A   I don't -- I don't -- no, I don't
19  remember.  I think I went to speak to
20  Mr. Washington first.  Then I came back because
21  he told me to speak to James Washington.  And
22  that's when I went in and tried to record Terry
23  admitting that he had touched me.
24  Q   Can you take a look at your complaint.
25  Mr. Brooks, can you take a look at your

Brooks - Confidential

1
2  complaint.  I want to direct you to
3  Paragraph 73.
4      It says "Plaintiff returned to Defendant
5  Cooper's office after his shower, hoping to
6  finally get his schedule sorted out, so that he
7  could have time to be a father to his
8  children."
9      Do you see that?
10  A   Yes.
11  Q   Does that refresh your recollection about
12  whether you went to speak with Mr. Cooper
13  before you went to speak with
14  Mr. Paul Washington?
15  A   No.  I don't know what sequence that I
16  went to speak to him.
17      It was after my shower, yes.  But I don't
18  know if I went to speak to Paul first or if I
19  went to speak to Terry first.  I don't know.  I
20  don't remember.
21  Q   Why did you go and meet with Mr. Cooper
22  after your shower?
23  A   I wanted to get him on the record saying
24  something about what he did.
25  Q   You recorded -- so you recorded that

Brooks - Confidential

1
2  meeting?
3  A   I did.
4  Q   Was there anyone in the room with you and
5  Mr. Cooper when you went down to his office?
6  A   No.
7      MR. SEIDENFELD:  For Plaintiff's 7, we're
8  going to play the file called "Terry 2."  And
9  we're going to play it from the two minute and
10  50 second mark to the six minute and 30 second
11  mark.
12      (Deposition Exhibit 7, File Entitled
13  "Terry 2," marked for identification as of this
14  date.)
15      MR. BARTOLOMEO:  Before we do that, can I
16  just borrow you for two seconds outside, both
17  of you?
18      MR. SEIDENFELD:  Sure.
19      (Recess taken.)
20  Q   Mr. Brooks, you said you wanted to correct
21  something about your prior testimony?
22  A   The last question that you asked me, was
23  there somebody in the room with us, and I said
24  no.  Somebody came later on.  Nobody was in the
25  room in the beginning when I was talking to

Brooks - Confidential

1
2  him.  But somebody came, opened the door and
3  yelled for Terry.
4  Q   And this was the meeting on July 21, 2016,
5  when you went back to Terry's office after you
6  had taken a shower?
7  A   Yes.
8  Q   Okay.  Now we're going to play the file
9  named Terry 2, which we had marked as
10  Plaintiff's Exhibit 7 from 2 minutes and 50
11  seconds to six minutes and 30 seconds.
12      (Tape Playing.)
13  BY MR. SEIDENFELD:
14  Q   Mr. Brooks, we stopped the recording at
15  426.
16      From 250 to 426, were you in Mr. Cooper's
17  office, or were you on your way there?
18  A   I was on my way there.
19  Q   Okay.  And do you know any of the other
20  people's whose voices you heard on the tape we
21  just played?
22  A   No.
23  Q   Okay.  And you didn't go talk to them or
24  report what happened to any of them?
25  A   No, I didn't know them.

Page 222

1          Brooks - Confidential
2     Q   Okay.  We're going to play the rest of the
3   file, Terry 2 starting at 426.
4          (Tape Playing.)
5   BY MR. SEIDENFELD:
6     Q   Mr. Brooks, is that the recording, a piece
7   of the recording that you made during your
8   meeting with Mr. Cooper?
9     A   Yeah, that was the second.
10    Q   Okay.  I heard some other voices on the
11  recording.
12         Do you know who any of those voices were?
13    A   No.  People was coming in and out.  I
14  don't know.
15    Q   People were -- the whole -- during the
16  whole time of the recording that we played
17  people were coming in and out?
18    A   They weren't coming inside the office.
19  But dudes were sticking their head in front of
20  the door and talking.
21    Q   Was the door open?
22    A   It wasn't wide open.  You could hear it
23  opening and closing.  You could hear it.
24    Q   Okay.  Again, why didn't you say anything
25  to Mr. Cooper about what had happened,

Page 223

1          Brooks - Confidential
2   allegedly happened, if you knew you were
3   recording this?
4     A   Like I said, I believe he knew that I was
5   recording, too.
6     Q   So why wouldn't you at least --
7     A   I didn't know what to think.  I never did
8   nothing like that before.
9          To answer your question, I did nothing
10  like this before.  I never had to try to get a
11  person to say what they were doing on tape.  I
12  never did it.
13    Q   I understand that you didn't know how to
14  get him to say what happened.
15         But why didn't you say what you alleged
16  had happened?
17    A   I didn't know how to speak about the
18  issue, period.
19    Q   Not even to say something along the --
20  Hey, Terry, why did you do this to me when --
21    A   No, not even to say that.  I wanted to
22  fight Terry.  And I don't really talk when I'm
23  ready to fight.  I wanted to fight.  That's
24  what I wanted to do.
25         So I went to speak to somebody that I

Page 224

1          Brooks - Confidential
2   could speak to, which was Mr. Paul Washington
3   so he could advise me on what I should do.
4     Q   That was after you spoke to Terry?
5     A   Immediately after.  I don't know.  I
6   don't -- yeah, yeah, it was after I spoke to
7   Terry.
8     Q   Why did you go speak to Terry a second
9   time before you went to go speak to
10  Paul Washington?
11    A   I told you I don't know if I went before
12  or after, but I know I wanted to get him on
13  tape saying something sexual to me.
14         I didn't want to initiate it.  I wanted
15  him to say it on his own like he always do.
16    Q   You say "like he always do."
17         Are you referring to -- other than the two
18  incidents we discussed, are there any other
19  times that Mr. Cooper touched you
20  inappropriately?
21    A   No.
22    Q   Why did you say to him, What can I do to
23  show my appreciation?
24    A   What?
25    Q   Why did you say to Mr. Cooper, what can I

Page 225

1          Brooks - Confidential
2   do to show my appreciation?
3     A   He said where's my appreciation at.  He
4   said where's my appreciation.
5     Q   Right.
6          And then later you responded what can I
7   do --
8     A   Later?  Immediately.
9          I said what can I do to show you my
10  appreciation, because I wanted him to say
11  something sexual.  But he knew I was lying to
12  him and he said, good-bye.
13    Q   Why did you thank him for changing your
14  schedule?
15    A   I was having a hard time getting my
16  schedule changed.
17    Q   Why say thank you to someone who you claim
18  has just subjected you to this type of
19  treatment?
20    A   Why?
21         Maybe it would have been better not to
22  thank him.
23    Q   I'm trying to understand your thinking at
24  the time.
25         Can you tell us what your thinking was at

Page 226

Brooks - Confidential

1  the time you thanked him?
2
3  A   No, I can't.  I don't know what I was
4  thinking.
5  Q   After this meeting with Terry, you went to
6  go see Paul Washington?
7  A   I don't know if it was before or after.  I
8  spoke to Paul Washington.  I don't -- I don't
9  remember.
10 Q   What did you say to Mr. Washington
11 Mr. Paul Washington?
12 A   I told him what happened.
13 Q   And what did you tell him happened?
14 A   I told him that Terry touched me.
15 Q   Did you tell him that you went down to
16 speak with Terry after that happened?
17 A   He told me to go speak to
18 James Washington.  And I think -- that's why I
19 think I went and spoke to Paul Washington first
20 before I came back.
21 Q   I'm sorry?
22 A   That's why I think I went to speak to
23 Paul Washington first before I came back in the
24 building.  I don't remember, though.
25 Q   You said before you came back in the

Page 227

Brooks - Confidential

1
2  building?
3  A   Yeah.
4  Q   You mean before you spoke with Terry in
5  his office a second time --
6  A   Yeah.
7  Q   -- or do you mean after -- you had to
8  leave the building?
9  A   Yeah.
10 Q   Which one?
11 A   Before I went and spoke to Terry.
12 Q   Okay.  Did you tell -- did you tell
13 Paul Washington that you were recording Terry?
14 A   No.
15 Q   Did you tell him you were going to go back
16 and speak to Terry again?
17 A   No.
18 Q   So you said you told him that Terry
19 touched you.
20     What specifically did you say?
21 A   I told him that Terry touched me.  I told
22 him he violated me.
23 Q   Did you give him any specifics?
24 A   I told him he grabbed my penis.  He was
25 like, Word?  Wow.

Page 228

Brooks - Confidential

1
2     And I told him I wanted to fight him, but
3  I didn't know what to do.  He said don't, don't
4  do nothing like that.  Go speak to
5  James Washington.  And then I think I went back
6  in the building to speak to James Washington,
7  but he wasn't there.  And so I went to go get a
8  recording.
9     That's -- yeah, that's what I think
10 happened.  Then I went and tried to get
11 Terry -- try to record Terry saying something
12 inappropriate to me on tape.
13 Q   Did Paul Washington suggest you do that?
14 A   What, record him?
15 Q   Yes.
16 A   No.
17 Q   How come if Paul Washington told you just
18 to go report the incident, why did you go back
19 and speak to Terry if that's the order that
20 these meetings happened in?
21 A   I just told you I wanted to get him on
22 record saying something inappropriate to me.
23 Q   You said then you went to go and try and
24 speak to James Washington.
25    What happened?

Page 229

Brooks - Confidential

1
2  A   He wasn't there, or he was in a meeting or
3  something; I don't know.  I know he was not
4  accessible.
5  Q   What did you do next?
6  A   I left.  I went to the Bronx.
7  Q   To your wife's house?
8  A   Yep.
9  Q   Why didn't you file a police report?
10 A   I'm uncomfortable with police to begin
11 with.  One of my parole stipulations is not to
12 have any police contact.
13 Q   That stipulation prevents you from
14 reporting what you believe to be an assault?
15 A   No police contact means no police contact
16 to me.  I never filed anything on anybody
17 before, ever.  I usually get my own justice.
18 Q   Why didn't you get your own justice
19 against Mr. Cooper?
20 A   I didn't want to go back to prison.  I
21 have children.  I didn't want to go to prison.
22 Q   Did you tell your parole officer what
23 happened?
24 A   I did.
25 Q   Who is your parole officer?

Page 230

1          Brooks - Confidential
2    A    Bido.
3    Q    And what's the last name?
4    A    That is the last name.
5    Q    The last name is P-i-d-o?
6    A    B-i-d-o.
7    Q    B-i-d-o.
8         And when did you tell your parole officer
9    about what happened?
10   A    Immediately, as soon as I seen her.
11   Q    Do you know if your parole officer
12   reported this to the police?
13   A    No.
14   Q    Did you --
15   A    I don't know.
16   Q    -- ask her not to?
17   A    No.
18   Q    What did your parole officer say to you
19   when you told her what you alleged happened?
20   A    She asked me if I was okay.  She asked me
21   was I comfortable staying at the Gates facility
22   anymore.  I said I'm all right.  He's not here,
23   because he wasn't there.
24        And that was about it.
25   Q    Do you know if this was before or after

Page 231

1          Brooks - Confidential
2    you spoke with Mr. James Washington the next --
3    the day after the alleged incident?
4    A    I believe it was after.
5    Q    It was after?
6    A    I believe so.
7    Q    You said it was -- you said you told your
8    parole officer immediately.
9         Was it the same -- was it that day?
10   A    The next time I seen her I told her.
11   Q    Do you remember when that was?
12   A    No.
13   Q    Was it after you had met with The Doe Fund
14   as part of their investigation?
15   A    I think so.  I'm not sure.
16   Q    When you left the Gates Avenue facility,
17   you said you went to your wife's house in the
18   Bronx?
19   A    Yeah.
20   Q    And what did you tell your wife about what
21   happened?
22   A    I typed up the report, that's what I did.
23   Q    Did you tell your wife about what
24   happened?
25   A    No.

Page 232

1          Brooks - Confidential
2    Q    Why not?
3    A    I was embarrassed.
4    Q    Why were you embarrassed?
5    A    Because I felt I should have fought him.
6    Q    Did you ever tell your wife about what
7    happened?
8    A    No.
9    Q    To this day she has no idea?
10   A    No.
11   Q    Does she know you're involved in a
12   litigation?
13   A    No.
14   Q    Mr. Brooks, you said you told your parole
15   officer that you weren't afraid to be at the
16   Gates Avenue facility, despite what I alleged
17   happened.
18        Why was that?
19   A    Because Terry was gone.
20   Q    But not immediately, right?
21   A    What do you mean, "not immediately"?
22   Q    He was --
23   A    He wasn't there at the time.
24   Q    What do you mean, "at the time"?
25   A    And Washington told me that he wouldn't be

Page 233

1          Brooks - Confidential
2    coming back until the end of the investigation.
3    Q    And that's when you met with
4    Mr. Washington, James Washington the next --
5    the morning after the day of the incident?
6    A    I'm going to need a break.  I'm going to
7    need a break.
8    Q    Okay.
9    A    I got to smoke.  I got to go.
10        (Recess taken.)
11        (Deposition Exhibit 8, Document Entitled
12   "Complaint," marked for identification as of
13   this date.)
14   Q    Mr. Brooks, I'm going to hand you what
15   we've marked as Plaintiff's Exhibit 8.
16        Is that the complaint that you typed up
17   the night of July 21, 2016 at your wife's
18   house?
19   A    Yes, it is.
20   Q    And you wrote this on your own?
21   A    Yes, I did.
22   Q    Did anyone review it?
23   A    No.
24   Q    And -- strike that.
25        Before you submitted it to

59 (Pages 230 to 233)

Brooks - Confidential

1
2    James Washington, did anyone look at it?
3    A   No.  But I think my wife, it's possible
4    that she could have seen me writing it.  But
5    she never made a comment.
6        I have a feeling she knows something is
7    wrong because she asked me -- but I don't
8    recall us having a conversation about it.
9    Q   Did your wife ever read this complaint?
10   A   I don't know.
11   Q   Did you ever show it to her?
12   A   No.
13   Q   Is it on your -- did you type it up on a
14   computer?
15   A   On her computer.
16   Q   Did you erase it after?
17   A   I believe so.
18   Q   What?
19   A   I believe I did.
20   Q   Did you print it out after you typed it
21   up?
22   A   Yes.
23   Q   Just one copy?
24   A   I don't recall how many copies I printed
25   out.

Brooks - Confidential

1
2    Q   Okay.  How did you provide this to your
3    attorneys, electronically or in hard copy?
4    A   I don't remember.
5    Q   It's possible that your wife has read
6    this?
7    A   It's possible.
8    Q   But she has never discussed it with you?
9    A   I don't recall having a conversation with
10   her about it.
11       But our sex life was not the same.  And
12   she used to ask me what's wrong with me.
13   Something bothering me because we usually --
14   Q   I'm sorry, what --
15   A   She asked me what was wrong with me and
16   if --
17   Q   This date, the 21st?
18   A   No, afterwards.
19       That's why I said I don't know if she read
20   it because she was asking me about our sex
21   life, why it wasn't like it used to be.
22   Q   Were you back together with your wife as
23   of 2016?
24   A   No.  We would see each other off and on.
25   Q   Okay.  And do you have sexual relations

Brooks - Confidential

1
2    with your wife when you see her?
3    A   It wasn't as frequent as -- after this
4    occasion, that's why.
5    Q   How frequently did you have sexual
6    relations with your wife before July 21, 2016?
7    A   I don't know.  I wasn't keeping count.
8    But when I seen her, when I spent the night at
9    her house, when I was on my weekend passes,
10   stuff like that.
11   Q   Was it every time you saw her?
12   A   I don't remember if it was every time, but
13   we had a healthy sex life.
14   Q   What do you mean by "healthy sex life"?
15   A   We were attracted to one another; we had
16   sex.
17   Q   Are you not attracted to your wife
18   anymore?
19   A   I am, but I'm not really motived towards
20   having sex like that anymore.
21   Q   When was the last time -- actually, strike
22   that.
23       After July 21st, how often did you have
24   sex with your wife?
25   A   Not very often.

Brooks - Confidential

1
2    Q   Do you know the frequency?
3    A   No.
4    Q   After July 21, 2016, did you have sexual
5    relations with any other women?
6    A   Yes, I did.
7    Q   And what -- how many women?
8    A   Maybe three.
9    Q   On a regular basis with any of them?
10   A   No.
11   Q   Just the single occasion?
12   A   Yeah.
13   Q   With all -- with all three of them?
14   A   With like one I've been, every now and
15   again, when she come to New York I have sex
16   with her.
17   Q   What's "every now and again"?
18   A   Whenever she has time off from school.
19   Q   Whenever you see her you have sex with
20   her?
21   A   Yeah.  But she don't come very often.  I
22   think about three times altogether.
23   Q   And over what time period?
24   A   A year.
25   Q   Is that present?

Page 238

Brooks - Confidential

1          Brooks - Confidential
2       A year from the present, from today?
3       You have to say "yes."
4    A   Yeah, I believe so.
5    Q   Let's go back to your complaint.
6       When you returned to Gates Avenue, you
7    brought the complaint with you in an envelope?
8    A   Yes.
9    Q   And --
10   A   I don't know if it was in an envelope,
11   though. I know I brought the complaint with
12   me.
13   Q   Was it folded -- did you -- so some people
14   couldn't see what was on it?
15   A   I don't remember.
16   Q   Okay. What did you do with it?
17   A   I put it in Mr. Washington's mailbox.
18   Q   Okay. At this point had you told anyone
19   about what happened, other than Paul
20   Washington?
21   A   No.
22   Q   And that was the night of July 21st, the
23   same day as the incident?
24   A   Yes.
25   Q   The next morning you met with

Page 239

Brooks - Confidential

1          Brooks - Confidential
2    James Washington?
3    A   Yes.
4    Q   And what did you -- what did
5    Mr. Washington tell you?
6    A   He told me that he was -- there would be
7    an investigation. And until the completion of
8    that investigation, Terry would not be coming
9    back in, that I didn't have to worry about
10   seeing him.
11   Q   And was that the case?
12   A   No. I did see him again.
13   Q   You saw him the day that he came in to be
14   interviewed by The Doe Fund, right?
15   A   Yes, I believe so.
16   Q   But he wasn't working, he was just there
17   to be interviewed?
18   A   As far as I know.
19   Q   And after that date did you ever see
20   Mr. Cooper again?
21   A   No.
22   Q   Okay. And as far as you know, are you
23   aware that The Doe Fund terminated him?
24   A   I found that out later.
25   Q   Okay. When later?

Page 240

Brooks - Confidential

1          Brooks - Confidential
2    A   When somebody from The Doe Fund called me.
3    Q   Okay. Do you know if it was Kanise
4    from --
5    A   I believe it was Kanisa.
6    Q   And that was shortly after you had met
7    with The Doe Fund as part of their
8    investigation?
9    A   It was after. I don't remember how long
10   after, but it was after.
11   Q   And when you met with -- when The Doe Fund
12   conducted their investigation, who did you meet
13   with?
14   A   Two HR people and Mr. Washington.
15   Q   Ms. Gilmore?
16   A   That name sounds familiar, yes.
17   Q   The woman who's been -- she just stepped
18   out.
19      The woman who has been sitting here with
20   us here today?
21   A   Yes, she does look familiar.
22   Q   And another person from The Doe Fund?
23   A   Yes.
24   Q   And they took your allegation seriously?
25   A   What do you mean did they take my

Page 241

Brooks - Confidential

1          Brooks - Confidential
2    allegation seriously?
3    Q   They took you seriously; they didn't blow
4    you off and say go away?
5    A   They asked me a series of questions.
6    Q   To find out what happened; is that
7    correct?
8       To understand your allegations, correct?
9    A   They asked me questions.
10      What their motive was, I don't know.
11   Q   Mr. Brooks, in this case, you're
12   complaining that The Doe Fund and
13   Mr. Washington and Mr. Cooper retaliated
14   against you.
15      What's the basis for your claim?
16   A   I never said Mr. Cooper retaliated against
17   me.
18   Q   Who retaliated against you?
19   A   The employees at The Doe Fund.
20   Q   Which employees?
21   A   Mr. Wiggins, who was disturbing my routes,
22   not allowing me to go on my routes. He refused
23   to give me a new schedule. He would pull me
24   off of my routes.
25      Even though I was there on time and on the

Page 242

Brooks - Confidential

1
2  van, he would have me taken off the van and had
3  to stand on the corner, and kind of made me a
4  rover; meaning that I had a steady site that I
5  was going to, and he pulled me off of that
6  site, which was the Vernon site, without my
7  knowledge.
8       And what else?
9  Q   Let me -- we'll go -- actually, I'm sorry,
10 tell me the other people who you claimed
11 retaliated against you, and we'll go back
12 through.
13 A   It was Mr. Wiggins.  I think it was
14 Mr. Stevens.  He used to wake me up every
15 morning even though I had a sleeping pass.  And
16 he would wake me up, and I was not able to get
17 sleep so I could go to work.
18       And other little things that was
19 happening.  I tried to recall most of the
20 things that was going on.
21 Q   What else was going on that you allege as
22 retaliation?
23 A   Like I said, with the work sites.
24 Q   Mr. Wiggins?
25 A   Mr. Wiggins.

Page 243

Brooks - Confidential

1
2  Q   So for now -- we'll go through the
3  incidents.  But I just want you to tell me all
4  the people who you claimed retaliated against
5  you?
6  A   Mr. Washington.
7  Q   James Washington?
8  A   Yeah.
9  Q   Okay.  Who else?
10 A   Timothy Matthews.  Eric, who was the head
11 of security.
12 Q   Anyone else?
13 A   That's all, to my recollection.
14      Oh, well, Mr. O'Neil Young.  He was kind
15 of -- he was giving me a hard time.  But, you
16 know, I don't know if that was retaliation.  I
17 don't know if it was intentional.
18 Q   Anyone else?
19 A   Not that I recall at the moment.
20 Q   What did Mr. Young do to retaliate, if
21 anything, against you?
22 A   Well, I said I don't know if it was
23 retaliation or whatever.  He was just giving me
24 a hard time.
25 Q   About what?

Page 244

Brooks - Confidential

1
2  A   He was pretending that I wasn't trying to
3  get my own apartment.
4  Q   Anything else?
5  A   Not that I remember.
6  Q   Eric, head of security, what did he do?
7  A   I had an overnight pass and I was out at
8  my wife's house.  Mr. Washington had gave me
9  permission to go out and come in after 10:00.
10 And when I returned he said that I didn't have
11 an overnight pass.  And that I wasn't allowed
12 to go into my room.  And I protested and I told
13 him that Mr. Washington himself gave me
14 permission, as well as Mr. Porter, who was my
15 counselor at the time.
16 Q   When was this?
17 A   This was after the incident with
18 Mr. Cooper.
19 Q   When?
20 A   I don't remember.  I recorded it, though.
21 I recorded a portion of it.  I didn't get to
22 record the first part because I didn't know
23 that this was going to happen.  So when I
24 walked in I didn't know that it was going to be
25 a problem.

Page 245

Brooks - Confidential

1
2       And when I protested against it saying I
3  was going up to my room, he told me that I had
4  to sit in some corner and wait until --
5  sometime in the morning.  And I told him I'm
6  not going to do that.  He told me that he's
7  going to call the police on me.
8  Q   Did you go back to your room?
9  A   I did not.
10 Q   Where did you go?
11 A   I went and sat down.
12 Q   Where did you sit down?
13 A   I think I went to the backyard to smoke a
14 cigarette.
15 Q   Do you know what time you returned?
16 A   No.
17      Eventually, you know --
18 Q   No, I'm asking you what time you came back
19 to Gates Avenue.
20 A   No, I don't remember what time I came back
21 to Gates.
22 Q   Anything else Eric did to retaliate
23 against you?
24 A   Well, he was used by Timothy Matthews,
25 telling me that I lost my bed.  This happened

Brooks - Confidential

1   several times.
2       MR. SEIDENFELD:  I'm sorry, could you just
3   read back.
4       (Record read.)
5   Q   Okay, and when was that?
6   A   I don't know the exact date.
7   Q   Was it close towards the time when you
8   left the Gates Avenue facility?
9   A   Was it towards the time that I left the
10  Gates Avenue facility?
11  Q   You want me to rephrase it?
12  A   Yes, please.
13  Q   How long before -- strike that.
14      How close in time did this happen to the
15  time when you left Gates Avenue?
16  A   Permanently?
17  Q   In July of 2017.
18  A   I can't really recall.
19      What I do know is it happened on several
20  occasions.
21  Q   When was the last time it happened?
22  A   I don't know.  I recorded it.  I recorded
23  it, and I recorded Eric saying that Tim -- that
24  it was Tim that was saying that I lost my bed.
25

Brooks - Confidential

1   And he don't -- and that he believes it was
2   retaliation against me.  He said he don't know
3   if it was something personal with me or
4   whatever.
5   Q   Eric said that you?
6   A   Eric said that to me, because he said it
7   was abnormal for them to be doing that to me.
8   Q   Anything else that Eric did to retaliate
9   against you?
10  A   Eric was part of the security there.  So
11  the security would often come up to my room
12  when I'm sleep and ask me for a urine.
13  Q   Was that part of your parole drug testing?
14  A   They are not parole.
15  Q   Was it part --
16  A   They are not my parole officers.
17  Q   Was it part of the terms you agreed to
18  when you agreed to stay at the Gates Avenue
19  facility?
20  A   No.  That was part of The Doe Fund
21  program.  I was no longer a part of The Doe
22  Fund program.  They were not allowed to ask me
23  for urine anymore.
24  Q   When you say you were no longer a part of
25

Brooks - Confidential

1   The Doe Fund program, what do you mean?
2   A   I was no longer a apart of The Doe Fund
3   program meaning, I was no longer on the work
4   staff, on the work crews.  I was no longer
5   eligible to get the trainings that was offered
6   and, therefore, I was no longer -- I was no
7   longer eligible to go on my weekend visits with
8   my wife and children.
9   Q   But you were still residing at The Doe
10  Fund facility?
11  A   Because it's a shelter.  It's a shelter.
12      They did everything that they could do to
13  kick me out.  They wanted me out.
14  Q   Who wanted you out?
15  A   All of them.  Particularly,
16  Timothy Matthews -- and -- as was stated by
17  Eric.  And so they tried to make life difficult
18  for me.  They changed my room.  That's how my
19  room got changed from the first guy, Turk, that
20  I was rooming with, into a larger room
21  downstairs.
22  Q   Didn't you request for your room to be
23  changed?
24  A   I did not.  No, I did not.
25

Brooks - Confidential

1   Q   So what else did -- anything else that
2   Eric did to retaliate against you?
3   A   Not that I remember.  I don't remember
4   every little thing that they did.
5       I just remember -- what I do remember, it
6   was something every single day.
7       But, you know, that was one of the, you
8   know, problems was the urine.
9       What they did have permission to do, being
10  a DHS shelter, was to take a Breathalyzer test.
11  I did that.  But I wouldn't urine for them.  So
12  they were upset with me about that.
13  Q   That just happened one time?
14  A   No, it happened several times.
15  Q   Do you remember when?
16  A   No, I can't pinpoint every time that it
17  happened, all the dates.
18  Q   Okay.  And how did Mr. Matthews retaliate
19  against you?
20  A   By telling the security that I had lost my
21  bed when I had a right to be out at that time.
22  There was a culture there where you call before
23  the time and let them know that you were coming
24  late, that they would hold the bed.
25

Page 250

Brooks - Confidential

1        I would call the front desk and let them
2  know I was behind for whatever reason, and that
3  became a problem.  And even though I would call
4  in advance, they would take my bed anyway and
5  make me sit inside this room for hours.
6  Q   How many times -- when did that happen?
7  A   It happened on a few occasions.  I don't
8  remember the exact times, but I do recall tape
9  recording one of the times.  Maybe once or
10  twice I tape recorded it.
11  Q   Anything else Timothy Matthews did to
12  retaliate against you?
13  A   No.  It was more, you know, verbal
14  attitudes and things of that nature.  I
15  recorded what I had.
16  Q   What did Mr. Stevens do to retaliate
17  against you?
18  A   I told you he would come --
19  Q   Just the wake up?
20  A   -- to my door and bang on the door and
21  jingle his keys and slam doors in the hallways
22  and I couldn't sleep.
23  Q   What about -- anything else that
24  Mr. Stevens did?
25

Page 251

Brooks - Confidential

1  A   You know, he had a standoffish attitude.
2  All of them had a standoffish attitude when
3  dealing with me.  I didn't care.  I figured
4  that they didn't like me because of the report
5  that I made against, you know, one of their
6  coworkers.  So it was hostile.  They were
7  hostile.
8        Also, I do know that -- I don't know who
9  did it, but one of them told some of the work
10  crew what happened with Terry.  And I remember
11  speaking with a guy and he said Terry got fired
12  because he touched somebody.  And I don't know
13  if he knew it was me or not, but . . .
14  Q   Who told you this?
15  A   Somebody who worked on one of the routes.
16  And I went in and spoke to Mr. Washington about
17  it.  I was very upset.  And I told
18  Mr. Washington I thought that this was supposed
19  to be between us and HR.
20        And he act like he was surprised, like he
21  didn't know how it got out of the room.  But
22  only me, him and HR was there.  So, you know,
23  who said something.
24        And so --
25

Page 252

Brooks - Confidential

1  Q   The person who said that Terry got fired
2  for touching someone didn't say -- didn't tell
3  you that he knew it was you?
4  A   No, he didn't say that.
5  Q   Okay.  So as far as you know, whatever was
6  told didn't specifically relate to your
7  incident with Terry, or you weren't identified?
8  A   No.  He didn't say if he knew it was -- I
9  don't know if he knew it was me or not, or if
10  he was mentioning that to -- hoping that I
11  would say something about it.  But I just
12  listened.
13        And I said, Really, oh, okay.  And that
14  was that.
15  Q   When -- when did this happen?
16  A   I don't remember when it happened.  I just
17  remember it happened.  I don't remember what
18  date it was.
19  Q   Did it happen in 2017?
20  A   I don't remember when it happened.
21  Q   Do you remember where you were working
22  when it happened?
23  A   No.
24  Q   Was it when you were at 4C?
25

Page 253

Brooks - Confidential

1  A   I don't recall.  I don't recall.
2  Q   You don't remember who?
3  A   I know the guy by face, but I don't know
4  his name.
5  Q   He was a RWA program member?
6        He was on the workforce crew with you?
7  A   Not with me.
8  Q   On the workforce crew?
9  A   Yeah, he was on the workforce crew.
10  Q   Okay.  Any other thing Mr. Stevens did to
11  retaliate against you?
12  A   I don't recall everything that happened.
13  I can't -- I don't have a recollection of
14  everything that happened.  I just know every
15  day living there I didn't feel comfortable in
16  there anymore.
17  Q   Mr. Brooks, we need to know -- we don't
18  know what happened.  Only you know what
19  happened.  If you can't -- if you don't
20  remember anything else, you can tell us, that's
21  fine.
22  A   Like I said, I don't recall every incident
23  that happened.  All I know is every day it
24  was -- I didn't feel comfortable being there
25

1      Brooks - Confidential
2   anymore and Terry was gone, you know.
3      And I addressed that to Mr. Washington,
4   like, I shouldn't feel like -- I shouldn't be
5   retaliated against by the staff.  If that was
6   their friend, they should have told him to stop
7   doing what he was doing.
8   Q   How did Mr. Williams retaliate against
9   you?
10  A   Well, he was -- I was trying to get my
11  change of program, and they told me I had to
12  speak it Wiggins.
13     I went to speak to Wiggins one day, and he
14  started talking, like, tough street talk.  I
15  recorded him saying that he kick ass from -- in
16  Ready, Willing & Able to the streets.  He's
17  well-known in Harlem, from the east side to the
18  west side.
19     To me it appeared to be a intimidation
20  thing where he was trying to intimidate me.  So
21  I concluded he knew about the situation that
22  happened with me and what's his name.  So --
23  Q   Why did you conclude that based on that?
24  A   Because I had no problems with that man.  I
25  didn't even know him.  All I knew was he was

