2   UNITED STATES DISTRICT COURT
3   EASTERN DISTRICT OF NEW YORK
    ----------------------------------------X
4   GREGORY BROOKS,

5                           PLAINTIFF,

6   -against-          Docket No.:
7                      1:17-cv-03626-PKC-LB

8   THE DOE FUND, INC., TERRY COOPER
    individually and in his official capacity,
9   JAMES WASHINGTON individually and in his
    official capacity, and ANTHONY WIGGINS
10  individually and in his official capacity,

11                          DEFENDANTS.
    ----------------------------------------X
12

13          DATE:  July 6, 2018

14          TIME:  9:27 A.M.

15

16          DEPOSITION of the Defendant, TERRY

17  COOPER, taken by the respective parties,

18  pursuant to a Notice and to the Federal

19  Rules of Civil Procedure, held at the

20  offices of Lewis Brisbois Bisgaard & Smith,

21  LLP, One Riverfront Plaza, Suite 800,

22  Newark, New Jersey 07102, before Rosanne

23  LeBoeuf, a Notary Public of the State of New

24  Jersey.

25

---

2   F E D E R A L   S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED by

5   and between the counsel for the respective

6   parties herein that the sealing, filing and

7   certification of the within deposition be

8   waived; that the original of the deposition

9   may be signed and sworn to by the witness

10  before anyone authorized to administer an

11  oath, with the same effect as if signed

12  before a Judge of the Court; that an

13  unsigned copy of the deposition may be used

14  with the same force and effect as if signed

15  by the witness, 30 days after service of the

16  original & 1 copy of same upon counsel for

17  the witness.

18

19          IT IS FURTHER STIPULATED AND AGREED

20  that all objections except as to form, are

21  reserved to the time of trial.

22

23          *   *   *   *

24

25

---

                                        2

2   A P P E A R A N C E S:

3

4   DEREK SMITH LAW GROUP, PLLC
        Attorneys for the Plaintiff
5       GREGORY BROOKS
        1 Penn Plaza, Suite 4905
6       New York, New York 10119
        BY:  KELLY L. O'CONNELL, ESQ.
7

8

9   JACKSON LEWIS, P.C.
        Attorneys for the Defendants
10      THE DOE FUND, INC. and JAMES WASHINGTON
        666 Third Avenue, 29th Floor
11      New York, New York 10017
        BY:  STEVEN J. SEIDENFELD, ESQ.
12

13

14  LEWIS BRISBOIS BISGAARD & SMITH, LLP
        Attorneys for the Defendant
15      TERRY COOPER
        One Riverfront Plaza, Suite 800
16      Newark, New Jersey 07102
        BY:  BRADLEY J. BARTOLOMEO, ESQ.
17

18

19

20

21

22      *         *         *

23

24

25

---

                                        4

1                   T. COOPER

2          T E R R Y   C O O P E R, called as a witness,

3   having been first duly sworn by a Notary

4   Public of the State of New Jersey, was

5   examined and testified as follows:

6   EXAMINATION BY

7   MS. O'CONNELL:

8          Q.   Please state your name for the

9   record.

10         A.   Terry Cooper.

11         Q.   Where do you reside?

12         A.   18 Marshall Street, Apartment 3W,

13  Irvington, New Jersey 07111.

14         Q.   Thank you for coming in today.

15         A.   Thank you for coming.

16         Q.   I know you're going through some

17  things today, but are you okay to testify?

18         A.   Yes.

19         Q.   Have you spoken with your attorney

20  about procedures for taking deposition?

21         A.   Yes.

22         Q.   You understand that you've been

23  placed under oath and have an obligation to

24  testify truthfully today?

25         A.   Yes.

T. COOPER

Q. Do you understand that even though we're in an informal conference room, your testimony has the same effect as testifying in court in front of a judge and jury?

A. Yes.

Q. Do you understand that the court reporter can't transcribe responses that are nonverbal, like nodding your head, shaking your head and other inaudible responses?

A. Yes.

Q. Do you understand that you need to wait for me to ask the complete question before responding?

A. Yes.

Q. And if you don't understand that I'm asking, you can simply ask me to rephrase the question, we can get the questions repeated, but I'm here to try to help you understand the question; do you understand that?

A. Yes.

Q. If, for some reason, there's an earlier answer at any point that you want to change or modify, you can just simply let me

T. COOPER

know and we can go back to that point and we can change your testimony or add whatever sort of commentary you feel is necessary.

A. Yes.

Q. Are you on any sort of medications?

A. No.

Q. And you haven't consumed any alcohol recently?

A. No.

Q. And you haven't consumed any drugs in the last few hours that would affect your testimony?

A. No.

Q. Have you ever been deposed before?

A. Excuse me?

Q. Have you ever been deposed before?

A. No.

Q. Tell me what you did to get ready for today's deposition.

A. I spoke with my attorney.

Q. Did you go over any documents?

A. Yes.

Q. What documents were those?

T. COOPER

A. I remember I don't remember.

MR. BARTOLOMEO: To the best of your recollection.

Q. To the best of your recollection. There may be questions today that you don't understand or remember every single detail, but if you just say to the best of your recollection it's this or that.

A. We/went over the entire complaint, certain background information on myself. I'm going to leave it at that. Yeah, it's safe to say that.

Q. Could you state your full name?

A. Terry Cooper.

Q. You don't have a middle name?

A. No.

Q. Do you go by any other names?

A. No.

Q. Do you have any nicknames?

A. No.

Q. What's your date of birth?

A. 6/14/64.

Q. Are you presently married?

A. No.

T. COOPER

Q. Have you been --

A. Well, actually, yes. I'm separated, but yes.

Q. What's the name of your spouse?

A. Joyce.

Q. Do you have any children?

A. Three.

Q. How old are they?

A. 33, 31 and 25.

Q. What are their names?

A. Danielle, Dominique and Demetrius.

Q. They all live in the New York City and New Jersey area?

A. Yes.

Q. Have you ever been arrested before?

A. Yes.

MR. BARTOLOMEO: If you don't mind, I'm just going to mark this part of the transcript as confidential.

MS. O'CONNELL: Is it a sealed record?

MR. BARTOLOMEO: I thought we had an existing confidentiality agreement.

T. COOPER

1   T. COOPER
2       MR. SEIDENFELD:   There's a
3   protective order.
4       MR. BARTOLOMEO:   And then when we
5   come off of this, we can go back.
6       (Whereupon, at 9:31 A.M., the
7   testimony was deemed confidential and
8   placed in a separate booklet.)
9       (Whereupon, at 9:37 A.M., the
10  non-confidential testimony resumed.)
11      Q.   I'm going to talk about your
12  education.  Can you give my some of your
13  background information, like where did you
14  start school?
15      MR. BARTOLOMEO:   Just one second.
16  Do you want to go back on?
17      MS. O'CONNELL:   Let's go back on.
18      MR. BARTOLOMEO:   Sorry.  Did you
19  understand the question, Terry?
20      THE WITNESS:   No.
21      A.   Could you repeat that, please.
22      MS. O'CONNELL:   Could you read
23  back the question?
24      (Whereupon, the referred-to
25  question was read back by the

T. COOPER

1   T. COOPER
2       Q.   Then after that?
3       A.   I don't remember.
4       Q.   About how old were you when you
5   were a public bus driver?
6       A.   I started at 21.
7       Q.   About how many years did you do
8   that?
9       A.   Nine.
10      Q.   Then, if I'm correct, when you
11  were about 30, do you remember when you
12  were working when you were around 30 after
13  the public bus system job?
14      MR. BARTOLOMEO:   Objection.  Go
15  ahead and answer.
16      A.   I'm not sure.
17      Q.   I know you don't remember the
18  exact last job you had after the public bus
19  driver position.  Do you remember another
20  job that was soon after you were a bus
21  driver?
22      A.   For several years I worked at
23  Overlook Hospital in Summit, New Jersey.
24      Q.   What were you doing there?
25      A.   I work in maintenance.

10

T. COOPER

1   T. COOPER
2   reporter.)
3       A.   Yes.  I completed my education in
4   the Newark public school system.  I
5   graduated from Arts High School and I have
6   two years of college.
7       Q.   You were in the Newark system for
8   grade school and high school?
9       A.   Yes.  I graduated from Newark Arts
10  High School performing arts school.
11      Q.   Where did you go to college?
12      A.   I started a Virginia State
13  University and then I went to Jersey City
14  State College.
15      Q.   Did you graduate from any of those
16  institutions?
17      A.   No.
18      Q.   Why not?
19      A.   I just never did.
20      Q.   What did you do after college?
21      A.   I worked several jobs.
22      Q.   What was the first one that you
23  worked after college?
24      A.   I was a public bus driver for New
25  Jersey Transit.

12

T. COOPER

1   T. COOPER
2       Q.   Do you remember what the name of
3   your position was?
4       A.   Maintenance.
5       Q.   Were you a supervisor there?
6       A.   No.
7       MR. BARTOLOMEO:   Terry, just
8   remember.  We don't want you to guess.
9   To the extent that you remember
10  something, tell her, but I don't think
11  she wants you to guess.  You can
12  correct me if I'm wrong, but I don't
13  want you to guess.
14      MR. SEIDENFELD:   We don't want you
15  to guess.
16      THE WITNESS:   Okay.
17      A.   No, I don't remember the title.
18      Q.   Do you remember where you worked
19  after that one?
20      A.   No.
21      Q.   What's the next job that you
22  remember?
23      A.   The Doe Fund.
24      Q.   About when did you start there?
25      A.   December 2008 -- 2007, excuse me.

T. COOPER

1
2    Q.    So, this is a few years after you
3    left prison for the burglary charge?
4    A.    Yes.
5    Q.    Do you remember what you did after
6    you left prison for the burglary charge?
7    A.    After I left prison for the
8    burglary charge, I was a trainee with The
9    Doe Fund.
10   Q.    That would have been around 2006?
11   A.    No, actually it was 2007.
12   Q.    That you started as a trainee?
13   A.    As a trainee with The Doe Fund,
14   yes.
15   Q.    That was the year that you left
16   prison in New York?
17   A.    Yes.
18   Q.    In what location were you at?
19   A.    The Gates Avenue facility.
20   Q.    How long were you a trainee there?
21   A.    Seven months.
22   Q.    After you were a trainee for seven
23   months, what happened then?
24   A.    They offered me employment.
25   Q.    Do you remember who offered you

T. COOPER

1
2    Q.    What were your duties as a
3    dispatch aide?
4    MR. SEIDENFELD:    Objection.
5    MR. BARTOLOMEO:    You can answer.
6    A.    As a dispatch aide, you pretty
7    much just do the little things that the
8    staff members would ask you to do; little
9    paperwork, filing, some driving.
10   Q.    Did you also go out on the routes
11   when you were working as a dispatcher?
12   MR. SEIDENFELD:    Objection.
13   A.    Yes, I did.
14   MR. SEIDENFELD:    Mr. Cooper, you
15   can take a break whenever you need to
16   as long as you answer the last
17   question.
18   THE WITNESS:    Thank you.
19   Q.    I'm trying to get through this as
20   fast as we can today.  I know you have
21   family matters that you need to attend to.
22   We're going as fast as possible.
23   A.    I really appreciate that.
24   Q.    Were there other trainees working
25   as dispatch aides along with you?

14

T. COOPER

1
2    employment?
3    A.    No.
4    Q.    Was Mr. Washington there at the
5    time?
6    A.    No, he wasn't.
7    Q.    Was it more like the system of The
8    Doe Fund offered you employment or do you
9    remember a specific person?
10   MR. BARTOLOMEO:    Objection. Go
11   ahead and answer.
12   MR. SEIDENFELD:    Objection.
13   A.    It was a specific person.  The
14   dispatcher that was actually there at the
15   time, the boss, Tina Haluska.
16   Q.    You think it was her?
17   A.    Yes.
18   Q.    Do you know it was her?
19   A.    Yes.
20   Q.    Do you know why she offered you
21   employment?
22   A.    Actually as trainee I was working
23   for her.
24   Q.    How were you working for her?
25   A.    As dispatch aide.

16

T. COOPER

1
2    MR. SEIDENFELD:    Objection.
3    A.    No.
4    Q.    Do you remember if there were
5    other trainees that were trainees when you
6    were a trainee that are now currently
7    working with The Doe Fund?
8    MR. BARTOLOMEO:    Objection. Go
9    ahead and answer.
10   A.    Yes.
11   Q.    Who were those people?
12   A.    Off the top, I can't really say.
13   There are quite a few trainees that were
14   trainees with me that went on to become
15   staff members and are still staff members.
16   Q.    Some of those current staff
17   members, are they staff members just at the
18   Gates Ave. facility?
19   A.    No, throughout the organization.
20   Q.    They're all at different
21   locations?
22   A.    Yes.
23   Q.    Would you say that's not unusual
24   that trainees later become full-time staff
25   members?

T. COOPER

1            MR. SEIDENFELD:  Objection.

2     A.    It's very usual.

3     Q.    If you can just take a guess at

4 the trainees that were training with you in

5 2007 that are now current staff today,

6 around how many would you say?

7            MR. BARTOLOMEO:  Objection. I'm

8       going to instruct you not to guess.  To

9       the best of your approximation, if you

10       can, please provide an answer but I

11       don't want you guessing.

12     Q.    Or a range, like, between 20 and

13 40?

14            MR. BARTOLOMEO:  To the extent

15       that you can approximate.

16     A.    I'm not going to answer, because

17 it would be a guess.

18            MR. BARTOLOMEO:  To the best of

19       your ability if you can provide any

20       answer, if not, then you can't.

21     A.    Maybe 20.  Maybe more.

22     Q.    How many trainees were with you in

23 2007?

24     A.    Wow.  Out of the Gates Ave.

---

T. COOPER

1            MR. BARTOLOMEO:  Objection.

2            MR. SEIDENFELD:  Objection.

3            MR. BARTOLOMEO:  You can answer.

4     A.    Yes.

5     Q.    So, how many dispatchers were

6 there when you were promoted?

7            MR. SEIDENFELD:  Objection.

8            MR. BARTOLOMEO:  Objection. You

9       can answer.

10     A.    Two.

11     Q.    Do you remember around what date

12 you were promoted to, I guess, full-time

13 dispatcher?

14            MR. BARTOLOMEO:  Objection. You

15       can answer.

16            MR. SEIDENFELD:  Objection.

17     A.    I don't remember.

18     Q.    How did your duties change once

19 you were no longer a dispatch aide?

20            MR. SEIDENFELD:  Objection.

21     A.    It didn't change.

22     Q.    Did you have, at that time then, a

23 dispatch aide underneath you?

24            MR. BARTOLOMEO:  Objection.

---

18

T. COOPER

1 facility alone it was maybe like 80 of us.

2 If I'm answering this question properly.

3            MR. BARTOLOMEO:  If you don't

4       understand the question, Terry, please

5       just let her know.

6     Q.    Just at the Gates Ave. facility.

7 I've never been there so I don't know how

8 many trainees you could contain in 2007.

9            MR. BARTOLOMEO:  In 2007 she's

10       also talking about, when you were

11       there, versus now or the most recent.

12     Q.    When you were there?

13     A.    When I was there, it was about 80

14 trainees.

15     Q.    I know we've been using the term

16 trainees.  We're referring to the

17 individuals that are in the Ready, Willing &

18 Able program of The Doe Fund, right?

19            MR. BARTOLOMEO:  Objection. You

20       can answer if you understand.

21     A.    Yes.

22     Q.    Then when you were promoted from

23 dispatch aide to full dispatch, was Tina

24 still working with you?

---

20

T. COOPER

1            MR. SEIDENFELD:  Objection.

2            MR. BARTOLOMEO:  Go ahead and

3       answer.

4     A.    Yes.

5     Q.    And who was that?

6     A.    I don't remember.

7     Q.    Was that someone who was a trainee

8 in the Ready Willing & Able Program?

9     A.    Yes.

10     Q.    Do you remember if that person

11 then went on to become a dispatcher?

12            MR. SEIDENFELD:  Objection.

13     A.    I don't remember.

14     Q.    Did you hold any other positions

15 with The Doe Fund besides dispatcher and

16 dispatcher aide?

17            MR. SEIDENFELD:  Objection.

18     A.    Yes.

19     Q.    What positions were those?

20     A.    I was a graduate service advisor

21 and a case manager.

22     Q.    When did your position change from

23 dispatcher to some of these other positions?

