1

2    UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

3    -----------------------------------------X
GREGORY BROOKS,

4

                         PLAINTIFF,

5

6             -against-       Case No:
                           17-cv-03626

7

8    THE DOE FUND, INC. TERRY COOPER
individually and in his official capacity,

9    JAMES WASHINGTON individually and in his
official capacity, and ANTHONY WIGGINS,

10   individually and in his official capacity,

11                      DEFENDANTS.
    -----------------------------------------X

12

13               DATE:  June 25, 2018

14               TIME:  10:58 a.m.

15

16          DEPOSITION of the Defendant,

17   JAMES WASHINGTON, taken by the Plaintiff,

18   pursuant to a Notice and to the Federal

19   Rules of Civil Procedure, held at the

20   offices of The Derek T. Smith Law Group,

21   PLLC, 1 Penn Plaza, Suite 4905, New York,

22   New York 10119, before Scott Torrance, a

23   Notary Public of the State of New York.

24

25

1

2     A P P E A R A N C E S:

3

4     THE DEREK T. SMITH LAW GROUP, PLLC
         Attorney for the Plaintiff
5        GREGORY BROOKS
         1 Penn Plaza - Suite 4905
6        New York, New York 10119
         BY:   KELLY L. O'CONNELL, ESQ.
7

8
      JACKSON LEWIS, P.C.
9        Attorneys for the Defendants
         THE DOE FUND, INC. and JAMES WASHINGTON
10       individually and in his official capacity
         666 Third Avenue - 29th Floor
11       New York, New York 10017
         BY:   LORI D. BAUER, ESQ.
12

13
      LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
14       Attorneys for the Defendant
         TERRY COOPER
15       77 Water Street - Suite 421
         New York, New York 10005
16       BY:   BRADLEY BARTOLOMEO, ESQ.

17

18              *         *         *

19

20

21

22

23

24

25

1

2　　　F E D E R A L　 S T I P U L A T I O N S

3

4

5　　　IT IS HEREBY STIPULATED AND AGREED by and

6　　between the counsel for the respective

7　　parties herein that the sealing, filing and

8　　certification of the within deposition be

9　　waived; that the original of the deposition

10　　may be signed and sworn to by the witness

11　　before anyone authorized to administer an

12　　oath, with the same effect as if signed

13　　before a Judge of the Court; that an

14　　unsigned copy of the deposition may be used

15　　with the same force and effect as if signed

16　　by the witness, 30 days after service of

17　　the original & 1 copy of same upon counsel

18　　for the witness.

19

20　　　IT IS FURTHER STIPULATED AND AGREED that

21　　all objections except as to form, are

22　　reserved to the time of trial.

23

24　　　　　　　*　　　*　　　*　　　*

25

1                    J. WASHINGTON

2    J A M E S   W A S H I N G T O N, called as

3    a witness, having been first duly sworn by

4    a Notary Public of the State of New York,

5    was examined and testified as follows:

6    EXAMINATION BY

7    MS. O'CONNELL:

8         Q.    Please state your name for the

9    record.

10        A.    James Washington.

11        Q.    Please state your address for

12   the record.

13        A.    145 Elmira Loop, Apartment 3F,

14   Brooklyn, New York 11239.

15        Q.    Thank you for coming this

16   morning.  Have you spoken with your

17   attorney regarding the procedures for

18   taking depositions?

19        A.    Yes.

20        Q.    Have you been a party to a

21   deposition before?

22        A.    No.

23        Q.    Okay.  So, this is your first

24   deposition?

25        A.    Yes.

J. WASHINGTON

Q. All right. And do you understand that you've been placed under oath and have the obligation to testify truthfully today?

A. Yes.

Q. And do you understand that the court reporter cannot transcribe inaudible responses such as nods, yeahs or other signs, they need to be verbal responses?

A. Yes.

Q. And do you understand that you need to wait for the complete question to be asked before responding?

A. Yes.

Q. And do you agree that unless you don't tell me, that I'm going to assume that you understand my questions today?

A. Yes.

Q. If at any time you realize that you've given an inaccurate answer, an incomplete answer, you'll let me know so you can modify your answer later in the day?

A. Yes.

1                    J. WASHINGTON

2          Q.    Have you consumed any

3    medication that would impact your ability

4    to testify truthfully today?

5          A.    No.

6          Q.    And you haven't consumed any

7    alcohol or other substances that would

8    affect your ability to testify truthfully

9    today?

10          A.    No.

11          Q.    Is there any reason why you

12    would be unable to testify today?

13          A.    No.

14          Q.    Do you have any questions

15    before we begin the deposition?

16          A.    No.

17          Q.    Can you tell me everything you

18    did to get ready for this deposition?

19          A.    Can you be more specific,

20    please?

21          Q.    What did you do to prepare for

22    today's deposition?

23          A.    I met with the lawyers.

24          Q.    Okay.

25          A.    On --

1                    J. WASHINGTON

2          Q.    Go ahead.

3          A.    On Thursday.

4          Q.    Did you review any documents?

5          A.    Yes.

6          Q.    What documents were those?

7          A.    Case notes for Gregory Brooks,

8    late night overnight policy.  And I believe

9    there were more, but I can't remember

10   exactly what they were.

11         Q.    Okay.  Did you review anything,

12   like a complaint that was filed, legal

13   documents to that capacity?

14         A.    Yes.

15         Q.    Okay.  Do you remember if you

16   read the federal complaint that my client

17   filed?

18         A.    I can't recall.

19         Q.    Could you state your full name

20   for the record?

21         A.    James Darryl Washington.

22         Q.    Have you been known by any

23   other names?

24         A.    No.

25         Q.    Do you have any nicknames?

1                    J. WASHINGTON

2          A.    No.

3          Q.    And in all legal documents, you

4    use that name?

5          A.    Yes.

6          Q.    And what's your date of birth?

7          A.    January 8th, 1956.

8          Q.    And are you presently married?

9          A.    Yes.

10         Q.    What's the name of your spouse?

11         A.    Althea Washington.

12         Q.    And what's her age?

13         A.    56.

14         Q.    Okay.  Is she employed also?

15         A.    Yes.

16         Q.    And who are you employed with,

17   currently?

18         A.    The Doe Fund.

19         Q.    And which location?

20         A.    520 Gates Avenue, Brooklyn.

21         Q.    How long have you been working

22   at that location?

23         A.    I believe six to seven years.

24         Q.    Where were you working before

25   that?

1                    J. WASHINGTON

2          A.    The Doe Fund, but at a

3    different location.

4          Q.    And what location was that?

5          A.    Cook Street.

6          Q.    Is that location called Cook

7    Street?

8          A.    Yes.

9          Q.    And where's Cook Street?

10         A.    In Brooklyn.

11         Q.    How long did you work at the

12   Cook Street location?

13         A.    For about two years.

14         Q.    And before the Cook Street

15   location, where were you working?

16         A.    Jersey City.

17         Q.    For The Doe Fund or --

18         A.    Yes.

19         Q.    Okay.  Is that location just

20   called Jersey City Doe Fund or --

21         A.    It was called Ready, Willing &

22   Able, Jersey City.

23         Q.    How long did you work at Ready,

24   Willing & Able, Jersey City?

25         A.    Eight years.

1                    J. WASHINGTON

2          Q.     At the Ready, Willing & Able,

3     Jersey City, which you worked, what was

4     your role there?

5          A.     Associate director of the

6     Community Improvement Project.

7          Q.     And what's that do?

8          A.     Street maintenance.

9          Q.     What were your duties for that

10    position?

11         A.     Basically oversee the

12    operation.

13         Q.     Would you go out on, I guess,

14    with the work crew?

15         A.     No, no.

16         Q.     And were you also -- always

17    working in that capacity at the Jersey City

18    Doe Fund?

19         A.     Yes.

20         Q.     Did you work anywhere with The

21    Doe Fund before that also?

22         A.     Yes.

23         Q.     Where was that?

24         A.     The Harlem location, 155th and

25    Frederick Douglass.

1                    J. WASHINGTON

2          Q.    And about how many years did

3     you work there?

4          A.    Not sure.

5          Q.    And just a guess, around what

6     year are we at the Harlem location?

7                MS. BAUER:  Object to the form.

8                You can answer.

9          A.    Uh, I guess maybe seven years.

10         Q.    Seven years that you were

11    working there?

12         A.    Yes.

13         Q.    Did you work at another

14    location before the Harlem location, too?

15         A.    Yes.

16         Q.    And before we move on to that:

17    At the Harlem location, what was your

18    capacity with The Doe Fund?

19         A.    Could you repeat that, please?

20         Q.    When you were at The Doe Fund's

21    Harlem location, what were you working as?

22         A.    Associate director of CIP.

23         Q.    And what's CIP?

24         A.    Community Improvement Project.

25         Q.    Okay.  So, before The Doe

```
 1                    J. WASHINGTON
 2    Fund's Harlem location, where were you
 3    working?
 4         A.    The Gates Avenue location in
 5    Brooklyn.
 6         Q.    Okay.  Where you work
 7    currently?
 8         A.    Yes.
 9         Q.    And what was your position
10    then?
11         A.    I had a few different
12    positions.  I was hired, uh, originally at
13    that location and I started out as a
14    supervisor for the Community Improvement
15    Project.
16         Q.    That was your first position?
17         A.    Yes.
18         Q.    And you were a supervisor for
19    about how long before you advanced?
20         A.    Maybe a year.
21         Q.    And what was the position that
22    you advanced to?
23         A.    Senior supervisor.
24         Q.    Of CIP?
25         A.    Yes.
```

1                    J. WASHINGTON

2          Q.     And did you advance again?

3          A.     Yes.

4          Q.     And how long were you a senior

5     supervisor at CIP?

6          A.     I mean, this is a guess, but

7     I'm thinking maybe two, three years.

8          Q.     And what did you advance to

9     after you were a senior supervisor?

10         A.     Associate director of CIP.

11         Q.     And when you're associate

12    director of CIP at all these different

13    locations, are you the only associate

14    director of CIP or are you the associate

15    director at CIP at this specific location

16    you're at, at that time?

17         A.     Initially, I was the only one.

18         Q.     And how long, in total, were

19    you at the Gates Avenue facility that first

20    go-around?

21         A.     I can't recall.  It's been so

22    long.

23         Q.     Were you at another location

24    before the Gates Ave at that one time that

25    we just discussed?

1                    J. WASHINGTON
2          A.     Can you repeat that, please?
3          Q.     Were you at any other -- were
4    you working at any other Doe Fund location
5    before you started working as a supervisor
6    of CIP at the Gates Ave location in
7    Brooklyn?
8          A.     No.
9          Q.     Where were you working before
10   that?
11         A.     I was a firefighter in Upstate
12   New York, in Syracuse, New York.
13         Q.     And around what year was this?
14         A.     What year for --
15         Q.     You were a firefighter in
16   Syracuse, New York.
17         A.     I came to The Doe Fund in '94.
18   It's about eight years before that,
19   mid-'80s.
20         Q.     That time period that you said
21   eight years before you began working at The
22   Doe Fund, what was going on those eight
23   years?
24              MS. BAUER:  Object to the form.
25         Q.     You can answer.

1                    J. WASHINGTON

2        A.    That's when I was working at

3    the fire department.

4        Q.    Okay.  So you --

5        A.    I was there for about eight

6    years, right.

7        Q.    What's your current salary at

8    The Doe Fund?

9            MS. BAUER:  What does that

10        matter?

11            MS. O'CONNELL:  He's a

12        defendant in this action.

13            MS. BAUER:  So?

14            MS. O'CONNELL:  Salary's

15        relevant to damages.

16            MS. BAUER:  I'm going to just

17        object.

18            But you can answer.

19        A.    Approximately 79.

20        Q.    And do you have benefits, like

21    healthcare or life insurance?

22        A.    Yes.

23        Q.    What benefits do you have?

24        A.    Health, dental, vision, life

25    insurance.

1                    J. WASHINGTON

2          Q.     Do all Doe Fund employees have

3     additional benefits beyond their salary?

4          A.     I wouldn't know.

5          Q.     Okay.  Have you ever been

6     arrested?

7          A.     Yes.

8          Q.     When were you arrested?

9          A.     I believe it was around 1976 or

10    '77.

11         Q.     And what were you arrested for?

12         A.     Obstruction.

13         Q.     And were you found guilty?

14         A.     I think -- I pled out.  So,

15    yes.

16         Q.     Did you serve time for the

17    obstruction?

18         A.     No.

19         Q.     Were you arrested at any other

20    time period?

21         A.     No.

22         Q.     And where did this arrest take

23    place?

24         A.     Syracuse.

25         Q.     What were the circumstances

1                    J. WASHINGTON

2      surrounding the obstruction charge?

3                    MS. BAUER:  I'm going to

4           object.

5                    But you can answer.

6      A.      Uh, my girlfriend at the time,

7      her brother got into a little bit of

8      trouble with the police.  It was in front

9      of our apartment.  And I kind of got

10     involved and he got away and they took me.

11     Q.      Did you spend any time in jail

12     with regard to this arrest?

13     A.      One night.

14     Q.      Have you entered into any

15     agreement with The Doe Fund regarding this

16     lawsuit?

17                   MS. BAUER:  Object to the form.

18     A.      I'm not sure what you mean by

19     agreement.

20     Q.      An agreement as far as

21     representation.

22     A.      Yes.

23     Q.      Is the company paying for your

24     legal expenses?

25     A.      Yes.

1                    J. WASHINGTON

2          Q.     Do you know how much?

3          A.     No.

4          Q.     Do you know if there's a cap on

5     the amount of legal fees that they're able

6     to pay?

7          A.     No.

8          Q.     Did the company advise you if

9     you needed to seek separate counsel?

10         A.     Yes.

11         Q.     Have you ever filed bankruptcy?

12         A.     No.

13         Q.     Have you been a party to any

14    litigation?

15         A.     No.

16         Q.     This is the only litigation

17    that you've been a part of?

18         A.     Yes.

19         Q.     Have you ever been a witness in

20    any lawsuit?

21         A.     No.

22         Q.     Have you ever been a part of an

23    EEOC investigation?

24         A.     Not sure what that is.

25         Q.     Do you know what the EEOC is?

1                    J. WASHINGTON
2          A.    No.
3          Q.    Okay.  I want to talk a little
4     bit about your education.  What's the
5     highest level of education that you've
6     completed?
7          A.    Some college.
8          Q.    And how much college did you
9     take?
10         A.    About a year and a half.
11         Q.    And why did you stop?
12         A.    I was young.
13         Q.    What does that mean?
14         A.    College got boring.
15         Q.    Around how old were you when
16    you started with The Doe Fund?
17         A.    I can't remember.
18         Q.    Did you ever take continuing
19    education classes with regards to your
20    current employment with The Doe Fund?
21         A.    Yes.
22         Q.    What sort of classes do you
23    take?
24         A.    A variety of management
25    classes, um, health-related classes, um,

1                    J. WASHINGTON

2    and also trainings that The Doe Fund sets

3    up.

4          Q.    What sort of training?

5          A.    First aid, CPR, fire guard,

6    F80, sexual harassment.  Um, there are a

7    few others, I just can't remember them all.

8          Q.    About how often does The Doe

9    Fund have trainings?

10          A.    Every year.

11          Q.    How often do they have

12    trainings on sexual harassment?

13          A.    I don't know.

14          Q.    When was your last sexual

15    harassment training?

16          A.    Last year.

17          Q.    Do you remember if they had a

18    training in the year before that, too?

19          A.    Yes, they did.

20          Q.    And do you remember if they had

21    a training in 2006 -- sorry, 2016?

22          A.    I don't recall.

23          Q.    Do you recall if there was a

24    sexual harassment training in 2015?

25          A.    Not sure.

1                    J. WASHINGTON

2        Q.    When you are being transferred

3   to different Doe Fund locations, do you

4   undergo retraining each time you're

5   transferred?

6        A.    No.

7        Q.    When you began working at The

8   Doe Fund most recently about six or seven

9   years ago, did you receive new training

10  then?

11              MS. BAUER:  Object to the form.

12       A.    Not sure.

13       Q.    Do you recall when you were

14  transferred to The Doe Fund Gates Ave

15  facility most recently in receiving sexual

16  harassment training at that time?

17       A.    I don't recall.

18       Q.    And at The Doe Fund currently,

19  what's your title?

20       A.    Facility director.

21       Q.    And what's that mean?

22       A.    It means that I pretty much am

23  in charge of the facility, the 520 Gates

24  Avenue facility.

25       Q.    In charge of what exactly?

1                    J. WASHINGTON

2          A.     Making sure that the building

3     is up to code.

4          Q.     And what sort of codes?

5          A.     Fire department codes, um,

6     Department of Building codes, health

7     department codes, things of that nature.

8          Q.     And besides being up to code,

9     what other aspects are involved with being

10    a facility director?

11         A.     Making sure the staff that I

12    supervise are running their departments

13    appropriately.

14         Q.     About how many departments are

15    there?

16         A.     I supervise one, two, three --

17    I supervise four.

18         Q.     And what departments are those?

19         A.     Social services, contract

20    services, housekeeping, maintenance.

21         Q.     How long have you been the

22    facility director at Gates Ave?

23         A.     Three, maybe four years.

24         Q.     Do you recall the year you

25    started to be the facility director?

                    J. WASHINGTON

1

2          A.    I'm sorry?

3          Q.    Do you recall the year you

4    first became the facility director of Gates

5    Ave?

6          A.    No.

7          Q.    What was your position before

8    that?

9          A.    Associate director.  Associate

10   facility director.

11         Q.    How were those responsibilities

12   different?

13              MS. BAUER:  Object to the form.

14              You can answer.

15         A.    Well, as the associate

16   director, I took more of a hands-on, uh,

17   with the departments.  In other words, with

18   social services, I made sure that, uh, the

19   case managers and their files were up to

20   date.

21         Q.    So it's within the social

22   services department that there's case

23   managers watching over or looking after the

24   residents of The Doe Fund?

25         A.    They're not looking over them,

1                    J. WASHINGTON

2     they're pretty much helping them achieve

3     their goals.

4          Q.    Are there subdepartments within

5     social services?

6          A.    No.

7          Q.    Are there other departments at

8     the Gates Ave facility besides those four?

