FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 0 2 2020 ★

BROOKLYN OFFICE




JUN 03 2020

1

Wednesday, April 29, 2020

Dear Judge Chen,

My name is Gregory Brooks and I am the plaintiff in the case Gregory Brooks vs. THE DOE FUND, INC., JAMES WASHINGTON, and TERRY COOPER, I would like to directly introduce myself, as I have been having representation issues and am in need of legal representation. I am a laymen to the law so I hope in your wise understanding of that you do not prejudice me if I do not know the rules and procedures of the courts. I am a father and resident of the State of New York, I am employed with the Department of Parole threw a program AIM. I am a taxpaying citizen of the Federal Government and United States. I respectfully request that you reconsider your decision and allow a jury trial to proceed in the Federal Court for the following reasons:

Plaintiff was always under the impression that a Sexual Harassment suit was recognized by the courts from original Complaint of Plaintiff and all documents, files, recordings and evidence. Plaintiff was under the impression that a Title VII was filed with the courts. Plaintiff would like the opportunity to prove to the courts that plaintiff had no knowledge that Title VII was not filed through attorneys. Plaintiff would like the opportunity to argue that Plaintiff claim was always Sexual Harassment assault and battery and retaliation. Plaintiff was under the impression that Attorney was making these specific arguments to the courts.

**BACKGROUND**

RECEIVED
JUN 02 2020
PRO SE OFFICE

I.     **Relevant Facts**[1]
       **Plaintiff Response**

On July 17, 2016, Plaintiff allegedly observed an unspecified individual telling Defendant Cooper, "Get your ass out of here, Terry, you're holding us up," to which Cooper replied, "Everything you say has to do with my ass. I know you want some. You just can't stop thinking about my ass." (*Id.* ¶ 51.) Plaintiff did not report this incident. (*Id.* ¶ 53.)

Plaintiff did not report this incident. (*Id.* ¶ 53.)
Plaintiff did not report that incident. Plaintiff did not know how to report such an incident at that point. Plaintiff was in a work van with multiple other employees and a Supervisor at the time when the comment was made. Plaintiff was a new hire and new resident at the Doe Fund. Plaintiff was intimidated. Plaintiff was in a new place surrounded by new people. Plaintiff was nervous and was hoping that he could prove his worth to the company. All of the employees had been working for the Doe Fund previously, Plaintiff was just issued a route. Plaintiff did not know any of the men by name in the van at the time. Plaintiff later learned the name of one Anthony Marshall. All of the men were too intimidated by the power of the Supervisor Terry and the administration of the Doe Fund to report Defendant Cooper (see recordings of multiple employees "It's hard to fire Terry. He's the one that writes our checks." "You don't want no problems with Terry. You would prefer to have problems with Washington.") People were intimidated. The plaintiff included. The plaintiff was intimidated by being in a new place. That does not equate to the Plaintiff misinterpreting the facts, fabricating a story or that this occurrence is not valid. It is evidence. There were others in the van. There should have been an

investigation done by the organization once knowledge of this occurrence was made known and persons that were present should have been interviewed for fact finding. Once the federal courts were made aware of a statutory crime there should have been a federal investigation launched for fact finding and proper disciplinary measures should have followed. On record Plaintiff is requesting the courts to launch a federal investigation into the years of sexual harassment and assault of this Supervisor Defendant Cooper and the Doe Fund.

The United States Labor Law says "a hostile work environment exists when ones behavior within a workplace creates an environment that is difficult or uncomfortable for another person to work in, due to discrimination. Common complaints in Sexual Harassment lawsuits include fondling, suggestive remarks, sexually suggestive photos displayed in the workplace, use of sexual language, or off color jokes." Play Recording Of Trainees.
The recordings satisfy all of the descriptions. The Supervisor made the workplace a hostile environment for years according to accounts by employees that were with the company for years. Several employees complained of multiple occasions of sexual harassment. The Doe Fund does not only owe damages to the Plaintiff, they also owe damages to all other staff on the recording and any and all staff that had to be subjected to open sexual harassment from this Supervisor.
The Law says, "For a violation to impose liability, the conduct must create a work environment that would be intimidating, hostile or offensive to a reasonable person."
Plaintiff asserts that any reasonable person would believe that unwanted sexual invitations, jokes and innuendos from a Supervisor can be intimidating, hostile and offensive. All of which the Supervisor did to the Plaintiff, and several other staff. Like one employee said he did it "to everybody!"

On the evening of July 21, 2016, Plaintiff submitted a written complaint to Defendant Washington, alleging that, on that day, when Plaintiff was discussing route reassignment with Defendant Cooper in his office, Cooper touched Plaintiff's genitals twice. (*Id.* ¶ 56.) Plaintiff further alleged that, later that day, Defendant Cooper came into Plaintiff's bedroom at the Facility and again touched his genitals. (*Id.*) After the bedroom incident, Plaintiff went to take a shower, but, when Plaintiff was in the bathroom before the shower, Defendant Cooper looked in for a few seconds and did not say anything. (*Id.* ¶¶ 57–58.) After the shower, Plaintiff returned to Defendant Cooper's office to continue the discussion about his route reassignment. (*Id.* ¶ 59.)

After the shower, Plaintiff returned to Defendant Cooper's office to continue the discussion about his route reassignment. (*Id.* ¶ 59.)
Plaintiff was not in the Defendant Coopers office for small talk or for discussion about his route reassignment. Plaintiff was voice recording Cooper, and by then Cooper was aware. Plaintiff was in shock immediately following the assault. Studies have shown that victims of traumatic experiences behave irregularly. Plaintiff was victimized and did not know what to do about it but Plaintiff thought to secure evidence. Plaintiff was recording Cooper for evidence, but Defendant Cooper became aware.

# COMPLAINT

7/21/2016

<u>Sexual Harassment</u>

I am <u>GREGORY BROOKS</u>, I joined Ready Willing and Able (The Doe Fund) program on approximately 6/27/2016. I reside at the facility located on <u>520 Gates Avenue, Brooklyn NY 11216</u>. Below is a formal complaint for sexual harassment made against Mr. Terry (the dispatch supervisor). The following statement I swear to be true and accurate (under the penalty of perjury) to the best of my knowledge and recollection.

<u>Incident Report</u>

On July 21, 2016 at approximately 9am Mr. Terry (the dispatch supervisor) asked me to come to his office while I was outside having a smoke break. There were several other men outside smoking as well; including Mr. Stevens (the House Manager) and Mr. Washington (from PAL). I finished my cigarette and proceeded to Mr. Terry's office as directed.

When I got inside Mr. Terry informed me that he was going to change my route from Hudson River Park as I requested previously but I may have to work one day out of the weekend. I told him that I only can have my children on the weekend and I need to have them free so I could spend time with my children. Mr. Terry began to say that "it's all that [he] could do". As he was talking he began to fling his hands in my direction and he touched my genital area. I thought it was a mistake so I did not make an issue out of it. I backed away to prevent from it happening again because he was still talking and flinging his hands. He touched me again and this time he grabbed the front of my pants at the waist then said "I'm sorry I talk with my hands". I was in shock and did not know what to do. My first instinct told me to hit him, but I did not want to get arrested for assault.

I stood there in shock and I suppose in Mr. Terry's mind my silence was approval or consent for him to grab my penis and say "What's this?" I did not answer I did not move. My mind was numb. I did not want to leave the program because I did not have a place of my own and I did not want to cause trouble because I am a trainee. I did not think no one would believe me if I told them what happened. I decided to tape record him so I told him that "I [had] to take a shower and get ready to pick up my son". He said that He'll "be up in 2 minutes" (meaning the room that I was staying in). I ran upstairs and found my phone. I put it on record and a few moments later Mr. Terry was knocking at the door. When I opened it he was breathing hard. He asked "why was [my] door locked". He came towards me and noticed my phone on the bed. He picked it up to my dismay and looked at it then said "are you on the phone?" I said "yeah".

Once again he grabbed my genital area and this time I had a hot flash because I nearly hit him. He was talking and touching me simultaneously. I could not think straight because nothing like that had ever happened to me before. I pulled away and he let go of me. I guess he picked up on my body language because he began to see himself out of the room. I told him that I had to take a shower and showed him all of my clothes I had laid out. He said that he "liked [my] sneakers", then left.

I did not have what I needed on record but I had to do something. I went to someone I trusted (Mr. Paul Washington of PAL) and told him what happened; and asked "what should I do". He said to speak to Mr. James Washington (the Program Director). I was embarrassed and did not want everyone at the facility to know what transpired. When I entered the entrance to the Doe Fund; I tried to walk straight to the back where Mr. Washington's office is located, and was stopped by security. I told the guard that I had to see about my check because today was payday. He said "Okay" I went to the back and the woman that handles the checks was sitting at her desk (which is an a jointing office to the Directors office) I asked about my pay and told her that I would not be here after she comes from the bank, and could she leave my stipend with security. I did not hear her response. I noticed that Mr. Washington's door was closed so I asked her "is Mr. Washington in" she said "yes but he is in a meeting with the case managers". I decided

to attempt to wait for him but I had a 12 o'clock appointment.

I went to the front entrance to wait. I was very upset and the security guard noticed, he asked "What's wrong? Is everything alright with you?" I said "no I need to speak to Mr. Washington" He got on the phone to attempt to call him. A moment later he said "He's not answering, what's the issue?" I did not want to share the issue with anyone else but Mr. Washington. I said "Its important" and left it at that. He tried to call three more times than told me "He must be in a meeting" I said I had to leave was there a number that I can contact him at. Another guard told me just to call the number on my identification. I left and proceeded to my appointment.