1      Brooks - Confidential
2   the guy I had to go speak to.
3   Q   Speak to about what?
4   A   About getting a new schedule, a new work
5   schedule.
6   Q   And do you know what Mr. Wiggins' title
7   was?
8   A   No.  But I do -- what people told me was
9   that he was like a Mr. Washington for the
10  porter.
11  Q   For the who?
12  A   For the porter, I believe.  I could be
13  wrong.
14     But people told me he was like a
15  Mr. Washington, that he was somebody.  And when
16  Mr. Washington is not there, he was the guy.
17     And he was making little subtle threats.
18  Q   What kind of threats?
19  A   Indirect threats.
20  Q   What did he say?
21  A   I told you.  Like how he kick ass from
22  here to Harlem, and everybody -- he's about
23  that mess, you know, meaning violence.
24     And so he was giving me a tough time with
25  getting my schedule, talking about he not going

1      Brooks - Confidential
2   to give me two weekend days off.  You know, I'm
3   going to get what he give me.  Stuff like that.
4   Q   Is this when you were on the Workforce
5   Development phase of the program?
6   A   This was when I was doing the street
7   cleaning, trying to get my thing changed.
8   Because even though Terry wasn't there, I still
9   hadn't got a schedule, a work schedule.
10     And I was trying to get my hands on a work
11  schedule, because I had to turn in my work
12  schedule to my counselor and to my parole, and
13  they refused to give it to me.
14     And so he was the guy I was told I had to
15  speak to.  And when I did, this is what
16  happened.  He was telling me about how he kick
17  ass.  And he was telling me he wasn't going to
18  give me days.
19  Q   Anyone else you claim retaliated against
20  you?
21  A   No.  I mean, I recall Mr. Ronald Holly
22  saying that I need to get my shit together.
23  And I didn't understand where that was coming
24  from.  This was one of the opportunities where
25  he pulled me off of the work truck.  And I'm

1      Brooks - Confidential
2   like, What do you mean I need to get my shit
3   together?  He said you need to get your shit
4   together.
5      I was there on time.  I was on the work
6   truck.  They pulled me off of the work truck,
7   made me stand on the corner and said I was
8   going to a different route.
9      And so I spoke to Mr. Bell about it,
10  and . . .
11  Q   Anyone else retaliated against you?
12  A   I wouldn't say retaliated against.  I was
13  just -- I was having a lot of hard times on the
14  sites.  I would be doing my job.  And there was
15  a guy at the Vernon route, and the Myrtle route
16  that would just give me a hard time.
17  Q   Do you remember his name?
18  A   No.  He was the supervisor for those
19  routes.  The Vernon route.  I can't remember
20  his name.  I probably wrote it down somewhere.
21  But right now I don't remember his name.  He
22  would always run up on me and, you know, bother
23  me about something.
24     I'm a good worker.  I like to work.  So I
25  know my work ethic is exemplary.  So I couldn't

Brooks - Confidential

1 understand why he was bothering me so much.
2 Q   Anyone else?
3 A   Not that I could recall at this point.
4 Q   How did Mr. Washington retaliate against
5 you?
6 A   I believe I explained that already.
7 Q   I don't believe you did.
8     Can you answer again?
9 A   I was speaking with him about all of this
10 stuff.  He would tell me that it was going to
11 be taken care of, and he would send me to
12 somebody, and then it would be a problem.
13 Q   What stuff?
14 A   Everything from taking off of work.  I got
15 put in for a no call no show.
16 Q   Did anything -- who put you in for a no
17 call no show?
18 A   Mr. Bell, put me in for a no call no show.
19 And anyway it wasn't true.
20     Me and Mr. Washington had discussed that,
21 and I was getting the day off because I needed
22 to see my parole officer and then I needed to
23 return back to the facility to speak to HR.
24     On that day I was put in for a no call no

Brooks - Confidential

1 show.  And I was very clear with Mr. Washington
2 about it, and I still got put in for a no call
3 no show.
4 Q   How do you know you were put in for a no
5 call no show?
6 A   Because he told me.  Mr. Bell told me I
7 was put in for a no call.  He's the one who did
8 it.
9 Q   Would you have any -- were there any
10 repercussions for --
11 A   Yeah.  It's a writeup.  It's on my work
12 record.
13 Q   Did anything happen?
14 A   What do you mean, "did anything happen"?
15 Q   Did you lose an assignment?
16     Did you lose any pay?
17 A   No, it's --
18 Q   Were you suspended, demoted?
19     Were you terminated?
20     Did anything happen to you as a result of
21 you alleging you were written up for a no show?
22 A   It was put on my record that I didn't call
23 or didn't show.  And it was expressed to me if
24 I got more no call no shows, that I would be

Brooks - Confidential

1 terminated from the work assignments.
2     I didn't think that was fair because
3 Mr. Washington is the one that told me I could
4 have off that day; and he did the same thing
5 with my late pass.
6     He told me that I had a late pass, and
7 when I came in, I was accosted by the security
8 and berated and yelled at, talking about why
9 I'm not in on time.
10 Q   When was this?
11 A   The time I told where I told you he said
12 that he was going to call the police on me.
13 Q   Who said he was going to call the police
14 on you?
15 A   Eric.
16 Q   Okay.  Any other people who retaliated
17 against you?
18 A   That's all I could recall at this time.
19 Q   You also claimed for discrimination based
20 on your race.
21     Who discriminated against you based on
22 your race?
23 A   I feel it was not -- it was not only my
24 race.  It was my status as well.

Brooks - Confidential

1 Q   First, I want to ask you who do you allege
2 discriminated against you based on your race?
3 A   All the administers at The Doe Fund.
4 Q   How did they discriminate against you
5 based on your race?
6     Strike that.
7     Who at The Doe Fund?
8 A   Timothy, James Washington, Mr. Wiggins.  I
9 don't know if his name -- his name is
10 Anthony Wiggins, Mr. Stevens.
11 Q   How did Timothy discriminate against you
12 based on your race?
13 A   I feel like they wouldn't have did that if
14 I was another race.
15 Q   And what do you base that on?
16 A   Their attitudes towards me.
17 Q   Were there other people at The Doe -- at
18 the Ready, Willing & Able program who they
19 treated differently?
20 A   I don't know about what they did with
21 other people.  I wasn't in other people's
22 business like that.
23 Q   Did Timothy say anything to you that made
24 you believe he was discriminating against you

Brooks - Confidential

1
2  based on your race?
3  A   Are you asking me did he say any racial
4  comments?
5  Q   Did he?
6  A   I can't remember.
7  Q   What's Timothy's race?
8  A   I believe he's either Spanish or
9  Caucasian.  I'm not sure.
10  Q   How did Mr. Washington discriminate
11  against you based on your race?
12  A   The same thing.
13  Q   Mr. Washington, the same thing you mean by
14  giving you attitude?
15  A   Yeah.
16  Q   Did Mr. Washington say anything to you
17  that you believed that made you believe that
18  this attitude was based on your race?
19  A   Not that I recall.
20  Q   And what's Mr. Washington's race?
21  A   I don't know.
22  Q   You don't know if Mr. Washington's
23  African-American?
24  A   No, I believe they said he was Dominican.
25  I don't know.  I'm not sure.

Brooks - Confidential

1
2      MR. SEIDENFELD:  Can we take a minute.
3      (Recess taken.)
4  BY MR. SEIDENFELD:
5  Q   Isn't it true that Mr. Washington is
6  African-American?
7  A   I tell you I don't know.
8  Q   Would it surprise you to learn -- to know
9  that he's African-American?
10  A   No, it wouldn't.
11  Q   What facts do you have to support your
12  claim that Mr. Washington discriminated against
13  you based on your race?
14  A   Because I believe that because I was --
15  not only because of my race, but because I was
16  incarcerated.
17  Q   Well, right now I'm just asking you about
18  your race.
19  A   In the precarious situation, they would
20  treat me different if I was of another race.
21  Q   So it's just your opinion?
22  A   Yes.
23  Q   Okay.  Isn't it true that Mr. Stevens is
24  African-American?
25  A   Are you telling me that he's

Brooks - Confidential

1
2  African-American?
3  Q   Isn't it true that he's African-American?
4  A   Okay.
5  Q   Is that yes?
6  A   If you say so.
7  Q   It's not if I say so.
8  A   I don't know their ethnical background.
9  Q   Would it surprise you to know he was
10  African-American?
11  A   No.
12  Q   What facts do you have to support your
13  claim that Mr. Stevens discriminated against
14  you based on your race?
15  A   I believe that I would have been treated
16  different if I was from another race.
17  Q   So your only basis is your opinion?
18  A   Yeah.
19  Q   What facts -- strike that.
20      Do you know -- isn't it true that
21  Mr. Wiggins is black or African-American?
22  A   I don't know that.
23  Q   Would it surprise you to know that
24  Mr. Wiggins is African-American?
25  A   Okay.

Brooks - Confidential

1
2  Q   What facts do you have to support your
3  claim that Mr. Wiggins treated you differently
4  because of your race?
5  A   I believe I would have been treated
6  different if I was somebody from another race.
7  Q   Is the only basis for that allegation your
8  opinion?
9  A   That's how I feel, yes.
10  Q   Okay.  What facts do you have to support
11  your claim that Timothy Matthews discriminated
12  against you based on your race?
13  A   Things that he was doing.
14  Q   What things?
15  A   Getting me kicked out.  Having me put to
16  sit in a room after I did everything that the
17  organization requested that I do, I still was
18  punished for it.
19  Q   What did --
20  A   I believe he wouldn't have did that to me
21  if I was from another race.
22  Q   And that's just based on your opinion?
23  A   That's how I feel about it.
24  Q   Okay.  Anyone else you allege
25  discriminated against you based on your race?

TSG Reporting - Worldwide - 877-702-9580

1          Brooks - Confidential
2    A    Not that I recall.
3    Q    Mr. Brooks, who did you tell about your
4    allegations with -- who did you tell -- strike
5    that.
6         Mr. Brooks, who did you tell about what
7    you alleged happened between you and
8    Mr. Cooper?
9    A    I told Mr. Paul Washington.  I told
10   Mr. James Washington.  I told my counselor.
11   Q    Who is your counselor?
12   A    Yolanda.
13        I told my PO.  I told a few counselors.
14   Q    Counselors where?
15   A    Therapists.
16   Q    Who?
17   A    Early on when we read the report, I told
18   that man.
19   Q    Dr. Reich?
20   A    Yes.
21   Q    Did you tell anyone else at The Doe Fund?
22   A    Not that I recall, no.
23   Q    And who is Yolanda?
24   A    She was my drug and alternative to
25   violence counselor.

1          Brooks - Confidential
2    Q    Did she work for The Doe Fund?
3    A    No, she did not.
4         (Deposition Exhibit 9, Document Entitled
5    Plaintiff's Responses and Objections to
6    Defendants' First Set of Interrogatories,"
7    marked for identification as of this date.)
8    Q    Mr. Brooks, I'm going to hand you what's
9    been marked as Exhibit 9.  The document is
10   titled "Plaintiff's Responses and Objections to
11   Defendants' First Set of Interrogatories."
12        Have you ever seen this before?
13   A    Yeah, I believe so.
14   Q    When?
15   A    I can't remember.
16   Q    So how do you know if you've seen it
17   before?
18   A    It look like something I've seen before.
19        Yeah, I believe I've seen this before.
20   Q    When?
21   A    I can't remember when.
22   Q    Was it recently?
23   A    I don't remember when I seen it.
24   Q    Take a look at the second to last page of
25   the document?

1          Brooks - Confidential
2    A    Page 19?
3    Q    Page 19.
4         You see the date there, April 6, 2018?
5    A    I see the date, yes.
6    Q    Do you know if you saw this document
7    before or after this date?
8    A    I don't -- I don't know.
9    Q    Is it possible?
10   A    I don't remember.
11   Q    It's possible that you saw it for the
12   first time after this date?
13   A    Yeah, it's possible.  I can't remember
14   reading it or nothing.
15   Q    You don't remember reading information in
16   this document?
17   A    No.
18   Q    So to the extent there are questions here
19   that ask for information, did you provide the
20   information in these answers?
21   A    Yes.
22   Q    How do you know that?
23        If you haven't -- if you haven't read it,
24   how do you know that you provided the
25   information in the answers?

1          Brooks - Confidential
2    A    Okay.  Rephrase the question, please, sir.
3        Say that again.
4    Q    I asked you if you read this document and
5    you said no.
6    A    No, I --
7    Q    And then my question -- then I asked you
8    if you read the answers, and you said no.  And
9    then I said how --
10        MR. SEIDENFELD:  Actually, could you read
11   back my last question.
12        (Record read.)
13   A    I know that I probably -- I didn't read it
14   in its totality, I'm sure.  I probably briefed
15   over it, so . . .
16   Q    What do you mean, "briefed over it"?
17   A    Just skimmed through it.
18   Q    So you didn't read every single answer to
19   these -- to the questions that are in this
20   document?
21   A    No, I didn't read everything on this
22   document.  No, I did not.
23        MR. SEIDENFELD:  We're going to go off the
24   record.
25        (Recess taken.)

Page 270

Brooks - Confidential

1    Brooks - Confidential
2  BY MR. SEIDENFELD:
3    Q   Mr. Cooper -- I'm really sorry.
4  Mr. Brooks, I apologize.
5       Mr. Brooks, you have a claim in this
6  litigation, sir, claiming -- alleging sexual
7  harassment; is that correct?
8    A   Did you just ask me if I have a claim
9  against sexual harassment --
10   Q   You have a claim of sexual harassment,
11 correct?
12   A   Yes.
13   Q   Other than the incidents we discussed
14 involving Mr. Cooper, is there anything else
15 that supports your -- any other facts -- do you
16 have any other facts to support your claim of
17 sexual harassment?
18   A   Just the recordings that I produced.
19   Q   Other than the incidents with Mr. Cooper
20 on July 21, 2016, you don't allege that you
21 were sexually harassed in any other way?
22   A   By anyone else, you mean?
23   Q   By anyone else, certainly, yes.
24   A   No, I don't.
25   Q   What, if anything -- what about -- did

Page 271

Brooks - Confidential

1    Brooks - Confidential
2  Mr. -- do you allege that Mr. Cooper did
3  anything other than what we discussed that
4  constituted sexual harassment?
5    A   No.
6    Q   Before we spoke briefly about your
7  allegations of retaliation.  You mentioned some
8  names and some facts that you believe were
9  retaliatory.
10      For Mr. Matthews, what facts do you have
11 to support the claim that he retaliated against
12 you?
13   A   A recording where Eric stated that.
14   Q   And what's the basis that that was based
15 on retaliation?
16   A   I had been doing everything I was supposed
17 to do in the program, and I had been following
18 all the rules and guidelines set up for me
19 while living in the Gates Avenue facility.
20 They had no reason to punish me.
21   Q   So just your opinion?
22   A   That's a fact.
23   Q   I'm asking -- no, no, no.  I'm not
24 asking you about what happened.
25      I'm asking you what facts support the

Page 272

Brooks - Confidential

1       Brooks - Confidential
2  claim that what you said happened was based on
3  retaliation?
4    A   I told you the recordings that I have with
5  other staff members saying that what they were
6  doing to me was abnormal.  It's something
7  that's not done.  And it's something that my
8  hand didn't call for.  And it wasn't just Eric,
9  it was also Mr. Bell, who was also a
10 supervisor.  He took over from Mr. Cooper's
11 position as the dispatch supervisor.  And he
12 apologized to me because he knew that they were
13 retaliating against me.
14      And I got that on record as well.
15   Q   How did Mr. Bell know what happened
16 between you and Mr. Cooper?
17   A   I don't know how he knew.  I don't know
18 how he knew or if he knew that something was
19 going on with Mr. Cooper.
20      But what I do know is he knew people were
21 doing things to me that my hand didn't call
22 for, and he apologized to me for it.
23   Q   So you don't know if Mr. Bell knew about
24 what happened between you and Mr. Cooper?
25   A   I never discussed it with him.

Page 273

Brooks - Confidential

1       Brooks - Confidential
2    Q   Okay.  Do you know if Mr. Matthews knows
3  about what happened between you and Mr. Cooper?
4    A   I believe so.
5    Q   And what's the basis for that opinion?
6    A   What's the basis of that opinion, is
7  after -- prior to this situation, I didn't have
8  any problems with any of the staff.
9       After the situation it was a hostile
10 situation with all of the staff.  And I never
11 had no personal disagreements with anyone.
12   Q   You don't know for a fact that
13 Mr. Matthews knew about the incident between
14 you and Mr. Cooper?
15   A   I never told him.
16   Q   And you don't know if anyone else told
17 him?
18   A   I was never there to witness someone tell
19 him.  But I feel that he did --
20   Q   And that's just your opinion?
21   A   I'm quite sure they did.
22      I mean, he's administration staff.  I had
23 dudes in the work crew that knew something
24 happened.  So I'm quite sure Mr. Matthews knew.
25   Q   You don't have any factual basis for that?

Page 274

Brooks - Confidential

1
2    A   I never witnessed somebody tell him, and I
3    never told him myself.
4    Q   How about Eric, head of security; do you
5    know if he knew about the allegations of the
6    incident between you and Mr. Cooper?
7    A   I believe he knew.
8    Q   How -- why do you believe that?
9    A   Based on how he was treating me.  He was
10   also hostile towards me and he threatened to
11   call the police on me.  And I never had a
12   problem with him before.  I didn't disrespect
13   him.  I wasn't loud or boisterous towards him.
14   Q   But you never told him?
15   A   Did I ever tell him about the incident?
16   Q   Mm-hmm.
17   A   I never told him about the incident, no.
18   Q   Did you ever witness anyone tell him?
19   A   No.
20   Q   Do you know if O'Neil Young was aware of
21   the allegations -- strike that.
22      Do you know if O'Neil Young knows about
23   the allegations you made concerning you and
24   Mr. Cooper?
25   A   I don't know.

Page 275

Brooks - Confidential

1
2    Q   Did you ever tell him?
3    A   I never told him.
4    Q   Did you ever see anyone tell him?
5    A   No, I did not.
6    Q   Do you know if Ronald Holly knows about
7    your allegations regarding Mr. Cooper?
8    A   I believe that he did.
9    Q   Did you ever tell him?
10   A   No, I did not.
11   Q   Did you ever witness anyone tell him?
12   A   No, I did not.
13   Q   Do -- it's only your opinion that you are
14   basing that belief on?
15   A   Not just opinion.  The evidence is in the
16   way they were treating me.  They were treating
17   me in a hostile nature after the incident.
18   Before the incident I didn't have a problem
19   with any of these gentlemen at all.
20   Q   But you don't know for sure if he knew?
21   A   I never witnessed it.
22   Q   Do you know if Mr. Wiggins knows about the
23   allegations between and you Mr. Cooper?
24   A   I believe so.
25   Q   And did you tell him?

Page 276

Brooks - Confidential

1
2    A   No, I did not tell him.
3    Q   Did you ever witness anyone tell him?
4    A   No.
5    Q   What do you base the belief on?
6    A   His treatment of me.  His hostile behavior
7    towards me.  His, you know, indirect threats of
8    violence.
9    Q   What's your belief that you alleged that
10   those threats are based on retaliation?
11   A   Because I did not know the man prior to
12   this.  I never met him.  I never seen him
13   before.  There was no reason for him to be
14   hostile with me.
15   Q   So you didn't interact with Wiggins before
16   of the incident with Cooper?
17   A   No, I did not.
18   Q   Did you interact with Ronald Holly before
19   the incident with Mr. Cooper?
20   A   Yes.
21   Q   Did you interact with O'Neil Young before
22   the incident with Cooper?
23   A   No.
24   Q   Did you interact with Eric before the
25   incident with Mr. Cooper?

Page 277

Brooks - Confidential

1
2    A   Yes.
3    Q   Did you interact with Mr. Matthews before
4    the incident with Cooper?
5    A   Yes.
6    Q   Did Mr. Stevens know about the allegations
7    you made against Mr. Cooper?
8    A   I believe so.
9    Q   Did you ever tell him?
10   A   No, I did not.
11   Q   Did you ever see anyone tell him?
12   A   No, I did not.
13   Q   What's the basis of your belief he knew?
14   A   Because he was hostile towards me as well.
15   Q   And you told Mr. Washington about the
16   incident between you and Mr. Cooper, correct?
17   A   Yeah.
18   Q   What facts do you have to support your
19   claim that Mr. Washington retaliated against
20   you based on the fact that you told him about
21   the incident with Mr. Cooper?
22   A   Like I addressed earlier, I would ask him
23   for permission to stay out late or to have a
24   home pass, and he would give me permission.
25   Then when I came back, I was in trouble.  And I

Page 278

1           Brooks - Confidential
2  was punished for it.
3  Q   How were you punished?
4  A   I told you that earlier.  I was made to
5  sit in a room and wait for hours before I was
6  able to get in my bed or go to the room.
7       MR. SEIDENFELD:  I think we're going to
8  finish for today.
9       MR. BARTOLOMEO:  I'd like to at least put
10  on the record that on behalf of
11  Defendant Cooper, we are reserving our right to
12  call the witness back to complete the
13  deposition, or at least to take the deposition
14  of the witness pursuant to the federal rules.
15       MR. SEIDENFELD:  And we reserve the right
16  to bring Mr. Brooks back for the remainder of
17  the time that we have under the rules.
18       MR. BARTOLOMEO:  And can we just -- can
19  you just go off the record for a second.
20       (Discussion off the record.).
21       MR. SEIDENFELD:  The interrogatories that
22  we introduced today as Exhibit 9 are not
23  verified.  We had asked Mr. Brooks' counsel to
24  verify them today, and she responded that they
25  would not able -- that Mr. Brooks would not be

Page 279

1           Brooks - Confidential
2  able to review and verify them today, and has
3  committed to get them to us at a subsequent
4  time.
5       Ms. O'Connell, can you tell us when you
6  can get them done by?
7       MS. O'CONNELL:  We will get them to you by
8  next Friday, at the latest, which is the 15th.
9       MR. BARTOLOMEO:  And I'm sorry.  I don't
10  mean to cut you off.
11       And to the extent that there's any changes
12  in what we have already received, I'd like to
13  also reserve our rights to come back and call
14  the witness back just based on those grounds
15  alone, to ask questions about the differences
16  in the interrogatory answers.
17       (Continued on the following page to
18  include jurat.)
19
20
21
22
23
24
25

Page 280

1           Brooks - Confidential
2       MS. O'CONNELL:  And plaintiff reserves the
3  right to review the deposition transcript,
4  which I believe would be provided before the
5  next deposition?
6       MR. BARTOLOMEO:  No, I'm objecting to
7  that.
8       MR. SEIDENFELD:  Object to that.
9       Okay, we're off.
10       (Time noted:  6:33 p.m.)
11
12       _____
13            GREGORY BROOKS
14  Subscribed and sworn to before me
15  this _____ day of _____, 2018.
16
17  _____
18
19
20
21
22
23
24
25

Page 281

1
2            C E R T I F I C A T E
3  STATE OF NEW YORK    )
4                       :ss
5  COUNTY OF NEW YORK   )
6
7       I, MICHELLE COX, a Notary Public within
8  and for the State of New York, do hereby
9  certify:
10       That GREGORY BROOKS, the witness whose
11  deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
13  record of the testimony given by the witness.
14       I further certify that I am not related to
15  any of the parties to this action by blood or
16  marriage, and that I am in no way interested in
17  the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto set my
19  hand this 21st day of June 2018.
20
21       _____
22            MICHELLE COX, CLR
23
24
25

71 (Pages 278 to 281)

Page 282

```
1
2                        INDEX
3    WITNESS         EXAMINATION BY      PAGE
4    GREGORY BROOKS    MR. SEIDENFELD        5
5
6
7                      EXHIBITS
8    DEPOSITION  EXHIBITS           FOR ID.
9    Exhibit 1   Letter dated August 3, 2017   102
                 from Stephen Reich to Derek
10               Smith
11   Exhibit 2   Document Bates-stamped TDF   130
                 00001 through TDF000004
12
     Exhibit 3   Document Entitled "Complaint"  154
13
     Exhibit 4   Document Entitled "Community   164
14               Improvement Project, Field
                 Schedule"
15
     Exhibit 5   Document Entitled "Work -      167
16               Gregory Brooks - Client
                 Tracking Database"
17
     Exhibit 6   File Entitled "Terry"         211
18
     Exhibit 7   File Entitled "Terry 2"       220
19
     Exhibit 8   Document Entitled "Complaint"  233
20
     Exhibit 9   Document Entitled Plaintiff's  267
21               Responses and Objections to
                 Defendants' First Set of
22               Interrogatories"
23
24
25
```

Page 283

```
1    NAME OF CASE:
2    DATE OF DEPOSITION:
3    NAME OF WITNESS:
4    Reason Codes:
5        1. To clarify the record.
6        2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
                    _____
25
```

TSG Reporting - Worldwide - 877-702-9580

CONFIDENTIAL

Page 284

1

2                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK

3

4    GREGORY BROOKS,                    )
                                        )
5         Plaintiff,                    )
                                        )
6           vs.                         ) Case No. 17-3626
                                        )
7    THE DOE FUND, INC., TERRY          )
     COOPER individually and in his)
8    official capacity, JAMES           )
     WASHINGTON individually and in)
9    his official capacity, and     )
     ANTHONY WIGGINS individually   )
10   and in his official capacity, )
                                        )
11        Defendants.                   )
     ------------------------------)

12

13

14

15

16

17       CONFIDENTIAL DEPOSITION OF GREGORY BROOKS
18                New York, New York
19               Friday, June 15, 2018
20

21

22

23

24   Reported by:
     MICHELLE COX
25   JOB NO. 144395

CONFIDENTIAL

Page 285

June 15, 2018
10:29 a.m.

Confidential Deposition of GREGORY
BROOKS, held at the offices of Jackson Lewis
666 Third Avenue, New York, New York,
pursuant to Notice, before Michelle Cox, a
Certified LiveNote Reporter and Notary Public
of the State of New York and New Jersey.

Page 286

A P P E A R A N C E S :

    DEREK SMITH LAW GROUP
    Attorneys for Plaintiff
        1 Pennsylvania Plaza
        New York, New York 10119
    BY:   KELLY O'CONNELL, ESQ.

    JACKSON LEWIS
    Attorneys for The Doe Fund and
    James Washington
        666 Third Avenue
        New York, New York 10017
    BY:    STEVEN SEIDENFELD, ESQ.
        LORI BAUER, ESQ.

    LEWIS BRISBOIS
    Attorneys for Terry Cooper
        77 Water Street
        New York, New York 10005
    BY:   BRADLEY BARTOLOMEO, ESQ.

ALSO PRESENT:  Eunice Gilmore

Page 287

        IT IS HEREBY STIPULATED AND AGREED by and
between the attorneys for the respective
parties herein, that filing and sealing be and
the same are hereby waived.
        IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question, shall be reserved to the time of the
trial.
        IT IS FURTHER STIPULATED AND AGREED that
the within deposition may be sworn to and
signed before any officer authorized to
administer an oath, with the same force and
effect as if signed and sworn to before the
Court.

Page 288

                    Brooks
G R E G O R Y  B R O O K S, called as a witness,
having been duly sworn by a Notary Public, was
examined and testified as follows:
EXAMINATION BY
MR. BARTOLOMEO:
    Q   Good morning, Mr. Brooks.
        My name is Bard Bartolomeo.  We met the --
last week.  I guess it was under a week ago, in
connection with this matter that you've brought
against the Doe Fund and my client,
Mr. Terry Cooper.  I'm from the law firm of
Lewis Brisbois.
        And if you recall last time, my colleague,
Mr. Seldenfeld, gave instruction to you about
the conduct and also the rules regarding the
deposition.
        Do you recall him giving you those
instructions?
    A   Yes.
    Q   I'll just briefly go over them so it's
clear for today's purposes, and clear for
record.
        I'm happy to accommodate you with a break
at any time.  If you need to take a break, just

CONFIDENTIAL

Page 289

Brooks

1
2   please -- just understand that if I pose a
3   question to you, you have to answer the
4   question first before we can take a break.
5        Again, please keep all your testimony
6   oral.  The court reporter can't take down a nod
7   of the head or any head gestures.  So to the
8   extent that you, you know, do nod your head in
9   response to an answer, what I will ask you to
10  do is to please verbalize it.
11       Do you understand?
12  A   Yes, I understand.
13  Q   Okay.  Great.  Also, I'd just ask, many
14  times you may be able to anticipate what the
15  rest of my question is going to be.  Before you
16  go ahead and answer, just please hear out the
17  entire question.  The reason why is because the
18  court reporter is only able to take down one
19  person's statement at a time.
20       So if you would just please wait until the
21  end of the question, and when it's finished,
22  and then you can go ahead and answer.
23       Do you understand?
24  A   Yes, I understand.
25  Q   And last time we had asked you, or at

Page 290

Brooks

1
2   least asked you if you had -- excuse me -- been
3   recording the proceedings.
4        Are you recording the proceedings today?
5   A   No.
6   Q   I'm just going to ask that you don't.  And
7   then should you decide to do so, please do let
8   us know.
9        So since your deposition on June 7th, have
10  you reviewed any documents in connection with
11  this matter?
12  A   Yes.
13  Q   And can you please tell me.
14  A   Interrogatory.
15  Q   Interrogatories, the legal document which
16  asked you questions and you explained some
17  answers?
18  A   Yes.
19  Q   Anything else other than your
20  interrogatory responses?
21  A   No.
22  Q   And did you -- in your interrogatory
23  responses, did you sign any verification page
24  to authentic or indicate that those answers
25  were accurate?

Page 291

Brooks

1
2   A   Yes.
3        MR. BARTOLOMEO:  Okay.  And I'd just ask
4   that, Counsel, when you have an opportunity, to
5   furnish us with a copy of that verification
6   page.
7        MS. O'CONNELL:  I have two copies.  I just
8   need the signed one back because he signed it
9   today.
10       MR. BARTOLOMEO:  That's fine.  I'm sure we
11  can make a copy of that during a break.
12  BY MR. BARTOLOMEO:
13  Q   And I guess, you know, I'm going to ask
14  you this, Mr. Brooks:  Was there any changes
15  that you made to the interrogatories after you
16  read them?
17  A   Additions.
18  Q   Additions.
19       MR. BARTOLOMEO:  And have you now served
20  on us interrogatories that reflect additional
21  changes or additions to what was included?
22       And I'm asking this of counsel.
23       MS. O'CONNELL:  Yes.  I believe there was
24  three or four.  None of them after Question 5.
25       MR. BARTOLOMEO:  Okay.  So if you would

Page 292

Brooks

1
2   give us -- I'm sorry.  I'm going to go off the
3   record.
4        (Discussion off the record.)
5   BY MR. BARTOLOMEO:
6   Q   Mr. Brooks, you just did sign the
7   interrogatories during a break.  My colleague
8   and I will have a chance to review them and
9   then ask you questions about them later.
10       Other than the interrogatories, have you
11  reviewed any documents since the last time we
12  met?
13  A   No.
14  Q   If you wouldn't mind just speaking up.
15  A   No.
16  Q   I'm a little hard of hearing.
17  A   No.
18  Q   Did you have an opportunity to review your
19  transcript from the deposition on June 7th?
20  A   No.
21  Q   Other than any conversations that you may
22  have had with your attorney or attorneys from
23  her office, did you speak to anybody else about
24  the testimony that you gave at your deposition
25  on June 7th?