24            MR. SEIDENFELD:  Objection.

**21**

T. COOPER

1
2     A.   I don't remember the exact dates.
3     Q.   Do you remember around how long
4 you were working as a dispatcher before the
5 position changed?
6        MR. SEIDENFELD:   Objection.
7     A.   No.
8     Q.   Can you give me approximation,
9 several months or several years for
10 instance?
11     A.   I dispatched, I would say, maybe
12 two years. Then I went to graduate
13 services. Graduate services for about a
14 year, and then I went to case management.
15     Q.   All these were at the Gates Ave.
16 location?
17     A.   Yes.
18     Q.   In those two years that you were a
19 dispatcher at Gates Avenue location, did
20 your duties or responsibilities change in
21 any way?
22     A.   No.
23     Q.   Then when you went on to working
24 graduate services, what were your duties
25 there?

**23**

T. COOPER

1
2        MR. BARTOLOMEO:   Objection.
3        MR. SEIDENFELD:   Objection.
4     A.   No.
5     Q.   Then after working in graduate
6 services you went on to become case manager,
7 correct?
8     A.   Yes.
9     Q.   Do you remember around what year
10 that was?
11     A.   No.
12     Q.   What were your duties as case
13 manager?
14        MR. BARTOLOMEO:   What was his
15 answer?
16        (Whereupon, the referred-to answer
17 was read back by the reporter.)
18        MR. SEIDENFELD:   Could you speak
19 up?
20        THE WITNESS:   I'll speak louder.
21        MS. O'CONNELL:   Could you read
22 back the question?
23        (Whereupon, the referred-to
24 question was read back by the
25 reporter.)

**22**

T. COOPER

1
2     A.   To assist the graduates.
3     Q.   Who are the graduates?
4     A.   Graduates are trainees that have
5 completed the program.
6     Q.   How would you assist them?
7     A.   Various ways. Providing
8 information with housing. I can't really
9 say because I don't remember. Honest answer
10 is just assisting them.
11     Q.   With employment too?
12     A.   No, that's how they became
13 graduates. They were employed.
14     Q.   Through The Doe Fund employment?
15     A.   No. It could be through The Doe
16 Fund or it could be outside The Doe Fund,
17 just as long as they were employed.
18     Q.   Did you supervise anyone when you
19 were working in graduate services?
20        MR. SEIDENFELD:   Objection.
21        MR. BARTOLOMEO:   Objection.
22     A.   No.
23     Q.   Going back a little bit when you
24 were a dispatcher, besides the dispatch
25 aide, did you supervise anyone else?

**24**

T. COOPER

1
2     A.   My duties were anything pertaining
3 to The Doe Fund, certain classes, making
4 sure that they comply with all Doe Fund
5 rules and regulations, help to reunite them
6 with their families, pretty much just be
7 there for them.
8     Q.   About how long were you working as
9 a case manager?
10     A.   Around three years.
11     Q.   These three positions that we're
12 discussing, why did your position changed?
13        MR. SEIDENFELD:   Objection.
14        MR. BARTOLOMEO:   Objection. Go
15 ahead and answer it.
16     A.   Well, from dispatch to graduate
17 services was a promotion. From graduate
18 services to case management was a promotion.
19     Q.   After being a case manager, what
20 did you work after that?
21     A.   I came back to dispatcher.
22     Q.   Do you remember what year that
23 was?
24     A.   At Gates Avenue. 2014.
25     Q.   Where were you working as a case

25

T. COOPER

1    manager?
2         A.    I started at Gates Avenue and went
3    onto Porter Avenue.
4         Q.    Why did your position change from
5    case manager at Porter to dispatcher at
6    Gates Avenue?
7              MR. SEIDENFELD:   Objection.
8              MR. BARTOLOMEO:   Objection.
9         A.    Because I lost my job at Porter
10   Avenue and then a year later I was rehired
11   back at Gates Avenue as a dispatcher.
12        Q.    Around when did you lose the job
13   at Porter?
14        A.    I don't remember the dates.
15        Q.    Was it in 2013?
16        A.    I think so.
17             MR. BARTOLOMEO:   Again, if you
18   don't know, you don't know.
19             THE WITNESS:   I don't know.
20        Q.    Could you tell me the
21   circumstances of why you lost the job at
22   Porter?
23             MR. SEIDENFELD:   Objection.
24             MR. BARTOLOMEO:   Objection.  Go

27

T. COOPER

1         A.    Yes.
2         Q.    When you say you lost your job,
3    did they terminate you?
4              MR. SEIDENFELD:   Objection.
5         A.    Yes.
6         Q.    Do you remember who terminated
7    you?
8         A.    No.
9         Q.    It wasn't someone in particular?
10        A.    I'm just going to say HR.
11             MR. BARTOLOMEO:   Terry, again, we
12   don't want you guessing.
13             MS. O'CONNELL:   I think you made
14   that clear.
15             MR. BARTOLOMEO:   I'm allowed to
16   speak to my client.  If you want to
17   take a break and I'll speak to him
18   outside.  Please don't guess.
19        A.    I'm going to say no.
20        Q.    Was there a time where you were
21   keeping up with your case notes before you
22   weren't keeping up with your case notes
23   again?
24             MR. SEIDENFELD:   I'm sorry, I

26

T. COOPER

1    ahead and answer.
2         A.    I was not keeping up with my case
3    loads properly.
4         Q.    How so?
5         A.    I just wasn't keeping up with my
6    case loads properly.  That's the best way to
7    answer that.
8         Q.    Do you feel that was fair?
9              MR. SEIDENFELD:   Objection.
10        A.    Yes.
11        Q.    Do you think there were any other
12   circumstances that created the situation
13   where you lost your job?
14             MR. BARTOLOMEO:   Objection.
15             MR. SEIDENFELD:   Objection.
16             MR. BARTOLOMEO:   Go ahead and
17   answer.
18        A.    No.
19        Q.    Were you given any written
20   warnings?
21        A.    Yes.
22        Q.    Do you remember how many?
23        A.    No.
24        Q.    Was there more than one?

28

T. COOPER

1    didn't hear that.
2              MS. O'CONNELL:   Could you read
3    that back?
4              (Whereupon, the referred-to
5    question was read back by the
6    reporter.)
7         A.    Yes.
8         Q.    When did it start to go downhill?
9              MR. SEIDENFELD:   Objection.
10        A.    I don't know.
11        Q.    You can't think of any
12   circumstances why it went downhill?
13             MR. SEIDENFELD:   Objection.
14        A.    No.
15        Q.    Was your workload increased?
16        A.    I don't remember that.
17        Q.    The written warnings you received
18   from The Doe Fund, do you remember the
19   nature of those written warnings?
20             MR. BARTOLOMEO:   Objection.
21             MR. SEIDENFELD:   Objection.
22        A.    No.
23        Q.    Do you remember what time of the
24   year you were terminated at the Porter Ave.

28

T. COOPER

1    location?
2        A.    No.
3        Q.    Do you remember when you returned
4    back to the Gates Ave. location in 2014?
5        A.    No, I don't remember the exact
6    date.
7        Q.    Do you know roughly how many
8    months went by between the time you were
9    terminated and the time you got your job
10   back?
11           MR. BARTOLOMEO:   Objection. Go
12       ahead and answer.
13       A.    I don't remember.
14       Q.    How did you get your job back?
15           MR. SEIDENFELD:   Objection.
16       A.    I applied.
17       Q.    Through the normal application
18   route or a different way?
19           MR. SEIDENFELD:   Objection.
20       A.    Yes.
21       Q.    How did you apply?
22           MR. SEIDENFELD:   Objection.
23       Q.    Was it online?  Did you meet with
24   someone in person?  What was the application

29

T. COOPER

1           MR. BARTOLOMEO.   Objection.
2        A.    No, I would just say associates.
3        Q.    Was returning to dispatch
4    essentially a demotion from being a case
5    manager?
6           MR. SEIDENFELD:   Objection.
7           MR. BARTOLOMEO:   Objection. Go
8       ahead and answer if you can.
9        A.    I would say yes.
10       Q.    Was the pay less as a dispatcher
11   than as a case --
12       A.    Yes.
13           MR. BARTOLOMEO:   I know it's tough
14       to do sometimes, Terry, but just let
15       her finish the question before you
16       answer, even if you know what she's
17       going to ask because the court reporter
18       can't take down two people talking at
19       the same time.
20           THE WITNESS:   Excuse me.
21           MR. BARTOLOMEO:   That's fine.
22       It's very natural.  We all do it.
23       Q.    When you were a dispatcher in
24   2014, do you remember what you were paid?

30

T. COOPER

1    process?
2           MR. BARTOLOMEO:   Objection. Go
3       ahead and answer.
4        A.    I don't remember.
5        Q.    Do you remember who you met for
6    the interviews?
7        A.    No.
8        Q.    Did you have any connection at the
9    Gates Ave. location that made it easier to
10   get a job there?
11           MR. SEIDENFELD:   Objection.
12           MR. BARTOLOMEO:   Objection.
13       A.    No.
14       Q.    Did you still know people at the
15   Gates Ave. location in 2014?
16           MR. SEIDENFELD:   Objection.
17           MR. BARTOLOMEO:   Objection.
18       A.    Yes.
19       Q.    Who did you know there?
20       A.    Everybody.
21       Q.    Would you say you were friends
22   with some of those people?
23       A.    We were associates.
24       Q.    Not friends?

32

T. COOPER

1        A.    No.
2        Q.    Was it above minimum wage?
3           MR. BARTOLOMEO:   Objection.
4        A.    Yes.
5        Q.    Do you know, in general I guess,
6    the pay discrepancy between the case manager
7    position and the 2014 dispatcher position?
8           MR. BARTOLOMEO:   Objection.
9           MR. SEIDENFELD:   Objection.
10       A.    No.
11       Q.    When you were a dispatcher the
12   first time around 2007, were you ever
13   disciplined?
14           MR. BARTOLOMEO:   Objection.
15           MR. SEIDENFELD:   Objection.
16       A.    No.
17       Q.    You don't remember being
18   disciplined ed at all?
19           MR. BARTOLOMEO:   Objection.
20           MR. SEIDENFELD:   Objection.
21       A.    No.
22       Q.    When you were working in graduate
23   services, were you disciplined in that
24   position?

33

```
1                    T. COOPER
2              MR. SEIDENFELD.  Objection.
3         A.   Yes.
4         Q.   What do you remember about that?
5         A.   I signed documents that I should
6    not have.
7         Q.   That was the only thing?
8         A.   Yes.
9         Q.   Did you receive a written warning
10   for that?
11             MR. SEIDENFELD:   Objection.
12        A.   Yes.
13        Q.   Was there only one written warning
14   at that time?
15             MR. SEIDENFELD:   Objection.
16        A.   Yes.
17        Q.   When you were a case manager at
18   Gates, did you receive any written warnings?
19        A.   No.
20        Q.   Did you receive any discipline?
21             MR. SEIDENFELD:   Objection.
22        A.   No.
23        Q.   When you were a case manager at
24   Porter, did you receive any written
25   warnings?
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

```
1                    T. COOPER
2    take a five-minute break.
3              (Whereupon, at 10:12 A.M., a brief
4    recess was taken.)
5         Q.   Were you ever involved, while you
6    were at The Doe Fund, in allegations of
7    discrimination against you?
8              MR. SEIDENFELD:   Objection.
9              MR. BARTOLOMEO:   Objection.
10        A.   No.
11        Q.   While you were at The Doe Fund,
12   were you involved in allegations of sexual
13   harassment made against you?
14             MR. SEIDENFELD:   Objection.
15             MR. BARTOLOMEO:   Objection.
16        A.   Yes.
17        Q.   Besides the allegations my client
18   brought, what were the other allegations?
19             MR. SEIDENFELD:   Objection.
20             MR. BARTOLOMEO:   Objection.
21        A.   There was a client that made an
22   accusation that I had touched him.
23        Q.   Was this at the Porter Ave.
24   location?
25        A.   Yes, it was.
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

34

```
1                    T. COOPER
2         A.   Yes.
3         Q.   How many do you remember?
4         A.   I don't remember.
5         Q.   Was it more than two at Porter?
6         A.   I don't remember.
7         Q.   Did you receive any discipline at
8    Porter other than the termination?
9              MR. SEIDENFELD:   Objection.
10        A.   No.
11        Q.   Do you remember the name of your
12   old supervisor at the Porter Ave. location?
13             MR. SEIDENFELD:   Objection.
14        A.   William Glenn.
15             MR. SEIDENFELD:   It's not clear
16   for which role.
17             MS. O'CONNELL:   When he was a case
18   manager.  That's the only position he
19   worked at at Porter.
20        Q.   Right?
21        A.   William Glenn.
22        Q.   What was his job title?
23        A.   He was the director of the RWA
24   program.
25             MS. O'CONNELL:   We're going to
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

36

```
1                    T. COOPER
2         Q.   When you say "a client," you were
3    his --
4         A.   A trainee.  Excuse me.
5         Q.   You were his case manager?
6         A.   No, I wasn't.
7         Q.   But he was still your client?
8              MR. BARTOLOMEO:   Objection.
9         Q.   He was a Doe Fund client?
10        A.   He was assigned to another case
11   manager, but he was a trainee.
12        Q.   So, you weren't supervising that
13   trainee?
14             MR. SEIDENFELD:   Objection.
15             MR. BARTOLOMEO:   Objection.
16        A.   No, I wasn't.
17        Q.   About how many case managers are
18   at the Porter Ave. location?
19             MR. SEIDENFELD:   Objection.
20             MR. BARTOLOMEO:   Objection.  Go
21   ahead and answer.  Before you answer,
22   are you talking about now, back in the
23   time he was there?
24             MS. O'CONNELL:   In 2013.
25        A.   When I actually sat in that
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

T. COOPER

1  office, there was 10 case managers.
2      Q.    What was the nature of this
3  trainee's complaint?
4          MR. BARTOLOMEO:   Objection.  Go
5      ahead and answer.
6      A.    I don't understand what you're
7  asking me.
8      Q.    You said this trainee made an
9  allegation of sexual harassment against you.
10  What did he say?
11          MR. SEIDENFELD:   Objection.
12      A.    It was said to me that the trainee
13  said that I touched him.
14      Q.    That's all you knew?
15          MR. BARTOLOMEO:   Objection.
16          MR. SEIDENFELD:   Objection.
17      A.    Yes.
18      Q.    When it was said this person said
19  you touched him, did you know that meant
20  sexually or what did you take that to mean?
21          MR. SEIDENFELD:   Objection.
22      A.    It was said to me that I touched
23  him in a sexual manner.
24      Q.    Why do you think he would say

---

T. COOPER

1      A.    They look crazy.
2      Q.    In what way?
3      A.    Their eyes, their whole -- they
4  just look a little shot out, spaced out.
5  It's the best way to describe it, to me.
6  They look scary.
7      Q.    Scary?
8      A.    Yes.
9      Q.    Like in a way, that they're going
10  to harm someone?
11      A.    It could be --
12          MR. SEIDENFELD:   Objection.
13      A.    -- taken that way.
14      Q.    Would you say how people look on
15  spice can vary?
16          MR. SEIDENFELD:   Objection.
17      A.    Yes, I guess you can.
18      Q.    Were you able to substantiate that
19  this person was under the influence of
20  Spice?
21          MR. SEIDENFELD:   Objection.
22          MR. BARTOLOMEO:   Objection.
23      A.    No.
24      Q.    What made you think that he was on

---

T. COOPER

1  that?
2          MR. SEIDENFELD:   Objection.
3          MR. BARTOLOMEO:   Objection.
4      A.    I can't really say, but the
5  trainee was under the influence and I
6  believe that had a lot to do with it.
7      Q.    Why do you mean when you say
8  "under the influence"?
9      A.    He was under the influence of
10  Spice.
11      Q.    What's Spice?
12      A.    It's a -- to my understanding,
13  it's a bootleg marijuana.
14      Q.    Have you seen other people under
15  the influence of Spice before?
16          MR. SEIDENFELD:   Objection.
17      A.    Yes, I have.
18      Q.    Where did you see that?
19      A.    At the facilities and in the
20  public, in the streets in general.
21      Q.    What does it look like when
22  someone is under the influence of Spice?
23          MR. BARTOLOMEO:   Objection.  You
24      can answer.