9          A.    Yes.

10         Q.    And what departments are those?

11         A.    Food service, CIP: Community

12    Improvement Project.

13         Q.    Where does Ready, Willing &

14    Able fall into?

15         A.    Everything.

16         Q.    So, it's just all of the

17    departments?

18         A.    It's mainly CIP, but, I mean,

19    Ready, Willing & Able is a program, all

20    right?  Um, I mean, all of those

21    departments pretty much fall under or fall

22    within Ready, Willing & Able.

23         Q.    So you've listed, as far as

24    departments, social services, contract

25    services, housekeeping, maintenance, food

1                    J. WASHINGTON

2    services, and CIP.  Am I leaving any out?

3         A.    I don't think so.

4         Q.    I think I have three

5    departments that you observe and you

6    mentioned four.  Could you tell me the four

7    departments one more time just to make sure

8    I have all of them?

9         A.    Social service, maintenance,

10   housekeeping, contract services.

11        Q.    Okay.  So, housekeeping and

12   maintenance are separate?

13        A.    Yes.

14        Q.    Okay.  Is Ready, Willing & Able

15   synonymous with The Doe Fund?

16        A.    Yes.

17        Q.    About how many employees work

18   at the Gates Ave facility?

19             MS. BAUER:  I'm going to object

20        to the form.

21             You can answer.

22        A.    I mean, I don't have an exact

23   number, but I believe it's approximately

24   ten or more.

25        Q.    Are most Doe Fund facilities

1                    J. WASHINGTON

2    also operated by around ten employees?

3         A.    No.

4         Q.    Do some of them have more or

5    less?

6         A.    No.

7         Q.    Which facility is the largest

8    for The Doe Fund?

9         A.    Porter.  Porter Avenue.

10        Q.    Around how many does Porter

11   have?

12              MS. BAUER:  Employees?

13              MS. O'CONNELL:  Employees, yes.

14              MS. BAUER:  Now?  You mean

15         today?

16              MS. O'CONNELL:  Yes, today.

17        A.    I don't know.

18        Q.    Do you know how many employees

19   they had about three years ago?

20        A.    No.

21        Q.    Two years ago?

22        A.    No.

23        Q.    Would you say they have more

24   than 20?

25        A.    Yes.

1                    J. WASHINGTON

2          Q.    And more than 20 years ago?

3          A.    Yes.

4          Q.    And more than 20 today?

5          A.    Yes.

6          Q.    Where does The Doe Fund's upper

7    management work out of?

8                MS. BAUER:  Object to the form.

9                You can answer.

10         A.    There are two locations.

11         Q.    And where are those?

12         A.    84th Street and 102nd Street.

13         Q.    In Manhattan?

14         A.    Yes.

15         Q.    Is that where HR works, too?

16         A.    HR works out of 102nd.

17         Q.    About how long were you

18   assistant facility director at Gates Ave?

19         A.    Maybe two, three years.

20         Q.    And to be clear, before you

21   began being assistant facility director at

22   Gates Ave, you were at another location,

23   the --

24         A.    Cook Street.

25         Q.    Okay.  About how many

1                    J. WASHINGTON
2    supervisors were at The Doe Fund Gates Ave
3    social services department?
4         A.    One.
5         Q.    And who's that person?
6         A.    Timothy Mathews.
7         Q.    Was it also Timothy Mathews two
8    or three years ago?
9         A.    No.  Two, three years ago?
10   Maybe two years ago.  I don't believe he
11   was -- maybe two years ago.
12        Q.    Who was it then?
13        A.    Charles Bryant.
14        Q.    What happened to Charles
15   Bryant?
16        A.    He got a promotion.
17        Q.    And where did he -- what was he
18   promoted to?
19        A.    Day program coordinator.
20        Q.    Did he move out of the Gates
21   Ave location?
22        A.    Yes.
23        Q.    And where's he working now?
24        A.    I'm sorry?
25        Q.    Where's he working now?

1                    J. WASHINGTON

2          A.     Now he's no longer with The Doe

3     Fund.

4          Q.     Oh, okay.  How many supervisors

5     did you have in 2016 in contract services

6     at the Gates Ave facility?

7          A.     One.

8          Q.     And who was that?

9          A.     Contract services' name was

10    changed from the day program to contract

11    services, so, it was Charles Bryant.

12         Q.     Okay.  And who was the

13    supervisor in 2016 for CIP?

14         A.     There were a number of

15    supervisors.

16         Q.     About how many?

17         A.     I don't know.

18         Q.     Do you remember any of their

19    names?

20         A.     Not really, no.

21         Q.     Was there more than five?

22         A.     Yes.

23         Q.     More than ten?

24         A.     I don't know.

25         Q.     Is it a part of the duties as

1                    J. WASHINGTON
2    facility director to make sure that your
3    employees there attend trainings?
4         A.    The ones that I supervise, yes.
5         Q.    And for the ones that you don't
6    supervise, whose task is it to make sure
7    that they attend trainings?
8         A.    Their department head.
9         Q.    So, the department head may be
10   outside of the Gates Ave facility?
11        A.    Correct.
12        Q.    And HR on 102nd Street, is HR
13   for all of The Doe Fund locations?
14        A.    Correct.
15             MR. BARTOLOMEO:  Can I just
16        take a two-second break?
17             MS. BAUER:  Yes.
18             (Whereupon, a brief recess was
19        taken.)
20        Q.    Have you ever been terminated
21   from a job?
22        A.    No.
23        Q.    Are there any of your current
24   supervisors that started out as being Doe
25   Fund residents at one time?

1                    J. WASHINGTON

2          MS. BAUER:  Object to the form.

3          A.    Yes.

4          Q.    And who are those individuals?

5          A.    Timothy Mathews, James Stevens.

6    Those are the only two.

7          Q.    Can you think of any other

8    supervisors that were once Doe Fund

9    residents within the last ten years that

10   you remember?

11         MS. BAUER:  Object to the form.

12         A.    Too many to mention.

13         Q.    Why do you say that?

14         A.    Because The Doe Fund is made up

15   of quite a few former residents.

16         Q.    Even beyond the Gates Ave

17   facility?

18         A.    Yes.

19         Q.    So, would you say it's fairly

20   common for The Doe Fund to hire people that

21   were once residents of The Doe Fund?

22         A.    Yes.

23         Q.    And hire people that were once

24   participants in the Ready, Willing & Able

25   program?

1                    J. WASHINGTON

2          A.    Yes.

3          Q.    Is it encouraged to do that?

4                MS. BAUER:  Object to the form.

5          A.    I don't think it's encouraged,

6     no.

7          Q.    Besides supervisors, does The

8     Doe Fund also employ prior participants of

9     the Ready, Willing & Able program to be

10    employees of The Doe Fund?

11               MS. BAUER:  Can you repeat that

12          question?

13         A.    Yes, please.

14         Q.    A moment ago, you were

15    discussing The Doe Fund employees, former

16    residents, or participants of the Ready,

17    Willing & Able program that are now

18    currently supervisors.

19               Does The Doe Fund also do the

20    same thing with regards to hiring employees

21    as non-supervisors?

22               MS. BAUER:  Object to the form.

23               You can answer.

24         A.    Yes.

25         Q.    Around what percentage, to your

1                    J. WASHINGTON
2       knowledge, of Doe Fund employees or
3       supervisors were former participants in the
4       Ready, Willing & Able program?
5            A.    I don't know.
6            Q.    Would you say more than five
7       percent?
8            A.    I don't know.
9            Q.    Do you participate in hiring
10      new employees at the Gates Ave facility?
11           A.    Yes.
12           Q.    And have you participated in
13      hiring new employees at the other Doe Fund
14      facilities, too?
15           A.    No.
16           Q.    How do you participate in
17      hiring?
18           A.    If there's an opening, I would
19      interview, along with HR, any qualified
20      candidates for the departments that I
21      oversee.
22           Q.    Would you be involved in hiring
23      both employees and supervisors?
24           A.    For my departments, yes.
25           Q.    Were you involved in hiring

```
 1                    J. WASHINGTON
 2    Terry Cooper?
 3         A.    No.
 4         Q.    Is that because he was
 5    transferred to the Gates Ave facility?
 6         A.    He was not in my department.
 7    He was not one of the people that I would
 8    interview to hire.
 9         Q.    Going back to interviewing for
10    employees and supervisors in your
11    department, is there any sort of incentive
12    to hire a new employee that was once a
13    participant in the Ready, Willing & Able
14    program?
15              MS. BAUER:  Object to the form.
16         A.    No.
17         Q.    To your knowledge, within the
18    past ten years, has there been supervisors
19    that were formerly incarcerated working for
20    The Doe Fund?
21         A.    Could you repeat that, please?
22              MS. O'CONNELL:  Could you read
23         it back?
24              (Whereupon, the referred to
25         portion of the record was read back
```

```
 1                    J. WASHINGTON
 2            by the reporter.)
 3        A.    Yes.
 4        Q.    How many do you know of?
 5        A.    Too many to remember -- to
 6   mention.
 7        Q.    What are the sort of minorities
 8   working within The Doe Fund?
 9            MS. BAUER:  Object to the form.
10            You can answer.
11        A.    Hispanics, women, Asian, and
12   there are probably others, but I'm not sure
13   of their nationalities.  And
14   African-Americans.
15        Q.    In your role as director of the
16   Gates Ave facility, do you have any role or
17   connection with residents' parole?
18        A.    Yes.
19        Q.    And how's that?
20        A.    There are a number of trainees
21   that are on parole or had finished parole.
22        Q.    And how are you connected?
23        A.    I mean, I pretty much
24   conversate with everybody, with all the
25   guys.
```

1                    J. WASHINGTON

2        Q.    With their parole officers?

3        A.    From time to time.

4        Q.    And what do you discuss?

5        A.    They'll call -- if the case

6    manager or if the associate director is not

7    available, they'll contact me to find out

8    how the trainee's doing.

9        Q.    Because you have access to the

10   trainee's records?

11       A.    I have access to their case

12   notes, yes.  I don't have case to their,

13   um -- to their criminal justice records.

14       Q.    You have at least access to

15   what the caseworker --

16       A.    Yes.

17       Q.    -- The Doe Fund caseworker has?

18       A.    Yes.

19       Q.    Okay.  And the caseworker and

20   essentially The Doe Fund makes notes

21   whether that resident is doing well or not

22   performing well while they're at The Doe

23   Fund?

24            MS. BAUER:  Object to the form.

25            You can answer.

1                J. WASHINGTON

2        A.      There are a number of reports

3   or follow-ups.  Uh, the case manager has to

4   meet with the trainee at least once a week

5   or you're supposed to meet with the trainee

6   once a week to get an update on how he's

7   doing, if there's any issues, and that

8   meeting will be documented in the case

9   notes.

10               If a trainee does not meet with

11  his case manager every week, that's also

12  documented, that the trainee missed, uh, a

13  scheduled meeting.

14       Q.      And what sort of things would

15  the case management worker write down that

16  could affect the resident's parole terms?

17       A.      Nothing.

18       Q.      Are there any circumstances

19  that you could think of that would

20  adversely affect a resident's parole?

21       A.      No.

22       Q.      For residents at The Doe Fund

23  that are on parole, is cooperating with The

24  Doe Fund some sort of term of their parole?

25       A.      Not at my location.

1                    J. WASHINGTON

2          Q.     Are there other locations like

3     that?

4          A.     Porter Avenue.

5          Q.     And how is Porter different

6     from the Gates Ave facility?

7          A.     Well, Porter accepts parolees

8     now.  Within the last couple of years, they

9     have been pretty much working with parole

10    to build a criminal justice program.

11         Q.     And what's that mean?

12         A.     That means that any trainee

13    that's interested in enrolling in Ready,

14    Willing & Able, uh, must be on parole for

15    Porter Avenue.

16         Q.     But the Gates Ave also accepts

17    parolees, right?

18         A.     Not anymore.

19         Q.     When did they quit accepting

20    parolees?

21         A.     About a couple of years ago.

22         Q.     How many's a couple?

23         A.     Two.

24         Q.     Two.  But in 2016, they

25    accepted parolees?

1                    J. WASHINGTON

2          A.    Right.  I believe that's when

3     it changed over.

4          Q.    Do you know why they quit

5     accepting parolees?

6          A.    Because they were trying to

7     build the program at Porter.

8          Q.    Otherwise, move parolees to

9     that one specific location rather than

10    different locations?

11         A.    Right.  Well, we wouldn't move

12    them from Gates.  They would just

13    transition out.  You know, once they

14    completed a program, then we would stop

15    taking any guys that were on parole.

16         Q.    How is the Porter location a

17    better location for parolees?

18              MS. BAUER:  Object to the form.

19         A.    I don't know if it's better.

20    It's just, they're trying to build a

21    criminal justice program there.

22         Q.    But why not have it at Gates,

23    too?  Why did they make the change?

24         A.    I would not know.  I'm not up

25    in that decision-making process.

1                    J. WASHINGTON

2        Q.     So, who does Gates Ave

3    currently accept?

4        A.     We accept anybody from the

5    Department of Homeless Services that's

6    ready, willing, and able to change their

7    lives.

8        Q.     So I understand that Gates Ave

9    currently does not accept the parolees and

10   it's just Porter now, how could The Doe

11   Fund affect a parolee's terms or --

12       A.     I'm not --

13              MS. BAUER:  Object to the form.

14       Q.     Go ahead.

15       A.     I'm not sure of how it's set up

16   at Porter.  I work at Gates.  I mean,

17   Porter is different than Gates.

18       Q.     But a few years ago, Gates also

19   accepted parolees.

20       A.     Correct.

21       Q.     So, you must understand how it

22   worked back then, right?

23       A.     There was no difference.  Now I

24   believe there's a difference at Porter, but

25   I'm not sure what it is.

1                    J. WASHINGTON

2         Q.    Okay.  You mentioned, I think,

3    residents enrolling out of the program or

4    essentially advancing beyond the program.

5    Can you tell me about that?

6         A.    Once they complete the program,

7    they don't necessarily advance out.  There

8    are different phases to the Ready, Willing

9    & Able program and the final phase is,

10   well, one, they get employed; and, two,

11   they find housing.

12        Q.    And when they get employed,

13   they get employed either with The Doe Fund

14   or outside employment?

15        A.    Employed, period.

16        Q.    It doesn't matter?  It could be

17   with The Doe Fund or outside?

18        A.    Correct.

19        Q.    Could you tell me about the

20   different, I guess, stages that a Ready,

21   Willing & Able participant goes through?

22        A.    Okay.  The first 30 days is

23   pretty much an orientation phase.  It's

24   basically for us to evaluate the trainee

25   and for the trainee to evaluate us to see

```
 1                 J. WASHINGTON
 2    if we're good fits for each other.
 3              Um, the first 30 days is also
 4    where we allow them and help them
 5    accumulate any IDs, address any medical
 6    issues they may have.  During that first
 7    30 days, they're assigned a work -- I'm
 8    sorry.  There's an assignment in-house
 9    where they clean the building.  That's for
10    the first 30 days.  After the first
11    30 days, they receive a CIP assignment
12    where they would clean the streets.
13         Q.    When they're cleaning the Gates
14    Ave facility, how is that different from
15    the work that maintenance is doing, or
16    housekeeping?
17         A.    They work with housekeeping.
18    Housekeeping pretty much designates where
19    they would clean in the building.  And also
20    during that first 30 days, they receive a
21    $15 stipend.
22         Q.    And does house -- so
23    housekeeping tells them where to work --
24         A.    Yes.
25         Q.    -- in the building?
```

1                    J. WASHINGTON

2          A.     Yes.

3          Q.     Do they give them certain hours

4    to work or --

5          A.     Yes.  Hours are from 8:00 to

6    4:00.

7          Q.     So, they have to work

8    continuously between 8:00 to 4:00?

9          A.     It depends on whether or not

10   they have medical issues that need to be

11   attended to, whether or not they need to go

12   and try to get IDs, socials, PPD tests,

13   yeah.

14         Q.     And if they have those certain

15   issues, need to get an ID or some sort of

16   medical issue, they have to get permission

17   from who to not be working those hours?

18         A.     From the housekeeping

19   supervisor.

20         Q.     And do they get a certain

21   schedule as far as their hours?

22         A.     Monday through Friday.

23         Q.     And they can ask for days off,

24   too?

25         A.     No.

1                    J. WASHINGTON

2        Q.    No?

3        A.    No.

4        Q.    And about how many people are

5   working in maintenance or housekeeping at

6   one time?

7        A.    Well, maintenance and

8   housekeeping are separate.

9        Q.    Okay.  Are you saying the

10  residents in their early stage are working

11  just with housekeeping?

12       A.    Yes.

13       Q.    Okay.  And about how many

14  residents are working with housekeeping at

15  one time?

16       A.    That kind of depends on how

17  many trainees we pretty much accepted into

18  the program during those first 30 days, so

19  the -- the number varies.

20       Q.    And the new program

21  participants, do they need to buy any

22  materials or does housekeeping have all the

23  materials?

24       A.    Housekeeping provides the

25  materials.

1                    J. WASHINGTON

2          Q.    So they have the cleaner, the

3    brooms?

4          A.    Correct.

5          Q.    All of that?

6          A.    Correct.

7          Q.    Is there a uniform that they

8    need to wear?

9          A.    Yes.

10         Q.    And what does the uniform look

11   like?

12         A.    It's a blue uniform.  It has

13   Ready, Willing & Able logo on the -- on the

14   back of the shoulder.

15         Q.    Is that different from what the

16   supervisor of housekeeping is wearing?

17         A.    The supervisor of housekeeping

18   has -- our guy has various uniforms that he

19   wears.

20         Q.    Okay.

21         A.    He can wear green.  He can wear

22   blue.

23         Q.    But it still says Ready,

24   Willing & Able on it?

25         A.    Yes.

1                    J. WASHINGTON

2          Q.     So the blue Ready, Willing &

3    Able uniforms are more for the newer

4    participants or --

5          A.     For all participants.

6          Q.     All participants?

7          A.     Right.

8          Q.     Okay.  Are the new participants

9    only working at this specific facility that

10   they're living in or do they also go to

11   other Doe Fund locations to help --

12         A.     No.  The facility that they're

13   living in.

14         Q.     Okay.  What if someone doesn't

15   know how to clean, does the supervisor tell

16   them how to do a certain job?