## CONCLUSION

I feel violated in a way that I can not form into words. I have never been violated like this in my entire lifetime. I have been to prison and no one has ever violated me in this fashion. Mr. Terry was taking advantage of me because he knows that I am in a precarious situation. My only regret is that I froze both mentally and physically when he touched my penis. I did not know how to respond other than to strike him, but I did not. I thought about all that I stood to lose if I had; and I used the measures that my aggression counselor (Mrs. Yolanda) advised me to use. I am not homosexual and I do not condone being touched by another man in a sexual manner at all. Mr. Terry was using his position of authority to violate participants in the Doe Fund program. On many occasions I have heard Mr. Terry say inappropriate things to Doe Fund clients. He says sexual orientated jokes and statements incessantly. I was uncomfortable hearing them but I did not say anything because I did not want to make myself a target. Mr. Terry has been at the Doe Fund way longer than I have and he is a supervisor, so common sense told me to just keep my mouth shut and stay away from him. I am beginning to wonder is this acceptable behavior at the Doe Fund? Everyone has heard him make sexual innuendos, comments and invitations and as of yet no one has said anything to stop him.

Now that Mr. Terry has touched me I have no choice but to do something about it. I would like to press charges against him, I would like him removed from his position at the Doe Fund because he was not being professional and sexual harassment is against the law. I am mentally traumatized at this point because I was sexually victimized by Mr. Terry and I never want to see that man again.

Cordially,

Gregory Brooks

The Law states, "The United States Supreme Court stated in Oncale v. Sundowner Offshore Services, Inc. that Title VII is "not a general civility code." Thus, federal law does not prohibit simple teasing, offhand comments, or isolated incidents that are not extremely serious. Rather, the conduct must be so objectively offensive as to alter the conditions of the individuals' employment. The conditions of employment are altered only if the harassment culminates in a tangible employment action or is sufficiently severe or pervasive."

It is clear from the original complaint that this was no simple teasing, or offhand comment, or isolated incident. It did in fact alter the conditions of the Plaintiffs employment. Plaintiff became targeted and harassed by other staff members and management. Eventually Plaintiff was pushed out of employment and out of the organization.

Defendant Washington received the complaint on the morning of July 22, 2016 and forwarded it to Eunice Gilmore, TDF's Associate Director of Human Resources; Kenise Etwaru, TDF's Director of Human Resources; Elizabeth Hanson, TDF's Chief Compliance Officer; and

Craig Trotta, TDF's Director of CIP. (*Id.* ¶¶ 61–62.) That day, Defendant Cooper was suspended. (*Id.* ¶¶ 63, 79.)

That day, Defendant Cooper was suspended. (*Id.* ¶¶ 63, 79.)

Yes the Defendant Cooper was suspended at that point. Would not the court agree "too little too late?" By the time the Supervisor was suspended had harassed hundreds of men. Plaintiff urges the courts to defer their attention to the recordings. In the recording titled "Trainees" there are multiple employees complaining of being harassed daily and even on that very day (attention). These acts of sexual harassment was out in the open for all employees, supervisors, managers and Directors to see. This is where the liability lies. The admission of the Director himself:

1.  The Doe Fund was knowledgeable and therefore responsible and liable as they allowed the sexual assaults to continue daily prior to current claim (See Recording Titled Washington).
    a.  The Doe Fund knew that defendant Cooper was sexually harassing employees, trainees and residents for multiple years. It was displayed and discussed in the open with high ranking employees present. The behavior was not correctively addressed prior to complaint and civil suit. Recording of the Director James Washington acknowledging that he witnessed Mr. Cooper on several occasions and addressed Mr. Cooper prior to current claim (attention). Washington claimed on record that he also informed Cooper's direct supervisor of the sexual harassment that he witnessed. Because of this Plaintiff was never supposed to have met defendant Cooper as these accounts came before Plaintiff became a resident and employed with The Doe Fund.
        i.  Mr. Washington told Plaintiff that he observed Mr. Cooper behave in an inappropriate sexual manner and confronted Cooper individually and contacted Cooper's direct supervisor. If he did, who is this supervisor? Did the supervisor make a report of this account? Did Mr. Washington document this account? If so, where is that report? If not, there is liability. Why was this report, if it exist, not in the discovery? Plaintiff did request any and all documents and voice and video recordings.
        ii. Once Mr. Washington informed Coopers direct Supervisor, why was there no investigation conducted? Why is it that no HR rep went around and interviewed other employees at the Gates facility to discover if Cooper was making inappropriate sexual comments to them also? The Plaintiff conducted his own investigation and discovered that Defendant Cooper had been harassing nearly all of the trainees he spoke with. How was the Plaintiff a homeless man, capable of doing something in a matter of months that a huge resourceful multimillion dollar organization could not do in several years?
        iii. If the HR department would have launched an investigation after the Director blew the whistle, they would have discovered that Cooper had been sexually harassing everyone and they could have paired that information with the 2013 sexual assault claim, and fired Cooper. <u>The Plaintiff would never had met Cooper if The Doe Fund investigated a report from their very own Director.</u>

During the investigation, Hanson noted a prior incident in 2013, where Jerome House accused Defendant Cooper of sexual harassment. (Exhibit 11, Dkt. 82-11, at ECF 4–5; *see also* TDF's 56.1, Dkt. 68, ¶ 134.) House claimed that Defendant Cooper came into his room while House was lying on his bed, that Defendant Cooper took a piece of paper off the floor and placed it on House's genitals, and that Defendant Cooper then picked up the paper and brushed his hand against House's genitals. (Plaintiff's Exhibit 27, Dkt. 82-27, at ECF 2; Plaintiff's Exhibit 28,Dkt.82-28, at ECF 1.) House was under the influence of K2 or Spice, synthetic cannabinoids, at the time. (TDF's 56.1, Dkt. 68, ¶ 136; Deposition of Jerome House ("House Depo."), Dkt. 82-4, at 48:11–23.) Emails from that time indicate that the police interviewed both House and Defendant Cooper. (Plaintiff's Exhibit 28, Dkt. 82-28, at ECF 2–3.) The investigation report assessment states that, "[a]t this point in time, the allegations of Sexual Harassment remain allegations;
Interviews already conducted do not indicate or imply such an occurrence took place.

Nevertheless [,] this does not mean the Trainee did not experience uncomfortable feelings during his interaction with Mr. Cooper." (*Id.* at ECF 7.) Defendant Cooper was issued a written warning for failing to remove House from the Facility when House appeared to be under the influence of drugs. (Plaintiff's Exhibit 29, Dkt. 82-29.)

Victim Blaming. Minimizing the Abuse. Excusing and dismissing inappropriate behavior. Telling the victim that "you're imagining things." All of these are tactics of psychological abuse used as a means of silencing the victim and re-victimizing the victim.
The Plaintiff asks the court to please refer to the both victim complaints. Look at how similar the behavior that both men described in Supervisor Terry. Although neither men knew each other and one incident happened in 2013, the other in 2016 and they both reported similar things. Not merely being touched, but the body language of Supervisor Terry. Both men reported that Terry was "looking around."
What is similar about these complaints?

1. Both men were homeless.
2. Both men had criminal histories.
3. Both needed the job to survive.
4. Both men are trainees which are new employees on the street crew.
5. Both these men are African American.
6. Both these men are assaulted in the residential area of the facility.
7. Terry "fling" his hands as a pretense to touch one, Terry placed a miscellaneous piece of paper on the genitals of another as a pretense to touch the other.
8. Both men said they "blanked out" or had a "hot flash" as a physical reaction to being touched by Supervisor.
9. He was aggressive with both men. Even the third witness. He was aggressive with him also and they considered it "touchy feely."
10. Neither man wanted to tell the police.

11. None of the men wanted any trouble because they both knew that Terry was a powerful Supervisor.
12. None of these men got justice for being violated by a Supervisor.

The Doe Fund used the fact that the victim House used some type of drug to dismiss the first victim claim as illegitimate. They wrote Terry up for not having victim hospitalized when he observed that the victim appeared to be intoxicated "off spice." They covered up a state and federal crime, blamed the victim, coached Defendant Cooper on what to say to the police and disciplined the Supervisor for something completely removed from the assault, the complaint and the police report. The Supervisor was relocated to the Gates facility where his reign of sexual harassments continued unabated to scores of employees.

The law states, "Small matters, annoyances, and isolated incidents are usually not considered to be statutory violations of the discrimination laws."

This is no small matter, a superior reached into an employee's pants and began to stroke his genitals, which is a serious offense. It was more than mere annoyance, his behavior was –a crime. It is a felony. Additionally it was no isolated incident based on the history of the Supervisor. A police report was made against the same Supervisor at another Doe Fund Facility on Porter Ave in 2013, years prior to the instant claim. It did not end there, he continued his assaults openly for years afterward.

On August 4, 2016, Defendant TDF concluded its investigation relating to the incident involving Defendant Cooper and Plaintiff, and Defendant Cooper was terminated. (TDF's 56.1, Dkt. 68, ¶ 81.)

Again too little too late. The Doe Fund fired defendant Cooper to protect themselves from legal liability, not an adequate and timely response to a legitimate complaint nor corrective action. An investigation could have been launched about Mr. Cooper's behavior a long time ago, (see Washington) but he was never investigated or held accountable for sexual harassment. TDF although they fired Mr. Cooper, they hired and paid for an attorney for Mr. Cooper. TDF did not want Mr. Cooper to say something that would confirm the claims, so they silenced Mr. Cooper with an attorney. The Plaintiff informed HR that he had legal counsel and the Doe Fund was preparing for a legal battle. That is the reason why Mr. Cooper was terminated. And based on all of the evidence accumulated against Defendants, they do not deserve a pass for these neglects of duty and responsibility to the safety of their employees and community. Retaliation.

The United States Labor Law says "a hostile work environment exists when ones behavior within a workplace creates an environment that is difficult or uncomfortable for another person to work in, due to discrimination. Common complaints in Sexual Harassment lawsuits include fondling, suggestive remarks, sexually suggestive photos displayed in the workplace, use of sexual language, or off color jokes." Play Recording Of Trainees.

The recordings satisfy all of the descriptions. The Supervisor made the workplace a hostile environment for years according to accounts by employees that were with the company for years. Several employees complained of multiple occasions of sexual harassment. The Doe Fund

does not only owe damages to the Plaintiff, they also owe damages to all other staff on the recording and any and all staff that had to be subjected to open sexual harassment from this Supervisor.