CONFIDENTIAL

Page 293

Brooks

1
2    A    No.
3    Q    Did you listen to any of the audio
4    recordings that are related to this lawsuit
5    since your last deposition?
6    A    No.
7    Q    Would you please just describe
8    Terry Cooper for me.
9         When did you guys first meet?
10   A    I first seen him my first day going to The
11   Doe Fund.
12   Q    And what does he look like in terms of
13   physical appearance?
14        Can you just describe him, generally.
15   A    Maybe 6'3", 6'4", something like that.
16   I'm not good with height, but he's taller than
17   me.  Maybe 300 pounds or more.  Light
18   complexion.  Kind of overweight.
19   Q    When you say "light complexion," is he
20   Caucasian, White, Black, Hispanic, something
21   else?
22   A    I don't know what he is.  He's not
23   Caucasian, though.
24   Q    Do you know if he's African-American?
25   A    No.

Page 294

Brooks

1
2    Q    Would you describe him as an outgoing
3    person?
4    A    I don't know him personally.
5    Q    You don't -- withdrawn.
6         On a general, if you can approximate, you
7    know, how much time did you spend with
8    Mr. Cooper before the incident that you allege
9    happened on the 21st?
10   A    Not much time.  I briefly had to speak to
11   him a couple of times about the schedule.
12   Other than that, not much time at all.
13   Q    I just want to turn your attention to the
14   time period we were talking about last time.
15   You gave a pretty detailed history of your
16   incarceration history.  I believe that you
17   testified that you had been in prison or in
18   jail, off and on, for about 15 years; is that
19   correct?
20   A    Yes.
21   Q    Do you recall giving that testimony last
22   week?
23   A    Yes, that's about right.
24   Q    I'm asking if you recall giving that
25   testimony?

Page 295

Brooks

1
2    A    Yeah, I do.
3    Q    Did there ever come a time when you were
4    incarcerated that you became aware of inmates
5    engaging in homosexual activities?
6    A    Yeah.
7    Q    And when was the first time during your
8    incarceration history that you became aware of
9    such activities?
10   A    I heard about it.  There's always whispers
11   about what's going on, but I don't know because
12   I don't deal with that.
13   Q    When you say "you don't deal what that,"
14   what do you mean?
15   A    I don't get involved with what other
16   people are doing in prison.  I mean, you hear
17   about it, it's like gossip in the Street.  But
18   I don't get involved.  I don't ask about it.
19   It's none of my business.
20   Q    When you say you don't get involved with
21   what other people are doing in prison, are you
22   saying you didn't get involved with anybody in
23   you kept to yourself the entire time you were
24   in prison over the 15 years?
25   A    I had a few people that I socialized with.

Page 296

Brooks

1
2    Q    How --
3    A    I --
4    Q    I'm sorry.  I didn't let you finish.  Go
5    right ahead.
6    A    Yeah, on my last sentence I had a friend
7    or two that I socialized with.
8         But prior to that I used to gangbang, so I
9    had a lot of brothers, and I socialized with
10   them as well.
11   Q    Were any of those individuals gay, any of
12   the people that you socialized with?
13   A    No.
14   Q    And how are openly gay men treated in
15   prison?
16        When I say "openly gay," I mean those that
17   were known to people in prison as being gay?
18   A    Different times different situations.
19   Q    What do you mean by "different times
20   different situations"?
21   A    A long time ago, they couldn't be in a
22   regular population.
23   Q    And why was that?
24   A    Because they would get assaulted.
25   Q    When you say "a long time ago," about

CONFIDENTIAL

Page 297

Brooks

1
2  approximately how many years ago are you
3  talking about?
4  A   Around '94, '95, '96.
5  Q   '94 through '96, around then?
6  A   Yes.
7  Q   And did there come a time when that
8  changed?
9  A   Yup.
10  Q   When did that change?
11  A   I don't know. I don't know when it
12  changed. But I know the last time when I went
13  to prison, homosexual was in general
14  population, which I had never seen before.
15  Q   Okay. And that was for which stay, for
16  approximately how many years did you live in a
17  situation or in a prison or a jail where
18  homosexuals were part of the general
19  population?
20  A   The last time I went to prison.
21  Q   Right.
22     So for how many years during your
23  incarceration history did you stay in a jail or
24  prison that had homosexuals as part of the
25  general population?

Page 298

Brooks

1
2  A   About four.
3  Q   Did you ever see -- withdrawn.
4     When you say that homosexual would have
5  been assaulted, what do you mean by that?
6  A   It's just like people being put under
7  protective custody. They were not allowed in
8  regular, general population, because it was
9  looked down upon.
10     So just like people that's being convicted
11  of rape, if you go to prison and you go to
12  regular population, you get assaulted.
13     If you did something to a child, and you
14  go to prison and you go to regular population,
15  you get assaulted. That's just what my
16  experience has been in prison.
17  Q   Okay. And I understand, and I think my
18  question was a little bit different.
19     When you say "assaulted," can you describe
20  what an assault is in the terms that you're
21  using?
22  A   Assaulted, that's just from what I know,
23  what I heard of. I didn't personally get
24  involved with that type of stuff. I just heard
25  about it.

Page 299

Brooks

1
2  Q   What I'm asking you to describe is
3  actually when you say "assault," what kind of
4  behavior are you talking about?
5     Like, you know, I'd like you to define the
6  term "assault"?
7     MS. O'CONNELL: Objection.
8     You can answer.
9  A   Beat up, jumped, cut, stabbed, stuff like
10  that.
11  Q   If somebody -- if a homosexual tried to
12  engage a person who was not a homosexual while
13  they were in prison, what would happen to them,
14  if anything?
15  A   I don't know. That's -- I don't know what
16  other people do.
17  Q   When you said you were gangbanging, you
18  said there was a number of people you
19  associated with.
20     Were you aware of any of those individuals
21  assaulting a homosexual man for engaging in
22  homosexual activities?
23  A   No.
24  Q   Did you ever see anyone in prison assault
25  a homosexual man?

Page 300

Brooks

1
2  A   I did.
3  Q   And can you describe that situation for
4  me.
5  A   Yeah, I remember they brought a homosexual
6  to one of the galleries that I was on. I
7  didn't actually see it, but I know what
8  happened, because I was locked into a pin
9  myself. The guy got cut.
10  Q   When you say, "the guy got cut," what do
11  you mean?
12  A   He got cut.
13  Q   Like did he get stabbed -- withdrawn.
14     Where did he get cut?
15  A   I believe he got cut in his face. I saw
16  the blood, but I didn't see the actual assault.
17  Q   What is your understanding about what the
18  reason was for assaulting him?
19  A   I don't know. I wasn't -- I didn't talk
20  about it. I just knew that dude was gay and he
21  got cut.
22     But I don't know if they had a particular
23  history with each other. I don't know.
24  Q   Were there individuals in prison or in
25  jail who were not openly gay; meaning, known to

CONFIDENTIAL

## Page 301

Brooks
1
2   the population, but who did engage in
3   homosexual activities?
4       MS. O'CONNELL:  Objection.
5   A   I assume so.  I don't know.
6   Q   Did there ever come a time when someone
7   attempted to engage you in homosexual activity
8   while you were incarcerated?
9   A   No.
10  Q   Did you ever proposition any individual to
11  engage in homosexual activity when you were in
12  prison?
13  A   No.
14  Q   And I know you're laughing?
15      But why is it funny, Mr. Brooks?
16  A   Because I'm not a homosexual.
17  Q   Had somebody attempted to engage you or
18  proposition you to engage in homosexual
19  activity, how would you have responded?
20  A   I don't know how I would respond.  It got
21  to happen.  When it happened, then I'll
22  respond.  I don't know.
23  Q   Sitting here today, if someone approached
24  you and tried to engage you or proposition you
25  in homosexual activity, how would you respond?

## Page 302

Brooks
1
2   A   I don't know.
3   Q   Whiling you were on the street or out of
4   prison, rather, or jail, did anyone ever try to
5   proposition you and engage in homosexual
6   activity?
7   A   Are you talking about before this
8   incident?
9   Q   Before this incident, you're alleged
10  incident that occurred with Mr. Cooper, did
11  anybody before that ever try to engage you in
12  homosexual activity?
13  A   No.
14  Q   Did you ever assault anybody for
15  participating in homosexual activity?
16  A   No.
17  Q   Do you have any friends that are gay?
18  A   No.
19  Q   And why is that?
20  A   I have a very small circle of friends.  I
21  have family members that's gay.
22  Q   And how many family members do you have
23  that's gay?
24  A   Several.
25  Q   Do you talk to them?

## Page 303

Brooks
1
2   A   Yeah.
3   Q   And what's your general opinion about
4   those individuals?
5   A   What?
6   Q   What is your general opinion about those
7   individuals?
8   A   I don't have a general opinion about my
9   family.  They are my family.  I love them,
10  period.
11  Q   Okay.  So you said there are several.
12      Can you tell me exactly how many family
13  members that you know that are gay?
14  A   From what I could remember, off the top of
15  my head, six.
16  Q   And have any of those family members ever
17  tried to engage you in homosexual activity with
18  them?
19  A   No.
20  Q   Of these six individuals, how many of them
21  are men?
22  A   One.
23  Q   Do you get along with that individual, the
24  man?
25  A   Yeah.

## Page 304

Brooks
1
2   Q   And when was the last time you spoke to
3   that gay relative, the male gay relative?
4   A   Couple of months ago.
5   Q   During the time you were incarcerated,
6   were you ever charged with any additional
7   crimes?
8   A   What?
9       Say that again.
10  Q   Sure.
11      While -- during the 15 years you were in
12  prison or jail, was there ever a time that you
13  were charged with additional crimes while you
14  were incarcerated?
15  A   While I was incarcerated, yes.
16  Q   What were those crime?
17  A   Assault.
18  Q   Other than the assault -- withdrawn.
19      Is the assault that you're just referring
20  to now, the one that happened in the yard where
21  you ended up in solitary confinement for five
22  years after?
23  A   No.
24  Q   Okay.  So when was the first
25  time -- withdrawn.

CONFIDENTIAL

Page 305

Brooks

1
2         How many times were you charged with
3  assault while you were in prison?
4     A   I don't know, maybe three times.
5     Q   And when was the most recent time that you
6  were charged with assault?
7     A   I can't remember.
8     Q   If you can just give me an approximate
9  date, as in the year, that would be helpful.
10    A   Maybe 2007, 2008.
11    Q   And which prison were you in at that time?
12    A   I was in Rikers island.
13    Q   Can you describe for me the incident that
14  led to you being charged with assault while you
15  were in Rikers in 2007, 2008.
16    A   Describe to you the incident?
17    Q   Yeah, tell me what happened.
18    A   Me and the CO was not seeing eye to eye.
19  So we had a fight, and I got charged with it.
20    Q   When you say "CO," do you mean corrections
21  officer or correctional officer?
22    A   Yeah, I mean correction officer.
23    Q   And that would be somebody who would be
24  considered your supervisor?
25    A   Was my supervisor?  My supervisor?

Page 306

Brooks

1
2     Q   Yeah.  Somebody who is in a position of
3  authority, let's put it that way.
4         A correction officer is somebody who is in
5  a position of authority in jail.
6         MS. O'CONNELL:  Objection.
7     A   I guess.
8     Q   I'll make it easier for you, Mr. Brooks.
9         If a correction officer tells you to do
10  something, do you have to do it, while you're
11  in prison?
12    A   I guess.  That depends.  That depend on
13  what they are telling you to do.
14    Q   And when you say you were not seeing eye
15  to eye with this correction officer, what were
16  you not seeing eye to eye about?
17    A   Well -- well, let me see how did this
18  situation happen.
19        It was more complex than that.  One of my
20  brothers I was gangbanging at the time, one of
21  my brothers got violated by a correctional
22  officer.  And he called to me and told me about
23  it over the gate, and I told him all right.
24        When the correctional officer came to my
25  cell, I gave him what I -- he was a new officer

Page 307

Brooks

1
2  on my tier.  So he didn't know what I got to
3  eat.  So I told him what I got to eat.  He
4  didn't bring it and so we had a fight.
5     Q   And when you said one of your brothers was
6  "violated" by a correctional officer, what do
7  you mean by that?
8     A   That's what he told me.  He said the
9  officer violated him.  They brought him to an
10  isolation cell, and what he explained to me is
11  for no reason they brought him to an isolation
12  cell.
13    Q   What was your understanding of what
14  "violated" mean?
15    A   They did something unjust and unfair to
16  him.
17    Q   And is that something unjust and unfair,
18  other than bringing him to an isolation cell,
19  or he was describing the fact that he was
20  brought to an isolation cell was something
21  unfair and unjust?
22    A   Yeah.  For no reason.
23    Q   And am I correct in understanding that
24  because he was brought into an isolation cell,
25  you took it upon yourself to get into an

Page 308

Brooks

1
2  argument that lead to an assault charge with a
3  corrections officer?
4     A   Yes, that's exactly what happened.
5     Q   Okay.  And was it your understanding that
6  anything else happened to that brother of yours
7  while he was in that isolation cell that was
8  caused by any of the corrections officers?
9         MS. O'CONNELL:  Objection.
10    Q   Do you understand my question?
11    A   No, I do not.
12    Q   Okay.  Did he say to you anything else
13  other than the fact that he was brought into an
14  isolation cell?
15        For example, did they injure him; did they
16  not provide him food.  I don't know.  I'm
17  speculating.
18        Anything else other than bringing him to
19  an isolation cell that caused him to say he was
20  being violated?
21    A   I don't know.  I didn't ask.
22    Q   You also testified -- withdrawn.
23        The charge that was brought against you in
24  connection with that particular incident, were
25  you convicted of that charge?

CONFIDENTIAL

Page 309

Brooks

1
2   A   No, I was do not.
3   Q   Were you convicted of any additional
4   charges while you were in prison or in jail?
5   A   No, I was not.
6   Q   And the other assaults, you said there
7   were approximately three, the one before that
8   one, when did that occur?
9   A   I really don't know.  That's the last one
10  that I remember.  I really don't know the
11  others.  It was earlier.  I can't remember.
12  Q   What was the -- what led to that assault
13  charge?
14  A   I don't know.  I can't remember.
15  Q   And the one that you did just describe
16  that you do in 2007, 2008, what -- did you
17  physically injure that corrections officer?
18  A   I don't know.
19  Q   What was told to you about why you were
20  being charged with assault?
21  A   Why I was being charged with assault?
22  Q   Yes, why were you charged with assault
23  during that incident?
24  A   Because I had a fight with a correction
25  officer.

Page 310

Brooks

1
2   Q   And when you say a "fight," what do you
3   mean by a "fight"?
4   A   A fistfight.
5   Q   And did you punch the ^corrections
6   officer?
7   A   I did.
8   Q   And how many did you punch him?
9   A   I don't remember.
10  Q   Okay.  Do you know if there was blood?
11  A   I don't remember.  I don't recall seeing
12  any blood.
13  Q   Do you know if he had to receive any
14  medical care as a result of your fight?
15  A   I don't know.
16  Q   Did you have to receive any medical care
17  as a result of your fight?
18  A   They took me to the clinic.
19  Q   And did you receive care, medical care of
20  any kind?
21  A   I seen a nurse or whatever.
22  Q   Okay.  Did she administer any type of
23  treatment to you?
24  A   I don't know.  They probably gave me
25  Band-Aids or something.  I don't really

Page 311

Brooks

1
2   remember.
3   Q   You're ready to go, Mr. Brooks?
4   A   Give me a second.
5   Q   Last time --
6      MR. BARTOLOMEO:  Just go off the record
7   for one more second.
8   BY MR. BARTOLOMEO:
9   Q   Last time you testified that you had
10  received or brought to The Doe Fund a camera;
11  is that correct?
12  A   Yes.
13  Q   Do you recall giving that testimony,
14  Mr. Brooks?
15  A   Yes.
16  Q   What was the reason -- withdrawn.
17     Can you describe the camera?
18     What kind of camera was it?
19  A   A Canyon.
20  Q   Canyon, was it like a digital camera?
21  A   Yeah, a Canyon T3I.
22  Q   And who -- did it save, like, the files
23  when you took a picture to a memory card of
24  sorts?
25  A   Say again.

Page 312

Brooks

1
2   Q   Where did it save the files?
3      When you took a picture, where was the
4   information of that picture saved?
5   A   Yeah, on a memory card.
6   Q   And where is that memory card today?
7      Does your attorney have it?
8   A   No.
9   Q   Do you still have it?
10  A   Yes.
11  Q   Are the pictures that you provided to your
12  attorney and which she's provided to us, excuse
13  me, not the pictures -- withdrawn.
14     What did you use that camera for in terms
15  of -- related to this litigation?
16  A   I used the camera to bluff The Doe Fund
17  employees into getting a written confession out
18  of Terry.  That's why I used the camera.
19  Q   Did you take any pictures, video or audio
20  recordings with that camera that are related to
21  this litigation?
22  A   No, I did not.  I did that with my phone.
23  Q   Where did you get the camera from?
24  A   I bought it.
25  Q   And when did you buy the camera; was it

Page 313

Brooks

1
2  before or after the alleged incident with
3  Mr. Cooper?
4     A   It was before.
5     Q   And why would you have bought the camera
6  before the alleged incident with Mr. Cooper?
7     A   Because I shoot and edit videos.
8     Q   What kind of videos do you shoot and edit?
9     A   Things that have to do with my business,
10  my books.
11    Q   Did you ever shoot and edit videos of
12  anybody who was a participant -- excuse me, was
13  a client of The Doe Fund?
14    A   No, not that I recall.
15    Q   And you said that you recorded any of the
16  videos and audio recordings related to
17  litigation on your phone; is that correct?
18    A   Yes.
19    Q   And does your phone -- withdrawn.
20        What kind of phone did you use at that
21  time?
22    A   I think it was an LG.
23    Q   And did the phone save the videos and
24  audio clips, excuse me, to a memory card?
25    A   I think so.

Page 314

Brooks

1
2     Q   Where is that phone today?
3     A   I lost it.
4     Q   When did you lose that phone?
5     A   A year or so ago.
6     Q   And how did you get the files, the audio
7  files off that phone?
8     A   I saved it to my computer.
9     Q   Do you still have that computer?
10    A   Yes, I do.
11    Q   And do you still have the original folder
12  or place on your computer where you saved those
13  files?
14    A   My computer is broken right now.
15    Q   That's not my question, Mr. Brooks.
16    A   So I can't get in it.  So I don't know.  I
17  can't answer that question.
18    Q   The last time that you were able to use
19  your computer, were the files still on your
20  computer?
21    A   As far as I can remember.
22    Q   I'm going to ask you just to hold on to
23  that computer, not to throw it away.  If you'd
24  like, you can give it to your attorney, at some
25  point; if I wanted to actually ask for a

Page 315

Brooks

1
2  forensic sort of sweep of the computer to get
3  those files, I'm going to put you on notice
4  that I'd like to do that.
5     Q   Who else has heard the audio files, other
6  than the individuals here?
7     A   Nobody.
8     Q   Did you ask any of the individuals who are
9  on those recordings for the permission to
10  record?
11    A   No.
12    Q   Other than what you had testified last
13  time about Mr. Cooper, if you didn't ask for
14  anyone's permission, did you tell them you were
15  taping?
16    A   No.
17    Q   Other than what you testified with respect
18  to Mr. Cooper, do you know if anybody else
19  suspected that you were taping them or
20  recording them at any time?
21    A   Say that again.
22    Q   Other than -- last time you testified that
23  you said that you suspected Mr. Cooper knew
24  that you were recording him; is that correct?
25    A   Yeah.

Page 316

Brooks

1
2     Q   Other than him, did any of the individuals
3  who appear on those audio recordings, do you
4  believe that they suspected you were taping
5  them?
6     A   No.
7     Q   So a number of these files that you
8  produced are timed and date stamped.
9        Do you know what I mean by that?
10    A   Yeah.
11    Q   And how do they get those stamps or
12  identification marks?
13    A   The phone does it on its own.
14    Q   If I were to tell you that some of the
15  audio files are not time and date stamped, what
16  would be your understanding of the reason why
17  that is?
18    A   I don't know.
19    Q   Did you record all of the audio files and
20  videos that you've produced in the course of
21  this litigation, did you record those all on
22  the same phone?
23    A   Maybe not.
24    Q   Where else would you have recorded it?
25    A   I had different phones at different times.

CONFIDENTIAL

Page 317

Brooks

1
2   Q   Okay.  So other than the LG that you've
3   already testified to, what other phones did you
4   use to record any videos or audios recordings,
5   excuse me, that's been produced in this
6   litigation?
7   A   An LG phone.  I was getting LG phones.  I
8   had two LG phones.
9   Q   Do you have either of those phones?
10  A   No.
11  Q   And what happened to the one that you
12  didn't lose?
13  A   The other one got broken and it got
14  misplaced.  I don't know what happened to it.
15  Q   You brought a number of different claims
16  in this lawsuit, Mr. Brooks.  I'm going to walk
17  you through some of them and ask what your
18  understanding is with respect to the
19  allegations that you've made.
20      Turning your attention back to Mr. Cooper,
21  what race is Mr. Cooper?
22  A   I don't know.
23  Q   If you were to take -- withdrawn.
24      If you were to use your best estimate or
25  your best understanding, what is your

Page 318

Brooks

1
2   understanding of what race he is?
3   A   Are you asking me to guess?
4   Q   I'm not asking to you guess.  I'm saying,
5   just based on your observations, what's your
6   understanding of what race he is?
7   A   I don't know.
8   Q   I know you don't know definitively.  But
9   I'm asking you what's your understanding --
10  A   I know he's not Caucasian.  And I'm not
11  going to guess.  I don't know what race he is.
12  Q   I'm not asking you to guess.
13  A   You are asking me to guess.
14  Q   No, Mr. Brooks.  I don't think I've used
15  the word.  And I don't think I've asked you to
16  guess.
17      I said what is your best understanding?
18      MS. O'CONNELL:  Objection.
19  A   He's a light-skinned --
20  Q   I'm asking you to give an educated --
21  A   I don't know --
22  Q   He's a light-skin what?
23  A   He's a light-skinned individual.
24  Q   Last time you testified about certain
25  instances that you believe you were

Page 319

Brooks

1
2   discriminated against because of your race.
3      In what ways do you claim Mr. Cooper
4   discriminated against you based of your race?
5   A   He knew I was in a vulnerable situation,
6   being homeless, being Black, coming home
7   from prison, being on parole, and he took
8   advantage of that.
9   Q   And I asked you in what sense do you
10  believe you were being discriminated,
11  specifically by Mr. Cooper, against you, based
12  on your race; what type of things did he do?
13      MS. O'CONNELL:  Objection.
14  A   He touched me.
15  Q   Other than the alleged -- the allegations
16  that you made with respect to any sort of
17  contact that Mr. Cooper, and you had with each
18  other, what else, if anything, do you claim
19  that he did or said that led you to believe
20  that he was discriminating against you based on
21  your race?
22      MS. O'CONNELL:  Objection.
23  A   He tried to use his position to violate
24  me.  He was trying to use, I guess, his
25  position, his superior position as a means to

Page 320

Brooks

1
2   get what he wanted.
3      He knew I needed my schedule changed, so
4   he kind of tried to use that over my head.
5      MR. BARTOLOMEO:  I'm going to move to
6   strike the last answer as nonresponsive.  And
7   I'll ask it again very clearly.
8   Q   Mr. Brooks, in what ways do you allege
9   Mr. Cooper discriminated against you based on
10  your race?
11      And I'll just ask that you listen to the
12  question and address that question
13  specifically.
14      MS. O'CONNELL:  Objection.
15  A   I believe he did what he did because I was
16  ^Black.
17  Q   And what did you say that he did.
18      Are you referring to the incident on the
19  21st?
20  A   Yeah, he used that as an intimidation
21  tactic.
22  Q   That you're Black as an intimidation
23  tactic?
24      I don't understand.  Can you clarify for
25  us.

Brooks

1
2    A   He did what he did because I was black, in
3    a vulnerable situation.  And he used everything
4    that he could to be intimidating.
5    Q   Okay.  And what facts do you have to
6    support that Mr. Cooper discriminated against
7    you based on your race?
8    A   What facts do I have?
9    Q   Yeah.
10       What facts do you have to support your
11   allegations that Mr. Cooper discriminated
12   against you based on your race?
13   A   Well, I got a bunch of recordings and
14   statements that I made immediately after the
15   situation, so . . .
16   Q   And what -- do you play in the
17   recordings -- withdrawn.
18      So can you tell us anyone who is a
19   different race than you that Mr. Cooper treated
20   more favorably?
21   A   I wasn't around him like that.  He was not
22   my peer.  I wasn't around him.  I only went to
23   him when I had to.
24   Q   So do you have any understanding that
25   Mr. Cooper treated anybody more favorably or

Brooks

1
2    less favorably who is not black?
3    A   I don't know.
4    Q   In what ways do you claim the audio
5    recordings support your allegation that
6    Mr. Cooper discriminated against you based on
7    your race?
8    A   Well, a lot of different people knew
9    Mr. Cooper's personality, and they described it
10   on those audio recordings.
11   Q   And I'm asking you specifically, you've
12   made a very severe or significant claim against
13   my client, Mr. Brooks.
14      And I just want to understand what do you
15   say supports your allegation that Mr. Cooper
16   discriminated against you based on your race,
17   what on those recordings.
18   A   I don't remember.  I haven't listened to
19   those audio recordings.  I've been trying to
20   put the audio recordings behind me.  I've been
21   trying not to think about it.
22      So I don't listen to it.
23   Q   When was the last time you listened to the
24   recordings, Mr. Brooks?
25   A   I don't remember.  I don't remember.

Brooks

1
2    Q   Is there anything on the video that you've
3    also produced in the course of this litigation
4    that supports your claim that Mr. Cooper
5    discriminated against you based on your race?
6    A   I don't -- I don't recall any video
7    or . . .
8    Q   And just so the record is clear, is it
9    your testimony, Mr. Brooks, that you don't have
10   any recollection of what's on those recordings?
11      MS. O'CONNELL:  Objection.
12   Q   And I mean, sitting here today, is it your
13   testimony that you currently have no
14   recollection of what's on those recordings?
15      MS. O'CONNELL:  Objection.
16   A   Nope.  No.
17   Q   No what?
18   A   No.
19   Q   No what?
20   A   I just don't know your specific question.
21   Q   You brought a lawsuit.  And are you --
22   just so I'm clear.  You brought a lawsuit
23   alleging discrimination among other
24   allegations.
25      Is it your testimony today that you don't

Brooks

1
2    know what facts you have or information you
3    have to support those allegations?
4       MS. O'CONNELL:  Objections.
5    A   No.  I know that I was touched by a man,
6    and it was not my will, and I got proof that
7    he's like that.  And I know that people that
8    was in The Doe Fund also experienced his
9    behavior, and that's what I recorded, period.
10   Q   And you've said now multiple times you
11   have "proof."
12      I'm just asking you to tell me what that
13   proof is.
14   A   That proof is that your client,
15   Mr. Cooper, walked around sexually harassing
16   people all day.  And he was well-known for it.
17   He did it for many years.
18      But me, he touched.  And other than that,
19   I don't know what you're asking me for.
20   Q   Okay.  Earlier today you've testified that
21   you really didn't spend very much time at all
22   with Mr. Cooper.  And I'm paraphrasing
23   obviously.  But that you really didn't interact
24   with him and you didn't see him much.
25      Do you recall giving that testimony?

CONFIDENTIAL

Page 325

Brooks

1
2   MS. O'CONNELL:  Objection.
3   A   I didn't tell you that I didn't see him
4   much.  I didn't hang out with him.  We wasn't
5   friends.  We didn't socialize.  When I had to
6   interact with him, which was very rare, it was
7   when I needed something.
8   Q   Okay.
9   A   When I needed something, that's it.  I
10   would see him around the building every day.
11   Yes, I seen him around the building every day.
12   I didn't interact with him every day, though.
13   Q   And who do you allege he also sexually
14   harassed other than yourself?
15   A   I don't know who he sexually harass.
16   Q   It is correct that you just did say,
17   Mr. Cooper -- you actually, said, I believe it
18   was my client, walked around sexually harassing
19   people all day.  And I'm paraphrasing again.
20   A   That's what I said.
21   Q   And I'm asking you now, since you said
22   that, who did he sexually harass other than
23   yourself?
24   A   I don't know everybody in The Doe Fund.  I
25   don't know everybody in The Doe Fund by name.

Page 326

Brooks

1
2   I didn't socialize with everybody in The Doe
3   Fund.
4        I wasn't keeping a score of everybody that
5   he was sexually harassing.  I was not doing
6   that.  But I heard him speaking to people all
7   the time and saying jokes and comments that
8   were sexual in nature.
9        Was I watching who he was talking to, no,
10   that's not my type of scene.
11        But there are people on the recordings
12   that have said that he spoke to them in that
13   manner as well.
14        It was about six guys at one time that was
15   like, yeah, he did that to me.  Yeah, he did
16   that to me.  Yo, I almost punched Terry in the
17   face because he said this to me, yeah.
18   Q   Were any of those individuals employees of
19   The Doe Fund?
20   A   We all worked for The Doe Fund.  We were
21   on the street crew.
22   Q   Have you ever heard the term "trainee"?
23   A   Yeah, I heard the term "trainee."
24   Q   And where did you hear that?
25   A   Where did I hear that?

Page 327

Brooks

1
2        I mean, I've heard it.  I've 41 years old.
3   I've heard the term.
4   Q   I'm not trying to be difficult here.
5        But in terms in connection with The Doe
6   Fund, have you heard the term "trainee" used?
7   A   Yes.
8   Q   What is your understanding of what a
9   trainee is at The Doe Fund?
10   A   A trainee is a person that's working on
11   the street crew.
12   Q   Does it cover any of the jobs at -- excuse
13   me, any of the employment -- withdrawn.
14        Mr. Washington, James Washington, did you
15   ever see Mr. Cooper sexually harass
16   Mr. Washington?
17   A   No, I did not.
18   Q   What about Mr. Wiggins; did you ever see
19   Mr. Cooper sexually harass Mr. Wiggins?
20   A   No, I did not.
21   Q   What about Dash Porter?
22   A   No, I did not.
23   Q   What about Mr. Holly?
24   A   I don't recall.
25   Q   Mr. Bell?

Page 328

Brooks

1
2   A   I didn't meet him until Mr. Cooper was
3   gone.
4   Q   Mr. Stevens?
5   A   I don't know.
6   Q   Which gender is Terry; is he a male or
7   female?
8        MS. O'CONNELL:  Objection.
9   Q   What is your understanding, Mr. Brooks, of
10   what Mr. Cooper's gender is?
11   A   He's a male.
12   Q   In what ways do you claim Mr. Cooper
13   discriminated against you based on your gender?
14        MS. O'CONNELL:  Objection.
15   A   He was trying to force me to do something
16   that was against my will.
17   Q   When you say that, are you referring to
18   the allegation you made about the incidents
19   that occurred?
20   A   Yeah, I'm not a homosexual, and he tried
21   to force me to do a homosexual act.
22   Q   In what ways did he try to force you to do
23   a homosexual act?
24   A   By touching me.
25   Q   Did he ask that you touch him?