---

T. COOPER

1  Spice?
2          MR. SEIDENFELD:   Objection.
3      A.    As I stated, the way the trainee
4  looked and the way he was acting.
5      Q.    Was this at night or in the
6  morning?  When was this that you saw him on
7  Spice?
8          MR. SEIDENFELD:   Objection.
9          MR. BARTOLOMEO:   Objection.
10      A.    I'm not really sure.  It's been a
11  while.
12      Q.    Do you remember this person's
13  name?
14          MR. SEIDENFELD:   Objection.
15      A.    No.
16      Q.    Do you remember what he looked
17  like?
18      A.    No.  It's been years.
19          MR. SEIDENFELD:   Objection.
20      Q.    Do you know his race?
21          MR. SEIDENFELD:   Objection.
22      A.    I know he was black.
23          MR. SEIDENFELD:   To the extent
24      that Mr. Cooper is talking about any

T. COOPER

1  identifying information about this
2  individual, that's a matter before the
3  court currently and in dispute and I
4  want to mark it confidential.
5        MS. O'CONNELL:   There's no other
6  identifying information because he
7  doesn't know the name and I doubt he
8  knows the Social Security number.
9        MR. SEIDENFELD:  Well, to the
10  extent of whatever he knows, whatever
11  he says, I want it marked confidential.
12  Q.    Do you remember if this individual
13  was tall or short?
14  A.    No.
15  Q.    Do you remember if he was
16  around -- an approximation of his age?
17        MR. SEIDENFELD:   Objection.
18  A.    I'm not safe to say, no.
19  Q.    Do you remember what my client
20  looked like?
21  A.    Yes.
22  Q.    Would you say that my client and
23  this other individual had visual
24  similarities?

T. COOPER

1  A.    Of the facility, the Porter Ave.
2  facility.
3  Q.    Do you remember his name?
4  A.    At that time it was Thomas Perry.
5  Q.    What did Thomas tell you?
6  A.    I can't quote, but he says that a
7  trainee said that I touched him and he
8  called the police and that I had to go speak
9  to a detective.  I went and spoke with the
10  detective and that was that.
11  Q.    Do you remember any aspects of an
12  investigation that the Doe Fund made?
13        MR. SEIDENFELD:   Objection.
14  A.    I don't know.
15  Q.    Did you speak with anyone
16  regarding the 2013 sexual harassment
17  complaint besides Thomas?
18        MR. SEIDENFELD:   Objection.
19  A.    I don't remember.
20  Q.    Do you remember if you were
21  interviewed by anyone other than the
22  detective?
23        MR. SEIDENFELD:   Objection.
24  A.    I don't remember.

42

T. COOPER

1        MR. BARTOLOMEO:   Objection.
2        MR. SEIDENFELD:   Objection.
3  A.    I can't say.
4  Q.    Would you say that they are about
5  the same height?
6        MR. SEIDENFELD:   Objection.
7        MR. BARTOLOMEO:   Objection.
8  A.    I can't say.
9  Q.    Would you say that they're about
10  the same build?
11        MR. SEIDENFELD:   Objection.
12        MR. BARTOLOMEO:   Objection.
13  A.    I cannot say.
14  Q.    Who told you that this person made
15  a complaint of sexual harassment against
16  you?
17        MR. SEIDENFELD:   Objection.
18        MR. BARTOLOMEO:   Objection. Go
19  ahead and answer.
20  A.    My supervisor.
21  Q.    So, William --
22  A.    No, actually -- excuse me -- the
23  director of the program at the time told me.
24  Q.    Of the whole Doe Fund program?

44

T. COOPER

1  Q.    Do you remember the outcome of the
2  investigation?
3        MR. SEIDENFELD:   Objection.
4  A.    Nothing else was said to me.
5  Q.    Did you ever see this person again
6  after that made the allegations against you?
7  A.    Yes.
8  Q.    When did you see him?
9  A.    He was still at the facility.
10  Q.    They did not move him?
11        MR. SEIDENFELD:   Objection.
12  A.    Not immediately.
13  Q.    When did they move him?
14        MR. SEIDENFELD:   Objection.
15  A.    I can't say.
16  Q.    Do you remember if they moved him?
17  A.    I can't say.
18  Q.    Did they change anything regarding
19  your duties or position after this?
20        MR. SEIDENFELD:   Objection.
21  A.    No.
22  Q.    Do you remember if you were
23  written up for this allegation?
24        MR. BARTOLOMEO:   Objection.

45

T. COOPER

1
2      A.    Not for the allegation itself.
3      Q.    Why do you say that?
4      A.    I was written up because I didn't
5    follow protocol.  Okay.  Like I said to you
6    earlier, he was under -- he looked as if he
7    was under the influence.  When a trainee is
8    under the influence and a staff member
9    notices that, we're supposed to make that
10   trainee stay in the observation room.  I did
11   not do that.  That's why I was disciplined,
12   because I didn't do what I was supposed to
13   do as a staff member when I recognized that.
14     Q.    Have you recognized someone under
15   the influence in the past?
16           MR. SEIDENFELD:   Objection.
17     A.    No.
18     Q.    Was this the first time that you
19   would have needed to do something?
20     A.    Yes.
21     Q.    Were you well informed of the
22   policy?
23     A.    Yes.
24     Q.    Why didn't you place him in the
25   observation room?

47

T. COOPER

1    the Reporter.)
2      Q.    I've handed you what's been marked
3    as TC Exhibit 1, which is Bates Stamped
4    TDF181 through 182.
5            Do you recall ever seeing this
6    document?
7      A.    Yes.
8      Q.    What is it?
9            MR. SEIDENFELD:   Objection.
10     A.    Incident report.
11     Q.    Do you recall seeing this exact
12   same incident report or simply incident
13   reports like it?
14           MR. SEIDENFELD:   Objection.
15     A.    Repeat that?
16     Q.    Do you recall seeing this exact
17   incident report?
18     A.    Yes.
19     Q.    Where did you see it?
20     A.    Actually when it was written and a
21   copy was given to me.
22     Q.    Do you recall who created this
23   incident report?
24           MR. SEIDENFELD:   Objection.
25

46

T. COOPER

1
2      A.    I don't know.
3      Q.    Do you remember where you saw him?
4      A.    No.
5      Q.    Because you didn't place him in
6    the observation room, was that something
7    that was on your permanent record?
8            MR. SEIDENFELD:   Objection.
9            MR. BARTOLOMEO:   Objection.  Go
10   ahead and answer.
11     A.    I don't know.
12     Q.    Besides that instance, before
13   then, were you warned about touching people
14   in the workplace?
15           MR. SEIDENFELD:   Objection.
16           MR. BARTOLOMEO:   Objection.
17     A.    No.
18           MR. BARTOLOMEO:   Off the record.
19           (Whereupon an off-the-record
20   discussion was held.)
21           MS. O'CONNELL:   Let's mark this
22   TC-1.
23           (Whereupon, a 2013 Incident Report
24   was marked as Plaintiff's Exhibit TC-1
25   for identification as of this date by

48

T. COOPER

1
2            MR. BARTOLOMEO:   Objection.
3      A.    Yes, Ms. Bromfield.
4      Q.    Who is she?
5      A.    She was, and I say was because
6    she's no longer there, like an associate
7    director of the facility.
8      Q.    Of Porter Ave.?
9      A.    Yes.
10     Q.    Was this created on the date the
11   complaint was made against you?
12           MR. SEIDENFELD:   Objection.
13           MR. BARTOLOMEO:   Objection.
14     A.    I don't know.
15     Q.    Was the person making the
16   complaint in the same room when this was
17   being created?
18           MR. SEIDENFELD:   Objection.
19     A.    No.
20     Q.    Actually, there's another version
21   of this that's printed, so you could read
22   the handwriting.
23           At the time you received this
24   document, you read it and went over it with
25   Ms. Bromfield, right?

48

```
1                  T. COOPER
2            MR. SEIDENFELD:   Objection.
3      A.    Yes.
4      Q.    What were your thoughts at the
5   time that she presented you with this?
6            MR. SEIDENFELD:   Objection.
7      A.    I thought it was -- can I speak
8   freely?
9      Q.    Yes, speak freely.
10     A.    I thought it was bullshit.
11     Q.    Why?
12     A.    Because how could someone accuse
13  me of something like that.  That's how I
14  felt, okay?  So, yeah.  It was a bunch of
15  nonsense to me.
16     Q.    Did you feel it was a
17  misunderstanding?
18           MR. SEIDENFELD:   Objection.
19           MR. BARTOLOMEO:   Objection.
20     A.    Yes.
21     Q.    Why do you think that?
22     A.    I felt that way because why would
23  someone think I was doing what he said I was
24  doing.
25     Q.    And no one has ever said anything
```

49

```
1                  T. COOPER
2   spoke for itself.
3      Q.    Did they, to your knowledge, do a
4   complete investigation into the incident?
5            MR. SEIDENFELD:   Objection.
6            MR. BARTOLOMEO:   Objection.
7      A.    I don't know.
8      Q.    When you met with Ms. Bromfield,
9   did it seem that she was on your side when
10  it came to the allegations and took your
11  viewpoints?
12           MR. SEIDENFELD:   Objection.
13           MR. BARTOLOMEO:   Objection.
14     A.    I don't know.
15           MS. O'CONNELL:   Let's mark this
16  Exhibit 2.
17           (Whereupon, a Typed incident
18  report was marked as Plaintiff's
19  Exhibit TC-2 for identification as of
20  this date by the Reporter.)
21     Q.    I've just handed you TC Exhibit 2.
22           MR. SEIDENFELD:   Do you have a
23  copy?
24           MS. O'CONNELL:   Here you go.
25     Q.    It's Bates Stamped TDF186 through
```

50

```
1                  T. COOPER
2   like that to you before?
3            MR. BARTOLOMEO:   Objection.
4      A.    No.
5      Q.    At the time, were you afraid that
6   you were going to be terminated?
7            MR. BARTOLOMEO:   Objection.
8      A.    No.
9      Q.    Why not?
10     A.    Because I didn't do anything.
11     Q.    But the allegations were very
12  severe.  You didn't fear you were going to
13  be terminated at the time?
14           MR. SEIDENFELD:   Objection.
15           MR. BARTOLOMEO:   Objection.  Go
16     ahead and answer.
17     A.    No, I didn't.
18     Q.    Did you feel The Doe Fund also
19  believed you didn't do this?
20           MR. SEIDENFELD:   Objection.
21           MR. BARTOLOMEO:   Objection.
22     A.    Honestly, yes.  I felt that they
23  believed that.
24     Q.    Why did you think that?
25     A.    Because my work and my reputation
```

52

```
1                  T. COOPER
2   187.  Do you recall seeing this document
3   before?
4            MR. SEIDENFELD:   Objection.
5            MR. BARTOLOMEO:   Objection, and
6     you're permitted and entitled to review
7     the document before answering any
8     questions about it, and to the extent
9     that you reviewed it, when we've spoken
10    versus previously, go ahead and make
11    that distinction.
12     A.    It looks like the same thing I
13  just read.
14     Q.    Do you recall seeing this exact
15  same document before or just the handwritten
16  incident report?
17           MR. SEIDENFELD:   Objection.
18     Q.    I want you to take a moment --
19           COURT REPORTER:   Did you answer
20    that question?  I'm sorry.
21           THE WITNESS:   No, I didn't.
22     Q.    Take a moment to go through the
23  document, if you haven't already.
24     A.    I don't recall.  This looks like
25  the same document I just read.  I'm have not
```

T. COOPER

1    seen it like this, but it seems like the
2    same thing I just read.
3        MR. BARTOLOMEO:  Just answer her
4        question.  Have you seen this
5        particular document?
6    A.    No.
7    Q.    Is there anything in this report
8    that you agreed happened?  I know you're not
9    going to agree to everything, but is there
10   anything that you remember that did happen?
11       MR. BARTOLOMEO:  Objection, and
12       now's the time to read this entire
13       thing before you make a statement.
14   Q.    As you're reading it, if there's
15   something you want me to know, you can do
16   that too.
17       MR. BARTOLOMEO:  Objection.
18       You're entitled to read it first.
19   A.    I don't agree with any of this.
20   Q.    Did you go to the trainee's room
21   that day?
22       MR. SEIDENFELD:  Objection.
23       MR. BARTOLOMEO:  Objection. Go
24       ahead and answer.
25

---

T. COOPER

1   Q.    Was the trainee in his bed when
2   you entered the room?
3   A.    He was lying across his bed.
4   Q.    Do you remember if he was face up
5   or face down or on his side?
6       MR. SEIDENFELD:  Objection.
7       MR. BARTOLOMEO:  Objection.
8   A.    Face up.
9   Q.    Was there anyone else in the room?
10  A.    Yes.
11  Q.    What do you remember about the
12  other person?
13       MR. SEIDENFELD:  Objection.
14  A.    As far as?
15  Q.    Did you talk to the other person
16  too?  Did you know the other person?
17       MR. SEIDENFELD:  Objection.
18       MR. BARTOLOMEO:  Objection.
19  A.    I don't remember if I had a
20  conversation with the other person, but yes.
21  I knew the other person.  The other person
22  was my client, my trainee.
23  Q.    So, you were that person,
24  Mr. Santana's case manager?
25

---

T. COOPER

1  A.    I went to the trainee's room, yes.
2  Q.    Did you have any sort of dialogue
3  with the trainee?
4  A.    There was a paper on the floor.
5  The paper was picked up.  It was laying next
6  to trainee's bed.  So, I just laid it --
7  dropped it right on the trainee.  That was
8  the end of that.
9  Q.    Do you remember why you went to
10  the trainee's room?
11  A.    Because I had noticed the trainee
12  when he came in the building and he didn't
13  look right.
14  Q.    About how much time passed between
15  him entering the building and you going to
16  his room?
17  A.    I can't say.  I don't know.
18  Q.    Did you follow him to his room?
19  A.    No.
20  Q.    Was there like an hour between the
21  time he went to the room?
22       MR. SEIDENFELD:  Objection.
23       MR. BARTOLOMEO:  Objection.
24  A.    I can't say.
25

---

T. COOPER

1  A.    Yes.
2  Q.    Did you have a cordial
3  relationship with Mr. Santana?
4       MR. SEIDENFELD:  Objection.
5       MR. BARTOLOMEO:  Objection.
6  A.    Could you be a little more
7  specific, please?
8  Q.    Did you have a bad
9  client/supervisor relationship with
10  Mr. Santana?
11       MR. SEIDENFELD:  Objection.
12       MR. BARTOLOMEO:  Objection.
13  A.    We just had a case manager/trainee
14  relationship.  That's it.
15  Q.    You got along okay, there was no
16  animosity against you?
17       MR. BARTOLOMEO:  Objection.
18  A.    Just fine.
19  Q.    About how long were you
20  Mr. Santana's case manager?
21  A.    His duration with the program.
22  Q.    Did he graduate?
23  A.    I don't remember.  I don't know.
24  Q.    Did he become employed with the
25

57

```
1                  T. COOPER
2    Doe Fund afterwards?
3              MR. BARTOLOMEO:   Objection.
4              MR. SEIDENFELD:   Objection.
5         A.    I don't remember.
6         Q.    Do case managers normally go to
7    trainees' bedrooms?
8              MR. SEIDENFELD:   Objection.
9              MR. BARTOLOMEO:   Objection.
10        A.    If they have to.
11        Q.    What are the circumstances that
12   they would have to?
13             MR. SEIDENFELD:   Objection.
14        A.    If they need to speak with their
15   client and there's not a security available
16   to get them for them.  If they're doing
17   actual room checks, then yes, they would go
18   to the rooms.
19        Q.    But you weren't doing room checks
20   that day, right?
21             MR. SEIDENFELD:   Objection.
22             MR. BARTOLOMEO:   Objection.  Go
23        ahead and answer.
24        A.    No, I wasn't.
25        Q.    Do you know who John Wu is?
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

59

```
1                  T. COOPER
2         Q.    When you had the interaction with
3    Santana, do you remember handing him a piece
4    of paper?
5         A.    No.
6         Q.    Do you remember touching his
7    chest?
8              MR. BARTOLOMEO:   Objection.
9         A.    No.
10        Q.    Do you agree with the statement
11   that you are a touchy, feely person?
12             MR. BARTOLOMEO:   Objection.  Go
13        ahead and answer.
14        A.    Yes.
15        Q.    Why is that?
16        A.    Over my entire life, my
17   50-something years being here, I have a
18   tendency, when I talk, I use my hands and
19   sometimes that's not good, because people
20   take it the wrong way.  I don't know if you
21   guys notice, but as I'm talking right now I
22   keep holding my hands.  So, yes.
23        Q.    When you say you talk with your
24   hands, can you tell me more about that?
25             MR. SEIDENFELD:   Objection.
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