17         A.     He tells them and he shows

18   them.

19         Q.     Okay.  When there isn't enough

20   Ready, Willing & Able participants to

21   engage in housekeeping tasks, does the

22   housekeep -- what happens?  Does the

23   supervisor just do the work?

24         A.     Yes.

25         Q.     Okay.  So the more

1                    J. WASHINGTON

2    participants, the less work the supervisor

3    has to do, as far as the actual cleaning?

4         A.    No.  Because there are still

5    other tasks that he needs to perform.

6         Q.    So -- I'm sorry, go ahead.

7         A.    So, when he has less, uh, he

8    would pitch in, uh, clean and still take

9    care of his tasks.

10        Q.    Okay.  Could you tell me a

11   little bit about the -- what sort of tasks

12   are assigned to the participants when

13   they're doing housekeeping?

14        A.    They clean the bathrooms, mop

15   the hallways, um, clean the cafeteria, mop

16   the cafeteria, um, wipe down doorknobs,

17   clean windows.  That's just a few of the

18   things that they do.

19        Q.    Can a supervisor somehow punish

20   an employee if they're not doing their

21   task?

22        A.    No.

23        Q.    Do they evaluate them, if

24   they're not doing a good job or are doing a

25   good job?

1                    J. WASHINGTON
2        A.     Yes.
3        Q.     And what's the evaluation
4   process?
5        A.     There's a form that he fills
6   out and gives to the case manager and then
7   the case manager will address the trainee,
8   talk to the trainee, see if there's an
9   issue, find out if there's something going
10   on that may be bothering the trainee, and
11   try to get to the bottom of the issue.
12        Q.     In these early stages that
13   we're discussing, is there certain
14   circumstances where the new participant
15   would be discharged from the program?
16             MS. BAUER:  Object to the form.
17             You can answer.
18        A.     I mean, if -- I mean, it has to
19   be something drastic because we realize
20   that everybody comes from different
21   backgrounds.  Everybody will say that
22   they're there for the correct -- you know,
23   for the right seasons, to get their lives
24   back together, but some guys have different
25   motives.  Uh, maybe they just want to get

1                    J. WASHINGTON
2    out of the shelter they were living in, you
3    know, living in a dorm with 25 other guys.
4              We have rooms that house two
5    guys, um, so, it has to be something really
6    drastic, um, I mean, fighting, stealing,
7    things of that nature.
8         Q.    And the stipend that you
9    mentioned, how often is that paid?
10        A.    The $15 stipend, every week,
11   once a week.
12        Q.    Do they ever get more than
13   that?
14        A.    Yes.
15        Q.    How does the participant get
16   more?
17        A.    Well, they work Monday through
18   Friday, right?  That's the normal schedule.
19        Q.    Yes.
20        A.    If they want to work a Saturday
21   or a Sunday, then the stipend -- the $15
22   stipend will be doubled.
23        Q.    Oh, okay.  Is there any other
24   ways?
25        A.    No.

1                    J. WASHINGTON

2          Q.    And this is what we're

3    discussing is for the first 30 days, right?

4          A.    Correct.

5          Q.    And how does a participant move

6    out of the first 30 days into, I guess, the

7    next --

8          A.    Well, once he's finished his

9    first 30 days or sooner, if there's a need,

10   uh, in the -- uh, in CIP, then, uh, that

11   trainee's name would be brought up in our

12   staff meeting.  The case manager, myself,

13   the social director would agree that this

14   person is eligible to start his next

15   assignment.

16               And he would -- that trainee

17   would go to orientation, uh, to get the dos

18   and the don'ts of the CIP assignment.  And

19   then that following week, that trainee

20   would start his CIP assignment.

21         Q.    During the first 30 days, is

22   the participant allowed to have outside

23   employment?

24         A.    No.

25         Q.    During the next phase after the

1                    J. WASHINGTON

2    first 30 days, are they allowed to have

3    outside employment?

4         A.    Not until much later.

5         Q.    How is it they don't need to

6    pay by the hour for the first 30 days?

7         A.    Because they're participating

8    in a program.  It's not a -- it's not a

9    job.  It's a program.

10        Q.    But do they still get a pay

11   stub?

12        A.    Yes.

13        Q.    And how are they paid?

14        A.    The first 30 days, they are

15   paid in cash.

16        Q.    So they get cash and a pay stub

17   to reflect --

18        A.    Correct.

19        Q.    Okay.  Is there any monies put

20   on some sort of card?

21        A.    Not during the first 30 days,

22   no.

23        Q.    When does that come?

24        A.    Once they start their, uh, CIP

25   assignment.

1                    J. WASHINGTON

2         Q.    And then when they start the

3    CIP assignment, they have a second

4    orientation, basically?

5         A.    Yes.

6         Q.    Okay.  And what is said in that

7    orientation?

8         A.    I'm not there, but it's

9    basically to go over the rules of that work

10   assignment, the dos and the don'ts, no cell

11   phones, no headphones, you know, basically

12   no electronic devices, following the

13   supervisor's direction, making sure you're

14   up and ready, on time, to be transported to

15   your assignment, things of that nature.

16        Q.    And, again, there's -- that

17   participant is being evaluated at all times

18   based on their work?

19             MS. BAUER:  Object to the form.

20        A.    They're supposed to be

21   evaluated, yes.

22        Q.    When you say "supposed to

23   be" --

24        A.    Well, I mean, the supervisors

25   have quite a few trainees that they have to

1                    J. WASHINGTON
2    monitor.  Um, so, I mean, the supervisor
3    will check on the trainee from time to time
4    and he's supposed to be evaluating, uh, and
5    there is supposed to be a monthly
6    evaluation for the guys, not weekly.
7          Q.    And they provide -- what sort
8    of CIP tasks or work is assigned?
9          A.    The main function is sweeping,
10   cleaning the streets, changing garbage
11   cans.
12         Q.    Are they being monitored at all
13   times when they're doing this?
14         A.    Not at all times, because like
15   I said, the supervisor has a number of
16   guys, uh, that he needs to check on.  So,
17   it's not like he's constantly with one guy,
18   um, you know, for all those hours in a day.
19   He has to check on his entire crew.
20         Q.    So, I guess my understanding is
21   one task could be going into the work van
22   and then go cleaning up like a park or a
23   street, right?
24         A.    Yes.
25         Q.    And about how many people go on

1                    J. WASHINGTON
2    this -- how many people are in the crew?
3         A.    Well, I mean, the crew size
4    varies because they work in different
5    areas.  Some areas require maybe two or
6    three guys, another area may require
7    five -- five guys.
8         Q.    Okay.  So, the supervisor goes
9    with them and watches the whole crew as
10   they perform?
11        A.    He will travel around and watch
12   them to make sure that they're doing the
13   job correctly.
14        Q.    And it's that supervisor that's
15   gives them instructions about how they
16   perform their tasks that day, right?
17        A.    Yes.
18        Q.    Are there certain rules when
19   the participants are outside The Doe Fund
20   facility working as far as what they can
21   and cannot do?
22        A.    Yes.
23        Q.    Can you tell me a little bit
24   about that?
25        A.    As I mentioned before, no

1                    J. WASHINGTON

2     electronic devices, no phones, no

3     headphones, no Smartwatches, um, no

4     fraternizing.

5          Q.    So no talking?

6          A.    Fraternizing basically means no

7     guests on the routes.  Uh, a route needs to

8     be completed in a timely manner.  Make sure

9     you're back at the pick-up point, uh, at

10    the specific time, things of that nature.

11         Q.    Every route that a participant

12    goes on, does it require defendant training

13    or different procedures?

14              MS. BAUER:  Object to the form.

15         A.    Some of them do.  I'm not

16    familiar with all of them.  Um, like I

17    said, you know, the areas vary, you know.

18    Some may require two guys, some may require

19    five.  So, you know, I'm pretty sure

20    everything is -- is not standard on each

21    route.  They vary.

22         Q.    And, again, when they're going

23    on these routes, they're in their blue

24    Ready, Willing & Able uniform?

25         A.    Yes.

1                    J. WASHINGTON

2         Q.    What is this phase called after

3   the first 30 days?

4         A.    Of the CIP assignment phase?

5         Q.    Yes.

6         A.    Yeah.

7         Q.    It's just called CIP assignment

8   phase?

9         A.    Yes.

10        Q.    Is there ongoing training

11  during this phase?

12        A.    I'm not sure what you mean

13  ongoing.

14        Q.    Are they being trained about

15  how to do their tasks throughout this next

16  phase?

17             MS. BAUER:  Object to the form.

18        A.    I'm not sure, but I think so.

19        Q.    And are they given a variety of

20  different types of assignments to learn new

21  tasks or learn new skills?

22        A.    I think it depends on whatever

23  route they're assigned to.

24        Q.    What's a more complicated

25  route?

1                    J. WASHINGTON

2          A.    Well, downtown Brooklyn for

3     one.  Um, I mean, there's a lot more

4     involved in downtown Brooklyn than just

5     sweeping the streets and changing garbage

6     cans.  I believe they have to remove fliers

7     from poles.

8               Uh, I believe mailboxes and

9     mail storage boxes are painted, light poles

10    are painted.  You know, I believe the

11    garbage cans there are different.  Uh, some

12    are, uh, automated, that require special

13    techniques.

14         Q.    Okay.  But the supervisor tells

15    them all of this --

16         A.    Yes.

17         Q.    -- how to do it?

18         A.    Yeah.

19         Q.    Okay.  During the first

20    30 days, are the hours kept track of?

21         A.    Yes.

22         Q.    And during the CIP days, the

23    hours are also kept track of, right?

24         A.    Yes.

25         Q.    And are they paid by the hour

1                    J. WASHINGTON

2    at that time?

3         A.    Yes.

4         Q.    And how much are they paid by

5    the hour?

6         A.    Right now, $13 an hour.

7         Q.    Okay.  Would it be different in

8    Jersey City?

9         A.    Back then, yes.

10        Q.    Oh, okay.  But also, now,

11   because Jersey City's a different state,

12   would it be a different hourly rate?

13        A.    It wouldn't be a salary.  It

14   would still be a stipend.

15        Q.    Correct.  During the CIP period

16   because the participants are being paid by

17   the hour, is it kind of up to the

18   participants to ask for more work or try to

19   accumulate as many hours possible?

20        A.    Can you repeat that, please?

21             MS. O'CONNELL:  Could you read

22        it back?

23             (Whereupon, the referred to

24        portion of the record was read back

25        by the reporter.)

1                    J. WASHINGTON

2          A.    They can, yes.

3          Q.    Is there a cap on how many

4    hours they could accumulate?

5          A.    That, I don't know.

6          Q.    Is there a minimum?

7          A.    30.

8          Q.    And, again, during this time,

9    they can't seek other employment

10   opportunities?

11         A.    Well, they're participating in

12   the program, so, the employment phase

13   doesn't come until much later.

14         Q.    Okay.  During this phase, do

15   they have health insurance from The Doe

16   Fund?

17         A.    No.

18         Q.    Do they have any health

19   insurance, to your knowledge?

20         A.    We require all trainees to

21   apply for Medicaid.

22         Q.    Do they have any sick days?

23         A.    Yes.

24         Q.    How many sick days?

25         A.    Three.

1                    J. WASHINGTON

2          Q.    And how much time do they need

3    to be in the CIP phase of this?  How long

4    does that participant need to stay in the

5    CIP phase?

6          A.    Well, it varies.  Uh, it

7    depends.  Um, because we have vocational

8    trainings, uh, if a trainee wants to

9    participate in culinary, if an assignment

10   becomes available in food service, then

11   that trainee could also go to food service.

12         Q.    Okay.  So, you're referring to

13   they can essentially not work on the street

14   assignments and work more internally in the

15   kitchen?

16         A.    Correct.

17         Q.    And there's a number of

18   different vocational trainings, so they

19   could be trained as far as working within

20   The Doe Fund facility?

21         A.    As far as being reassigned,

22   yes.

23         Q.    And do they simply apply to be

24   reassigned?

25         A.    Well, you have to apply for the

1                    J. WASHINGTON
2    specific locations.  You have to fill out
3    an application if you're interested in
4    culinary, uh, if you're interested in the
5    computer lab, yeah.
6         Q.    And then you -- if you're
7    reassigned, you still need to make your
8    minimum of 30 hours?
9         A.    Yes.
10        Q.    Could it be a mix of working
11   with the crew, cleaning, and also kitchen?
12        A.    No.
13        Q.    It has to be completely one or
14   the other?
15        A.    Yes.
16        Q.    And when someone applies and is
17   accepted for a certain vocation, let's say
18   the kitchen assignment, are they expected
19   to be working there indefinitely, or what
20   happens to them?
21             MS. BAUER:  Object to the form.
22        A.    Well, each vocation requires
23   that you participate in certain classes.
24   Uh, for example, culinary, uh, you have to
25   take a food handler's class, you have to

1                   J. WASHINGTON

2    take a customer service class.  So, each

3    vocation is different.

4          Q.    For a food handling class, is

5    that some sort of certification program?

6          A.    Yes.

7          Q.    And does the Doe Fund pay for

8    the certification?

9          A.    I'm not sure how it comes

10   about, but, um, the trainee would have to

11   take that particular class.

12         Q.    And when does the CIP phase

13   end?

14         A.    If a trainee continues in the

15   CIP phase till the end, uh, it would end

16   after he goes through CSS, Career Success

17   Strategies.  Um, then he would, uh, start

18   the job search phase, and then during the

19   job search phase, if he found employment,

20   um, the next phase would be to find

21   housing.

22         Q.    How long does it take to get to

23   this CSS phase?

24         A.    Typically, eight to nine

25   months.

1                  J. WASHINGTON

2          Q.    What if someone is already

3     working in a different vocation, do they

4     have to do the job search if they're

5     already working in a different department?

6          A.    Yes.  They would have to do the

7     job search, because they're not employed at

8     that point.  They're just assigned to the

9     kitchen.

10         Q.    From the job search phase,

11    could they apply to positions at The Doe

12    Fund?

13         A.    No.

14         Q.    How is it then that other

15    employees that were once participants in

16    the Ready, Willing & Able program, were --

17    had their opportunity for employment with

18    The Doe Fund?

19         A.    I'm not sure.

20         Q.    Is there a point where the

21    participant is cut off from working at The

22    Doe Fund if they're unable to find outside

23    employment?

24         A.    Yes.

25         Q.    When is that?

1                    J. WASHINGTON

2          A.      After two months.

3          Q.      Two months after CSS?

4          A.      Two months after job search.

5          Q.      Okay.  When someone finds a job

6     during this job search portion, are they

7     still able to live at The Doe Fund

8     facility?

9          A.      Yes.

10         Q.      And how long could they live

11    there?

12         A.      It depends on when they find

13    housing.

14         Q.      Do you remember when Timothy

15    Mathews first began working for The Doe

16    Fund?

17         A.      No.

18         Q.      Do you remember when James

19    Stevens first began working for The Doe

20    Fund?

21         A.      No.

22         Q.      Do you recall when any of the

23    other employees or supervisors that you

24    mentioned earlier were once Ready, Willing

25    & Able participants began working for The

1                    J. WASHINGTON

2   Doe Fund?

3          A.     No.

4                 MS. O'CONNELL:  Can we mark

5          this J.W. Exhibit 1.

6                 (Whereupon, J.W. Exhibit, 1

7          Community Improvement Project Field

8          Schedule, was marked for

9          identification as of this date by the

10         reporter.)

11                MS. O'CONNELL:  J.W. Exhibit 1

12         is what has been Bates stamped TDF

13         142, Community Improvement Project

14         field schedule.

15         Q.     I just handed you what's been

16   marked J.W. Exhibit 1.  Do you recognize

17   this type of document?

18         A.     Yes.

19         Q.     What is it?

20         A.     It's a CIP work schedule.

21         Q.     Is this similar to how all

22   field schedules are?

23         A.     Yes.

24         Q.     How is it different from a

25   schedule that the participants receive

1                    J. WASHINGTON
2    their first 30 days?
3         A.    Well, the days off, for one.
4         Q.    How is it different from a
5    schedule that other Doe Fund employees
6    have?
7               MS. BAUER:  Object to the form.
8         A.    Well, this schedule is for
9    trainees.  Um, Doe Fund staff members don't
10   receive this.
11        Q.    Does it typically say who the
12   case manager is on here?
13        A.    Correct, it would.
14        Q.    And it says under field
15   supervisor, Hudson River p.m. Saturday to
16   Wednesday.  Is a person's name supposed to
17   be there or is that just like the exact, I
18   guess, vocation that they're supposed to be
19   working in?
20        A.    Sometimes they would have the
21   route instead of the supervisor because the
22   supervisor rotates.
23        Q.    What is the Hudson River route?
24        A.    Hudson River Park Trust, uh,
25   along the West Side Highway -- West

                        J. WASHINGTON

1              J. WASHINGTON

2    Street -- West Side Highway.

3              MS. O'CONNELL:  Could you mark

4         this?

5         Q.    I'm handing you what's been

6    marked J.W. Exhibit 2, Bates stamped TDF

7    26.  Do you recognize this document?

8              (Whereupon, J.W. Exhibit 2,

9         Work-To-Pay Hours, was marked for

10        identification as of this date by the

11        reporter.)

12        A.    Yes.

13        Q.    What is it?

14        A.    It's the work-to-pay hours.

15        Q.    And is that based off of the

16   field schedule that I gave you earlier,

17   Exhibit 1?

18        A.    The bottom portion seems to be,

19   July.

20        Q.    So, in other words, each field

21   schedule that participants receives, it

22   would be all on the client tracking

23   database or that information would be

24   transferred here after they work it?

25             MS. BAUER:  Object to the form.

1                    J. WASHINGTON

2          Q.    Is that a "yes"?

3          A.    After they show up for the

4    assignment and those hours are completed,

5    the hours would be inputted or entered

6    in -- on a tracking database to reflect the

7    work assignment.

8          Q.    And is this sort of database

9    only used for CIP participants?

10         A.    No.

11         Q.    Why do you say that?

12         A.    It's also used for trainees

13   that are assigned to the kitchen, food

14   service, and also custodial.

15         Q.    Custodial --

16         A.    I'm sorry.

17         Q.    -- trainees?

18         A.    Housekeeping.

19         Q.    Oh.  So the participants

20   working the first 30 days?