By Plaintiff's account, on July 23, 2016, Anthony Wiggins, a director at TDF, was supervising Plaintiff's route and told Plaintiff that he (Wiggins) did not have any information about Plaintiff's new schedule. (Plaintiff's 56.1 Counterstatement ("Pl.'s 56.1 Counter"), Dkt. 81, ¶ 247.) Wiggins instructed Plaintiff to speak to his case manager Porter the following day. (*Id.* ¶ 248.) The next day, Wiggins and Porter told Plaintiff that "he would have to work weekends and that they would have a set schedule for him by the end of the day." (*Id.* ¶ 249.) Plaintiff "remember[s] working the Hudson route for a couple of weeks" and "had [] problems trying to get it changed," (Brooks Depo., Dkt. 82-3, at 171:6–9), even though Plaintiff's "Work-to-Pay History" does not show Plaintiff working on the Hudson route after July 24, 2016 (Exhibit K, Dkt. 69-1, at ECF 321).

Associate Director Holly told Plaintiff that his schedule had been in the computer and that Plaintiff did not have to come to work on Saturdays. (*Id.* ¶ 269.)

Please see recording titled "Playing With Schedule" Tuesday, December 20, 2016, 10:59:10 AM. Managers at the Doe Fund was giving Plaintiff the run around about receiving a schedule as retaliation for the complaint made against Supervisor. The recording "Playing With Schedule" was evidence from another Director Holly giving an apology to the Plaintiff for being ran around in circles. This was acknowledgement of another Director recognizing that Plaintiff was being targeted and treated unfairly. But the retaliation did not end there.

The Plaintiff produced several recordings and reports of incidents where Management and other staff retaliated against Plaintiff. After filing the complaint, the staff began to make threats of physical violence and intimidation, false reports was written against plaintiff, management would pull plaintiff off a work vehicle on his regular route and make plaintiff stand on the street corner for hours to wait to go to another site, they began to keep changing the work schedule, they began to target the plaintiff as a means to force plaintiff out of the job.

The Law states, "A hostile work environment may also be created when management acts in a manner designed to make an employee quit in retaliation for some action."

On July 25, 2016, Plaintiff saw Defendant Cooper while waiting for a meeting with Human Resources. (Pl.'s 56.1 Counter, Dkt. 81, ¶¶ 251–52.) Defendant Cooper said to Plaintiff, "You say, this mother fucker."5 (*Id.* ¶ 254 (capitalization omitted).) One of the RWA workers then

5 The meaning, if any, of this statement by Defendant Cooper is unclear.

8 advised Plaintiff, "You don't want no problems with [Cooper]. You would rather have problems with Mr. James Washington before you have a problem with [Cooper]." (*Id.* ¶ 259 (capitalization omitted).)

Intimidation.

Defendant Cooper approached Plaintiff in a hostile and aggressive manner. Defendant Cooper was hovering over Plaintiff only few inches away from plaintiff when he made these loud

statements. The Plaintiff on several occasions wrote and verbally told Defendant Washington and HR that he did not want to see Defendant Cooper again (see original complaint). Defendant Washington assured Plaintiff that he would not have to see Cooper again (see recording Mr. Washington), but Defendant Washington and HR scheduled Defendant Cooper and Plaintiff around the same time. With all of the evidence of knowledge of Coopers Harassment and abuse, this error is of enormous proportions. Plaintiff believes it was intent. A way to intimidate the Plaintiff. It was a breach of security that put the plaintiff in danger of being assaulted. Plaintiff was approached and confronted by Defendant Cooper and intimidated in front of the Gates facility on date scheduled by Defendant Washington to meet with HR after claim was made against Cooper. See recording with Washington

On July 29, 2016, Plaintiff called the Facility and received confirmation that he was approved to stay out late. (*Id.* ¶¶ 271–72.) When Plaintiff returned at the scheduled time, Eric White, a TDF security guard (TDF's 56.1, Dkt. 68, ¶ 114), told him that he was not allowed back in because he was late. (Pl.'s 56.1 Counter, Dkt. 81, ¶¶ 273, 311; Brooks Depo., Dkt. 82-3, at 244:6–15.) White told Plaintiff to "sit in some corner and wait" and, when Plaintiff refused, told Plaintiff that "he's going to call the police on [Plaintiff]." (Pl.'s 56.1 Counter, Dkt. 81, ¶ 312; Brooks Depo., Dkt. 82-3, at 245:2–7.)

Retaliation. Harassment.
If it was simply employment, Plaintiff could have just quit the job and the harassment would have ended. But after Plaintiff was forced to quit the job the harassment continued because the Plaintiff lived at a Doe Fund Facility. Plaintiff was harassed by multiple Doe Fund staff. This includes when Plaintiff is simply coming in and out of the facility. Plaintiff recorded Washington previously giving Plaintiff permission for a late night because plaintiff was experiencing retaliation. Washington assured plaintiff several times on the recording that he has a late night not an overnight. Defendant Washington told Plaintiff that it was approved and authorized. When Plaintiff returned to the facility he was confronted in a hostile manner, intimidated, threatened and told to sit in a corner, threatened to be kicked out of the program and threatened to have Plaintiff falsely arrested by the police.

On July 30, 2016, Albert Bell, a TDF dispatcher (TDF's 56.1, Dkt. 68, ¶ 70), told Plaintiff that he had been written up as a "No Call, No Show" for July 25, 2016. (Pl.'s 56.1 Counter, Dkt. 81, ¶¶ 277–79.) However, a July 25, 2016 report shows that Plaintiff was actually marked as absent for a personal appointment. (Exhibit P, Dkt. 69-1, at ECF 342–43.) Plaintiff was also written up as a "No Call, No Show" for July 28, 2016.6 (*Id.* ¶ 282.)

Retaliation.
In accurate and false disciplinary reports was written into the employment file history of the Plaintiff. No call no show is cause for termination. Management wrote two of these false no call no show reports against Plaintiff and put them in his file. See Recording No Call No Show & Recording Washington. Plaintiff was told by Washington that he could take the days off and it he would make note of it and notify the staff. Instead Plaintiff later found out that those days Washington confirmed that Plaintiff had off, the Doe Fund wrote a disciplinary report that

Plaintiff did not call in to notify staff that he would be absent and that he did not report to duty as scheduled. This is a disciplinary action filed against Plaintiff.

The law states "if an employee reported safety violations at work, was injured, attempted to join a union, or reported regulatory violations by management, and management response was to harass and pressure the employee to quit by imposing unwarranted discipline..."

Plaintiff "had to speak to several different people" about his schedule. (Brooks Depo., Dkt. 82-3, at 171:9–10.)

Plaintiff was made to run around in circles just to get a work schedule. Plaintiff believes this was a means to frustrate and discourage Plaintiff from working and deny work hours.

When he went to speak with TDF Director Wiggins, Wiggins told Plaintiff that "he kick[s] ass from [] Ready, Willing & Able to the streets [;] [h]e's well-known in Harlem, from the east side to the west side"; that "he's about that mess"; and that Plaintiff "was fucking up." (*Id.* at 254:13–18, 255:22–23, 342:20; Pl.'s 56.1 Counter, Dkt. 81, ¶¶ 290–93.)

Intimidation. Threats.

Previous complaint made by Plaintiff:

> Mr. Wiggins is a supervisor, he is a director of the Porter facility I have been told by some residents. I met Mr. Wiggins immediately after making the complaint against Mr. Terry. It had seem to be a problem with my schedule. No one on the staff would print me my schedule. After inquiring about it several times Mr. Dash Porter told me that I had to meet with Mr. Wiggins to get it. I went into the office to meet with Wiggins and when I entered the office I said "I was supposed to see someone about my schedule." I did not know who Mr. Wiggins was or the other fellow that was in the office as well. Mr. Wiggins said "Who are you?" I said "I'm Gregory Brooks." Mr. Wiggins said "Oh your Brooks." He went on to say "Why I hear about you causing so many problems in my program?" He looks at me in the eyes and continue "Have you ever heard about me? Do you know who I am? I kick ass around here." I said "what you mean by that?" I considered it a threat. "I kick ass in the streets and in the program. Ask about me from the West side of Harlem to the East side, everybody know me out there for putting in work." He went on to say how people feared him because he "bust his gun." I asked him about my schedule and he said he don't be playing games with participants "It's either you are going to do the program the way it is or you leave." (See timeline) Report titled Wiggins Saturday, April 29, 2017, 6:14:18 PM

Wiggins also told Plaintiff that he would not give Plaintiff two weekend days off. (Pl.'s 56.1 Counter, Dkt. 81, ¶ 287.) Wiggins also made Plaintiff get off the bus that took him to his assignment and "had [him] standing on the corner for a while before [] anything happened with [him]." (Brooks Depo., Dkt.82-3, at 358:1–15.)

Previous complaint made by Plaintiff:

Then the supervisors would not allow me to go on the Vernon route, claiming that I was late. I had been coming out at the same time every day without an issue. I was coming to the front of the RWA building approximately a half hour prior to when the van was supposed to load. Then I started having problems getting on the van. When I attempted to inquire about it I was curtly stopped from speaking and told to comply and discuss it at some other time. Sometimes I would be present before the van was loaded and then taken off the route and told to stand outside "to the side" until they find out "what to do with" me or if they had a route to send me on at all. They would send me on a route that I was not scheduled on. Made me kind of like a rover. I never knew where they would send me next. A few times the supervisors would even take me out of the van from my scheduled route after it was fully loaded and literally about to pull off. Supervisor Bell would yell to the route supervisor Mr. Burges "Where's Brooks?! Send Brooks out! He's not going on this route". I would be taken off the van although there were guys that were not normally on the Vernon route, and made to wait outside until he "figured out what to do with" me. Report titled Wiggins Saturday, April 29, 2017, 6:14:18 PM

On an unspecified date, Vernon Bergis, a TDF supervisor, made Plaintiff work in the rain, when Plaintiff tried to seek shelter. (Pl.'s 56.1 Counter, Dkt. 81, ¶¶ 297–99.)

Retaliation. Targeting.