CONFIDENTIAL

Page 329

Brooks

1
2    A   He did not.
3    Q   And other than the specific allegations,
4    are you -- do you have -- withdrawn.
5        Other than the testimony you just gave, is
6    there anything else that you claim Mr. Cooper
7    did that discriminated against you based on
8    your gender?
9        MS. O'CONNELL:  Objection.
10   A   I don't remember
11   Q   You can't remember what?
12   A   I can't remember if he did something else.
13   Q   Sitting here today, do you have any proof
14   of any other things Mr. Cooper did or you
15   allege Mr. Cooper did that discriminated
16   against you based on your gender?
17       MS. O'CONNELL:  Objection.
18   A   I can't remember.
19   Q   And I think this is probably a good time
20   to mark as an exhibit -- I believe we're at 10.
21   I'm going to pass to you, in a moment, a copy
22   of what's been marked -- will be marked, as
23   Exhibit 10 for identification.
24       It's a copy of the responses and
25   objections to defendant's first set of

Page 330

Brooks

1
2    interrogatories that were produced today.
3        Your attorney has indicated that the
4    interrogatories contain some additional
5    information, and which she believes to be in
6    the first four or five questions and responses.
7        MS. O'CONNELL:  Can we go off the record
8    for a second?
9        MS. O'CONNELL:  Sure.
10       (Recess taken.)
11       (Deposition Exhibit 10, Document Entitled
12   "Plaintiff's Responses and Objections to
13   Defendants' First Set of Interrogatories,"
14   marked for identification as of this date.)
15   BY MR. BARTOLOMEO:
16   Q   I'm going to present to you now what's
17   been marked for identification as Plaintiff's
18   Exhibit No. 10.  I think your attorney was
19   going to make a quick statement on the record
20   about Exhibit 10.
21       MS. O'CONNELL:  We're willing to stipulate
22   that we've made changes to Interrogatories 1, 4
23   and 5.
24       MR. BARTOLOMEO:  And is it just correct,
25   Counsel, that everything else in there is the

Page 331

Brooks

1
2    same, other than those three responses?
3        MS. O'CONNELL:  Everything else has been
4    unchanged besides those three.
5        MR. BARTOLOMEO:  Okay, great.
6    BY MR. BARTOLOMEO:
7    Q   Mr. Brooks, earlier today you testified
8    that you reviewed interrogatories.
9        These are interrogatories now before you
10   that are the ones you reviewed?
11   A   Yes.
12   Q   And is that -- if you turn your attention
13   to the last page, I believe it's Page 21; is
14   that your signature on the last page?
15   A   Yes, that's my signature.
16   Q   And that indicates that you're declaring,
17   under penalty of perjury, that you reviewed
18   those responses that are now sitting before
19   you, as Plaintiff Exhibit 10, and that they are
20   all true, accurate and correct, to the best of
21   your knowledge?
22   A   Yes, they are true and accurate to the
23   best of my knowledge.
24   Q   If you don't mind just turning your
25   attention to Interrogatory No. 9.  It is on

Page 332

Brooks

1
2    Page 11.
3        Do you see that question and response
4    there?
5        Do you see the question and answer as
6    titled "Interrogatory No. 9"?
7        Yes or no.
8    A   Yeah, I can see it.
9    Q   And the question reads:  Identify each
10   person -- and I'm paraphrasing again -- who you
11   claimed discriminated against you based upon
12   your race and/or status of being previously
13   convicted.  And identify each document which
14   relates to supports or refutes this allegation.
15       In response, your response indicates that
16   (As read):  "Plaintiff states in addition to
17   each person listed in Rule 26(a) Disclosures,
18   you also add Doe Fund House Manager Stevens."
19       I'm going to ask you, other than the
20   claims you made against Mr. Cooper, and how he
21   alleged discriminated against you based on your
22   race, in what ways did Mr. Washington, or do
23   you claim Mr. Washington discriminated against
24   you based on our race?
25   A   Because I feel like Mr. Washington, as

CONFIDENTIAL

Page 333

Brooks

1
2  well as others, would not have treated me in
3  the same regard had I been of another race.
4  Q   In what way do you claim that Mr. Stevens
5  discriminated against you based on our race?
6  A   For the same reason.
7  Q   And I believe you just said that they
8  wouldn't have treated you the same way, if you
9  were from another race?
10  A   Yes.
11  Q   In what way did they treat you?
12  A   They were hostile towards me, and they
13  were doing things to try to get me kicked out
14  of my shelter situation.
15  Q   And you're claiming those things
16  occurred -- withdrawn.
17      Are you claiming those things occurred
18  before or after the alleged incident with
19  Mr. Cooper?
20  A   Yeah, it happened after I made the
21  complaint about what Mr. Cooper did.
22  Q   In what ways do you claim
23  Mr. Paul Washington discriminated against you
24  based on your race?
25  A   Paul Washington never discriminated

Page 334

Brooks

1
2  against me.
3  Q   Based on your race?
4      Based on your race?
5      You said he never discriminated against
6  you?
7  A   Paul Washington didn't have nothing to do
8  with none of that.
9  Q   So Mr. Paul Washington -- just so the
10  testimony -- the record is clear, is it your
11  now testimony that Mr. Paul Washington did not
12  discriminate against you, in any way, based on
13  anything?
14      Is that correct, Mr. Brooks?
15  A   Does Paul Washington work for The Doe
16  Fund?
17  Q   Mr. Brooks, I'm entitled to be asking the
18  questions today, and you're here to give
19  testimony.
20      So I asked you a question, would you
21  please answer the question.  If you need me to
22  repeat it, I will.
23  A   No, Paul Washington doesn't work for The
24  Doe Fund.  Paul Washington is somebody that I
25  went to.

Page 335

Brooks

1
2  Q   And I understand that, Mr. Brooks.
3      And I'm asking you, are claiming that
4  Mr. Paul Washington discriminated against you
5  in any way?
6  A   No.
7  Q   You see Ms. Gilmore is here, correct?
8  A   Yeah.
9  Q   Okay.  In what ways did Ms. Gilmore
10  discriminate against you based on your race?
11      MS. O'CONNELL:  Objection.
12  Q   Do you remember the question?
13  A   I can't remember the interaction I had
14  with Ms. Gilmore.
15  Q   What facts do you have to support your
16  allegations that Ms. Gilmore discriminated
17  against you based on our race?
18      MS. O'CONNELL:  Objection.
19  A   I have no recollection of our interaction
20  at all.
21  Q   That wasn't my question.
22      My question is:  What facts do you have to
23  support your allegation that Ms. Gilmore
24  discriminated against you based on your race?
25  A   I don't know I.  Don't remember.

Page 336

Brooks

1
2  Q   You don't remember how she discriminated
3  against you, correct?
4  A   I don't remember.
5  Q   Do you remember any way in which you
6  allege -- withdrawn.
7      What facts do you have to support any of
8  the allegations that you've made that
9  Ms. Gilmore discriminated against you?
10      MS. O'CONNELL:  Objection.
11  A   I don't recall.
12  Q   Do you have any understanding of how she
13  discriminated against you based on your gender?
14  A   I don't recall.
15  Q   And what about your conviction status?
16  A   I don't recall.
17  Q   Your ethnicity?
18  A   I don't recall.
19      MS. O'CONNELL:  Objection.
20  Q   What's Ms. Gilmore's race, to the best of
21  your understanding?
22  A   I don't know.
23  Q   You can see her sitting here today?
24  A   Yes.
25  Q   And what's your understanding of what her

CONFIDENTIAL

Page 337

```
1              Brooks
2   race she?
3   A   I don't know.
4       MS. O'CONNELL:  Objection.
5   A   I don't know.
6   Q   You've named a number of other individuals
7   that you claimed discriminated against you
8   based on your race -- excuse me, based on your
9   gender.
10      Mr. Wiggins, how did he discriminate
11  against you based on your gender?
12      MS. O'CONNELL:  Objection.
13  A   I don't recall.
14  Q   And Mr. Porter, how did he discriminate
15  against you based on your gender?
16      MS. O'CONNELL:  Objection.
17  A   I don't recall.
18      MR. BARTOLOMEO:  And, Counsel, what are
19  your objections for?
20      MS. O'CONNELL:  My client can't testimony
21  to legal opinions.  You're asking for the
22  reasons why he was subject to discrimination.
23      MR. BARTOLOMEO:  In what way is asking him
24  about allegations that he's made about being
25  discriminated against, in what way does that
```

Page 338

```
1              Brooks
2   call for a legal opinion?
3       MS. O'CONNELL:  Because he may not
4   completely understand every legal aspect of
5   discrimination, why that would be.
6       MR. BARTOLOMEO:  And I'm not asking him to
7   write a brief.  I'm asking him what is his
8   basis of understanding that he believes he was
9   discriminated against.
10      MS. O'CONNELL:  We're just preserving ou
11  objections for the record.
12      MR. BARTOLOMEO:  Okay.
13  BY MR. BARTOLOMEO:
14  Q   In what way do you believe you were
15  treated differently by Mr. Wiggins based upon
16  your gender?
17  A   Well, because I made a complaint about a
18  sexual assault, I believe I was treated
19  differently.
20  Q   And you based that on the fact that --
21  you're saying that he treated you differently
22  because of the complaint.
23      Is there anything having to do with your
24  gender that you believed Mr. Wiggins treated
25  you differently?
```

Page 339

```
1              Brooks
2   A   Well, I was assaulted because of my
3   gender.  I was assaulted because of my gender.
4   I was assaulted verbally and physically because
5   of my gender.
6       I was told that -- I like to be chained
7   down, whipped and things like that by your
8   client, Mr. Cooper, and that was because of my
9   gender.
10      And after I wrote, informing The Doe Fund
11  of what had transpired between me and your
12  client, they decided to retaliate against me.
13  And Mr. Wiggins was one of those people, as
14  well as Mr. Stevens, as well as
15  Mr. James Washington, as well as
16  Timothy Matthews, as well as Eric.
17  Q   As well as who?
18  A   Eric.
19  Q   Who's Eric?
20  A   Eric was the head security guard at the
21  facility.
22      And all this transpired because of my
23  gender.
24  Q   So other than the allegations of being
25  treated differently after you made the
```

Page 340

```
1              Brooks
2   complaint about the alleged incident on the
3   21st, was there anything that you believed
4   Mr. Wiggins did to treat you differently
5   because of your gender?
6   A   You said other than the incident?
7   Q   Yeah.
8       You just said, and you've testified a
9   number of times that things changed and people
10  treated you differently after you made this
11  complaint; is that correct?
12  A   That's correct.
13  Q   I'm asking, was there anything else, other
14  than those circumstances that you described,
15  that you believe Mr. Wiggins did on the basis
16  of your gender; in ways did he treat you
17  differently based on your gender?
18  A   Well, what he did is, he started pulling
19  me off the buses and started screwing around
20  with my work situation.
21  Q   This was after you made the complaint?
22  A   This is after I made the complaint.
23  Q   Before you made the complaint --
24  A   Before I made the complaint I never met
25  the man.
```

CONFIDENTIAL

Page 341

Brooks

1
2  Q   And Mr. Wiggins, he's a man; is that
3  correct?
4  A   Yeah.
5  Q   And is it your testimony that Mr. Wiggins
6  treated you differently because you're a man?
7  A   Not only because I'm a man, because of the
8  whole situation.
9  Q   And, again, I'm asking you a very specific
10 question.  I believe it calls for a yes-or-no
11 answer.  To the extent you need to explain
12 more, that's fine.
13    But I'm asking you:  Do you believe
14 Mr. Wiggins treated you differently because you
15 were a man?
16 A   Yes.
17 Q   And other than what you've already
18 testified to, in what other ways did he do
19 that?
20 A   Well, he was making threats.
21 Q   And what kind of threats did Mr. Wiggins
22 make?
23 A   Well, he was making direct threats.  He
24 was telling me about how bad he is on the
25 street.  How he kick ass in The Doe Fund and

Page 342

Brooks

1
2  out of The Doe Fund, from the west side of
3  Harlem to the east side of Harlem.  I happen to
4  be from Harlem.
5  Q   And why did you perceive those as threats?
6  A   Because he was saying it directly to me.
7  Q   Was anybody else standing with you?
8  A   Was there --
9  A   Anybody else present?
10    MS. O'CONNELL:  Objection.
11 A   I don't recall.
12 A   Somebody else was in the room, but I don't
13 recall who it was.
14    This is when I was trying to get my
15 schedule.  And I was told that I had to see
16 Mr. Wiggins for my schedule.  And this is when
17 I went into the room, he started telling me
18 things and making threats.  I don't remember
19 everything that he said, but he made -- well,
20 he was saying I was fucking up.  And that's
21 when all the threats and stuff came in.
22 Q   Mr. Porter -- withdrawn.
23    Is there anything other than just your
24 personal opinion that gives you the reason to
25 believe that Mr. Wiggins treated you

Page 343

Brooks

1
2  differently because of your gender?
3  A   I don't recall.
4  Q   Isn't it true that there were no females
5  that were treated better than you by
6  Mr. Wiggins?
7  A   I don't recall.  It was a male facility.
8  It was very few females around.
9  Q   So when you say "male
10 facility" -- withdrawn.
11    Other than Ms. Gilmore, how many other
12 females -- withdrawn.
13    At your particular facility, how many
14 females were there?
15 A   I don't really recall.  I know I seen
16 around, maybe three.  I don't recall.  And they
17 were workers and they were in and out.  They
18 had offices and whatever.
19 Q   When you say "workers," that means they
20 weren't clients of The Doe Fund, they weren't
21 residents;  Is that correct?
22 A   No, they weren't residents.
23 Q   Were any of the residents female?
24 A   None of the residents were females.
25 Q   And, you know, Mr. Porter, you've also

Page 344

Brooks

1
2  claimed that he discriminated against you -- he
3  also treated you differently based on your
4  gender.
5     In what ways, other than what you told us
6  about today already, with respect to the things
7  that happened after the incident, in what ways
8  do you claim Mr. Porter treated you differently
9  based on your gender?
10    MS. O'CONNELL:  Objection.
11 A   I don't recall.
12    MR. BARTOLOMEO:  Off the record.
13    (Recess taken.)
14 BY MR. BARTOLOMEO:
15 Q   You claimed that Hanson discriminated
16 against you based on your race; is that
17 correct?
18 A   I don't recall.
19 Q   You don't recall whether or not you
20 brought a claim against Mr. Hanson for
21 discriminating against you based on your race?
22 A   Yeah, I don't recall.
23    MS. O'CONNELL:  Ms. Hanson.
24 A   I don't recall.
25 Q   What facts do you have to support that

Brooks

Ms. Hanson discriminated against you based on your race?

MS. O'CONNELL: Objection.

A I don't recall.

Q And what facts do you have to support that Ms. Hanson treated you differently because of your race?

A I don't recall.

Q Isn't it true your only basis is your opinion?

MS. O'CONNELL: Objection.

A I don't believe so.

Q Excuse me?

A I don't believe so.

Q You don't believe what?

A That's my only basis is my opinion. I have several recordings and facts.

Q Okay. So I just asked you what facts do you have to support that Ms. Hanson discriminated against you based on your race?

A I don't recall everything that's in those recordings.

Q I'm not asking you to recall everything, Mr. Brooks.



Brooks

I'm asking you what, to the best of your knowledge, sitting here today, what facts do you have to support that Ms. Hanson treated you differently because of your race?

MS. O'CONNELL: Objection.

A I don't recall.

Q Isn't it true that Ms. Hanson did not treat females better than you?

A I don't know.

Q You don't know?

A No.

Q I'm sorry, could you speak up?

A No.

Q And Mr. Porter, what facts do you have to support that Mr. Porter treated you differently based on your race?

MS. O'CONNELL: Objection.

A I don't recall.

Q Is there any other basis for your allegation that Mr. Porter treated you differently based on your race other than your opinion?

Mr. Brooks?

A Yeah, I don't recall.



Brooks

Q What is the -- what facts do you have to support that Mr. Bell treated you differently based on your race?

MS. O'CONNELL: Objection.

Q Mr. Brooks, are you awake?

A I am awake.

Q Because your eyes are closed, that's why I'm asking.

A Yeah, I'm starting to get a headache.

Q Why don't we take a moment.

A I don't need a moment. Let's get to it.

Q So I just ask, if you could, to the best of your knowledge, tell me what facts you have to support that Mr. Bell treated you differently because of your race?

A Well, I don't recall, but I do remember, Mr. Bell writing me up for no call no show, and it wasn't correct.

So I felt that that was wrong. I didn't feel he would do that in a situation where I was different, from another race or not being in a shelter and having financial problems at the time, so . . .

Q And what race is Mr. Bell?



Brooks

A I don't know.

Q What's his complexion?

A He's light skin.

Q Is he Caucasian.

A He is not Caucasian.

Q Do you know if he's Hispanic?

A I don't know if he's Hispanic or not.

Q Have have you heard Mr. Bell speak Spanish at any time?

A I don't recall.

Q Mr. Porter, what race is he?

A I don't know.

Q What complexion is he?

A Brown skin.

Q And Ms. Hanson, what race is she?

A I don't know.

Q And what's her complexion?

A I don't recall.

Q And you've alleged that a number of individuals have also discriminated against you -- excuse me, that have treated you differently based on your gender.

We've talked about Mr. Cooper and Mr. James Washington and Mr. Wiggins.

CONFIDENTIAL

Page 349

Brooks

1
2      Mr. Porter, in what ways did Mr. Porter
3  treat you differently based on your gender?
4      A   I don't recall that.
5      Q   And when I say, "Mr. Porter," is that
6  correct that he's a male?
7      It's a yes-or-no question, Mr. Brooks.
8      A   Yes.
9      Q   And Ms. Gilmore, is Ms. Gilmore a male or
10  female?
11      A   Female.
12      Q   And Ms. Hanson is also female; is that
13  correct?
14      A   I'm assuming so.  Being that you're saying
15  "Ms."
16      Q   Okay.  Well, you are the one that met
17  Ms. Hanson.
18      What is your understanding of whether
19  she's male or female?
20      A   Ms. Hanson, I'm assuming is a female.
21      Q   I don't want you to assume.  I'm just
22  asking you to the best of your knowledge?
23      A   Female.
24      Q   In what ways did Ms. Hanson treat you
25  differently based upon your gender?

Page 350

Brooks

1
2      A   I don't recall.
3      Q   And Mr. Holly, is that a male as well?
4      A   Yes.
5      Q   And in what ways did Mr. Holly treat you
6  differently based on your gender?
7      A   I can't recall.
8      Q   Mr. Bell is also a male, correct?
9      A   Yes.
10      Q   And Mr. Bell, in what ways did he treat
11  you differently based upon your gender?
12      A   I can't recall.
13      Q   Mr. Stevens, in what ways did Mr. Stevens
14  treat you differently based upon your gender?
15      A   Mr. Stevens was harassing me.  Ringing the
16  keys and banging on the door when I was
17  sleeping.
18      And his ^anonymity for me spawned out of
19  the fact that I wrote a sexual harassment
20  report on his coworker.
21      Q   What part of what you just told us was
22  because you -- what part of what you just
23  testified to do you allege Mr. Stevens did
24  because of your gender?
25      A   It was based on my gender.  I was

Page 351

Brooks

1
2  assaulted because of my gender.
3      Q   I understand the allegations that you've
4  made against Mr. Cooper.
5      What I'm saying right now, Mr. Stevens,
6  what did he to treat you differently because
7  of your gender?
8      A   I just told you earlier that he was
9  banging on my door and keeping me awake when I
10  needed to sleep for work.
11      Q   Did you ever see him do that with anybody
12  else?
13      A   No, he did not.
14      Q   What time did he bang on your door?
15      A   Every morning.
16      Q   At what time?
17      A   Around seven o'clock, something like that.
18      Q   Isn't it true that The Doe Fund, the
19  residence requires you -- has a curfew at a
20  certain hour and wake up at a certain time?
21      A   Yeah.  That's for people that don't
22  have -- I have last passes.  I worked
23  overnight.  And so I'm able to stay in and
24  sleep, and you knew that.  He was aware of
25  that.  All the staff knew that.

Page 352

Brooks

1
2      I work overnight.  I get in around
3  two o'clock in the morning.  Take a shower.
4  I'm in bed around 3:00.  He comes banging on
5  the door at 7:00, you know, and jingling his
6  keys to keep me awake.  So I would usually have
7  to leave the facility because I couldn't sleep,
8  with him coming back and forth.
9      And I'd be tried while I was on -- at
10  work.  And I had a job that was dangerous.  I
11  was driving a forklift.  Sometimes I was
12  falling asleep on the forklift.
13      Q   Is there -- is it your testimony that
14  there's an exception to the rule that everybody
15  must be up at 7:00 a.m. when you worked late in
16  the night?
17      A   There's an exception to the rule?
18      That is the policy, when you would have a
19  late night pass, you get to sleep in.  When you
20  have a late night job, you get to sleep in.
21  And that's in every shelter.
22      Q   And Mr. Stevens, that's a male, correct?
23      A   Yes, he is.
24      Q   And is he, Mr. Stevens, is it your
25  understanding -- withdrawn.

CONFIDENTIAL

Page 353

Brooks

1
2    Do you have an understanding of what
3    Mr. Stevens' job was?
4    A   House manager.
5    Q   And house manager, is it part of their job
6    to wake everybody up?
7    A   I don't know.  I don't know his job
8    description.
9    Q   And did you have roommates at the time, at
10   the time you claim Mr. Stevens was banging on
11   the door and jingling key?
12   A   Yes.
13   Q   Did those roommates all have the ability
14   to sleep in, as you're describing?
15   A   I don't know.
16   Q   Did you talk to your roommates at all?
17   A   Very rarely.
18   Q   Were they the same individuals?
19   A   Not all the time.
20   Q   What were their names?
21   A   I don't know.
22   Q   How long did you share a room with these
23   individuals?
24   A   I don't remember.
25   Q   You also make allegations in this case

Page 354

Brooks

1
2    that based upon your conviction status that you
3    were treated differently.
4       You've also made allegations that based
5    upon your conviction status, people treated you
6    less favorable; is that correct?
7    A   I believe so.
8    Q   In what ways did Mr. Cooper treat you less
9    favorably based on your conviction status?
10   A   By assaulting me.
11   Q   Other than what you claim was an assault,
12   Mr. Brooks, is there anything else that you
13   claim Mr. Cooper did to treat you differently
14   because of your conviction status?
15   A   By talking to me in a sexual manner.
16   Q   And are these the same -- withdrawn.
17      Are these the same comments you told us
18   about today and last week?
19   A   I believe I wrote it in my complaint.
20   Q   I understand.
21      But I'm asking with respect to the
22   deposition testimony you gave, is there
23   anything else in addition to what you already
24   told us that you believe Mr. Cooper said, and
25   he did so based upon your conviction status?

Page 355

Brooks

1
2    MS. O'CONNELL:  Objection.
3    A   I don't recall.
4    Q   Are you aware of whether -- withdrawn.
5       Do you know if Mr. Cooper has ever been
6    convicted of a crime?
7    A   No, I don't.
8    Q   Can you tell me anyone who you believe
9    Mr. Cooper treated differently than you
10   because -- withdrawn.
11      Can you tell me anyone that Mr. Cooper
12   treated more favorably than you because they
13   had a different conviction status?
14   A   I don't know.
15   Q   Mr. James Washington, how did --
16   Mr. James Washington, what facts do you have to
17   support that Mr. James Washington treated you
18   differently based upon your conviction status?
19   A   Because I came to him with an issue, and
20   he didn't uphold me.  He actually did things
21   that made my situation worse.
22   Q   What things?
23   A   And none of this could have been
24   accomplished if I wasn't -- hadn't been
25   convicted of a crime and wasn't in his care.

Page 356

Brooks

1
2    Q   Are you saying as a result of you being
3    convicted of a crime you were forced to be
4    under his care?
5    A   That's not what I said.
6    Q   Okay.  So explain to me what you said,
7    then, because I didn't understand?
8    A   I said he was a director and I went to him
9    with an issue.  That issue got blown up.
10   People found out about it that wasn't supposed
11   to know about it.  And then I was treated
12   harshly in his facility that he was head of.
13   And I went to tell and told him about that as
14   well, and it never stopped.
15   Q   When you said there was an issue, what
16   issue was that?
17   A   The issue of Mr. Cooper touching me and
18   sexually harassing me.  The issue of me being
19   pulled over -- pulled out of buses when I was
20   on my way to work.  The issues with me being,
21   you know, waken up while I was resting for
22   work.  I went to him with several issues;
23   issues of me getting a pass and then coming in
24   and having to sit in a room for hours, not
25   being able to go to my bed.  When I got direct

CONFIDENTIAL

Page 357

Brooks

1  permission from Mr. Washington himself.  It's
2  issues like that that I felt I was being
3  targeted because of my conviction.  And not
4  only just because of my conviction, because I
5  wrote a statement against a fellow coworker of
6  his.
7      Q   Other than what you already told me, is
8  there anything else that you say that supports
9  your claim that Mr. Washington treated you
10  differently because of your conviction status?
11     A   Not that I could recall.
12     Q   And Mr. Wiggins, you've also claimed he
13  treated you differently based on your
14  conviction status.
15     What facts do you have to support that
16  complaint?
17     A   Because I was convicted, I guess he felt
18  like he could speak to me in a hostile manner.
19  And he also was responsible for pulling me off
20  of the buses when I was going to work.  He was
21  responsible for not -- for me not receiving a
22  copy of my schedule.  He was responsible for
23  making all these decisions that went against
24  me, and he used other workers to do so.

Page 358

Brooks

1  For example, I was getting on the bus.
2  I'm on the bus.  I'm waiting to go out to my
3  work site.  I'm there.  I'm on time, and
4  another guy get a call and come to the bus and
5  say, Is Brooks in here?  The supervisor said,
6  Yeah.  I'm like, Yeah, I'm right here.  They
7  like, Brooks, come off the bus.
8      I later found out that it was because of
9  Mr. Wiggins.  Mr. Wiggins specifically called
10  somebody because he wasn't even on the site.
11  He called somebody, told them to pull me off
12  the bus so I wouldn't go to work, and had me
13  standing on the corner for a while before --
14  before anything happened with me, so . . .
15     Q   Do you know if Mr. Washington's ever been
16  convicted of a crime?
17     A   I don't know.
18     Q   Do you know if Mr. Wiggins has ever been
19  convicted of a crime?
20     A   I don't know.
21     Q   Do you know if Mr. Porter's ever been
22  convicted of a crime?
23     A   I don't know.
24     Q   Do you know if Ms. Gilmore has ever been

Page 359

Brooks

1  convicted of a crime?
2      A   I don't know.
3      Q   Do you know if Ms. Hansen's ever been
4  convicted of a crime?
5      A   I don't know.
6      Q   Do you know if Mr. Holly has ever been
7  convicted of a crime?
8      A   I don't know.
9      Q   Do you know if Mr. Bell has ever been
10  convicted of a crime?
11     A   I think he might have said that he was,
12  but I don't remember.
13     Q   And Mr. Stevens, do you know whether
14  Mr. Stevens has ever been convicted of a crime?
15     A   I don't know.
16     Q   And with respect to Mr. Porter, what facts
17  do you have to support your claim that
18  Mr. Porter treated you differently because of
19  your conviction status?
20     A   I don't recall.
21     Q   And Ms. Gilmore, what facts do you have to
22  support that Ms. Gilmore treated you
23  differently based upon your conviction status?
24     A   I don't recall.

Page 360

Brooks

1      Q   And Ms. Hanson, what facts do you have to
2  support that Ms. Hanson treated you differently
3  because of been your conviction status?
4      A   I don't recall.
5      Q   And Mr. Holly, what facts do you have to
6  support your claim that Mr. Holly treated you
7  differently based upon your conviction status?
8      A   I don't recall.
9      Q   Mr. Bell, what facts do you have to
10  support that Mr. Bell treated you differently
11  based upon your conviction status?
12     A   I don't recall.
13     Q   And Mr. Stevens, what facts do you have to
14  support that Mr. Stevens treated you
15  differently based upon your conviction status?
16     A   I don't recall.
17     Q   What residents at the Gate Avenue facility
18  were treated better than you and did not have a
19  conviction history?
20     MS. O'CONNELL:  Objection.
21     A   I don't know what other residents were
22  doing or their interaction with the status, I
23  don't know.
24     Q   So do you have any basis to claim that the

CONFIDENTIAL

Page 361

Brooks

1  individuals that you've named or stated treated
2  you differently because of your conviction
3  status, do you have any basis to claim that
4  they treated other residents who were not
5  convicted of a crime differently?
6  A    All I know is how they treated me.
7  Q    Are there other residents at the Gates
8  Avenue facility that have been convicted of
9  crimes?
10  A    I don't know.
11  Q    Isn't it true that The Doe Fund's purpose
12  is to help formally incarcerated individuals to
13  achieve self-sufficiency?
14  A    That's what I believed when I came there.
15  Q    Have you ever been convicted of a civil
16  assault, other than what you've already
17  testified to today?
18  A    No.
19  Q    Do you know what a civil assault is?
20  A    No, but I've never been convicted of an
21  assault, period, so . . .
22  Q    You've brought allegations, or part of
23  your complaint alleges that Mr. Cooper
24  committed an assault on you; is that right?

Page 362

Brooks

1  A    Yes.
2  Q    And what is your understanding of what a
3  civil assault is?
4  A    I don't haven an understanding.  I don't
5  know what it means.
6  Q    How are you able to make allegations that
7  Mr. Cooper did such a thing?
8  A    I know Mr. Cooper assaulted me sexually,
9  and that's what I said.
10  Q    Do you believe that Mr. Cooper, at any
11  time, intended to inflict any injury upon you?
12  A    Yeah.
13  Q    And what kind of injury is that?
14  A    Psychological injury.
15  Q    Is it your claim that Mr. Cooper intended
16  to -- withdrawn.
17      What is -- do you know what a civil
18  battery is?
19  A    No.
20  Q    And you're smiling, Mr. Brooks.
21      What's funny about this?
22  A    I don't understand what you're talking
23  about.
24      You think I'm a lawyer or something?

Page 363

Brooks

1  Q    No, but I do think that -- I'm going to
2  show you now what's been marked as Plaintiff's
3  Exhibit 3.
4      MR. BARTOLOMEO:  If you're okay with this,
5  Counsel, I'll just use my copy from the last
6  deposition?
7      MS. O'CONNELL:  The complaint.
8      (Discussion off the record.)
9  BY MR. BARTOLOMEO:
10  Q    I'm going to show you what's been marked
11  for identification at the June 7th deposition,
12  that's Plaintiff's Exhibit 3.  This is a copy
13  of the complaint, Mr. Brooks.
14      Do you recall seeing this document at the
15  last deposition?
16      MR. BARTOLOMEO:  And I'm showing the
17  witness the first page of the complaint.
18  A    It's possible.  It's possible.
19  Q    It's possible that you saw it at the last
20  deposition?
21  A    Yeah, it's possible.  I've seen a lot of
22  records.  They all look similar to me.
23  Q    Okay.  If you wouldn't mind just taking a
24  quick look at this, and tell me whether you've

Page 364

Brooks

1  read through this document before.
2      I ask that we go off the record while the
3  witness reviews.
4      (Brief recess.)
5  A    It's possible that I briefed through this.
6  Some of the language in here is similar
7  Q    Can you state that again, for the record.
8  I didn't hear you.
9  A    It's possible that I briefed through it.
10  Some of the language is similar -- familiar.
11  Q    I'm going to turn your attention now to
12  Page 22.
13      At the bottom of the page, Mr. Brooks,
14  would you just take a look.  It says as a 12
15  cause of action -- excuse me, as an 11th cause
16  of action, what does it say, assault and
17  battery; is that correct?
18  A    Yeah, I see that.
19  Q    What is your understanding of what a
20  battery is?
21      MS. O'CONNELL:  Objection.
22  Q    And I'm asking you, in your personal
23  knowledge, not as an attorney.  I'm not asking
24  for a legal opinion.