58

```
1                  T. COOPER
2         A.    Yes.  Mr. Wu was in charge of
3    security.
4         Q.    Do you know who Amy Sternhel is?
5         A.    Yes.  I don't know if she was a
6    nurse or a doctor.
7         Q.    And she was on the premise of
8    Porter?
9         A.    Yes.
10        Q.    You said you remember speaking to
11   detectives about this incident?
12             MR. SEIDENFELD:   Objection.
13        A.    Yes.
14        Q.    What do you remember about that?
15             MR. BARTOLOMEO:   Objection.  Go
16        ahead and answer.
17        A.    I just remember going to the
18   office and speaking with a young lady.  I
19   don't remember the questions that were asked
20   or anything.  I just remember that it
21   happened.
22        Q.    Did they speak to you about your
23   interaction with Santana that night too?
24        A.    As I said, I don't remember.
25             MR. SEIDENFELD:   Objection.
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

60

```
1                  T. COOPER
2              MR. BARTOLOMEO:   Objection.
3         A.    Maybe that's just an expression I
4    use when I say that, but I move my hands a
5    lot.  I'll be talking to you, like that.
6    That's the best way I can describe what I'm
7    trying to say.
8              MS. O'CONNELL:   Let the record
9         reflect that Mr. Cooper touched his
10        attorney's hand and then upper arm near
11        the shoulder.
12             MR. SEIDENFELD:   Objection.
13             MR. BARTOLOMEO:   Objection to the
14        characterization.
15        Q.    Would you agree that you just
16   touched your attorney's hand?
17             MR. SEIDENFELD:   Objection.
18             MR. BARTOLOMEO:   Objection.
19        A.    Yes, I will.
20        Q.    What would you call touching the
21   arm part; the shoulder or the arm?
22        A.    Say that again?
23        Q.    When you touched your attorney's
24   shoulder or arm, how would up characterize
25   touching his upper arm?
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

61

T. COOPER

1
2        MR. SEIDENFELD:   Objection.
3        MR. BARTOLOMEO:   Objection. Where
4    else did you touch me?
5    A.    His arm and his hand.
6    Q.    When you speak to other people,
7    sometimes you do that; is that so?
8        MR. SEIDENFELD:   Objection.
9        MR. BARTOLOMEO:   Objection.
10   A.    Yes.  I've been known to do that,
11   yes.
12   Q.    You've been known to do that at
13   the workplace too?
14       MR. BARTOLOMEO:   Objection.
15       MR. SEIDENFELD:   Objection.
16   A.    Yes.
17   Q.    Have you ever received any written
18   warnings for that conduct?
19       MR. SEIDENFELD:   Objection.
20       MR. BARTOLOMEO:   Objection. Go
21   ahead and answer.
22   A.    No.  No.
23   Q.    Have supervisors seen you do that?
24       MR. SEIDENFELD:   Objection.
25   A.    Yes.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

63

T. COOPER

1
2    A.    I don't know.
3    Q.    Did they tell you that after this
4    complaint of sexual harassment was made in
5    2013?
6        MR. SEIDENFELD:   Objection.
7        MR. BARTOLOMEO:   Objection.
8    A.    I don't know.
9    Q.    Do you remember Santana telling
10   you, around that time, that he didn't like
11   to be touched by men?
12   A.    No, I don't.
13   Q.    Do you remember any persons, while
14   working at The Doe Fund, they don't like to
15   be touched by men?
16       MR. SEIDENFELD:   Objection.
17   A.    No, I do not.
18   Q.    Do you remember any persons, when
19   working at The Doe Fund, that told you not
20   to touch them?
21       MR. SEIDENFELD:   Objection.
22       MR. BARTOLOMEO:   Objection.
23   A.    No, I don't.
24   Q.    How would you describe your
25   sexuality?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

62

T. COOPER

1
2    Q.    And you engaged in that conduct
3    with supervisors of The Doe Fund too?
4        MR. SEIDENFELD:   Objection.
5    A.    Yes, I have.
6    Q.    Have any supervisors told you not
7    to do that?
8        MR. SEIDENFELD:   Objection.
9    A.    Yes.
10   Q.    About how many times has that
11   happened?
12       MR. BARTOLOMEO:   Objection.
13       MR. SEIDENFELD:   Objection.
14   A.    I can't answer that.  I don't
15   know.
16   Q.    More than once?
17   A.    Yes to that.
18   Q.    More than five times?
19       MR. SEIDENFELD:   Objection.
20       MR. BARTOLOMEO:   Objection.
21   A.    I'll just say more than once.
22   Q.    Did they tell you that before this
23   complaint was made of sexual harassment in
24   2013?
25       MR. SEIDENFELD:   Objection.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

64

T. COOPER

1
2        MR. SEIDENFELD:   Objection.
3        MR. BARTOLOMEO:   Objection as
4    well.
5    A.    I wouldn't.
6    Q.    You wouldn't describe it?
7    A.    No.
8    Q.    In a sexual way, do you like
9    women?
10       MR. BARTOLOMEO:   Objection.
11   A.    Are you asking me my sexuality?
12   Q.    Yes.
13   A.    Okay.  I'm only laughing because
14   of what I was getting ready to say.  Excuse
15   me.  Scratch that.  Bisexual.
16   Q.    Have you always been bisexual?
17   A.    Yes.
18   Q.    Would you say that people around
19   you know that you're bisexual?
20       MR. SEIDENFELD:   Objection.
21       MR. BARTOLOMEO:   Objection.
22   A.    I would not say.
23   Q.    Did Santana, your trainee when at
24   the Porter location, know that you were
25   bisexual at the time?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

65

1          T. COOPER
2          MR. BARTOLOMEO:   Objection. To
3      the extent you understand and know what
4      Santana thought, you can answer.
5      A.    I'm going to say no.  It's my
6  business at the workplace.  It's none of
7  their business.
8      Q.    What is your understanding of
9  Mr. Santana's sexuality?
10          MR. SEIDENFELD:   Objection.
11          MR. BARTOLOMEO:   Objection.
12      A.    I have none.
13      Q.    When you were working at The Doe
14  Fund, did anyone know that you were
15  bisexual?
16          MR. SEIDENFELD:   Objection.
17          MR. BARTOLOMEO:   Objection.
18      A.    I don't know.
19      Q.    Do you know if anyone assumed you
20  were gay?
21          MR. SEIDENFELD:   Objection.
22          MR. BARTOLOMEO:   Objection.
23      A.    I don't know.
24      Q.    Would it surprise you if someone
25  thought that you were gay?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

67

1          T. COOPER
2  harassment made against you?
3          MR. SEIDENFELD:   Objection.
4          MR. BARTOLOMEO:   Objection.
5          Have you had a chance to review
6      the document?
7      THE WITNESS:   Yes.
8      Q.    Does it refresh your recollection
9  about the interview or investigation in
10  2013?
11          MR. SEIDENFELD:   Objection.
12      A.    Yes.
13      Q.    Was there anyone else present
14  besides the individuals listed at the top?
15          MR. BARTOLOMEO:   Objection.
16      A.    No.
17      Q.    What was the tone of the meeting
18  when you met with Perry, Bromfield and Glenn
19  that day?
20          MR. SEIDENFELD:   Objection.
21          MR. BARTOLOMEO:   Objection.
22      You're asking independent recollection
23      or what he has now reviewed?
24      Q.    Your recollection?
25      A.    I don't remember.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

66

1          T. COOPER
2          MR. SEIDENFELD:   Objection.
3          MR. BARTOLOMEO:   Objection.
4      A.    Again, I don't know.
5      Q.    Would it surprise you if someone
6  that you were working with at The Doe Fund
7  thought you were bisexual?
8          MR. SEIDENFELD:   Objection.
9          MR. BARTOLOMEO:   Objection.
10      A.    Again, I don't know.
11          MS. O'CONNELL:   Mark this TC-3.
12          (Whereupon, an Investigative
13      report was marked as Plaintiff's
14      Exhibit TC-3 for identification as of
15      this date by the Reporter.)
16      Q.    I handed you what's been marked as
17  TC Exhibit 3, Bates Stamped TDF191 through
18  193.
19          Do you recall seeing this
20  document?
21      A.    No, I don't.
22      Q.    Does this document, and take your
23  time to look through it, but does it refresh
24  your recollection about the investigation
25  into the 2003 allegation of sexual

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

68

1          T. COOPER
2      Q.    The person making the allegations,
3  was he in the room with you or did he appear
4  at any time?
5          MR. SEIDENFELD:   Objection.
6      A.    I don't remember.
7      Q.    Did you have any previous history
8  with the person making the allegations
9  against you?
10          MR. SEIDENFELD:   Objection.
11      A.    No.
12      Q.    You didn't have any negative
13  history?
14          MR. SEIDENFELD:   Objection.
15      A.    None.
16      Q.    If you could turn to the second
17  page where it says five; do you see that?
18      A.    Yes.
19      Q.    It say, "Terry was questioned
20  about any supervisory interventions
21  regarding his hands on/off style of
22  communication."  Do you remember them
23  discussing that?
24      A.    No, I don't remember this.
25      Q.    Do you know what they mean by

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

69

```
1              T. COOPER
2    hands on/off style of communication?
3              MR. SEIDENFELD:   Objection.
4        A.   I'm going to say no.  I don't
5    remember.
6        Q.   Does it have to do with you
7    talking with your hands?
8              MR. SEIDENFELD:   Objection.
9              MR. BARTOLOMEO:   Objection.
10       A.   I don't remember.
11             MR. BARTOLOMEO:   You're trying to
12   understand what his understanding of
13   what they meant was or are you asking
14   what they understood?
15       Q.   What do you understand it to mean?
16             MR. SEIDENFELD:   Objection.
17       A.   I don't remember what I understood
18   it to mean at that time.  I'm just going to
19   say I don't know.
20       Q.   What do you understand it to mean
21   now?
22       A.   Now, I would say it means as far
23   as the way I talk with my hands.
24       Q.   Do you recall William Glenn
25   addressing you talking with your hands?
```

```
1              T. COOPER
2    chest, is touching someone on the chest in
3    the workplace sexual harassment?
4              MR. SEIDENFELD:   Objection.
5              MR. BARTOLOMEO:   Objection.
6        A.   I don't know.
7        Q.   Can you understand how it would
8    make someone feel uncomfortable if another
9    man touched them on the chest?
10             MR. SEIDENFELD:   Objection.
11             MR. BARTOLOMEO:   Objection.
12       A.   I don't know.
13       Q.   If a man touched you on the chest,
14   would you feel uncomfortable?
15             MR. SEIDENFELD:   Objection.
16             MR. BARTOLOMEO:   Objection.
17       A.   I don't know.
18             MR. BARTOLOMEO:   Do you mind if we
19   take a quick break?
20             MS. O'CONNELL:   Okay.
21             (Whereupon, at 11:17 A.M., a brief
22   recess was taken.)
23             MS. O'CONNELL:   What was the last
24   question?
25             (Whereupon, the referred-to
```

70

```
1              T. COOPER
2              MR. SEIDENFELD:   Objection.
3              MR. BARTOLOMEO:   Objection.
4        A.   No, I don't remember this.
5        Q.   Do you recall Donna Harris
6    addressing your communication style of
7    talking with your hands?
8              MR. BARTOLOMEO:   Objection.
9              MR. SEIDENFELD:   Objection.
10       A.   No, I don't.
11       Q.   If your supervisors made
12   complaints about your communication style,
13   would that be in your file or some sort of
14   permanent record?
15             MR. SEIDENFELD:   Objection.
16             MR. BARTOLOMEO:   Objection.
17       A.   I don't know.
18       Q.   Does The Doe Fund have a different
19   policy for oral warnings versus written
20   warnings?
21             MR. SEIDENFELD:   Objection.
22             MR. BARTOLOMEO:   Objection.
23       A.   I don't know.
24       Q.   Going back to Santana's complaint
25   where he stated that you touched him on the
```

72

```
1              T. COOPER
2    question and answer were read back by
3    the reporter.)
4        Q.   And again, you don't remember
5    anything else that really happened after you
6    were interviewed?
7              MR. SEIDENFELD:   Objection.
8              MR. BARTOLOMEO:   Objection.
9        A.   No.
10       Q.   You said that you saw the person
11   who made allegations against you on several
12   occasions after your interview, right?
13             MR. SEIDENFELD:   Objection.
14             MR. BARTOLOMEO:   Objection.
15       A.   Yes.
16       Q.   Do you know if this person
17   graduated or were they terminated from the
18   program?
19             MR. SEIDENFELD:   Objection.
20             MR. BARTOLOMEO:   Objection.
21       A.   I don't know.
22       Q.   You don't know what happened to
23   them?
24       A.   No.
25       Q.   Just one day you did not see that
```

73

T. COOPER

1           T. COOPER
2 person again?
3           MR. SEIDENFELD:   Objection.
4    A.   Yes.
5    Q.   Did they give you any sort of
6 instructions about minimizing contact with
7 that person?
8           MR. SEIDENFELD:   Objection.
9    A.   Not to my knowledge.
10    Q.   From what you recall, you were
11 only instructed how to handle individuals
12 that appeared to be under the influence?
13           MR. SEIDENFELD:   Objection.
14           MR. BARTOLOMEO:   Objection.
15    Q.   Or did you receive any other
16 instructions besides how to handle
17 individuals that were under the influence?
18           MR. SEIDENFELD:   Objection.
19           MR. BARTOLOMEO:   Objection.
20    A.   I not following the question.
21    Q.   After the allegations were made
22 against you, did The Doe Fund give you any
23 sort of instructions about how to change
24 your conduct after these were made against
25 you?

75

T. COOPER

1           T. COOPER
2 what you've told me today, that has to do
3 with your termination in 2013?
4           MR. BARTOLOMEO:   Objection.
5    A.   No.
6    Q.   After the 2013 allegations were
7 made against you, did you feel any prejudice
8 coming from other Doe Fund employees?
9           MR. SEIDENFELD:   Objection.
10           MR. BARTOLOMEO:   Objection.
11    A.   No.
12    Q.   Do you feel The Doe Fund
13 mishandled its investigation in 2013?
14           MR. SEIDENFELD:   Objection.
15           MR. BARTOLOMEO:   Objection.
16    A.   No.
17    Q.   When you worked with The Doe Fund,
18 did you see anyone else that was an employee
19 of The Doe Fund talk with their hands?
20           MR. SEIDENFELD:   Objection.
21           MR. BARTOLOMEO:   Objection.
22    A.   I don't know.
23    Q.   You don't recall seeing anyone?
24    A.   That's nothing I pay attention to.
25    Q.   Do you recall any instances where

74

T. COOPER

1           T. COOPER
2           MR. SEIDENFELD:   Objection.
3           MR. BARTOLOMEO:   Objection. Go
4    ahead and answer.
5    A.   I don't know.  I don't remember.
6 I don't know.
7    Q.   About how soon after these
8 allegations were made were you terminated?
9           MR. SEIDENFELD:   Objection.
10           MR. BARTOLOMEO:   Objection.
11    A.   I don't know, but mind you this
12 has nothing to do with me being terminated,
13 these allegations.
14    Q.   Nevertheless, was it a month after
15 you were terminated?
16           MR. BARTOLOMEO:   Objection.
17    A.   I have no idea.
18    Q.   How can you be so sure that the
19 2013 allegation had nothing to do with your
20 termination?
21           MR. SEIDENFELD:   Objection.
22           MR. BARTOLOMEO:   Objection.
23    A.   Because I know why I was
24 terminated.
25    Q.   Is there anything else, other than

76

T. COOPER

1           T. COOPER
2 a Doe Fund employee engaged in sexual
3 harassment?
4           MR. SEIDENFELD:   Objection.
5           MR. BARTOLOMEO:   Objection.
6    A.   No.  I don't know.
7    Q.   Do you recall any allegations,
8 other than the ones we're talking about
9 today, that were made against other Doe Fund
10 employees?
11           MR. SEIDENFELD:   Objection.
12           MR. BARTOLOMEO:   Objection.
13    A.   I don't know.
14    Q.   Has anyone sexually harassed you
15 at the workplace while you were working at
16 the Doe Fund?
17           MR. SEIDENFELD:   Objection.
18    A.   No.
19    Q.   Has anyone made any comments that
20 made you feel uncomfortable that were sexual
21 in nature?
22    A.   No.
23    Q.   Has anyone touched you
24 inappropriately when you were at the Doe
25 Fund?