21         A.    Correct.

22         Q.    Okay.  Is it used for any other

23   Doe Fund employees?

24              MS. BAUER:  Object to the form.

25              You can answer.

1                    J. WASHINGTON

2        A.     This is not used for Doe Fund

3    staff.

4        Q.     And if you look under admission

5    date, which is that bold larger font, and

6    it has, I guess, different columns, where

7    it says pay rate, you see that?

8        A.     Yes.

9        Q.     What is that referring to?

10       A.     Okay.  If you look down at the

11   bottom, that same column, where it says

12   stipend two, that reflects the 30 days, the

13   first 30 days.  The full-basic reflects

14   once they've been assigned the CIP or the

15   kitchen.

16       Q.     And full-basic would be based

17   off the hours worked?

18            MS. BAUER:  Object to the form.

19       A.     No.  It's -- it means that

20   they're no longer working housekeeping.  It

21   means that they've been assigned to either

22   CIP or kitchen.

23       Q.     And then, one, two, three, the

24   third column, which is three more to the

25   left of pay rate, is that the abbreviation

1                    J. WASHINGTON

2    for total hours there?

3              MS. BAUER:  Can you repeat that

4         or read it back?  I didn't hear what

5         you said.

6         Q.    If you're going from the left

7    where it says week ending date, one, two,

8    three, where it says TTL HRS, do you see

9    that?  I think the abbreviation for total

10   hours; is that correct?

11        A.    Correct.

12        Q.    And that would be the total

13   hours that the participant worked in a

14   given week, right?

15        A.    Yes.

16        Q.    And what does PPA done mean,

17   which is one more column to the right?

18        A.    Prior period adjustment.

19        Q.    And what would that be used

20   for?

21        A.    If a trainee completed hours

22   prior and those hours were not entered, you

23   would enter them in PPA.

24        Q.    And what does contract grad

25   mean?  It looks like the column is blank,

1                    J. WASHINGTON
2  but I didn't know what that meant.
3          A.    From time to time we have
4  trainees that have gotten employed, have
5  moved out and at some point they lost their
6  employment and they needed assistance, then
7  they could come back to us, to The Doe Fund
8  RWA and we would help them out by giving
9  them a 30-day contract.  So, that's where
10 the contract grad would come in.
11         Q.    There would be a Doe Fund
12 contract employee for 30 days?
13         A.    No, no.  They would not be an
14 employee.  We would come back -- they would
15 come back and we would assist them.  Um,
16 so, they wouldn't lose their apartment,
17 we'd give them an assignment and we would
18 also have them work with our career
19 development specialists to try and find
20 employment.
21         Q.    And now I'm going to the right
22 of that first long line going down in the
23 columns.  What do those abbreviations mean?
24         A.    I'm sorry, where?
25         Q.    The -- you see the first big

1                    J. WASHINGTON

2    horizontal line -- I'm sorry, vertical

3    line?

4         A.    Uh-huh.

5         Q.    What are these abbreviations to

6    the right meaning?

7              MS. BAUER:  Can you read it for

8          him so he knows where you're looking?

9         Q.    SUWRK, I'm guessing this means

10   Sunday -- is it basically like a schedule,

11   like Sunday work, Sunday late, Sunday

12   hours?  It says SU where your finger's at.

13        A.    Correct.

14        Q.    So, for each day of the week,

15   that particular day of the week, WRK

16   meaning work, whether they're working or

17   not, essentially?

18        A.    Correct.

19        Q.    And then their rate and then

20   the hours worked that day, right?

21        A.    No.  Route.

22        Q.    Oh, route, okay.

23              MS. O'CONNELL:  Exhibit 3.

24              (Whereupon, J.W. Exhibit 3,

25          Comp Data, was marked for

1                    J. WASHINGTON

2              identification as of this date by the

3              reporter.)

4         Q.    I just hand you what's been

5    marked as Exhibit 3, Bates stamped TDF 27

6    through TDF 36.  Do you recognize this set

7    of documents?

8         A.    Yes.

9         Q.    What is it?

10        A.    It's a printout of the comp

11   data.

12        Q.    As in compensation?

13        A.    I'm sorry?

14        Q.    As in compensation?

15        A.    No.

16        Q.    What does that mean then, comp?

17        A.    The comp data, it's the card.

18   It's the company that they use is the name

19   of the card that the trainees receive.

20        Q.    So how they receive their

21   payment for --

22        A.    How they receive their stipend.

23        Q.    And Doe Fund loads the cards

24   directly?

25        A.    I'm sorry?

1                    J. WASHINGTON

2          Q.    Does Doe Fund load the cards

3     directly?

4          A.    I don't know.  Either they load

5     or the company loads.  I'm not sure.

6          Q.    Who handles this sort of work

7     at The Doe Fund?

8          A.    Uh, people at HR.

9          Q.    So the --

10         A.    102nd.

11         Q.    Okay.  So HR loads the card

12    with the amount called VMF under the amount

13    column --

14               MS. BAUER:  Objection to form.

15          He did not testify to that.

16         Q.    Do you see the amount column?

17         A.    Yes.

18         Q.    It looks like there's some sort

19    of highlights where it says "bank load."

20    Is there any reason why the amounts are

21    much higher than just the stipend amount of

22    30-some dollars?

23         A.    I'm not sure I understand the

24    question.

25         Q.    How much was the stipend,

1                    J. WASHINGTON

2    about?

3         A.    Which stipend?  The 30-day

4    stipend?

5         Q.    Yes, the 30-day --

6         A.    15.

7         Q.    15 per week, right?

8         A.    Yes.

9         Q.    And then the second phase, they

10   get how much?

11        A.    It depends on how many hours

12   they work.

13        Q.    Okay.  So, based on the hours,

14   that's why there would be a variance in the

15   amount loaded to the card, right?

16        A.    I don't know.  Why there's a

17   difference, I don't know.

18        Q.    Do you know what sort of

19   deductions participants have taken out of

20   their stipend --

21             MS. BAUER:  Object to the form.

22             You can answer.

23        Q.    -- as you're calling it?

24        A.    34.50 is taken out for savings,

25   which the trainee gets that at the end of

1                    J. WASHINGTON
2    his stay in the program, um --
3          Q.    How do they get that amount;
4    via check or cash?
5          A.    It's loaded to their card.
6          Q.    Okay.
7          A.    And 1.24 is taken out for
8    program fees.
9          Q.    Does that include living
10   expenses then?
11              MS. BAUER:  What expenses?
12              MS. O'CONNELL:  Living expenses
13          or housing.
14         A.    Program fees.  Whatever the
15   program fees include, um, it could be
16   housing.
17         Q.    Could you flip to the next
18   page, TDF 28.  To the bottom left it says,
19   "take home comp data."  Is that the amount
20   that's left over after the deductions that
21   are put on the card?
22         A.    Yes.
23         Q.    Under what circumstances does
24   the program service fee change?
25         A.    It doesn't, as long as they're

1                    J. WASHINGTON

2      participating in the program.

3            Q.      Are all of these documents Doe

4      Fund documents where it has the individual

5      pay statements?

6            A.      Yes.

7            Q.      On the first page, is there a

8      reason why it says card/employee number, if

9      you're saying he's not an employee?

10           A.      I'm sorry, where are you?

11           Q.      At the top.  One of the -- I

12     guess second line down under customer ID

13     number.

14           A.      I have no idea what that number

15     represents.

16           Q.      Are some Doe Fund employees

17     also paid via this comp card?

18           A.      No.

19           Q.      It's just the participants?

20           A.      Correct.

21                   MS. O'CONNELL:  Exhibit 4.

22                   (Whereupon, J.W. Exhibit 4,

23               Trainee Handbook, was marked for

24               identification as of this date by the

25               reporter.)

1                    J. WASHINGTON

2          Q.    Do you recognize this document?

3          A.    Yes.

4          Q.    What is it?

5          A.    It's the trainee handbook.

6                MS. O'CONNELL:  Let the record

7          reflect I handed the witness

8          Exhibit 4 which has been Bates

9          stamped TDF 149 through TDF 153.

10         Q.    Is this the Ready, Willing &

11    Able CIP handbook that you still use today?

12         A.    I'm not sure.

13         Q.    You could take your time and

14    look through the document.

15         A.    Yes, it's the same.

16         Q.    And does this encompasses some

17    of the same rules that you were describing

18    earlier about what participants can and

19    cannot do while working?

20         A.    Yes.

21         Q.    Is there additional, I guess,

22    ground rules outside of this document that

23    are given verbally?

24         A.    I'm not sure.

25         Q.    Is there a document that The

1                    J. WASHINGTON
2    Doe Fund or the Ready, Willing & Able
3    program provide that give certain specific
4    instructions with individual vocations or
5    field projects?
6          A.    Each vocational training has
7    its own set of rules outside of CIP.
8          Q.    And would there be different
9    rule or additional rules for participants
10   that are working in the field?
11         A.    I'm not sure what you mean.
12         Q.    If someone's doing the Hudson
13   route, do they receive additional rules or
14   instructions in a physical form like this
15   when they're going to one of those routes?
16         A.    I'm not sure.
17         Q.    Okay.  But there would be at
18   least some verbal rules or instructions?
19         A.    Yes.
20         Q.    Okay.
21               MS. O'CONNELL:  Off the record.
22               (Whereupon, a discussion was
23          held off the record.)
24               MS. O'CONNELL:  This is 5.
25               (Whereupon, J.W. Exhibit 5,

1                    J. WASHINGTON

2              Trainee Statement, was marked for

3              identification as of this date by the

4              reporter.)

5         Q.    I've just handed you what's

6    been marked as J.W. Exhibit 5, which is

7    Bates stamped Brooks 20 through 23.  Do you

8    recognize this document?

9         A.    Yes.

10        Q.    What is it?

11        A.    It's the statement that

12   trainees receive.

13        Q.    Okay.  The part on the right

14   where it says other benefits and

15   information savings total to date, is that

16   the savings that's taken out as a deduction

17   each time?

18        A.    The 128?

19        Q.    Yes.

20        A.    I believe that's the total.

21        Q.    But that's the total of the

22   32 --

23        A.    Correct.

24        Q.    -- that's taken out on this

25   particular first page of Brooks 20?

1                    J. WASHINGTON

2              And then going under the column

3    deductions other where it says net pay comp

4    data, that's the comp data card, right?

5         A.    Correct.

6         Q.    And because the 120 on this

7    particular page is going to the comp data

8    card, that's the reason why there's no net

9    check?  That part is left zero?

10        A.    I'm not sure.

11        Q.    Okay.  When it's deposited to

12   the account, it's just deposited to the

13   comp data account, right?

14        A.    I'm not sure where you're

15   looking at.

16        Q.    Oh, sorry.  At the bottom on

17   the image of the check, it says deposited

18   to the account of, and then it says account

19   number, Gregory Brooks.  That information,

20   is that basically the comp data card?

21        A.    Yes.

22        Q.    Okay.  And all of these bank

23   statements are mailed to The Doe Fund

24   participants' address while they're living

25   at The Doe Fund location, right?

1                    J. WASHINGTON

2         A.    I'm not sure where they're

3    mailed to.

4                    MS. O'CONNELL:  Exhibit 6.

5                    (Whereupon, J.W. Exhibit 6,

6              Trainee Weekly Evaluation Form, was

7              marked for identification as of this

8              date by the reporter.)

9         Q.    I handed you what's been marked

10   as J.W. Exhibit 6, which has been Bates

11   stamped TDF 145.  Do you recognize this

12   document?

13        A.    Yes.

14        Q.    What is it?

15        A.    It's a trainee weekly

16   evaluation form.

17        Q.    And these are given out weekly

18   to trainees or basically any persons in the

19   Ready, Willing & Able program?

20        A.    No.

21        Q.    Who is it not given out to?

22        A.    I'm sorry, who is it not given

23   out to?

24        Q.    Who is it given out to, I

25   guess?

1                    J. WASHINGTON

2          A.    It's given out to the case

3     manager.

4          Q.    Okay.  Does the trainee look at

5     this or is it in the personnel folder, not

6     to be seen by the trainee?

7                MS. BAUER:  Object to the form.

8          A.    The case manager receives it,

9     reviews it, and goes over it with the

10    trainee.

11         Q.    Are these considered when

12    looking at whether a trainee will be

13    considered for a vocational program?

14         A.    Yes.

15         Q.    If a trainee meets standards,

16    is it more likely enough than not that they

17    may have an opportunity to engage in

18    participating in a vocational program?

19         A.    Yes.

20         Q.    So they don't necessarily have

21    to have -- exceed standards?

22         A.    No.

23         Q.    And these are given out every

24    week, right?

25         A.    I don't know.

1                    J. WASHINGTON

2          Q.    Okay.  Is there any

3    circumstances where they wouldn't be given

4    out each week?

5          A.    It depends on the supervisor.

6    I mean, supervisors take vacations, they're

7    out sick, so, I'm not really sure of the

8    frequency.

9          Q.    If a trainee was doing poorly,

10    would there be higher odds that a negative

11    evaluation would be needed?

12          A.    Can you say that again, please?

13          Q.    If a trainee was doing poorly,

14    would the need of a negative evaluation be

15    more necessary?

16              MS. BAUER:  Object to the form.

17          A.    Yes.

18          Q.    So in the case of Gregory

19    Brooks, who's listed as the trainee here,

20    Doe Fund produced only this one trainee

21    weekly evaluation form and there's no other

22    one, would that, I guess, mean that he was

23    doing well in the program?

24          A.    It could mean a number of

25    things.

1                    J. WASHINGTON
2          Q.     If he was doing poorly, you
3    would expect, though, to see more negative
4    evaluations, though, right?
5          A.     Yes.
6          Q.     Okay.  Can other individuals
7    that aren't necessarily the trainee's
8    direct supervisor that week create a
9    negative evaluation form if needed?
10              MS. BAUER:  Object to the form.
11         A.     No.
12         Q.     Would there be any other types
13   of documents about negative performance or
14   negative participation that could be placed
15   in a trainee's performance file?
16         A.     Yes.
17         Q.     What sort of documents are
18   those?
19         A.     Trainee incident report.
20         Q.     Any others?
21         A.     I don't think so.
22         Q.     When a participant applies for
23   a vocational program, is it necessary that
24   they have the cover letter or resume?
25         A.     No.

1                    J. WASHINGTON

2          Q.     Is it more helpful for placing

3     them if they have a cover letter or a

4     resume?

5          A.     No.

6          Q.     Do you look for any specific

7     achievements in a participant's, I guess,

8     job history when placing them for a

9     vocation?

10         A.     No.

11         Q.     What sort of criteria do you

12    look at?

13         A.     It depends on the vocation.

14         Q.     Is it fair to say that there is

15    an opportunity for basically anyone that's

16    ready, willing, and able?

17         A.     Yes.

18         Q.     Okay.

19                MS. O'CONNELL:  Exhibit 7.

20                (Whereupon, J.W. Exhibit 7,

21          Trainee Terms of Participation, was

22          marked for identification as of this

23          date by the reporter.)

24         Q.     I'm handing you what's been

25    marked as J.W. Exhibit 7, Bates stamped TDF

1                   J. WASHINGTON
2      1 through TDF 4.  Do you recognize this
3      document?
4              A.    Yes.
5              Q.    What is it?
6              A.    It's the trainee terms of
7      participation.
8              Q.    And does this document contain
9      some of the, I guess, criteria in different
10     phases that we're going about earlier?
11             A.    Yes.
12             Q.    And under D, program phases,
13     did any of these dollar amounts change from
14     when my client signed this in 2016?
15             A.    Yes.
16             Q.    And what dollar amounts do you
17     see that have changed?
18             A.    The 34.50.
19             Q.    And where's that?
20             A.    Second to the last paragraph or
21     third to the last paragraph.
22             Q.    And what is that today?
23             A.    It's 34.50 now.  Before it was
24     32.
25             Q.    And I believe earlier you also

1                    J. WASHINGTON

2      mentioned that the per hour changed, was

3      that correct, in paragraph 3 in Section D?

4           A.     Right.   The paid incentive,

5      yes.  It's now 13 instead of 9.20.

6           Q.     Did any of these approximation

7      of days or weeks or months in these

8      different phases of programs changed from

9      2016 till today?

10          A.     No.

11          Q.     Have trainees ever been injured

12     on the job while working under your

13     supervision as facility director of the

14     Gates Ave?

15          A.     We've had trainees injured

16     while on their work assignments, yes.

17          Q.     Under those circumstances,

18     would they be covered by Workers'

19     Compensation?

20          A.     Yes.

21          Q.     And are these rules in front of

22     you rules that are necessary for the first

23     30 days and the other phases after the

24     first 30 days?

25          A.     Yes.

1                    J. WASHINGTON

2          Q.    Do participants ever engage in

3    voluntary work?

4          A.    I'm not sure.

5          Q.    Are they required to maintain

6    volunteer hours or anything like that?

7          A.    No.

8          Q.    On page 3 of this exhibit, at

9    the very top, it says No. 5.  If you could

10   take a moment and read No. 5 to yourself,

11   and just let me know when you're done.

12         A.    Okay.

13         Q.    Is that a true statement,

14   according to this policy?

15         A.    Yes.

16         Q.    Are you aware of circumstances

17   where noncompliance did result in a parole

18   violation?

19         A.    No.

20         Q.    Is that something that a case

21   manager may have more information about?

22         A.    No.

23         Q.    Do you know instances where

24   participants were afraid that noncompliance

25   could result in a parole violation?

1                     J. WASHINGTON

2          A.    No.

3          Q.    Do participants' parole

4    officers visit them at the locations, at

5    the Gates Ave location?

6          A.    Yes.

7          Q.    And where do they meet them?

8          A.    In the lobby.

9          Q.    And then do they like hold a

10   meeting there or -- or what?  What happens

11   then after that?

12         A.    Well, once they meet -- I mean,

13   they meet with their parolee, it's

14   basically just the two of them.