Previous complaint made by Plaintiff:

Eventually I was put on a daily route they called "The Vernon Route" that was supervised by Mr. Burges. Mr. Burges would give me a hard time on the route everyday even though I was on time every day and did my job effectively. I was even offered a permanent job by the owner of a pizza shop that witnessed me working the Vernon route. He said "come by the pizza shop and have a slice for lunch." I did and he offered to employ me. I told Mr. Porter my case manager and he said that if I take the job I would be kicked off the program, so I did not accept the job. I continued working the route and many people came to me with offers or compliments for my quality of work. I did not know then that supervisor Mr. Burges was being trained as an "Supervisor In Training" at the time by director Wiggins. I eventually learned after leaving employment at the Doe Fund that Burges was considered by some participants as "Wiggins pet." (See Wake Up Call)

One day I went into work and was told abruptly by Mr. Bell "You know your schedule changed right? Your not on the Vernon Route no more?"

In a conversation with Mr. Bell I inquired about why I was dealing with so much hostility and why was my schedule being changed without my knowledge? Mr. Washington entered the room and the discussion. (See Recording Mr. Bell 1)

- Mr. Bell told Mr. Washington and I that Wiggins took Mr. Brooks off of the Vernon Route.
- Mr. Bell said usually he does things like that for "Unreliable or too much tardiness."

I was never late, I came early and if I had an appointment I communicated that immediately to supervisors. I always worked really hard on the job, most of my co-workers would tell me "Your doing too much."

- Mr. Bell then told Mr. Washington "Why he did that to this gentleman? I don't know."
- I told Mr. Bell that I was always on time arriving the latest 6:43-6:45am Like I was initially directed to by Terry. (See Terry 2) The bus usually pulls off around between 7:00 - 7:10am. Mr. Bell tells me "If you're on time your late." I would watch him load the van and overlook me.
- Mr. Bell then says to me "I personally want to apologize. For all of the discrepancies. I don't know if I can control any of them but I apologize that you're going through those things." He continued to say "The person I was; I would have been going ballistic about all the things that happened." He thanked me for always being polite and cooperating, but told me that he is being "Micro managed" by Mr. Wiggins and he cannot tell Mr. Wiggins what to do.

The Plaintiff produced several recordings and reports of incidents where Management and other staff retaliated against Plaintiff. After filing the complaint, the staff began to make threats of physical violence and intimidation, false reports was written against plaintiff, management would pull plaintiff off a work vehicle on his regular route and make plaintiff stand on the street corner for hours to wait to go to another site, they began to keep changing the work schedule, they began to target the plaintiff as a means to force plaintiff out of the job.

In August 2016, Plaintiff took a breathalyzer test for alcohol that was inconclusive. (Brooks Depo., Dkt. 82-3, at 400:19, 401:19–404:7.) At some point after that, Associate Director Matthews brought Plaintiff into his office and asked Plaintiff if there was a problem and if Plaintiff wanted to do the program. (*Id*. at 402:10–18; Pl.'s 56.1 Counter, Dkt. 81, ¶ 281.)

Harassment.

Timothy Matthews Assistant Director confronted the plaintiff and was suggesting that Plaintiff was a problem and should leave the program. Plaintiff spoke to Mr. Washington about this and was told that it was basically a figment of the Plaintiff's imagination. However it later proved to be the beginning of a campaign by Timothy Matthews to target Plaintiff and run plaintiff out of the workforce, the program and the shelter. See recording with Eric the Security Guard

On September 1, 2016, Plaintiff informed his case manager Porter that he had found outside employment and would no longer be participating in the RWA program. (TDF's 56.1, Dkt. 68,¶¶ 90–91.) Plaintiff continued to reside in the TDF shelter. (*Id*. ¶ 92.)

Plaintiff had finally had enough of the harassment/Retaliation and found another source of employment.

At the shelter, James Stevens, a TDF House Manager, would wake Plaintiff up by "banging on [Plaintiff's] door[,]" as well as "jingling his keys" and "slam[ming] doors in the hallways."

(Pl.'s 56.1 Counter, Dkt. 81, ¶¶ 308–09, 354; Brooks Depo., Dkt. 82-3, at 352:2–8.) While TDF requires its resident to wake up at 7 a.m., Plaintiff and Defendants dispute whether Plaintiff

10 obtained late-night passes because of his outside employment and whether a late-night pass allowed a resident to sleep in past 7 a.m. (Pl.'s 56.1 Counter, Dkt. 81, ¶ 303; Defendants TDF and Washington's Response to Pl.'s 56.1 Counter, Dkt. 74, ¶¶ 304, 306.)

Harassment. Retaliation.
James Stevens was intentionally depriving Plaintiff from sleep by banging and slamming doors and jingling his keys. In a random discussion Robert Green also an employee of the Doe Fund mentioned that he observed the behavior. Green told Plaintiff that he spoke with House Manager James Stevens and told him to stop making noise and waking up Brooks/Plaintiff when he knew that plaintiff worked over night and Stevens replied "Fuck that." (See recording Wakeup call) Recording reveals that employee Green knew that the policy allowed for residents to sleep. If it was not a policy why jingle keys and slam doors? Why not wake Plaintiff up and tell him that he is required to leave the facility during the morning like the rest of the residents that do not have overnight work? It would force the Plaintiff to go back and forth to work with absolutely no sleep. All other shelters allow those that work overnight to rest in the day to rejuvenate for work. TDF is a regulated by DHS rules regarding residents with overnight jobs.

Around the time that Plaintiff was looking for his own apartment, Plaintiff's new case manager, O'Neil Young, gave Plaintiff "a hard time" by "pretending that [Plaintiff] wasn't trying to get [his] own apartment." (Brooks Depo., Dkt. 82-3, at 243:20–244:3; Pl.'s 56.1 Counter, Dkt. 81, ¶ 310.) Plaintiff does not know "if [this] was retaliation." (Brooks Depo., Dkt. 82-3, at 243:22–24.) In Plaintiff's case notes, Young noted that Plaintiff had missed apartment viewings, and, when asked why he had missed one of the viewings, Plaintiff replied that he had overslept. (Exhibit J, Dkt. 69-1, at ECF 306–07.)

Harassment.
Plaintiff did not automatically assume that every employee was retaliating against plaintiff. But after Mr. Young continued to target Plaintiff and claim that Plaintiff was not cooperating with or attempting to find independent shelter Plaintiff figured that Mr. Young was possibly attempting to sabotage Plaintiff. The apartment Plaintiff currently resides is the same apartment that Plaintiff told Mr. Young that he was waiting for renovations to be done to apartment before he could move in. But Mr. Young wrote reports as if Plaintiff was attempting to avoid securing independent living and being difficult with cooperating with the program.

On several occasions, Associate Director Matthews used security guard White to tell Plaintiff that Plaintiff had "lost" his bed in the TDF shelter. (Pl.'s 56.1 Counter, Dkt. 81, ¶ 314; Brooks Depo., Dkt. 82-3, at 245:22–246:2.) White told Plaintiff that "it was retaliation against [him]," but also that "[White] [did not] know if it was something personal with [Plaintiff]." (Brooks Depo., Dkt. 82-3, at 247:2–5.) Plaintiff was also assigned to a different room, despite not requesting a change. (Pl.'s 56.1 Counter, Dkt. 81, ¶¶ 330, 333.)

Harassment. Retaliation.

See recording Targeted By Tim Monday, July 03, 2017, 10:13:16 PM, where employee of Doe Fund White verbally admits to Plaintiff that Assistant Director of the Gates facility Timothy Matthews had formally directed him Eric White Supervisor of Security at the Gates Facility and other staff to target Plaintiff to make sure that Plaintiff loses his bed and get Plaintiff kicked out of the shelter.  Plaintiff was being retaliated against. The Plaintiff and White did not get along because previously White being directed by orders of management was told to harass Plaintiff. White noticed that Plaintiff was always working hard at seeking and maintaining employment and seeking shelter for independent living. Plaintiff was not hanging around the shelter like other residents wasting time, using drugs and alcohol, unemployed and not seeking to or maintaining employment. Mr. White notice Plaintiff positive determination and attitude and confessed to Plaintiff that he was being targeted by the Assistant Director. White confirmed that he did not know why the director would target Plaintiff because White observed Plaintiff always doing what he was supposed to do.

Plaintiff also got "the runaround" (from unidentified individuals) about a housing voucher. (Brooks Depo., Dkt. 82-3, at 390:2–21.)

Termination of services.

Doe Fund promised services in their contract. They did not fulfill their end of the services that they advertised to provide. Plaintiff was attempting to receive a housing voucher for homeless residents. The Doe Fund services assist residents with securing housing vouchers. At that time the Doe Fund was offering a LINC voucher to the Plaintiff. But every time Plaintiff went to inquire about the voucher Plaintiff was put off, rerouted and delayed. Plaintiff had enough of going in circles with Doe Fund employees about a housing voucher and sort to secure one himself. Plaintiff connected with the Veterans Association and was able to secure a SEPS housing voucher on his own.

On July 13, 2017, Plaintiff was asked to move out of the Facility due to a curfew violation. (Pl.'s 56.1 Counter, Dkt. 81, ¶¶ 334, 336.)

Termination of Shelter

As directed by Timothy Matthews Plaintiff was forced to leave shelter and return to the streets. See recording titled Mr. Wash you lost your bed Thursday, July 13, 2017, 8:31:10 AM.

## II. Procedural History

Plaintiff commenced this action on June 15, 2017, about a month before moving out of the Facility. (*See generally* Complaint, Dkt. 1.) The Complaint contains fourteen causes of action, Case 1:17-cv-03626-PKC-LB Document 84 Filed 03/31/20 Page 10 of 34 PageID #: 2686 11 only three of which allege violations of federal law. The First Cause of Action alleges race discrimination, in violation of Title VII, only as to Defendant TDF. (*Id.* at 16.) The Second Cause of Action alleges a retaliation claim under Title VII, only as to Defendant TDF. (*Id.* at 17.) The Fourteenth Cause of Action alleges discrimination and retaliation, in violation of § 1981, as to all Defendants. (*Id.* at 24.)