CONFIDENTIAL

Page 365

Brooks

2  MS. O'CONNELL:  Objection.
3  A  An assault.
4  Q  So battery and assault are the --
5  A  Similar.
6  Q  -- same thing.
7  Did you concept to Mr. Cooper touching
8  you?
9  A  No.
10  Q  At any time?
11  A  No.
12  Q  Do you believe that your consent was
13  implied?
14  A  No.
15  Q  Now, I'm just going to show the witness
16  what's been previously marked for
17  identification as Plaintiff's Exhibit No. 8.
18  And I would ask you turn your attention -- this
19  is a copy of your complaint that you
20  acknowledged that during the last deposition.
21  If you would just turn to Paragraph 4 for me,
22  Mr. Brooks.
23  A  Turn to Paragraph 4.
24  Q  Yeah, it's the fourth full paragraph.  And
25  I believe there's a sentence that says, "I

Page 366

Brooks

2  suppose."  Just read that into the record where
3  it says, "I suppose."
4  A  "I stood there in shock and" --
5  Q  Mr. Brooks, I would ask that you just
6  read -- if not, I can read it for you -- the
7  sentence that begins with "I suppose," and
8  Mr. --
9  A  That is the sentence.
10  "I stood there in shock, and I suppose, in
11  Mr. Terry's mind, my silence was approval or
12  consent for him to grab my penis and say,
13  What's this?"
14  That's the sentence.
15  Q  Thank you.
16  Does that refresh your recollection of
17  whether he thought that your consent was
18  implied?
19  A  No.
20  MS. O'CONNELL:  Which exhibit is this?
21  MR. BARTOLOMEO:  Eight.
22  Q  No, that doesn't refresh your recollection
23  as to whether you believed that your consent
24  was implied?
25  A  No.  I didn't believe that my consent was

Page 367

Brooks

2  implied.  I was trying to figure out what made
3  him decide that he could do some shit like
4  that.  That's what I was trying to reconcile in
5  my mind.  And it had just happened to me.  So I
6  don't . . .
7  Q  Do you believe that Mr. Cooper intended to
8  cause you physical harm, not psychological?
9  A  Yes.
10  Q  In what way do you believe that Mr. Cooper
11  intended to cause you physical harm?
12  A  Well, he touched me in a physical matter,
13  and I'm not a homosexual.  And he came into my
14  room and he closed the door behind him.  And he
15  came and approached me, and I felt threatened.
16  Q  What do you allege that Mr. Cooper was
17  saying while he touched your penis, if
18  anything?
19  A  He was talking about my schedule.  He was
20  trying to barter what he was going to give me
21  for my schedule, and at the same time he was
22  touching my penis.
23  Q  Do you have any other basis for your claim
24  of assault, other than the alleged incident on
25  July 21st between you and Mr. Cooper?

Page 368

Brooks

2  A  No.
3  Q  Do you have any other basis for the claim
4  of battery, other than the incident you allege
5  occurred on July 21st between you and
6  Mr. Cooper?
7  A  Say that again.
8  Q  Do you have any other basis for your claim
9  of battery, other than the incident you allege
10  occurred on July 21st between you and
11  Mr. Cooper?
12  MS. O'CONNELL:  Objection.
13  A  I don't recall.
14  Q  Do you allege that Mr. Washington
15  committed a battery on you?
16  A  No.
17  Q  Do you allege that Mr. Washington
18  committed an assault on you?
19  A  No.
20  Q  Do you allege that anyone else at The Doe
21  Fund committed a battery on?
22  A  I'm assuming battery mean physical, and I
23  would say no.
24  Q  Do you believe that anyone else, other
25  than Mr. Cooper -- excuse me.  Withdrawn.

CONFIDENTIAL

Page 369

Brooks

1
2      Do you allege that anyone else at The Doe
3  Fund committed an assault against you other
4  than Mr. Cooper?
5  A   Not physical.
6      MS. O'CONNELL:  Could we go off the record
7  for a second.
8      (Recess taken.)
9      MR. BARTOLOMEO:  Based on an
10  off-the-record conversation between all counsel
11  for all parties, I believe that plaintiffs
12  counsel is willing to stipulate, that the 11th
13  cause of action, which current reads:
14  "Eleventh cause of action:  Assault and battery
15  (against All, Cooper individually)" is
16  actually -- I believe counsel's willing to
17  stipulate that's just being alleged as against
18  Mr. Cooper individually and against no other
19  individuals or the Doe Fund; is that right?
20      MS. O'CONNELL:  Yes, counsel is
21  stipulating to that.
22  BY MR. BARTOLOMEO:
23  Q   I'm going to turn your attention back to
24  what's been marked as Plaintiff's Exhibit 3 for
25  identification.

Page 370

Brooks

1
2      You have alleged as a 13th cause of
3  action, Mr. Brooks, that there was -- "All
4  defendants have committed a crime of violence
5  motived by gender."
6      Do you see where that is on that third
7  page, in big boldface and capital letters, in
8  the middle of the page.
9      It's a yes-or-no question.
10  A   Yeah, I see it.
11  Q   What is your understanding of what a crime
12  of violence motived by gender is?
13  A   Threats of violence or actual violence
14  because of someone's gender.
15  Q   Are you alleging in this lawsuit that
16  somebody threatened violence as against you?
17  A   Yeah.
18  Q   Other than what you've already testified
19  to, tell us who and what you believe were those
20  threats?
21  A   Mr. Wiggins.
22  Q   Right.
23      And I believe that you testified earlier
24  today about what you believe Mr. Wiggins did to
25  threaten you; is that correct?

Page 371

Brooks

1
2  A   Yes.
3  Q   Other than Mr. Wiggins and the testimony
4  that you gave regarding the way you perceived
5  the comments he was making as threats, who else
6  at The Doe Fund threatened you with violence?
7  A   I don't recall.
8      I mean, I already testified to the fact
9  that Terry came into my room and closed the
10  door and it was intimidation.
11      But other than that, I don't recall.
12  Q   Was it violent?
13      Was there anything that Terry did to you
14  or said to you violent?
15  A   Yeah, he touched me.
16  Q   Other than the alleged touching of you,
17  what else do you claim was done by Mr. Cooper
18  that was violent?
19  A   The intimidation, by coming into my room,
20  approaching me.  He's a very big man.  And he
21  basically had me cornered into a room with the
22  door closed.
23  Q   Other than what you've just testified to,
24  anything else that you allege Mr. Cooper did
25  that was "violent"?

Page 372

Brooks

1
2  A   Yeah.
3      He also, when I was outside, he approached
4  me and said, "You said this motherfucker what,"
5  in a very hostile manner.  He came like -- I
6  wasn't talking to him.  I was -- wasn't even
7  facing him, and he walked right up on me and
8  said that to me.
9      And the people that was around was like
10  just chill, chill, chill.
11  Q   Who was around?
12  A   It was other Doe Fund employees.  I don't
13  remember everybody, but --
14  Q   Was there any staff there?
15  A   I remember their face, but I don't know
16  their names.
17  Q   Were any of them staff?
18  A   Yeah.
19  Q   Were any of them residents?
20  A   Everybody worked at The Doe Fund.  The Doe
21  Fund is a working organization, they put you to
22  work.
23  Q   I understand what your understanding is.
24      And what I'm asking you is, if there's a
25  distinction, my understanding is that

CONFIDENTIAL

Page 373

Brooks

1  Mr. Stevens is different, and he maintains a
2  different status at The Doe Fund than you do --
3  did; is that correct?
4  A   He was a house manager.
5  Q   Correct.
6      Did Mr. Stevens -- was he a "resident" of
7  The Doe Fund?
8  A   No.
9  Q   A participant in the Ready, Willing & Able
10 program?
11 A   I don't know if he was a participant.  I
12 don't know how The Doe Fund regulates their
13 business.
14 Q   Mr. Washington, was he a participant in
15 the Ready, Willing & Able?
16 A   I don't know.  I don't know how they
17 regulate their business.  What I do know is
18 they have rank in the organization.
19 Q   And as far as that rank goes, did you have
20 any rank in the organization?
21 A   No, I did not.  I just was a cleaner and a
22 resident.
23 Q   Other than what you've already testified
24 to, what other acts or statements were made to

Page 374

Brooks

1  you that you believed were violent during the
2  time that you were at The Doe Fund?
3  A   I don't recall I started to smoke
4  marijuana to kind of not remember this.  So
5  it's a lot of things that I just don't
6  remember.  I tried to smoke the memory away.
7  It's a dark part of my life that I would love
8  to forget.  So I just don't remember a lot of
9  stuff that happened.
10 Q   And when was the last time you smoked
11 marijuana?
12 A   It's been maybe a year, something like
13 that.
14 Q   Were you ever smoking marijuana during the
15 time you were a resident at The Doe Fund?
16 A   Maybe.  Possibly towards the end when I
17 was dealing with a lot of hostility towards me,
18 maybe.
19 Q   Did you smoke any marijuana before, and I
20 don't mean just the day of, but before the
21 incident that you allege occurred on July 21st?
22 A   No.
23 Q   Is it your testimony that you never smoked
24 marijuana in your life before the incident that

Page 375

Brooks

1  you allege occurred on July 21st?
2  A   No, no, no.  I smoked before, but I hadn't
3  smoked in five years.  I quit.  I relapsed
4  after this incident.  I didn't smoke marijuana
5  in about five years.  I quit.
6  Q   And is it your understanding that there
7  are certain rules in place at The Doe Fund with
8  respect to substances, alcohol, narcotics and
9  other drugs?
10 A   Yep.  Yes, it is.
11 Q   And would one of those rules prohibit any
12 resident from engaging in consumption or use of
13 any substances, illegal substances?
14 A   Yeah, I know you're not supposed to use
15 drugs on the grounds, and I didn't.  I surely
16 didn't.
17 Q   Is it your understanding that you could
18 use drugs when you're not on The Doe Fund
19 grounds, but even while you're still a Doe Fund
20 resident?
21 A   I know that you're not supposed to come
22 into the facility drunk and stuff like that.
23 That's the reason they did a Breathalyzer test.
24 Q   And they also do urinalysis, right, they

Page 376

Brooks

1  take pee samples?
2  A   They only do urinalysis for participants
3  in the program.  I wasn't a participant in the
4  program.
5  Q   Did you ever fail any of those urinalysis?
6  A   No, I did not.
7  Q   Did you ever fail a Breathalyzer test?
8  A   No, I did not.
9  Q   At any time -- withdrawn.
10     You also brought a claim of intentional
11 infliction of emotional distress.  I believe
12 it's on Page 22.  Do you mind turning to that
13 Page 22.
14     Do you see that in the middle of the page
15 in big boldface and capital letters?
16 A   Which one you said it was?
17 Q   Intentional infliction of emotional
18 distress.
19 A   Yeah.
20 Q   Do you have any facts to support your
21 claim for intentional infliction of emotional
22 distress that are different from the ones that
23 you allege with respect to the alleged sexual
24 harassment on July 21?

CONFIDENTIAL

---

Page 377

Brooks

1
2    A   The emotional distress come in -- not
3    the -- because of the sexual assault by
4    Mr. Terry, and also the following actions that
5    happened with the other staff there, by
6    targeting me and making my life difficult.
7        I was under the impression they were
8    supposed to help, being that I was coming home
9    and I needed a place to stay.  I needed work.
10   But they didn't do these things.
11       And because I made the complaint against
12   Mr. Terry, I was targeted and harassed by the
13   rest of the staff, which caused me emotional
14   distress.
15   Q   And just so we can try to move things
16   along today, I mean, if you've already told us
17   about it, and When I say to you, "other than
18   what you've already testified to," just assume
19   that I understand and remember the things that
20   you've already told us about.
21       So I'm asking about specifics for only
22   claims that you have or any facts that support
23   your claim for this cause of action, other than
24   what you've already testified to.
25   A   I'm not sure what you really mean by that.

---

Page 378

Brooks

1
2    Q   What I mean is, is that you've told us
3    that there's certain things that happened or
4    you allege happened between you and Mr. Cooper
5    on July 21st.
6        You also allege, as a result of those
7    things and that situation, that you've suffered
8    emotional distress.
9        And you've also alleged, and it's my
10   understanding that your testimony is, is that
11   you've also alleged that as a result of
12   complaining about this alleged incident with
13   Mr. Cooper, that there are certain things that
14   happened afterwards and you believe that you
15   were targeted, right?
16   A   Yeah, that's a fact.
17   Q   Okay.  So that's a summary.
18       And we've heard about, and we've heard
19   from you on all of those things.
20       And I'm saying, other than what you've
21   already told me about, is there anything else?
22   A   Oh, is there anything else.
23       Well, yeah, this situation that happened
24   with Mr. Cooper caused me to relapse.
25       It caused me to, you know, pick up drugs

---

Page 379

Brooks

1
2    again, to try to deal with or abate the
3    depression.  And that caused a problem with my
4    parole.
5        I came home and I was on Level 4.  Level 4
6    is the best level you could be on.  You only
7    have to see parole once every four months.  And
8    that was because of my behavior while I was
9    incarcerated.  It was exemplary.
10       I ran the drug programs while I was
11   incarcerated.  I did the alternative to
12   violence programs.  I advocated, and I was the
13   one that was in control of running the groups.
14       So when I came home and this happened to
15   me, I picked up again.  I relapsed.
16       Bad on me, hurt me, but it also hurt me as
17   far as parole was concerned because now I got
18   dropped from Level 4 to Level 1.
19   Q   What is Level 1?
20   A   Level 1 means that instead of going to see
21   my parole officer once every four months, so
22   that would be three times a year.  I had to go
23   see him every week, again.
24   Q   Is there a level where you have to see a
25   parole officer every two weeks?

---

Page 380

Brooks

1
2    A   Yeah, that's Level 2.
3        And eventually I got put into Level 2
4    where I went to go see them every two weeks.
5    But after the incident, it became every week.
6        Now, it was every two weeks.  I'm
7    currently still on Level 2.
8    Q   Okay.  Why did you get dropped to Level 2
9    from Level 4?
10   A   Because of drug use and because I got
11   kicked out of The Doe Fund.  They kicked me
12   out.  They did their best to kick me out.
13   Wicked people.
14       They kicked me out of The Doe Fund, so I
15   was homeless.  Slept with a friend, at a
16   friend's until my apartment thing kicked in.
17       My parole officer came to see me at The
18   Doe Fund.  I was no longer there.  So he was
19   about to put out a warrant for my arrest,
20   saying that I had ran away from parole, so to
21   speak.
22       And so that caused me stress.  I had to go
23   to another drug program and do another drug
24   program, which was about eight months, and to
25   deal with my relapse problem that occurred

---

CONFIDENTIAL

Page 381

Brooks

1
2    behind the stress that I was dealing with at
3    The Doe Fund from what happened with
4    Mr. Cooper.
5    Q    Just --
6    A    Also, me and my wife, our sexual
7    interaction is not what it used to be.  I don't
8    feel like touching her often.
9        And so it made my situation with my wife
10   worse.  She started to feel like I didn't want,
11   I wasn't attracted to her anymore.
12   Q    We are far afield from what the original
13   question was.
14       The original question was that to support
15   your claim what -- you know, what things were
16   done that caused you this emotional distress.
17   I think you've now answered that.  I just want
18   to ask you, Mr. Brooks, you know, as far as
19   your level, your parole level.
20       Your status, if I understand you
21   correctly, you were on Level 4 when you were
22   released from incarceration; is that right?
23   A    Yes.
24   Q    And were you on Level 4 at the time you
25   entered The Doe Fund?

Page 382

Brooks

1
2    A    Yes.
3    Q    And at what point -- withdrawn.
4        Were you on Level 4 through the date of
5    July 21, 2016?
6    A    I'm not good with dates.
7    Q    Well, then July 21, 2016 is the date that
8    the allege that Mr. Cooper inappropriately
9    touched you, correct?
10   A    Yeah.
11   Q    At any point before that, had your parole
12   level changed?
13   A    No, I was on Level 4.
14   Q    So it was your testimony that from start
15   to finish, from the start of The Doe Fund until
16   July 21, you were on Level 4?
17   A    I was on Level 4, yeah.
18   Q    Did you take any other drugs other than
19   marijuana after the alleged incident on
20   July 21?
21   A    Yeah, I took sleeping medication.
22   Q    Was that the -- withdrawn.
23       What's the name of that medication
24   Mir-something.  It's a long name.  I don't
25   understand it.

Page 383

Brooks

1
2    Q    If I told you it was Mirtazapine; is that
3    correct?
4    A    Yeah, that sounds like it.
5    Q    And where did you get that medication
6    from?
7    A    From a psychologist, therapist.
8    Q    I'm asking specifically, what person
9    prescribed you this medication?
10   A    Two people prescribed me the medication.
11   Q    Who?
12   A    Mr. ^Kulloford, and I think her name is
13   Ms. Luna.  I don't remember.  She has an
14   African name.  I'm really not good with names.
15       If I don't see a person every day, every
16   day, I don't remember their names, and I don't
17   remember things.
18       MS. O'CONNELL:  May we let him see the
19   interrogatories.
20       MR. BARTOLOMEO:  No, not yet.  Thank you.
21   I want to just get what his understanding is
22   based on.
23   BY MR. BARTOLOMEO:
24   Q    And after the incident that you allege
25   happened on July 21st, how much marijuana were

Page 384

Brooks

1
2    you smoking?
3        If you can tell me in term of frequency,
4    as a number of days out of the week, and also
5    quantity, in terms of each time you smoked or
6    during those days that you smoked how much you
7    would smoke.
8    A    After the incident, I can't recall -- I
9    don't know how much marijuana I was smoking.  I
10   can't tell you that.
11   Q    Were you smoking in the morning?
12   A    I can't say.  I don't remember.
13   Q    So you have no recollection, Mr. Brooks,
14   as to how much or how often you were smoking
15   marijuana?
16   A    No.
17   Q    Could it have been a pound of marijuana
18   you would smoke in one day?
19   A    I couldn't even afford a pound of
20   marijuana, sir.
21   Q    Okay.  Maybe we can get a pretty good idea
22   of what maybe you were smoking.
23       How much could you afford to smoke in one
24   day?
25   A    I don't remember.  I don't remember.

CONFIDENTIAL

Page 385

Brooks
1
2    Q   I'm not asking you for the exact, you
3    know, grams and ounces here.  I'm just asking
4    for generally.
5        Did you smoke one joint a today, two
6    joints a today, one blunt a day, two blunts a
7    day?
8    A   It depended on how I felt, sir.
9    Q   And if you could approximate for me, to
10   the best of your recollection, how often.
11       Was it every day?  Was it once a month?
12   Once a year?  Was it something else?
13       How often were you smoking marijuana?
14   A   I think it started gradually to become an
15   every-day thing.
16   Q   And on those days when this became an
17   every-day thing, how much were you smoking a
18   day?
19   A   I can't say.
20   Q   How much could you afford to smoke a day
21   once it became that?
22   A   I don't remember.
23   Q   Did you smoke by yourself or with other
24   people?
25   A   I smoked by myself.

Page 386

Brooks
1
2    Q   Did you ever smoke with other people?
3    A   No.
4    Q   There's also a claim in the complaint, and
5    it says, a claim of interference with
6    protective rights.
7        Do you see that at the bottom?
8        You made a claim for interference with
9    your protective rights.  And I believe it's
10   Page 21 in the middle of the page, the
11   9th cause of action.
12       Do you see that where it's written in bold
13   and caps?
14   A   You say in the middle, "^Ninth Cause of
15   Action in the Field with Protective Rights,"
16   okay.
17   Q   Okay.  Are you -- in your -- withdrawn.
18       Are you claiming that anything -- anything
19   different in this claim where you've claimed
20   that -- your -- interference with protective
21   rights, is there anything different, and other
22   than what you've told us about, the acts that
23   were committed in response to your lodging a
24   complaint against Mr. Cooper?
25   A   I don't understand your question.

Page 387

Brooks
1
2    Q   Sure.
3        What is the basis for your allegation that
4    there was an interference with your protective
5    rights?
6    A   I don't know.  I don't know how to answer
7    that question.
8    Q   What's your understanding of what
9    "interference of protective rights" means,
10   Mr. Brooks?
11   A   It's a legal term.  I really --
12   Q   I'm asking you for your personal
13   understanding, to the best that you understand,
14   what does that mean?
15   A   I don't know.
16   Q   Page -- excuse me, Paragraph 127, here.
17       Paragraph 127 of the complaint reads that:
18   Defendant Doe Fund and Defendant Wiggins
19   retaliated against you by withdrawing
20   employment opportunities to plaintiff and
21   discouraging you from taking full-time
22   employment outside of the program.
23       In what ways did The Doe Fund retaliate
24   against you by -- excuse me.
25       In what ways did they withdraw employment

Page 388

Brooks
1
2    opportunities?
3    A   I believe I testified to that already.  I
4    told you that they were pulling me off the van
5    and not letting me go on my routes.  They were
6    writing me up for things that I didn't do,
7    clearly.
8    Q   And what --
9    A   They just made the working environment
10   very hostile.
11   Q   And --
12   A   As far as outside --
13   Q   Yeah, go ahead.
14   A   Like I testified to before -- in fact,
15   before -- even before I was getting a job I was
16   telling them that I had possibilities because I
17   seen that there were hostilities while I was
18   going to work with the supervisors.
19       So I told my counselor, Listen, I could
20   get a job.  And he told me that, no, I
21   shouldn't be getting a job.  I need to do the
22   program.  Because if I get my own job I'm no
23   longer a part of the program no more.
24       But when I couldn't take it anymore, the
25   hostility and the playing the games with me, I

CONFIDENTIAL

Page 389

Brooks

1   just went and got my own job anyway and
2   decided, forget it, I won't be a part of the
3   program if this is the way they are going to
4   treat me.
5      As you know, when I did get my own job,
6   they were interfering with it.  They were
7   causing me problems with my late night pass.
8   And I'll get a pass, finally get a pass, and
9   I'll be sleeping, you know, staff would come
10  banging on the door, wake my up to make sure,
11  you know, I had sleepless nights.
12     Things of that nature is what I recall
13  happening.
14  Q   Okay.  And as far as Mr. Cooper, do you
15  allege Mr. Cooper interfered with your
16  employment outside of The Doe Fund?
17  A   No, I can't say that he has.
18  Q   And now in Paragraph 128, the complaint
19  that's in front of you, it says "The Doe Fund
20  retaliated against plaintiff by refusing other
21  housing opportunities to you that were
22  typically offered to others."
23     What housing opportunities were refused to
24  you that were typically offered to other?

Page 390

Brooks

1   A   Well, I was asking to get a links voucher.
2   And I was supposed to be set up with getting a
3   link vouchers a couple of times, that would
4   have enabled me to get housing.
5   Q   And what happened?
6   A   I continued to ask and ask, and I was
7   getting the runaround about the links voucher.
8   So what I ended up doing is going out and
9   getting a SEP voucher on my own, that had
10  absolutely nothing to do with the company.
11     So I ended up getting my own apartment
12  without any help or assistance from The Doe
13  Fund.  And I just felt like, you know, they
14  didn't do nothing that they claimed that they
15  was going to do, like help me with independent
16  living; you know, finding a house, finding
17  stable work.  They did none of that.  I did
18  that on my own.
19     In fact, they kind of hindered me from
20  doing a lot of things.
21  Q   And who gave you the runaround?
22  A   Well, The Doe Fund.
23     MR. BARTOLOMEO:  We'll break in a few
24  minutes for lunch.  I just wanted to find out.

Page 391

Brooks

1   Q   You said Doe Fund employees.
2      Is there anybody specific that you recall
3   having given you the runaround about the links
4   voucher?
5   A   I know it was my counselor.  My case
6   manager.
7   Q   What's that person's name?
8   A   Mr. O'Neil.  Both of my case managers.
9   Both of them, Mr. O'Neil and Mr. Porter.  I was
10  asking them about the voucher, the links
11  voucher.  I didn't get any leeway towards it.
12  I never got a link voucher at all.  And the
13  link voucher was the typical voucher that they
14  gave to residents in The Doe Fund.
15  Q   Was one of the conditions of your parole
16  that you be enrolled in the Ready, Willing &
17  Able program?
18  A   No, it wasn't a condition of the parole.
19  Q   There was no requirement that you
20  participate in any type of program; is that
21  correct?
22  A   Not the Ready Willing & Able program.
23     It was a condition of my parole that I go
24  to a drug program and an alternative to

Page 392

Brooks

1   violence program.
2   Q   And did the Ready, Willing & Able program
3   provide you with those, drug program and
4   alternative to violence programs?
5   A   No.
6      MR. BARTOLOMEO:  I think this is probably
7   a good time to stop for us to stop.  I have
8   some more.  I think this is good for lunch.
9      (Luncheon Recess:  1:28 p.m.)
10     A F T E R N O O N   S E S S I O N
11     (Time noted:  1:53 p.m.)
12     (Deposition Exhibit 11, Document Entitled
13  "Appeal from the United States District Court
14  for the Northern District of Mississippi, USDC
15  No. 1:12-CV-190," marked for identification as
16  of this date.)
17  G R E G O R Y   B R O O K S, resumed and
18  testified as follows:
19  EXAMINATION BY (Cont'd.)
20  MR. BARTOLOMEO:
21  Q   We just returned from lunch, Mr. Brooks.
22  I'll just remind you you're still under oath.
23  And all the rules we discussed this morning and
24  last time now applies.

Page 393

Brooks

1
2 Q   Did you ever live in Mississippi?
3 A   No.
4 Q   Can you just take a look at what's been
5 marked for identification as Plaintiff's
6 Exhibit No. 11.
7     It's titled -- it's a multiple-page
8 document that's 26 pages, I believe.  It's
9 regarding Case No. 14-60357.  It's caption "In
10 the United States Court of Appeals For the
11 Fifth Circuit.  Gregory Brooks,
12 Plaintiff-Appellant, versus the City of West
13 Point, Mississippi; Jimmy Birchfield;
14 Willimam Spralding, Defendants-Appellees."
15     The Gregory Brooks that's referred to in
16 the caption; is that you?
17 A   No.
18 Q   You haven't filed any other lawsuits other
19 than the one we're currently here for today?
20 A   No.
21 Q   If you just look at Page 2 of this
22 document that's Plaintiff's Exhibit 11.
23     Do you have -- do you have a sister that
24 lives in Atlanta?
25 A   No.

Page 394

Brooks

1
2 Q   Have you, at any time, had family members
3 that lived in Atlanta?
4 A   Any family members that lived in Atlanta?
5     I have family members that live in Georgia
6 right now.
7 Q   Okay.  Do you know if any of those ever
8 lived in Atlanta, Georgia?
9 A   No.
10 Q   We don't need you to look at that anymore.
11 Just put it right above this one here.  And
12 this is marked.
13     All right.  Last time at your deposition,
14 Mr. Brooks, you testified that you -- it was
15 your understanding that somebody told you that
16 Mr. Cooper got fired because he was accused of
17 touching someone.
18     Do you recall giving that testimony?
19 A   I recall something similar.
20 Q   Okay.  Then can you clarify for the record
21 exactly what you recall saying.  I don't want
22 to paraphrase what you did say.
23 A   I don't know if you're talking about when
24 I seen another one of the cleaners and he told
25 me that Cooper was fired for touching somebody.

Page 395

Brooks

1
2 Q   What was that person's name?
3 A   I don't know.
4 Q   How long after the incident did this
5 individual -- like how many days after this
6 incident or the alleged incident with
7 Mr. Cooper, how many days after did this person
8 tell you that he believed Terry got fired
9 because he was accused of touching somebody?
10 A   I don't know.  I don't remember.
11 Q   How did that person -- withdrawn.
12     Did that person tell you anything else,
13 other than he believed that Terry had been
14 fired for touching somebody?
15 A   No.  What he said -- he said that he
16 believes that Terry got fired because he
17 touched somebody.  He said he don't know if it
18 was because he touched somebody or because he
19 was stealing from The Doe Fund.  Because he
20 said that Terry was stealing that -- it's been
21 accused that Terry was stealing, so, outside of
22 everything.
23 Q   So he gave you two possible explanations
24 for why Mr. Cooper was fired?
25 A   Yes.

Page 396

Brooks

1
2 Q   Isn't it true that you have no knowledge
3 who Mr. Washington told -- withdrawn.
4     Isn't it true that you don't have any
5 knowledge to confirm that Mr. Washington told
6 anyone, other than yourself, about the
7 investigation into your allegations against
8 Mr. Cooper?
9 A   That I have no knowledge.
10     Well, he was the only other person that
11 knew.  So between me, him and the HR people
12 that got together -- that was the only people
13 that knew.
14     So for a dude that doesn't even live in
15 the facility, because he didn't live there, he
16 just was a day worker.  He used to come in and
17 go out.
18     For him to have knowledge that, you know,
19 Terry had touched somebody or was fired because
20 of -- or he assumed Terry was fired because of
21 it, he shouldn't have known that.
22 Q   And what -- so -- withdrawn.
23     So is it correct to say that this is an
24 assumption that you're making based on people
25 that you understood had knowledge and the fact

CONFIDENTIAL

Page 397

Brooks

1
2  that somebody had told you that they believed
3  that one of the possibilities for why Terry got
4  fired was because he had touched somebody?
5  A   Yeah, I believe that somebody leaked the
6  information.
7  Q   And can you describe what this cleaner
8  person looked like?
9  A   He was tall, brown skin, a little bit
10  older.  He had like -- he was slim.  Had like
11  salt and pepper hair.
12  Q   Male?  Female?
13     It was male, correct?
14  A   A guy.
15  Q   And then was this person -- withdrawn.
16     Do you know how often this person was
17  working at The Doe Fund?
18     Was it every day or something else?
19  A   No.  I don't know.
20  Q   Did you see him most days that you were
21  there?
22  A   No.  I only seen him a handful of times.
23  Q   When was the last time that you slept
24  with -- you had sexual intercourse with your
25  wife?

Page 398

Brooks

1
2  A   Wow.  A couple of weeks ago.
3  Q   And the time before that?
4  A   Was a couple of years ago.
5  Q   And when was the last you slept with a
6  woman other than your wife?
7  A   A few weeks ago.
8  Q   Was it before or after you slept with your
9  wife, the most recent time?
10  A   Before.
11  Q   Have you ever had any other sort of -- any
12  sexual interactions -- it doesn't necessarily
13  mean having intercourse -- with any women other
14  than your wife since the most recent time you
15  had intercourse with her?
16  A   Say that again.
17  Q   Yeah.
18     Did you have any sort of sexual
19  interactions with other women other than your
20  wife since the time that you last slept with
21  her?
22     MS. O'CONNELL:  Objection.
23  Q   So after that time, have you been with any
24  other women?
25     And I don't mean necessarily having had

Page 399

Brooks

1
2  sex with her.
3     MS. O'CONNELL:  Objection.
4  A   As far as I understand your question, I
5  don't think so.
6  Q   Did you kiss any other women?
7  A   No.
8  Q   If I said that, you know, making out with
9  a woman, what would your understanding of that
10  be?
11  A   Kiss her.
12  Q   So you have not kissed or otherwise
13  engaged in any sexual interactions with another
14  women other than your wife since the last time
15  you slept with your wife; is that correct?
16  A   That's correct.
17  Q   What was name of the woman that you slept
18  with right before you slept with your wife?
19  A   Sarah.  Sarah.  Her name is pronounced
20  differently.  In America it would be Sarah.
21  But her name is pronounced Sarrah.
22  Q   And have you known this woman for a long
23  time, or is this somebody you just met,
24  something else?
25  A   Yeah, I've known her for over a year.