T. COOPER

1
2      A.      No.
3      Q.      While you worked at the Doe Fund,
4   were you ever romantically involved with an
5   employee?
6              MR. SEIDENFELD:   Objection.
7              MR. BARTOLOMEO:   Objection.
8      A.      No.
9      Q.      Were you ever romantically
10  involved with a trainee at The Doe Fund?
11             MR. SEIDENFELD:   Objection.
12             MR. BARTOLOMEO:   Objection.
13     A.      No.
14     Q.      Were you ever sexually involved
15  with an employee at The Doe Fund?
16             MR. SEIDENFELD:   Objection.
17             MR. BARTOLOMEO:   Objection.
18     A.      No.
19     Q.      Were you ever sexually involved as
20  a trainee at any Doe Fund location?
21             MR. SEIDENFELD:   Objection.
22             MR. BARTOLOMEO:   Objection.
23     A.      No.
24     Q.      Have you ever attempted to become
25  romantic or sexually involved with an

T. COOPER

1   you received, did they look like this?
2              MR. SEIDENFELD:   Objection.
3              MR. BARTOLOMEO:   Objection.
4      A.      Yes.
5      Q.      Do you have copies of those still?
6      A.      No.
7      Q.      Have you ever seen your personal
8   record?
9              MR. SEIDENFELD:   Objection.
10     A.      Repeat that?
11     Q.      Have you ever seen your personal
12  record?
13     A.      No.
14     Q.      Do you know if you had one while
15  you were at The Doe Fund?
16     A.      No.
17     Q.      Do you know how records on the
18  employees are kept?
19             MR. SEIDENFELD:   Objection.
20     A.      No.
21     Q.      At any time while you were an
22  employee of The Doe Fund, did you hear any
23  gossip or rumors about you?
24             MR. SEIDENFELD:   Objection.

T. COOPER

1
2   employee at The Doe Fund?
3              MR. SEIDENFELD:   Objection.
4              MR. BARTOLOMEO:   Objection.
5      A.      No.
6              MS. O'CONNELL:   Let's mark this
7      Exhibit 4.
8              (Whereupon, a 7/2013 written
9      warning was marked as Plaintiff's
10     Exhibit TC-4 for identification as of
11     this date by the Reporter.)
12     Q.      I'm handing you what's been marked
13  as TC Exhibit 4 Bates Stamped TDF194.  Do
14  you recognize this document?
15     A.      Yes.
16     Q.      What is it?
17     A.      Excuse me?
18     Q.      What is it?
19     A.      It's a warning that I received.
20     Q.      And it's just for the failing to
21  put the person who made complaint against
22  you into the observation area, right?
23             MR. SEIDENFELD:   Objection.
24     A.      Yes.
25     Q.      The other written warnings that

T. COOPER

1
2              MR. BARTOLOMEO:   Objection.
3      A.      No.
4      Q.      Nothing of that nature?
5              MR. SEIDENFELD:   Objection.
6              MR. BARTOLOMEO:   Objection.
7      A.      No.
8      Q.      Would you say you like to make
9   jokes while you're working?
10     A.      Be more specific.
11     Q.      When you're working at The Doe
12  Fund, would you occasionally make jokes?
13             MR. SEIDENFELD:   Objection.
14     A.      Yes.
15     Q.      Did those around you think that
16  you were funny?
17             MR. SEIDENFELD:   Objection.
18             MR. BARTOLOMEO:   Objection.
19     A.      I don't know.
20     Q.      Did they laugh at you?
21             MR. SEIDENFELD:   Objection.
22     A.      Yes.  If I made a joke and it was
23  funny, yes.
24             MS. O'CONNELL:   You can take that
25     if you need to.

81

```
1                T. COOPER
2           THE WITNESS:  Yes, please.
3           MS. O'CONNELL:  Let's take a
4      break.
5           (Whereupon, at 11:49 A.M., a brief
6      recess was taken.)
7      Q.    Do you recall any instances when
8  employees didn't think your jokes at work
9  were funny?
10     A.    I don't know.
11     Q.    Do you recall any instance where
12 any trainee at The Doe Fund didn't think
13 that your comments were funny?
14     A.    I don't know.
15     Q.    Do you believe that any of your
16 comments that you made at the workplace were
17 sexual harassment?
18         MR. SEIDENFELD:  Objection.
19     A.    I don't know.
20     Q.    When you returned to The Doe Fund
21 in 2014 to work as a dispatcher, do you
22 believe that you violated any terms of The
23 Doe Fund's employment policy?
24         MR. SEIDENFELD:  Objection.
25         MR. BARTOLOMEO:  Objection.
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

83

```
1                T. COOPER
2           MR. SEIDENFELD:  Objection.
3           MR. BARTOLOMEO:  Objection.
4      A.    No, I did not.
5      Q.    What is your understanding of The
6  Doe Fund's sexual harassment policy?
7           MR. SEIDENFELD:  Objection.
8      A.    I have none.
9      Q.    You don't understand it?
10         MR. BARTOLOMEO:  Objection.
11     Q.    What do you mean?
12     A.    I don't remember their policy.  I
13 don't know.
14         MS. O'CONNELL:  Let's mark this
15     Exhibit 5.
16         (Whereupon, an Employee Handbook
17     was marked as Plaintiff's Exhibit TC-5
18     for identification as of this date by
19     the Reporter.)
20     Q.    I've handed you what's been marked
21 as TC Exhibit 5 Bates Stamped TDF195 through
22 197. Do you recognize this document?
23     A.    No, I don't.
24         MR. BARTOLOMEO:  Make sure you
25     look through the whole thing before you
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

82

```
1                T. COOPER
2      A.    I don't know what you mean.
3      Q.    For instance, do you feel that you
4  engaged in any conduct that would be a
5  violation of The Doe Fund's discrimination
6  policy?
7           MR. SEIDENFELD:  Objection.
8           MR. BARTOLOMEO:  Objection.
9      A.    No.
10     Q.    You don't believe, after you
11 returned to The Doe Fund in 2014, that you
12 engaged in any conduct that would be, I
13 guess, classified as sexual harassment?
14         MR. SEIDENFELD:  Objection.
15         MR. BARTOLOMEO:  Objection.
16     A.    No.
17     Q.    Did you behave differently around
18 Doe Fund supervisors than non-supervisors
19 when you worked at The Doe Fund?
20         MR. SEIDENFELD:  Objection.
21         MR. BARTOLOMEO:  Objection.
22     A.    No.
23     Q.    Did you behave differently around
24 supervisors than you did around residents of
25 The Doe Fund?
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

84

```
1                T. COOPER
2      answer any questions.
3      Q.    Did you have some time to go over
4  the document?
5      A.    Yes.
6      Q.    Do you recall what this document
7  is now?
8      A.    Yes, I do.
9      Q.    Do you recall seeing it any other
10 time besides today?
11     A.    I think when I was hired.  I'm not
12 sure.
13     Q.    You think you may have seen this
14 when you were hired back in 2007?
15         MR. SEIDENFELD:  Objection.
16         MR. BARTOLOMEO:  Objection.
17     A.    I'm not sure if 2007 or when I was
18 rehired, but I believe this was part of
19 the -- when you get hired, you know, you go
20 over all of the paperwork.  I believe this
21 was one of them.
22     Q.    Do you recall signing that you
23 received an employee handbook?
24     A.    No, I don't.
25     Q.    Do you recall signing any Doe Fund
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

T. COOPER

1    documentation about receiving employee
2    policies?
3          MR. SEIDENFELD:   Objection.
4       A.    No, I don't.
5       Q.    You don't recall or you know you
6    didn't do it?
7       A.    I don't recall.
8       Q.    When you were going through the
9    document, did it refresh your recollection
10   about what The Doe Fund's sexual harassment
11   policy was?
12         MR. SEIDENFELD:   Objection.
13      A.    No.
14      Q.    So, going through it didn't make
15   you remember what you understood at the time
16   when you were a Doe Fund employee?
17      A.    No.
18      Q.    Do you recall having any training
19   while a Doe Fund employee on sexual
20   harassment?
21      A.    No.
22      Q.    No, you didn't receive training?
23      A.    I don't remember.
24      Q.    Do you know if The Doe Fund had

---

87

T. COOPER

1    please do so.
2       A.    Any type of sexual advance that's
3    not welcomed, whether it be verbal,
4    physical.  That's what I would consider
5    sexual harassment.
6       Q.    And what is your understanding of
7    a zero tolerance for sexual harassment as it
8    is noted in The Doe Fund's employee
9    handbook?
10         MR. SEIDENFELD:   Objection.
11         MR. BARTOLOMEO:   Objection.
12   There's no foundation.  You can answer
13   him does he have an understanding.
14      A.    I don't know.
15      Q.    You worked at The Doe Fund for
16   quite some time.  Do you recall other
17   employees being terminated?
18         MR. SEIDENFELD:   Objection.
19         MR. BARTOLOMEO:   Objection.
20      A.    Have I known of someone else being
21   terminated, is that what you're asking me?
22      Q.    Yes, at The Doe Fund?
23      A.    Yes.
24      Q.    These people that were terminated,

---

86

T. COOPER

1    any training period on sexual harassment?
2          MR. SEIDENFELD:   Objection.
3          MR. BARTOLOMEO:   Objection.
4       A.    I don't remember.
5       Q.    Did you receive any other type of
6    training concerning employment
7    discrimination while you worked at The Doe
8    Fund?
9          MR. SEIDENFELD:   Objection.
10      A.    I don't know.
11      Q.    What's your understanding of what
12   sexual harassment is?
13         MR. SEIDENFELD:   Objection.
14         MR. BARTOLOMEO:   Objection.  Go
15   ahead and answer.
16      A.    I can't even begin to describe it.
17   I don't know.  It's weird.  I don't know.
18      Q.    Your version of it is completely
19   fine.  I'm trying to understand what you
20   understand.
21      A.    I understand that.
22         MR. BARTOLOMEO:   To the best of
23   your ability if you can describe what
24   you understand sexual harassment to be,

---

88

T. COOPER

1    what were some of the things that they were
2    terminated for?
3          MR. SEIDENFELD:   Objection.
4          MR. BARTOLOMEO:   Objection.
5       A.    I don't know.
6       Q.    Do you recall anyone working at
7    The Doe Fund being terminated for
8    non-performance-based issues?
9          MR. SEIDENFELD:   Objection.
10         MR. BARTOLOMEO:   Objection.
11      A.    I don't know.
12      Q.    Do you recall any Doe Fund
13   employees using foul language at the
14   workplace?
15         MR. SEIDENFELD:   Objection.
16         MR. BARTOLOMEO:   Objection.
17      A.    Using what?
18      Q.    Foul language?
19         MR. SEIDENFELD:   Objection.
20      Q.    Cursing?
21      A.    I don't know.
22      Q.    Would it surprise you if other
23   employees were swearing at the workplace.
24         MR. SEIDENFELD:   Objection.

T. COOPER

1
2     MR. BARTOLOMEO:   Objection.
3     A.   No.
4     Q.   Why not?
5     A.   I just -- I mean I don't know why
6  it wouldn't surprise me.  We're grown
7  people.  Grown people curse.
8     Q.   Can you repeat yourself?
9     A.   Grown people curse.  Adults.  It
10  wouldn't surprise me to hear any adult curse
11  anywhere.
12     Q.   At the workplace?
13     A.   At the workplace, in a grocery,
14  anywhere.
15     Q.   Including The Doe Fund?
16     MR. SEIDENFELD:   Objection.
17     A.   Anywhere, yes.
18     Q.   Would it surprise you if
19  supervisors were using obscene language like
20  that?
21     MR. SEIDENFELD:   Objection.
22     A.   It would not surprise me if anyone
23  used that type of language.
24     Q.   In the employee handbook it says
25  that foul and obscene language is prohibited

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

T. COOPER

1
2  recall.
3     MS. O'CONNELL:   He doesn't recall
4  anything.
5     MR. BARTOLOMEO:   You're now saying
6  and assuming that people are doing it
7  and then asking a question based on an
8  assumption that's you're making about
9  enforcement of policies.
10     MR. SEIDENFELD:   That he knows
11  nothing about.
12     MR. BARTOLOMEO:   Go ahead and ask
13  the question.  If you don't mind
14  reading it back.  Go ahead and answer
15  to the best of your ability this
16  question that's based on complete
17  speculation and conjecture.
18     Q.   Does The Doe Fund strictly enforce
19  their policies?
20     MR. SEIDENFELD:   Objection.
21     A.   I don't know.  I'm sorry, I don't
22  know.
23     Q.   Would you agree that The Doe Fund
24  strictly enforces their policies?
25     MR. SEIDENFELD:   Objection.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

90

T. COOPER

1
2  by the policy, but you're saying it wouldn't
3  surprise you to hear it.  Does that mean
4  that The Doe Fund doesn't enforce strictly
5  their policies?
6     MR. SEIDENFELD:   Objection.
7     MR. BARTOLOMEO:   Objection.
8     MR. SEIDENFELD:   We're giving you
9  a lot of latitude.
10     MS. O'CONNELL:   He doesn't
11  remember anything.
12     MR. BARTOLOMEO:   He just testified
13  that he doesn't recall people ever
14  cursing.  So, you're asking would it
15  surprise you that they don't enforce
16  their policies, he just testified he
17  doesn't recall anybody cursing.  So,
18  you're making an assumption based on
19  testimony he didn't give.  It's
20  actually contrary to the testimony he
21  gave.
22     MS. O'CONNELL:   He didn't say he
23  never heard it, he said he doesn't
24  remember.
25     MR. BARTOLOMEO:   He doesn't

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

92

T. COOPER

1
2     MR. BARTOLOMEO:   Objection.
3     A.   Really, again, I don't know one
4  way or the other.  Who am I to say.
5     Q.   When you were an employee of The
6  Doe Fund, were you aware of the complaint
7  process?
8     MR. SEIDENFELD:   Objection.
9     Q.   Were you aware of the complaint
10  process for sexual harassment when you were
11  an employee of The Doe Fund?
12     MR. SEIDENFELD:   Objection.
13     A.   No.
14     Q.   Were you aware of the complaint
15  process for discrimination when you were an
16  employee of The Doe Fund?
17     MR. SEIDENFELD:   Objection.
18     A.   No.
19     Q.   Were you aware that comments that
20  included sexual innuendos was prohibited by
21  The Doe Fund?
22     MR. SEIDENFELD:   Objection.
23     MR. BARTOLOMEO:   Objection.
24     A.   No.
25     Q.   When you were a manager at The Doe

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

93

T. COOPER

1  Fund, were you aware of your obligations if
2  you were told of potential sexual harassment
3  at the workplace?
4        MR. BARTOLOMEO:   Objection.
5  You're now calling him a manager.  He's
6  not here to correct each and every one
7  of your question of things that he
8  hasn't testified to.  If you want to
9  ask him were you ever a manager at The
10 Doe Fund, go right ahead and ask him.
11 You haven't asked him that.  He's never
12 stated he's a manager.  Please, I'm not
13 trying to be difficult, but ask him
14 these questions before you start making
15 these assumptions.
16       MS. O'CONNELL:   I think your point
17 is made.
18       MR. BARTOLOMEO:   Okay, then if I
19 made my point, then let's not continue
20 to do it.
21       MR. SEIDENFELD:   Could you read
22 back the question?
23       MR. BARTOLOMEO:   Please read it
24 back and if you can answer the

---

95

T. COOPER

1  Pretty much that's all I did.  Pretty much
2  that was that.  I made sure trainees got to
3  and from their designated assignments and
4  gave them their schedules.
5        Q.   Did you help arrange their
6  schedules?
7        MR. BARTOLOMEO:   Objection.
8        A.   Yes.
9        Q.   You would help them change their
10 schedules, right?
11       MR. SEIDENFELD:   Objection.
12       A.   Yes.
13       Q.   You would help them change the
14 routes that they were on if they were on
15 cleanup, right?
16       MR. SEIDENFELD:   Objection.
17       A.   I'm going to say yes.
18       Q.   Would you say that the trainees
19 were essentially below you because you were
20 a dispatcher?
21       MR. SEIDENFELD:   Objection.
22       MR. BARTOLOMEO:   Objection.
23       A.   No.  Who am I to say that?  No.
24       Q.   You have more power over the

---

94

T. COOPER

1  question, please do so.
2        (Whereupon, the referred-to
3  question was read back by the
4  reporter.)
5        MR. SEIDENFELD:   Objection.
6        A.   I was never a manager.  I can't
7  answer that.
8        Q.   Did you supervise trainees?
9        MR. SEIDENFELD:   Objection.
10       MR. BARTOLOMEO:   Objection.  Go
11 ahead and answer if you can.
12       A.   I can't, because I never
13 supervised any.
14       Q.   Were you assisting in managing
15 schedules when you were a dispatcher in
16 2014?
17       MR. SEIDENFELD:   Objection.
18       MR. BARTOLOMEO:   Objection.
19       A.   Could you be a little more
20 specific, please?
21       Q.   When you were a dispatcher in
22 2014, what were you doing?
23       A.   I gave trainees schedules,
24 arranged transportation for trainees.