15         Q.    And as part of the phase called

16   graduated services, did we already discuss

17   that, but under a different name?  Is

18   graduated services career service or career

19   success strategies or --

20         A.    No.

21         Q.    -- is that different?

22         A.    No.  It's different.

23         Q.    How are they different?

24         A.    Career success strategies, they

25   work with the trainee while he's still

```
 1                   J. WASHINGTON
 2    living in the facility.
 3          Q.     In the graduate services?
 4          A.     That's after the trainee moves
 5    out.
 6          Q.     Where would that be, I guess,
 7    located?
 8          A.     I'm not sure what you mean.
 9          Q.     How does graduate services of
10    The Doe Fund work with the participants
11    after they leave, I guess, living at the
12    facility?
13          A.     Well, once a trainee graduates,
14    we have a retention policy.  That's where
15    the graduate services person comes in.  In
16    order for the grad to be a graduate, he has
17    to submit employee pay stubs and also
18    submit proof of housing, um, for an
19    extended amount of time in order to receive
20    the grant.
21          Q.     And then he would be able to
22    have $200 per month?
23          A.     It's, I think, every four
24    months now.
25          Q.     For $200?
```

1                    J. WASHINGTON

2          A.    Yes.

3          Q.    So they still have the $1,000

4    incentive?

5          A.    Correct.

6          Q.    And what is paid training

7    incentive?

8          A.    Are we on --

9          Q.    On the last page of the

10   document, the first paragraph, last

11   sentence where it says, "I will continue to

12   receive the paid training incentive for a

13   period of approximately two months."

14         A.    Well, that's the job search.

15         Q.    Thank you.

16               Do you remember who Terry

17   Cooper is?

18         A.    Yes.

19         Q.    When did you first meet him?

20         A.    I don't remember the exact

21   year.

22         Q.    Was it before you were working

23   at Gates Ave, this latest round?

24         A.    Yes.

25         Q.    Did you learn about Terry

1                    J. WASHINGTON

2    Cooper when you worked at Cook Street?

3           A.    I'm sorry?

4           Q.    Before Gates Ave, you were

5    working at Cook Street, right?

6           A.    Correct.

7           Q.    Did you have knowledge about

8    Terry Cooper when you were working at Cook

9    Street?

10          A.    Before that.

11          Q.    Even before that?

12          A.    Yes.

13          Q.    So Jersey City?

14          A.    Uh, before that.

15          Q.    Harlem?

16          A.    I think so.

17          Q.    Okay.  So, over 15 years ago?

18          A.    Approximately.

19          Q.    Okay.  And what did you learn

20   about Terry Cooper then?

21          A.    I'm not sure what you mean by

22   that.

23          Q.    You remember learning of an

24   individual named Terry Cooper back then.

25   What did you learn the first time or how

1              J. WASHINGTON

2    did you hear about him?

3              MS. BAUER:  Object to the form.

4         A.    I met Terry, I believe he was a

5    case manager at the time, I think.  I'm not

6    really sure; can't remember.

7         Q.    In Harlem?

8         A.    Did I meet him in Harlem?

9         Q.    When you first learned about

10   Terry Cooper, did you meet him in person or

11   did you hear about him from other people?

12        A.    I met him.

13        Q.    Okay.  So, did you meet him at

14   the Harlem location?

15        A.    I'm not sure exactly where I

16   met him.

17        Q.    Okay.  And what was your first

18   impression about him?

19        A.    He seemed like a nice guy.

20        Q.    Has Terry Cooper been in the

21   program -- working with The Doe Fund about,

22   approximately, the same amount of time as

23   you?

24        A.    No.

25        Q.    More or less?

1                    J. WASHINGTON

2          A.     Less.

3          Q.     Was he ever a participant in

4     the Ready, Willing & Able program?

5          A.     I don't remember.

6          Q.     Do you recall when Terry Cooper

7     first started working with you at the Gates

8     Ave facility?

9          A.     No.

10         Q.     Was he there before or after

11    you began working at the Gates Ave facility

12    this most recent time as facility director?

13         A.     He came after.

14         Q.     Okay.  Do you know why he was

15    moved to the Gates Ave facility?

16         A.     No.

17                MS. BAUER:  Can you just put an

18            objection to the form on --

19                MR. BARTOLOMEO:  Yes.  I was

20            going to say, note my objection as

21            well.

22         Q.     Do you know of any complaints

23    besides the complaint made by my client

24    against Terry Cooper?

25                MR. BARTOLOMEO:  Objection.

1                    J. WASHINGTON

2          A.    No.

3          Q.    Did you know of any questions

4    about Terry Cooper's performance?

5                MR. BARTOLOMEO:  Objection.

6          A.    No.

7          Q.    Does The Doe Fund keep a

8    permanent record of their employees?

9                MS. BAUER:  Objection to form.

10         A.    I don't know.

11         Q.    Do you have a permanent record?

12               MS. BAUER:  Objection to form.

13               MR. BARTOLOMEO:  Objection.

14         A.    I don't know.

15         Q.    Is there another name that it

16   would go by or --

17         A.    I don't know.

18         Q.    Does anyone of The Doe Fund

19   evaluate you?

20         A.    Yes.

21         Q.    Who's that?

22         A.    That would be my supervisor,

23   Felipe Vargas.

24         Q.    And where does he work?

25         A.    I believe his office is at 84th

1                    J. WASHINGTON

2    Street.

3         Q.    And do you make evaluations of

4    the supervisors under you?

5         A.    Yes.

6         Q.    And I assume you keep them

7    somewhere, right?

8         A.    Yes.

9         Q.    And where do you keep them?

10        A.    Locked up did in my drawer.

11        Q.    So, the physical files?

12        A.    Yes.

13        Q.    Okay.  Who would have

14   evaluations of Terry Cooper?

15        A.    His supervisor.

16        Q.    Which is?

17        A.    At the time, it was Smithson

18   Smith.

19        Q.    Smith and Smith?

20        A.    Yeah.

21        Q.    First name Smith, last name

22   Smith?

23        A.    Smithson like Smithsonian,

24   yeah.

25        Q.    To your knowledge, does The Doe

```
 1                    J. WASHINGTON
 2   Fund keep electronic records of performance
 3   issues of their employees?
 4        A.    I don't know.
 5        Q.    Did you have any access to
 6   Mr. Cooper's personnel records or
 7   evaluation records?
 8        A.    No.
 9              MS. BAUER:  Kelly, whenever
10        would be a good time for a break.
11              MS. O'CONNELL:  Okay.  I guess
12        we could break now.
13              (Whereupon, a discussion was
14        held off the record.)
15              (Whereupon, a brief recess was
16        taken.)
17        Q.    What is your understanding of
18   The Doe Fund sexual harassment policy?
19        A.    In what way?
20        Q.    Do you know what sexual
21   harassment is?
22        A.    Yes.
23        Q.    What is that?
24        A.    There are a lot of different
25   interpretations, touching, inappropriate
```

1                    J. WASHINGTON

2       comments, um, I mean, continually asking

3       somebody out.  I mean, there's a lot of

4       ways that sexual harassment can -- can

5       happen, can take place.

6              Q.    Is it your understanding that

7       would take place less at the Gates Ave

8       location because it's mostly men working

9       there or living there?

10                  MS. BAUER:  Object to the form.

11                  MR. BARTOLOMEO:  Join in the

12             objection.

13             A.    I'm not sure what you mean.

14             Q.    You mentioned sexual harassment

15      could be asking someone out, so -- because

16      the Gates Ave location, it's a higher

17      percentage of men working there, right?

18             A.    Trainees, staff?  I mean,

19      which?

20             Q.    I mean, people that are working

21      there, living there, participating in the

22      Ready, Willing & Able program, most of

23      these people are men, right?

24             A.    All of them are men.

25             Q.    Okay.

1                    J. WASHINGTON

2          A.     The trainees.

3          Q.     So does that make the sexual

4    harassment less common?

5          A.     No.

6          Q.     Okay.  Based on your

7    understanding, can sexual harassment occur

8    between someone who's an employee and

9    someone who is a participant in the Ready,

10   Willing & Able program?

11         A.     Yes.

12         Q.     Okay.  And what happens if

13   there's an incident of alleged sexual

14   harassment under those circumstances?

15              MS. BAUER:  I'll object to the

16         form.  You can answer.

17              MR. BARTOLOMEO:  I join in the

18         objection.

19         A.     When you say what happens, I'm

20   not quite sure what you mean.

21         Q.     What does The Doe Fund do if

22   there's been an alleged incident of sexual

23   harassment?

24              MS. BAUER:  Object to the form.

25              MR. BARTOLOMEO:  Join.

1                    J. WASHINGTON

2         A.    Well, I mean, first we'd have

3    to be informed about it.  Once we're

4    informed, there's a process, um, that's in

5    place.  If I'm notified, um, my first

6    response would be to notify HR.

7         Q.    Okay.  Do you know what steps

8    are taken after that?

9         A.    No.

10        Q.    Are you a participant in any

11   investigations under certain circumstances?

12             MS. BAUER:  Object to the form.

13             MR. BARTOLOMEO:  Join.

14        A.    I guess when you say certain

15   circumstances, I guess it depends on the

16   circumstances.

17        Q.    If you are informed and you

18   notify HR about sexual harassment that

19   essentially occurs under your roof because

20   you're the direct facility director, are

21   you involved?

22        A.    That would depend on HR.

23        Q.    Okay.  So it's up to Doe Fund's

24   HR whether or not you're involved in a

25   sexual harassment investigation?

1                    J. WASHINGTON

2          A.    Yes.

3          Q.    Have you been involved in

4    investigations involving sexual harassment

5    at The Doe Fund other than the

6    circumstances that gave rise to my client's

7    complaint?

8          A.    No.

9          Q.    So this is the first time?

10         A.    Yes.

11         Q.    Are all Doe Fund employees

12   aware of The Doe Fund sexual harassment

13   policy?

14              MS. BAUER:  Object to the form.

15              MR. BARTOLOMEO:  Join in the

16        objection.

17         A.    I don't know.

18         Q.    Do you personally try to make

19   sure that employees working at the Gates

20   Ave location are aware of the sexual

21   harassment policy?

22         A.    Those that I supervise, yes.

23         Q.    And how do you do that?

24         A.    Well, I get with HR to make

25   sure what to find out, if they have

```
 1                    J. WASHINGTON
 2    participated in previous, uh, sexual
 3    harassment trainings.
 4         Q.    And what do you do if you find
 5    out someone under your supervision has not
 6    participated?
 7         A.    Then I'd arrange for them to
 8    take the next training.
 9         Q.    Do you know roughly how often
10    these trainings are?
11         A.    No.
12         Q.    How do you make sure that all
13    participants in the Ready, Willing & Able
14    program are aware of The Doe Fund sexual
15    harassment policy?
16         A.    Rephrase -- repeat that,
17    please.
18              MS. O'CONNELL:  Could you read
19         back, please?
20              (Whereupon, the referred to
21         portion of the record was read back
22         by the reporter.)
23              MS. BAUER:  Object to the form.
24         You can answer.
25         A.    The staff -- my staff, I know,
```

         1                    J. WASHINGTON
         2    but the trainees, I'm not certain if
         3    they're aware.
         4         Q.    Do you know who would make
         5    certain that they're aware?
         6         A.    That's something that also
         7    would come through either HR or, um, upper
         8    management, the process.
         9         Q.    Do you know what Doe Fund
        10    employees are instructed to do if they see
        11    a violation of The Doe Fund sexual
        12    harassment policy?
        13         A.    They're supposed to notify
        14    their immediate supervisor or HR.
        15         Q.    Is it a violation of any Doe
        16    Fund policy if a Doe Fund employee observes
        17    or has knowledge of an incident involving
        18    sexual harassment to not notify the proper
        19    people?
        20              MS. BAUER:  Object to the form.
        21         A.    Yes.
        22         Q.    Do you know an instance where
        23    that has occurred?
        24         A.    No.
        25         Q.    Do you know what the policy is

```
 1                    J. WASHINGTON
 2      for Ready, Willing & Able participants to
 3      inform their supervisor or proper
 4      authorities about alleged violation of
 5      sexual harassment?
 6           A.    No.
 7           Q.    If there was a serious charge
 8      of sexual harassment made against a Doe
 9      Fund employee working in your facility,
10      would you want to know about that charge as
11      a precaution?
12           A.    Yes.
13           Q.    Why's that?
14           A.    Well, I mean, as the facility
15      director, even if I'm not the supervisor of
16      that particular staff member, I would still
17      want to know what's going on.
18           Q.    Do you feel in such
19      circumstances a type of responsibility to
20      protect the participants or employees in
21      your facility?
22                MS. BAUER:  Object to the form.
23           A.    Could you either rephrase or
24      repeat that?
25           Q.    I'll rephrase.
```

                        J. WASHINGTON

1

2          A.      All right.

3          Q.      As facility director of the

4    Gates Ave location, do you feel a

5    responsibility to protect The Doe Fund

6    participants and The Doe Fund employees

7    from instances of sexual harassment?

8          A.      Yes.

9          Q.      Even if an earlier allegation

10   was unfounded?

11              MS. BAUER:  Object to the form.

12              MR. BARTOLOMEO:  Object to the

13          form.

14         A.      I really don't know how to

15   answer that because I would have to be made

16   aware of the previous allegation.

17         Q.      Okay.  Do you know how The Doe

18   Fund would keep track of certain things so

19   you could become aware?

20              MS. BAUER:  Object to the form.

21              MR. BARTOLOMEO:  Join in the

22          objection.

23         A.      No.

24         Q.      To your knowledge, there's no

25   system that could have made you aware?

1                         J. WASHINGTON

2          A.     To my knowledge, no.

3          Q.     Are you familiar with the

4    allegations my client's bringing?

5          A.     Yes.

6          Q.     At this time, are you now aware

7    of prior instances of sexual harassment by

8    Terry Cooper, other than the allegations my

9    client brought?

10         A.     Yes.

11              MS. BAUER:  Let me just caution

12         you, if it's something your attorneys

13         told you, you shouldn't be testifying

14         to it.  Do you understand?  So, if

15         you know -- if you can answer the

16         question without divulging anything

17         that we -- Steven or I spoke to you

18         about --

19              THE WITNESS:  Okay.

20         A.     Then I'd have to say --

21              MS. BAUER:  If it's something

22         that we spoke to you about, you can

23         say, my attorney -- you could just

24         say, no, other than my attorney.

25              I'm not trying to coach him,

1                    J. WASHINGTON

2          I'm just trying to explain that --

3                MS. O'CONNELL:  I don't want to

4          get into attorney-client privilege.

5                MS. BAUER:  I know you don't.

6          A.    Other than what was discussed

7    with my attorneys, no.

8          Q.    Okay.

9                (Whereupon, a discussion was

10         held off the record.)

11               (Whereupon, a recess was

12         taken.)

13               MS. O'CONNELL:  This is 8.

14         Exhibit 8.

15               (Whereupon, J.W. Exhibit 8,

16         Incident Report, was marked for

17         identification as of this date by the

18         reporter.)

19         Q.    I hand you what's been marked

20   J.W. Exhibit 8, which is Bates stamped TDF

21   181.  Do you know what this document is?

22         A.    It's an incident report.

23         Q.    Have you seen this particular

24   incident report before?

25         A.    No.

1                    J. WASHINGTON

2          Q.      And is this incident report the

3     type that would be used for Doe Fund

4     participants or Doe Fund employees?

5          A.      This one would be trainee --

6          Q.      Okay.

7          A.      -- I believe.  This one is from

8     where?

9          Q.      And what does RWA mean?

10         A.      Ready, Willing & Able.

11         Q.      And it looks like there's been

12    some scribble-out, I guess, from the first

13    page, so, it -- is it saying that the

14    victim is a Ready, Willing & Able person

15    that's the victim, right?

16         A.      Where are you looking?

17         Q.      The first page to the middle

18    right, which says victim member group.

19         A.      Yes.

20         Q.      So does this mean it's an

21    incident report where the victim is a

22    Ready, Willing & Able person and they're

23    making a complaint about a staff member?

24         A.      I don't know.

25         Q.      Are these incident reports

1                    J. WASHINGTON

2    later typed up or documented in another

3    way?

4         A.    To my knowledge, no.

5         Q.    Okay.  Towards the bottom left,

6    can you identify that person?

7         A.    Ladonna Bromfield.

8         Q.    Do you know who she is?

9         A.    She was a case manager at

10   Porter.

11        Q.    Okay.

12              (Whereupon, J.W. Exhibit 9,

13        e-mail, was marked for identification

14        as of this date by the reporter.)

15        Q.    I'm handing you what's been

16   marked as J.W. Exhibit 9, Bates stamped TDF

17   186 through 187.  Have you ever seen this

18   document before?

19        A.    No.

20        Q.    It's an e-mail from Ladonna and

21   subject incident between Terry Cooper and

22   trainee blank, which has been redacted, on

23   6/24/13.

24              Do you recognize any of the

25   individuals that this e-mail was addressed

1                    J. WASHINGTON

2    to?

3         A.    Yes.

4         Q.    Who do you recognize?

5         A.    Kenise, Eunice, Thomas, Felipe.

6         Q.    For those who you identified,

7    do you know what their titles were at that

8    time in 2013?

9         A.    No, I don't.

10        Q.    Are these HR people within Doe

11   Fund, or who are they?

12        A.    Two of them are.

13        Q.    Which two?

14        A.    Kenise and Eunice.

15        Q.    Okay.  And Thomas and Felipe,

16   they work at Porter, to your knowledge?

17        A.    Thomas did.  Felipe, I'm not

18   sure.

19        Q.    Have you had a chance -- I know

20   I didn't instruct you to, but did you begin

21   to read or scan any part of this document?

22        A.    No, I didn't.

23        Q.    Please take a moment to read

24   through it and let me know when you have

25   finished.

1                    J. WASHINGTON
2          A.    I'm finished.
3          Q.    Okay.  Based on what you read,
4    is this sort of incident where even if an
5    allegation was unfounded, you would want to
6    know about it?
7               MS. BAUER:  Object to the form.
8            You can answer.
9          A.    Yes.
10         Q.    Would it be accurate to
11   describe Terry Cooper as a touchy, "feely"
12   person?
13              MS. BAUER:  Object to the form.
14              MR. BARTOLOMEO:  Objection.
15         A.    No.
16         Q.    Have you ever witnessed Terry
17   Cooper touch another man?
18         A.    I mean, if you can consider
19   shaking hands touching.
20         Q.    But nothing beyond shaking
21   hands?
22         A.    No.
23         Q.    And nothing like that has
24   happened, to your knowledge, at the Gates
25   Ave facility involving Mr. Cooper?