Plaintiff argues to the court that Plaintiff commenced this action of sexual harassment the moment Plaintiff was touched. This was a recorded action and formal complaint written by Plaintiff on the day of the assault. This written complaint is in the Plaintiff own words. Sexual Harassment was the purpose of filing the action on June 15, 2017 and should have been filed as such. (See Complaint 7/21/2016) Plaintiff was told by his attorney Kelly O'Connell that they (her and Derrick Smith) were going to add race discrimination and other claims on to the claim of Sexual Harassment.

Ineffective assistance of counsel, Negligence of the courts

# COMPLAINT

7/21/2016

Sexual Harassment

I am GREGORY BROOKS, I joined Ready Willing and Able (The Doe Fund) program on approximately 6/27/2016. I reside at the facility located on 520 Gates Avenue, Brooklyn NY 11216. Below is a formal complaint for sexual harassment made against Mr. Terry (the dispatch supervisor). The following statement I swear to be true and accurate (under the penalty of perjury) to the best of my knowledge and recollection.

The remaining causes of action, against all Defendants, in sum and substance, allege claims for: race and sex/gender discrimination, sexual harassment, hostile work environment, conviction status, and retaliation, all under NYSHRL and NYCHRL; interference with protected rights under NYCHRL; a violation of the GMVA; supervisory liability; assault and battery; and intentional infliction of emotional distress. (*Id.* at 17–24.)

Plaintiff argues that in the order of 1. Sexual Harassment Title VII by Defendant Cooper see Complaint 7/21/16/recordings of Cooper/HR recording etc. 2. Hostile work environment resulted following complaint. (See all attached evidence) 3. Retaliation Plaintiff argues that he was retaliated against by multiple employees and managers of the Doe Fund. See all attached evidence 4. Discrimination Males that have criminal convictions and little protections and limited inclusion into society. Cooper's behavior would not have been tolerated, celebrated, allowed, dismissed, ignored or encouraged if Cooper's victims were not vulnerable males with very little society protections. 5. Gender discrimination/abuse by Defendant Cooper and the Doe Fund. Defendant Cooper was allowed to openly sexually harass homeless vulnerable males Doe Fund had knowledge of his behavior. See all attached evidence behavior in addition to

Cause of Action alleges race discrimination, in violation of Title VII, only as to Defendant TDF. (*Id.* at 16.) Cause of Action alleges a retaliation claim under Title VII, only as to Defendant TDF. (*Id.* at 17.) Cause of Action alleges discrimination and retaliation, in violation of § 1981, as to all Defendants. (*Id.* at 24.)
and

all under NYSHRL and NYCHRL; interference with protected rights under NYCHRL; a violation of the GMVA; supervisory liability; assault and battery; and intentional infliction of emotional distress. (*Id.* at 17–24.)

Disclaimer. Request to Court
Plaintiff being a layman to the law asks the court to protect and preserve any and all rights of the plaintiff known and unknown from the point of the original claim until present.

Discovery in this matter closed on August 31, 2018. (*See* July 11, 2018 Order.)
Defendants' motions for summary judgment were fully briefed on May 17, 2019. (*See* Dkts. 66, 75.)

Ineffective assistance of counsel

Throughout representation Plaintiff would ask Attorney for information or give Attorney information to make known to the courts. Plaintiff did not receive responses to many of plaintiff inquiries, and apparently Attorney was not informing the courts properly through filing although they were supplied with all information in a timely manner from Plaintiff. Plaintiff would like to bring to the courts attention that Plaintiff did in fact request documents, records, complaints, recordings video and audio from defendant. Plaintiff requested all records of employees that Defendant Cooper supervised or managed or was in the program at the time when Defendant Cooper was employed at the Doe Fund. Plaintiff made several request for these records verbally in the very beginning of representation. Plaintiff specifically requested video of day in question that Defendant Cooper sexually assaulted Plaintiff Brooks. Plaintiff informed attorney Kelly of the video camera. A month or so later plaintiff took a photo of the lobby with shot of camera area and provided photos to attorney. The Defendant never produced these recordings or these records. Plaintiff has a right to interview and request an investigation of other employees that has been Supervised by Defendant Cooper. Plaintiff believed that Judge was making a decision on that right.

Fri, Jan 19, 11:54 AM

to Kelly

Good afternoon Kelly,
Happy New Year! I was thinking about you. How is everything?

What is the latest with the case? How are we looking? What can we expect?

Hope all is well.
Sincerely,
Greg

Kelly O'Connell <kelly@dereksmithlaw.com>

Thu, Feb 1, 2:10 PM

to me

Hey Greg,

Thank you for checking in. No major news yet. I am still working on discovery with opposing counsel and I'm hoping to set up depositions soon.

I will keep you updated as soon as I learn anything. Until then, just hang tight.

Sincerely,

Kelly L. O'Connell, Esq.

DEREK SMITH LAW GROUP, PLLC
Attorneys at Law
Employment Lawyers Representing Employees Exclusively
Toll Free No. (800) 807-2209
DiscriminationAndSexualHarassmentLawyers.com (website)
NYC Office: One Penn Plaza, Suite 4905, New York, NY 10119| (212) 587-0760
Philadelphia Office: 1845 Walnut Street, Suite 1600, Philadelphia, PA 19103 | (215) 391-4790
NJ Office: 73 Forest Lake Drive, West Milford, NJ 07421 | (973) 388-8625

CONFIDENTIALITY NOTE: The information contained in this transmission is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, do not read it. Please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

Ok, thanks for the update.Ok, thank you.Sounds good.
 Discovery Questions: Answers Due

Inbox
x

Kelly O'Connell <kelly@dereksmithlaw.com>

Fri, Feb 16, 1:09 PM

to me

Good afternoon Gregory,
Since we are in the discovery stage, I need your assistance and insight when it comes to our answering Defendant's requests for certain discovery and use of evidence as I work on your case.  Your participation is extremely important as you know so much more insider information and the inner workings of their system.

The general purposes of discovery are to uncover evidence, avoid surprises, narrow the issues, lock in key testimony, and—on occasion—permit recovery of certain costs and fees where appropriate. It is important, however, to look beneath the surface of discovery and decide which activities we truly need to engage in to develop our case and which activities may be unnecessary, wasteful, or even damaging to our claims or defenses.

To preserve evidence, we need from our opponent, early requests to inspect documents or other materials are especially important. Once we make a formal request, the opposing party has an affirmative responsibility to preserve the documents and materials at issue. Our early request should limit our opponent's ability to claim that important documents or materials were inadvertently disposed of or lost in the regular course of business despite pending litigation. Early requests may even set up a spoliation claim if our opponent fails to preserve what appears to be benign information that later proves important.

Neutral nonparties, including banks, telephone companies, police departments, and brokerage firms, sometimes keep very useful records (e.g., tape recordings of telephone calls, security or surveillance videos) for a very short time. Failure to subpoena records promptly may result in your evidence being lost forever.

As far as what can be discoverable, the basic rule of discovery is that a party may obtain any information that pertains -- even slightly -- to any issue in the lawsuit, as long as the information is not "privileged" or otherwise legally protected. Here are some of the things lawyers often ask for in discovery:
· anything a witness or party saw, heard or did in connection with the dispute
· anything anyone said at a particular time and place (for example, in a business meeting related to the dispute or during a phone call)
· the identity of anyone who might know something about the dispute or about the injuries or money losses either party suffered
· detailed information on how a business is run (for example, a party might try to determine how a company that sold a dangerous product decides what to sell, or how a business makes employment-related decisions or keeps its accounting records)
· documents relating to the dispute, and the personal, educational, and professional background of a witness.

There are different parts of discovery and different requests that are standard. Here are the most important documents at the beginning of discovery that both the Plaintiff and Defendant produce to the other side:
· Requests for production of documents. In a request for production of evidence, one party asks the other for physical evidence related to the dispute. Requests for production are usually used to gather pertinent documents, such as contracts, emails, employment files, billing records, or documents related health. However, these requests can also be used to inspect physical objects or property -- for example, in a dispute where the

Plaintiff was injured when the roof caved in and whether an employer maintained a safe office building is at issue, the Plaintiff's lawyer might ask to have a roofing expert inspect the office building.
· Interrogatories. Interrogatories are written questions one party sends to the other to be answered under oath. The answers can be used at trial in the same way as deposition answers -- to challenge a party who changes her story later.

Keeping all of this in mind, I need your help answering Defendant's discovery requests. Please see the two documents attached. Read them and begin to think of possible answers. Create a draft of your version of the answers, using the corresponding numbers for each question (you do not have to retype the question, just write your answer), which I will review and use for the legal document I respond to Defendant's requests.

If you do not have a document asked for in the "Requests for Production of Documents", say so in the answer. Or, if you do have the document let me know if I have it, or if I do not have it in your file, please let me know where it is. This section begins on page 7 under the title "DOCUMENTS TO BE PRODUCED." Also, for the "Interrogatory" questions, if a question does not apply to you let me know. This section begins on page 8 under the title "INTERROGATORY NO. 1."

Additionally, if there is any evidence in your possession that you have not submitted to me, please let me know so that I can review it and possibly produce it in discovery.

Sincerely,

Kelly L. O'Connell, Esq.

DEREK SMITH LAW GROUP, PLLC
Attorneys at Law
Employment Lawyers Representing Employees Exclusively
Toll Free No. (800) 807-2209
DiscriminationAndSexualHarassmentLawyers.com (website)
NYC Office: One Penn Plaza, Suite 4905, New York, NY 10119| (212) 587-0760
Philadelphia Office: 1845 Walnut Street, Suite 1600, Philadelphia, PA 19103 | (215) 391-4790
NJ Office: 73 Forest Lake Drive, West Milford, NJ 07421 | (973) 388-8625

CONFIDENTIALITY NOTE: The information contained in this transmission is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, do not read it. Please

immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

2 Attachments

Gregory Brooks <gregoryamiribrooks@gmail.com>

Mon, Feb 19, 8:38 AM

to Kelly

Good Morning Kelly,
Great to hear from you! I have been having some difficulty. That's is a lot of paperwork for me. How long do you suppose we have to produce? I do have additional information for you to consider. I gave you most of this stuff though. Were you able to go over all the documents and recordings that I provided? Were you able to contact Mr. Green and Mr. Marshall to secure a written statement? I no longer have Mr. Greens number. I lost that phone.