Page 400

Brooks

1
2  Q   And is this one of the women you told us
3  about last time, you said that there was one,
4  if I recall, you would see and sleep with
5  whenever she would come to New York?
6  A   That's correct
7  Q   Is that the woman you're referring to?
8  A   Yes.
9  Q   Where does she live?
10  A   She lives in Baltimore.
11     MR. BARTOLOMEO:  Go back to play what's --
12  I'm going to play what's been marked now --
13  we'll mark for identification as Plaintiff's
14  Exhibit 12, and it's an audio clip, so we're
15  going to play it from the moment of the six
16  minutes.
17     This was provided by plaintiff, and it
18  was, our understanding, it was last modified on
19  August 8th of 2016.  And it's titled "Play
20  Mr. Washington."
21     (Deposition Exhibit 12, File Entitled
22  "Play Mr. Washington," marked for
23  identification as of this date.)
24     MR. BARTOLOMEO:  So if we would just play
25  it and queue it from the sixth minute.

Page 401

Brooks

1  (Tape playing.)
2  BY MR. BARTOLOMEO:
3  Q   Was that you and Mr. Washington on that
4  tape, Mr. Brooks?
5  A   Yes.
6  Q   Was anybody else on that tape?
7  A   No.
8  Q   There came a point where you said -- you
9  stated on that audio clip that the "route
10 situation had been kind of simmering down."
11     What did you mean by that?
12 A   I meant behind the last couple of days, I
13 wasn't having issues.
14 Q   So your route situation had basically been
15 resolved; is that correct?
16 A   Not resolved. I was just saying they
17 didn't bother me for the last couple of days.
18 Q   You said something about a Breathalyzer on
19 that tape also.
20     Do you remember that?
21 A   Yes.
22 Q   Isn't it true that you say here that the
23 issue with the Breathalyzer was just an error
24 with the machine?

Page 402

Brooks

1  A   Yeah.
2  Q   And the security guard said that you we're
3  okay to go?
4  A   Yeah.
5  Q   And Mr. Matthews also said you were okay
6  to go, correct?
7  A   Yeah, that's after he brought me down into
8  his office.
9  Q   Who brought you down into his office?
10 A   Mr. Matthews.
11    He brought me down in the office and asked
12 me, What, is there a problem I don't want to do
13 the program. And I found that to be strange
14 for him to say that.
15    What does me blowing in a Breathalyzer
16 have to do with me not wanting to do the
17 program anymore?
18 Q   Wasn't one of the conditions of you being
19 in the program that you comply with the rules
20 of the program?
21 A   Absolutely. And I was complying to the
22 rules of the program. That's why it didn't
23 make sense to me for him to say that.
24 Q   So maybe I'm unclear.

Page 403

Brooks

1     Is it permitted for a participant in the
2  program to refuse a drug test?
3  A   As you heard on the tape that -- number
4  one, that wasn't a drug test; it was a
5  Breathalyzer.
6  Q   I'm just asking as a general matter, is it
7  permitted for a participant in the program to
8  refuse a drug test?
9  A   I don't know.
10 Q   With respect to -- the same question
11 regarding an alcohol test or a Breathalyzer, is
12 it permitted for a participant in the program
13 to refuse an alcohol or a Breathalyzer test.
14 A   I don't know if it's permitted to refuse a
15 alcohol/Breathalyzer test in the program.
16    But I know that I was not refusing. I
17 blew into that Breathalyzer a few times. And
18 he just assumed I didn't want to do the
19 program. And I blew in it and I waited. And I
20 sat there and waited for him to try to fix
21 their machine so I can do it again for them.
22    Because they came upstairs and got me so I
23 can do it again; even though I blew on it a
24 couple of times with the staff.

Page 404

Brooks

1     And another staff -- what I mean by
2  "staff" is security. Another security, like I
3  said in the tape, had blew on it and it came up
4  the same way. He knew he wasn't drinking
5  either, and knew it was something wrong with
6  their machine.
7  Q   I'm going to now play for you, on same
8  exhibit, Exhibit 12, I believe it is, another
9  clip.
10    (Tape Playing.)
11 Q   It's true that you asked Mr. Washington
12 who else knows during that audio clip; is that
13 correct?
14 A   Yes.
15 Q   And isn't it true that you don't know if
16 anyone outside those involved in the
17 investigation knew about the complaint that you
18 made about Mr. Cooper?
19 A   Say that again.
20 Q   Isn't it true you don't know if anyone
21 outside of those involved in the investigation
22 knew about the complaint and allegations you
23 brought against Mr. Cooper?
24 A   I don't know how other people found out.

CONFIDENTIAL

Page 405

Brooks

1  
2  That was the reason why I had that conversation
3  with him, because I don't know how did other
4  people found out that was not a part of the
5  investigation, that was not in the room with
6  me, him and the HR people talking. How did
7  people outside of that found out about it;
8  because I sure enough didn't tell nobody. But
9  people had accurate information on what
10  happened, so that was my issue.
11  Q   And so this is just your assumption that
12  you're making; is that correct?
13  A   It wasn't an assumption. It was an actual
14  fact. It was a dude that wasn't involved,
15  didn't have nothing to do with it, didn't even
16  live in the facility, and he knew that Terry
17  had touched somebody.
18      Like, how did he find that out?
19  Q   I understand.
20      But he didn't tell you that anyone
21  involved in the investigation had told him this
22  information, did he?
23  A   Nah, he never told me who told him.
24  Q   Did you ask him who told him?
25  A   No.

Page 406

Brooks

1  
2  Q   Isn't it correct you just stated you're
3  also a trainee?
4  A   Yeah, that's what what I said.
5  Q   Okay. And you also distinguish that as
6  against somebody who you claim was an employee
7  of the company for three years, meaning
8  Mr. Cooper?
9  A   No. But I said that saying that I was new
10  to the company, and I was only a route worker.
11  Q   Okay. I can read for you, Mr. Brooks, if
12  you'd like, exactly what you said from that
13  audio clip.
14      It says "I know, I'm a trainee. I
15  understand that. He was an employee. He's
16  been with the company, from what I hear like
17  three years or more, right?
18      And I believe you were referencing --
19  speaking about Mr. Cooper; is that correct?
20  A   Yes, I was speaking about him.
21  Q   Okay. And just to confirm, you said that
22  the guy -- I believe that audio clip reflects
23  this.
24      But just to confirm, you told
25  Mr. Washington during that audio clip that you

Page 407

Brooks

1  
2  were -- that he told you it was two stories,
3  right?
4  A   Right.
5  Q   Last time you gave some testimony,
6  Mr. Brooks, about having had your room --
7  actually, let me go through.
8      Are you alleging as a result of your
9  filing the complaint against Mr. Cooper, that
10  Mr. Cooper retaliated against you in any way?
11      MS. O'CONNELL: Objection.
12  A   The next time I seen him he approached me
13  in a hostile manner. And it appeared to me he
14  actually wanted to have a fight with me.
15  And . . .
16  Q   And that was your only interaction with
17  Mr. Cooper after the date that you filed the
18  incident --
19  A   That was my only interaction after.
20  Q   And approximately how long did that
21  interaction last for?
22  A   A few seconds.
23  Q   And other than you saying that he
24  approached you in a hostile manner, is there
25  anything else that you're claiming that

Page 408

Brooks

1  
2  Mr. Cooper did to retaliate against you in
3  connection with, or as a result of your filing
4  to a complaint against Mr. Cooper?
5      MS. O'CONNELL: Objection.
6  A   I don't know what else he did, but I know
7  that other staff members was retaliating. I
8  don't know if it was on his behave, he told
9  them to do it or whatnot. But I was catching
10  it from a lot of different people.
11  Q   And I understand, and we'll get to that
12  other stuff in just a moment.
13      But specifically, did Mr. Cooper -- are
14  you claiming that Mr. Cooper did anything else,
15  other than that one incident that you described
16  now, to retaliate against you for your filing
17  the complaint against Mr. Cooper?
18      MS. O'CONNELL: Objection.
19  A   I don't recall.
20  Q   And is it correct to say that the only
21  interaction you had with Mr. Cooper after the
22  time you filed your complaint against him was
23  that brief encounter you just described?
24  A   Yes.
25  Q   Have you ever, since that time of filing

CONFIDENTIAL

Page 409

Brooks

1
2  your complaint, other than that one brief
3  encounter, have you ever seen or spoken to
4  Mr. Cooper again?
5      A   No.
6      Q   I'm going to now mark, for identification,
7  Plaintiff's Exhibit 13.
8      (Recess taken.)
9      (Deposition Exhibit 13, E-mail Chain,
10  marked for identification as of this date.)
11      Q   I'm going to show you now what's been
12  marked as Plaintiff's Exhibit 13 for
13  identification.  If you would just review the
14  document and look up when you've finished
15  reviewing the document and we'll know that
16  you've looked it over.
17      You had a chance to review the document,
18  Mr. Brooks?
19      A   I'm doing that now.
20      Q   I'm just going to describe for the record
21  what it is.
22      MR. BARTOLOMEO:  It's an e-mail that says
23  "Confidential" at the top.  It says "Mail -
24  Sexual Harassment Complaint."  It's a two-page
25  document.  The first e-mail on the upper

Page 410

Brooks

1
2  right-hand corner indicates that it was sent on
3  Friday, July 22, 2016 at 7:29 a.m.
4      It's Bates No. DoeFund -- Bates labeled
5  Doe Fund 000161 and 162.
6      A   All right.
7      Q   You've now had an opportunity to do that?
8      Mr. Brooks, have you ever seen this
9  document before?
10      A   No.
11      Q   You're familiar with what it's referring
12  to now that you've had an opportunity to review
13  it?
14      A   Yeah.  I believe it's referring to my
15  complaint.
16      Q   Okay.  And if you can take a look at the
17  top, the first one says "Sexual Harassment
18  Complaint."  It says underneath that "19
19  messages."  The name written under that is
20  "James Washington," correct?
21      A   Yes.
22      Q   And then the time and date stamp again of
23  that e-mail that Mr. Washington sent, it
24  indicates it's Friday, July 22, 2016 at
25  7:29 a.m.

Page 411

Brooks

1
2      Do you have any reason to believe that
3  this e-mail by Mr. Washington was sent at any
4  other time than what's indicated in this page?
5      Do you have any reason to believe that,
6  Mr. Brooks?
7      A   Do I have any reason to believe?
8      Q   That it was sent at a different time.
9      A   Other than what's indicated on the page?
10      Q   It's not a trick question.  I'm just
11  asking if you have any reason.
12      A   I don't know.
13      Q   Sitting here today --
14      A   I don't know.
15      Q   Isn't it true, based on the time that's
16  written, 7:29 a.m., and the time which
17  Mr. Washington indicates in the e-mail that he
18  received your complaint, isn't it true that
19  he -- once he saw your complaint, he
20  immediately started investigating the
21  complaint?
22      A   Yes.
23      Q   And then if you look at the second e-mail
24  at the bottom -- we just briefly read that
25  over -- isn't it true Mr. Cooper was instructed

Page 412

Brooks

1
2  not to report to work while the matter was
3  being investigated?
4      A   Yes.
5      (Deposition Exhibit 14, File Entitled
6  "Washington on Vernon," marked for
7  identification as of this date.)
8      Q   And now I'm going to play you something
9  from the audio clips.  This is also -- this is
10  an audio clip.  We're going to mark for
11  identification as Plaintiff's Exhibit 14.  It's
12  titled "Washington on Vernon."  We're going to
13  play the segment between two minutes to 50
14  seconds to five minutes and 59 seconds.  The
15  audio clip indicates that it was last modified
16  on July 22, 2016.
17      (Tape playing.)
18  BY MR. BARTOLOMEO:
19      Q   Mr. Brooks, you've now listened to that
20  audio clip, which we've marked for
21  identification as Plaintiff's Exhibit 14.
22      Is that a conversation you had with
23  Mr. Washington?
24      A   Yes, it is.
25      Q   And how long after the alleged incident

CONFIDENTIAL

Page 413

Brooks

1
2  with Mr. Cooper did that conversation happen;
3  was it the next day, next week, something other
4  than that?
5  A   I don't remember.
6  Q   If I indicated to you now that the --
7  excuse me, that the date on the audio file says
8  it was last modified on July 22, 2016, does
9  that refresh your recollection as to what date
10  that conversation took place?
11  A   No, I don't remember.
12  Q   What date did you file your complaint
13  against -- excuse me.  Withdrawn.
14      What date do you allege the incident with
15  Mr. Cooper occurred?
16  A   I don't -- I told you I don't remember
17  dates at all, so -- but I do know that when I
18  wrote the complaint, I had the date on that
19  complaint.
20  Q   All right.  On the complaint, I believe
21  what we've referred to is Plaintiff's Exhibit
22  Exhibit 8.  I've now placed that before you.
23      Mr. Brooks, if you would please pick you
24  head up, look at it.  And tell me if there's a
25  date on there that would refresh your

Page 414

Brooks

1
2  recollection as to when the incident you allege
3  occurred with Mr. Cooper.
4  A   7/21/2016.
5  Q   Now, if I told you that this audio clip
6  last modified or bears a stamp, a time and date
7  stamp of 7/22 of 2016, would that be the day
8  after the alleged incident with Mr. Cooper?
9      Yes or no?
10  A   Yes.
11  Q   And would this make sense that this
12  conversation was held -- withdrawn.
13      Was this conversation held with
14  Mr. Washington right after he received and
15  reviewed your complaint?
16  A   Yes, it was after.  It was after me making
17  the complaint.
18  Q   And he also told you that he had sent the
19  complaint over to HR; is that correct?
20  A   Yes.
21  Q   And he also told you that Mr. Cooper would
22  not returned to Gates Avenue facility until the
23  matter was resolved, correct?
24  A   Yes.
25  Q   And isn't it true that also during that

Page 415

Brooks

1
2  conversation, you and Mr. Washington discussed
3  your schedule; is that correct?
4  A   Yes.
5  Q   And that was the same day that he had
6  received your complaint; is that correct?
7  A   I believe so.
8  Q   Do you have any reason not to believe so?
9  A   I believe so.
10  Q   I'm asking you -- withdrawn.
11      Isn't it true that Mr. Washington called
12  Mr. Bell on the telephone to assist with your
13  schedule?
14  A   To assist?
15      Sounds to me he was calling for
16  information.
17  Q   I think that's just a matter of, what we
18  would say, semantics.
19      What is your understanding of why
20  Mr. Washington was calling Mr. Bell on the
21  telephone that day?
22  A   To get accurate information.  We didn't
23  know where Vernon was.  He didn't know -- I
24  said Queens.  He said Vernon.  I didn't know
25  what he was talking about when he was saying

Page 416

Brooks

1
2  Vernon.  And so he obviously didn't know
3  either, so he called Mr. Bell to find out.
4  Q   So they are doing this in attempt to help
5  you out with your schedule; is that right, give
6  you information, provide you information to
7  help out with your schedule, correct?
8  A   I can't say I know what was his reason for
9  doing that.  You got to ask him that.
10  Q   Is it your understanding that they were
11  trying to assist you with your scheduling?
12  A   No.
13  Q   Then what were they doing?
14  A   He was getting information.  He was trying
15  to find out where I was going to be available
16  to speak with HR.
17  Q   You were able to get that information on
18  your own?
19  A   Clearly I wasn't because I went in there
20  to speak to him about it.
21  Q   Okay.  And so if you asked somebody to
22  assist you, you asked -- isn't it true you
23  asked Mr. Washington to assist you with getting
24  information about your schedule?
25  A   I didn't ask Mr. Washington to assist me.

CONFIDENTIAL

Page 417

Brooks

1
2  I was telling him my situation, and he was
3  telling me when I had to be available to speak
4  with HR on that day.
5  Q   Isn't it true that Mr. Washington made an
6  accommodation for you on Monday, July 25 so
7  that you could be interviewed in connection
8  with your complaint?
9  A   Made an accommodation?
10  Q   Yes.
11      Do you understand what that mean?
12  A   For something that they wanted me to do?
13      He wanted me to be there to speak to HR.
14  Q   Mr. Brooks, again, I'm going to remind you
15  what the rules of the deposition are, okay.  I
16  get to ask the questions, you get to give the
17  answers.  I'm asking a question, your answer
18  should be responsive to my question and not
19  just what you want to tell me, unless it's
20  responsive to my question.  Because we'll
21  continue to make motions to strike your answers
22  as nonresponsive.  We can continue to do this
23  all day if you'd like, okay.
24      I'm asking you if he made an
25  accommodation, meaning he helped you get out of

Page 418

Brooks

1
2  the work assignment, on that Monday so you
3  could be interviewed in connection with your
4  complaint.
5      Is that a yes or no?
6  A   I don't know.
7  Q   You don't know if Mr. Washington assisted
8  you with changing your schedule so that you
9  could be interviewed on that Monday?
10  A   I don't know.
11  Q   Were you interviewed in connection with
12  your complaint?
13  A   Yes.
14  Q   Who was present?
15  A   Two women and Mr. Washington.
16  Q   What day of the week was it?
17  A   I don't remember.
18  Q   Were you supposed to work that day?
19  A   I believe so.
20  Q   Did you work on that day?
21  A   I can't remember.
22  Q   I'm going to ask now for another clip,
23  which is titled "Playing with schedule,
24  Ronald Holly."  We're going to mark this for
25  identification as Plaintiff's Exhibit 15.  The

Page 419

Brooks

1
2  clip "Playing with Schedule, Ronald Holly," it
3  is -- we're going to play 0 through 1 minute 30
4  seconds, and it does not bear a time or date
5  stamp.  So we're going to go without further
6  ado, playing the chip.
7      (Deposition Exhibit 15, File Entitled
8  Playing with Schedule, Ronald Holly," marked
9  for identification as of this date.)
10      (Tape Playing.)
11  Q   Mr. Brooks?
12  A   Yes.
13  Q   You were able to listen to that, correct?
14  A   Yeah.
15  Q   So is that correct that that was a
16  conversation with Mr. Holly?
17  A   Yes.
18  Q   And Holly says today is the 29th.
19      He's referring to July 29th, correct?
20  A   Yes.
21  Q   And then Holly also told you that your
22  schedule is fixed and you didn't have to work
23  weekends; is that correct?
24  A   That's what he said.
25  Q   Was is correct, though, what he said?

Page 420

Brooks

1
2  A   No.  I end up having problems later on
3  with Mr. Bell, telling me that I was supposed
4  to be at work.
5  Q   You told Mr. Stevens during that
6  conversation, also, during that audio clip,
7  that you had a copy of your schedule?
8  A   Yeah.  That was a misstatement.  I had
9  seen a copy.  He showed it to me on the
10  computer.  He didn't give me a copy in my hand.
11  Q   And you told him your days off were
12  Saturday and Sunday?
13  A   That's what I told him, yes.
14      MR. BARTOLOMEO:  I need a few moment break
15  if that's okay.
16      (Recess taken.)
17  BY MR. BARTOLOMEO:
18  Q   Mr. Brooks, before -- excuse me.
19      Last time you were here you testified to a
20  couple of different medications that you had
21  been prescribed for sleeping.
22      When was the last time you took either of
23  those medications?
24  A   A couple of weeks ago.
25  Q   And was this the Remeron or the

CONFIDENTIAL

Page 421

```
              Brooks
 1
 2   Mirtazapine?
 3   A   Yeah, Mirtazapine?
 4   Q   And I think you mentioned something about
 5   Tizanidine; is that correct?
 6   A   Yeah.
 7   Q   Are currently prescribed?
 8   A   Mirtazapine.
 9   Q   Are you currently prescribed Tizanidine?
10   A   No, Mirtazapine.
11   Q   Are you currently being prescribed any
12   other medications other than Mirtazapine?
13   A   No, not right now.
14   Q   What -- can you tell me all the different
15   medications you've been prescribed, other than
16   than Mirtazapine and Tizanidine since the time
17   you've been out of prison, or the most recent
18   time you were out of prison?
19   A   No, I can't tell you that.  I don't
20   remember.
21   Q   To the best of your recollection, what
22   other medications have you taken or been
23   prescribed -- withdrawn.
24       To best of your recollection, what other
25   medications have you been prescribed, other
```

Page 422

```
              Brooks
 1
 2   than Mirtazapine or Trazodone since the time
 3   you were released from prison most recently?
 4   A   I don't remember.
 5   Q   What doctor prescribed you Mirtazapine?
 6   A   Two different doctors.  I answered that
 7   earlier.
 8   Q   Mr. Brooks, I'm entitled to ask you a
 9   question.  If you could please answer the
10   question, we'll get out of here a lot quicker.
11       Who prescribed you -- most recently, who
12   prescribed you Mirtazapine?
13   A   I don't remember her name.
14   Q   Who most recently described you Trazodone?
15   A   I don't recall.
16   Q   What were you prescribed Mirtazapine for?
17   A   Depression.
18   Q   And what's your understanding of what kind
19   of medication Mirtazapine is?
20       MS. O'CONNELL:  Objection.
21       MR. BARTOLOMEO:  Based on what?
22       I'm asking what his understanding, what
23   kind of the medication it is.
24       MS. O'CONNELL:  I mean, he's not a doctor.
25       MR. BARTOLOMEO:  That's why I'm asking
```

Page 423

```
              Brooks
 1
 2   Mr. Brooks as Mr. Brooks, what's his
 3   understanding.
 4   A   I don't know.
 5   Q   What was your understanding -- strike
 6   that.
 7       What is your understanding of how often
 8   you're supposed to be taking Mirtazapine?
 9   A   I don't recall what the doctor told me.
10   Q   Do you still have the pill jar at home?
11   A   Yes, I do.
12       MR. BARTOLOMEO:  I'm going to call for a
13   production of at least a couple of the label of
14   that pill jar.  If you would provide us with
15   that.
16   Q   I'm going to ask, Mr. Brooks, that you
17   give that -- either take a picture of the label
18   of that pill jar or you give that pill jar,
19   however you want to work it out with your
20   attorney.  But I'm going to call for production
21   of the copy of the label of that pill jar.
22       Do you still have the Trazodone at home?
23   A   No.
24   Q   Do you have any other medications other
25   than Mirtazapine at home?
```

Page 424

```
              Brooks
 1
 2   A   No, I used them.
 3   Q   What did you use?
 4   A   I don't recall the names of them.
 5   Q   Do you still have the empty pill bottle
 6   from those particular prescriptions?
 7   A   It's possible.  I might, I might not.  I
 8   don't know.
 9   Q   I would ask that you conduct a search for
10   any and all pill bottles, prescription pill
11   bottles that you have in your possession,
12   whether it's at home or elsewhere, provide
13   copies of either the labels or the actual pill
14   bottles to your attorney, and that your counsel
15   provide us with copies of the same upon
16   receipt.
17   A   Okay.
18   Q   Where have you sought medical treatment
19   since the time that you started living at the
20   Gates Avenue facility?
21   A   Well, I first went to my counselor for a
22   referral, because I didn't know where to go or
23   how to go about it.
24       So I went to my counselor for a referral.
25   I started speaking to my counselor about it,
```

CONFIDENTIAL

Page 425

Brooks

1  Yolanda. I got a -- that, for me asking for
2  the referral, they had me speak to an in-house
3  therapist. And I believe his name was
4  Culliford, I'm not sure. I can't remember.
5  And he's the one -- I discussed the situation,
6  what happened with the assault by Mr. Cooper,
7  how I was feeling. I couldn't sleep, you know,
8  I was feeling down. And he gave me the
9  medication.
10      Then I --
11  Q   If you could do for me a favor, just list
12  the places. And we can get into all the
13  details later. But it will just help for me
14  understanding what the names of all these
15  places or doctors that you've seen since you
16  started living at the Gates facility.
17      So right now I think you testified to
18  Yolanda, and you also testified to
19  Dr. Culliford or Mr. Culliford.
20      Other than Yolanda and Mr. or
21  Dr. Culliford, what other facilities,
22  hospitals, treatment centers, doctors, have
23  you've seen, just their names.
24  A   I went to Bright Point. I went to

Page 426

Brooks

1  something Horizon.
2  Q   You said Bright Point?
3  A   Yeah, Bright Point Health.
4  Q   And that's New Horizon, if that's correct?
5  A   It's some kind of Horizon. I went there,
6  spoke with them.
7  Q   Were is Bright Point Health?
8  A   I believe it's on Church Avenue in
9  Brooklyn. That's all I could remember right
10  now. I might be able to find business cards or
11  something.
12      I went to speak to the doctor at Brooklyn
13  Plaza, my clinic there. She's the one that
14  gave me a prescription.
15  Q   If I said that individual's name was
16  Kehide Idowu --
17      MR. BARTOLOMEO: I'll spell that for you.
18  The first name is K-e-h-i-d-e, last name,
19  I-d-o-w-u.
20  Q   -- would that refresh your recollection as
21  to who that individual was?
22  A   Yeah, exactly. Very difficult to
23  remember.
24  Q   So now we've talked about Bright Point

Page 427

Brooks

1  Health, some sort of Horizon facility, Brooklyn
2  Plaza Medical Center, Dr. Culliford, Yolanda.
3      Anybody else that you've seen since the
4  time you were at the Gates Avenue facility?
5  A   I had the drug counselor at Reborn for New
6  Life. And I tried to get a referral there as
7  well.
8  Q   So I'm just going to ask you, and we're
9  going to start to talk about each of them.
10      You know, Dr. Culliford, you said that
11  Dr. Culliford was the one who prescribed the
12  Mirtazapine; is that correct?
13  A   Yes.
14  Q   Where does Dr. Culliford work?
15  A   Brooklyn Plaza clinic.
16  Q   Are you -- is that the same place that the
17  other individual with the last name Idowu that
18  we just spoke about, is it the same place they
19  live -- excuse me, work?
20  A   What?
21      The one you asked about before?
22  Q   Yeah, Kehide Idowu.
23      I asked you if that was the person from
24  Brooklyn, and you said yes?

Page 428

Brooks

1  A   Yeah.
2  Q   And I asked you, Dr. Culliford, where does
3  that person work, you said Brooklyn.
4      Are they both at the same place?
5  A   No, no. He was at -- I forgot the name of
6  the organization. I could get some -- get a
7  name, but I forgot.
8      MS. O'CONNELL: Off the record.
9      (Discussion off the record.)
10  BY MR. BARTOLOMEO:
11  Q   You said at home you may have some
12  business card or other records. I ask that you
13  conduct a search for any records that would
14  provide us with additional details about your
15  medical treatment since the time that you
16  arrived at the Gates facility, and then provide
17  those records to your attorney, and then she
18  will, in due course, provide them to us.
19      MS. O'CONNELL: Can you let us know more
20  specifically what other sort of records or --
21      MR. BARTOLOMEO: He just said that he
22  might have business cards.
23      I'm asking for anything with identifying
24  information as to where Mr. Brooks sought

CONFIDENTIAL

Page 429

Brooks

1
2 and/or received medical treatment or therapy
3 treatment since the time that he had arrived at
4 the Gates facility to present.
5 So I don't know what kind of records those
6 would be; invoices --
7 MS. O'CONNELL:  Okay.
8 MR. BARTOLOMEO:  -- receipts, anything
9 like that.
10 BY MR. BARTOLOMEO:
11 Q  You said Dr. Culliford was part of some
12 group; is that right, Mr. Brooks?
13 A  No.
14 Q  What did you say about Mr. Culliford,
15 where he works?
16 A  He's a therapist at a drug program that I
17 was attending.
18 Q  And where is that drug program that you
19 attended, where is that located?
20 A  I believe it's York Avenue.
21 Q  York Avenue, is that what you said?
22 A  I believe so.  I would have to double
23 check.  I can't really recall.
24 Q  How many times did you see Dr. Culliford?
25 A  Once, maybe twice.

Page 430

Brooks

1
2 Q  And what did he treat you for --
3 withdrawn.
4 Did he provide you with any treatment?
5 A  Yeah, for depression.
6 Q  And what kind of treatment did he provide
7 you?
8 A  He gave me the prescription medication.
9 Q  You said he prescribed you medication?
10 A  Yes.
11 (Deposition Exhibit 16, Document Entitled
12 "Your Personal Prescription Information," marked
13 for identification as of this date.)
14 Q  I'm now going to show you what's been
15 marked for identification as Plaintiff's
16 Exhibit 16.
17 Can you tell me what this document that
18 you're looking at is?
19 A  Prescription information.
20 Q  Okay.  And is your name on there?
21 A  Yes, it is.
22 Q  Is that the correct date of birth?
23 A  Yes.
24 Q  And it does indicate that Dr. Culliford is
25 the doctor.

Page 431

Brooks

1
2 His name does appear on this label, right?
3 A  Yes.
4 Q  And it says take one tablet by mouth every
5 night at bedtime, correct?
6 A  Yes.
7 Q  Is there a reason why you didn't take one
8 tablet every day as directed?
9 A  I did at the time, but eventually that was
10 causing problems with me -- with waking up and
11 going to work.  That was -- at the same time
12 that he gave me that was the same time I was
13 having problems at The Doe Fund with being able
14 to maintain sleep.
15 Q  And how many -- do you know, off the top
16 of your head -- withdrawn.
17 To the best of your recollection, how many
18 pills are still left in your prescription?
19 A  I don't know.
20 In that bottle there's none.  I got
21 another whole bottle.
22 Q  And did you refill your prescription?
23 A  I got another prescription altogether.
24 Q  You got another prescription altogether;
25 is that what you said?

Page 432

Brooks

1
2 A  Yes.
3 Q  From whom?
4 A  From the other therapist that I spoke to
5 and seen.
6 Q  Which therapist was that?
7 A  I don't know how to describe her name --
8 pronounce her name.
9 Q  Where did you meet her?
10 A  The Brooklyn Plaza person.
11 Q  So you're referring to a doctor, a nurse,
12 a psychiatric therapist?
13 A  Yes.
14 Q  Which one?
15 A  A therapist.  She's the one I spoke to
16 about the incident, and she prescribed me
17 medication.
18 Q  If I told you that we received out to
19 Dr. Culliford's office and we were unable to
20 obtain -- we were advised that there's no
21 records of him having seen you as a patient, do
22 you have an understanding as to why that would
23 be?
24 A  No, I'm not there.  I don't deal with
25 their business.

CONFIDENTIAL

Page 433

Brooks

1
2       Why would I have an understanding why?
3       I'm not a part of that business.  I just
4   went to go see him.
5       Q    Do you know if you gave this piece of
6   paper, the one that's now marked as
7   Plaintiff's 16 in front of you, did you give a
8   copy of this to your attorney?
9       A   I believe so.
10      Q    Do you know why there's no date that's on
11  this label?
12      A   No.
13      Q    Do you know when it's from, what date?
14      A   I know it was a year or so back, maybe
15  two.
16      Q    And did he prescribe this medication to
17  you once, more than once?
18      A   Once.  I only seen him one time.
19      Q    Okay.  A few moments ago you said it was
20  one or two times.
21      So it your testimony --
22      A   I've since him one or two times in the
23  facility.  But I only got medications from him
24  one time.
25      Q    How many times did you meet with him,

Page 434

Brooks

1
2   personally, speak to the doctor?
3       A    One or two times.
4       Q    Was it one or is it two?
5       A    I believe I spoke to him briefly on
6   another occasion, but I can't really remember.
7       Q    You also testified a few moments ago that
8   New -- or some Horizon.
9       If I stipulated and -- if I indicated to
10  you that this was New Horizon; does that sound
11  right to you?
12      A   I'm not sure.  I'm not exactly sure.  But
13  I'm pretty sure I have the business card at
14  home.
15      Q    And earlier today you went through the
16  process of having to look at the
17  interrogatories.  You signed a verification
18  which means you read those and were swearing
19  under oath that that was accurate, to the best
20  of your knowledge?
21      A    Yeah, to the best of my knowledge,
22  correct.
23      Q    If you wouldn't mind just opening your
24  eyes and picking up your head, Mr. Brooks, I'll
25  be able to better hear you.  I want to make

Page 435

Brooks

1
2   sure you're fully with us.  If you need to take
3   a break, I'm happy to do that.  If you're
4   tired, I just ask that you fully participate in
5   this procedure.
6       A   I have a headache.
7       Q    Would you like to take a break?
8       A   I don't want to take a break.  I want to
9   get this over with.  So please proceed.
10      Q    I'm going to now put this back in your
11  hands.  It is Plaintiff's Exhibit 10.
12      Earlier today, once again, you had told us
13  you read over these, they were truthful to the
14  best of your knowledge and accurate to the best
15  of your knowledge.
16      Would you please read Response No. 4 to
17  determine whether New Horizon is the accurate
18  and true place that you went and sought
19  treatment?
20      A    Yeah, I believe so.
21      Q    When did you go to New Horizon for
22  treatment?
23      A    I believe that -- that may be mixed up
24  with the Resource Training & Counseling Center.
25      Q    What?  Say that again?