---

96

T. COOPER

1  trainees, right?
2        MR. SEIDENFELD:   Objection.
3        MR. BARTOLOMEO:   Objection.
4        A.   I never considered myself to have
5  any power, no.
6        Q.   What's the differences between the
7  trainees and you being a dispatcher?
8        MR. SEIDENFELD:   Objection.
9        A.   The only difference is one was a
10 trainee and one is a staff member.  Title.
11 That's it.  Trainee, staff.
12       Q.   But everyone is working for The
13 Doe Fund?
14       MR. SEIDENFELD:   Objection.
15       MR. BARTOLOMEO:   Objection.
16       A.   I'm not going to answer that
17 because I'm not really sure what you're
18 asking me.
19       MR. BARTOLOMEO:   Then tell her
20 that and ask her to rephrase.
21       A.   I don't really understand what
22 you're asking me.
23       Q.   Do trainees work for The Doe Fund?
24       MR. SEIDENFELD:   Objection.

T. COOPER

1
2          A.   I guess you can say yes.
3          Q.   And as a staff member, you're also
4    working for The Doe Fund?
5               MR. SEIDENFELD:   Objection.
6          A.   Yes.
7          Q.   As a Doe Fund staff member, what
8    is your understanding of your obligations if
9    a trainee tells you about potential sexual
10   harassment?
11              MR. SEIDENFELD:   Objection.
12         A.   If a trainee told me?
13         Q.   Yes.
14         A.   Something about --
15         Q.   Not necessarily complaining about
16   you, but complaining about someone sexually
17   harassing them while they're at The Doe
18   Fund.  What's your understanding of your
19   obligation as a Doe Fund staff member?
20              MR. SEIDENFELD:   Objection.
21              MR. BARTOLOMEO:   Objection.
22         A.   My obligation would be to take it
23   to a higher authority.
24         Q.   When you worked at The Doe Fund,
25   what was your primary means of communication

---

T. COOPER

1
2          A.   A trainee?  There was no need for
3    a dispatcher to know a trainee's phone
4    number.  If a trainee was on a specific
5    assignment, they would be handed a Doe Fund
6    radio.  So, staff members would reach out to
7    that client through The Doe Fund's cellular.
8    So, in other words, at no point would a
9    staff member just be able to call a trainee.
10   If we know what assignment he's on, we would
11   call the radio that's for that specific area
12   and that's how we would reach them.  If we
13   needed to reach them and they weren't
14   picking up that phone, a supervisor that's
15   actually out there in the field would go to
16   them and let them know that dispatch or
17   whatever is trying to reach you.
18         Q.   In general, is there a system
19   where Doe Fund staff members can obtain a
20   trainee's phone number if they needed to
21   call them?
22              MR. SEIDENFELD:   Objection.
23         A.   When a trainee comes through
24   intake, his personal file, they may be asked
25   a phone number, but other than that, no, not

---

98

T. COOPER

1
2    between other employees?
3               MR. SEIDENFELD:   Objection.
4               MR. BARTOLOMEO:   Objection.
5          A.   Telephone, radio.
6          Q.   Did you use email too?
7          A.   Yes.
8          Q.   Was there some sort of directory
9    to obtain phone numbers of the different
10   staff members?
11              MR. SEIDENFELD:   Could you read
12         back the question?
13              (Whereupon, the referred-to
14         question was read back by the
15         reporter.)
16         A.   Each facility had facility
17   directory.  So, I guess you would say yes,
18   we had -- in our offices there was a
19   directory posted on the board.
20         Q.   Was there some sort of directory
21   for trainees at The Doe Fund?
22         A.   No.
23         Q.   If you wanted to look up a
24   trainee's phone number, was there a way to
25   do that?

---

100

T. COOPER

1
2    that I know of.
3          Q.   Would that just be in a physical
4    file?
5               MR. SEIDENFELD:   Objection.
6          A.   What do you mean?
7          Q.   Would the intake information just
8    be in their physical file?
9          A.   Yes.
10         Q.   Could it also be electronically
11   too?
12              MR. SEIDENFELD:   Objection.
13         A.   I have no idea.
14         Q.   Do you recall if you ever received
15   updates to any of The Doe Fund's policies?
16              MR. SEIDENFELD:   Objection.
17         A.   I don't know.
18         Q.   What was The Doe Fund procedure to
19   update their policies?
20              MR. SEIDENFELD:   Objection.
21         A.   I don't know.
22         Q.   Do you remember ever receiving
23   emails that a policy has been changed?
24         A.   I don't know.  I don't remember.
25   It's been a while.

101

T. COOPER

1
2    Q.    When you were an employee at Gates
3    Ave. in 2016 until your termination, were
4    you aware of laws that prohibited
5    discrimination in the workplace?
6           MR. BARTOLOMEO:   Objection.
7    A.    Was I aware of what?
8    Q.    Laws?
9    A.    No.
10    Q.    When you were a Doe Fund employee
11    in the period of 2014 to your termination,
12    were you aware of any laws prohibiting
13    sexual harassment in the workplace?
14           MR. SEIDENFELD:   Objection.
15           MR. BARTOLOMEO:   Objection.
16    A.    No.
17           MS. O'CONNELL:   Let's mark this
18    TC-6.
19           (Whereupon, a Trainee's Handbook
20    was marked as Plaintiff's Exhibit TC-6
21    for identification as of this date by
22    the Reporter.)
23    Q.    I've handed you what's been marked
24    as TC Exhibit 6, Bates Stamped TDF149
25    through 153. I want you to take your time

103

T. COOPER

1
2    Q.    Going over documentation regarding
3    this case over the past, I don't know, few
4    months or years, do you recall any more
5    details about my client?
6           MR. SEIDENFELD:   Objection.
7           MR. BARTOLOMEO:   Objection.
8    A.    No.
9    Q.    Before my client made complaints
10    against you, what was the extent to your
11    interaction with him?
12           MR. SEIDENFELD:   Objection.
13    A.    Nothing. I don't -- I don't even
14    really remember the guy, so I can't even say
15    that there was any type of relationship or
16    that because I don't remember.
17    Q.    Do you recall the investigation
18    that happened after my client made
19    complaints against you?
20           MR. SEIDENFELD:   Objection.
21    A.    No.
22    Q.    What do you recall from that time
23    period?
24           MR. SEIDENFELD:   Objection.
25           MR. BARTOLOMEO:   Objection.

102

T. COOPER

1
2    to look over this document, but do you
3    recognize it?
4    A.    Vaguely. This is a Trainee
5    Handbook.
6    Q.    Do you recall receiving a Trainee
7    Handbook when you joined The Doe Fund in
8    2007?
9    A.    I don't remember.
10    Q.    As a Doe Fund staff member, when
11    was the last time that you reviewed this
12    document?
13           MR. SEIDENFELD:   Objection.
14    A.    I don't remember.
15    Q.    Did you receive any training on
16    the policies regarding trainees when you
17    were at The Doe Fund?
18           MR. SEIDENFELD:   Objection.
19    A.    Again, I don't remember.
20    Q.    Do you recall the first time that
21    you met my client, Mr. Brooks?
22    A.    No.
23    Q.    What do you remember about him?
24           MR. SEIDENFELD:   Objection.
25    A.    Honestly speaking, nothing.

104

T. COOPER

1
2    A.    I don't recall anything.
3           MS. O'CONNELL:   Can we take a
4    short break?
5           MR. BARTOLOMEO:   Sure.
6           (Whereupon, at 12:28 P.M., a brief
7    recess was taken.)
8           MS. O'CONNELL:   What was the last
9    question?
10           (Whereupon, the referred-to
11    question and answer were read back by
12    the reporter.)
13    Q.    You've been saying that you don't
14    recall much about the time period in 2016
15    when my client brought claims of sexual
16    harassment against you. Is there anything
17    that you think would refresh your
18    recollection?
19    A.    Actually, no.
20    Q.    Your phone is going off. Do you
21    need to answer it?
22    A.    Let me just look at it for one
23    second. No. Thank you.
24    Q.    You went through the Federal
25    Complaint with your attorney recently?

T. COOPER

1       MR. BARTOLOMEO:   Objection.
2
3       A.       Yes -- I don't know.
4       Q.       Did you ever listen to a recording
5   taken by my client?
6       A.       Yes.
7       Q.       When's the last time you listened
8   to that?
9       A.       Yesterday.
10      Q.       Did that refresh your recollection
11  of certain facts that happened in 2016
12  regarding my client?
13      MR. BARTOLOMEO:   Objection.
14      A.       Not really.
15      MS. O'CONNELL:   I'm going to play
16      a part of the recording.   That one was
17      already in evidence, right?
18      MR. BARTOLOMEO:   Of the -- I don't
19      know which one you're playing.
20      MS. O'CONNELL:   Are you guys
21      stipulating to the two recordings or
22      no?
23      MR. BARTOLOMEO:   No.   You have the
24      witness right here to confirm.
25      MS. O'CONNELL:   We are going to

106

T. COOPER

1   mark this recording as TC Exhibit 7.
2       (Whereupon, a Terry 1 recording
3   was marked as Plaintiff's Exhibit TC-7
4   for identification as of this date by
5   the Reporter.)
6       MS. O'CONNELL:   We are now
7   listening to what's been marked as TC
8   Exhibit 7, which is a recording called
9   Terry and it is 12 minutes 44 seconds.
10  We will play the relevant portion.
11      (Whereupon the recording was
12  played.)
13      Q.       Is this the recording that you
14  listened to yesterday with your attorney?
15      A.       Yes, it is.
16      Q.       Is that your voice on the
17  recording?
18      A.       Yes, it is.
19      Q.       Do you recall the interaction on
20  the recording?
21      A.       Vaguely, yes.
22      Q.       And that was my client on the
23  recording too, right?
24      MR. BARTOLOMEO:   Objection.

T. COOPER

1       A.       Okay.
2       Q.       Is that a yes?
3       A.       I'm going to say yes, because like
4   I -- yes.   We'll just say yes.
5       MR. BARTOLOMEO:   Again, we don't
6       want you to guess.
7       A.       I'm not guessing, but like I said
8   to you earlier, I don't really remember your
9   client.   I don't remember any of them
10  clients just about.   So, the conversation I
11  remember.   So, that's why I'm going to say
12  yes, it was your client.
13      MR. BARTOLOMEO:   If you don't
14      know, then --
15      MS. O'CONNELL:   You can't --
16      MR. BARTOLOMEO:   We don't want to
17      correct an honest answer here, so do
18      you know if that's her client or do you
19      not know that it's her client?   Because
20      if you don't know, then say that.   If
21      you do know, then say yes.   That's all
22      we need.   I don't need you to
23      speculate.
24      A.       I'm just going to say I don't know

108

T. COOPER

1   because just by the voices.   I recognize my
2   voice.
3       MS. O'CONNELL:   In the future if
4       you want to make speaking objections,
5       we can take a break and you can talk to
6       your client.
7       MR. BARTOLOMEO:   Sure.   Fair
8       enough.
9       Q.       Were your interactions with my
10  client at any time sexual?
11      A.       No.
12      Q.       Did you receive any indication
13  from my client that he wanted any sort of
14  sexual relationship with you?
15      A.       No.
16      Q.       Do you recall, at any time, my
17  client expressing that he lacked any
18  interest in a sexual relationship with you?
19      A.       No, he never -- no.   No.
20      Q.       Do you recall why you went to my
21  client's bedroom that day?
22      A.       Yes, because I was -- I told him
23  that I would let him know if I could switch
24  his work for him.

T. COOPER

1    Q.    And do you recall speaking with
2 him before you went to his bedroom that day?
3    A.    Yes, I did.
4    Q.    Where did that interaction take
5 place?
6    A.    In my office.
7    Q.    Do you recall what happened in the
8 office?
9    A.    I mean he asked me to switch his
10 work and we just basically discussed that.
11    Q.    Do you recall why my client wanted
12 his schedule to be changed?
13         MR. SEIDENFELD:   Objection.
14    A.    Yes. He wanted to be with his
15 family.
16    Q.    At the time, did you think you
17 could make that happen for him?
18         MR. SEIDENFELD:   Objection.
19    A.    At that time I told him I would do
20 anything I could to try to make it happen,
21 but I couldn't promise him anything.
22    Q.    If you were already discussing the
23 schedule changes in your office, why was it
24 necessary for you to go to the residents'

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

109

T. COOPER

1    A.    It had to be done immediately. It
2 should have been done already.
3    Q.    Was there a certain time in the
4 future that was the hundred percent cutoff?
5         MR. SEIDENFELD:   Objection.
6    A.    I can't really same what time it
7 was. Like I said, I don't really remember
8 all these things, but I do recall the
9 schedule locks in the system at a certain
10 time and after that, once it's locked you
11 can't make any changes.
12    Q.    This is a computer system?
13    A.    Yes, but it's through the whole
14 company, not just Gates Avenue facility.
15 All of that's on the same thing. So, when
16 he asked -- requested that I try to change
17 his schedule, it was like a last minute
18 thing. So, I was trying to help him out
19 before it locked.
20    Q.    In your office, did you have his
21 schedule on your computer? How were you
22 viewing his schedule in the system?
23         MR. SEIDENFELD:   Objection.
24    A.    Actually on the computer.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

110

T. COOPER

1 area where my client's bedroom was?
2         MR. SEIDENFELD:   Objection.
3         MR. BARTOLOMEO:   Objection. Go
4 ahead and answer.
5    A.    As you heard in the tape, I needed
6 to know if I couldn't get him the days that
7 he actually wanted, if I could only get one
8 or the other, which one was he going to
9 accept. There was a time period. I had to
10 hurry up and do what I was going to do so I
11 could send it in. Once I hit submit and it
12 goes in, then it goes to someone else and
13 they do whatever they can do.
14         So, he wanted Saturday and Sunday.
15 If I couldn't get both days, it was either
16 you're going to have Saturday off or Sunday
17 off. Once I did he, he couldn't come back
18 to me and say I would rather have Sunday off
19 or I would rather Saturday. So, let me just
20 ask and make sure.
21    Q.    Was there a deadline you were
22 facing to make that submission?
23    A.    Yes.
24    Q.    What was that deadline?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

112

T. COOPER

1    Q.    Was the schedule pulled up during
2 that initial meeting in your office?
3         MR. SEIDENFELD:   Objection.
4         MR. BARTOLOMEO:   Objection.
5    A.    I don't remember.
6    Q.    If you were in such a rush to make
7 sure you met the deadline or cut off, why
8 couldn't you have just called my client?
9         MR. SEIDENFELD:   Objection.
10         MR. BARTOLOMEO:   Objection.
11    A.    How was I going to call him?
12    Q.    As a dispatcher, had you gone to
13 trainees' residents' quarters to discuss
14 their schedule changes before?
15         MR. SEIDENFELD:   Objection.
16    A.    I don't know.
17    Q.    Normally did you?
18         MR. SEIDENFELD:   Objection.
19         MR. BARTOLOMEO:   Objection.
20    A.    I don't know.
21    Q.    How did you know which room my
22 client was in?
23    A.    We have a board in every office
24 showing us where each resident sleeps.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

T. COOPER

1
2      Q.     Just the room number and no other
3   information?
4      A.     Their name and their room number.
5      Q.     When you went to my client's
6   bedroom, was the door locked?
7      A.     Yes.
8      Q.     It was closed too?
9          MR. SEIDENFELD:   Objection.
10     A.     I don't know.
11     Q.     Do you remember how close you were
12   standing to my client at the time when you
13   were in the bedroom?
14     A.     No.
15     Q.     Do you remember where my client
16   was in the bedroom when you entered?
17     A.     No.
18     Q.     Do you remember ever making
19   physical contact with my client when you
20   were in the bedroom?
21     A.     No.
22     Q.     Was anyone else in the bedroom
23   when you were discussing the schedule with
24   my client at that time?
25     A.     No.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