1                    J. WASHINGTON

2          A.    No.

3                MR. BARTOLOMEO:  Objection.

4          Q.    Involving any other Doe Fund

5     employee?

6                MR. BARTOLOMEO:  Objection.

7                MS. BAUER:  Objection.

8          A.    To my knowledge, no.

9          Q.    Do you know who a W. Glenn is?

10         A.    William Glenn.

11         Q.    Who's he?

12         A.    He is the director of Harlem --

13    Harlem facility.

14         Q.    Okay.

15                MR. BARTOLOMEO:  He's the

16          director of what?

17                MS. BAUER:  The Harlem

18          facility?

19                THE WITNESS:  Yeah.

20                MR. BARTOLOMEO:  Which

21          facility?

22                MS. BAUER:  Harlem.

23                MR. BARTOLOMEO:  Harlem

24          facility, okay.

25                MS. O'CONNELL:  This is

1                    J. WASHINGTON

2          Exhibit 10.

3               (Whereupon, J.W. Exhibit 10,

4          Investigative Interview Report, was

5          marked for identification as of this

6          date by the reporter.)

7          Q.    I just handed you what's been

8     marked J.W. Exhibit 10, Bates stamped TDF

9     191 through 193.  Have you ever seen this

10    document before?

11         A.    No.

12         Q.    It says investigative interview

13    report regarding Terry Cooper and what has

14    been redacted on June 25th, 2013, at 9:00

15    a.m.  Is this consistent to incident

16    reports that you know of that The Doe Fund

17    creates?

18              MR. BARTOLOMEO:  Objection.

19              MS. BAUER:  Double that

20         objection.

21         A.    No.

22         Q.    Why do you say so?

23         A.    This is my first time seeing

24    something like this.

25         Q.    Okay.  Did you see the

                         J. WASHINGTON
 1
 2     investigative interview or other
 3     investigative documents relating to my
 4     client, Mr. Brooks?
 5          A.    Yes.
 6          Q.    And you -- from your knowledge,
 7     this seems inconsistent?
 8          A.    Similar, yes.
 9          Q.    Okay.  If a Doe Fund
10     participant is believed to have been under
11     the influence of some sort of drug or
12     suffering from some sort of psychiatric
13     defect, is there a certain Doe Fund policy
14     regarding those circumstances?
15               MS. BAUER:  Objection.
16               MR. BARTOLOMEO:  Objection.
17          A.    Substance use, yes.
18          Q.    And what's that?
19          A.    Drug test.
20          Q.    Okay.  Is there certain
21     circumstances where they need to go to an
22     observation area?
23               MS. BAUER:  Objection.
24          A.    No.
25          Q.    If you look at paragraph three

1                    J. WASHINGTON

2  where it says 2 note, do you see that

3  paragraph?

4          A.    Yes.

5          Q.    The creator of this report

6  noted that Terry neglected to have the

7  trainee escorted to an observation area for

8  safety reasons.  He had no excuse for not

9  following up on his intervention steps in

10  performance issue.

11              Do you know what that's

12  referring to?

13          A.    No.

14          Q.    Would it be against Doe Fund's

15  sexual harassment policy to have a staff --

16  a Doe Fund employee touch a participant's

17  chest?

18              MS. BAUER:  Object to the form.

19              MR. BARTOLOMEO:  Object.

20          A.    Yes.

21          Q.    Would it also be against The

22  Doe Fund sexual harassment policy to touch

23  their leg?

24              MS. BAUER:  Object to the form.

25              MR. BARTOLOMEO:  Objection.

1                    J. WASHINGTON

2          A.    Yes.

3          Q.    And I asked, you might of

4    answered already, but would it be against

5    Doe Fund's sexual harassment policy for a

6    Doe Fund employee to touch a Doe Fund

7    participant's penis?

8          A.    Yes.

9                MS. BAUER:  Objection to form.

10               MR. BARTOLOMEO:  Objection.

11         Q.    Even if it's through their

12   pants?

13               MS. BAUER:  Objection to form.

14               MR. BARTOLOMEO:  Objection.

15         A.    Yes.

16         Q.    And what if the witness

17   involved in this 2013 incident, in the last

18   paragraph, last line, explained because of

19   his past history of being incarcerated, he

20   didn't want any implications made, and that

21   had to do with him, I guess, not

22   volunteering the information soon after

23   this alleged incident occurred, have you

24   heard of these sort of circumstances

25   before?

```
 1                    J. WASHINGTON
 2              MR. BARTOLOMEO:  Objection.
 3              MS. BAUER:  Objection.
 4         A.    No.
 5         Q.    Who's Donna Harris?
 6         A.    She was a caseworker.
 7         Q.    Okay.  Was she a supervisor in
 8    2013?
 9         A.    Uh, I don't know.
10         Q.    If you could turn to the next
11    page, No. 5.  If you could read that to
12    yourself and let me know when you're
13    finished.
14         A.    Okay.
15         Q.    Do you know what they're
16    referring to in that paragraph when they
17    said regarding his hands-on/off style of
18    communication?
19         A.    No.
20         Q.    Based on the report, does it
21    seem that there was a warning given to
22    Mr. Cooper about his communication style?
23              MR. BARTOLOMEO:  Objection.
24         A.    I haven't read the entire
25    report.  You mean this one in my hand or --
```

1                    J. WASHINGTON

2          Q.    I mean this paragraph 5, where

3    William Glen and Donna Harris addressed him

4    about his communication style several

5    months ago and added that he is not always

6    consistent of this behavior associated with

7    his communication style, though he

8    continues to work on it.

9          A.    Okay.  Repeat the question,

10   please.

11         Q.    Does that paragraph seem like a

12   warning was given to Mr. Cooper about his

13   communication style?

14               MS. BAUER:  Objection.

15         A.    I don't know.

16         Q.    If there was a necessity for

17   The Doe Fund to give a warning to an

18   employee, would it always be written or in

19   certain circumstances would it be an oral

20   warning?

21               MR. BARTOLOMEO:  Objection.

22         A.    I don't -- honestly, I don't

23   know.

24         Q.    Do you always give written

25   warnings or do you sometimes give oral

1                    J. WASHINGTON

2     warnings?

3                    MR. BARTOLOMEO:  Objection.

4          A.    It depends on the circumstance.

5          Q.    If you could turn to the last

6     page of this document.  Do you know of any

7     reason why the font on number -- for No. 3

8     would be larger?

9          A.    No.

10         Q.    Okay.  If you -- did you read

11    No. 3 already?

12         A.    I'm reading it now.

13         Q.    Okay.

14         A.    Okay.

15         Q.    Is it consistent with The Doe

16    Fund's sexual harassment policy to move the

17    participant rather than the alleged

18    harasser?

19                   MS. BAUER:  Object to the form.

20                   MR. BARTOLOMEO:  Objection.

21         A.    I don't know.

22         Q.    About how soon after this

23    June 25th, 2013 report was made was Terry

24    Cooper transferred to the Gates Ave

25    facility?

1                    J. WASHINGTON

2              MR. BARTOLOMEO:  Objection.

3              MS. BAUER:  Objection.

4        A.    I don't know.

5        Q.    Was it that same year?

6        A.    I'm sorry?

7              MR. BARTOLOMEO:  Objection.

8        Q.    Was it that same year, 2013?

9        A.    I don't know.

10             MR. BARTOLOMEO:  You asked him

11        earlier today when he was transferred

12        and he said that he didn't know

13        exactly when.  And now you're asking

14        him in regard to a report that he

15        didn't draft.  So, I'm not sure

16        exactly --

17             MS. O'CONNELL:  I'm just

18        refreshing his recollection.

19             MR. BARTOLOMEO:  That's fine.

20             (Whereupon, J.W. Exhibit 11,

21        memorandum, was marked for

22        identification as of this date by the

23        reporter.)

24        Q.    I'm handing you what's been

25    marked as J.W. Exhibit 11, which is Bates

1                    J. WASHINGTON

2    stamped TDF 194.  Have you ever seen this

3    document before?

4         A.    No.

5         Q.    Do you recognize basically what

6    this document is?

7         A.    I'm sorry, could you repeat,

8    please?

9         Q.    Have you seen any document

10   similar to this document in front of you?

11        A.    Yes.

12        Q.    Is it consistent to -- I guess

13   let me -- you tell me exactly what this

14   would be called.

15        A.    Well, basically what it says, a

16   memo.

17        Q.    Okay.  Is this how -- is it

18   consistent with how The Doe Fund creates

19   written warnings?

20        A.    Yes.

21        Q.    For employees under your

22   supervision given written warnings, are

23   they given written warnings consistent to

24   this document?

25        A.    Yes.

```
 1                    J. WASHINGTON
 2              MS. BAUER:  Object to the form.
 3         Q.    Do you know how long a written
 4    warning would remain in a Doe Fund
 5    employee's personnel file?
 6              MS. BAUER:  Object to the form.
 7         A.    No.
 8         Q.    And at the top of this memo
 9    where it says from, it says, William Glenn,
10    director of RWA, was he the director of RWA
11    for all of The Doe Fund?
12         A.    No.
13         Q.    Where was he the director of?
14         A.    Porter.
15         Q.    Just Porter?  Okay.
16              Is he still the director of RWA
17    for Porter?
18         A.    No.
19         Q.    Where's he now?
20         A.    Director at Harlem.
21         Q.    Of Harlem?
22              When did he begin working in
23    Harlem?
24         A.    I don't know.
25         Q.    And Thomas Perry, program
```

1                    J. WASHINGTON
2      director, was he program director of just
3      Porter?
4           A.    Yes.
5           Q.    Is he still program director of
6      Porter?
7           A.    No.
8           Q.    Where is he now?
9           A.    He's no longer with The Doe
10     Fund.
11          Q.    And do you know when -- around
12     when he left?
13          A.    No.
14          Q.    Since you've been working at
15     the Gates Ave location, have you observed
16     Mr. Cooper violate The Doe Fund's sexual
17     harassment policy?
18               MR. BARTOLOMEO:    Objection.
19          A.    No.
20          Q.    Have you ever heard him make
21     jokes in a sexual nature?
22          A.    No.
23          Q.    Has any employee of The Doe
24     Fund gone to you to report violations of
25     the sexual harassment policy?

1                    J. WASHINGTON

2          A.    No.

3          Q.    Have any participants, other

4    than my client, gone to you to notify you

5    of him violating the sexual harassment

6    policy?

7          A.    No.

8          Q.    Do you first recall when my

9    client made a complaint about sexual

10   harassment to you?

11         A.    Not the exact day.

12         Q.    Oh.  What do you remember?

13         A.    I remember coming into work one

14   morning, because I get in early and I

15   checked my mailbox, and there was an

16   envelope in my mailbox marked urgent.

17         Q.    And what did you do then?

18         A.    When I got to my office, I got

19   settled and I read the, uh -- I opened the

20   envelope and I read it.

21         Q.    What did you do after reading

22   it?

23         A.    After reading it, I called for

24   Mr. Brooks.

25         Q.    Okay.  What happened?  Was he

1                    J. WASHINGTON

2    available?

3         A.    Was he available?  I don't

4    remember.  I'm drawing a blank.

5         Q.    Okay.  Did you meet with him

6    right away?

7         A.    No, I don't -- no.

8         Q.    What was your initial thought

9    upon reading his complaint?

10        A.    That I need to reach -- I need

11   to talk to him and I need to get with HR.

12        Q.    And when did you get with HR?

13        A.    Uh, immediately.

14             MS. O'CONNELL:  This is 12.

15             (Whereupon, J.W. Exhibit 12,

16         TDF 159 through 160, was marked for

17          identification as of this date by the

18          reporter.)

19        Q.    Take a moment to review that.

20   I've handed you what's been marked as J.W.

21   Exhibit 12, TDF 159 through 160.

22        A.    Okay.

23        Q.    Is this consistent with the

24   document that you received that day when

25   you found a letter marked urgent in your

1                        J. WASHINGTON
2    mailbox?
3         A.    Yes.
4         Q.    And when you read it, did you
5    believe this was an allegation of sexual
6    harassment?
7         A.    Yes.
8         Q.    And when you eventually met
9    with my client, Mr. Brooks, did you hear a
10   recording?
11        A.    No.
12        Q.    Did you ever hear a recording
13   made by my client?
14             MR. BARTOLOMEO:  Objection.
15        A.    Outside of meeting with the --
16   yes, I did.
17        Q.    When did you hear a recording?
18        A.    Much, much later.
19        Q.    Like a few days later or how
20   much later?
21        A.    It's been a couple years.  I'm
22   trying to remember.
23        Q.    Maybe this could refresh your
24   recollection, Exhibit 13.
25        A.    I believe I heard it when HR

```
 1                    J. WASHINGTON
 2    and myself sat with him.
 3          Q.     Okay.
 4                 (Whereupon, J.W. Exhibit 13,
 5          TDF 172 through 174, was marked for
 6          identification as of this date by the
 7          reporter.)
 8          Q.     I'm handing you what's been
 9    marked as J.W. Exhibit 13, Bates stamped
10    TDF 172 through 174.  Do you recognize this
11    document?
12          A.     Yes.
13          Q.     What is it?
14          A.     It's a detailed account of when
15    HR and myself sat with Mr. Brooks.
16          Q.     Do you know who drafted this
17    document?
18          A.     It was either Kenise or Eunice.
19          Q.     Were both of them in the room
20    at this time?
21          A.     No.
22          Q.     And this is when he played you
23    the recording or a recording?
24                 MR. BARTOLOMEO:  Objection.
25                 MS. BAUER:  Why don't you had
```

1                    J. WASHINGTON

2          take a few minutes and read it.

3          A.    Okay.  So, he did play the

4    recording.

5          Q.    When you heard the recording,

6    what did you think?

7          A.    That it wasn't conclusive.

8    There was a lot of silence.

9          Q.    So at that time, you didn't

10   know one way or the other?

11         A.    Right.

12               MS. BAUER:  Objection to form.

13               MR. BARTOLOMEO:  Objection.

14         Q.    Did he seem genuine during the

15   interview when you met him?

16               MR. BARTOLOMEO:  I assume

17         you're talking about Brooks?

18               MS. O'CONNELL:  Yes,

19         Mr. Brooks.

20         A.    Honestly, I don't know.

21         Q.    Okay.  If I played you the

22   recording, would you recognize it?

23         A.    Yes.

24               MS. O'CONNELL:  Are we

25         stipulating to the recording or --

1              J. WASHINGTON

2              MS. BAUER:  You could play it

3        for him.

4              MR. BARTOLOMEO:  Just tell the

5        court reporter which recording it is

6        just so --

7              MS. O'CONNELL:  Yes.  And I

8        guess we're marking this as

9        Exhibit 14.

10             (Whereupon, J.W. Exhibit 14,

11        electronic audio file named Terry 3,

12        was marked for identification as of

13        this date by the reporter.)

14             (Audio being played.)

15             MR. BARTOLOMEO:  What's the

16        name of the recording so I have it?

17             MS. O'CONNELL:  Terry 3.

18        Q.    Does that recording refresh

19   your recollection of what you heard during

20   that meeting?

21        A.    Yes.

22        Q.    Does it seem like the exact

23   same recording?

24        A.    Yes.

25        Q.    And is that Terry Cooper's

                    J. WASHINGTON

1

2    voice on the recording?

3        A.    Yes.

4        Q.    And is that my client Gregory

5    Brooks' voice on the recording?

6        A.    Yes.

7        Q.    Did you listen to that

8    recording before you met with Mr. Cooper?

9              MS. BAUER:  Object to the form.

10       A.    Yes.

11       Q.    At the time, what was

12   Mr. Cooper's position in The Doe Fund?

13       A.    Dispatcher.

14       Q.    And what are the duties

15   involved being dispatcher?

16       A.    To make sure the crews get out

17   on time, make sure all routes are manned

18   properly.

19       Q.    Is it typical for the

20   dispatcher to go to the residents' area of

21   where The Doe Fund participants are living?

22       A.    No.

23       Q.    Is it prohibited?

24             MR. BARTOLOMEO:  Objection.

25       A.    No.

1                    J. WASHINGTON

2          Q.     Would you just say it's

3     unusual?

4                 MR. BARTOLOMEO:  Objection.

5          A.     No.

6          Q.     Is it necessary for the

7     dispatcher to go to the residents' area?

8                 MR. BARTOLOMEO:  Objection.

9          A.     Sometimes.

10         Q.     Would maneuvering a

11    participant's schedule necessitate the

12    dispatcher to go to a participant's

13    bedroom?

14                MS. BAUER:  Objection.

15                MR. BARTOLOMEO:  Objection.

16         A.     No.

17         Q.     Did Mr. Cooper, as dispatcher

18    of The Doe Fund at the Gates Ave facility,

19    have access to my client's cellphone number

20    to call him?

21         A.     I don't know.

22         Q.     If a participant has a

23    cellphone, would the Doe Fund have their

24    cellphone number?

25         A.     Yes.

1          J. WASHINGTON

2     Q.    What sort of Doe Fund employees

3     at the Gates Ave facility would regularly

4     go to the residents' area where the

5     participants are living?

6          MR. BARTOLOMEO:  Objection.

7     A.    Case managers, myself, the

8     social director and housekeeping staff and

9     sometimes dispatchers.

10     Q.    Are the doors in the residents'

11     area typically open or shut, or does it not

12     matter?

13     A.    Typically closed.

14     Q.    Are they typically locked?

15     A.    It depends on the trainee.

16     Q.    Is there any policy about

17     whether a trainee could lock their door?

18     A.    No specific policy, no.

19     Q.    So they're allowed to lock it?

20     A.    Yes.

21     Q.    In the recording, we hear

22     Mr. Cooper knock on the door and he asked

23     why the door was locked?

24          MS. BAUER:  Objection.

25          MR. BARTOLOMEO:  Objection to

1                    J. WASHINGTON

2          form.  I think you're talking about a

3          different recording.  The one you

4          played that has nothing to do with

5          him locking the door.

6                    MS. O'CONNELL:  If we could go

7          off the record.

8                    MR. BARTOLOMEO:  Yes, my

9          apologies.