I was able to begin on one but I realized that we need information from them to identify some of the witnesses.
1) We need - a full list of everyone working for the Doe Fund including copies of identification photos.
I need this in order to identify potential witnesses. I did not know many of them by name but I do remember faces. I also never spoke with any of them or divulged anything about the case and I do not have their contact information.
If the Doe Fund can provide a list with current contact information we can contact them and request a written statement.

When will be a good time to visit the office? It may be best to work on this in person. I have filled out a lot on one document, but I have questions. And, I do have other evidence for you to consider.
Let me know a good time to meet so I can inform my employer. Thanks.

Best regards,
Gregory Brooks

Kelly O'Connell <kelly@dereksmithlaw.com>

Tue, Jul 3, 9:41 AM

to Ariana, me

Here is an updated version of the document I need you to sign.

Attachments area

Gmail virus scanners are temporarily unavailable – The attached files haven't been scanned for viruses. Download these files at your own risk.

Gregory Brooks <gregoryamiribrooks@gmail.com>

Tue, Jul 3, 12:46 PM

to Kelly

1. "Mr Bell 2" voice of Mr Bell, Mr. Washington and Gregory Brooks.
2. "Mr. Bell off Saturday and Sunday" voice of Mr Bell and Gregory Brooks.
3. "Wake up call" voice of Mr. Green, my first roommate and Gregory Brooks.
4. "Steps to room" voice of Gregory Brooks.

Gregory Brooks <gregoryamiribrooks@gmail.com>

Tue, Jul 3, 1:38 PM

to Kelly

I tried to call the office. Couldn't contact Arion. Let me know a good time to come in. I'll take a look at the document later today.

Gregory Brooks <gregoryamiribrooks@gmail.com>

Wed, Jul 4, 5:48 AM

to Kelly

The video "steps to room" I have to make a correction. The voice on there is unknown. I did not speak. There was a guy on the second floor platform that was talking over the phone.
I made that video to show you how long it took to reach my room from his office. Also to show the camera which was blinking a little green light. We need that footage from the defense.

Kelly O'Connell <kelly@dereksmithlaw.com>

Thu, Jul 5, 7:58 AM

to Ariana, me

Good morning Gregory,

I hope you had a good Independence Day. Thank you for your new corrections. I am attaching the newest version now. Can you come in today to sign?
Attachments area

Gmail virus scanners are temporarily unavailable – The attached files haven't been scanned for viruses. Download these files at your own risk.

Gregory Brooks <gregoryamiribrooks@gmail.com>

Thu, Jul 5, 9:41 AM

to Kelly

Yes. I can come in today.

Kelly O'Connell <kelly@dereksmithlaw.com>

Thu, Jul 5, 9:55 AM

to me

What time?

Gregory Brooks <gregoryamiribrooks@gmail.com>

Thu, Jul 5, 10:22 AM

to Kelly

Can someone meet me down stairs at 3 or do you need me to come up?

These documents and recordings were requested way before discovery began. Plaintiff is reiterating in writing to attorney Kelly. Defense never produced as requested by Plaintiff. The dates prove that the request was made prior to the dates here, and all of which was prior to discovery deadlines. For that Plaintiff request that the court demand that all filings and request for information reset. Plaintiff made the request in a timely manner and Defendants failed to produce. Plaintiff ask that courts intervene and force Defense to produce.

Tue, Jul 24, 3:38 PM

to Kelly

Greetings Kelly,
We should request a listing of all Doe Fund clients (specifically those that were at Gates AVE during Mr. Coopers employment there) so that we can identify some of the people on the recordings and to interview the residents. In the recording titled "trainees" one of the residents mentioned that someone confided in him that he was having sexual intercourse with Terry. I would like to discover who that person was and how did that relationship begin.

Do we have investigators at Derrick Smith? Since they have not made an offer to settle it appears to me that they are preparing for trial. If we are to go to trial we should have overwhelming evidence to wipe the floor with them. And the evidence is there because he has been aggressively pursuing clients and assaulting them. I am not an isolated incident.

We can go as far as the Porter facility where it all began because before he got reported there I'm sure that he was violating many other men who probably too humiliated to file a report. If this case is going to go the distance we should be fully prepared to prove our case. If I am going to be required to go public on this with the entire world knowing that I have been sexually assaulted, I do not want to chance any possibility of losing. The humiliation will be too great.
Looking forward to your input. Thanks for everything.
Sincerely,
Gregory Brooks
Mon, Sep 3, 9:13 PM

to Kelly

Hello Kelly,
I found one of the guys that is in the recording titled trainees. He is the one that said someone confided in him that he was having sexual relations with Terry. I found a message he sent to me on Facebook a while ago. His name is Robert Frager.
Also I have a new job. The last one went out of business a couple weeks ago.
I scheduled a day to meet with a therapist. I will keep you posted.
I would like to meet with you soon. I start work at 4:30 Monday - Wednesday. I'm off on Thursdays and Fridays. Let me know what's best for you. Thanks.

Sincerely,
Gregory Brooks

Kelly O'Connell

Sun, Sep 16, 9:10 AM (12 days ago)

to me

Hey Greg,

That would be awesome but since discovery is closed we can no longer use him.

Sincerely,

Kelly L. O'Connell, Esq.

DEREK SMITH LAW GROUP, PLLC
Attorneys at Law
Employment Lawyers Representing Employees Exclusively
Toll Free No. (800) 807-2209
DiscriminationAndSexualHarassmentLawyers.com (website)

Miami Office: 100 SE 2nd Street, Suite 2000, Miami, FL 33131 | (305) 946-1884
NYC Office: One Penn Plaza, Suite 4905, New York, NY 10119| (212) 587-0760
Philadelphia Office: 1845 Walnut Street, Suite 1600, Philadelphia, PA 19103 | (215) 391-4790
NJ Office: 73 Forest Lake Drive, West Milford, NJ 07421 | (973) 388-8625

---

CONFIDENTIALITY NOTE: The information contained in this transmission is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, do not read it. Please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

Kelly O'Connell (kelly@dereksmithlaw.com)
Hello Kelly,
Wow. I was not aware of that. Not exactly great news. Okay, even if we cannot use him as a witness if we get his statement can we use that information to cross examine Mr Cooper on the stand? With actual names dates and occurrences he will likely have a hard time recovering from that. Simply because he would be shocked that we know.
Is that allowed?

## DISCUSSION[7]
### I.    Plaintiff's Title VII and § 1981 Race Discrimination Claims

Plaintiff asserts race discrimination claims under Title VII and § 1981 against Defendant TDF.

### A. Plaintiff's Federal Discrimination Claims Are Limited to Race

As an initial matter, the Court explains why Plaintiff's federal discrimination claims are limited to race. First, Plaintiff's Complaint does not assert a Title VII sex discrimination claim. (*See* Complaint, Dkt. 1.) Plaintiff's Title VII claim asserts only that: "Defendant [TDF] engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of his *race*." (*Id.* ¶ 144 (emphasis added).) Second, even though Plaintiff's § 1981 claim appears to also assert a gender discrimination claim, in that it alleges that "Plaintiff was discriminated against by Defendants because he is an African American *man*," (*id.*

¶ 194 (emphasis added)), "§ 1981 only prohibits discrimination 'on account of [a person's] race, ancestry, or ethnic characteristics.'" *Colon v. St. John's Riverside Hosp.*, No. 19-CV-5846 (CM), 2019 WL 5260722, at *2 n.3 (S.D.N.Y. Oct. 15, 2019) (brackets in original) (quoting *Zemsky v. City of New York*, 821 F.2d 148, 150 (2d Cir. 1987)). Thus, Plaintiff's Title VII claim is explicitly limited in the Complaint to race, and his § 1981 is limited to race by operation of the statute.8

> 7 Defendants TDF and Washington concede Plaintiff's status as an employee between June 27, 2016 and September 1, 2016 for the purpose of summary judgment motions. (TDF's Brief, Dkt. 67, at 5.) Defendant Cooper argues in passing that Plaintiff was not an employee but does not engage in any substantive discussion regarding Plaintiff's employment status. (Cooper's Brief, Dkt. 75-3, at 9–19.) Furthermore, as previously noted, it is undisputed that TDF pays RWA participants for the work they perform during the workforce development phase of the program.
> *See supra* n.3. Therefore, the Court assumes for purposes of this Order that Plaintiff was TDF's employee between June 27, 2016 and September 1, 2016.
> Case 1:17-cv-03626-PKC-LB Document 84 Filed 03/31/20 Page 13 of 34 PageID #: 2689 14

Ineffective assistance of counsel.

By contrast, Plaintiff's NYSHRL and NYCHRL discrimination claims explicitly reference sex/gender discrimination: "Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of his *race and sex/gender, together with sexual harassment, causing a hostile work environment* and wrongful termination." (Complaint, Dkt. 1, ¶ 150 (emphasis added); *see also id*. at ¶¶ 162, 189.) Plaintiff never sought to amend the Complaint, but instead pretends that a Title VII sex discrimination claim has been in the Complaint all along, arguing that the Complaint references sexual harassment or sex discrimination multiple times in the fact section of the Complaint. (Plaintiff's Opposition to Defendants TDF and Washington's Motion ("Pl.'s TDF Oppo."), Dkt. 77, at 10 n.3.) Plaintiff further argues that Defendants will not be prejudiced if he is permitted to pursue this claim because a sex discrimination claim has been brought under NYSHRL and NYCHRL. (*Id*.) The Court disagrees.