Page 436

Brooks

1
2       A    The Resource Training & Counseling Center.
3       Q    What are you saying about that?
4       I'm sorry, not 100 percent . . .
5       A   I believe that they are the ones that
6   referred me to New Horizon, I believe.
7       Q    All right.  Mr. Brooks, I'm going to ask
8   that you -- I understand you have an headache.
9   I'm trying to be sympathetic to that.  I've
10  offered Tylenol.  I've offered a break.  But
11  I'm going to ask that you listen to question,
12  otherwise I will have a break until that you're
13  ready to proceed and that we can get these
14  questions answered.
15      I asked you, when did you go to New
16  Horizons?
17      A   I don't recall.
18      Q    Who did you see at New Horizon?
19      A   I don't recall.
20      Q    And what was the purpose of going to New
21  Horizon?
22      A   Depression.
23      Q    If we contacted New Horizon, would they
24  have any record of you having visited there?
25      A   I can't recall.

CONFIDENTIAL

Page 437

Brooks

1
2  Q   Did you have to fill out any paperwork at
3  New Horizon in connection with showing up and
4  seeking treatment there?
5  A   I don't recall.
6  Q   I'm going to take a break.  Hopefully
7  you're able to refresh your recollection at
8  some point.  I'm going to take a few-minutes
9  break.  Thank you.
10     (Recess taken.)
11 BY MR. BARTOLOMEO:
12  Q   So we are back on the record.
13     Last time we were talking about New Horizon or
14  New Horizons, excuse me.
15     If I told you it was on Rockaway Boulevard
16  in Ozone Park, does that refresh your
17  recollection as to where it was?
18  A   I can't say that it does.
19  Q   You also testified a little while ago that
20  you saw a -- let me just see here -- a
21  psychiatric -- withdrawn.
22     A nurse, I believe or therapist Kehinde,
23  K-e-h-i-n-d-e, Idowu, I-d-o-w-u.
24     Do you recall saying that you saw that
25  individual?

Page 438

Brooks

1
2  A   Yes.
3  Q   Is that a male or female?
4  A   It's a female.
5  Q   And what did that person -- withdrawn.
6     How many times did you see that
7  individual?
8  A   I seen her one time.  She set up a
9  schedule for me to see her every week, but I
10  was unable to do so because I was working two
11  jobs at the time, and our schedules conflicted.
12  So it was a part of the plan for me to get a
13  different therapist.
14  Q   Did that individual prescribe you any
15  medication?
16  A   She did.
17  Q   And what did she prescribe you?
18  A   Remeron, I believe it was.  And I believe
19  Mirtazapine.
20  Q   Mirtazapine?
21  A   It's another form --
22  Q   Same thing?
23  A   Yeah.
24  Q   And you say you saw her only one time?
25  A   Yes.

Page 439

Brooks

1
2  Q   And Dr. Culliford -- withdrawn.
3     And she was at Brooklyn Medical Plaza,
4  correct?
5  A   Yes.
6  Q   All right.  And was Dr. Culliford at
7  Brooklyn Medical Plaza?
8  A   No, he was not.
9     (Deposition Exhibit 17, Document
10  Bates-Stamped BKLYN PLAZA 000001 through BKLYN
11  PLAZA 000017, marked for identification as of
12  this date.)
13  Q   And now I'm going to show you what's been
14  marked as 17, I believe it is.
15     The court reporter just placed in front of
16  you what's been marked as -- marked for
17  identification as Plaintiff's Exhibit No. 17.
18  It's a document that is Bates-stamped Brooklyn
19  Plaza 001 TO 000017.
20     On the cover page it indicates, at the
21  bottom, that it's the Brooklyn Plaza Medical
22  Center, located 650 Fulton Street, Brooklyn,
23  New York 11217.
24     And if we turn to Page 15, in the upper
25  left-hand, right under where the logo is for

Page 440

Brooks

1
2  Brooklyn Medical Plaza, it indicates a date of
3  8/23/2017 otherwise, August 23rd of 2017.
4     Do you see where I'm referring to on
5  Page 15?
6     It would be indicated at the bottom which
7  page it is, bottom right, excuse me.
8  A   Yeah, 815.
9  Q   Okay.  So in the upper right-hand corner
10  of that page -- withdrawn.
11     You've never seen this before, am I
12  correct --
13  A   No.
14  Q   -- these records?
15     The top right-hand corner of the page, is
16  that your name, "Gregory Brooks"?
17  A   Yes.
18  Q   And does that accurately describe you as a
19  "41 year old male"?
20  A   Yes.
21  Q   And in August of 2017, were you also
22  living at 630 Howard Avenue, Apartment 16?
23  A   Yes.
24  Q   Okay.  And it indicates your primary care
25  physician or PCP is Natasha A Baron.

CONFIDENTIAL

Page 441

Brooks

1
2     Do you see that?
3  A   Yes.
4  Q   Who is Natasha Baron?
5  A   I don't know.  I go to that clinic for
6  other reasons, medical reasons.  That might be
7  my primary medical doctor.
8     But whenever I go, if she's not there, I
9  see another doctor.
10  Q   Okay.  Do you know who you saw on this
11  particular occasion, August 23, 2017?
12  A   I believe it was Ms. Idowu.
13  Q   Okay.  If it says at the bottom it was
14  electronically signed by Gorgette Alexis, M.D.,
15  does that refresh your recollection as to you
16  may have seen on that occasion?
17  A   No, not really.
18  Q   Okay.  And you see in the upper right-hand
19  corner on the line is, it says "Progress Notes:
20  Georgette Alexis, M.D."?
21  A   You said the upper?
22  Q   Sorry, right there.
23     You see where it says --
24  A   "Progress Notes," yes.
25  Q   Does that refresh your recollection as to

Page 442

Brooks

1
2  who you would have seen on that date?
3  A   No.  I go to that clinic often whenever I
4  have medical problems, and I see different
5  people all the time.
6  Q   Okay.  And August 23, 2017, that was just
7  about a month after you had allegedly been
8  touched by Mr. Cooper; is that right?
9  A   No, I got touched by him in 2016.
10  Q   Okay.  And it says here that the reason
11  for your appointment was, it says, "Patient
12  said that he has pain under his right leg that
13  started yesterday.  Lump on leg.  No. 2.  Left
14  eye blurry and feels like eyelash in eye.
15  Feels irritated.  Blurriness in left eye.
16  Discomfort in left eye stated" -- I
17  believe probably means started -- "last week."
18     Do you see where it says that?
19  A   Yes, I do.
20  Q   Does it say you complained of anything
21  else on that occasion?
22  A   No.
23  Q   If you turn to the next page, which is
24  Labeled 16.  And there's a section titled
25  "HPi."  Under, it says "Activity," it describes

Page 443

Brooks

1
2  "41-year-old male.  History of depression.  Was
3  seen by psych in past.  Refused to take meds as
4  prescribed.  Complains of irritation left eye.
5  Feels like eyelash in eye with transient
6  episodes of blurring last few min symptoms for
7  two, three weeks.  No weakness, ataxia,
8  headache" -- and the rest is not relevant for
9  the current questions.
10     Does anywhere in there say that you
11  complained about any incident with -- or
12  alleged incident with Mr. Cooper that led you
13  to have a history of depression?
14  A   I don't see nothing from the paragraph in
15  which you were reading, and I'm following.
16     However, what I want to explain to you,
17  these was my health doctors for my physical
18  health.  I didn't know that they dealt with
19  psychological health.
20     So my primary doctor there, I asked him
21  for a reference, and that's how I was
22  introduced to other people.
23     But I asked for a reference.  I wasn't
24  willing to discuss my mental health with a
25  doctor that didn't have nothing to do with

Page 444

Brooks

1
2  that.
3  Q   And you said you asked for a reference and
4  he gave you a reference; is that correct?
5  A   I don't recall if the first time when I
6  went to see him, I don't recall if he gave me a
7  reference that time.  But the next time that I
8  did, yes, he did.
9  Q   Because if you look on Page 17 under
10  "Disorder of the eye unspecified," it says
11  "Referral to New York Eye and Ear infirmary.
12  Ophthalmology."
13     And I don't see, unless you can point me
14  where on this document that there is any
15  referral for any sort of psychiatric care.
16     Take a moment, if you'd like, to read the
17  first few pages of that record that starts on
18  Page 15 and ends on Page 17.
19     So, please, if you can, to the extent you
20  believe there's something in there, point me
21  where you see anything about a referral to a
22  psychiatric.
23  A   No.
24     Just like I said to you just now, I don't
25  recall if he gave it to me that time, but I do

CONFIDENTIAL

Page 445

Brooks

1
2  remember mentioning it to him.  But I'm quite
3  sure that he -- that the next time he did give
4  me a referral.
5  Q   Okay.  So let's turn to Page 11, if you
6  would.
7      So approximately seven months later, in
8  March 5, 2018, you again presented to Brooklyn
9  Plaza Medical Center to see a physician there.
10  It indicates that Dr. Pandya -- Dr. Pandya may
11  have seen you on that date.
12      And it says "Reason for Appointment.  41
13  year old male here for follow up visit.  Last
14  seen by Dr. Nicome on February 20, 2018."
15      It says "follow-up patient denies any
16  lower back pain, complaints of episodes of neck
17  spasm.  No knee pain now.  Feel depress not
18  suicidal."
19      Did you complain to Dr. Pandya on that
20  date of your psychiatric depression or a
21  request -- a -- psychiatric depression as a
22  result of your incident or alleged incident
23  with Mr. Cooper on July 21st?
24  A   Yes.
25  Q   You did?

Page 446

Brooks

1
2  A   I didn't discuss with him in detail, but I
3  complained to him that I was depressed, and it
4  was because of the incident with Mr. Cooper.
5  Q   And so he did make a reference -- referral
6  to you to psychiatry?
7  A   I'm not sure if he did it on that day or
8  on another time I seen him.  But that is the
9  doctor I discussed it with.
10  Q   And now this is almost, I want to say,
11  March 2018, this is almost a year and a half
12  after that incident; is that correct?
13  A   Yes.
14  Q   Okay.  And turn to Page 8 where it says,
15  on the upper right-hand corner, dated March 14
16  of 2018.  It's about nine days later.  This is
17  when you went and saw Dr. Idowu or rather nurse
18  practitioner Idowu.
19      Is this where Dr. Idowu prescribed you
20  with the medications that you testified to
21  earlier?
22  A   Yeah, I believe so.
23  Q   Okay.  And if you take a look at this, the
24  date is March 14, 2018.  This is the first time
25  in any of these medical records that we have

Page 447

Brooks

1
2  any indication that you complained of a prior
3  history of an incident that you alleged to have
4  happened in July 2016.
5      What was the reason that you waited to
6  tell any of these doctor about this particular
7  incident?
8  A   That's not true.  I spoke to Dr. Culliford
9  about it.  That's how I got the prescription to
10  begin with.
11  Q   And when did you talk to Dr. Culliford
12  about it?
13  A   That was maybe a couple of months after
14  the incident.
15  Q   Okay.  And where is Dr. Culliford located?
16  A   I told you I don't really recall.  I don't
17  recall.  I could get the information.  But he
18  was a part of my drug program.  And he was in
19  the same building as my drug program.
20  Q   And how would you go about getting that
21  information?
22  A   I go could go through my records and
23  find -- because I had to get a certificate of
24  completion from them.  And I believe the name
25  of the organization is on there.

Page 448

Brooks

1
2  Q   If I told you it was CSDENY?
3  A   That's it.  That's exactly it.
4  Q   If I told you that we've contacted them
5  and that they have no record of any records,
6  medical records pertaining to you, would that
7  be surprising to you?
8  A   Well, I contacted them for medical records
9  and they told me that they had lost the file,
10  and they actually -- they gave me a letter
11  saying that it was they fault that they lost
12  the file.
13      MR. BARTOLOMEO:  I now demand a copy of
14  that letter?
15      MR. SEIDENFELD:  Did you provide that to
16  us?
17      MR. BARTOLOMEO:  I have not seen that.
18      MS. O'CONNELL:  I don't know.
19  BY MR. BARTOLOMEO:
20  Q   Well, I mean, have you produced that to
21  your attorney, Mr. Brooks?
22  A   I'm not sure.
23  Q   I would ask that did you give that to your
24  attorney, and that obviously you produce that
25  in due course.

CONFIDENTIAL

Page 449

Brooks

1
2      MR. BARTOLOMEO:  Consider that a formal
3   demand on the record.
4      Would you mark this now.  I think we're on
5   18; is that correct?
6      THE COURT REPORTER:  Mm-hmm.
7      (Deposition Exhibit 18, E-mail dated June
8   5, 2018, from Daniel Tolbert to Steven
9   Seidenfeld, marked for identification as of
10   this date.)
11   Q   The record has just been placed before
12   you, what's been marked for identification as
13   Plaintiff's Exhibit No. 18.  It's Bates Labeled
14   at the bottom, CSEDNY01.  Just take a quick
15   moment to look at document, and then I'll ask
16   you some questions.
17      I'm just going to describe the document.
18   It's an e-mail from Daniel Tolbert to my
19   colleague, Steven Seidenfeld, who is the
20   attorney for The Doe Fund.
21      Daniel Tobert's e-mail address has an
22   handle, @CSEDNY.org, as a representative of
23   that facility.
24      It says "Dear Mr. Steven Seidenfeld, As
25   per your request regarding information on

Page 450

Brooks

1
2   Mr. Gregory Brooks, date of birth, July 19,
3   '76, our records show no person of that name or
4   date of birth at this program.  Thank you."
5      Looking at that, Mr. Brooks, do you have
6   an understanding why they say that they have no
7   name -- no records -- excuse me, their records
8   show no person of that name or date of birth at
9   their program?
10   A   Yes, I do.
11   Q   And what's your understanding?
12   A   My last name, Scott.  They would have me
13   under Scott.
14   Q   So how often do you use Scott as a last
15   name.
16   A   Scott is my middle name.
17   Q   I understand that.  But you just told me
18   that they would have you under a different
19   name?
20   A   That's because when I came from prison,
21   that's my prison institutional name.
22   Q   What is your prison institutional name?
23   A   Gregory Scott.
24      So when I came from prison it was
25   mandatory under parole that I had to do a drug

Page 451

Brooks

1
2   program and alternative to violence program
3   and, therefore, it had to be under the name of
4   Gregory Scott.
5      MR. SEIDENFELD:  I just want to put on the
6   record that Ms. O'Connell, we've been trying to
7   get these records for months.  And this is
8   information that would have helped us
9   tremendously, and we're hearing this for the
10   first time today.
11      MS. O'CONNELL:  I haven't had any --
12      MR. SEIDENFELD:  To the extent you --
13   going back to the fall of 2017 we've been
14   trying to get these records.  And for us to
15   just hear this now, I just want to put on the
16   record that it's -- we're very surprised to
17   hear this.
18      MS. O'CONNELL:  I'm just as surprised as
19   you.  I've been requesting the exact same
20   records.
21      MR. SEIDENFELD:  And I just want to say,
22   instead of going through the process of us
23   sending another HIPPA release, I would ask that
24   you and Mr. Brooks just work to get these as
25   quickly as possible.

Page 452

Brooks

1
2   BY MR. BARTOLOMEO:
3   Q   So when you say, Mr. Brooks, this was your
4   "parole name" or "institutional name," what do
5   you mean, since I am not familiar with that
6   term?
7   A   What I mean by that is, when I was
8   arrested, when I told the police my name is
9   Gregory Scott Brooks, he just wrote
10   Gregory Scott.  And, therefore, I guess he
11   assumed that was my last name and not my middle
12   name.  So that became my official institutional
13   record when I went up north and everything like
14   that.
15      Because when I was on Rikers Island on a
16   previous case, they had me as
17   Gregory Scott Brooks, like I told them.
18   Q   So when do use -- is there a particular
19   circumstance when you use your name,
20   Gregory Scott versus that when you use
21   Gregory Brooks?
22   A   No.  I just told you the reason for the
23   discrepancy.
24   Q   No, I understand what the explanation is
25   as to why there's a discrepancy.

CONFIDENTIAL

Page 453

Brooks

1
2       I'm saying now, going forward, when you
3   were released from incarceration, you said that
4   you were required to use your parole -- I don't
5   know if you called it "parole name," or your
6   institutional name" for certain purposes.  I
7   just want to understand what those purposes
8   are, because I'm not familiar with how that
9   works.
10  A   Oh.
11      Like I was trying to explain to you, I had
12  to take drug programs.  And according to
13  parole, I had to take it under that
14  institutional name.
15  Q   What other things, other than the drug
16  programs?
17  A   Drug programs, alternative to violence.
18  Q   Anything else that you would have used
19  Gregory Scott rather than Gregory Brooks?
20  A   No, sir.
21  Q   So if we asked the Brooklyn Plaza Medical
22  Center whether they had records for a
23  Gregory Scott, with your same Social Security
24  and date of birth, they would say; no; is that
25  correct?

Page 454

Brooks

1
2   A   They should have Gregory Scott Brooks, my
3   complete name.
4   Q   Okay.  Have you used Gregory Scott with
5   any other medical provider other than with the
6   CSEDNY?
7   A   No, not that I recall.
8   Q   With employers, have you used Gregory Scott
9   with any employers since the time you were
10  released from incarceration?
11      Have you used Gregory Scott with any
12  employers?
13  A   No, not that I recall.
14  Q   Between the time that you
15  were -- withdrawn.
16      Other than what you've already testified
17  to, as to having seen somebody a few months
18  after the incident, other than that medical
19  provider, who else did you see between the time
20  that you were released -- excuse me, between
21  the time that the alleged incident occurred on
22  July 21st, and the date when you first
23  presented to Brooklyn Plaza Medical Center,
24  which was in March -- August of 2017?
25  A   Who else have I seen or seek to see?

Page 455

Brooks

1
2   Q   The question is:  What other doctors or
3   medical services did you seek in between the
4   time you were -- that you allege the incident
5   occurred on July 21, 2016, and the first time
6   you went to this doctor -- this facility,
7   excuse me, on August of 2017?
8   A   I seen another doctor, which
9   we'vediscussed.
10  Q   Culliford?
11  A   Robert.  Robert something.  I don't
12  remember his last name.  And other than him, I
13  was going on my own kind of search for doctors.
14  I was looking them up online, trying to see
15  which ones that could accept my insurance.  And
16  I was not getting very good luck.
17      So I tried Bright Point.  I went down and
18  I spoke to them, and we were supposed to start
19  me with speaking.  Like I went through an
20  intake process.  And then when they were
21  supposed to give me a psychologist to speak to,
22  but I had work, work issues.
23      That's one of the reasons why I relapsed
24  because I wasn't able to speak to anybody about
25  the issues that I was dealing with.

Page 456

Brooks

1
2   Q   And when you say "relapse," you're talking
3   about smoking marijuana?
4   A   Yeah.
5   Q   And approximately when was that; that was
6   sometime in late 2017 or is that in early 2018?
7   A   I don't remember when it restarted
8   exactly.
9       (Recess taken.)
10      (Deposition Exhibit 19, Document Entitled
11  "Plaintiff's Initial Rule 26(a) Disclosures,"
12  marked for identification as of this date.)
13  Q   You said you wanted to clarify something.
14  A   Yeah.
15      One of the problems -- one of the reasons
16  you'll probably having problems getting those
17  records from EEDY because we had a problem
18  there.
19      The issues that I was speaking to with the
20  therapist, the doctor/client privilege was
21  violated.  When I came in, other people from
22  the organization that wasn't therapist, they
23  were just a part of the drug program, they knew
24  about the issue.  So we had a problem with
25  that.  And I addressed it with them, that I was

44

CONFIDENTIAL

Page 457

Brooks

1 not happy that people had found out about it.
2 So maybe that's probably one of the reasons why
3 they are not coming up with the paperwork.
4 Q   And you say, "other people in the
5 program," meaning other people as part of the
6 program, not The Doe Fund, you're not referring
7 to The Doe Fund?
8 A   No.
9 Q   All right.  Sounds good.
10      Well, we are well aware you had problems
11 with it, that shouldn't have, of course,
12 affected their legal requirements, not that
13 this is your concern, for turning over records
14 that we gave them with your name, address,
15 Social Security number, and your signature
16 saying that you authorized us to obtain copies
17 of those records.  So we can take that up with
18 them.
19      Obviously, to the extent that, you know --
20 to the extent that upon receipt of additional
21 records, Counsel, I am just going to reserve my
22 rights.
23      Apparently these records have been sought
24 out for some time.  We have the right to bring

Page 458

Brooks

1 the witness because, to the extent we want to
2 question him on any information that's revealed
3 or that's obtained with respect to his medical
4 history.
5 Q   I've now placed before you, Mr. Brooks,
6 what's been marked for identification as
7 Plaintiff's Exhibit 19.
8      At the bottom of this first page
9 continuing on to Page 2 -- withdrawn.
10      Let me just describe this for the court
11 reporter.  This is what's been -- indicates at
12 the top right-hand portion of the page, is
13 "Plaintiff's Initial Rule 26a Disclosures,"
14 signed by Derek Smith on Page 3, dated
15 September 18th of 2017.
16      Now, I'm not going to ask you if you
17 prepared this document, Mr. Brooks, but I am
18 going to ask you to look at the names listed
19 towards the bottom of the first page and the
20 top of the second page.
21      If you would just take a moment to review
22 all those names; and once you've done that,
23 please let me know.
24      I'm going to be asking you, in essence, if

Page 459

Brooks

1 you've given me all the information that you
2 had to tell me about these individuals that you
3 wanted to share that's relevant to your
4 lawsuit.
5      So if you would look them over with that
6 question in mind.
7 A   Okay.  I looked over them.
8 Q   So have you told us -- and I'm going to
9 name just the names:  Terry Cooper,
10 James Washington, Anthony Wiggins,
11 Dashell Porter, Eunice Gilmore,
12 Elizabeth Hanson, Timothy Matthews,
13 Ronald Holly, Mr. Bell, Paul Washington.
14      You've had an opportunity over the course
15 of the last two days of your deposition, to
16 tell us everything that you believe was
17 relevant to the claims that you've brought
18 forth in this lawsuit for each of these
19 individuals.
20      Have you told us everything that you
21 believe is relevant to the claims in this
22 lawsuit with respect to those individuals that
23 I've just mentioned?
24 A   I believe so.  To my recollection, yes.

Page 460

Brooks

1 Q   Is there anything you'd like to add with
2 respect to any of those individuals?
3 A   At this point, no.  No.
4 Q   I believe at some point --
5 A   Oh --
6 Q   Go ahead, if you have something further to
7 say, go ahead.
8 A   Well, I do know that when I first came
9 into the organization, Dash Porter, he was my
10 case manager.  And I was very excited about
11 being a part of The Doe Fund.  I thought that
12 it could be a career thing for me because it
13 was something I wanted to get into.  I wanted
14 to get into helping people that came home from
15 prison reestablish their lives.  Because the
16 transition to get back into work, to get back
17 to stable living is really difficult for a
18 prisoner.  I know because I've been on that end
19 of the road quite a few times.
20      After becoming, you know, starting to
21 write and tell my stories through writing, I
22 figured that that would be a very good asset to
23 the organization, and I expressed that with
24 Mr. Porter.  And he thought so as well.  He

CONFIDENTIAL

Page 461

Brooks

1
2    thought I could growth in the organization as
3    well.
4         But then, of course, after this situation,
5    where I made the complaint, and it appeared to
6    me that The Doe Fund wanted to attack the
7    victim instead of the actual predator.  It made
8    me not want to be a part of the organization
9    anymore.
10   Q   I understand that.  But I was asking
11   specifically with respect to the people that
12   are named, do you have anything else that you
13   want to add, about them, about actions that
14   they took, statements that they made, or
15   anything else that's in connection with the
16   claims of discrimination, harassment,
17   retaliation, or the other allegations and
18   causes of actions set forth in the complaint?
19   A   I thought I was answering.
20        So at this point, no, there's nothing else
21   I want to add.
22   Q   Now, with respect to additional
23   individuals, at some point you had -- or your
24   attorney has communicated that there was a
25   Julio, the Chelsea driver, Chelsea route

Page 462

Brooks

1
2    driver.
3         Anything more regarding your
4    claims -- withdrawn.
5         What, if any -- withdrawn.
6         Do you know what I'm referring to when I'm
7    refer to Julio?
8    A   Yes, I do.
9    Q   And who is he?
10   A   He was one of the route supervisors for
11   Chelsea Piers.
12   Q   Does he have any other involvement in this
13   case, other than him having potentially
14   overheard the alleged comments by Mr. Cooper
15   that were made near or in the van?
16   A   No, sir.
17   Q   What contact or communications have you
18   had with Julio since the date of the incident?
19   A   None whatsoever.
20   Q   And then there's a "A. Marshal."
21        Do you know what A.'s first name is?
22        Is it Anthony?
23   A   Yes.
24   Q   And Anthony Marshal, do you have any --
25   other Mr. Marshal having -- made have heard the

Page 463

Brooks

1
2    alleged statements made by Mr. Cooper in or
3    around the van, does he have any further
4    knowledge about this matter?
5    A   There's recordings of Mr. Marshal
6    describing Terry.  And I believe that you have
7    those recordings.
8    Q   And just so that you can summarize for us,
9    what was your recollection of what Mr. Marshal
10   said, with respect to how he described Terry?
11   A   It's been a really long time since I've
12   listened to those recordings, sir.
13        What I do know is he was saying that Terry
14   was loose.  He always talking homosexual shit.
15   He said things to other people in his presence.
16   Talking about people's penises, things of that
17   nature.
18        But do I remember everything that that man
19   said, no, I do not.
20   Q   And have you had any contact or
21   communication with Mr. Marshal since the time
22   of the alleged incident?
23   A   Yes, I have.
24   Q   When was the last time you spoke to
25   Mr. Marshal?

Page 464

Brooks

1
2    A   Maybe a couple of months ago.  It wasn't
3    over the phone.  It was via text.
4    Q   What was Mr. Marshal's title?
5    A   He was a cleaner as well, street cleaner.
6         MR. BARTOLOMEO:  And I'm going to demand a
7    copy of those text message conversations.  To
8    the extent that you still have the text message
9    conversation on your phone, to the extent that
10   it's still there, I'd ask that you not delete
11   it.
12        Please provide a copy of screen shots or
13   some other form of the message to your
14   attorney, and that way we can have copies of it
15   as well.
16        MR. SEIDENFELD:  You don't have to check
17   now, Mr. Brooks.
18        THE WITNESS:  Okay
19        MS. O'CONNELL:  Don't worry about it.
20   BY MR. BARTOLOMEO:
21   Q   Timothy Green, who is he?
22   A   He was also a cleaner.
23   Q   And, what, if any, information you believe
24   Mr. Green possesses that's relevant to the
25   claims in this lawsuit?

CONFIDENTIAL

Page 465

Brooks

1
2      A   Mr. Green knew extensively about Terry and
3   his history and his sexual harassment that
4   Terry did on a daily basis.
5      Mr. Green is the one who I found out that
6   Terry had actually touched another man before
7   me.
8      He actually was telling me about that,
9   that Terry had touched somebody in the past at
10  the Porter facility. And I got that on the
11  recording, and I believe you have that
12  recording as well.
13     Q   And now, Mr. Green, did you tell him at
14  any time that you had been touched by Terry or
15  allegedly touched by Terry?
16     A   No. I don't believe I told him at all. I
17  think that this is a surprise for him. But he
18  knew something happened with somebody. I don't
19  know if he knew it was me, but he knew
20  something happened with somebody.
21     Q   Why, if any, did you have the conversation
22  about Terry's past history with Mr. Green?
23     A   It came up. He was talking about Terry.
24  It came up. So I grabbed my phone and started
25  recording. I didn't get the beginning of the

Page 466

Brooks

1
2   conversation.
3      Me and him talked about The Doe Fund in
4   totality, a lot. But he had been in The Doe
5   Fund before me. He knew more about The Doe
6   Fund than I did.
7      So when he started talking -- he was my
8   roommate at the time. When he started talking
9   about it. And when he started talking about
10  Terry, I grabbed my phone and started
11  recording.
12     Q   Did he see you grab your phone and start
13  recording; do you know he seen you grab your
14  phone?
15     A   I don't know if he seen it or not.
16     Q   I mean, you'd have to turn on the phone,
17  go to the voice recording software on the
18  phone?
19     A   Of course. But I don't know if he
20  actually seen that or not. People always start
21  handling their telephone. So he probably
22  didn't know I was recording.
23     Q   You said he was your roommate at the time,
24  or at a time.
25     Would he have any knowledge or witnessed

Page 467

Brooks

1
2   your allegations about being woken up early and
3   not being allowed to sleep in?
4      A   Yes.
5      Q   He would have knowledge of those
6   incidents?
7      A   Yes.
8      He made a comment about that on another
9   recording, but he was not my roommate at that
10  time. I had another roommate altogether. But
11  he was on the same floor as me in a
12  different -- he was across the hall from me.
13     And he made mention to the fact that -- I
14  didn't really interact with him at this point.
15  And so when he mentioned that he spoke to
16  James Stevens on my behalf, I was kind of
17  surprised. And he told James Stevens, Like,
18  yo, you know that man go to work -- you know
19  what I'm saying -- at night. Why you making so
20  much noise? And James Stevens was like, I
21  don't give a fuck. Fuck him.
22     So we ended up having a pretty good
23  rapport after having that conversation.
24     Q   Any other knowledge that Tim -- Mr. Green
25  has, that you believe he has, other than what's

Page 468

Brooks

1
2   on the recordings they provided your attorney
3   which she's provided us?
4      A   I don't know.
5      Q   When was the last time you spoke to
6   Mr. Green, whether it be over a text message or
7   on the phone or otherwise?
8      A   Last -- a couple of months ago.
9      Q   How many times have you spoken to
10  Mr. Green since the beginning of this lawsuit?
11     A   How many times have I spoken to him?
12     Q   Yes, since the beginning of this lawsuit,
13  since you filed the complaint.
14     A   I don't know. I don't think --
15     Q   Can you approximate for me.
16     Is it one, is it a thousand, somewhere in
17  between?
18     A   I can't tell you that. He was my
19  roommate. I don't even know if we had the
20  lawsuit going while we were roommates. I don't
21  remember that.
22     Q   Did you ever ask Mr. Green to submit any
23  sort of statement on behalf of you in
24  connection with this lawsuit?
25     Your attorney can't help you answer this.