T. COOPER

1   your office to go to his bedroom?
2
3          MR. BARTOLOMEO:   Objection.
4      A.     No.
5      Q.     Did he say why he left the office?
6      A.     I don't remember.
7      Q.     From your office to my client's
8   bedroom, about how long would it take you to
9   get there?
10         MR. SEIDENFELD:   Objection.
11     A.     He was on the third floor.  I
12   think it would take a few minutes because
13   it's three flights of steps.
14     Q.     Would it take between two and
15   three minutes?
16     A.     For some.
17     Q.     Would it take two or three minutes
18   for you?
19     A.     No.
20     Q.     More time or less time?
21     A.     Yes, more.
22     Q.     Do you recall picking up my
23   client's phone when you were in the bedroom?
24     A.     Actually, yes.
25     Q.     Do you know why you picked it up?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

114

T. COOPER

1
2      Q.     Was there anyone else around that
3   you could recall?
4          MR. SEIDENFELD:   Objection.
5      A.     I don't know.
6      Q.     Do you recall talking with your
7   hands when you were in the bedroom with my
8   client?
9      A.     I don't remember.
10     Q.     Is that something you kind of do
11   unknowingly?
12         MR. SEIDENFELD:   Objection.
13         MR. BARTOLOMEO:   Objection.
14     A.     Yes, but I don't remember.
15     Q.     Do you remember if you were
16   talking with your hands when you were in the
17   office several minutes before you went to
18   the bedroom?
19         MR. SEIDENFELD:   Objection.
20     A.     I don't remember.
21     Q.     When you were in the office, do
22   you recall telling my client "I'm sorry, I
23   talk with my hands"?
24     A.     I don't know.
25     Q.     Do you recall why my client left

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

116

T. COOPER

1
2      A.     Because it looked like it was on.
3      Q.     Like he was on the phone?
4      A.     Yes.  It looked like the phone was
5   on.  You know how you can look at the phone
6   and see the blank?  It looked as if it was
7   on.
8      Q.     At that time you didn't think you
9   were being recorded?
10     A.     At that time, yeah, I started to
11   believe -- is the phone on or what?
12     Q.     Then did you go to my client's
13   bedroom a second time also?
14     A.     I don't know.
15     Q.     Take your time.
16     A.     I don't remember.
17     Q.     Did you answer?
18     A.     Yes, I did.  I said I don't know.
19     Q.     When my client went to your office
20   after he met you upstairs, did you think he
21   was recording you at that time?
22     A.     I honestly don't know.  I don't
23   know what I thought.  I don't remember.
24     Q.     If I played you that recording,
25   would it refresh your recollection?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

T. COOPER

1    A.   Maybe.

2    MS. O'CONNELL:   We'll mark this

3   Exhibit 8.

4    (Whereupon, a Terry 2 recording

5   was marked as Plaintiff's Exhibit TC-8

6   for identification as of this date by

7   the Reporter.)

8    MS. O'CONNELL:   So, SC Exhibit 8,

9   this is Terry 2. I believe it's 7

10   minutes, 52 seconds. I'm going to play

11   a portion.

12    (Whereupon the recording was

13   played.)

14    Q.   Do you recall this conversation?

15    A.   Yeah.

16    Q.   Is that your voice on the

17   recording?

18    A.   Yes, it is.

19    Q.   That's my client again, right?

20    MR. BARTOLOMEO:   Objection.

21    A.   That's the same person that I

22   heard before. I don't know if that's your

23   client.

24    Q.   It sounded like a third voice in

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

T. COOPER

1    A.   The proper response was to be I'm

2   going to do what I'm supposed to do. That's

3   all I ever asked of all of them.

4    Q.   What you were supposed to do is

5   assist in changing the schedule?

6    MR. SEIDENFELD:   Objection.

7    A.   What I expect from any trainee,

8   especially if I go out of my way to change

9   something, is go out there and do what

10   you're supposed to do. Make my glad that I

11   went the extra mile to help you.

12    Q.   By the time that my client went to

13   your office the second time that day, the

14   schedule was already okayed in the system?

15    A.   Well, it had been sent through. I

16   hadn't gotten a final. Once I send it in,

17   it doesn't come back in a couple of seconds,

18   couple of minutes, whatever that it's done,

19   but I've done all that I could do.

20    Q.   Did you listen to any other

21   recordings besides these two?

22    A.   I don't think so.

23    Q.   Both of those conversations on the

24   two recordings we just listened to, they

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

118

T. COOPER

1   the mix that we just listened to. Do you

2   remember who that was?

3    MR. SEIDENFELD:   Objection.

4    A.   No.

5    Q.   Do you recall if that was a staff

6   member?

7    MR. SEIDENFELD:   Objection.

8    A.   I don't know whose voice that was.

9   So, I don't know if it was a staff member.

10   I don't know who it was.

11    Q.   Now that I played you part of this

12   recording, do you recall thinking that

13   you're being recorded at that time?

14    MR. SEIDENFELD:   Objection.

15    A.   I don't know.

16    (Whereupon the recording was

17   played.)

18    Q.   Do you recall what you said just

19   there? Did you hear it?

20    A.   Yes, I did.

21    Q.   What was it?

22    A.   I said what's my appreciation.

23    Q.   What did you expect your

24   appreciation to be?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

120

T. COOPER

1   took place the same day?

2    MR. BARTOLOMEO:   Objection.

3    A.   Yes. I think so, yes.

4    Q.   Is there anything else that I can

5   do to refresh your recollection about events

6   that happened that day?

7    MR. SEIDENFELD:   Objection.

8    MR. BARTOLOMEO:   Objection.

9    A.   No.

10    Q.   After seeing my client in your

11   office that second time on the recording we

12   just listened to, Exhibit 8, do you recall

13   seeing him another time?

14    MR. SEIDENFELD:   Objection.

15    Q.   Do you need to take that?

16    A.   No.

17    MS. O'CONNELL:   Could you read

18   back the question?

19    (Whereupon, the referred-to

20   question was read back by the

21   reporter.)

22    A.   I don't know.

23    Q.   Do you recall what my client was

24   wearing that day?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

121

```
1                    T. COOPER
2         A.    No, I don't.
3         Q.    Going back to the first recording
4    we listened to, Exhibit 7.  After you were
5    finished with having the conversation in the
6    bedroom, do you recall where you walked to
7    after you the left the bedroom?
8         A.    Back downstairs to my office.
9         Q.    Do you recall where my client
10   went?
11              MR. SEIDENFELD:  Objection.
12        A.    He said he was going to take a
13   shower.
14        Q.    And you went straight to your
15   office?  You did not go to the bathroom?
16        A.    I don't remember, but you pass the
17   bathroom going back towards my office, so...
18        Q.    Back where the showers were?
19        A.    Yes.
20        Q.    I'm sorry, did you say you
21   remember seeing my client after you met him
22   the second time in your office?
23              MR. SEIDENFELD:  Objection.
24              MR. BARTOLOMEO:  Objection.
25        A.    No.
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

123

```
1                    T. COOPER
2         Q.    -- eleven?
3              MS. O'CONNELL:  Yes.
4         Q.    Did you read that?
5         A.    Yes, I did.
6         Q.    Do you recall seeing my client
7    that day?
8         A.    Yes, I do.
9         Q.    Did you talk to him at all?
10        A.    Not at all.
11        Q.    Do you disagree with what's
12   written in paragraph 97?
13        A.    That I said this?
14        Q.    Yes, did you say that?
15        A.    No, I did not.
16        Q.    Did you confront my client?
17        A.    Not at all.
18        Q.    Not at any time after he made the
19   allegation?
20              MR. BARTOLOMEO:  Objection.
21        A.    Not at all.  Number one, why would
22   I say this to him?  I had no knowledge of
23   what was going on at that point.  None at
24   all.
25        Q.    When did you first have knowledge
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

122

```
1                    T. COOPER
2         Q.    Do you remember seeing my client?
3         A.    No, I didn't say that.  I don't
4    remember.
5              MS. O'CONNELL:  Let's mark this
6         Exhibit 9.
7              (Whereupon, a Complaint was marked
8         as Plaintiff's Exhibit TC-9 for
9         identification as of this date by the
10        Reporter.)
11        Q.    I'm handing you what's been marked
12   as Exhibit 9, which is the Federal Complaint
13   that my client filed.  Do you recall seeing
14   this document?
15        A.    Yes.
16        Q.    When's the last time you read the
17   document?
18        A.    Yesterday.
19        Q.    Are you generally familiar with
20   what is written in the document?
21              MR. SEIDENFELD:  Objection.
22        A.    Yes.
23        Q.    If you turn to paragraph 97, I
24   believe.  Which is page --
25              MR. BARTOLOMEO:  Eleven.
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

124

```
1                    T. COOPER
2    of it?
3         A.    When I saw your client, I had just
4    gotten out of my car on my way into the
5    office to meet with HR and everyone.  That's
6    when I found out what was going on.  Up
7    until that point, I had no knowledge of what
8    was going on, so why would I say these
9    things to your client?
10        Q.    Where were you getting out of your
11   car?
12        A.    On Gates Avenue.
13        Q.    Like parking on the street?
14        A.    Yes.
15        Q.    About how close to the entrance of
16   the building?
17        A.    I don't know.
18        Q.    So, there was no involvement of
19   coworkers attempting to separate the two of
20   you that day?
21              MR. SEIDENFELD:  Objection.
22              MR. BARTOLOMEO:  Objection.
23        A.    What was there to separate?
24        Q.    Is there anything else that you
25   recall from the days that the recordings
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

125

```
1                    T. COOPER
2    were made when you discussed the scheduling?
3              MR. SEIDENFELD:   Objection.
4              MR. BARTOLOMEO:   Objection.
5         A.   No.
6         Q.   And there's nothing I can do to
7    help refresh your recollection?
8              MR. SEIDENFELD:   Objection.
9              MR. BARTOLOMEO:   Objection.
10        A.   No.
11        Q.   To be clear, you never touched my
12   client's pants?
13        A.   No.
14        Q.   Never touched his groin?
15        A.   No.
16        Q.   And you never touched his penis?
17        A.   No.
18        Q.   Have you ever touched my client in
19   any way?
20             MR. SEIDENFELD:   Objection.
21        A.   No.
22        Q.   Did you ever unintentionally touch
23   my client when you were speaking with your
24   hands?
25             MR. SEIDENFELD:   Objection.
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

127

```
1                    T. COOPER
2              (Whereupon, at 1:29 P.M., a brief
3         recess was taken.)
4              MS. O'CONNELL:   Let's mark this
5         Exhibit 10.
6              (Whereupon, a Brooks Complaint was
7         marked as Plaintiff's Exhibit TC-10 for
8         identification as of this date by the
9         Reporter.)
10        Q.   I'm handing you what's been marked
11   as TC Exhibit 10.  Do you recall ever seeing
12   this document?
13        A.   No.
14        Q.   Is this the first time that you've
15   seen this document?
16             MR. BARTOLOMEO:   Just take a look
17        through it.  Make sure you look at both
18        pages before you answer the question.
19        A.   Actually, yes.  I have seen this
20   before.
21        Q.   When did you see it?
22        A.   When HR called me to the office.
23        Q.   So, the first time you learned of
24   the complaint they showed you --
25        A.   Yes.  This was the first time
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

126

```
1                    T. COOPER
2              MR. BARTOLOMEO:   Objection.
3         A.   I don't know.
4         Q.   After the date that the recordings
5    were made and you assisted my client with
6    his schedule, did you ever make any other
7    changes to my client's scheduling?
8         A.   No.
9         Q.   At that time, did you know of any
10   other employees that had made any complaints
11   about my client?
12             MR. SEIDENFELD:   Objection.
13        A.   I don't know.
14        Q.   Do you recall the investigation
15   into my client's claims?
16        A.   No, I don't.
17        Q.   During the investigation, did you
18   know that my client had any recordings?
19             MR. SEIDENFELD:   Objection.
20        A.   I wasn't aware of the
21   investigation, so how could I be aware of
22   it.  So, the answer is no.
23             MR. BARTOLOMEO:   Just give me 30
24        seconds.
25             MS. O'CONNELL:   Okay.
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

128

```
1                    T. COOPER
2    knowing anything at all about this.
3    Everything hit me at the same time.
4         Q.   Who, from HR, showed you this?
5         A.   Eunice Gilmore.
6         Q.   How did that conversation go?
7              MR. SEIDENFELD:   Objection.
8         Q.   What happened during this meeting
9    when she showed you my client's complaint?
10        A.   They brought me in the office and
11   asked me, "Okay, Terry.  I know you're
12   wondering why you haven't been working the
13   last days," bah, bah, bah, bah.  "A trainee
14   made a complaint about you," and then they
15   handed me a copy of his complaint, asked me
16   to read over it and then they asked me some
17   questions in reference to it.
18             MS. O'CONNELL:   Let's mark this
19        Exhibit 11.
20             (Whereupon, an Investigation was
21        marked as Plaintiff's Exhibit TC-11 for
22        identification as of this date by the
23        Reporter.)
24        Q.   I'm handing you what's been marked
25   as TC Exhibit 11.  It's Bates Stamped TDF169
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

129

T. COOPER

1  through 171.  Do you recognize this
2  document?
3       A.   No, I was never given this.
4       Q.   Did you see it at any time before
5  now?
6       A.   Excuse me?
7       Q.   Had you seen it at any time before
8  now?
9       A.   No.
10      Q.   Take your time and look through
11  the document, because I want to ask you some
12  questions.
13      A.   Read it out loud?
14      Q.   No, read it to yourself so you can
15  refresh your recollection of some facts
16  regarding the investigation.
17           MR. BARTOLOMEO:   When you say
18      "facts," you mean someone else's
19      recollection of the facts.  I don't
20      think we established that he's created
21      it -- I'm not sure those are actual
22      facts.
23      A.   Okay.
24      Q.   Did you have enough time to go

131

T. COOPER

1  that you disagree with?
2       A.   No.
3           MR. SEIDENFELD:   Objection.
4           MR. BARTOLOMEO:   Note my objection
5      as well.
6       Q.   On page two, essentially the
7  middle of the document?
8           MR. BARTOLOMEO:   What does the
9      sentence start with?
10          MS. O'CONNELL:   It starts with
11      "Terry was asked why he would go
12      upstairs."
13      Q.   Do you see that?
14      A.   I have it.
15      Q.   You said you didn't remember why
16  you went up the first time.  It mentions
17  also a second time.  Now seeing this
18  document, do you recall why you went up the
19  second time?
20          MR. SEIDENFELD:   Objection.
21          MR. BARTOLOMEO:   Objection.  Go
22      ahead and answer if you can, Terry.
23      A.   No.
24      Q.   A few more paragraphs up, in bold,

130

T. COOPER

1  through the document?
2       A.   Yeah.
3       Q.   Are you familiar with certain
4  aspects of the allegations that are
5  discussed in this document?
6           MR. SEIDENFELD:   Objection.
7           MR. BARTOLOMEO:   Objection.
8       A.   Yes.
9       Q.   Is it accurate?
10          MR. SEIDENFELD:   Objection.
11          MR. BARTOLOMEO:   Objection.
12      Accurate as to what?
13      Q.   Are the questions and your answers
14  that happened during, I guess, this
15  investigation when you met these individuals
16  at the top, are the questions and answers
17  accurate?
18          MR. SEIDENFELD:   Objection.
19      A.   Based on what I can really
20  remember, but this is a while back so, I'm
21  not going to guess at anything, but based on
22  what I can remember, yeah.  I guess so.  I
23  just said I'm not going to guess.
24      Q.   Is there anything specifically

132

T. COOPER

1  it says, "I asked Terry was there anyone
2  else present when you were discussing these
3  changes," and you mentioned another trainee;
4  do you see that?
5       A.   Yes.
6       Q.   Does that seem accurate?
7           MR. SEIDENFELD:   Objection.
8       A.   No, it doesn't.  No, not at all.
9       Q.   Is it that you don't recall or you
10  disagree?
11      A.   I disagree.  I don't recall.  I
12  don't even know that name.  So, no.
13      Q.   Then on the last page of the
14  document, under the section call Recap
15  regarding Terry's trips upstairs to
16  Gregory's room, I wanted to direct your
17  attention to, "Terry then states can I say
18  something?"  Do you see that?
19      A.   Yes.
20      Q.   Do you recall your answer that is
21  recorded in this document?
22          MR. BARTOLOMEO:   Objection.
23      Independent of this document, does he
24      recall giving that answer?