10                   (Whereupon, a discussion was

11         held off the record.)

12         Q.    And you can correct me if I'm

13   wrong because I've never been there, but we

14   hear a knock at the door and it seems like

15   the door opened because there's more

16   outside or -- noises, seemingly after the

17   knocks on the door and then those noises go

18   away.  Is that because they're noises in

19   the hall outside the bedrooms?

20         A.    Yes.

21         Q.    And what sort of activity or

22   noises is going on outside the bedroom in

23   the hall?

24                   MS. BAUER:  Objection.

25                   MR. BARTOLOMEO:  Objection.

1                  J. WASHINGTON

2        A.    I don't know.  I wasn't there.

3        Q.    Do you know of any deadline

4   that a dispatcher needed to submit changes

5   into the system, if he was changing a

6   participant's schedule?

7              MR. BARTOLOMEO:  Objection.

8        A.    Rephrase that.

9        Q.    I'm sorry.  Is there any

10  deadline that a Doe Fund dispatcher would

11  have to monitor if they're going to make a

12  change to a participant's schedule?

13       A.    Dispatchers don't change the

14  schedules.  They have to kick it up to the

15  deputy director of CIP for changes.

16       Q.    Would there be any reason for

17  Cooper to have to -- I guess, essentially,

18  to rush the process, to get it done that

19  morning?

20       A.    Well, it depends on what day it

21  was.  If it was a Thursday or a Friday, the

22  changes have to be submitted before the

23  crew sheet is locked.

24       Q.    And when is the crew sheet

25  locked?

1                    J. WASHINGTON

2          A.    The crew sheet is locked on

3    Friday mornings before 12:00.

4          Q.    Okay.  Did you listen to any

5    other recordings besides that one?

6          A.    No.

7                MS. BAUER:  Can we take a short

8          break?

9                MS. O'CONNELL:  Yes.

10               (Whereupon, a brief recess was

11         taken.)

12               (Whereupon, J.W. Exhibit 15,

13         TDF 169 through 171, was marked for

14         identification as of this date by the

15         reporter.)

16         Q.    I've placed in front of you

17   what has been marked as J.W. 15.

18         A.    No.  This is 15.

19         Q.    Yes, that's 15.  It looks very

20   similar to the one we just went over.

21               MS. BAUER:  Yes, she --

22         A.    Oh, this one?

23         Q.    Yes.

24               MS. BAUER:  It's a new one.

25         Q.    It's a new one.

1                    J. WASHINGTON

2        A.    Oh.

3        Q.    I'll give you more time.  Let

4   me know if you recognize the document.  15

5   is Bates stamped TDF 169 through 171.

6        A.    Okay.

7        Q.    Do you recognize the document?

8        A.    Yes.

9        Q.    And what is it?

10       A.    What is it?

11       Q.    What is the document?

12       A.    It's an account of the meeting

13  that we had with Terry Cooper.

14       Q.    And do you know who created

15  this document?

16       A.    Eunice Gilmore.

17       Q.    And at the top where it says

18  present in the meeting with Terry Cooper,

19  was that everyone that was there that day?

20       A.    Yes.

21       Q.    And Elizabeth Hanson, where

22  does she work?

23       A.    Her office was at 102nd Street.

24       Q.    And the director of fleet

25  services, where does he work out of?

1                    J. WASHINGTON

2          A.     He works out of Harlem.

3          Q.     Why was he there that day?

4          A.     Because Craig Trotta, who

5    oversees CIP, was on vacation, so when

6    Craig's on vacation, Sal is the next person

7    in charge.

8          Q.     And before you started asking

9    Mr. Terry Cooper some of these questions

10   that are in bold in this document, did he

11   have a chance to read over the complaint?

12               MR. BARTOLOMEO:  Objection.

13         A.     I'm not sure.

14         Q.     Do you remember any -- do you

15   remember anything notable based on your

16   interview with Mr. Terry Cooper?

17               MS. BAUER:  Objection.

18               MR. BARTOLOMEO:  Objection.

19         A.     I'm not sure what you mean by

20   notable.

21         Q.     Was there anything that seemed

22   to be a discrepancy between what Mr. Cooper

23   was saying and what Mr. Brooks was saying?

24         A.     Yes.

25         Q.     And what was that?

1                    J. WASHINGTON

2          A.    The basics of both accounts

3    were the same, but the description of what

4    Brooks claimed happened and what Terry

5    claimed happened were totally different.

6          Q.    Did you think it was odd that

7    Terry didn't remember exactly what day this

8    happened?

9                 MR. BARTOLOMEO:  Objection.

10         A.    No.

11         Q.    And when Terry was asked if

12   anyone else was present while he was

13   discussing the changes -- that's the second

14   page -- do you know who Robert Frager is?

15         A.    Robert Frager.

16         Q.    Frager.

17         A.    He was a client.

18         Q.    Is he now a Doe Fund employee?

19         A.    No.

20         Q.    Did he ever become a Doe Fund

21   employee?

22         A.    No.

23         Q.    Do you remember what Terry said

24   is the reason why he went up to the

25   residential area a second time?

1                    J. WASHINGTON

2          A.    I honestly don't recall.

3          Q.    On the last page of the

4    document where it says in bold and

5    underline, Recap of details regarding

6    Terry's trips upstairs to Gregory's room,

7    if you look at the second -- I guess it's

8    the third paragraph -- there isn't a space

9    in between the second and third

10   paragraph -- but where it says, Terry then

11   stated, can I say something, question mark,

12   do you see that?

13         A.    Yes.

14         Q.    Do you remember when this

15   happened and what he said?

16         A.    This is pretty accurate.

17         Q.    When he is saying, "If I am

18   guilty of one thing, is that I bring

19   laughter to the building.  Yes, I am

20   loud!,", what did you take him to mean that

21   as?

22         A.    I mean, Terry has the kind of

23   voice that carries.  I mean, he's loud in

24   that way.

25         Q.    Is he loud in any other way?

1                    J. WASHINGTON

2          A.    No.

3          Q.    When he says, "I wake people up

4    with jokes," what does he mean by jokes?

5                MS. BAUER:  Object to the form.

6                MR. BARTOLOMEO:  Objection.

7          A.    I don't know.

8          Q.    Have you ever heard Mr. Cooper

9    make a joke?

10         A.    No.

11         Q.    Even something that could be, I

12   guess, taken as a joke, as if you don't

13   think it's funny?

14               MR. BARTOLOMEO:  Objection.

15         A.    No.

16         Q.    And he says -- the next item

17   line -- next line down, "Now I have been

18   told to watch my hands," that was him

19   saying that or who -- was this a Doe Fund

20   supervisor at the meeting asking him this

21   or this is what Terry Cooper was saying?

22               MS. BAUER:  Objection.

23               MR. BARTOLOMEO:  Objection.

24         A.    That's what Terry was saying.

25         Q.    So, he was saying, "Now I have

1                    J. WASHINGTON

2    been told to watch my hands," yes?

3         A.    Correct, yes.

4         Q.    Was he referring to prior to

5    the meeting that day, he's been told to

6    watch --

7              MS. BAUER:  Objection.

8              MR. BARTOLOMEO:  Objection.

9         Q.    -- his hands?

10        A.    I don't know what he was

11   referring to or when he was referring to.

12        Q.    At this point of the meeting

13   with Terry Cooper, did anyone else in the

14   room tell him to watch his hands?

15        A.    No.

16        Q.    And the next line down, was

17   this also what Terry Cooper said during the

18   meeting?

19        A.    Which line?

20        Q.    "Do I have a habit of touching

21   people when I talk?  Yes.  But even with

22   jokes, if someone says, quote, hey, Terry

23   like don't stay that to me or don't joke

24   around with me like that, question mark, I

25   apologize and that won't ever happen again.

```
 1                  J. WASHINGTON
 2    They don't have to worry about me because
 3    I'll be just like hi and bye from that
 4    point."
 5              MS. BAUER:  Objection.
 6              MR. BARTOLOMEO:  Objection.
 7         A.    So, your question was?
 8         Q.    Was that something that Terry
 9    said at the meeting?
10         A.    Yes.
11         Q.    And that's how you -- you
12    basically remember him saying it?
13         A.    Yes.
14         Q.    And what we just went over, the
15    added statements by Terry, these were just
16    statements he volunteered?
17              MR. BARTOLOMEO:  Objection.
18         A.    I believe he volunteered them
19    in answering a question.
20         Q.    When you were interviewing
21    Terry Cooper that day, along with the other
22    Doe Fund supervisors, did you know that --
23    at that time of the 2013 allegation of
24    sexual harassment?
25              MS. BAUER:  Objection to form.
```

1                    J. WASHINGTON

2            MR. BARTOLOMEO:  Objection.

3       A.    No.

4       Q.    To your knowledge, did anyone

5  else at the meeting know of the 2013

6  allegation of sexual harassment?

7            MS. BAUER:  Objection.

8       A.    I wouldn't know.

9       Q.    Do you know what happened --

10  what was done with the -- that

11  investigative documentation after it was

12  written up?

13       A.    No.

14       Q.    Did you receive a copy?

15       A.    No.

16       Q.    And then after that, Craig

17  Trotta became involved in the sexual

18  harassment allegations being made by my

19  client?

20            MS. BAUER:  Objection.

21            MR. BARTOLOMEO:  Objection.

22       A.    I'm not sure who became

23  involved.

24       Q.    What was your involvement after

25  the investigation interview with my client

1                    J. WASHINGTON

2    and Terry Cooper on those days?

3         A.    There was no other involvement.

4         Q.    What is your understanding of

5    what happened afterwards?

6         A.    In regards to?

7         Q.    The investigation.

8         A.    I don't know.  They didn't

9    include me in that.

10        Q.    Did you see Terry Cooper after

11   that interview?

12        A.    No.

13        Q.    When did you first learn that

14   Mr. Cooper was terminated?

15        A.    I can't recall.

16        Q.    Would you typically be involved

17   in the termination of an employee under

18   circumstances like the ones my client's

19   alleging?

20             MR. BARTOLOMEO:  Objection.

21        A.    If that person was somebody

22   that I supervised.

23        Q.    Did my client follow the

24   appropriate procedures for making his

25   complaint?

1                    J. WASHINGTON

2              MR. BARTOLOMEO:  Objection.

3         A.    Yes.

4         Q.    Was there anything else he

5    could have done as far as bringing to The

6    Doe Fund's attention his allegations of

7    sexual harassment?

8              MS. BAUER:  Objection.

9         A.    No.

10        Q.    To your knowledge, did he

11   cooperate with the investigation?

12        A.    Your client or --

13        Q.    My client.

14        A.    I really don't know.

15             MS. O'CONNELL:  Exhibit 16.

16             (Whereupon, J.W. Exhibit 16,

17        Sexual Harassment Policy, was marked

18        for identification as of this date by

19        the reporter.)

20        Q.    Do you recognize this document?

21             MS. O'CONNELL:  I've handed

22        Mr. Washington what's been marked as

23        J.W. Exhibit 16, Bates stamped TDF

24        196 through 197.

25        A.    Yes.

                         J. WASHINGTON

1

2       Q.      What is it?

3       A.      It's The, uh, Doe Fund sexual

4   harassment policy.

5       Q.      Was this sexual harassment

6   policy in effect at the time of my client's

7   claims of sexual harassment?

8       A.      Yes.

9       Q.      In your opinion, does The Doe

10  Fund live up to its policy of zero

11  tolerance for harassment?

12      A.      Yes.

13      Q.      And why do you say that?

14      A.      I mean, I can only go by the --

15  this allegation, and it seems to me

16  everything has been followed to the letter,

17  as far as my involvement goes.

18      Q.      Can you make the same opinion

19  based on the allegations of sexual

20  harassment made against Terry Cooper in

21  2013?

22              MS. BAUER:  Objection.

23              MR. BARTOLOMEO:  Objection.

24      A.      I can't speak to that one

25  because I don't know.

1                    J. WASHINGTON

2          Q.    In this section where it's

3    discussing equal employment opportunity

4    workplace harassment policy, the last

5    paragraph discusses prohibiting

6    retaliation.  Was that in the policy in

7    2016 also?

8          A.    Which paragraph?

9          Q.    The very last paragraph.

10         A.    What page?  The last page?

11         Q.    Yes.  Sorry.

12         A.    Can you repeat the question?

13         Q.    To your understanding, did The

14   Doe Fund also prohibit in their employee

15   handbook retaliation as it states in this

16   paragraph?

17         A.    Yes.

18         Q.    And did you receive training in

19   retaliation?

20         A.    Yes.

21         Q.    Is that a part of The Doe Fund

22   standard training on workplace

23   discrimination?

24              MS. BAUER:  Object to the form.

25              You can answer.

                    J. WASHINGTON

1

2          A.     Yes.

3          Q.     Are you aware that my client

4    recorded you on two occasions -- two or

5    more occasions while he was living at The

6    Doe Fund?

7          A.     You mean outside of what I

8    discussed with my attorneys, no.

9          Q.     Have you listened to those

10   recordings?

11         A.     With my attorneys?

12                MS. BAUER:  You can answer.

13         A.     Yes.  Yeah.

14         Q.     I'm going to play you what I

15   believe are the recordings you've already

16   listened to, so you can identify yourself

17   and authenticate those recordings.

18         A.     Okay.

19         Q.     I assume that you listened to

20   the recordings in whole.  If you really

21   need me to play the whole thing, we can.

22   I'll play you a part so you can let me know

23   if you listened to this specific recording.

24         A.     Okay.

25         Q.     But it should be the exact same

```
1                    J. WASHINGTON
2    recordings that were produced to your
3    client.
4              MS. BAUER:  I just want to say
5              on the record that even if he
6              recognizes his voice on the
7              recording, I don't know that it's
8              authentication under the federal
9              rules.
10             MS. O'CONNELL:  Okay.
11             MS. BAUER:  So just note my
12             objection.
13             MR. BARTOLOMEO:  I join in that
14             as well.  I mean, I guess, because
15             you don't want to cue or tip anything
16             off, we could wait to have the names
17             of the recordings given until after
18             the question has been posed,
19             assuming.  I mean, I don't remember
20             what the names are, but I'm saying,
21             for purposes of the questions, I
22             think it would be more fair, but at
23             the end, could you just tell us which
24             recording as well so I have it for my
25             record?
```

```
 1                  J. WASHINGTON
 2              (Audio being played.)
 3              MS. O'CONNELL:  Yes.  I'll mark
 4         this as Exhibit 17, this recording?
 5              MR. BARTOLOMEO:  Yes, it's 17.
 6              MS. O'CONNELL:  In our
 7         stipulation, I'm also going to
 8         hopefully have a compiled list of
 9         which recordings were for this office
10         so we can make sure they're kept
11         track of.
12              (Whereupon, J.W. Exhibit 17,
13         electronic audio file labeled
14         Mr. Washington on Vernon schedule,
15         was marked for identification as of
16         this date by the reporter.)
17              (Audio being played.)
18         Q.    Whose voice is on the recording
19    speaking currently?
20         A.    Me.
21         Q.    Have you recognized any other
22    voices yet?
23         A.    Gregory Brooks.
24         Q.    Do you recall what you were
25    discussing at this time?
```

1                    J. WASHINGTON

2          A.    Yes.

3          Q.    And what is that?

4          A.    Um, his allegation and the

5     investigation.

6          Q.    Have you listened to this

7     recording recently?

8          A.    I don't think so.

9          Q.    Okay.  I'll continue playing it

10    for you.

11                (Audio being played.)

12         Q.    And who was it that you were on

13    the phone with?

14         A.    Albert Bell.

15         Q.    Albert Bell?

16         A.    Yes.

17         Q.    And who is he?

18         A.    Dispatcher.

19         Q.    Dispatcher where?

20         A.    Gates.

21         Q.    So, there's more than one

22    dispatcher at Gates?

23         A.    Well, yeah, there has to be

24    because Terry couldn't work, you know,

25    seven days straight.  So, we have to have a

1                    J. WASHINGTON
2        fill-in.
3              Q.    And do you recall when you made
4        this phone call and had this discussion
5        with my client?
6              A.    No.
7              Q.    Was it soon after he made the
8        complaint of sexual harassment to you?
9                    MR. BARTOLOMEO:  Objection.
10             A.    Yes.
11             Q.    Could it be that same day?
12             A.    I don't know.
13             Q.    But somewhere between a few
14       hours after learning of the complaint and a
15       week?
16                   MR. BARTOLOMEO:  Objection.
17             A.    It was within a week.
18             Q.    Okay.
19             A.    It was within a few days.
20             Q.    Okay.  At this time, was my
21       client concerned about his work schedule?
22                   MS. BAUER:  Object to the form.
23             A.    Yes.
24             Q.    Do you recall why he was
25       concerned?

1                    J. WASHINGTON

2          A.    He needed weekends off to be

3    with his kids, and so we were trying to

4    work it out where he could have the

5    weekends off.

6          Q.    Is that something that The Doe

7    Fund typically attempts to do?

8          A.    For those clients -- we stress

9    family reunification, so, yeah, that is

10   something that we do.

11         Q.    So as my client being a father

12   of two, that was a factor in trying to

13   allow him to have the weekends off?

14         A.    Yes.

15         Q.    Do you recall if you were able

16   to make that happen?

17         A.    I don't remember.

18         Q.    Do you recall, at least at that

19   time in 2016, what the policy was for

20   participants where family reunification was

21   a goal, were they allowed to have late

22   nights?

23         A.    No, not the family

24   reunifications.

25         Q.    Was there any other sort of

1                  J. WASHINGTON
2    late night or weekend benefit tied to the
3    goal of family reunification?
4         A.    It pretty much depended on the
5    length of time in program.
6         Q.    Do you recall my client, after
7    he made his complaints of sexual
8    harassment, complaining that he was being
9    retaliated against?
10        A.    No.
11        Q.    Do you recall if after he made
12   his complaints of sexual harassment, making
13   complaints that his schedule wasn't being
14   properly maintained?
15             MS. BAUER:  Objection.
16        A.    No.  What I do remember is him
17   complaining that he felt as though people
18   were looking at him differently.
19        Q.    Would it be a part of The Doe
20   Fund's policy when claims of sexual
21   harassment are made like the ones my client
22   made, to keep that contained so that other
23   participants or employees do not find out?
24             MS. BAUER:  Objection to form.
25             MR. BARTOLOMEO:  Objection.