Although a laymen to the law Plaintiff wrote the original Complaint 7/21/2016 using the language of "Sexual Harassment" and "under the penalty of perjury" and Plaintiff described "touching" which the claim is based on (See Complaint). Plaintiff presented attorney with copies of original complaint, which was also filed with the Doe Fund and the courts have records of the original complaint as well (See Complaint). Therefore Defendants knew from that point on that the complaint and claim was about a Title VII Sexual Harassment, so allowing the original Complaint to act as Title VII Claim would not be unfair to Defendant. Any and all rights at that point should have been preserved by the Federal courts for the Plaintiff. All of Plaintiff original complaints, recordings and evidence accrued was for the sole purpose of proving a Sexual Harassment claim and therefore Plaintiff request that the Courts consider Plaintiff original Complaint the original Claim and add the required laws applicable. As Plaintiff did not

fail to produce evidence or complaint to the knowledge of the Federal court concerning Sexual Harassment of Defendant Cooper. Plaintiff made the courts aware of the sexual assault prior to any deadlines in case. Plaintiff learning that attorneys did not technically file a Sexual Harassment Title VII claim is new news to Plaintiff. Plaintiff learned of this by notice of judge decision the end of 4/2020. Plaintiff offers evidence that plaintiff has requested many things of attorney that Plaintiff never received as evidence that it is no error of Plaintiff.

Plaintiff request that courts reconsider its decision in the interest of justice. The Plaintiff represents hundreds of men that has been sexually harassed or assaulted by Defendant Cooper. Plaintiff was the only one of the men to summon the courage to speak out and expose the hidden crimes of the Doe Fund. To deny Plaintiff justice because an attorney may have forgot to technically declare sexual harassment, and to ignore all of the additional evidence recordings, documents, files etc. complaining of sexual harassment along with the mountains of evidence provided by the Plaintiff himself, would be a grave error of the courts. It would not only deny proper justice to Plaintiff, but also to the hundreds of other victims that Plaintiff represents as well as the community.

This case has been ongoing for almost three years, discovery is long-closed, and summary judgment motions have been fully briefed. Plaintiff, who is represented by counsel, has been aware of the basis for a Title VII sex discrimination claim all this time, yet gives no explanation for why he never attempted to add this claim to his Complaint.

Ineffective assistance of counsel.
Plaintiff was not aware. Plaintiff was not allowed to be present at court dates. Plaintiff was not allowed to be present for any communications between Defendant and Plaintiff counsel. Plaintiff was misrepresented by counsel. Plaintiff did not have any knowledge of Title VII nor was Plaintiff made aware by any officer of the court that Plaintiff was supposed to have technically filed a Title VII. Plaintiff never heard the term Title VII used until now. Plaintiff is a layman and attorneys never informed him of this error. Judge also never informed Plaintiff of this error. Plaintiff has always been under the impression that the courts and the defense were aware that the claim was for sexual harassment. Plaintiff counsel never informed Plaintiff that they did not file a Title VII Sexual Harassment. Even if attorney did make an error, Plaintiff original Complaint 7/21/2016 Titled Sexual Harassment should have been recognized by the courts.

*At the latest*, such a request to amend should have been made before the close of discovery, and sufficient justification for the delay would had to have been shown. *See Frenkel v. N.Y.C. Off-Track Betting Corp.*, 611 F. Supp.2d 391, 394 (S.D.N.Y. 2009), *opinion adopted*, 701 F. Supp. 2d 544 (S.D.N.Y. 2010) ("[T]he Court may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay."

Ineffective assistance of counsel.

The Plaintiff is a layman to the law. However the Plaintiff cannot phantom a scenario were a Sexual Harassment Law Firm receives a sexual harassment complaint, takes it on as a sexual harassment case and does not file Sexual Harassment claim. Does that make sense to the courts? Attorney's Derrick Smith and Kelly O'Connell and Marwan Porter kept this hidden from Plaintiff until now. Plaintiff learned by reading the Judgment of Pamela K Chen. Plaintiff request the courts to take some action to rectify this technical error of filing and use original complaint as a Title VII as it was written before the limit and in the words of the Plaintiff himself under penalty of perjury, not counsel. Plaintiff request that the courts take action in the interest of justice and preserving the integrity of the courts, and call an investigation into this matter. Plaintiff request that email communications from attorney to client be inspected. Plaintiff request any and all known and unknown to Plaintiff and courts transactions of payment from Defendant to attorney's Derrick Smith and Kelly O'Connell and Marwan Porter or any affiliates or parties.

Plaintiff also request a federal investigation into this matter. Plaintiff also inquires to the courts, in all of the courts years on the bench is it not odd that a Sexual Harassment Attorney with a sexual harassment case did not file for sexual harassment? Why did the courts fail to hold attorney accountable? The courts footnotes shows that the courts did not have all the necessary information to make a fully informed decision. Therefore Plaintiff request that judge reconsider decision and have all these issues resolved correctly.

> Foot note:
> The Court notes that, because Plaintiff's complaint to the Equal Employment Opportunity Commission is not part of the record, it is not established that Plaintiff asserted both a race and gender discrimination claim before that agency.

Because Plaintiff is represented by counsel, the Court "is under no obligation to construe [his] pleadings liberally." *Powell v. Merrick Acad. Charter Sch.*, No. 16-CV-5315 (NGG) (RLM), 2018 WL 1135551, at *7n.4 (E.D.N.Y. Feb. 28, 2018).

Plaintiff respectfully disagrees with courts on this point. If courts found it odd that the Plaintiff was complaining about sexual harassment but defense counsel did not file sexual harassment, Courts did have an obligation to construe his pleadings liberally. Courts never petitioned Plaintiff into court to inform Plaintiff of this oddity, so Plaintiff could have sworn knowledge and consent.

Lastly, Defendant TDF would be unfairly prejudiced by the belated addition of a Title VII sex discrimination or harassment claim because the standard for employer liability under Title VII is materially different from those under NYSHRL and NYCHRL. *See Swiderski v. Urban Outfitters, Inc.*, No. 14-CV-6307 (JPO), 2017 WL 6502221, at *7 (S.D.N.Y. Dec. 18, 2017)

The Defendant TDF is not unfairly prejudiced by any addition to Title VII. The Defendant participation in crime makes the Defendant the aggressor. The Defendant has possibly broken multiple federal and state laws by withholding and destroying evidence from a crime (Plaintiff requested video tape of the Doe Fund front desk camera. Defendant never produced the video.

This video is important in Plaintiff case. It shows Plaintiff walking into Defendant's Cooper office and come out looking from side to side. Security guard noticed something was wrong and asked Plaintiff "Is everything alright?" Plaintiff runs up the stairs. It shows Defendant Cooper go upstairs into the residential area of the facility where he did not belong. It shows Plaintiff return to the front desk to speak with Mr. Washington. Records should reflect. It shows Plaintiff pacing in the middle of the lobby while waiting for Mr. Washington, appearing troubled and distressed. Security guards asked "Are you okay?")

Defendant is a codefendant in a criminal federal and state crime also. First their knowledge of the crimes of Defendant Cooper and covering up crimes of Defendant Cooper. The Defendants are more responsible for Cooper's behavior than anyone else because they are responsible for the safety of other employees and the community that they serve. Defendant Cooper harassed hundreds of men. This in and of itself is a federal offense. The fact that they have escaped responsibility for crimes that continued for years would unfairly prejudice the Plaintiff and the multiple other men that the courts hear in the recording Trainee making complaints of sexual harassment. The Defendant is co-conspirators with Cooper. Defendants are responsible for Cooper's behavior and they want him and themselves to escape a federal offense. That is the reason that they paid for Defendant Coopers attorney. They wanted to protect him and keep him quiet so he would not say anything to prove they are viable and responsible or damage them in court. The courts should note that Plaintiff had concerns about if Defendants were paying expensive attorney fees for a former employee that damaged the integrity of their organization.

> On Jul 5, 2018 10:00 PM, "Gregory Brooks" <gregoryamiribrooks@gmail.com> wrote:
> Anything I can do.
> Kelly please ask him is the Doe Fund paying for his attorney? If not who is? Where did he get the money to pay for his attorney? How much is his representation costs? Can we see bank records and payments?
>
> One of my main issues about it all is Mr. Cooper is a predator, and I was a victim as Doe Fund client. The Doe Fund decided to protect the predator and attack the victim, making themselves predators as well, super predators in fact.
>
> On Jul 5, 2018 8:53 PM, "Kelly O'Connell" <kelly@dereksmithlaw.com> wrote:
> Great! Thanks, Gregory!
>
> Sincerely,
>
> Kelly L. O'Connell, Esq

It appears to Plaintiff that everybody concerned including Judge, Plaintiff Counsel and Defense Counsel was aware of this error to file, the only one that was not aware was Plaintiff himself. That appears to be prejudice against Plaintiff. That is an unfair prejudice and unjust burden.

Accordingly, Plaintiff's Title VII and § 1981 claims are limited to race-based discrimination.

Plaintiff respectfully disagrees and request a reconsideration and time to address the courts with a new attorney. Now that the courts have information that the courts was not aware existed, the courts is in rights to reconsider and set a date for Plaintiff to be heard.

Plaintiff appeals to the courts for justice in this matter. Plaintiff request time to prepare to address the courts with a new attorney. Plaintiff has not had time to prepare because of just learning of this information while the Covid-19 virus has shut down the city and most of the world. Plaintiff found out April 22nd 2020 that his grandmother passed away due to Covid-19 and on April 24th 2020 Plaintiff was informed of Judge decision via telephone conference with Kelly O'Connell and Marwan Porter. Plaintiff has been dealing with burying his grandmother in a Covid-19 crisis, based on that and the attached arguments plaintiff ask to be heard by judge. Attorney Kelly O'Connell called to inform Plaintiff of judge decision. At which time Attorney O'Connell once again deserted and neglected her duties. Plaintiff immediately told Attorney that Plaintiff wanted to address the courts. Plaintiff was confused and had no idea what was happening. Plaintiff did not know what Judge was supposed to be deciding on. Plaintiff informed Attorney that Plaintiff wanted a reconsideration, appeal and an opportunity to have an audience with the judge. Plaintiff at that point knew something was drastically wrong. Plaintiff requested copy of judge ruling. Plaintiff is under the impression at this date that Attorney Kelly O'Connell did not inform courts as directed to request a reconsideration and notice to the courts to appeal. Plaintiff has recording of discussion where Plaintiff request Attorney Kelly O'Connell to request a reconsideration, an audience with the judge and request an appeal. Plaintiff asks that judge inspects the above and give the Plaintiff opportunity to address the courts properly with counsel.