CONFIDENTIAL

Page 469

Brooks

1
2   A   I spoke to my attorney about Mr. Green,
3   and my attorney --
4   Q   Wait. Just one second. I don't want you
5   to divulge any privileged conversations you had
6   with your attorneys. I'm asking you a very
7   specific question.
8       Did you speak to Mr. Green and ask him to
9   provide any sort of statement in connection
10  with this lawsuit?
11  A   I asked him to speak to my lawyer. That's
12  what I asked him.
13  Q   Did he speak to your lawyer?
14  A   I believe so, yes.
15  Q   When was that?
16  A   I don't know.
17  Q   Do you know how many times he met your
18  lawyer?
19  A   I don't know.
20  Q   Do you know if he actually met your
21  lawyer?
22  A   I don't know.
23  Q   Did he tell you what they spoke about?
24  A   No, I didn't speak to him after that.
25  Q   And did he agree to speak with your

Page 470

Brooks

1   lawyer?
2
3   A   I don't recall.
4   Q   Sitting here today, do you have any reason
5   to believe that he actually did, in fact, speak
6   with your lawyer?
7   A   Yes, I believe he did speak to my lawyer.
8   Q   Calvin Smith, who was that?
9   A   He was also a cleaner.
10  Q   Is he a resident of The Doe Fund?
11  A   He was.
12  Q   What kind of knowledge does Mr. Smith
13  possess regarding the claims that you assert in
14  this lawsuit?
15  A   He knew about, you know, the things that
16  Terry did at the facility, at the Gates
17  facility.
18  Q   To you or to other people?
19      The things you said -- the things Terry
20  did, are you referring to the things you allege
21  Terry did to you, or are you referring to the
22  things you allege Terry did to other people?
23  A   No, I'm referring to the things that he
24  seen Terry doing throughout the building,
25  period.

Page 471

Brooks

1
2   Q   Okay. Specifically, would he possess any
3   knowledge with respect to the claims you've
4   made against Mr. Cooper regarding the incidents
5   you allege to have occurred on July 21st?
6   A   Yes, I asked him to speak to my lawyer
7   about it.
8   Q   Other than Mr. Green and Mr. Smith, who
9   else have you asked to speak to your lawyer
10  about this case?
11  A   Mr. Marshal.
12  Q   That's Anthony Marshal?
13  A   Yes.
14  Q   And is he a former resident of The Doe
15  Fund?
16  A   I don't know if he's a resident right now.
17  I'm not sure.
18  Q   Okay. Anybody else other than the three
19  individuals you've just mentioned?
20  A   That I asked, no, not that I recall.
21  Q   Do you know if either -- do you know if
22  Mr. Smith spoke with your lawyer?
23  A   I believe that he did.
24  Q   And do you believe -- do you know if
25  Mr. Marshal spoke with your lawyer?

Page 472

Brooks

1
2   A   I believe he did as well.
3   Q   And did you speak to either of those
4   individuals after they spoke to your lawyer?
5   A   No.
6   Q   Did you -- when you were having this
7   conversation, where you asked him to speak to
8   your lawyer, did you tell Mr. Marshal what had
9   happened between you and Terry?
10  A   I believe I gave him a brief understanding
11  why I was asking him to contact my lawyer.
12  Q   What was that brief -- tell me what the
13  sum and substance of that brief --
14  A   I believe I told him I got violated at The
15  Doe Fund. And they was present, and they know
16  about things that go on at The Doe Fund, so
17  would they please contact my attorney and speak
18  on what they know.
19  Q   Okay. And you used the word "violated"
20  right now, which earlier today I was asking you
21  for that definition.
22      So does sexual misconduct or sexual
23  touching also classifying as someone having
24  violated someone?
25  A   Yes.

CONFIDENTIAL

Page 473

Brooks

1
2  Q   And I believe that question before was
3  with respect to Mr. Smith.
4      But with Mr. Marshal, did you tell him and
5  give him a brief synopsis of a brief summary of
6  what you were alleging happened with
7  Mr. Cooper?
8  A   Yes.
9  Q   And the same is true for Mr. Green?
10 A   No.
11 Q   And why if any -- why did you not tell
12 Mr. Green a brief summary of what you alleged
13 happened?
14 A   Oh, matter of fact, I think I did.  I
15 think -- yes, I did that also.  I was trying to
16 find it for you.
17 Q   No, no, no.  That's fine.  You can have
18 time after we're all done here.  You can look
19 for us.  I trust that you will do that.
20     Other than the three individuals, Marshal
21 Smith and Green, did you ask anybody else to
22 speak with your attorney in connection with
23 this lawsuit?
24 A   No.
25 Q   Kanise, who is that?

Page 474

Brooks

1
2  A   Doe Fund employee.
3  Q   What knowledge would she have, if any,
4  that's relevant to that claims that you've
5  asserted in this lawsuit?
6  A   They are the HR department that was
7  questioning me.
8  Q   They conducted or participated in your
9  interview in connection with this --
10 A   Yes.
11 Q   -- complaint that you filed?
12 A   Yes.
13 Q   And your parole officer, what knowledge
14 would they have, if any, about your claims
15 asserted in this lawsuit?
16 A   I informed my parole officer the very next
17 time that I seen her what had happened to me.
18 Q   And, what, if anything, did she tell you
19 to do about it?
20 A   She asked me did I want to leave the
21 facility.  And I told her, no.  I said Terry is
22 not here.  I think I'm all right.  She said
23 okay.
24 Q   All right.  I'm just going to shift gears
25 a little bit and try to run through your

Page 475

Brooks

1
2  current and most recent work history, okay,
3  Mr. Brooks.
4      Last time we talked a bit about 4C.
5      But you're currently employed at MaidPro,
6  correct?
7  A   Yes.
8  Q   When did you start there?
9  A   I believe October of last year.
10 Q   October of last year, I'm sorry?
11 A   Yes, I believe so.
12 Q   And we're not going to hold you to the
13 specific date.  We can probably get those
14 records.
15     What is your title there?
16 A   Inventory supply specialist.
17 Q   And what are your hours that you work?
18     Do you have a regular schedule?
19 A   From 9:30 a.m. until when I'm finished.
20 Q   Until what time?
21 A   Which is usually 4:30, 5 o'clock.
22 Q   Do you get paid by the hour?
23 A   I do.
24 Q   What do you get paid?
25 A   Minimum wage.

Page 476

Brooks

1
2  Q   Which is what?
3  A   Thirteen.
4  Q   Thirteen dollars per hour?
5  A   Yes.
6  Q   Are you eligible for overtime as well?
7  A   I can do over time, if I want to.
8  Q   And what are your duties at that job?
9  A   I keep an account of the inventory.  I
10 count what comes in, what goes out.
11     Yeah, I count what comes in more than what
12 goes out; I keep records of it.  Anything
13 that's missing from the supplies, I note it.  I
14 keep the office maintained, cleaned.  I put
15 together the bags for the cleaners that's going
16 out.
17 Q   And where --
18 A   Restock them.
19 Q   Sorry to interrupter you.
20 A   No problem.  Go ahead.
21 Q   I was just going to ask you where do you
22 report for work?
23     What's the address, location?
24 A   4647 Vernon.
25 Q   Vernon Avenue?

CONFIDENTIAL

Page 477

Brooks

1
2  A   Boulevard.
3  Q   And that's where?
4  A   In Queens.
5  Q   Did you ever work for a company called
6  United aeronautical?
7  A   I did.
8  Q   When did you work for United aeronautical?
9  A   2005, 2006, 2007, 2008, 2009, 2010.
10 Q   And what about Jetrow?
11 A   Yes.
12 Q   When did you work there?
13 A   I just got laid off from Jetrow about a
14 couple of week ago.  Sales were down.
15 Q   So you were working -- at the same time
16 you were working at MaidPro you were also
17 working at Jetrow?
18 A   Yes.
19 Q   And what were your hours at Jetrow?
20 A   Yes.
21 Q   And what were your hours?
22 A   From 6:00 to 11:00.
23 Q   6:00 p.m. to 11:00 p.m.?
24 A   Yes.
25 Q   And you said you just got laid off, so

Page 478

Brooks

1
2  that was the end.
3      But when did you start working for Jetrow?
4  A   I can't remember the date that I started.
5  I could get you that information.  But it's
6  been a few months, a couple of months,
7  something like that.
8  Q   Okay.  And what was your title there?
9  A   I was the backstock.
10 Q   Backstock?
11 A   Yes.
12 Q   And who was your supervisor, if you had
13 one?
14 A   I didn't really have a direct supervisor
15 because that position was a unique position.  I
16 just put the stock back from what the buyers
17 left over.  So I didn't really have nobody over
18 me on that.
19 Q   And was there a -- did you get paid
20 hourly?
21 A   I did.
22 Q   And what was your -- what were you getting
23 paid?
24 A   Minimum wage.
25 Q   And were you eligible for overtime there?

Page 479

Brooks

1
2  A   Yes.
3  Q   Little Lamb, when did you work there?
4  A   That's the same as MaidPro.  These are the
5  people who pay the checks.
6  Q   Okay.  So Little Lamb is who you get paid
7  from, but you actually work for MaidPro; is
8  that correct?
9  A   Yes.
10 Q   And what about Wild Cat?
11 A   That was a job through the welfare.
12 Q   Okay.  When did you work at Wild Cat?
13 A   A few months ago.
14 Q   It was when you stopped working there?
15     You started working there a few months
16 ago?
17 A   No, I stopped working there a few months
18 ago.  I don't remember when I started.
19 Q   What was your title there?
20 A   Cleaner.
21 Q   Cleaner?
22 A   Yes.
23 Q   And were you paid hourly?
24 A   Yes.
25 Q   And what were you paid?

Page 480

Brooks

1
2  A   Minimum wage.  That was a temporary job.
3  Q   Did you work a normal schedule, like a
4  Monday through Friday, 40 hours a week?
5  A   Yeah.
6  Q   And what were your hours that you were
7  working?
8  A   I don't -- I don't really remember.  I
9  know it was from the morning, maybe from 8:00,
10 something like that.
11 Q   And where was Wild Cat located, or where
12 is it located?
13 A   It's located somewhere around here, the
14 head office.  But this is not where I reported
15 to.
16 Q   Okay.
17 A   We do work in the shelters.
18 Q   So it would be various locations?
19 A   Yeah, they have various shelters that they
20 work in.
21 Q   Have you worked in any other places other
22 than Wild Cat, Jetro MaidPro, since you stopped
23 working at 4C?
24 A   No, not that I remember, no.
25 Q   And since -- withdrawn.

CONFIDENTIAL

Page 481

Brooks

1
2    I think I'm just going to take a look at
3  this briefly.  And, you know, I'll reserve the
4  rest of my time should I need it at some other
5  date.  But I believe I am pretty much complete
6  with my portion of the testimony at this time.
7        So if you just give me five minutes, take
8  a look at this.  If I have anything left, I'll
9  continue.
10        (Discussion off the record.)
11        (Recess taken.)
12        MR. BARTOLOMEO:  So thank you for your
13  patience today, Mr. Brooks.
14        Just for the record, to the extent that
15  there's any time remaining, I obviously reserve
16  that time to conduct a further deposition of
17  the plaintiff and, of course, given the fact
18  that we just learned today about the medical
19  records issue, I'm also reserving my right to
20  call the witness back to explore those medical
21  records upon receipt of those medical records.
22  BY MR. BARTOLOMEO:
23    Q   Mr. Brooks, I have one last question for
24  you today.
25        Have you told me everything that you

Page 482

Brooks

1
2  believe is relevant to the allegation in the
3  claims that you have brought against
4  Mr. Cooper?
5    A   I believe so.
6        MR. BARTOLOMEO:  Okay.  I have no further
7  questions at this time.
8        MR. SEIDENFELD:  I'm going to continue my
9  deposition in a minute, but I need to take a
10  five-minute break.
11        (Recess taken.)
12        (Deposition Exhibit 20, Document Entitled
13  "Notification of Bed Change Assignment," marked
14  for identification as of this date.)
15  EXAMINATION BY
16  MR. SEIDENFELD:
17    Q   All right.  Mr. Brooks, I know it's been a
18  long day.  Thank you for bearing with us.  I
19  know it's been a long day.  I'm going to hand
20  you what's been marked as Plaintiff's
21  Exhibit 20.
22        Mr. Brooks, I've just handed you what has
23  been marked as Plaintiff's Exhibit 20.
24        Have you seen this document before?
25    A   It's possible that I seen this.

Page 483

Brooks

1
2    Q   You testified last week when we met that
3  you had -- at some point you had your room
4  moved from the third floor to the first floor,
5  correct?
6    A   Yes.
7    Q   And is this document referencing that?
8    A   Yes.
9    Q   This is the date when it happened, May 1,
10  2017?
11    A   I don't remember the actual date.
12    Q   Was it around this time?
13    A   I can't say.
14    Q   Any reason to believe that this document
15  is not correct?
16    A   I can't say that it's not correct.
17    Q   Is that a "no"?
18    A   I can't say that it's not correct.
19    Q   Okay.  And you moved out of the Gates
20  Avenue facility in July 2017?
21    A   I don't remember the actual date.  I
22  didn't move out, I was kicked out.
23    Q   It was July 2017, around then, the best
24  you recall?
25    A   Yeah.

Page 484

Brooks

1
2    Q   Okay.  Isn't it true before you left the
3  Gates Avenue facility, that you already
4  arranged -- that you had already lined up the
5  apartment at 630 Howard Avenue?
6    A   Yes.
7        I was waiting to move in.  They were doing
8  some work on it.
9        MR. SEIDENFELD:  This is going to be 21.
10        (Deposition Exhibit 21, Document Entitled
11  "Client Acknowledgment of Responsibility Form,"
12  marked for identification as of this date.)
13    Q   Mr. Brooks, I've just handed you what's
14  been marked as Plaintiff's Exhibit 21.  I want
15  you to just to look at document bearing Bates
16  No. TD5 through 8.
17        MR. BARTOLOMEO:  I want to say, for the
18  record, Plaintiff's Exhibit 20 is a document
19  bearing Bates No. Brooks 251.
20    Q   Back to Plaintiff's 21, Mr. Brooks, I just
21  want you to look at the bottom of TDF5.
22        Is that your signature where it says
23  "signature" next to your name?
24    A   Yes, it is.
25    Q   Okay.  Have you seen this document before?

CONFIDENTIAL

Page 485

Brooks

1
2  A  I obviously seen it before.
3  Q  Okay.  Because you signed it.
4     You wouldn't have signed it unless you
5  read it?
6  A  I can't say that.  Sometimes I just glance
7  over stuff.
8  Q  Okay.  You at least glanced over what's
9  here, correct?
10    You would have at least glanced at what's
11 on this page, correct?
12 A  Yeah, for the most part.  That's what I
13 do.  For the most part.
14 Q  Okay.  Take a look at the last page of the
15 document, TDF008.  Very last page.
16    Next to where it says "Gregory Brooks" and
17 your signature, that's your signature?
18 A  Yeah, that's my signature.
19 Q  And if you going back to TDF 006.  It's
20 the "Statement of Client Rights and DHS Code of
21 Conduct," and "New York City Department of
22 Homeless Services," that's what it says there?
23 A  Yes.
24 Q  And this is a document that lays out your
25 rights and the code of conduct.

Page 486

Brooks

1
2  Q  What's expected of you by the Department
3  of Homeless Services by New York City, correct?
4  A  Yes.
5  Q  Okay.  And if you go back to the first
6  page of the document, the first page.
7  A  Mm-hmm.
8  Q  Title of TDF -- document with the Bates
9  No. TDF0005, is called "client Acknowledgment
10 of Responsibility Form," correct?
11 A  Yes.
12 Q  And this is something that would have been
13 given to you by the Department of Homeless
14 Services when you entered the Gates Avenue
15 facility, correct?
16 A  It's possible.
17 Q  If you look at date where you signed it,
18 you see it's 6/28/16, correct?
19 A  Mm-hmm.
20 Q  And that's about the time you entered the
21 Gates Avenue facility?
22 A  I don't know exactly when I entered the
23 Gates Avenue facility.
24 Q  It was around then, the June 2016, even if
25 you don't know the exact date?

Page 487

Brooks

1
2  A  Yeah, that might be right.
3     (Deposition Exhibit 22, Document
4  Bates-Stamped TDF158, marked for identification
5  as of this date.)
6  Q  Mr. Brooks, I've just handed you what's
7  been marked as Plaintiff's Exhibit 22, Bates
8  No. TDF000158.
9     Have you seen this before?
10 A  I can't say that I have.
11 Q  Has anyone ever discussed with you -- do
12 you know -- the document is titled "Policy for
13 Late Night/Overnight Passes:  Effective June 1,
14 2014."
15    Do you see that?
16 A  I see it on the page.
17 Q  It says "To:  All Gates Clients."
18 A  It say "Re:  Passes for Gates Avenue
19 Clients," correct.
20 A  Yes.
21 Q  It doesn't make reference -- strike that.
22    (Deposition Exhibit 23, Document
23 Bates-Stamped TDF24 through TDF25 and
24 Bates-Stamped TDF9 through TDF23, marked for
25 identification as of this date.)

Page 488

Brooks

1
2  A  I never received a copy of this.
3  Q  Of what?
4  A  Exhibit 22.
5  Q  Okay.  That's fine.
6     You have your testimony.
7     MR. SEIDENFELD:  Can we go off the record
8  for just one moment.
9     (Recess taken.)
10 BY MR. SEIDENFELD:
11 Q  Mr. Brooks, I've given you what's been
12 marked as Plaintiffs Exhibit 23, which
13 document bearing Bates No. TDF24 and 25 and
14 TDF9 through 23.
15    Have you ever seen this before?
16 A  I can't say that I have.
17 Q  So to the extent that these are the case
18 notes from when you met with Mr. Porter and
19 Mr. Young, to the extent that it says in here
20 that they showed you the late pass policy,
21 would you have any reason to doubt that that's
22 not correct?
23 A  Well, I never seen a late night policy.
24 They would give me a late pass when I asked for
25 one, or when I showed them my schedule for

CONFIDENTIAL

Page 489

Brooks

1
2   work, they would give me a late pass.  But they
3   never --
4   Q   Anyone ever explained to you what the
5   policy was, whether you've seen the late pass
6   policy or not?
7   A   I got explained the late pass policy when
8   they took my overnight visits.  And they said
9   that that was because I was no longer a part of
10   the program.
11      (Deposition Exhibit 24, File Entitled
12   "Late Night MW," marked for identification as
13   of this date.)
14   Q   I'm going to introduce as Exhibit 24, the
15   file you produced called "Late Night MW," which
16   is shown as last modified 7/29/16.  I'm going
17   to play from one minute to 2 minutes and 42
18   seconds.
19      (Tape Playing.)
20   Q   Mr. Brooks, was that a record that you
21   produced in this litigation?
22   A   Yes, it was.
23   Q   That was you speaking to Mr. Washington?
24   A   Yes.
25   Q   He was explaining to you the late pass

Page 490

Brooks

1
2   policy?
3   A   Okay.
4   Q   Is that a "yes"?
5   A   Yes, he was.
6   Q   And what he was explaining to you was
7   consistent with what is on document -- which is
8   on Plaintiff's 22, that if you're in the
9   program -- if you look at the chart at the
10   bottom of the page.
11      If you're in the program 30 to 60 days,
12   you get two late passes and no overnight
13   passes; that's what it says there?
14   A   Mm-hmm.
15   Q   And that's what Mr. Washington told you?
16   A   That's what he said.
17      MR. SEIDENFELD:  I'm going to go off for a
18   minute.  Off the record.
19      (Recess taken.)
20   Q   All right.  Mr. Brooks, the reason that
21   you were asked to leave Gates Avenue was for a
22   curfew violation.
23      Whether you agree with the decision or
24   not, that's what you were told?
25   A   Yes.

Page 491

Brooks

1
2   Q   Are you aware of other people being asked
3   to leave the facility because of curfew
4   violations?
5   A   No.
6   Q   Is it possible that there were people who
7   have been asked to leave because of curfew
8   violations that you weren't aware of?
9   A   I don't know.
10   Q   You don't know the reason why everyone who
11   was asked to leave Gates Avenue?
12   A   I don't know.  I don't even know when
13   people were asked to leave.  I'm not in
14   people's business like that.
15      So if I see somebody one day, and I don't
16   see them another, it's not -- it's not my
17   business or like -- because I don't socialize
18   with them.
19      You know what I mean?
20      So if I don't see somebody, it's just I
21   don't see them.
22   Q   Okay.  So you don't -- other than
23   yourself, you don't know the reasons why anyone
24   was asked to leave the Gates Avenue facility?
25   A   No.

Page 492

Brooks

1
2   Q   I want to ask you a couple of questions
3   about your claim for intentional infliction of
4   emotional distress.
5      Do you have any evidence that The Doe Fund
6   directed Mr. Cooper to engage in the conduct
7   that he did?
8      MR. SEIDENFELD:  Objection.
9   Q   You can answer.
10   A   I don't know.
11   Q   Any evidence that -- so, is that a "no"?
12   A   I don't know.
13   Q   Okay.  Any evidence that it was part of
14   Cooper's role as an employee at The Doe Fund to
15   engage in the conduct that you allege?
16      MR. BARTOLOMEO:  Objection.
17      MS. O'CONNELL:  Objection.
18   A   I don't know.
19   Q   You, in your interrogatories, said a
20   supervisor, Vernon, first name may be Bergis.
21   A   Bergis?
22   Q   You allege he retaliated against you?
23   A   Yes.
24   Q   What's the basis for your belief he
25   retaliated against you?

Page 493

Brooks

1
2 A   Well, he was giving me a hard time from
3 day one.  When I got on the Vernon route, he
4 was trying to sneak up on me and catch me not
5 working and take pictures of me.  However, he
6 kind of caught me working, but I observed him.
7 And he was always making trouble for me.  He
8 was always coming and saying something crazy.
9    So one particular day I remember it was
10 raining and I -- it was raining outside and I
11 went underneath something to get out of the
12 rain.  And he came yelling at me talking about
13 why I was not working.  I said, Yo, you see
14 that it's raining.  And when it's raining, we
15 generally get out of the rain.
16    And in all my other sites, that's what I
17 was taught that when it's raining, we get out
18 of the rain.  And so he started yelling at me
19 and everything and told me to get back to work.
20 Q   Anything else?
21 A   I can't remember everything that he did.
22 But I know every time I worked with him, he
23 created a problem between him and I.  And I
24 didn't understand why until I found out that he
25 was actually right under Mr. Wiggins.

Page 494

Brooks

1
2    Wiggins had trained him and everything
3 like that.  So then it started to make sense
4 why he would target me and start messing with
5 me.
6 Q   So did you tell Mr. Bergis about what
7 happened -- you allege happened between you and
8 Mr. Cooper?
9 A   No, I did not.
10 Q   Did you witness anybody else tell him?
11 A   No.
12 Q   The only basis that you have to believe
13 he's even aware of the complaint you made is
14 based on your opinion?
15    MS. O'CONNELL:  Objection.
16 Q   You can answer.
17 A   I don't know.
18 Q   So what's your basis?
19    I'm asking you that --
20 A   I told you.
21    MS. O'CONNELL:  Objection.
22 A   I told you I believe that, you know, that
23 it was through Wiggins.
24 Q   So you believe Wiggins told him?
25    Did you witness any conversation between

Page 495

Brooks

1
2 Mr. Bergis and Mr. Wiggins wherein they
3 discussed this?
4 A   No, I did not.
5 Q   And you didn't tell Mr. Wiggins?
6 A   No, I did not?
7 Q   And you've never witnessed any
8 conversation where anyone told Mr. Wiggins?
9 A   No, I did not.
10    MR. SEIDENFELD:  At this point I don't
11 have anything further.
12    But based on Mr. Brooks' testimony last
13 Friday, the fact that his complaint contains 14
14 separate causes of action.  The fact that we
15 represent both The Doe Fund and Mr. Washington,
16 we reserve the right to go to the judge to ask
17 for more time for his deposition, to the extent
18 we need it to cover the causes of action.
19    In addition, based on the testimony today
20 from Mr. Brooks, that there are medical records
21 that my office has spent countless hours
22 seeking, going back to November, and call after
23 call, and paralegal spending countless hours
24 trying to get those records, we just found out
25 today that, based on Mr. Brooks' testimony,

Page 496

Brooks

1
2 that we had received from Mr. Brooks and his
3 attorney, information that was not correct,
4 which had inhibited us from being able to get
5 those documents that we had been seeking.
6    So we also reserve the right to bring
7 Mr. Brooks back, to the extent we get those
8 records and we have additional questioning on
9 them.
10    And as I mentioned earlier, I would
11 request to Ms. O'Connell, to speed this up,
12 given the late date of this disclosure, that
13 she work with Mr. Brooks directly to get these
14 records to us so we don't have to go through
15 the process of doing -- of us issuing HIPAA
16 releases and sending them.  And I think if, you
17 know, Ms. O'Connell or Mr. Brooks reaches out
18 to these people more directly, we'll be able to
19 get them, and I would get them more
20 expeditiously.
21    And I would request that you get them to
22 us by next Friday.  And if not, like I said, we
23 would have to seek judicial intervention.
24    With those statements, I have nothing
25 further for now.

CONFIDENTIAL

---

Page 497

Brooks

1
2    MS. O'CONNELL:  I would like to add to the
3  record that I did not have any knowledge that
4  he was going by the name of solely
5  Gregory Scott, at any time.  So I don't want
6  that to be an implication on my part.  And it's
7  to my knowledge today that he was just using
8  the name Gregory Scott; it's the first time I'm
9  hearing it.  And it doesn't apply to all
10  medical records.
11    And I checked with my client, and it would
12  solely be stemming from documents from his
13  arrest and imprisonment, which could be solely
14  documents related to parole.  And the medical
15  documents related to the parole would be those
16  from the drug rehab programs -- drug programs,
17  specifically, CSDNY, which had the program
18  alternative to violence.
19    And I will be requesting those documents.
20  We have been independently attempting to get
21  those documents.  And my client has
22  independently attempted to get those documents
23  himself.
24    MR. SEIDENFELD:  This isn't going towards
25  my time.

---

Page 498

Brooks

1
2    But to the extent you knew there was an
3  issue with the releases that you provided us, I
4  just want to put on the record, you haven't
5  told us there was an issue with them.  To the
6  extent that you have been trying to get them
7  independently, that should have been pointed
8  out to us, and we could have saved a lot of
9  time and effort on our part trying to get
10  records using incorrect releases.
11    MS. O'CONNELL:  Wait, are you saying that
12  I knew?
13    Because I just told you I didn't know.
14    MR. SEIDENFELD:  You just said we've been
15  working to get them independently.
16    MS. O'CONNELL:  We've been trying.  We've
17  been trying to get all documents independently.
18    THE WITNESS:  But The Doe Fund knew both
19  of my last names.  They have a copy of my
20  institutional ID.
21  FURTHER EXAMINATION BY
22  MR. SEIDENFELD:
23    Q   What's your basis for that knowledge?
24    A   They have a copy of my institutional ID
25  that says Gregory Scott.

---

Page 499

Brooks

1
2    The ID that I got, that came from prison,
3  I had to hand over to them, and they have a
4  copy of that.
5    Q   I have to ask you a couple more questions.
6    So, Mr. Brooks, you, at some point in this
7  case, received from your counsel, releases that
8  my office had sent to you and asked you to
9  sign?
10    A   What, HIPAA records?
11    Q   Yes.
12    You signed those releases?
13    A   Yeah.
14    Q   And it didn't occur to you that since you
15  had already gone by another name that you
16  should inform your counsel that there might be
17  records available under an alternative name?
18    A   No, I didn't know that you'll was looking
19  for anything prison related.
20    Q   Well, the CSEDNY had records that were not
21  prison related.
22    And, in fact, you testified that that was
23  the first place where you received the
24  prescription for Mirtazapine, which is directly
25  relevant to this case; is that correct?

---

Page 500

Brooks

1
2    A   It is prison related because I went there
3  through parole.
4    MR. SEIDENFELD:  I have nothing further.
5    MR. BARTOLOMEO:  I have nothing further at
6  this time.
7    (Time noted: 5:40 p.m.)
8
9
   _____
   GREGORY BROOKS
10
11  Subscribed and sworn to before me
12  this _____ day of _____, 2018.
13
14  _____
15
16
17
18
19
20
21
22
23
24
25

---

CONFIDENTIAL

---

Page 501

```
 1
 2              C E R T I F I C A T E
 3     STATE OF NEW YORK    )
 4                         :ss
 5     COUNTY OF NEW YORK   )
 6
 7          I, MICHELLE COX, a Notary Public within
 8     and for the State of New York, do hereby
 9     certify:
10          That GREGORY BROOKS, the witness whose
11     deposition is hereinbefore set forth, was duly
12     sworn by me and that such deposition is a true
13     record of the testimony given by the witness.
14          I further certify that I am not related to
15     any of the parties to this action by blood or
16     marriage, and that I am in no way interested in
17     the outcome of this matter.
18          IN WITNESS WHEREOF, I have hereunto set my
19     hand this 27th day of June 2018.
20
21                    _____
22                    MICHELLE COX, CLR
23
24
25
```

---

Page 502

```
 1
 2                    INDEX
 3     WITNESS        EXAMINATION BY        PAGE
 4     GREGORY BROOKS    MR. BARTOLOMEO       288
 5                    MR. SEIDENFELD      482, 498
 6
 7
 8          INFORMATION REQUESTS
 9     REQUESTS:  291, 315, 423, 424, 428, 449, 452
10               EXHIBITS
11     DEPOSITION EXHIBITS          FOR ID.
12     Exhibit 10   Document Entitled "Plaintiff's  330
                   Responses and Objections to
13                 Defendants' First Set of
                   Interrogatories"
14
15     Exhibit 11   Document Entitled "Appeal from  392
                   the United States District
16                 Court for the Northern
                   District of Mississippi, USDC
17                 No. 1:12-CV-190
18     Exhibit 12   File Entitled "Play Mr.    400
                   Washington"
19     Exhibit 13   E-mail Chain         409
20     Exhibit 14   File Entitled "Washington on  412
                   Vernon"
21
22     Exhibit 15   File Entitled Playing with  419
                   Schedule, Ronald Holly"
23     Exhibit 16   Document Entitled "Your      430
                   Personal Prescription
24                 Information"
25
```

---

Page 503

```
 1
 2     DEPOSITION EXHIBITS          FOR ID.
 3     Exhibit 17   Document Bates-Stamped BKLYN  439
                   PLAZA 000001 through BKLYN
 4                 PLAZA 000017
 5     Exhibit 18   E-mail dated June 5, 2018,    449
                   from Daniel Tolbert to Steven
 6                 Seidenfeld
 7     Exhibit 19   Document Entitled "Plaintiff's  456
                   Initial Rule 26(a)
 8                 Disclosures"
 9     Exhibit 20   Document Entitled       482
                   "Notification of Bed Change
10                 Assignment"
11     Exhibit 21   Document Entitled "Client    484
                   Acknowledgment of
12                 Responsibility Form"
13     Exhibit 22   Document Bates-Stamped TDF158  487
14     Exhibit 23   Document Bates-Stamped TDF24   487
                   through TDF25 and
15                 Bates-Stamped TDF9 through
                   TDF23
16
17     Exhibit 24   File Entitled "Late Night MW"  489
18
19
20
21
22
23
24
25
```

---

Page 504

```
 1
 2     Case Name:  Gregory Brooks v. The Doe Fund, et al.
 3     Dep. Date:  June 15, 2018
 4     Deponent:  GREGORY BROOKS
 5     Pg.  Ln.  Now Reads  Should Read  Reason
 6     ___  ___  _____  _____  _____
 7     ___  ___  _____  _____  _____
 8     ___  ___  _____  _____  _____
 9     ___  ___  _____  _____  _____
10     ___  ___  _____  _____  _____
11     ___  ___  _____  _____  _____
12     ___  ___  _____  _____  _____
13     ___  ___  _____  _____  _____
14     ___  ___  _____  _____  _____
15     ___  ___  _____  _____  _____
16     ___  ___  _____  _____  _____
17
18                    _____
19                    GREGORY BROOKS
20
21     Subscribed and sworn before me
22     This_____ day of _____, 2018.
23
24     _____   _____
25     (Notary Public)    MY COMMISSION EXPIRES:
```

---