133

T. COOPER

1      MS. O'CONNELL:   Yes.

2      MR. BARTOLOMEO:   Or does he

3    remember the answer as it appears on

4    the page now?

5      Q.   Do you independently remember

6  this?  Take your time.

7      A.   I don't remember this, but it

8  sounds like I could say something like that,

9  but I don't really remember this.

10     Q.   Do you disagree with your

11  response?

12      MR. SEIDENFELD:   Objection.

13      MR. BARTOLOMEO:   Objection.  If

14    you don't understand, answer that way.

15     A.   I don't really remember it, so I

16  don't want to disagree to it, because I

17  don't really remember everything I said,

18  so...

19     Q.   At this time, would you agree that

20  you bring laughter to the building when you

21  worked at The Doe Fund?

22      MR. SEIDENFELD:   Objection.

23     A.   Sure.

24     Q.   It says here, "Yes, I am loud, but

25

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

135

T. COOPER

1  you would say?

2     A.   I can't recall that, no.

3     Q.   Do you recall if any of your jokes

4  were sexual in nature?

5     A.   No.  I'm going to say no.

6     Q.   Then you say, "Now I have been

7  told to watch my hands, yes."  Do you recall

8  saying something like that at the meeting?

9     A.   I'll say yes.  Yeah.

10     Q.   Now that we've gone through

11  several documents, including this document,

12  do you recall who told you to watch your

13  hands?

14     A.   No.

15     Q.   Then continuing down in the

16  following paragraph starting with, "Do I

17  have a habit of touching people when I

18  talk?"  Do you see that?

19     A.   Yes, I see it.

20     Q.   If you haven't read that, please

21  take the time to read it, but I just want to

22  know if that is a true statement.

23      MR. SEIDENFELD:   Objection.

24      MR. BARTOLOMEO:   The whole thing?

25

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

134

T. COOPER

1  everyone knows that and I respect them."  Do

2  you agree with that?

3      MR. SEIDENFELD:   Objection.

4     A.   Yes.

5     Q.   You also said, according to this

6  document, "I take something like sexual

7  harassment very seriously."  Do you agree

8  with that?

9      MR. SEIDENFELD:   Objection.

10      MR. BARTOLOMEO:   Objection.

11     A.   Yes.

12     Q.   And you say, also in this document

13  according to this document, "Everyone knows

14  I come in in the morning and I wake up

15  people with jokes."  Is that a true

16  statement when you were working at The Doe

17  Fund, that you would come in in the morning

18  and wake people up with jokes?

19      MR. BARTOLOMEO:   Objection.

20     A.   Yes.  Anything to get them up.

21     Q.   You would go into their residents'

22  area and wake people up with jokes?

23     A.   No, I be in the hallway.

24     Q.   Do you recall what sort of jokes

25

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

136

T. COOPER

1      MS. O'CONNELL:   The paragraph.

2     A.   Yes, that's true.  Yes.

3      MR. BARTOLOMEO:   Could we just

4    clarify what we're talking about, not

5    to be difficult?

6      MS. O'CONNELL:   Do you want to

7    read it into the record?

8      MR. BARTOLOMEO:   If you want to

9    read it into the record, that's fine.

10     Q.   We're referring to the paragraph

11  that says, "Do I have a habit of touching

12  people when I talk?  Yes, but even with

13  jokes if someone says 'Hey, Terry.  Like

14  don't say that to me or don't joke around

15  with me like that?  I apologize and that

16  won't ever happen again.  They don't have to

17  worry about me because I'll be just like hi

18  and bye from that point."

19      MR. BARTOLOMEO:   Does that change

20    your answer as to what you just agreed

21    with that you said was accurate?

22     A.   No, that's accurate.

23     Q.   Do you recall anyone that you

24  would be referring to?

25

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

137

T. COOPER

1
2      A.    No.
3      Q.    Just in general?
4      A.    Right.
5      Q.    But it's happened before?
6            MR. SEIDENFELD:   Objection.
7      A.    No, this is just a general
8   statement.
9      Q.    The next line down after that,
10  that says, "It was also asked has Terry ever
11  been accused of anything like this in the
12  past and he responded no."  Why did you say
13  that answer?
14           MR. SEIDENFELD:   Objection.
15           MR. BARTOLOMEO:   Objection.
16     Q.    Did you respond in that way in the
17  meeting?
18     A.    I don't know.
19           MS. O'CONNELL:   Let's mark this
20  Exhibit 12.
21           (Whereupon, a Letter of
22  termination was marked as Plaintiff's
23  Exhibit TC-12 for identification as of
24  this date by the Reporter.)
25     Q.    I'm handing you what's been marked

139

T. COOPER

1
2      Q.    How did this make you feel?
3      A.    I felt bad.  I did.
4      Q.    Why?
5      A.    Because I felt that everyone in
6   The Doe Fund, I had worked with each one of
7   them an amount of years and they knew me.  I
8   laughed and joked with each and every one of
9   them and they pretty much had a good feel of
10  me and they know that any and everything
11  that I've done for any client that has
12  passed through my office, helped them.  It
13  was to the better for them.  I have parents,
14  wives calling me and thanking me.  I
15  received flowers.  Clients didn't forget my
16  birthday and things like that.  So, to me
17  that spoke a lot about me and all of my
18  superiors, they saw this.  They knew this,
19  and to have a client come in here and take
20  my personality and twist it and I was a
21  little disappointed.  I was.
22     Q.    When you say twisted, what do you
23  mean by twisted?
24     A.    Make someone look at me
25  differently or think differently of me.

138

T. COOPER

1
2   as TC Exhibit 12, Bates Stamped TDF180.  Do
3   you recall seeing this document?
4      A.    Yes.
5      Q.    What is it?
6      A.    This was my Notice of Termination.
7      Q.    Was there other aspects of the
8   investigation besides that?
9      A.    Was there?
10     Q.    Was there other aspects of the
11  investigation besides your interview going
12  on before you were terminated?
13           MR. SEIDENFELD:   Objection.
14           MR. BARTOLOMEO:   Objection.
15     A.    I don't know.  If it was, I wasn't
16  aware of it.
17     Q.    On your part you were just
18  interviewed?
19     A.    Yes.
20     Q.    Were you on paid leave until you
21  were terminated?
22     A.    Yes.
23     Q.    Were you given the option to
24  resign?
25     A.    No.

140

T. COOPER

1
2   Prior to this, I don't think any of them
3   thought anything like this.  That's it.  I
4   don't have anything else to say.
5      Q.    After that investigation, were you
6   ever back at the workplace?
7            MR. BARTOLOMEO:   Objection.
8      A.    No.
9      Q.    Did you have access to any
10  computer system of The Doe Fund remotely?
11     A.    No.
12     Q.    Were trainees in The Doe Fund at
13  the time that you were working at the Gates
14  Ave. facility, was there a significant
15  number of trainees that were recently
16  incarcerated?
17           MR. SEIDENFELD:   Objection.
18           MR. BARTOLOMEO:   Objection.  Go
19  ahead and answer.
20     A.    I don't understand the question.
21     Q.    When you were working at the Gates
22  Ave. facility, about what percentage of
23  trainees were recently incarcerated?
24           MR. SEIDENFELD:   Objection.
25           MR. BARTOLOMEO:   Objection.

141

T. COOPER

1
2    Q.    You can give a range, if that
3    helps?
4          MR. BARTOLOMEO:   To the extent
5          that you can approximate, please do so.
6    A.    I would say 75 percent.
7    Q.    Were recently incarcerated?
8    A.    Yes.
9    Q.    And they know The Doe Fund is a
10   program that really helps these sort of
11   people, but would you say that for the
12   residents that were recently incarcerated,
13   they had a fear of returning back to prison?
14         MR. SEIDENFELD:   Objection.
15         MR. BARTOLOMEO:   Objection. To
16         the extent you can answer, go right
17         ahead.
18   A.    I don't know.  I can't speak for
19   them.
20   Q.    When you were a trainee, did you
21   fear being incarcerated again?
22   A.    Honestly, me?  No.
23   Q.    To your knowledge, does graduating
24   from the Ready Willing & Able Program help
25   trainees not return to prison?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

143

T. COOPER

1    recently incarcerated resident's conduct
2    within The Doe Fund, would that information
3    be passed to the parole officer or parole
4    system?
5
6          MR. SEIDENFELD:   Objection.
7          MR. BARTOLOMEO:   Objection.
8    A.    I can't say.  I don't know.
9    Q.    Could it?
10         MR. SEIDENFELD:   Objection.
11         MR. BARTOLOMEO:   Objection.
12   A.    I don't know.
13   Q.    Did you work at any other Doe Fund
14   locations besides Porter Ave. and Gates
15   Avenue?
16   A.    No, I haven't.
17   Q.    Did you believe that my client was
18   financially dependent on continuing to be a
19   trainee with The Doe Fund?
20         MR. SEIDENFELD:   Objection.
21         MR. BARTOLOMEO:   Objection.
22   A.    No, I have no idea.
23   Q.    Do you believe that my client's
24   probation depended on his participation with
25   the Ready Willing & Able Program?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

142

T. COOPER

1
2          MR. SEIDENFELD:   Objection.
3    A.    I can't really say because nothing
4    has the same effect on everyone.  So, that
5    might be the case with some individuals, but
6    maybe not with others.  So, I can't really
7    say.
8    Q.    Does the Ready Willing & Able
9    Program have any influence on the recently
10   incarcerated residents' parole terms?
11         MR. SEIDENFELD:   Objection.
12         MR. BARTOLOMEO:   Objection.
13   A.    I can't say.  I don't know.
14   Q.    Do you know if there's any
15   communication between The Doe Fund and
16   recently incarcerated residents' parole
17   officers?
18         MR. SEIDENFELD:   Objection.
19   A.    When I was a trainee there, yes.
20   The parole officers were kept abreast of
21   everything going on with the trainees,
22   because they were their clients.  So yeah.
23   I guess you can say the parole and The Doe
24   Fund, to a certain extent, were affiliated.
25   Q.    If The Doe Fund complained of a

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

144

T. COOPER

1
2          MR. SEIDENFELD:   Objection.
3          MR. BARTOLOMEO:   Objection.
4    A.    Again, I have no idea.
5    Q.    At what point can trainees seek
6    outside employment?
7          MR. SEIDENFELD:   Objection.
8          MR. BARTOLOMEO:   Note my objection
9          as well.
10   A.    At any point.  From day one, if
11   they found on their own a job, it's
12   acceptable.
13         MR. BARTOLOMEO:   Do you need to
14         take that?
15         THE WITNESS:   Yes.  Excuse me one
16         second, please.
17         (Whereupon, at 1:59 P.M., a brief
18         recess was taken.)
19   Q.    Where are you working now?
20   A.    Believe it or not, Amazon and --
21   that's the worst one.  Amazon and I work at
22   a women's shelter.
23   Q.    These are both in New Jersey or
24   New York?
25   A.    New Jersey.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

145

T. COOPER

1
2     Q.    Where's the Amazon location?
3     A.    I'm in Avenel.
4     Q.    What's the name of the women's
5  shelter?
6     A.    It's under a service, Alternative.
7     Q.    Alternative?
8     A.    Yes.  Out of curiosity --
9           MR. BARTOLOMEO:  What is it?
10          THE WITNESS:  I just wanted to ask
11  question.
12          MR. BARTOLOMEO:  This is not the
13  time.  You can ask when we're done and
14  off the record.  Do you need to talk to
15  me about something?  We can step
16  outside.
17          THE WITNESS:  Yes, real quick.
18          (Whereupon an off-the-record
19  discussion was held.)
20          MR. BARTOLOMEO:  I think you have
21  the full name, right?  Is that the full
22  name?
23     A.    Yes.  Alternative.
24     Q.    What's your position at Amazon?
25     A.    At Amazon, I'm a picker.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

147

T. COOPER

1
2  past?
3           MR. SEIDENFELD:  Objection.
4           MR. BARTOLOMEO:  Objection.
5     A.    No.
6     Q.    Did you have any knowledge of any
7  Doe Fund residents being sexually assaulted
8  in their past?
9           MR. SEIDENFELD:  Objection.
10          MR. BARTOLOMEO:  Objection.
11     A.    No.
12     Q.    While you were at The Doe Fund,
13  did you have any knowledge of recently
14  incarcerated residents being sexually
15  assaulted in jail?
16          MR. SEIDENFELD:  Objection.
17     A.    No.
18     Q.    When you were in jail, were you
19  ever sexually assaulted?
20     A.    No.
21     Q.    Would you like to change any of
22  your prior answers?
23     A.    No.
24     Q.    Did you understand all of my
25  questions today?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

146

T. COOPER

1
2     Q.    What's that?
3     A.    God, you don't want to know.  Just
4  what it says.  A picker.  I work at a fresh
5  fulfillment center where we actually pick
6  clients' orders, groceries.
7     Q.    Are you a supervisor at that job?
8           MR. SEIDENFELD:  Objection.
9     A.    No.
10     Q.    At Alternative, what's your
11  position there?
12     A.    I'm a case manager.
13     Q.    Since you've been terminated from
14  The Doe Fund, have you been terminated from
15  any other employment?
16     A.    No.
17     Q.    Have there been any other
18  allegations of sexual harassment made
19  against you since then?
20          MR. SEIDENFELD:  Objection.
21          MR. BARTOLOMEO:  Objection.
22     A.    No.
23     Q.    When you were working at The Doe
24  Fund, did you have knowledge of any of the
25  residents being sexually harassed in their

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

148

T. COOPER

1
2           MR. SEIDENFELD:  Objection.
3     A.    Yes.
4           MR. BARTOLOMEO:  Note my objection
5  to the last question.
6     Q.    Have you told me everything you
7  can about Mr. Brooks' claims today?
8     A.    Yes.
9     Q.    Is there anything that is
10  inhibiting your recollection today?
11     A.    No.
12     Q.    Is there any other documentation
13  that you can think of today that would
14  provide you additional information to better
15  answer my questions?
16          MR. SEIDENFELD:  Objection.
17          MR. BARTOLOMEO:  Objection.
18     A.    No.
19          MS. O'CONNELL:  Thank you.
20          MR. SEIDENFELD:  No questions.
21          MR. BARTOLOMEO:  No questions.
22          (Whereupon, at 2:11 P.M., the
23  Examination of this witness was
24  concluded.)
25          *    *    *

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

149

T. COOPER

D E C L A R A T I O N

        I hereby certify that having been first

duly sworn to testify to the truth, I gave

the above testimony.


        I FURTHER CERTIFY that the foregoing

transcript is a true and correct transcript

of the testimony given by me at the time and

place specified hereinbefore.




                    _____
                    TERRY COOPER


Subscribed and sworn to before me

this _____ day of _____ 20____.


_____
NOTARY PUBLIC

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

151

T. COOPER

C E R T I F I C A T E

        I, ROSANNE LEBOEUF, a Notary Public for

and within the State of New Jersey, do

hereby certify that prior to the

commencement of the examination the witness

was duly sworn.

        I DO FURTHER CERTIFY that the foregoing

is a true and accurate transcript of the

testimony as taken stenographically by and

before me at the time, place and on the date

hereinbefore set forth.

        I DO FURTHER CERTIFY that I am neither

a relative nor employee, nor attorney or

counsel to any of the involved; that I am

neither related to nor employed by such

attorney or counsel, and that I am not

financially interested in the outcome of the

action.

        IN WITNESS WHEREOF, I have hereunto set

my hand this 16th day of July 2018.


                    _____
                    ROSANNE LEBOEUF
                    ID No.: 2422296

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

---

150

T. COOPER

E X H I B I T S


PLAINTIFF'S EXHIBITS:

EXHIBIT   EXHIBIT                   PAGE

TC-1      2013 Incident Report        46

TC-2      Typed incident report       51

TC-3      Investigative report      66

TC-4      7/2013 written warning        75

TC-5      Employee handbook           83

TC-6      Trainee's Handbook         101

TC-7      Terry 1 recording          106

TC-8      Terry 2 recording          117

TC-9      Complaint                  122

TC-10     Brooks complaint           127

TC-11     Investigation              128

TC-12     Letter of termination    137


    (Exhibits retained by reporter.  TC-7 and

        TC-8 were retained by counsel.)


            I N D E X

EXAMINATION BY                    PAGE

MS. O'CONNELL                             4

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com