1                    J. WASHINGTON

2          A.     It is contained.

3          Q.     Okay.  Was his situation

4     contained, the one that he alleged?

5               MS. BAUER:  Objection.

6          A.     On my part, yes.

7          Q.     Did you hear of his allegations

8     of sexual harassment somehow being

9     contained?

10               MS. BAUER:  Objection.

11          A.     No.

12          Q.     Do you recall my client having

13     difficulties with -- and you can correct me

14     if I'm wrong -- if I'm phrasing this

15     wrong -- but returning to the Gates Ave

16     facility or entering the facility?

17          A.     What do you mean entering the

18     facility?

19          Q.     For instance, if he alleges

20     that he wasn't allowed back in the facility

21     after a certain time and there was a

22     problem with the system that made it so he

23     wasn't allowed to return at certain times

24     of the day.

25               MS. BAUER:  Object to the form.

1                    J. WASHINGTON

2              MR. BARTOLOMEO:  I join in that

3         objection.

4         A.    The only reason he would have

5    had difficulty returning after curfew is

6    because he violated curfew.

7         Q.    Are there circumstances where a

8    Doe Fund supervisor can essentially give a

9    free pass on curfew so that --

10        A.    No.

11        Q.    Okay.  In the recording you

12   just listened to, was there anyone else

13   that was a part of the conversation in that

14   recording?

15        A.    The part that I heard, it was

16   only me, Brooks, and then I talked to Bell

17   on the phone.

18              MR. BARTOLOMEO:  Are you done

19         with that one?

20              MS. O'CONNELL:  Yes.  I'm done

21         with that one.

22              MR. BARTOLOMEO:  Could you just

23         tell me what the name of that one is?

24              MS. O'CONNELL:  Mr. Washington

25         on Vernon schedule.

                        J. WASHINGTON
1
2                  MR. BARTOLOMEO:  Vernon,
3          V-E-R-N-O-N, right?
4                  MS. O'CONNELL:  Yes.
5                  I'm now going to play what
6          we'll mark as Exhibit --
7                  MR. BARTOLOMEO:  18.
8                  MS. O'CONNELL:  -- 18.
9          Mr. Wash -- it's just Wash, not
10         Washington -- lost bed.
11                 (Whereupon, J.W. Exhibit 18,
12         electronic audio file labeled
13         Mr. Wash lost bed, was marked for
14         identification as of this date by the
15         reporter.)
16                 (Audio being played.)
17         Q.    Do you recognize anyone's
18  voices on that recording?
19         A.    It was mine, Mr. Brooks, and
20  James Stevens.
21                 MS. O'CONNELL:  Can we take a
22         five-minute break real quick?
23                 MS. BAUER:  Yes.
24                 (Whereupon, a brief recess was
25         taken.)

1                    J. WASHINGTON

2          Q.    I'm now going to be playing

3    what we're marking as Exhibit 19.

4                    (Whereupon, J.W. Exhibit 19,

5              electronic audio file, was marked for

6              identification as of this date by the

7              reporter.)

8                    (Audio being played.)

9          Q.    Do you recall this meeting with

10   Mr. Brooks?

11         A.    Yes.

12         Q.    And was anyone else there at

13   that meeting?

14         A.    I believe it was just me and

15   him.

16         Q.    And what we're hearing in

17   Exhibit 19 as you and Mr. Brooks in the

18   recording?

19         A.    Yes.

20                  MR. BARTOLOMEO:  Which one is

21              it?

22                  MS. O'CONNELL:  That's

23              Mr. Washington.  And it's also

24              Plaintiff's Exhibit 12, to my

25              recollection.

1                    J. WASHINGTON

2        Q.    And I'm just going to play you

3    a few more just for the purposes of

4    identifying the individuals on the

5    recordings, at least the speakers.  One

6    moment, please.

7              MR. BARTOLOMEO:  So you're

8         marking this as J.W. 20?

9              (Whereupon, J.W. Exhibit 20,

10        electronic audio file labeled Greene

11        discusses Terry, was marked for

12        identification as of this date by the

13        reporter.)

14             MS. O'CONNELL:  Yes.

15        Q.    Do you recognize the individual

16   in this recording?

17        A.    Brooks is the only one I

18   recognize.

19             (Audio being played.)

20        Q.    Do you recognize that person

21   yet?

22        A.    No.

23        Q.    And you still don't recall who

24   that person is yet?

25        A.    No.

                    J. WASHINGTON

 1

 2              MR. BARTOLOMEO:  What's the

 3         name of the recording?

 4              MS. O'CONNELL:  Greene

 5         discusses Terry.

 6         Q.    Do you know a Timothy Greene?

 7         A.    Yes.

 8         Q.    Who is he?

 9         A.    He was a resident at Gates

10    Avenue.

11         Q.    Would you say the recording you

12    just listened to is an accurate

13    representation of Mr. Greene's voice?

14              MS. BAUER:  Objection to form.

15              MR. BARTOLOMEO:  Objection.

16         A.    No.

17         Q.    Why is that?

18         A.    I know of a few people that

19    sound pretty much exactly like him, like

20    that voice.  That's why I couldn't be sure

21    who it was.

22         Q.    But it -- it wouldn't surprise

23    you if that was Mr. Greene's voice

24    because --

25              MS. BAUER:  Objection.

1                    J. WASHINGTON

2                    MR. BARTOLOMEO:  Objection.

3          A.    It could be Greene and it could

4     also be somebody else.

5          Q.    And those other few people are

6     also either Doe Fund employees or were Doe

7     Fund residents?

8          A.    Yes.

9                    MR. BARTOLOMEO:  Off the

10              record.

11                  (Whereupon, a discussion was

12              held off the record.)

13                  MS. O'CONNELL:  This is Exhibit

14              J.W. 21.

15                  (Whereupon, J.W. Exhibit 21,

16              electronic file labeled Mr. Bailey or

17              Mr. Bailey, "They're fucking raping

18              people here", was marked for

19              identification as of this date by the

20              reporter.)

21         Q.    At any point, if you believe

22    you recognize the person, let me know.

23         A.    Okay.

24                  MR. BARTOLOMEO:  Off the

25              record.

```
 1                    J. WASHINGTON
 2                (Whereupon, a discussion was
 3         held off the record.)
 4                (Audio being playing.)
 5          Q.    Do you recognize the person in
 6  that recording?
 7          A.    No.
 8          Q.    Do you know who Mr. Bailey is?
 9          A.    William Bailey?
10          Q.    Was William Bailey an employee
11  of The Doe Fund in 2016?
12          A.    No.
13          Q.    Was he a resident with The Doe
14  Fund?
15          A.    Yes.
16          Q.    And how long was he a resident
17  of The Doe Fund?
18          A.    Almost two years.
19          Q.    Why was he a resident for so
20  long?
21          A.    Mr. Bailey was an older
22  gentleman.  He spent almost 30 years
23  incarcerated and it was difficult for him
24  to adjust.
25          Q.    And who is Ronald Holly?
```

1                     J. WASHINGTON

2          A.    Ronald Holly was a deputy

3     director of CIP.

4          Q.    And how long did he work for

5     The Doe Fund?

6          A.    I don't know.

7          Q.    Going back to Mr. Greene, who I

8     mentioned earlier, do you know if he's a

9     Doe Fund employee?

10         A.    Yes, he is.

11         Q.    And where does he work?

12         A.    I'm not sure of his location,

13    but he works for EDC.

14         Q.    EDC?

15         A.    Yes, Economic Development

16    Corporation.

17         Q.    And that's a part of The Doe

18    Fund?

19         A.    We partner with them, yes.

20         Q.    Do you know what his position

21    is?

22         A.    No, I don't.

23         Q.    What does EDC do?

24         A.    They do various things.  They

25    would remove graffiti and other things that

1                    J. WASHINGTON

2    I'm not too familiar with.

3            Q.    And do you know an Anthony

4    Marshall?

5            A.    Yes.

6            Q.    And who is that?

7            A.    He is currently a trainee in

8    our program.

9            Q.    Okay.  How long has he been in

10   the program?

11           A.    This is his second stint with

12   us.  He's been with us maybe six -- six

13   months, maybe.

14           Q.    Was he in the program when

15   Mr. Brooks was there?

16           A.    Yes.

17           Q.    Why is it his second stint in

18   the program?

19           A.    I'm not sure of why he left the

20   first time.  Um, it -- he left, he got

21   involved with substances, he went through

22   rehab and he asked to come back.  And at

23   that time, we were expecting one of our

24   guys to move out, so when the trainee moved

25   out, we brought Mr. Marshall back.

```
 1                    J. WASHINGTON
 2         Q.    And who is Mr. Wiggins at the
 3   Gates Ave facility?
 4         A.    There is no Mr. Wiggins there
 5   now.
 6         Q.    What was his position in 2016?
 7         A.    He was the deputy director of
 8   CIP.
 9         Q.    And what does that entail?
10         A.    Pretty much, um, overseeing the
11   routes, uh, managing the bids, uh, making
12   sure trainees' schedules and routes are
13   coordinated.
14              MS. BAUER:  What was the name
15          of that tape with the --
16              MR. BARTOLOMEO:  21.
17              MS. BAUER:  21?
18              MS. O'CONNELL:  Mr. Bailey --
19          it's either called just Mr. Bailey or
20          Mr. Bailey, quote, "They're fucking
21          raping people here."
22              This is 22.
23              (Whereupon, J.W. Exhibit 22,
24          copy of the case notes for Gregory
25          Brooks, was marked for identification
```

                        J. WASHINGTON

1

2          as of this date by the reporter.)

3          Q.     I'm handing you what's been

4   marked as J.W. 22, Bates stamped TDF 9

5   through TDF 23.  Do you recognize this

6   document?

7          A.     Yes.

8          Q.     What is it?

9          A.     It's a copy of the case notes

10  for Gregory Brooks.

11         Q.     And is this an accurate

12  description of case notes for all

13  participants in the Ready, Willing & Able

14  program?

15         A.     Yes.

16         Q.     Are case notes also used for

17  Doe Fund employees that are not in the

18  Ready, Willing & Able program?

19         A.     No.

20         Q.     Okay.  And who has access to, I

21  guess, modify the case notes?

22         A.     Case manager, the associate

23  director, and myself.

24         Q.     And, so, in the top, I guess in

25  that dark column, it says posted by, and a

1               J. WASHINGTON

2    lot of them are by O'Neill Young.  Who is

3    that?

4         A.    He was a case manager.

5         Q.    And it also says, last modified

6    in the column at the top.  Is that because

7    you or other supervisors can then modify

8    the entries?

9         A.    Yes.

10        Q.    Okay.  And under what

11   circumstances would you modify the entries?

12        A.    Let's say in certain cases, if

13   there's -- for example, on 7/13, the

14   initial entry was by O'Neill Young.  But if

15   there was another -- another interaction

16   with the client, with the trainee on that

17   same date, we would enter that information

18   in that same case number.

19        Q.    And were these notes created,

20   essentially in a timely manner,

21   concurrently with events happening with my

22   client or his case?

23        A.    Yes.

24        Q.    And does it seem to be all of

25   the notes or case notes for my client from

1                    J. WASHINGTON
2    the time he entered The Doe Fund until he
3    left?
4              MS. BAUER:  Objection to form.
5              You can answer.
6         A.    I haven't looked at all of
7    them.  Yes.
8         Q.    Would these case notes also
9    include when my client would make
10   complaints -- any sort of complaint?
11        A.    Yes.
12             MS. O'CONNELL:  23.
13             (Whereupon, J.W. Exhibit 23,
14        Bates stamp TDF 86 through 141, was
15        marked for identification as of this
16        date by the reporter.)
17        Q.    I'm handing you what's been
18   marked as J.W. Exhibit 23, Bates stamped
19   TDF 86 through 141.  Do you recognize this
20   group of documents?
21        A.    Yes.
22        Q.    What is it?
23        A.    These are logs of the passes
24   that Gregory Brooks received.
25        Q.    I understand there may be

1          J. WASHINGTON

2     different versions of passes, but could you

3     tell me the different versions of passes?

4          A.     Instead of the case manager

5     putting in a late pass every night that a

6     client's going to be working, he would put

7     in a multiuse late pass.  That's the

8     difference between a late pass and a

9     multiuse.

10          Q.     And what's the difference

11     between the multiuse late -- in the late

12     pass and the overnight pass?  I see

13     overnight pass is towards the bottom.

14          A.     Right.  The overnight ends at

15     5:00 a.m.

16          Q.     Okay.  The late pass ends at?

17          A.     Late pass ends at either

18     2:00 -- well, 2:00 or 3:00.

19          Q.     And the multiuse late -- on the

20     individual, I guess, long entry contained

21     later in the document, would that say the

22     start and end date for that multiuse pass?

23          A.     All passes would have the start

24     and end date.

25          Q.     Are there circumstances where a

```
 1                    J. WASHINGTON
 2    client is -- a client with a job that
 3    necessitates having a certain type of pass
 4    isn't in the system?
 5         A.    No.  DHS requirements are that
 6    every working client, if he works in the
 7    evening, he has to have a pass.
 8         Q.    Are there times at the Gates
 9    Ave facility when someone forgets to put
10    that in the system?
11         A.    No.
12         Q.    Do you recall any times when my
13    client wasn't in the system and he alleged
14    that he was supposed to be in the system
15    for working late?
16         A.    I don't recall.
17         Q.    And would there be passes in
18    this type of pass request log that would
19    differentiate him requesting passes for
20    seeing his family and passes he needed for
21    work?
22         A.    Rephrase that, please.
23         Q.    In this log of pass requests,
24    would there be the passes that he needed to
25    see his family also?
```

1                    J. WASHINGTON

2                    MS. BAUER:  You could look, if

3         you want.

4         A.    If a client wasn't working and

5    he needed a pass, there would be -- we

6    would have to document where the client

7    would be, with an address --

8         Q.    Would it --

9         A.    -- and a contact person.

10         Q.    Would it be different from this

11   set of pass --

12         A.    No.

13         Q.    Okay.  On the first page where

14   it says status, most of the entries are

15   approved.  Who approves those?

16         A.    It would either be myself, the

17   social director, or the evening house

18   manager.

19         Q.    And why would there be a pass

20   cancelled?

21         A.    If it was part of a multiuse

22   late pass or if the client was supposed to

23   go to work and then find out that the

24   client didn't have to work, then the pass

25   would be cancelled.

1                    J. WASHINGTON

2          Q.    Okay.  Have you understood all

3    of the questions I've asked you today?

4          A.    Yes.

5          Q.    Would you like to change any of

6    your prior answers?

7          A.    No.

8          Q.    Have you told me everything you

9    can tell me about Mr. Brooks' claims?

10         A.    Yes.

11         Q.    Okay.  Thank you very much.

12         A.    That's it?

13         Q.    Yes.

14              MR. BARTOLOMEO:  I have no

15         questions.

16              (Whereupon, at 5:23 p.m., the

17         Examination of this witness was

18         concluded.)

19

20              o        o        o        o

21

22

23

24

25

1                    J. WASHINGTON

2              D E C L A R A T I O N

3

4         I hereby certify that having been

5    first duly sworn to testify to the truth, I

6    gave the above testimony.

7

8         I FURTHER CERTIFY that the foregoing

9    transcript is a true and correct transcript

10   of the testimony given by me at the time

11   and place specified hereinbefore.

12

13

14   _____

                    JAMES WASHINGTON

15

16

     Subscribed and sworn to before me

17

     this _____ day of _____ 20___.

18

19

20   _____

          NOTARY PUBLIC

21

22

23

24

25

1                    J. WASHINGTON

2                    I N D E X

3

4   EXAMINATION BY                              PAGE

5   MS. O'CONNELL                               4

6

7      INFORMATION AND/OR DOCUMENTS REQUESTED

8                    (NONE)

9

10                 E X H I B I T S

11  J.W. EXHIBITS:

12  EXHIBIT    EXHIBIT                          PAGE

13  NUMBER     DESCRIPTION

14    1        Community Improvement
               Project Field Schedule    65
15    2        Work-To-Pay Hours         67
16    3        Comp Data                 72
17    4        Trainee Handbook          77
18    5        Trainee Statement         79
19    6        Trainee Weekly
               Evaluation Form           82
20
21    7        Trainee Terms of
               Participation             86
22    8        Incident Report           108
23    9        E-mail                    110
24

25      (EXHIBITS CONTINUED ON NEXT PAGE.)

1                    J. WASHINGTON

2                  E X H I B I T S

3

4    J.W. EXHIBITS:

5    EXHIBIT   EXHIBIT                          PAGE

6    NUMBER    DESCRIPTION

7    10        Investigative Interview
               Report                           114
8
     11        Memorandum                       121
9
     12        TDF 159 through 160              126
10
     13        TDF 172 through 174             128
11
     14        Electronic audio file
12             named Terry 3                    130

13   15        TDF 169 through 171             136

14   16        Sexual Harassment Policy    146

15   17        Electronic audio file
               labeled Mr. Washington
16             on Vernon schedule               151

17   18        Electronic audio file
               labeled Mr. Wash lost
18             bed                              158

19   19        Electronic audio file        159

20   20        Electronic audio file
               labeled Greene discusses
21             Terry                            160

22   21        Electronic audio file    162
               labeled Mr. Bailey or
23             Mr. Bailey, quote,
               "They're fucking raping
24             people here"

25        (EXHIBITS CONTINUED ON NEXT PAGE.)

1                        J. WASHINGTON

2                     E X H I B I T S

3

4    J.W. EXHIBITS:

5    EXHIBIT   EXHIBIT                          PAGE

6    NUMBER    DESCRIPTION

7
     22        Copy of the case notes
8              for Gregory Brooks           166

9    23        Bates stamp TDF 86           169
               through 141
10

11    (Exhibits retained by Court Reporter.)

12

13           QUESTIONS MARKED FOR A RULING

14                     (NONE)

15

16

17

18

19

20

21

22

23

24

25

1                    J. WASHINGTON

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK      )
                            :  SS.:
5    COUNTY OF BRONX        )

6

7         I, SCOTT TORRANCE, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 9th day of July 2018.

21

22

23          _Scott Torrance_

24   _____
                  SCOTT TORRANCE

25