Communication

On approximately Friday April 24th 2020 at approximately 3:11pm Plaintiff requested the paperwork on judge decision.

On approximately Saturday April 25th 2020 Plaintiff sent message to Attorney O'Connell: Hello Kelly. I understand. You did all that you could. I would like to read the judge decision. If you would be kind enough to send me the paperwork. I would appreciate that.

On approximately April 27th 2020 4:41am Plaintiff Brooks sent email to Kelly O'Connell: Good morning Kelly, if you would please send me the name and date of the judge and the decision that the judge was making a ruling of. Also a copy of the motion that the judge was ruling on. I would like all the court information including address, numbers and emails to court and co-counsel. Please send it through email immediately. I would like to have a discussion with you this morning. Please give me a call.

To date Plaintiff has not received none of the information or formal request made to attorney. Plaintiff had no information. Attorney did not inform Plaintiff of crucial information, Attorney did not inform the courts of crucial information provided by Plaintiff. Attorney kept Plaintiff uninformed throughout the entire representation. Attorney having full knowledge that Plaintiff had been suffering trauma. Plaintiff had been diagnosed with severe depression as a result of the sexual assault. Plaintiff was prescribed psyche medication and not of sound mind. Attorney advised Plaintiff to focus on self-care and treatment, and did not share crucial information with client about the case. Therefore Plaintiff request time to find an attorney and present the facts to the courts, or that the courts appoint an attorney to represent Plaintiff.

Plaintiff cannot respond to the remainder of Judge ruling without proper assistance of counsel. Plaintiff respectfully request the courts to consider the following and preserve all rights retroactively:

I respectfully request that you reconsider your decision and allow a jury trial to proceed in the Federal Court for the following reasons:

1. The Doe Fund was knowledgeable and therefore responsible and liable as they allowed the sexual assaults to continue daily prior to current claim (See Recording Titled Washington).
   b. The Doe Fund knew that defendant Cooper was sexually harassing employees, trainees and residents for multiple years. It was displayed and discussed in the open with high ranking employees present. The behavior was not correctively addressed prior to complaint and civil suit. Recording of the Director James Washington acknowledging that he witnessed Mr. Cooper on several occasions and addressed Mr. Cooper prior to current claim. Washington claimed on record that he also informed Cooper's direct supervisor of the sexual harassment that he witnessed. Because of this Plaintiff was never supposed to have met defendant Cooper as these accounts came before Plaintiff became a resident and employed with The Doe Fund.
      iv. Mr. Washington told Plaintiff that he observed Mr. Cooper behave in an inappropriate sexual manner and confronted Cooper individually and contacted Cooper's direct supervisor. If he did, who is this supervisor? Did the supervisor make a report of this account? Did Mr. Washington document this account? If so, where is that report? If not, there is liability. Why was this report, if it exist, not in the discovery?
      v. Once Mr. Washington informed Coopers direct Supervisor, why was there no investigation conducted? Why is it that no HR rep went around and interviewed other employees at the Gates facility to discover if Cooper was making inappropriate sexual comments to them also? The Plaintiff conducted his own investigation and discovered that Defendant Cooper had been harassing nearly all of the trainees he spoke with. How was the Plaintiff a homeless man, capable of doing something in a matter of months that a huge resourceful organization could not do in several years?

   vi. If the HR department would have launched an investigation after the Director blew the whistle, they would have discovered that Cooper had been sexually harassing everyone and they could have paired that information with the 2013 sexual assault claim, and fired Cooper. <u>The Plaintiff would never had met Cooper if The Doe Fund investigated a report from their very own Director.</u>

  c. In addition there was a police complaint filed against Cooper (in approximately 2013) for forcibly touching another trainee and resident in a different Doe Fund Facility (Porter). Coopers previous complaint made to the police along with daily acts followed into the Gates Facility. Cooper publically displayed sexual jokes and invitations for sexual acts in the open prior to the Plaintiff's arrival at the facility. As confirmed in the recording with Director Mr. Washington, and recording of multiple other Employees complaining of daily inappropriate sexual comments, jokes and invitations (See Recording Titled Trainees). It was an accepted culture and ignored by administration until this complaint.

2. The recording (Trainees) is of multiple employees complaining of what one called "24-7 sexual harassment," shows the tradition of and bears the evidence of wide spread acts, common knowledge and transpiring every day for years. Not an isolated incident, in recording employees claim to not only witness it happen to other multiple employee's and residents, but it happened to all of themselves as well.

3. The only reason why The Doe Fund fired Cooper was because of the proceedings into a civil suit being filed, not because of corrective action. The Doe Fund wanted to avoid Criminal, Civil and economic responsibility.

4. The Defendants Administration was complicit for having knowledge of sexual harassment and not bringing corrective action against Cooper prior to Plaintiffs arrival at the facility. The highest levels of the organization allowed and ignored the behavior.

5. The previous complaint against Cooper at the Porter Facility several years prior of touching a resident in an identical manner (2013). A complaint was filed to the Brooklyn Police Department for Sexual harassment and the Defendants HR Department admits their knowledge of this incident in communication email and internal records. There should have been records of the Director confronting Cooper for inappropriate sexual behavior. There should have been an investigation done when Director Washington spoke with Coopers Direct Supervisor prior to current incident. There should have been some record of the exchange, but it was not, it was all swept under the rug. There was no investigation done because if there was the administration would have interviewed residents, employees, trainees and discovered that it had been transpiring for years to everyone. Which Plaintiff discovered it was transpiring long before Plaintiff arrived by interviewing employees, residents and trainees himself (See Recording Trainees).

6. The Plaintiff request the court to reconsider decision and allow a Federal Jury Trial against Defendants because of their negligence, abundant evidence of prior knowledge and complicity by not taking actions against a Zero Tolerance Police on Sexual Harassment in Federal and State Law, and private organization policies.

7. The Plaintiff respectfully request the court to allow the Defendants the right to a public trial to be judged by a Federal Jury. Plaintiff appeals to the courts to allow the Defendants to be responsible for their actions and inactions. That can only be possible if

there's a Federal trial by jury. The public should be allowed to judge organizations that neglect and discard their responsibility to federal and state law, directives and policies in regards to sexual harassment and liability.

8. Firing Defendant Cooper after process of civil suit began is not an act of corrective action on behalf of the Doe Fund, on the contrary they allowed the behavior daily. Firing Cooper was Damage Control because of the weight of liability of the Defendants. Firing Cooper was an attempt to avoid civil and criminal liability, not an expedient reaction to follow policies or protect other employees.

9. Plaintiff learned from Attorney O'Connell in a recorded discussion with attorney that Judge Pamela K Chen made bias comment against prisoners. Judge Chen exclaimed that Plaintiff was "in prison so why is he complaining about sexual abuse? He should be used to it." In light of this statement Plaintiff fears that there was an implicit bias and prejudice against prisoners and as Plaintiff was previously a prisoner such a bias and or prejudice at minimum reflects insensitivity at max arrest the ability to judge impartially. Making light of prison rape culture is not standard practice of the chair and something not accepted even for civilians with previous criminal sentences. On phone discussion with Plaintiff Attorney O'Connell attempted to change her original statement that the Judge that made comment was Judge Bloom and not Judge Chen. Plaintiff disputes this, and request that a change of venue be yielded to Plaintiff by the courts out of Plaintiff fear of prejudice. Comment made by judge unfairly prejudice Plaintiff and Plaintiff request a to have case transferred to Southern District of New York Federal courts to prevent any further unfair prejudice, possible bias of the court.

10. The Plaintiff Gregory Brooks is a Native. Descendant of Native Americans, Immigrant Irish, Spanish and African American lineage. The Plaintiff is a father of 3, has been consistently employed paying taxes to the Federal and State Government of The United States of America. Plaintiff is a family court advocate for youth in ATD and for the Probation Department AIM. For over 12 years Plaintiff has been on a multiple state campaign to reduce crime and violence in minority communities and the prison system. Plaintiff created income for less fortunate minorities struggling with poverty. Plaintiff has multiple years of internships, volunteering and training for organizations such as The Fortune Society, Exodus, CCFY, Goodwill, MAAC, College Initiative, The Legal Aid Society, Bronx Defenders etc. Plaintiff is certified in Mental Health First Aid, Credible Messenger, Mentoring, Peer Advocacy, Court Advocacy, Public Speaking etc. Plaintiff has dedicated his time, life and career to developing and healing communities. Plaintiff has been having issues with representation.

Plaintiff is laymen to the law and Federal court proceedings and request a reconsideration based on the above and more once proper representation is acquired by Plaintiff. Plaintiff write to the court not in disrespect of it's great knowledge and wisdom. Plaintiff was just made aware of things and reached out to the court directly to inform the courts what he learned. Plaintiff request that the court does not prejudice the Plaintiff for bringing these facts to the courts attention once Plaintiff was informed about it. Plaintiff write this response to judge not as an attorney because Plaintiff does not know law. Plaintiff is being honest and transparent with the courts and with the utmost respect request the opportunity for the public to be made aware of

the Defendants actions in original Plaintiff complaint and judge this action. The courts is correct that Plaintiff has had a troubled past and has had to face discrimination legal and otherwise because of Plaintiff past criminal record. Plaintiff experienced discrimination here through this process as well. Plaintiff want the courts to acknowledge that Plaintiff did the right thing as a laymen citizen informed the courts through original Complaint of Sexual Harassment and Retaliation and the Plaintiff request that the courts Honor that.
With respect to Judge Pamela K Chen.

Wednesday, April 29, 2020
Redraft: May 24, 2020

Cordially,
Gregory Brooks

Gregory Brooks
630 Howard Ave #16
Brooklyn, NY 11212

Judge
22
Bro
Cou
Cha

USMS

CERTIFIED MAIL®

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE



UNITED STATES
POSTAL SERVICE®

1000

11201

U.S. POSTAGE PAID
FCM LG ENV
BROOKLYN, NY
11215
MAY 26, 20
AMOUNT
**$9.00**
R2305E124151-07



Pamela K. Chen
Cadman Plaza East
oklyn, NY 11201
room: 4F
mbers: N631



7019 1120 0001 1353 8923

